GIBSON, DUNN & CRUTCHER LLP
JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:    415.393.8200
Facsimile:     415.393.8306

JAMES FOGELMAN, SBN 161584
  jfogelman@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MICHAEL HOLECEK, SBN 281034
  mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:     213.229.7520

Attorneys for Respondent DOORDASH, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| TERRELL ABERNATHY, et al., | CASE NO. 3:19-cv-07545-WHA |
| Petitioners, | **RESPONDENT DOORDASH, INC.'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| DOORDASH, INC., | [*Declarations of Joshua Lipshutz, Andrew Spurchise, Richard Zitrin, Mark Tuft, Tiffany Cao, and Stanley Tang filed concurrently herewith*] |
| Respondent. | |
| | Action Filed:  November 15, 2019 |
| | Hearing Date: November 25, 2019 |
| | Hearing Time: 1:45 p.m. |
| | Hearing Place: Courtroom 12 – 19th Floor |
| | Honorable William Alsup |

1

**CONTENTS**

2

Page

3

INTRODUCTION ................................................................................................ 1

4

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ...................................... 2

5

A.    Keller Lenkner Launches A Shakedown Scheme Against DoorDash ......................... 2

6

B.    Keller Lenkner Files Thousands Of Deficient Arbitration Demands With AAA......... 4

7

8

C.    Arbitration Organizations Are Recalibrating Their Procedures As A Reaction To Keller Lenkner's Scheme ................................................................... 5

9

D.    DoorDash Updates Its ICA To Choose CPR As The Administrator Going Forward ................................................................................ 6

10

E.    Keller Lenkner Files A Petition To Compel Arbitration And Moves For A TRO In The Northern District Of California ................................................. 6

11

12

F.    Keller Lenkner Files A Nearly Identical Petition To Compel Arbitration And Motion For TRO In San Francisco Superior Court........................................ 7

13

LEGAL STANDARD ........................................................................................... 7

14

ARGUMENT ................................................................................................... 8

15

A.    Petitioners Are Not Likely To Succeed On The Merits ................................... 8

16

1.    Petitioners Are Not Likely To Succeed On Their Petition To Compel Arbitration ................................................................ 8

17

18

2.    DoorDash's Decision To Update Its ICA Neither Unethical Nor Unlawful.......................................................................... 9

19

B.    Petitioners Will Not Suffer Irreparable Harm Absent A TRO.................................. 19

20

C.    The Balance Of Equities Tips In DoorDash's Favor ................................................ 20

21

1.    A TRO Would Violate DoorDash's First Amendment Rights ...................... 20

22

2.    A TRO Would Prevent DoorDash From Operating Its Business .................. 22

23

D.    A TRO Is Not In The Public Interest .......................................................... 22

24

CONCLUSION ................................................................................................ 23

25

26

27

28

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*24 Hour Fitness, Inc. v. Superior Court*,
66 Cal. App. 4th 1199 (1998)........................................................................................15

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011)..............................................................................9, 22, 23

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987) .....................................................................................................20

*Arias v. Raimondo*,
860 F.3d 1185 (9th Cir. 2017).......................................................................................18

*Avila v. S. Cal. Specialty Care, Inc.*,
20 Cal. App. 5th 835 (2018)..........................................................................................23

*Azeveda v. Comcast Cable Commc'ns LLC*,
2019 WL 5102607 (N.D. Cal. Oct. 11, 2019) .................................................................9

*Bernal v. Sw. & Pac. Specialty Fin., Inc.*,
2013 WL 5539563 (N.D. Cal. Oct. 8, 2013) ...................................................................9

*Brown v. Keller Lenkner, LLC*,
No. 1:18-cv-12423-NMG (D. Mass. Nov. 20, 2018)......................................................3

*Burlington No. & Santa Fe Ry. Co. v. White*,
548 U.S. 53 (2006) .......................................................................................................18

*Burrell v. Crown Cent. Petroleum, Inc.*,
176 F.R.D. 239 (E.D. Tex. 1997)..................................................................................21

*Camp v. Alexander*,
300 F.R.D. 617 (N.D. Cal. 2014)..................................................................................15

*Civil v. Spirit Delivery & Distrib. Servs.*,
2017 WL 1115162 (D. Mass. Mar. 24, 2017)................................................................15

*Cobell v. Norton*,
212 F.R.D. 14 (D.D.C. 2002)...................................................................................10, 14

*S.F. Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*,
213 Cal. App. 4th 1212 (2013)...........................................................................10, 11, 12

*Cordúa Rests., Inc.*,
368 N.L.R.B. No. 43 (2019)............................................................................................9

Gibson, Dunn & Crutcher LLP

*Davis v. Nordstrom, Inc.*,
  755 F.3d 1089 (9th Cir. 2014)...............................................................................9, 15

*Diva Limousine, Ltd. v. Uber Techs., Inc.*,
  No. 3:18-cv-05546-EMC (N.D. Cal. Jan. 9, 2019) ...................................................4

*Domingo v. New England Fish Co.*,
  727 F.2d 1429 (9th Cir. 1984)...............................................................................13

*Elrod v. Burns*,
  427 U.S. 347 (1976)...............................................................................................21

*Gilbert v. Nat'l Enquirer, Inc.*,
  43 Cal. App. 4th 1135 (1996)................................................................................21

*Gulf Oil Co. v. Bernard*,
  452 U.S. 89 (1981)............................................................................................13, 21

*Guz v. Bechtel Nat'l, Inc.*,
  24 Cal. 4th 317 (2000) ..........................................................................................16

*Harris v. TAP Worldwide, LLC*,
  248 Cal. App. 4th 373 (2016)................................................................................17

*Henry v. Regents of the Univ. of Cal.*,
  37 F. Supp. 3d 1067 (N.D. Cal. 2014) ..................................................................18

*Hernandez v. Best Buy Stores, L.P.*.
  2015 WL 7176352 (C.D. Cal. Nov. 13, 2015) ......................................................21

*Hynix v. Semiconductor Inc. v. Rambus Inc.*,
  2008 WL 350638 (N.D. Cal. Feb. 2, 2008)......................................................15, 19

*Idaho v. Coeur D'Alene Tribe*,
  794 F.3d 1039 (9th Cir. 2015).................................................................................8

*Jenifer v. Del. Solid Waste Auth.*,
  1999 WL 117762 (D. Del. Feb. 25, 1999) .............................................................14

*Jimenez v. Menzies Aviation Inc.*,
  2015 WL 4914727 (N.D. Cal. Aug. 17, 2015) ......................................................10

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009)...............................................................................21

*Koller v. Brown*,
  224 F. Supp. 3d 871 (N.D. Cal. 2016) ....................................................................7

*Lee v. Postmates Inc.*,
  2018 WL 4961802 (N.D. Cal. Oct. 15, 2018) .........................................................9

Gibson, Dunn &
Crutcher LLP

RESPONDENT DOORDASH, INC.'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
3:19-cv-07545-WHA

*LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC,*
 2018 WL 3126389 (N.D. Cal. Jun. 26, 2018) ...............................................................9

*Lillehagen v. Alorica, Inc.,*
 2014 WL 12768156 (C.D. Cal. Dec. 18, 2014) ......................................................10, 12

*Longcrier v. HL-A Co., Inc.,*
 595 F. Supp. 2d 1218 (S.D. Ala. 2008)........................................................................15

*In re M.L. Stern Overtime Litig.,*
 250 F.R.D. 492 (S.D. Cal. 2008)...................................................................................14

*Mokler v. Cty. of Orange,*
 157 Cal. App. 4th 121 (2007)........................................................................................18

*Muniz v. United Parcel Serv., Inc.,*
 731 F. Supp. 2d 961 (N.D. Cal. 2010) ..........................................................................18

*N.Y. Times Co. v. United States,*
 403 U.S. 713 (1971).......................................................................................................21

*Napa Valley Publ'g Co. v. City of Calistoga,*
 225 F. Supp. 2d 1176 (N.D. Cal. 2002) ........................................................................22

*Near v. State of Minn.,*
 283 U.S. 697 (1931).......................................................................................................21

*Neb. Press Ass'n v. Stuart,*
 427 U.S. 539 (1976).......................................................................................................21

*Nguyen v. Inter-Coast Int'l Training, Inc.,*
 2018 WL 1887347 (Cal. Ct. App. Apr. 20, 2018) ........................................................15

*O'Connor v. Uber Techs., Inc.,*
 2014 WL 1760314 (N.D. Cal. May 2, 2014) ...........................................................13, 14

*O'Connor v. Uber Techs., Inc.,*
 904 F.3d 1087 (9th Cir. 2018)........................................................................................14

*Parks v. Eastwood Ins. Servs., Inc.,*
 235 F. Supp. 2d 1082 (C.D. Cal. 2002).........................................................................21

*Peleg v. Neiman Marcus Grp., Inc.,*
 204 Cal. App. 4th 1425 (2012)................................................................................15, 17

*Peng v. First Republic Bank,*
 219 Cal. App. 4th 1462 (2013)......................................................................................16

*Philpott v. Ernst & Young LLP,*
 2010 WL 11406230 (W.D. Wash. Dec. 29, 2010).........................................................16

Gibson, Dunn &
Crutcher LLP

*Recinos-Recinos v. Express Forestry, Inc.*,
   2006 WL 197030 (E.D. La. Jan. 24, 2006) ...................................................................15

*Rosenfeld v. JPMorgan Chase Bank, N.A.*,
   732 F. Supp. 2d 952 (N.D. Cal. 2010) ........................................................................15

*Rushing v. Viacom Inc.*,
   2018 WL 4998139 (N.D. Cal. Oct. 15, 2018) ................................................................9

*Salgado v. Carrows Restaurants, Inc.*,
   33 Cal. App. 5th 356 (2019) .......................................................................................17

*Snider v. Superior Court*,
   113 Cal. App. 4th 1187 (2003) ....................................................................................10

*Stafford v. Brink's, Inc.*,
   2015 WL 12912324 (C.D. Cal. Aug. 14, 2015) .............................................................13

*Sweeney v. Tractor Supply Co.*,
   390 F. Supp. 3d 1152 (N.D. Cal. 2019) ....................................................................8, 17

*Talamantes v. PPG Indus., Inc.*,
   2014 WL 4145405 (N.D. Cal. Aug. 21, 2014) ..............................................................14

*Tarlton & Son, Inc.*,
   368 N.L.R.B. No. 101 (2019) .........................................................................................9

*Trudeau v. Google LLC*,
   349 F. Supp. 3d 869 (N.D. Cal. 2018) ...........................................................................9

*Weinberger v. Romero-Barcelo*,
   456 U.S. 305 (1982) ....................................................................................................22

*Winter v. Natural Resources Def. Council, Inc.*,
   555 U.S. 7 (2008) ..........................................................................................................7

*Wright v. Adventures Rolling Cross Country, Inc.*,
   2012 WL 2239797 (N.D. Cal. June 15, 2012) ..........................................................13, 15

*Yartzoff v. Thomas*,
   809 F.2d 1371 (9th Cir. 1987) .....................................................................................19

*Zango, Inc. v. PC Tools Pty Ltd.*,
   494 F. Supp. 2d 1189 (W.D. Wash. 2007) ....................................................................22

**Other Authorities**

AAA Employment/Workplace Fee Schedule, https://bit.ly/2rWv3V3 ..................................6

CPR, "What is the Employment-Related Mass Claims Protocol?",
   https://bit.ly/3376IJj ...........................................................................................6, 18, 20

F. Peter Phillips, New Protocol on Damages in Arbitration, Business Conflict Blog
(Mar. 14, 2011), https://bit.ly/2KJ7Oo3 ............................................................6

*Manual for Complex Litig.* § 21.12 (4th ed. 2004) ..............................................13

**Rules**

AAA Employment Arbitration Rule 4(b)(i)(1) ..................................................4, 5

Cal. R. Prof. Conduct 3.3 ......................................................................................14

Cal. R. Prof. Conduct 4.2 ...............................................................................10, 11

**Treatises**

ABA Model Rule Prof. Conduct 4.2 ......................................................................12

**Regulations**

ABA Comm. on Ethics and Prof. Resp., Formal Ethics Opinion No. 11-461 (2011) ..........................12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP

RESPONDENT DOORDASH, INC.'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
3:19-cv-07545-WHA

## INTRODUCTION

On November 9, 2019, DoorDash, Inc. updated the Independent Contractor Agreement ("ICA") that will govern the relationship between DoorDash and the delivery providers who choose to use DoorDash's mobile app from that date forward.  The update consisted primarily of changing the administrator of the ICA's arbitration clause from the American Arbitration Association ("AAA") to the International Institute for Conflict Prevention & Resolution ("CPR"), based on DoorDash's desire to utilize CPR's innovative and efficient arbitration procedures, and to no longer use AAA, on a going-forward basis.  *See* Tang Decl. Ex. B (redline comparison).  DoorDash did not email, telephone, or otherwise contact its delivery providers regarding the updated contract.  Rather, *if* an existing delivery provider chooses to log on to the DoorDash mobile app in order to use the DoorDash platform after November 9, a pop-up screen informs them that the ICA terms have been updated.  Delivery providers are not required to accept the new terms unless they wish to continue using the DoorDash app, and even then, they have 30 days after accepting the new terms to opt-out of the arbitration provision altogether.

The law is clear that companies are permitted to update their terms and conditions with customers, users, workers, and contractors—and companies frequently do so.  No rule precludes a company from updating its terms and conditions simply because some of those customers, users, workers, and contractors might be represented by counsel.  Indeed, one of the drafters of California Rule of Professional Responsibility 4.2—the Rule that Petitioners' TRO motion is based on—has reviewed DoorDash's conduct and determined that applying the Rule to this situation would be "unprecedented" and that DoorDash and its lawyers complied with their ethical duties.  Tuft Decl. ¶ 30.

Nor was DoorDash's contract update an effort to deprive anyone of their rights.  Under the terms of the new ICA, all delivery providers have exactly the same legal claims and defenses they had before.  The new terms simply mean that contractors who wish to assert an arbitration demand against DoorDash in the future must file their demand with CPR instead of AAA, unless they opt out of the new arbitration provision.  Arbitrations currently pending before AAA will continue unaffected by the new terms, as will all pending litigations against DoorDash.  And, as before, any provider who wishes to resolve their disputes in court, rather than through arbitration, can opt out of the new agreement.

RESPONDENT DOORDASH, INC.'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
3:19-cv-07545-WHA

The time for opting out of the new arbitration agreement has not yet expired for a single contractor, including the Petitioners here.

Petitioners have not met any of the requirements for a TRO.  Indeed, the relief that Petitioners seek is nonsensical—they filed this motion with full awareness of DoorDash's new terms and conditions and with the assistance of their attorneys.  If Petitioners do not wish to agree to the new terms, they are free to decline them.  If their attorneys believe it is not in Petitioners' best interest to agree to the new terms, they are free to advise Petitioners to decline them.  And if Petitioners or their attorneys believe that opting out of the new arbitration agreement is advisable, they can do that too. This is not a class action in which a Federal Rule of Civil Procedure 23(d) order is necessary to protect unnamed class members from potentially misleading communications.  Rather, this action was brought on behalf of a specific group of Petitioners who purport to be individually represented by counsel and can make informed decisions about whether to agree to, and opt out of, DoorDash's arbitration agreement.  What Petitioners cannot do is continue using the DoorDash platform under a set of terms and conditions that DoorDash no longer wishes to offer prospectively.  The Court should deny Petitioners' motion.

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

### A.  Keller Lenkner Launches A Shakedown Scheme Against DoorDash

In March 2019, Petitioners' counsel at Keller Lenkner wrote DoorDash's Chief Business and Legal Officer purporting to represent more than 3,000 DoorDash delivery providers in California and Illinois who allege they were misclassified as independent contractors.  *Id.*  The letter expresses an intention to file arbitration demands on behalf of those workers, warning DoorDash of the administrative costs of so many arbitrations:

> Although DoorDash's agreement requires individual arbitration, we understand that individual arbitration is expensive.  As you know, DoorDash's agreement requires DoorDash to pay all arbitration-related costs, including arbitration retainers and filing fees.  Applying its Employment/Workplace Fee Schedule, AAA will require DoorDash to pay a $2,200 filing fee, a $750 administrative fee, and an arbitrator's retainer of $4,000 or more.
>
> If we conclude that it is necessary to proceed to arbitration, we believe it is in our clients' interests to proceed with every arbitration simultaneously.  Based on 3,000 drivers, **proceeding to arbitration would obligate DoorDash to pay AAA more than**

Gibson, Dunn &
Crutcher LLP

***$20 million***—to say nothing of DoorDash's attorneys' fees and its underlying liability, which we believe is substantial. ***These numbers will continue to grow***, as several hundred additional DoorDash drivers engage our firm each week.

Lipshutz Decl. Ex. A (emphasis added).

The letter then goes on to explain Keller Lenkner's true intentions:  extracting a multi-million dollar payment from DoorDash in order to *avoid* the administrative costs of these arbitrations, irrespective of the merits of their alleged clients' claims.  "Before we serve demands on AAA that will trigger DoorDash's obligation to pay the costs outlined above, it would be sensible for the parties to explore whether we can agree on ***an alternative process*** for resolving our clients' claims."  *Id.* (emphasis added).  Keller Lenkner had no intention, nor the practical ability, to proceed with 3,000 arbitrations simultaneously.

DoorDash repeatedly told Keller Lenkner that a substantial number of their purported clients appear *nowhere* in DoorDash's database, raising serious doubts about Keller Lenkner's client acquisition and vetting process and the legitimacy of their purported client's claims.  *See* Lipshutz Decl. ¶ 3; *id.* Ex. C (July 11, 2019 email explaining that "dozens of the people on your list cannot be located in our system and do not appear to be Dashers"); Cao Decl. ¶ 6.[1]

---

[1]  *See* Zitrin Decl. ¶ 21 (discussing significant ethical questions raised by Keller Lenker's mass arbitration scheme and describing the scheme as "inappropriately extortive").

This is not the first time Keller Lenkner has faced problems with its client acquisition process.  In November 2018, a class-action complaint was filed against Keller Lenkner for false advertising as part of its client acquisition process.  *See Brown v. Keller Lenkner, LLC*, No. 1:18-cv-12423-NMG, Dkt. 1 (D. Mass. Nov. 20, 2018) (attached as Lipshutz Decl. Ex. M).  The *Brown* complaint alleged that certain radio advertisements directed Uber drivers to call a telephone number for help taking part in an FTC settlement.  *Id.* ¶¶ 2–3.  Individuals who called the number were be asked to provide personal information to "screen" them.  *Id.* ¶¶ 9–10.  Individuals who passed the "screening" process were sent a document entitled "Fee Agreement for Legal Services," despite the FTC stating that it would "never require[] anyone to pay money or provide information to cash refund checks." *Id.* ¶¶ 7, 11.  The *Brown* complaint alleged that Keller Lenkner used the advertisements as a "'bait and switch' tactic whereby [Keller Lenkner] use[d] the existence of the FTC ***court*** action and the Fund to bait Uber drivers into engaging [Keller Lenkner's] services to assist them in pursuing unrelated wage claims in ***an arbitration forum***."  *Id.* ¶ 27.  In another case, attorney Warren Postman of Keller Lenkner was disqualified after the court found he had an "untenable conflict" due to his receipt of confidential information about the defendant as part of his prior employment. *See Diva Limousine, Ltd. v. Uber Techs., Inc.*, No. 3:18-cv-05546-EMC, Dkt. 96 at 23 (N.D. Cal. Jan. 9, 2019) (attached as Lipshutz Decl. Ex. N).

Gibson, Dunn &
Crutcher LLP

**B.      Keller Lenkner Files Thousands Of Deficient Arbitration Demands With AAA**

Prior to Keller Lenkner's mass arbitration scheme, DoorDash had successfully utilized AAA to resolve individual disputes with individual Dashers. *See, e.g.*, Lipshutz Decl. ¶ 13.  And, in fact, when Keller Lenkner first filed AAA demands on behalf of only 250 delivery providers, DoorDash paid the AAA filing fees in August and September 2019 and commenced arbitration of those claims as well. *Id.* ¶ 6.  But that changed when DoorDash refused to pay the ransom Keller Lenkner demanded, and Keller Lenkner began filing thousands of facially deficient arbitration demands with AAA.

The AAA rules are clear.  Arbitration demands must, among other things, "include the applicable arbitration agreement," describe the "nature of the dispute," and state "the amount in controversy."  AAA Employment Arbitration Rule 4(b)(i)(1).  These requirements allow defendants to evaluate the allegations against them and decide whether to arbitrate on the merits, enter settlement discussions, or allow a default judgment.  For example, if a claimant seeks only a few hundred dollars from a company, it might make sense for the company to pay that amount without engaging in arbitration *or* litigation.  Not a single one of the thousands of arbitration demands filed by Keller Lenkner complied with these rules—leaving DoorDash unable to evaluate whether the claimants had even potentially viable, non-frivolous claims, whether the claimants had agreed to arbitrate those claims, and which defense strategy to pursue with respect to each of them.

On July 2, 2019, Keller Lenkner filed 250 simultaneous arbitration demands with AAA on behalf of purported Dashers.  *See* Lipshutz Decl. ¶ 4.  Each of the 250 was substantially identical, except for the claimants' personal information.  None of the demands included the applicable arbitration agreement or an amount in controversy.  *See id.* Ex. B.  But despite these deficiencies, DoorDash determined it would arbitrate those claims and, on August 20, 2019, paid the filing fees, totaling $475,000.  *Id.* ¶ 6.  To date, none of those 250 arbitrations has proceeded beyond the arbitrator selection process, let alone been resolved.  Spurchise Decl. ¶ 3.

On August 26, 2019, Keller Lenkner filed an additional 2,250 simultaneous arbitration demands.  Lipshutz Decl. ¶ 7.  Each of these demands was deficient—none included an email address associated with a DoorDash account, the applicable arbitration agreement, or an amount in controversy. *See id.* Ex. E.   On September 27, 2019, Keller Lenkner filed an additional 4,000 simultaneous

arbitration demands. *Id.* ¶ 8. Each of these demands suffered the same deficiencies—none included an email address associated with a DoorDash account, the applicable arbitration agreement, or an amount in controversy. *See id.* Ex. G.

Based on these deficient demands, and notwithstanding DoorDash's repeated complaints about the demands being deficient—including because many of the claimants appear to have no relationship whatsoever with DoorDash—AAA sent DoorDash two invoices totaling more than $11 million and demanded immediate payment *before AAA would take any action to arbitrate any dispute.* Lipshutz Decl. ¶ 9; AAA Employment/Workplace Fee Schedule, https://bit.ly/2rWv3V3. DoorDash repeatedly attempted to work with AAA to find a solution that would allow DoorDash to arbitrate the disputes on an individual basis without paying an unreasonable up-front fee of millions of dollars. Lipshutz Decl. ¶ 9. DoorDash told AAA that Keller Lenkner's demands were substantively deficient and violated AAA's own rules by, for example, failing to include the applicable arbitration agreement or state the amount in controversy. *Id.* Ex. J; AAA Employment Rule 4(b)(i)(1).

Unfortunately, AAA refused to examine the deficiencies in the demands or agree to a workable solution, consistently telling DoorDash that it was required to pay millions of dollars in up-front fees. Lipshutz Decl. ¶ 9. AAA required DoorDash to meet and confer with Keller Lenkner regarding the deficiencies, which DoorDash did on November 6, 2019. *Id.* ¶ 10. DoorDash explained to Keller Lenkner that its insufficient arbitration demands violated both the ICA and AAA's rules, but Keller Lenkner responded that the issue was unresolvable. *Id.* Ex. K. Keller Lenkner then asked AAA to close the 6,250 cases for which filing fees had not been paid. *Id.* Ex. L. AAA closed the cases on November 8, 2019. *Id.* ¶ 12. Before and after AAA closed the cases, DoorDash has remained willing to arbitrate before AAA with Petitioners who follow AAA's rules. DoorDash's willingness to arbitrate the claims at issue in this lawsuit before AAA for those who follow the rules will continue for any Petitioner who opts out of the new ICA.

## C.   Arbitration Organizations Are Recalibrating Their Procedures As A Reaction To Keller Lenkner's Scheme

Keller Lenkner's "mass arbitration" tactics have wreaked havoc on the arbitration system and arbitration organizations are beginning to respond. AAA, for example, recently announced a new

protocol for scenarios in which 25 or more demands are filed simultaneously against the same party by claimants represented by the same counsel. *See* AAA Employment/Workplace Fee Schedule, https://bit.ly/2rWv3V3. CPR, too, has created an innovative new protocol to foster a fairer, more efficient forum for mass arbitrations. *See* CPR, "What is the Employment-Related Mass Claims Protocol?", https://bit.ly/3376IJj. CPR's Mass Claims Protocol imposes reasonable up-front fees and contemplates 10 random bellwether arbitrations followed by a mediation, accompanied by detailed instructions for how the parties may resolve their dispute, and how objecting claimants may preserve their rights to arbitration on an individual basis. It even permits claimants who dislike the new protocol to opt out and go to court. *Id.* CPR's creative protocols in other contexts have been "endorsed by some of the most insightful practitioners in the field." F. Peter Phillips, New Protocol on Damages in Arbitration, Business Conflict Blog (Mar. 14, 2011), https://bit.ly/2KJ7Oo3 (praising CPR damages protocol as "solid").

**D.      DoorDash Updates Its ICA To Choose CPR As The Administrator Going Forward**

DoorDash revised its ICA on November 9, 2019. *See* Tang Decl. ¶ 9. The principal change to the ICA was a switch in arbitration administrators from AAA to CPR. *See id.* Ex. B. DoorDash *did not* contact any contractor regarding the update to its ICA. *Id.* ¶ 11. The only contractors who were shown and asked to agree to the updated ICA were those who contacted DoorDash by logging into the DoorDash platform on or after November 9 in order to request a delivery opportunity. Any contractor who did not want to agree to the new ICA was free to stop using the DoorDash platform. And those who did agree to the updated ICA are permitted to opt out within 30 days. *Id.* Ex. A, § XI.

**E.      Keller Lenkner Files A Petition To Compel Arbitration And Moves For A TRO In The Northern District Of California**

On November 15, 2019, Keller Lenkner filed a petition to compel arbitration on behalf of Petitioner Terrell Abernathy and 2,235 other purported Dashers, seeking an "[o]rder requiring that DoorDash arbitrate each Petitioner's claims under the Mutual Arbitration Provision, including by paying the arbitration fees and costs AAA determines are necessary to empanel arbitrators and proceed with arbitrations." Dkt. 1, ¶ 34. On the same day, Keller Lenkner also filed a motion to compel arbitration, attaching a *single one-page declaration* from one of the 2,236 Petitioners alleging that he

"worked" for DoorDash.  *See* Dkt. 5-2.

On November 17, Keller Lenkner moved for a TRO, requesting a "temporary injunction ordering DoorDash and its counsel to stop forcing Petitioners to sign new arbitration agreements pending a decision on the permissibility of that conduct by an arbitrator" or, at minimum, "a temporary injunction prohibiting DoorDash and its counsel from forcing Petitioners to sign new agreements until this Court decides Petitioners' pending Motion to Compel Arbitration."  Dkt. 10 at 22–23.  Again, Keller Lenkner filed a *single one-page declaration* that failed to allege *any* harm that would occur if the TRO were denied, or why any purported harm could not be eliminated by simply opting out of the new arbitration agreement.  *See* Dkt. 10-2.  The declarant does not state whether she has read (let alone objects to) the new ICA's terms, desires to opt out of arbitration, consulted with her attorneys, or would prefer to use the new CPR protocol.  *Id.*  This Court set the TRO hearing for November 25.

## F.    Keller Lenkner Files A Nearly Identical Petition To Compel Arbitration And Motion For TRO In San Francisco Superior Court

Two days later, Keller Lenkner filed a nearly identical case seeking the same relief on behalf of thousands of petitioners in state court.  *Boyd v. DoorDash, Inc.*, No. CPF-19-516930 (S.F. Super. Ct.).  It moved for a TRO in that case too, and noticed the hearing for November 21.  Because several of the petitioners in the state court action are also petitioners in this action, and because they assert federal claims in their AAA arbitration demands, DoorDash removed *Boyd* to this Court.  *See Boyd v. DoorDash, Inc.*, No. 3:19-cv-07646-JCS (N.D. Cal.).   On November 21, DoorDash filed an administrative motion to consider whether *Boyd* should be related to this case.  Dkt. 33.

## LEGAL STANDARD

In the Ninth Circuit, the standard for a TRO is the same as for a preliminary injunction.  *Koller v. Brown*, 224 F. Supp. 3d 871, 875 (N.D. Cal. 2016).  A TRO, like a preliminary injunction, is "an extraordinary remedy never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Rather, a TRO "may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  A party moving for a TRO "must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance

1    of equities tips in its favor; and (4) an injunction is in the public interest." *Idaho v. Coeur D'Alene*

2    *Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

3           The moving party must satisfy all four elements. While the Court may apply a "sliding scale"

4    approach that considers how "serious questions going to the merits" compare to the balance of

5    hardships, the moving party must *always* "show[] that there is a likelihood of irreparable injury and

6    that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127,

7    1134–35 (9th Cir. 2011).

8                                        **ARGUMENT**

9    **A.     Petitioners Are Not Likely To Succeed On The Merits**

10          Petitioners assert two grounds for their TRO motion but neither is meritorious. Counsel for

11   DoorDash did not violate Rule of Professional Conduct 4.2, and DoorDash's update to its ICA was

12   lawful—it did not violate the implied covenant of good faith and fair dealing, and it was not retaliatory.

13          **1.      Petitioners Are Not Likely To Succeed On Their Petition To Compel Arbitration**

14          In determining whether to compel arbitration, the court's role is "limited to determining

15   (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses

16   the dispute at issue." *Sweeney v. Tractor Supply Co.*, 390 F. Supp. 3d 1152, 1157 (N.D. Cal. 2019).

17   Petitioners, as the parties seeking arbitration, "bear[] the burden of proving the existence of an

18   arbitration agreement by a preponderance of the evidence." *Id.* (quotation marks omitted).

19          Petitioners do not argue in their TRO motion that they will succeed on the merits of their

20   underlying petition to compel arbitration—and they cannot do so. Petitioners did not provide sufficient

21   evidence of valid arbitration agreements between *each Petitioner* and DoorDash. Rather, they attached

22   a general copy of the ICA with no indication that any Petitioner agreed to it, and threadbare declarations

23   by two of the thousands of Petitioners. The declarants attest only that they worked for DoorDash and

24   either do not recall opting out of arbitration, Dkt. 5-2, or accepted the new ICA terms without fully

25   reading them, Dkt. 10-2. This evidence is insufficient to show the existence of a valid agreement to

26   arbitrate between the DoorDash and the two declarants.

27          More importantly, this evidence is insufficient to show the existence of a valid agreement

28   between DoorDash and the thousands of other Petitioners. Keller Lenkner provides no evidence that

each Petitioner entered into an agreement with DoorDash, or that if they did so, they did not opt out of the arbitration provision. This omission is demonstrative of Keller Lenkner's attempt to litigate the motion to compel as if it were a collective or class action. It is not, and thousands of Petitioners who are named parties cannot simply attach a single Petitioner's evidence—deficient as it is—to prove the existence of their own individual agreements. Because they have failed to carry their burden, Petitioners are not likely to succeed on the merits of their claim. *See Rushing v. Viacom Inc.*, 2018 WL 4998139 (N.D. Cal. Oct. 15, 2018) (denying motion to compel because proponent of arbitration failed to provide sufficient evidence of notice to prove existence of valid agreement); *LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*, 2018 WL 3126389, at *2–4 (N.D. Cal. Jun. 26, 2018) (denying motion to compel because movant failed to show other parties entered into arbitration agreement); *Bernal v. Sw. & Pac. Specialty Fin., Inc.*, 2013 WL 5539563, at *4 (N.D. Cal. Oct. 8, 2013) (denying motion to compel because the operative agreement between the parties had not been submitted into evidence).

## 2.    DoorDash's Decision To Update Its ICA Was Neither Unethical Nor Unlawful

Companies constantly update their terms of service and arbitration agreements in the ordinary course of business, and courts routinely find that such updates are lawful. *See, e.g.*, *Lee v. Postmates Inc.*, 2018 WL 4961802, at *5 (N.D. Cal. Oct. 15, 2018) (plaintiff was subject to revised arbitration terms, which plaintiff received and accepted after filing class action complaint); *Davis v. Nordstrom, Inc.*, 755 F.3d 1089, 1093 (9th Cir. 2014) (under California law, a business is "permitted to unilaterally change the terms of [a worker's] employment"); *Azeveda v. Comcast Cable Commc'ns LLC*, 2019 WL 5102607, at *6 (N.D. Cal. Oct. 11, 2019) (plaintiff bound by a revised arbitration agreement); *Trudeau v. Google LLC*, 349 F. Supp. 3d 869, 877 (N.D. Cal. 2018) (plaintiff bound by updated terms of service). In fact, the NLRB recently ruled that the promulgation of new or revised arbitration agreements restricting collective actions—even after a collective action suit has been filed—does not violate the NLRA because it does not affect the workers' substantive rights. *Tarlton & Son, Inc.*, 368 N.L.R.B. No. 101 (2019); *Cordúa Rests., Inc.*, 368 N.L.R.B. No. 43 (2019).

A company cannot cease its normal operations every time it has pending litigation or arbitration against it—a contrary rule would allow a single litigant to paralyze companies. Recognizing this fact,

courts repeatedly have held that communications between a business and its workers are proper, even when a worker has brought suit against the business. *See, e.g.*, *Lillehagen v. Alorica, Inc.*, 2014 WL 12768156, at *5¬7 (C.D. Cal. Dec. 18, 2014) (new hires signed arbitration agreement as condition of employment six months after putative class action filed); *Cobell v. Norton*, 212 F.R.D. 14, 20 (D.D.C. 2002) ("Defendants will be permitted to continue engaging in the regular sorts of business communications with class members that occur in the ordinary course of business."). When courts do restrict communications, it is primarily because those communications extinguish the workers' *substantive* rights in an ongoing suit. *See Cobell*, 212 F.R.D. at 20 ("mass mailing[s]" of letters to individual class members "ha[d] the effect of extinguishing the rights of those class members" without court approval); *Jimenez v. Menzies Aviation Inc.*, 2015 WL 4914727, at *6 (N.D. Cal. Aug. 17, 2015) (agreement unenforceable because it would extinguish pending claims and the company did not inform putative class members of the agreement's impact on their class rights or provide a clear opt-out opportunity).

### a.      DoorDash's Decision To Update Its ICA Did Not Violate Rule 4.2

As one of the drafters of Rule 4.2 has determined in this case, "Petitioners have made no showing of a likely breach of Rule 4.2." Tuft Decl. ¶ 27. DoorDash's decision to update its ICA was fully appropriate. The update was not a communication *sent to* Petitioners. It was shown only to delivery providers who *chose* to log on to the DoorDash platform. Tang Decl. ¶ 11. Petitioners' interpretation of Rule 4.2 is untenable because it would, in essence, prohibit counsel from advising clients on any outward-facing messaging, advertising, or correspondence. *See* Tuft Decl. ¶ 30.

Courts interpret Rule 4.2 "narrowly because a rule whose violation could result in disqualification and possible disciplinary action should be narrowly construed when it impinges upon a lawyer's duty of zealous representation." *Snider v. Superior Court*, 113 Cal. App. 4th 1187, 1198 (2003). "[A]ttorneys are afforded considerable latitude in advising their clients regarding communications with opposing parties." *S.F. Unified Sch. Dist. ex rel. Contreras v. First Student, Inc.*, 213 Cal. App. 4th 1212, 1234 (2013). Further, Rule 4.2 "does not prohibit communication with a represented person concerning matters outside the representation," and it "does not prevent represented persons from communicating directly with one another with respect to the subject of representation,

nor does it prohibit a lawyer from advising a client concerning such a communication." Cal. R. Prof. Conduct 4.2 cmts. 3, 4. The narrow construction of Rule 4.2, combined with the carve-outs from comments 3 and 4, make good sense. A broader construction would sweep in "an attorney's legitimate advocacy on behalf of a client." Tuft Decl. ¶ 30.

A finding that DoorDash's counsel's conduct violated Rule 4.2 would be "unprecedented." Tuft Decl. ¶ 30. As an initial matter, the ICA update does not concern the limited matter for which Petitioners retained counsel—their classification as independent contractors. *See* Rule 4.2 cmt. 3 (Rule 4.2 "does not prohibit communication with a represented person concerning matters outside the representation"). Petitioners' choice of arbitral forum is distinct from the substantive issue of their classification. Because the ICA update concerned a matter outside the limited scope of representation, Rule 4.2 does not prohibit it and counsel for DoorDash did not violate the rule.[2]

Moreover, Rule 4.2 does not prevent DoorDash from communicating with Petitioners in the course of ordinary business, and it does not prohibit DoorDash's counsel from advising DoorDash with respect to those communications. Rule 4.2 cmt. 3 ("This rule . . . does not prevent represented persons from communicating directly with one another with respect to the subject of representation, nor does it prohibit a lawyer from advising a client concerning such a communication."). Petitioners cannot cite a single case—and DoorDash is unaware of any—holding that a company's outside counsel violated Rule 4.2 by advising the company on an update to its terms and conditions. In view of the narrow treatment of Rule 4.2, this lack of legal support for Petitioners' position is unsurprising. Indeed, Petitioners' position "would unreasonably interfere with an attorney's legitimate advocacy on behalf of a client." Tuft Decl. ¶ 30.

Petitioners' reliance on *San Francisco Unified School District* (Mot. at 11) is misplaced. *San Francisco* itself recognized that "attorneys may actively advise their clients regarding such communications as long as the attorney does not overreach in light of the purposes underlying the rule." 213 Cal. App. 4th at 1234. And in that case, the employer conducted in-person interviews and phone

---

[2]  DoorDash is not waiving attorney-client privilege in responding to this motion. But, for purposes of resolving this motion, it would not matter if the Court assumes that DoorDash's outside counsel provided the advice alleged.

Gibson, Dunn &
Crutcher LLP

calls with employees (*see id.* at 1233)—a far cry from this case.  *San Francisco* says nothing about counsel advising a client on a communication the client is legally entitled to make, such as updates to its contracts with contractors.  *See* ABA Model Rule Prof. Conduct 4.2 cmt. 4 ("[A] lawyer is not prohibited from advising a client concerning a communication that the client is legally entitled to make.").  Further, *San Francisco* stated that the "overriding purpose of [Rule 4.2 is] to prohibit one side to a dispute from obtaining an unfair advantage over the other side as a result of having ex-parte access to a represented party."  *Id.* at 1235.  Petitioners cannot cite any such unfair advantage here.

"Most cases finding improper communications . . . involve misleading or coercive behavior by the employer."  *Lillehagen*, 2014 WL 12768156, at *7.  There is no such misleading or coercive behavior here.  The purpose of the ICA update was not to mislead or coerce Petitioners into "making uninformed or otherwise irrational decisions as a result of undue pressure from opposing counsel."  ABA Comm. on Ethics and Prof. Resp., Formal Ethics Opinion No. 11-461 (2011).  There was no undue pressure here where Petitioners were free to opt out of the new terms in the updated ICA— indeed, they all can opt out today (if that is their desire) because the 30-day window to opt out has not yet expired.

Nor was the ICA a contract that the "average layperson would not realize [they] were signing something with legally binding force."  *Lillehagen*, 2014 WL 12768156 at *7.  To the contrary, the ICA states in bold, capitalized font that Petitioners may take the time and seek "**ANY ASSISTANCE NEEDED TO COMPREHEND THE CONSEQUENCES OF ACCEPTING THIS AGREEMENT.**"  Tang Decl. Ex. A at 1.  Keller Lenkner purports to represent each and every individual Petitioner and, thus, knows how to contact them.  There is no reason Keller Lenkner could not contact each Petitioner to advise them to opt out—in fact, they could do so today.   In any event, Petitioners already agreed that they are required to arbitrate their disputes with DoorDash on an individual basis.  The updated ICA terms did not change this fundamental agreement but merely changed administrative matters like who performs the arbitration and how fees are collected.

To be clear, a lawyer may "fulfill a client's request" to "draft a formal agreement ready for execution" if the lawyer includes conspicuous language warning the other party to consult counsel.  ABA Formal Op. 11-461.  The revised ICA does exactly that.  *See* Tang Decl. Ex. A at 1.  Petitioners

1    have provided no evidence that counsel's assistance in drafting the revised agreement was an attempt

2    to circumvent the purposes of Rule 4.2 by pressuring them to make uninformed decisions without the

3    help of representation. Together, these factors demonstrate that the updated ICA posed no risk of

4    "obtaining an unfair advantage over the other side." *San Francisco*, 213 Cal. App. 4th at 1235.

5         Unable to cite any analogous law on Rule 4.2, Petitioners turn to cases involving

6    communications in the class-action context. But it is well-established that defendants are permitted to

7    "communicate with potential class members in t*he ordinary course of business.*" *Stafford v. Brink's,*

8    *Inc.*, 2015 WL 12912324, at *3 (C.D. Cal. Aug. 14, 2015) (quoting *Manual for Complex Litig.* § 21.12

9    (4th ed. 2004)); *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1438–39 & n.6 (9th Cir. 1984)

10   (reversing restriction on plaintiffs' counsel's communication because the relevant "rule does not forbid

11   . . . communications occurring in the regular course of business . . . which do not have the effect of

12   soliciting representation by counsel, or misrepresenting the status, purposes or effects of the action and

13   orders therein").

14        Federal Rule of Civil Procedure Rule 23(d) authorizes courts to regulate improper

15   communications with *class members*. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 100 (1981). Rule

16   23(d)'s purpose is to prevent communications "intended to undermine a class action by encouraging

17   individuals not to join the suit" or "chill participation in the class action." *Wright v. Adventures Rolling*

18   *Cross Country, Inc.*, 2012 WL 2239797, at *4–5 (N.D. Cal. June 15, 2012). These concerns do not

19   apply here because this case is not a class action, and Petitioners purport to be individually represented

20   by counsel. There is no danger of extinguishing anyone's right to join a suit—Petitioners all agreed to

21   settle disputes by arbitration on an individual basis. Furthermore, there is no danger of extinguishing

22   anyone's right to arbitrate disputes with DoorDash, as the updated ICA allows for the same substantive

23   right to arbitration of Petitioners' existing claims.

24        Even if Rule 23(d) applied here, it regulates only communications that are "so misleading or

25   coercive that it threatens the fair and efficient administration of [the] lawsuit." *O'Connor v. Uber*

26   *Techs., Inc.*, 2014 WL 1760314, at *5 (N.D. Cal. May 2, 2014). Petitioners argue that "DoorDash's

27   outside counsel" represented Uber in *O'Connor* where the district court found certain communications

28   to be improper under Rule 23(d). Mot. at 13 n.5. However, they fail to inform the Court that the district

court's Rule 23 orders were subsequently *reversed* by the Ninth Circuit.  *O'Connor v. Uber Techs., Inc.*, 904 F.3d 1087, 1095 (9th Cir. 2018) ("Rule 23(d) orders are moot and without foundation" and "must be reversed"); *see also* Cal. R. Prof. Conduct 3.3 (counsel shall not knowingly misquote legal authority).

Courts have found communications far more significant than a standard update to terms and conditions proper under Rule 23(d) and other similar class action statutes.  *See, e.g.*, *In re M.L. Stern Overtime Litig.*, 250 F.R.D. 492, 496–97 (S.D. Cal. 2008) (letter from company's CEO to employees regarding class action litigation and containing an offer of settlement, while containing "some self-serving" language, was not misleading or coercive); *Talamantes v. PPG Indus., Inc.*, 2014 WL 4145405, at *5–6 (N.D. Cal. Aug. 21, 2014) (despite suspicious timing of company email to potential plaintiffs in a FLSA suit discussing the litigation, the content of the email was not improper and did not violate Rules of Professional Conduct); *Jenifer v. Del. Solid Waste Auth.*, 1999 WL 117762, at *5 (D. Del. Feb. 25, 1999) (contacts between potential plaintiffs and defendant, including financial offers and in-person meetings without counsel, failed the test for coercion: "whether the conduct somehow overpowers the free will or business judgment" of potential class members).

Petitioners rely heavily on *Cobell* (Mot. 13–14), but that case is factually distinguishable because it concerned the defendant's affirmative communications with class members.  Here, there is no class, and DoorDash has not affirmatively sent the new ICA to anyone.  Tang Decl. ¶ 11.  But in any event, *Cobell* favors DoorDash.  The district court recognized that the defendants should be "permitted to continue engaging in the regular sorts of business communications with class members that occur in the ordinary course of business."  212 F.R.D. at 20.  The objectionable communications in *Cobell* were "mass mailing[s]" of letters to individual class members "that ha[d] the effect of extinguishing the rights of those class members" without court approval.  *Id.* at 19.  Here, by contrast, DoorDash did not mail any Petitioner with the terms of the new ICA, and its communication with those Petitioners who chose to log on to the DoorDash app did not extinguish any rights.[3]

---

[3]  The rest of Petitioners' Rule 23(d) cases are equally distinguishable on their facts.  In *Camp v. Alexander*, 300 F.R.D. 617 (N.D. Cal. 2014), the defendant sent misleading, coercive letters to putative class members discouraging participation in a collective action.  In *Wright*, the defendant sent emails and letters to potential class members asking them to withdraw from a lawsuit.  2012

14

Gibson, Dunn &
Crutcher LLP

### b.  DoorDash Did Not Breach The Covenant Of Good Faith And Fair Dealing

Courts routinely uphold agreements that (like the ICA) contain unilateral modification provisions, *see, e.g.*, *24 Hour Fitness, Inc. v. Superior Court*, 66 Cal. App. 4th 1199, 1214 (1998); *Davis*, 755 F.3d at 1093–94, because such revisions are subject to the covenant of good faith and fair dealing, *Peleg v. Neiman Marcus Grp., Inc.*, 204 Cal. App. 4th 1425, 1464 (2012).  To establish a breach of the covenant of good faith and fair dealing, a plaintiff must show: "(1) the parties entered into a contract; (2) the plaintiff fulfilled his obligations under the contract; (3) any conditions precedent to the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's rights to receive the benefits of the contract; and (5) the plaintiff was harmed by the defendant's conduct." *Rosenfeld v. JPMorgan Chase Bank, N.A.*, 732 F. Supp. 2d 952, 968 (N.D. Cal. 2010).  Petitioners fail to establish a likelihood of success on the merits on the first, fourth, and fifth elements of their claim.

*First*, Petitioners have not shown that they entered into a contract with DoorDash.  Neither the petition to compel arbitration nor motion for TRO includes any evidence that 2,235 of the 2,236 Petitioners in this case have any contractual agreement with DoorDash.  *Hynix v. Semiconductor Inc. v. Rambus Inc.*, 2008 WL 350638, at *2 (N.D. Cal. Feb. 2, 2008) ("Attorney argument is not admissible evidence.").

*Second*, Petitioners fail to establish how the updated ICA constitutes an "unfair[] interference with [their] rights."  The implied covenant of good faith prevents one contracting party from "unfairly frustrating the other party's right to receive the benefits of the agreement actually made."  *Guz v. Bechtel Nat'l, Inc.*, 24 Cal. 4th 317, 349 (2000).  The updated ICA does not frustrate Petitioners' substantive right to any "benefits of the agreement actually made."  In fact, the terms of the previous "Mutual Arbitration Provision" are nearly identical to the updated ICA, *see* Tang Decl. Ex. B at 10,

---

WL 2239797, at *2.  In *Civil v. Spirit Delivery & Distrib. Servs.*, 2017 WL 1115162 (D. Mass. Mar. 24, 2017), the defendant sought to "obtain releases which would exclude [plaintiffs] from the case."  In *Longcrier v. HL-A Co., Inc.*, 595 F. Supp. 2d 1218, 1227 (S.D. Ala. 2008), the defendant held meetings with plaintiffs during work hours and sought declarations without informing them of a class action.  In *Recinos-Recinos v. Express Forestry, Inc.*, 2006 WL 197030, at *3 (E.D. La. Jan. 24, 2006), the defendant engaged in campaign to threaten, intimidate, and coerce plaintiffs to withdraw claims by sending agents on personal visits to plaintiffs' homes and their families.  In *Nguyen v. Inter-Coast Int'l Training, Inc.*, 2018 WL 1887347, at *3 (Cal. Ct. App. Apr. 20, 2018), the plaintiffs were told to sign employee handbooks containing an arbitration provision that were handed out at an "impromptu meeting during work hours" without sufficient time for review.

15

Gibson, Dunn &
Crutcher LLP

including the language that Petitioners cite regarding "a speedy and efficient method for resolving disputes." In short, DoorDash has not violated the implied covenant of good faith and fair dealing because there has been no change that has "undermined the employee's rights." *Peng v. First Republic Bank*, 219 Cal. App. 4th 1462, 1474 (2013).

*Third*, Petitioners fail to establish how the updated ICA constitutes any harm whatsoever. Petitioners allege that they "will be forced to sign an agreement that purports to release the contractual rights they already invoked . . . without the advice of the counsel they specifically retained to vindicate those rights." Mot. at 18. Every aspect of that allegation is demonstrably false. DoorDash does *not* force anyone to sign the updated arbitration agreement—those who do not wish to be bound can stop using the DoorDash app or opt out within 30 days. The updated ICA does *not* release any contractual rights, and certainly no substantive rights to pursue any preexisting claim on the merits. And the ICA does *not* force contractors to continue without the advice of counsel. Again, Petitioners rely entirely on attorney argument to attempt to establish harm, rather than submitting *any* evidence of harm, such as declarations from any of the thousands of Petitioners. If any of its 2,236 purported clients fear that they will suffer harm at the hands of DoorDash's new arbitration agreement, Keller Lenkner has not submitted admissible evidence in support.

Petitioners cannot identify what aspect of the updated ICA, or rules of the CPR, would cause them harm. In fact, courts routinely uphold arbitration provisions naming the CPR as neutral arbitrator. *See, e.g.*, *Philpott v. Ernst & Young LLP*, 2010 WL 11406230, at *3 (W.D. Wash. Dec. 29, 2010) (finding "no basis to find that the use of CPR rules as opposed to AAA rules is unconscionable"). Instead, Petitioners contend that DoorDash "implement[ed] rules that [it] liked more." Mot. at 18. But whether DoorDash "like[s]" a particular protocol not mean Petitioners are harmed.

Petitioners argue that the new ICA "eliminate[s] the legal right to proceed with arbitration before AAA." Mot. at 8. Not so. The updated ICA allows any Petitioner who does not wish to abide by the new arbitration agreement (including CPR's procedural rules and protocols) to opt out within 30 days. Thus, Petitioners' argument that they are forced to agree to the updated ICA "without the advice of the counsel they specifically retained to vindicate those rights," Mot. at 18, is baseless. Petitioners' counsel can advise all of its purported clients right now to opt out of the updated ICA. In

any event, ***the updated ICA contains the same right to arbitrate the same underlying claims***—thus, no contractual rights have been "released."

Petitioners citation to *Peleg* (Mot. at 18) is misplaced. *Peleg* applied out-of-state law and holds that a unilateral modification is acceptable where it comports with the covenant of good faith and fair dealing. 204 Cal. App. 4th at 1465. *Peleg* is one of a long line of cases holding that unilateral modifications to an arbitration agreement do not render the agreement illusory because they are limited—not prohibited—by the covenant of good faith and fair dealing. *See Harris v. TAP Worldwide, LLC*, 248 Cal. App. 4th 373, 388–89 (2016). *Peleg* took issue with the modification provision because it permitted the defendant "to avoid its promise to arbitrate by amending the [arbitration] provision or terminating it altogether." 204 Cal. App. 4th at 1454. The plain terms of the updated ICA demonstrate that no such action has occurred here.

*Salgado v. Carrows Restaurants, Inc.*, 33 Cal. App. 5th 356, 362 (2019), is equally unavailing. *Salgado* concerned the retroactivity of an arbitration agreement—which is not applicable here because Petitioners already agreed to arbitrate any claims in the previous ICA. Petitioners also cite *Salgado* for the proposition that "an arbitration agreement sent to a represented party could be void." Mot. at 19. But in *Salgado*, the plaintiff challenged an arbitration agreement as unconscionable, with her counsel stating in a sworn declaration that "'defendants confronted [Salgado]' at work and 'forced her to sign' the arbitration agreement." 33 Cal. App. 5th at 362. Nothing remotely similar happened here.

### c.  The ICA Update Did Not Constitute Unlawful Retaliation

Petitioners contend that DoorDash retaliated against them for filing arbitrations by stripping their right to arbitrate in violation of California Labor Code § 98.6. Mot. at 20. But retaliation is not a ground to compel arbitration. *See Sweeney*, 390 F. Supp. 3d at 1157. Moreover, attempting to compel arbitration of a misclassification dispute based on a Labor Code provision that applies only to employees puts the cart before the horse and prejudges the outcome of the arbitration. There is no reason to consider Petitioners' retaliation claim here.

In any event, Section 98.6 prohibits retaliation against workers for exercising their rights under the Labor Code. To state a claim for retaliation under this section, "a plaintiff must show (1) she engaged in a protected activity, (2) her employer subjected her to an adverse employment action, and

(3) there is a causal link between the two.*"  Muniz v. United Parcel Serv., Inc.*, 731 F. Supp. 2d 961, 969 (N.D. Cal. 2010) (quoting *Mokler v. Cty. of Orange*, 157 Cal. App. 4th 121, 138 (2007)).

Here, no adverse action was taken.  The "adverse action" element of a § 98.6 claim is similar to adverse action for Title VII and the Fair Labor Standards Act retaliation claims.  *See Henry v. Regents of the Univ. of Cal.*, 37 F. Supp. 3d 1067, 1078 (N.D. Cal. 2014); *Muniz*, 731 F. Supp. 2d at 969–70; *see also Arias v. Raimondo*, 860 F.3d 1185, 1190 (9th Cir. 2017).  Thus, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge" under the Labor Code.  *Burlington No. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal citations and quotation marks omitted).

Petitioners argue that DoorDash "strip[ped]" them of their right to arbitrate.  Mot. at 21.  To the contrary, all contractors—including Petitioners—continue to have a right to arbitrate under the revised ICA.  Tang Decl. Ex. A § XI.  And importantly, any claimed "right to proceed with arbitration promptly" is not a condition of working with DoorDash, nor is it affected by using CPR as the neutral arbitrator.

Petitioners offer no support for their claim that arbitration with CPR would be slower than with AAA.  Mot. at 21.  In fact, the 250 AAA arbitration demands for which DoorDash paid filing fees have barely gotten off the ground, Spurchise Decl. ¶ 3, whereas CPR has instituted a protocol for efficiently handling mass arbitrations, *see* CPR, https://bit.ly/3376IJj.  Thus, Petitioners fail to show that changing the arbitrator in an optional arbitration clause entered into with all Dashers who choose arbitration would dissuade a reasonable worker from seeking to bring claims under the Labor Code or that the change is reasonably likely to affect their job performance or opportunity for advancement.

Additionally, Petitioners fail to adequately show a causal link between the alleged adverse action and filing their claims.  Causation may be shown by direct evidence or "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987).  Petitioners contend that the change in arbitrators was made as a "direct result" of their "filing claims under the Labor

Code." Mot. at 20–21.  But simply saying there is a causal link does not make it so, and they offer no further argument or any evidence in support of their threadbare conclusion.  "Attorney argument is not admissible evidence." *Hynix*, 2008 WL 350638, at *2.

Petitioners have failed to establish a prima facie case under § 98.6 and cannot prevail on the merits of their retaliation claim.

## B.    Petitioners Will Not Suffer Irreparable Harm Absent A TRO

Petitioners spend less than a page arguing that they would be harmed absent a TRO.  Indeed, they identify *no specific harm at all*, other than the alleged "[c]ircumvention of the right to counsel." Mot. at 21.

Petitioners contend that the Court should grant them extraordinary relief of a TRO to "prohibit[] DoorDash and its counsel from forcing Petitioners to sign new agreements."  Mot. at 4.  But they fail to articulate what harm they have or will suffer from DoorDash's revised arbitration agreement, issued in the normal course of its business.  *See* Tang Decl. ¶¶ 5–9 (DoorDash has updated its ICA four times in three years, each time involving changes to its arbitration agreement).  That is because no such harm exists.

To start, the filing of this Petition itself demonstrates that Petitioners have had the opportunity to consult counsel regarding their desire to agree to DoorDash's updated terms.  Indeed, the ICA states that any independent contractors *should* consult with counsel before agreeing to the updated terms. Tang Decl. Ex. A at 1.  Notably, Petitioners do not contend that a single one of them has agreed to the new agreement; they merely contend that "[s]ome Petitioners have already received the new agreement."  Mot. at 7.  And *even if* a Petitioner had signed the new arbitration agreement, that has no impact on their pending claims.  If Petitioners choose to sign the arbitration agreement, they can still resolve their disputes on an individual basis, before an arbitrator, as they did under the prior ICA.  That the arbitrations take place before a different arbitrator (CPR rather than AAA) does not constitute any type of substantive change or waiver of any rights.  Petitioners can also opt out of the arbitration agreement within 30 days of their agreement, and if they opt out, they can either (1) attempt to bring their claims before AAA, or (2) bring their claims before a court.  *Cf.* Mot. at 1 (contending that DoorDash "required its couriers to sign an agreement providing that disputes be brought in individual

arbitration," and that DoorDash has "force[d] . . . new rules on Petitioners" despite the fact Petitioners can choose not to accept the new terms or opt out). Petitioners' claim that DoorDash is somehow interfering with their livelihood and their "right" to proceed before AAA are baseless. Mot. at 1–2 (inaccurately accusing DoorDash of "tell[ing] them that if [Petitioners] want to continue earning a living, they must sign an agreement that purports to release their rights in this action" although agreement is neither compulsory, nor does it release any rights or claims); Mot. at 5. Petitioners are free to continue making a livelihood by using the DoorDash app. If they agree to arbitrate disputes with CPR, they can do so. If not, they can opt out.

Petitioners argue that the "new rules" will "force almost all individual claimants to wait while only a tiny fraction of claims are arbitrated." Mot. at 1. But, no different result would occur before AAA. Indeed, neither AAA nor the parties themselves had *any* realistic way to simultaneously resolve nearly 6,500 pending arbitrations, brought by the same counsel against DoorDash. AAA is incapable of expediently resolving all of these individual arbitrations at once or even in quick succession. *See* Spurchise Decl. ¶ 3. Finally, Petitioners also argue that the new agreement somehow forces them into a collective action. Mot. at 8. Such a view plainly mischaracterizes the CPR mass claims protocol, which provides for the only type of arbitrations permitted under the ICA—arbitrations on an individual basis. *See* https://bit.ly/3376IJj.

Petitioners have shown *no* possibility of harm, let alone irreparable harm.

## C.     The Balance Of Equities Tips In DoorDash's Favor

When considering a request for a TRO, "court[s] must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 542 (1987). Denying the TRO would not harm Petitioners' right to counsel (which they have clearly been exercising), force them to release any claims, or deny them a speedy and efficient arbitration. In contrast, a TRO would significantly harm DoorDash.

### 1.     A TRO Would Violate DoorDash's First Amendment Rights

DoorDash will suffer tremendous harm if the Court grants the TRO: stifling its right to free speech under the First Amendment. Keller Lenkner seeks an unconstitutional prior restraint. *Burrell v. Crown Cent. Petroleum, Inc.*, 176 F.R.D. 239, 243 (E.D. Tex. 1997) ("An order limiting

Gibson, Dunn &
Crutcher LLP

communications between parties and class members is a prior restraint of speech."); *Parks v. Eastwood Ins. Servs., Inc.*, 235 F. Supp. 2d 1082, 1084–85 (C.D. Cal. 2002) (restrictive order limiting future communications with putative class members runs the risk of imposing an unconstitutional prior restraint on speech); *see also Hernandez v. Best Buy Stores, L.P.*. 2015 WL 7176352, at *6 (C.D. Cal. Nov. 13, 2015) ("An order that effectively places a 'complete ban' on communications between counsel and members of a putative class has First Amendment implications and can result in 'serious restraints on expression.'" (quoting *Gulf Oil*, 452 U.S. at 95–100).

"Both [the Ninth Circuit] and the Supreme Court have repeatedly held that '[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (citations omitted). "[P]rior restraints on speech . . . are the most serious and the least tolerable infringement[s] on First Amendment rights." *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). Accordingly, it is well established that "[a]ny system of prior restraints of expression . . . bear[s] a heavy presumption against its constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. 713, 714 (1971) (per curiam) (quotation marks and citations omitted); *Gilbert v. Nat'l Enquirer, Inc.*, 43 Cal. App. 4th 1135, 1144 (1996) ("Prior restraints are disfavored and presumptively invalid."). This "heavy presumption" can only be overcome in "exceptional cases." *Near v. State of Minn.*, 283 U.S. 697, 631 (1931) (prevention of disclosure of military secrets during war).

DoorDash's ordinary business operations here are the opposite of "exceptional." The ICA update was the type of communication that companies send to workers every day. Without such communications, business could not function. Keller Lenkner's contention that a TRO will cause DoorDash to suffer only "pecuniary" harm, Mot. at 22, disregards fundamental constitutional protections. A TRO will cause DoorDash irreparable harm by intolerably violating its First Amendment right to free speech.

### 2.    A TRO Would Prevent DoorDash From Operating Its Business

A TRO would also cause significant harm to DoorDash's contractual and business relations.  Under Petitioners' view, DoorDash cannot interact with many of its contractors *at all*—whether it be to communicate critical safety information or relay compensation inquiries or details regarding Dasher's services—without first asking permission from Keller Lenkner.  But, to function properly, DoorDash must be able to transmit information to its workers, whether they are engaged in litigation or not.  It is neither administratively feasible (nor desirable) to pluck out these thousands of individuals on a case-by-case basis.  Insofar as those communications affect DoorDash's contractual ties, DoorDash must be able to draft, modify, amend, and negotiate its contracts freely.  Granting a TRO would signal to DoorDash and other similar organizations that they cannot engage in free enterprise if those with whom they interact have retained counsel.  *Zango, Inc. v. PC Tools Pty Ltd.*, 494 F. Supp. 2d 1189, 1196 (W.D. Wash. 2007) (denying TRO where granting a court-imposed injunction would ultimately "severely hamper Defendant's business.").

The balance of hardships dramatically favors DoorDash.

### D.    A TRO Is Not In The Public Interest

"In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982).  The analysis requires the court to "consider whether there exists some critical public interest that would be injured by the grant of preliminary relief."  *All. for the Wild Rockies*, 632 F.3d at 1138 (internal quotation omitted).  And a court will not grant preliminary relief unless the public interests in favor of doing so outweigh those that do not.  *Id.*

As indicated above, "[c]ourts have consistently recognized the public interest in safeguarding First Amendment rights."  *Napa Valley Publ'g Co. v. City of Calistoga*, 225 F. Supp. 2d 1176, 1197 (N.D. Cal. 2002).  Further, there is a public interest in continuing the strong public policy in favor of arbitration.  *Avila v. S. Cal. Specialty Care, Inc.*, 20 Cal. App. 5th 835, 843 (2018) ("California has a strong public policy in favor of arbitration as an expeditious and cost-effective way of resolving disputes.") (internal citation omitted).  Petitioners, on the other hand, have a clear agenda to substantially increase DoorDash's costs in defending against individual arbitrations "as leverage to

force a pre-arbitration global settlement" that is both "inappropriately extortive" and "extremely problematic," given that Petitioners are gathering thousands of clients without properly vetting them. Zitrin Decl. ¶¶ 21, 22.  Keller Lenkner has no desire, intention, or ability to actually arbitrate the thousands of claims it has demanded, and granting Petitioners' TRO would have the perverse effect of discouraging companies like DoorDash from utilizing arbitration.  In contrast, supporting organizations like CPR that are thinking creatively about how to handle "mass arbitrations" fairly and efficiently, would further the public's interest in efficient and inexpensive dispute resolution.

Petitioners make no attempt to argue that a TRO is in the public interest—nor can they. This alone is reason to deny Petitioners' motion.  *See All. for the Wild Rockies*, 632 F.3d at 1135 (TRO available only if "the plaintiff also shows . . . that the injunction is in the public interest").  Regardless, granting the TRO would infringe DoorDash's First Amendment rights and undermine the strong public policy favoring arbitration.

## CONCLUSION

Keller Lenkner purports to represent each of the 2,236 Petitioners in this action.  As retained counsel, Keller Lenkner is capable of providing legal advice to each client, including the advice to avoid the new ICA's arbitration agreement either by not agreeing at all or by opting out within 30 days. Instead, Keller Lenkner asks this Court to do its job for it.  Such a request is improper, and the Court should deny Petitioners' motion for a TRO.


Dated:  November 22, 2019                    GIBSON, DUNN & CRUTCHER LLP


By:   */s/  James Fogelman*
                    James Fogelman

Attorneys for Respondent DoorDash, Inc.

RESPONDENT DOORDASH, INC.'S OPPOSITION TO MOTION FOR TEMPORARY RESTRAINING ORDER
3:19-cv-07545-WHA

Gibson, Dunn &
Crutcher LLP