# Exhibit II

Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

```
TERRELL ABERNATHY, et al,        )
                                 )
             Petitioners,        )
   vs.                           ) No. C 19-7545 WHA
                                 )
DOORDASH, INC.,                  )
                                 )  San Francisco, California
             Respondent.         )  Monday
                                 )  November 25, 2019
_____  )  1:45 p.m.
```

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

```
For Petitioner:          KELLER LENKNER LLC
                         1300 I Street N.W.
                         Suite 400E
                         Washington, DC 20005
                    BY:  WARREN D. POSTMAN, ESQ.


                         KELLER LENKNER LLC
                         150 N. Riverside Plaza.
                         Suite 4270
                         Chicago, Illinois 60606
                    BY:  TRAVIS D. LENKNER, ESQ.
                         MARQUEL P. REDDISH, ESQ.


For Respondent:          GIBSON DUNN & CRUTCHER LLP
                         333 South Grand Avenue
                         Los Angeles, California 90071
                    BY:  JAMES P. FOGELMAN, ESQ.


                         GIBSON DUNN & CRUTCHER LLP
                         555 Mission Street.
                         Suite 3000
                         San Francisco, California 94105.
                    BY:  JOSHUA DAVID DICK, ESQ.
```

*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
             *Official Reporter - US District Court*
             *Computerized Transcription By Eclipse*

<u>**Monday - November 25, 2019**</u>                                        <u>**1:50 p.m.**</u>

**P R O C E E D I N G S**

**---oOo---**

**THE CLERK:**  Calling Civil Action 19-7545, Abernathy, et al versus DoorDash, Inc.

Counsel, please step forward and state your appearances for the record for the record.

**MR. POSTMAN:**  Good afternoon, your Honor.  Warren Postman of Keller Lenkner for the petitioners and movants.

**MR. FOGELMAN:**  Good afternoon, your Honor.  James Fogelman, with me is Josh Dick, of Gibson Dunn for the defendant.

**THE COURT:**  Thank you.  Welcome to you.

**MR. FOGELMAN:**  Thank you.

**THE COURT:**  So we're here on a TRO mediation.

Mr. Postman, please go ahead.

**MR. POSTMAN:**  Thank you, your Honor.

We're here because DoorDash is engaging in an unprecedented attempt to change the rules of arbitration in the middle of the process, and they are doing it in circumvention of the right to counsel.  That violates Rule 4.2.  It violates the covenant of good faith and fair dealing.  And it violates the Labor Code.

Each of those violations independently is causing our clients irreparable injury and each of them is an independent

1    ground to grant temporary relief while the Court decides the

2    pending Motion to Compel that we filed.

3        On the other side of the balance, DoorDash attacks the

4    strawman that we're asking for them to not be able to contact

5    any of their Dashers.  We're obviously not.

6        All we're asking is that DoorDash not try to change the

7    terms of the arbitration agreements that we are litigating over

8    in this action.  They have not identified any harm to them that

9    will occur --

10           THE COURT:  When you say "change the terms," do you

11   mean change the terms as to the petitioners, who are -- what is

12   it, 3,000 in this case?

13           MR. POSTMAN:  2,236.

14           THE COURT:  As to those individuals, or do you mean

15   as to people who have not yet filed a petition?

16           MR. POSTMAN:  Well, we think what they are doing is

17   improper as to all parties who have retained counsel and

18   represented that they are proceeding with arbitration.

19       You know, it's up to Your Honor in structuring the scope a

20   remedy whether -- how to craft the order, whether to tell them

21   to stop what you think is the violation --

22           THE COURT:  This is not a class action.

23           MR. POSTMAN:  Correct.

24           THE COURT:  So I can only give relief as to your

25   petitioners.

1              **MR. POSTMAN:**  And we're fine with that, Your Honor.

2              **THE COURT:**  All right.  So let's focus on it from the

3     point of view of the petitioners and what the injury is to

4     them.  What is the injury to them?

5              **MR. POSTMAN:**  So there's two injuries.  Two groups of

6     injuries, I would say.

7          One is having the right to have the advice of their lawyer

8     at the time they are being asked to agree to change the terms.

9     That's what Rule 4.2 is supposed to protect, that interest, and

10    we think that right is per se irreparable.

11             **THE COURT:**  4.2 of what?

12             **MR. POSTMAN:**  The California Rules of Professional

13    Conduct.

14         They represent the public policy of California and

15    generally of professional ethics; that when a client is

16    represented and seeking to bring a claim, for a lawyer to reach

17    out directly or indirectly and try to gain an advantage in

18    litigation by contacting the client outside the presence of

19    their lawyer, that is improper.

20         And in doing that here, you know, our clients are getting

21    this requirement that in order to -- the way it happens, and

22    this is in the Jackson declaration that we submitted, the

23    clients see this when they start their shift.  They have an

24    assigned shift.  And when they open up their app to start work,

25    they get the pop up.

1          It says nothing about affecting their pending claim.  It

2     says nothing about talking to a lawyer.  It says:  By signing

3     you've represented that you've done everything you need to get

4     assistance to understand the agreement.  But it doesn't mention

5     the pending action or the lawyer.

6          And there is, you know, scroll down through a lot of stuff

7     and you hit "Accept."  And you have to do that in order to

8     start your shift.

9          As the Jackson declaration described, there's only a few

10    minutes before you miss your window and then you don't get paid

11    for that shift.  And that creates a lot of pressure that is not

12    there if we can communicate to our client:  Here are the

13    implications of this, and here is -- you know, here is what we

14    would advise.

15         That's one set of irreparable injuries.

16         The other is that, as we describe in our brief, we think

17    this is a textbook violation of the covenant of good faith and

18    fair dealing.  DoorDash doesn't dispute that that applies to

19    arbitration agreements.  And to say that once you've started

20    down with arbitrations and you get rulings you don't like, you

21    can sabotage the process, force AAA to close it, and then the

22    very next day on a Saturday force the client to sign a new

23    agreement shifting to another gravely inferior process.  That

24    is not in keeping with the spirit of the bargain.

25              **THE COURT:**  How far did it get with the AAA?

1      **MR. POSTMAN:**  We filed demands.  We advanced over

2   $1.2 million in filing fees for our clients.  We met every

3   requirement, and that's what AAA determined.  They make a lot

4   of statements about the improper nature of the demands, but

5   they know full well that under the delegation clause in their

6   contract, all those issues are delegated to AAA and the

7   arbitrator.

8      So AAA made the threshold administrative determination --

9   I'm sorry, I'll slow down -- that each claimant had met their

10  filing requirements and had a right to proceed.

11     They invoiced DoorDash for their filing fees and AAA has

12  no ability and will not proceed with an arbitration unless the

13  respondent pays their fees.  DoorDash flatly refused.

14     AAA has no remedy at that point.  An arbitrator has not

15  been appointed, so they can't issue any -- any award or

16  sanctions.

17         **THE COURT:**  I misunderstood then.  I thought you said

18  that they got an adverse ruling they didn't like, so they gave

19  up on AAA.  What was that adverse ruling?

20         **MR. POSTMAN:**  That they have to proceed with all of

21  our clients' claims individually at the same time.

22     If I can zoom out for a little bit to speak to that

23  context, because I think this really informs the obvious

24  purpose of what they were doing, why it's related to the

25  representation, a lot of the harms here.

1        Keller Lenkner has put an extensive amount of resources in

2   preparing to litigate petitioner's claims because we think the

3   claims are incredibly strong.  Under California law DoorDash

4   employees have very strong claims.

5        We've got over 80 people working on these matters now.  We

6   partnered with Quinn Emanuel.  They have over 800 lawyers.

7   They have the largest law firm in the world dedicated just to

8   litigation.

9        As I said, we've advanced all those filings fees.  We did

10  that because we believe in the claims and we thought it was

11  time to bring resources to sort of overcome the obstacles that

12  DoorDash's class waiver puts in way of litigating these claims.

13       When we did that, DoorDash, they -- well, and I explained

14  the AAA process that we went through.  DoorDash's response,

15  what I think is remarkable about it, is they concede that they

16  switched agreements to address that problem they had.

17       Now, they frame it as wreaking havoc on the arbitration

18  program and wobble out of epithets that we think are neither

19  relevant or are completely baseless.

20       But the core theme running through their brief is -- and

21  they say expressly -- the CPR rules that they adopted in the

22  November 9th agreement were a reaction to Keller Lenkner's,

23  quote, scheme.

24       So when we brought up all these individual actions, they

25  no longer could bring superior resources to bear on three,

1   four, five individual employees.

2        There is, you know, something I didn't realize until I

3   started working on arbitrations.  I've done a lot of work on

4   enforcing arbitration agreements.  I never realized that even

5   though they are defended on the premise that arbitration is

6   speedy and informal and less litigious, that's the whole

7   trade-off in *ATT v Concepcion*.  Right?  You give up the class,

8   but you get this informality and speed.

9        When you actually get into arbitration as a single

10  employee, these companies turn it into full-fledged bloody

11  knuckle federal court style litigation.  There is depositions,

12  lots of them.  There is protective orders.  Fights about

13  discovery.  Dispositive motions.

14       And so if you're a small law firm, you can't get more than

15  a few of these done in a year.  And it's great.  The class

16  action waiver becomes a liability waiver, because you can only

17  fit a few employees through that pipe.  And we saw that and we

18  said:  We're going to bring the resources to bear and we'll do

19  them all.

20       You know, they have this thing, this statement in their

21  brief that I really -- I have to address.  They say -- and this

22  is on page three.

23            "Keller Lenkner had no intention nor the

24       practical ability to proceed with 3,000 arbitrations

25       simultaneously."

```
 1        And based on that statement, they accuse us of a shakedown
 2   and extortion.  What do they cite for that?  Nothing.  They
 3   don't have a citation.  And as I've described the resources we
 4   brought to bear, it's totally false.
 5              THE COURT:  What are the resources?
 6              MR. POSTMAN:  So we have, as I said, over 80 lawyers,
 7   you know --
 8              THE COURT:  How many?
 9              MR. POSTMAN:  I'm sorry.  Not 80 lawyers.  Sorry.
10   Over 80 personnel, combination of paralegals and lawyers.  We
11   have partnered with Quinn Emanuel, who has 800-plus lawyers and
12   is committed to litigating these.  And, you know, we've
13   advanced a lot of money.
14        The key point I was going to make, though, is we will
15   litigate them the way arbitration was intended.  And I don't
16   want to get too far into our litigation strategy, but the rules
17   of arbitration have processes to do this.  You can do them on
18   the papers.  You don't need to do all of that fighting that
19   wasn't supposed to be part of arbitration.  We can and we will
20   arbitrate these.
21        What DoorDash is so upset about is that by having them to
22   do them all at once, instead of staging them in five, ten,
23   claimant chunks, they have to face all these claims.
24        You look at the CPR agreement, which was the big switch in
25   the November 9th agreement.  They say it's innovative.  It's
```

 1    innovative because it's the first set of arbitrable rules that
 2    I'm aware of where even though everyone is purportedly bringing
 3    in an individual claim, there is a queue.  If there is more
 4    than 30 that the defendant is dealing with, they will take ten,
 5    the parties litigate that.  And, of course, that will be
 6    full-on, complex, all the sort of hard-fought litigation that
 7    *Concepcion* was saying you get from class actions; right?
 8    Because if it's essentially a bellwether, parties are going to
 9    fight like crazy.
10        But you don't get the benefit of the class action because
11    once that happens, the company isn't bound to anything.  They
12    can settle if they want; but if they don't want to, under the
13    CPR rules, everyone gets a number and you get in line.  And
14    they'll do it sequentially.
15        And as far as we can tell, there is 63 employment
16    arbitrators at CPR.  There is well over a thousand -- I don't
17    know the exact number, but there is orders of magnitude more at
18    AAA.
19        And it's really good for defendants, again, to be able to
20    have a class waiver become a liability waiver.  If you only
21    have to deal with a handful of claimants each year, you can
22    keep violating the law and, you know, you settle a few, you
23    take a few to an award.  Nobody can get a large amount of -- of
24    the claims against you.  So that's the context we are dealing
25    with.

1          And DoorDash's counsel is also counsel to Postmates.  We,

2     in our motion, which you may not have read yet, talked about

3     *Adams v Postmates*, where there was a related occurrence.

4     DoorDash's counsel here, Gibson Dunn, Ms. Evangelis, is counsel

5     for them.

6          They complained about AAA's failure to do everything the

7     CPR rules do.  They fought with AAA to get them to stage the

8     arbitrations.  They didn't want to proceed with them all at

9     once, like we were ready to.  And when they lost that argument,

10    AAA said:  No, everyone has got an individual right, and we

11    can't depart from that.  The contract is the contract.

12         The Supreme Court has said for years that an agreement to

13    arbitrate must be enforced according to its terms.  The

14    agreement calls for the commercial -- for the AAA rules.  We

15    have to go ahead, absent agreement from the parties to change

16    it.

17         And they were so upset about that because it put them

18    finally in the spot where they had to face a lot of claims that

19    they -- they don't dispute.  They worked behind the scenes

20    before the CPR rules were public with CPR to write into those

21    rules exactly the relief they couldn't get administratively

22    from AAA.

23         And they also don't dispute that it was DoorDash's lawyers

24    who masterminded this plan, who helped write the agreement.

25    And, of course, it was because we're dealing here with really

1   complex questions of arbitration and procedure.  DoorDash's CFO

2   didn't come up with the idea to change the rules of AAA.

3       And so in that context I think it's really easy to walk

4   through the elements of the claims we're alleging and show why

5   we're very likely to succeed on the merits of that.

6       So first question under Professional Rule of Conduct 4.2.

7   Does the change relate to the representation?

8       The whole point of the change was to address our

9   representation.  They say we wreaked havoc on their arbitration

10  system.  As I said, the rules specifically undo AAA's

11  conclusion that we can proceed at once.

12      Another way of saying it is if they don't relate to the

13  representation, will they stipulate here that they won't rely

14  on or mention the new rules in this action?

15          THE COURT:  Say that again?

16      MR. POSTMAN:  The new rules, the change, is not

17  related to this representation.  Keller Lenkner's

18  representation.  Well, they stipulate that they won't refer to

19  or rely on the new rules in the course of our representation.

20      The whole point is they are going to bring up these rules

21  to say that we can't go to AAA.

22          THE COURT:  I thought the -- I thought you said that

23  AAA had dismissed all the cases because they --

24      MR. POSTMAN:  Well --

25          THE COURT:  Because fees were not paid.

```
 1              MR. POSTMAN:  Sorry.

 2         Right.  They have administratively closed them.  And what

 3    happens next, and DoorDash is well aware of the process here,

 4    is that that's a breach of the arbitration agreement.

 5         So under Section 4 of the FAA when a party breaches an

 6    arbitration agreement -- and here the breach was refusal to

 7    comply with their end, which was comply with AAA's

 8    determination of how to move forward -- the Court can compel

 9    them to arbitrate and enforce according in the manner provided

10    for in the agreement, the arbitration agreement.  That's

11    Section 4 of the FAA.

12         So what we're asking Your Honor in the Petition to Compel

13    Arbitration and the Motion to Compel arbitration, the permanent

14    relief we're asking for is to find that by just refusing to

15    comply with AAA's determination and forcing AAA to close,

16    administratively close the proceedings, because it has no

17    alternative, they have breached their agreement, and the remedy

18    for that is specific performance, as often in a breach, which

19    is to order them to comply with AAA's determinations and move

20    forward.

21              THE COURT:  Did AAA refund your 1.2 million?

22              MR. POSTMAN:  Yes.

23              THE COURT:  When you have say "administratively

24    closed," can they be administratively reopened?

25              MR. POSTMAN:  I believe so.  It's up to AAA whether
```

```
 1   they ask us to refile the same demands exactly as they were or
 2   they will just administratively reopen them.  They can choose
 3   to do it either way.
 4        But I think at the end of the day this Court must and
 5   does -- I mean, Courts have ordered, as we cite in our Motion
 6   to Compel, parties to pay the fees to go ahead with
 7   arbitration.
 8        Were it otherwise, any time a party didn't want to
 9   arbitrate, they could just refuse to pay the fees at the front
10   end and they wouldn't have to.  That can't be the rule under
11   the FAA and that's not the rule in our Motion to Compel.  We
12   explained Your Honor can, and we argue should, remedy the
13   breach by ordering them to move forward.
14        So we're going to be in front of you, we believe, on that
15   motion, and we're going to be saying there is a clear agreement
16   to arbitrate.  Any questions they may have, any fights about
17   how arbitration should proceed under their clear delegation
18   clause has to go to AAA and the arbitrator.  They have been
19   enforcing delegation clauses for years and they know that
20   that's the case.
21        And so we'd like you to send it to AAA.  And what they are
22   going to say, I believe, they are free to correct me, is:  Oh,
23   no.  They have signed a different agreement.  They've agreed to
24   go elsewhere.  You judge, Your Honor, can't force them to go to
25   AAA.
```

```
 1         The entire right we're here in this action to enforce is
 2    the right under the contract to go to AAA.  Their new agreement
 3    effectively releases that right.  It says once you sign this,
 4    you no longer have it.  And if I'm wrong about that, they
 5    simply need to say that they won't come in and invoke that
 6    agreement when we're trying to remedy the breach of the AAA
 7    agreement.  To say it's not represented blinks reality.  They
 8    are doing it specifically, they say, as a reaction to our
 9    clients' claims.
10         So the related to representation thing I think just
11    doesn't hold water.
12         They make a related point.  They say over and over:  It's
13    just a procedural requirement we're changing.  We're not
14    extinguishing any rights.  We can't cite any unfair advantage.
15         Well --
16              THE COURT:  Tell me this.  What in the record proves
17    that AAA could hear these 3,000 -- give me the exact number
18    again.  I'm sorry.
19              MR. POSTMAN:  2,236.
20              THE COURT:  2,000-?
21              MR. POSTMAN:  -236.
22              THE COURT:  All right, 2236.  What in the record
23    shows us that AAA could hear these all at once, but CPR would
24    refuse to do so?
25              MR. POSTMAN:  AAA made an administrative
```

1   determination that they all had to move forward.  And I can

2   give you the cite for that.

3              THE COURT:  Does that mean AAA refused to adopt some

4   kind of class action procedure?

5              MR. POSTMAN:  Exactly, exactly.  So that was on

6   September 23rd, and it's Exhibit D to the Keller declaration in

7   support of this motion.

8              THE COURT:  Has AAA changed its mind on that?

9              MR. POSTMAN:  I don't believe so.  So we've -- again,

10  once a party refuses to pay, AAA has no ability to make them.

11  They are an administrator.  It's like if you don't pay the

12  docketing fee to a clerk, they can't docket it.

13      But Your Honor can remedy that breach.  And when you do,

14  AAA will move forward individually with them.

15             THE COURT:  What is the dollar amount that DoorDash

16  would have to put up with AAA?

17             MR. POSTMAN:  Their invoice was 4.275 million.

18             THE COURT:  How come yours was only 1.2?

19             MR. POSTMAN:  That's the structure --

20             THE COURT:  So the --

21             MR. POSTMAN:  Excuse me.

22             THE COURT:  I'm sorry.  Please go ahead.

23             MR. POSTMAN:  That's the structure of the fee

24  schedule set by AAA.

25      So under the fee schedule the claimant in an employment --

1   under the employment fee schedule, which applies here, pays

2   $300 per person to move forward, and the respondent pays 1,900.

3          **THE COURT:**  Is that the filing fee?

4          **MR. POSTMAN:**  Correct.

5          **THE COURT:**  In addition, are there fees for the

6   arbitrator?

7          **MR. POSTMAN:**  There are.  Those are assessed after an

8   arbitrator is assigned and does a preliminary conference and

9   gets an understanding of the case.  They set a retainer that

10  has to be paid.  And then there is also --

11         **THE COURT:**  By DoorDash?

12         **MR. POSTMAN:**  Correct.  And this is all a result of

13  the *AT&T v. Concepcion* line and arguments by defendants that

14  their agreements are not unconscionable because they don't

15  force claimants to pay more to proceed in arbitration than they

16  do to court.

17      Plaintiffs had long argued that arbitration agreements

18  with class waivers were unenforceable because of the

19  prohibitive fees.

20      And the respondents essentially wrote their agreements to

21  say:  Well, we'll cover those, because in exchange for giving

22  up a class waiver -- I'm sorry, in exchange for losing the

23  right to bring a class action, you get the right to move

24  forward in this informal process and we'll pay the bulk of the

25  fees.

1          Again, under the FAA contracts must be enforced according

2     to their terms.  The contracts incorporate the AAA rules.  The

3     AAA rules say AAA makes these administrative determinations.

4          We're happy to -- I'm happy to discuss why we believe

5     there is an overwhelming case that they have breached their AAA

6     agreement and that you should compel them to fix it by moving

7     forward.

8          I think what is clear, though, is that these are important

9     rights.  DoorDash has been litigating to compel arbitration

10    speaking about how important the rights to arbitrate are.  They

11    are not procedural.  They are a right under a contract.

12         And the Supreme Court in *Moses H. Cone* said:

13              "Section 2 is a declaration of a liberal policy

14         favoring arbitration notwithstanding any state's

15         substantive policies to the contrary.  The effect of

16         Section 2 is to create a body of federal substantive

17         law applicable to any arbitration agreement within the

18         coverage."

19         Federal law makes these important substantive rights.

20    That's what we are asserting in this Motion to Compel.  And the

21    agreement they are forcing our clients to sign without the

22    involvement of counsel --

23         **THE COURT:**  I -- I let us get off the -- I had a

24    question though.  What in the record shows us that CPR would be

25    a much longer period of time?

 1           MR. POSTMAN:  Sure.  So I've given you the citation

 2  for AAA.  CPR is document No. 1114, and this is just the

 3  protocol where it describes, as I did, that once there are more

 4  than 30 claims facing a defendant, they will proceed --

 5  everyone waits and they will proceed with ten.  And then after

 6  that, they will give everyone a number and proceed

 7  sequentially.

 8           THE COURT:  How long will it take to go through that,

 9  for 2,236 to go through that process?

10           MR. POSTMAN:  We state in our motion just -- just a

11  hypothetical.  I don't know how fast they will move these.  I

12  can't know that for sure, but we state -- there's numbers in

13  the brief that if each of the CPR arbitrators heard ten a year,

14  and that's on top of their other case loads, it would be four

15  years before some of these petitioners would get to start.

16      And we have other petitioners, other claims as well.  So

17  it's -- it's a very important substantive right to be able to

18  move forward with your claim.

19      I think everyone understands that if the agreement they

20  had written said:  New agreement.  Instead of going to AAA,

21  like you want, everyone can do -- there can be one arbitration

22  a year.  That's it.  That's obviously important.

23      Now, what we've done is a difference in degree, but not in

24  kind.  And they have done it in the middle of the process.

25  They forced AAA to close administratively the arbitrations --

1          **THE COURT:**  2,236?

2          **MR. POSTMAN:**  Yes.

3          **THE COURT:**  All 2,236 had filed?

4          **MR. POSTMAN:**  Correct.  And they didn't pay a single

5    fee on their end.

6          **THE COURT:**  How many of your 2,236 have signed or

7    clicked through and approved the agreement and/or opted out of

8    it?

9          **MR. POSTMAN:**  Every single one has signed and clicked

10   through the agreement, and nobody that we're aware of has opted

11   out.

12        And I'd like to, if I could, address a statement in their

13   brief that suggests we haven't established that.  That is just

14   not true.

15        The reason it's not true, they say we only attached a

16   general copy of the independent contractor agreement.  Well,

17   they don't make unique copies of the independent contractor

18   agreement.

19        The way it works when you sign up, as you said, Your

20   Honor, is you -- you're signing up.  There is a link where you

21   could see a general copy, and then you click on "Accept" and

22   you're deemed bound.  There is no signature, signed version.

23        And so in every case where they have moved to compel

24   arbitration against a plaintiff, what they do -- and you can

25   look at the Tang declaration, Docket 35-3, Paragraph 4 that

1    speaks to.

2        They say this person is driving for DoorDash.  That's the

3    nature of the claim.  And I'm quoting the declaration:

4            "Contractors are not able to use the DoorDash

5        platform or accept or perform delivery opportunities

6        without agreeing to the ICA."

7        So we've proved it the same way they've proved it, which

8    is to say -- we establish that they have driven for DoorDash

9    and that, as they said, you can't deliver without it.

10       We noted in footnote two of the Keller declaration that we

11   were providing one witness statement to save judicial

12   resources.  They are all identical.  We have every witness

13   statement in a box.  If DoorDash or Your Honor would like me

14   to, we can file them electronically.  We can give physical

15   copies.

16       But, you know, I can make the representation to the Court

17   that there is an evidentiary basis to show this.

18           **THE COURT:**  To show what?

19           **MR. POSTMAN:**  That every single petitioner is a party

20   to a valid arbitration agreement with DoorDash.  We proved it

21   the same way they do.

22           **THE COURT:**  You mean, the AAA one or the --

23           **MR. POSTMAN:**  The AAA one.

24           **THE COURT:**  All right.  Well, how about the CPR one?

25   How many of them have signed the CPR one -- not signed, but

```
 1   approved and clicked through there?

 2             MR. POSTMAN:   This was just rolled out a couple weeks

 3   ago, so we don't know the exact numbers.   They may have a live

 4   tally, but we don't know the exact numbers.

 5        But, you know, we're familiar with our clients.   We talk

 6   to them a lot.   Some drive every day full-time.   Some drive

 7   more sporadically.

 8             THE COURT:   Give me an estimate.   Is it more than

 9   half, less than half of your clients have clicked through the

10   new agreement?

11             MR. POSTMAN:   With full caveats that I'm really

12   estimating --

13             THE COURT:   Just a guess.

14             MR. POSTMAN:   -- I think it is about a third.

15             THE COURT:   Okay.   And of that one-third have any of

16   those opted out of the CPR agreement?

17             MR. POSTMAN:   We're in the -- yes.   We're in the

18   process of collecting statements.   We've suggested they opt

19   out, and we're in the process of collecting those.

20        We have a number.   We don't have them tied specifically to

21   petitioners.   It's developing as we speak.

22        I think the point we -- the reason we moved is these

23   rights -- and we're happy to walk through in total detail.   We

24   do it, I think, more in the Motion to Compel.   These rights are

25   intimately wrapped up with this Motion to Compel arbitration.
```

1   And for the defendant to be changing them by presenting an

2   agreement to our clients that they have to sign to start work,

3   that doesn't say it's going to affect this action, that doesn't

4   say consult a lawyer, it's improper and they have no interest

5   in it.

6       I mean, they could easily -- if they have -- they have put

7   nothing in the record.  There is no evidence in the record to

8   suggest it would be technologically hard for them to stop

9   sending our clients this new agreement.  So there is no -- no

10  technological problem with an evidentiary basis.

11      Absent that, what interests do they have in changing the

12  agreement for this action?  The only interest they could have

13  would be a litigation advantage.  But trying to get a

14  litigation advantage by reaching out to our clients is exactly

15  the thing you can't do.  And trying to get a litigation

16  advantage after the arbitration process has commenced by

17  changing the process is what the covenant of good faith and

18  fair dealing says you can't do.

19      I mean, the *Penet* case (phonetic spelling) says this very

20  expressly.  You can't change it once the claim has accrued.

21  Here it's not just accrued.  We've -- we've told them our

22  clients have retained counsel and we're pursuing actions.

23      So we're really just asking the Court to freeze the

24  status quo so that as we -- Your Honor can decide whether we

25  can compel arbitration before AAA or, you know, whether there

1    is some reason not to.

2         I will note the arbitration agreement that we're moving to

3    compel under expressly says that we can move in court to seek

4    temporary injunctive relief and that's -- you know, the one

5    exception under the agreement to having to send everything to

6    the arbitrator is that if the phrase is without that temporary

7    relief, the arbitration provided in this paragraph may be

8    rendered ineffectual.

9         If that's the case, we can come to the Court and say:

10   Hold on.  We're in the process of moving to compel.  You need

11   to issue temporary relief so we get to have this right.

12        So we're asking to freeze the status quo.  Really don't

13   think they have any legitimate interest in this action in

14   trying to stop us -- or, I'm sorry, in trying to reach out to

15   our clients and change the rules.

16        And, you know, in Rule 4.2 when this process is driven by

17   the lawyers to do this, as it obviously was, it's just plainly

18   improper.

19        There is another misleading, frankly, statement in the

20   brief that I do want to correct.  Let me...

21        (Brief pause.)

22        They say that they can't find 936 of our clients in their

23   DoorDash system, and they use this to suggest that we're

24   bringing claims for people who have not -- who aren't DoorDash

25   drivers.  That's opposition Page 3.

1          It's at best a half truth.  If you look at the Cao

2     declaration, which is Docket 35-4, it concedes that when they

3     ran this search, it was a list of 5,000 people.  They only

4     checked emails.  They didn't check for people's names.  They

5     didn't check for phone number.  They didn't check for address.

6     All of which they have.

7          So the point to that is evident.  They didn't really do a

8     full search.  The point to that is evidence that we're somehow

9     misrepresenting is entirely unfounded.

10          And there is another thing they do.  They put in the

11     record -- and this is ECF 35-5 -- an email where they have told

12     us about this, and they say:  We've told them.  We've told

13     Keller Lenkner that there are these people we can't find.

14          Well, they don't include the reply to the email.  In the

15     reply to the email we said:  People often have different

16     emails.  If you tell us who the people are, we'll give you

17     additional information so you can track them down.

18          We didn't know at this point they hadn't searched any of

19     the other identifying information.  They refused.  We renewed

20     that suggestion at least three other times.

21          In a good faith informal non-litigious arbitration process

22     parties confer like that.  They refused.  And then after not

23     really looking and refusing to confer, accuse us of bringing

24     claims on behalf of people who aren't Dashers.

25          Not only that, the list they are talking about is not a

1    list of petitioners.  It's a separate list we gave them to

2    request employment records under California Labor Code.  We

3    found about five petitioners that are on that list.  But to

4    point to that to suggest petitioners aren't DoorDashers is

5    particularly misleading.

6        And what's more, they have the list of petitioners'

7    information.  Presumably they have checked.  We have put in

8    evidence in the record saying that -- showing that they are

9    Dashers.  They have not disputed it as to a single person.

10   They, to date, have never identified a single petitioner who

11   they even assert is not a DoorDasher.

12       So under the classic *Celotex* standard, we have record

13   evidence.  They won't dispute it.  They point to some other

14   evidence where they did a partial search.  I don't think

15   that -- that counts, if they are not even petitioners, as

16   rebutting.

17           **THE COURT:**  All right.  I need to let the -- you'll

18   get a rebuttal.  I want to hear from the other side.

19           **MR. FOGELMAN:**  Thank you, Your Honor.

20       I heard your questions.  I think they are excellent

21   questions.  And I heard your comment this is not a class

22   action, which I think actually is quite important here.

23       I also heard counsel say that -- I'm trying to quote

24   here -- they are very familiar with their clients and talk to

25   them a lot.

 1          So why are we here?  According to the petitioners, all

 2   that's happened is that they have some, one person, that's all

 3   we know, because the only evidence --

 4          THE COURT:  We're here because you had a -- your

 5   client had an agreement to go to AAA.  And when it came time to

 6   pay the fee, you backed out and reneged on the agreement.

 7          MR. FOGELMAN:  Your Honor, I --

 8          THE COURT:  That's why we're here.

 9          MR. FOGELMAN:  I hear you, and I have an answer to

10   that, but I wanted to --

11          THE COURT:  You made the agreement.  Your law firm

12   and all the defense law firms have tried for 30 years to keep

13   plaintiffs out of court in employment cases.  And you've gotten

14   a lot of success in the courts.

15          After so finally somebody says:  Okay, we'll take you to

16   arbitration.  And suddenly it's not in your interest any more.

17   And now you're wiggling around trying to figure some way to

18   squirm out of your own agreement.

19          I am not -- you know, I'm a little older than you and

20   there is a lot of poetic justice here.

21          MR. FOGELMAN:  Your Honor, I don't think you look

22   older than me, and I appreciate that, but I will tell you this

23   much.

24          First of all, we have a valid defense to the Motion to

25   Compel arbitration.  I'm going to walk through that, but I

```
 1   would like to do that at the end, if you don't mind, because I
 2   do have --
 3          THE COURT:  I read the agreement.  There is no
 4   possible way to say that you don't have a valid defense -- I
 5   mean, that you do have a valid -- I mean, maybe on the merits,
 6   but that's what the arbitration is for.
 7          MR. FOGELMAN:  Well, I hear you, Your Honor.  Let me
 8   walk through what the merits are of both today's motion and
 9   that one, since the only tie between the two is they have both
10   been argued today, but today's relief is not related to the
11   Motion to Compel arbitration on the schedule --
12          THE COURT:  Let me ask you some questions about the
13   -- let's say that somebody opts out of the CPR agreement.
14   Let's say they click through it, but then they send you the
15   opt-out letter.
16       Does that then mean that the AAA arbitration agreement is
17   back in force?  Your brief was very cleverly written to avoid
18   answering that question.
19          MR. FOGELMAN:  I'll answer it directly.
20          THE COURT:  Answer it.
21          MR. FOGELMAN:  If someone either doesn't sign on to
22   the app, which they don't have to do, and we don't --
23          THE COURT:  Let's say they do sign on.
24          MR. FOGELMAN:  I'm with you.  Right.  I'm going to
25   answer every possibility.  I'm going to walk through them.
```

1          THE COURT:  All right.

2          MR. FOGELMAN:  If they don't sign on or they sign on

3     and agree to the new terms, but opt out, they are exactly where

4     they are today on every level.  They can pursue arbitrations in

5     AAA.  But although I have another comment about that, I'll wait

6     until the end.  But there is no --

7          THE COURT:  Wait.  Just a second.  They can pursue or

8     that you will agree that it's proper.

9          See, you said in your brief "attempt."  I understand how

10    your firm can use words like "attempt."

11         MR. FOGELMAN:  I --

12         THE COURT:  All lawyers -- but you will then come

13    back and say:  Oh, no.  There's some other reason why we won't.

14         Will you submit to arbitration in the AAA in those

15    circumstances?  You won't answer that question.

16         MR. FOGELMAN:  I'm answering every question --

17         THE COURT:  Answer that question.

18         MR. FOGELMAN:  So what's happened as of Friday, Your

19    Honor, is that a class, a putative class has actually been

20    settled.  I don't know if any of those people will wind up

21    wanting to go forward.  There will be --

22         THE COURT:  There is no class.  You've got a class

23    action waiver.

24         MR. FOGELMAN:  I hear you, Your Honor, but I'm

25    telling you --

```
 1              THE COURT:  You, yourself --

 2              MR. FOGELMAN:  On Friday -- on Friday, Your Honor, in

 3   another case a putative class action, motion for preliminary

 4   approval, was filed in another case --

 5              THE COURT:  DoorDash?  Involving DoorDash?

 6              MR. FOGELMAN:  Yes, Your Honor.  And the --

 7              THE COURT:  Who was the judge in that case?

 8              MR. FOGELMAN:  I have a case number.  I don't have

 9   the judge.  It was just filed on Friday.

10              THE COURT:  I'm not going to get into some other

11   judge.

12              MR. FOGELMAN:  Your Honor --

13              THE COURT:  That's an old -- I'm not -- I want to

14   solve my problem on my record.

15              MR. FOGELMAN:  Your Honor, I only --

16              THE COURT:  And I --

17              MR. FOGELMAN:  -- say that --

18              THE COURT:  If they --

19         (Simultaneous crosstalk.)

20              THE COURT:  Wait a minute.

21        So if they -- if they -- if the person opts out of the CPR

22   agreement, you say yes, they can go to AAA and arbitrate their

23   case, but will you submit to jurisdiction there?

24              MR. FOGELMAN:  Your Honor, the only reason I

25   mentioned the settlement is because I want that to be a caveat.
```

```
 1   They will have an opportunity to participate in that.  If they
 2   opt out, then these answers will apply.
 3        But here are the answers to every question I think you've
 4   asked.
 5        We've already agreed to AAA arbitration.  All the client
 6   was asking for is that they comply with the AAA rules, which
 7   are very minimal.  You attach an agreement to arbitrate.  You
 8   identify what your claim is.  And you identify what the amount
 9   in controversy is.  Some of these people have zero claims.
10   Some have $20.
11        And if they had done that -- which 250, by the way, are
12   going forward right now.  Separate issue, but there are people
13   going forward and there are court cases going forward.
14             THE COURT:  At the AAA?
15             MR. FOGELMAN:  AAA.  250 going forward at the AAA.
16             THE COURT:  Represented by the Keller law firm?
17             MR. FOGELMAN:  I think so, Your Honor.  Yeah.  Yeah.
18   I think so.  I think so.
19             THE COURT:  Okay.
20             MR. FOGELMAN:  Those are still going forward.  These
21   were a chunk of two sets of 2,000, where 4,000 were filed at
22   once.  Now they have been divided in two cases:  One before us
23   today and one that was removed from state court.  I don't know
24   what court has that at the moment, but it's here in the
25   courthouse.  Okay?
```

1      For the 2,200 here today, assuming that they -- there is

2   approval of the settlement and they opt out, they will have the

3   answer to do whatever they want.  The agreement that they

4   signed is just a new version, updated version of the terms of

5   service, the independent contractor agreement on a

6   going-forward basis.

7          THE COURT:  AAA is out.  CPR is in.  And some of the

8   other language has been changed.

9          MR. FOGELMAN:  Well, I --

10          THE COURT:  I read the difference.  I saw the red

11   line version.

12          MR. FOGELMAN:  If you saw Exhibit C to the Tang

13   declaration, you'll have seen in all capital, all black type

14   face it says, the first page, that anyone who signs on

15   permanently to the app.  No one is contacted unless they sign

16   in.  And he did not tell you how many people have signed in.

17   We'll get to that in a moment.

18          "Important please review this agreement

19       carefully.  In particular, please review the mutual

20       arbitration provision in Section 11, as it requires

21       the parties" -- this is the part he didn't talk about

22       -- "(unless you validly opt out of arbitration, as

23       provided below) to resolve disputes on an individual

24       basis to the fullest extent permitted by law through

25       final and binding arbitration.  By accepting this

```
 1          agreement, you acknowledge that you've read and
 2          understood all the terms, including Section 11, and
 3          have taken the time and sought any assistance needed
 4          to comprehend the consequences of accepting this
 5          agreement."
 6               THE COURT:  But if they don't click on that, then
 7     they don't get a job for that day; right?
 8               MR. FOGELMAN:  Your Honor, that -- we don't know how
 9     many people have clicked on it as of today.  There has been no
10     evidence in the record that more than this one person has
11     clicked on it.
12               THE COURT:  Well, but you're the company.  You ought
13     to know immediately.  You can look at the computer and it will
14     tell you.
15               MR. FOGELMAN:  It does not, Your Honor.  It takes
16     time to figure out who they are.  We cannot put their names in
17     the complaint --
18               THE COURT:  I'm going to say there are people out
19     there who are desperate, living paycheck to paycheck, and they
20     said:  What the hell, I've got no choice.  I better click on
21     this.
22          I have --
23               MR. FOGELMAN:  I understand what you're saying, Your
24     Honor --
25               THE COURT:  I have no --
```

1              **MR. FOGELMAN:**  I'm not disagreeing with you on

2     whether it's important to people or not.  You can assume it's

3     extremely important to people.  That's not going to change why

4     we're here today.

5          All that happens today is they -- if they click on -- and

6     the only evidence in the record is that one person clicked on.

7     That's all that's in the record.  If they click on, they read

8     the information that I just read to you and the actual

9     arbitration provision, and they can consult with their counsel.

10         This is not a class action where they are unrepresented.

11    They have a close connection to people who are their counsel.

12    They are familiar with their clients and talk to them a lot.

13    They can then ask them for advice and whether these are

14    actually better or not.

15         I think, Your Honor, there is a very good record in the

16    community-at-large that this is a faster and more efficient way

17    to arbitrate for everyone.  Counsel may disagree.

18         As you just heard him tell you, they have advised their

19    clients on their opinion on whether this is a better or worse

20    arbitration than the one they currently have a right to pursue.

21    At that point their client has got to make an informed

22    decision.

23         A, they don't have to agree at all to anything.  If that's

24    the case, they are still free to arbitrate in AAA, subject to

25    their decision of the settlement issue we talked about.

1          If they click on this, they still don't have to arbitrate.

2     They still don't have to arbitrate in the new arbitration form.

3     This is a new term on going-forward basis.  They could opt out

4     of the new provision by just mailing a letter.

5          Now, all I have in this record, Your Honor, for today is

6     the essentially one-page declaration of Ms. Jackson, which says

7     that she logged on on November 11th and she didn't realize that

8     it could be something that could affect her case, and she

9     didn't have enough time to thoroughly read through it.

10         This opt out is not immediate.  Each person has 30 days in

11    which to consult with their counsel -- and according to counsel

12    of record, they are in contact with them frequently -- and

13    decide for themselves if they like the AAA better or the new

14    one better.  If they opt out, they can do the AAA.  If they

15    decide to opt in, they can do the new one.  But that informed

16    decision is before them.  No one is forcing them to do anything

17    on that particular issue.

18         This is simply the fourth change, I think, in three years

19    to the standard agreement and many of these relate to the

20    arbitration agreement on a going-forward basis.  They are not

21    required to either agree to the new terms or, if they agree, to

22    enter into the new arbitration provisions.

23         Counsel has now said that a third, perhaps, have opted out

24    already.  Well, does that mean that two-thirds have made a

25    decision --

```
 1              THE COURT:  No.  He said a third had clicked through
 2    it.
 3              MR. FOGELMAN:  Okay.
 4              THE COURT:  I think that's what he said.
 5              MR. FOGELMAN:  So a third had clicked through it.
 6    And he said that some, perhaps all -- I don't know, there is
 7    nothing in the record.  Some have opted out.  Not this person,
 8    yet.  But this person has 30 days from November 11th, according
 9    to her statement, to opt out.
10         So why did we have to come here today?  What is the relief
11    they are seeking when if this person, rather than filling out
12    this declaration and jumping into an emergency motion, is
13    talking to counsel of record.  If she doesn't like the new
14    one -- I like it, maybe they would like it -- she doesn't have
15    to agree.  She can opt out, and some have.
16         What is the emergency relief and what is the emergency
17    they are asking the Court to engage in?
18         Walk me through this one hypothetical, Your Honor.  What
19    if there's a person who read the new terms, is not happy with
20    how AAA was going, wants to try the new provision because they
21    think it's better for them even after hearing the advice of
22    counsel.  Is Your Honor going to tell them that they can't make
23    an informed decision, even after speaking with their counsel,
24    of choosing the new form?  It's their right.  They can go to
25    the old form or the new one.  It's their choice.
```

1          But the injunction they are seeking today, Your Honor, is

2    really not just enjoining our client's speech and not just

3    enjoining our client's change of business practices, which is

4    in this case a contract for hundreds of thousands of

5    Californians, of which they are just a small part, but in many

6    ways they are asking for an injunction against their own

7    clients to prevent them from deciding on their own, with their

8    advice of counsel, to choose the new form.  That's not right.

9          All we have in this record is one person saying she

10   clicked through, and it doesn't even say she's opted out or is

11   going to opt out or she liked it or didn't like it.  She simply

12   says she wished she had more time.

13         Well, the contract gives her 30 days.  And if they are in

14   contact frequently with her, as they say they are, she's got

15   plenty of time after today to opt out.

16         **THE COURT:**  It may be that they clicked through it

17   and they don't know they even have to get a hold of the lawyer.

18   There may be some lag time before events catch up with it and

19   they may be on day 27 or 28.

20         **MR. FOGELMAN:**  Your Honor, the --

21         **THE COURT:**  Thirty days is not a very long period of

22   time.

23         **MR. FOGELMAN:**  Well, with all due respect, Your

24   Honor, it's 30 days from the time they click through.  All we

25   know is that one person has clicked through.  That's all that's

1  the record.  If the next person clicks through today, they have

2  30 days from today.  If the next person clicks through a month

3  from now, they have 30 days from that month.  If they click

4  through in February, et cetera, 30 days.  It's a rolling 30

5  days, Your Honor.  And they have counsel in frequent contact

6  with them.

7          THE COURT:  What date did you start rolling out the

8  new agreement?

9          MR. FOGELMAN:  November 9th, Your Honor.  So even

10 that date, there is still two weeks left for the first person.

11 She's not that person.  She says she clicked in on

12 November 11th.

13     But even two days earlier when they were rolled out, that

14 person still has two more weeks to opt out and they have

15 counsel in frequent contact with them.  You don't have to get

16 involved here and offer an injunction.

17          THE COURT:  Is counsel able to -- I saw in your

18 agreement.  It can't be counsel opting out on behalf of

19 everyone.  It has to be an individualized agreement.  Can

20 counsel deliver those agreements to your office?

21          MR. FOGELMAN:  Your Honor, it's spelled out in the

22 agreement if they want to sign up, how to opt out.  I believe

23 it's an address they mail it to and they have to sign it

24 themselves.

25          THE COURT:  Does it have to be postmarked that day,

```
 1   or can it be -- have to be received that day?
 2            MR. FOGELMAN:  I believe it's received within 30
 3   days, Your Honor, but I don't think that's in the record, that
 4   they are having trouble having it received.
 5            THE COURT:  So we've got the postal system.  It's at
 6   the mercy of the postal system.
 7            MR. FOGELMAN:  Your Honor, I have to say I'm not
 8   aware of anything in the record which suggests that they are
 9   having trouble getting it mailed or they have asked us to get
10   involved in waiving the term for specific people because it got
11   mailed late.  There is nothing in the record on that.
12        And I would say on this one, the AAA didn't close the
13   cases because we told them to.  What's in this record is that
14   plaintiff's counsel told them to close the file.
15            THE COURT:  Tell me, what was it.  DoorDash refused
16   to pay the filing fee, so AAA closed the cases
17   administratively.
18            MR. FOGELMAN:  Your Honor, it's not as nefarious as
19   that was brought to you at all.
20            THE COURT:  Tell me what happened.
21            MR. FOGELMAN:  They filed claims all at once without
22   any arbitration agreements, without identifying what their
23   claim is, and without identifying what the amount in
24   controversy is.  Those are the AAA rules that are part of our
25   agreement.
```

1       All we asked them to do -- that DoorDash asked them to do
2   was comply with those terms and they could arbitrate.  In fact,
3   there are 250 going forward right now.  That's all.
4       They decided that they didn't want to present an actual
5   agreement to arbitrate or identify the amount.  Why would you
6   do that?
7       I'll just walk you through one potential possibility here.
8   A person has a $20 claim.  If they put a $20 demand in there,
9   every defendant who receives that is going to go through the
10  same thought process every single time.  Should I just pay them
11  the $20, as opposed to paying $1,900 for a filing fee?  Should
12  I offer them $10 to compromise?  Should I fight this one, or
13  should I just let them take a default because they are not
14  taking the $20 and I'm not going to pay $1900 to save 20.
15      Those are the things that everyone who is sued in a
16  particular forum will always go through.  And that's all we
17  asked here, is that they comply with the agreement, which is
18  file the agreement that you have to arbitrate.
19          **THE COURT:**  The agreement requires that, or do the
20  rules require that?
21          **MR. FOGELMAN:**  Both.  Because the agreement requires
22  you to comply with the rules, and the rules expressly state
23  that's what AAA requires.  So if they had done that, they would
24  have been arbitrating right now.
25      The fact that the rules --

```
 1             THE COURT:  Wait, wait.  Hold that thought.
 2        Counsel, come back up here just on that one point.  I'm
 3   not going to interrupt you long.
 4         Now, what counsel is telling me is vastly different than
 5   what you represented.
 6             MR. POSTMAN:  Yes.
 7             THE COURT:  What you represented to me was that AAA
 8   closed the files administratively because DoorDash refused to
 9   pay the filing fee.
10             MR. POSTMAN:  Yes.
11             THE COURT:  Is that right?  That's what you told me;
12   right?
13             MR. POSTMAN:  Yes.
14             THE COURT:  Now, what counsel is now telling me is
15   that's false and that what happened was that the AAA closed the
16   files because AAA requires that a copy of the agreement be
17   attached; that the dollar amount be stated.  And I forgot what
18   the third thing was.  And that you failed to do that, and
19   that's why they were closed.
20             MR. FOGELMAN:  Your Honor, I think you are
21   misunderstanding what I said.  That's not what I said or meant.
22             THE COURT:  All right.  Then you rephrase what you
23   said.
24             MR. FOGELMAN:  You correctly repeated what I said,
25   but I did not say that was the reason they closed.  I said it
```

1    was closed because the plaintiffs asked them to close the file

2    instead of complying with the AAA rules in our agreement.

3    That's what I said.

4            **THE COURT:**  All right.  Is that true?

5            **MR. POSTMAN:**  Absolutely not.  Docket 5-12, email

6    from Heather -- from AAA to the parties:

7            "Respondent has failed to submit the previously

8        requested filing fees.  Accordingly, we have

9        administratively closed our files."

10       That's their closure notice.

11           **THE COURT:**  Show that to counsel, and then hand it up

12   to me so I can see it.

13           **MR. FOGELMAN:**  Your Honor --

14           **THE COURT:**  Wait --

15           **MR. FOGELMAN:**  -- there was a separate request by

16   plaintiff's counsel that preceded the closing, which is not

17   part of that email.

18       (Whereupon document was tendered to the Court.)

19           **MR. POSTMAN:**  That was my next point that I was about

20   to make.

21           **THE COURT:**  Just a minute.

22           **MR. FOGELMAN:**  I have that in my hand, too, if you'd

23   like to see that, Your Honor.  It's actually the Lipshutz

24   declaration.

25           **THE COURT:**  All right.  Say it again.

1        **MR. FOGELMAN:**  This is an email.  It says:

2            "We have conferred with counsel for DoorDash and

3        the parties are not able to come to a mutual agreement

4        to depart from the process or deadline that you

5        outlined in your email below.  Claimants accordingly

6        agree that if DoorDash has not paid the fees it owes

7        by November 7, 2019, AAA should close Claimants' cases

8        due to DoorDash's refusal to proceed so that Claimants

9        may seek additional remedies."

10       This is a request by them to close it so they could come

11   to court.

12       And what I'm saying to you, Your Honor, is that all

13   DoorDash asked was that they do what's required in court, which

14   is, in part, even here.  You've got to have an agreement to

15   arbitrate on which to base a Motion to Compel arbitration,

16   which they don't put before Your Honor.  They put one.

17       **THE COURT:**  But did AAA ever say that the reason it

18   was closing any file was because the agreement had not been

19   attached?

20       **MR. FOGELMAN:**  No, Your Honor.  That's -- I'm just

21   saying why DoorDash was not going to pay $11 million without at

22   least confirming they had an agreement with the people who were

23   claiming they had an agreement; that they knew what the claim

24   was and they knew what the amount in controversy was, which is

25   what the AAA rules require.

1          THE COURT:  Is it true that you did not attach the

2     agreements?

3          MR. POSTMAN:  No.  We filed each demand

4     electronically, as we're permitted to do, as they consented to

5     do.  They consented to accept electronic service.  We did that

6     by uploading each claimant's individual demand into an online

7     portal --

8          THE COURT:  By individual contract?

9          MR. POSTMAN:  And what we did is we attached the

10    relevant contract, arbitration agreement.  We did not attach

11    2,236 copies of the identical agreement online.  We attached

12    the agreement.

13         They never said that this was a problem.  They never in

14    the whole course of this --

15         THE COURT:  Well, wait, wait, wait.  For all 2,236

16    did you individually attach the agreement that corresponded to

17    that individual with their arbitration demand?

18         MR. POSTMAN:  No.  We attached -- we attached the

19    multiple agreements and designated which responded to which.

20    We didn't reattach thousands of the same agreement over and

21    over, but we did --

22         THE COURT:  If it's electronic, who cares.

23         MR. POSTMAN:  Going through folders.  I mean, we

24    easily could.

25         The silly thing about this is they never raised this, Your

1    Honor.

2        **THE COURT:**  But, wait.  I'm just trying to find out.

3    I'm not saying it's right or wrong, but I'm trying to find out

4    is it true.

5        It sounds like counsel for DoorDash is correct when he

6    says that you did not attach the individual contract to each

7    individual claim.

8        **MR. POSTMAN:**  I want to reiterate, there is no unique

9    contract.  That doesn't exist.  There is a generic contract

10   that is online that when you click through, you are deemed to

11   have accepted.

12       So you can't attach, you know, Warren Postman's contract.

13   It's not -- it doesn't exist.  So it's correct.  What happened

14   is we attached a single version of the general contract that

15   applied.

16       But very importantly here, here is what the key point is.

17   They didn't raise that dispute.  Had they raised it, that is

18   exclusively committed to AAA's determination and the

19   arbitrator's determination.  They don't get to decide

20   themselves whether they get to go forward.

21       AAA, and this is document 5-11 Page 2, said:

22           "We have made an administrative determination

23           that the minimum filing requirements have been met by

24           claimants."

25       Their contract says the AAA rules apply.  It says that:

1          "All other disputes, except for whether a class

2      waiver is invalid, with respect to this mutual

3      arbitration provision shall be determined exclusively

4      by an arbitrator and not any court."

5      And the AAA rules likewise say that AAA makes that

6  decision and an arbitrator makes that decision.

7          **THE COURT:**  Look.  Let me go back to DoorDash.

8      Since all of these are form contracts and you click

9  through them, there is never a signature; right?  There is

10 never a signature.

11         So why would you insist on seeing the electronic version?

12 You're the only one that has the electronic version anyway.  So

13 how could these individuals even -- I don't get your point.

14 Why did you insist on seeing the contracts?  They are not --

15 they are all the same.

16         **MR. FOGELMAN:**  For the same reason we insist on

17 seeing them at this Motion to Compel arbitration being heard in

18 January.  Because at a minimum we have to know we have an

19 agreement to arbitrate with them before you can go forward.

20         **THE COURT:**  You can look at your own records to see.

21         **MR. FOGELMAN:**  We could not do that, Your Honor.

22 That was the whole point.  We've asked them to -- first of

23 all --

24         **THE COURT:**  Maybe it's unconscionable that you would

25 have a system where no one could even tell if they have got

```
1   a -- because you're the one that -- they click on it, but do
2   you automatically send them an electronic copy?
3        To me, it's a screwed up system if you can't even tell who
4   you've got an agreement with.
5             MR. FOGELMAN:  Your Honor, I didn't say we couldn't
6   tell with sufficient information.  They didn't give us the
7   information.
8             THE COURT:  They gave you the name.  Look up Joe
9   Jones and --
10            MR. FOGELMAN:  All right.  How --
11            THE COURT:  -- see if there is --
12            MR. FOGELMAN:  All right.  So how many Joe Joneses
13  are there in --
14            THE COURT:  Including Ohio, probably one that works
15  for DoorDash.
16            MR. FOGELMAN:  We're only talking about California
17  right now, by the way.
18       But how many Joe Joneses are there, and how do I know
19  that's the Joe Jones in our system, if there is one.  We asked
20  for email addresses that they link to their account and were
21  not provided those with these claimants.
22       Even today, Your Honor, for the 2,236 plaintiffs they have
23  not attached the agreement, which they can print out
24  themselves, to a declaration saying:  I agreed to these terms
25  on this date.  Here is the email address that's linked to my
```

1    account, and I didn't opt out of arbitration.

2          Instead they treat it like a class action, which they

3    cannot do, and have one person say, I -- well, actually, she

4    doesn't mention her original agreement, but she says she read

5    the -- today, her declarant, Ms. Jackson, she read the new

6    ones.  That's all she says.

7          But, Your Honor, if you -- if you eliminate the obligation

8    to establish that you have an agreement to arbitrate, you put

9    the cart before the horse.

10         **THE COURT:**  I don't figure that at all, because you

11   set up this -- this Draconian system.  You get up at 5:00 a.m.,

12   and you're starting your work, and before you can get your

13   first job you've got to click through.  And now you expect

14   seven or eight months later that the poor guy is going to

15   remember the day that he clicked through it and be able to

16   somehow keep a -- get an electronic copy?  You're the one that

17   has all the click-through information.

18         **MR. FOGELMAN:**  It wouldn't be difficult --

19         **THE COURT:**  All they've got to do is give the name,

20   the name, and say:  I work for you, DoorDash.  Don't you

21   remember me?  I'm the poor guy who -- like Tiny Tim, who is

22   begging at Christmas for money --

23         **MR. FOGELMAN:**  Your Honor --

24         **THE COURT:**  -- and DoorDash -- come on.  This is so

25   Draconian.

1          MR. FOGELMAN:  Your Honor, I could tell you we're not

2     beating up on poor Tiny Tim.  What we're here to talk about

3     today are two things.

4          Primarily one is the relief they are asking for.  Why is

5     it an emergency?  Why is it irreparable?

6          And secondarily, although it's untethered with the relief

7     today, they are not linked to the petition to compel

8     arbitration, what is the likelihood they would prevail on that

9     one?

10         Now that we're on that topic, it's not difficult or

11    Draconian and it doesn't have to be done at 5:00 in the

12    morning.

13              THE COURT:  Let me --

14              MR. FOGELMAN:  May I --

15              THE COURT:  All right.  There is a point you raise

16    that I do want to ask counsel for plaintiffs.

17         Look.  Let's assume that this is Draconian; that it's

18    unconscionable and all of those things.  You are the lawyer and

19    you are in contact with 2236.  This is not a class action.  So

20    forget that class action analogy.  This is a -- you've got 2236

21    clients.  You can get on the phone tonight and call every one

22    of them or email them en masse and say:  Hey, don't click

23    through this thing.  And if you do click through it, my advice

24    to you is opt out and we will go to AAA.

25         Why isn't that enough of a remedy for you?  You have the

 1   remedy in your own hands.

 2          **MR. POSTMAN:**  Your Honor, we may have made a huge

 3   amount of progress today because it's most of the remedy.  And

 4   if I can explain why we're here, and I'm surprised about

 5   this --

 6          **THE COURT:**  You're not answering my question.

 7          **MR. POSTMAN:**  I'm saying --

 8          **THE COURT:**  You're sliding off, just like all the

 9   lawyers.  Always slide off.

10       Go ahead.  What is it you want to say?

11          **MR. POSTMAN:**  I apologize, Your Honor.

12       Docket document 11-13, which is the new November 9th

13   agreement.  And what I'm about to say is it's very surprising

14   to us that DoorDash's position is if you opt out, you get to

15   keep the right to go to AAA.  We're very happy with that and --

16          **THE COURT:**  That's what they said?  That's what they

17   said?

18          **MR. POSTMAN:**  Well, we're not -- there's the wiggle

19   words of the "attempts" and the he didn't quite answer the

20   question that you asked.

21          **THE COURT:**  I'll tell you this.  The word "attempts"

22   in my court will get you nowhere.

23       What he has said to me today is enough.  If somebody opts

24   out, they are going to be compelled to go to AAA, period.  And

25   no gimmicks by DoorDash.

 1              MR. POSTMAN:  Thank you, Your Honor.

 2              THE COURT:  That's the way I feel about it.

 3         That's what you said.  I'm going to give you a chance now.

 4    If you want to wiggle off of that, this is your time and place

 5    to wiggle.

 6              MR. FOGELMAN:  Your Honor, I have not been known as a

 7    wiggler.

 8              THE COURT:  Yes.  The word "attempt" was a wiggle

 9    word.

10              MR. FOGELMAN:  Your Honor, all I was saying was that

11    the agreement prior to the new one.  And that's what would

12    apply to people who don't click on it voluntary or agree to it

13    and don't opt out.  I don't know what percentage that could be.

14    It could be zero.

15         But whenever people either don't sign on or opt out and

16    then don't participate in the settlement, are allowed to go

17    back to AAA.  But we're still allowed to defend ourselves.

18    First and foremost, just establish you are, in fact, a person

19    we have an agreement with.

20              THE COURT:  But that agreement, that prior -- if they

21    opt out of the CPR, then you're telling me that the AAA

22    agreement comes back into place for all of those people for

23    whom there was such an agreement.

24              MR. FOGELMAN:  Yes.  If they have an agreement, they

25    have an agreement.  And if they don't click on it, it's still

```
 1   the agreement.  In they opt out after clicking on it, it's
 2   still the agreement.
 3           THE COURT:  But now you say "if they have an
 4   agreement."  They may not have an electronic -- you're the one
 5   with the copy.
 6           MR. FOGELMAN:  But they have a pen.  They can say:
 7   I agree to the terms on this date.  Here is the email address I
 8   use.  At least give us something.
 9           THE COURT:  I'm not going to require them to remember
10   the exact date.  No.
11           MR. FOGELMAN:  How about approximate, Your Honor?
12           THE COURT:  Maybe approximate.  What I would do is
13   allow Mr. Keller to march through your files, over the
14   Christmas holidays if need be, and to find their names as proof
15   that they, in fact, did it instead of -- no.  You're not going
16   to be able to get away with saying:  Oh, the poor guy, he
17   didn't keep a copy.  Oh, too bad for him.  No, it's not going
18   to work that way.
19           MR. FOGELMAN:  You can print out the copy from the
20   app and say:  This is what I agreed to.
21       Or you could -- you could do the minimum that the AAA
22   rules require, which are part of our agreement.
23       It is not asking for Draconian relief to say:  I am the
24   person who signed up.  Here is approximately when I did it.
25   And if I can, show you a copy of what I signed on to.  It looks
```

 1  like they have it.

 2       Counsel has it, that's what they say.  Just attach it to

 3  their declaration, say this is it --

 4            THE COURT:  All right.

 5            MR. FOGELMAN:  -- and say how much you're seeking --

 6            THE COURT:  All right.  Look --

 7            MR. FOGELMAN:  -- but we're not there.

 8            THE COURT:  Mr. Keller -- okay.  A lot of -- I don't

 9  know if this makes a lot of progress or not, but why isn't it

10  enough for you to get in touch with your clients and just say:

11  Please, I advise you to opt out of this thing.  Here is how you

12  do it.  Send a letter, so forth.

13            MR. POSTMAN:  So in classic lawyer fashion, I will

14  say that it's mostly enough.  It really is a lot.

15       The reason it's not all the way there is because getting

16  the message from their lawyer and the advice from a lawyer at

17  the same time instead of at 5:00 in the morning when you've got

18  to sign on, even if they have got an email and text message and

19  a phone call from us, is not as good.  And I think there is no

20  interest on the other side in doing it that way.

21       But I'm not going to fight for that last 5 percent.  I

22  would like to just clarify a couple points.

23       It is just not true that you can print the agreement from

24  your app, at least not so far as we have been able to figure

25  out.

1          **THE COURT:**  I can't print anything on my iPhone.

2          **MR. POSTMAN:**  It is also not true that we didn't give

3     them email addresses.  We have given them lists with the email

4     address, home address, phone number, name, city and state for

5     every one of these petitioners.

6          We've got a declaration from every one of them that

7     establishes they were party to an agreement, exactly the same

8     way DoorDash establishes it in court.  It's a declaration that

9     they drove for DoorDash, which can't happen unless you're a

10    party to the agreement.  And DoorDash has simply not tried to

11    search fully and when they have, they won't tell us who.  They

12    won't even let us -- and this is during arbitration.

13         **THE COURT:**  Well, maybe effective tomorrow you're

14    going to get a big deposition or two.  Because if this is the

15    kind of hide-the-ball we're going to get, then you get to do a

16    little discovery.

17         All right.  So you've got 95 percent of what you need

18    already, at least in terms of preliminary relief; is that true?

19         **MR. POSTMAN:**  Yes.

20         **THE COURT:**  All right.

21         **MR. FOGELMAN:**  Just to follow up, Your Honor, on the

22    idea of any Draconian issue of printing the agreement.

23         I have what they have attached to their papers.  It's the

24    blank version of the agreement they claim people have signed.

25    It's somewhere in one of these.  This is the arbitration

1    agreement.  And my theory is they could attach it to someone

2    and say:  Yes, I signed this and agreed or not.

3         They haven't done that to AAA, and they haven't done it

4    today, and they haven't done it for the hearing scheduled in

5    January.

6         This is not a class.  They are individuals.  It's not too

7    much to ask for them to say individually:  This is my lawyer.

8    Here is my declaration.  Here is my demand to arbitrate.  Here

9    is my demand for money.  It's not that complicated.

10        I know Your Honor thinks that we're wiggling.  I want to

11   set the record straight.  It's not a Herculean effort to do

12   that.

13            THE COURT:  All right.

14        MR. POSTMAN:  May I add one thing just for clarity,

15   Your Honor?

16            THE COURT:  Of course.

17        MR. POSTMAN:  I appreciate the stipulation about

18   being able to go back to AAA.

19        The reason I was surprised by it is because the CPR

20   agreement really looks differently.  It says that that

21   agreement:

22            "...supersedes any prior contract between the

23        parties and shall constitute the entire agreement and

24        understanding between the parties."

25        And then it says, again, in the arbitration provision

1   that:

2           "This mutual arbitration provision" -- the

3       November 9th one -- "is the full and complete

4       agreement relating to the formal resolution of

5       disputes covered by this mutual arbitration

6       agreement."

7       And it says:

8           "If the contractor opts out, the contractor will

9       not be subject to this provision."

10      So that doesn't say you get to go back to AAA.  It says

11  the one agreement, the CPR one, no longer applies.

12      I respectfully -- I think they got caught with their hand

13  in the cookie jar and they are trying to give it back.  I'll

14  take it.  But I don't want any confusion later that --

15          **THE COURT:**  Well, all right.  I have a question on

16  that, too.

17      When I was looking at this, admittedly on a hurry-up

18  basis, because this was an emergency motion, I said to myself:

19  Well, one way to read all this is just the way you described it

20  for DoorDash, is that AAA comes back to life for those people

21  who opt out if they, in fact, had a AAA agreement to begin

22  with.

23      And then it occurred to me, well, it could be that that's

24  what DoorDash wants us to believe, but then they are going to

25  play a trick on me.  I'm being a little cynical here.  After 20

 1   years on this job, forgive me, I am a little cynical.

 2       And the cynical thing would be to say, just like counsel

 3   just said, the new DoorDash agreement with CPR that refers to

 4   CPR, yes, you can opt out of it, but if you opt out of it, then

 5   you get to go to court.  But since there is a class action

 6   waiver, it will still be an individual case.

 7       Now, you're telling me that that is not your

 8   interpretation; that your interpretation is if you opt out of

 9   it, you get to go to AAA, if you had a prior agreement on AAA.

10       **MR. FOGELMAN:**  Yes.

11       **THE COURT:**  All right.  With that statement, I don't

12   think there is any need for emergency relief today.

13       However, I'm going to allow expedited discovery effective

14   immediately.  You can get in there and start taking depositions

15   on both sides and limited document requests, but you can take

16   document requests.  Don't do 35.

17       I'll give each side ten document requests, and I'll give

18   each side four depositions, all to be -- when is this hearing

19   in January?

20       **MR. FOGELMAN:**  Your Honor, I think it's mid January.

21   The 17th maybe?

22       **THE COURT:**  I know that this may wreck your holidays.

23   It's too bad.  That's the way it is.  You big firms, you get

24   big pay.  You get big -- that's why you're here.  It's part of

25   the burden.  You don't --

```
 1              MR. DICK:  January 9th, Your Honor.

 2              MR. FOGELMAN:  What is it?

 3              MR. DICK:  January 9th.

 4              MR. FOGELMAN:  January 9th, Your Honor.

 5              THE COURT:  So I think all this discovery ought to be

 6   done by December 15th.

 7              MR. FOGELMAN:  Your Honor, if I may just briefly.

 8              THE COURT:  Please, go ahead.

 9              MR. FOGELMAN:  As I mentioned at the beginning, just

10   so it was clear, there was a motion for preliminary class

11   settlement approval filed on Friday or Thursday at midnight, I

12   forget what, and these people are all going to have an

13   opportunity to participate in that resolution.

14              THE COURT:  Tell me about that case.  I don't even

15   know what case you're talking about.

16              MR. FOGELMAN:  It's the Marciano case.  I forget the

17   case number.

18              THE COURT:  What court is it in?

19              MR. FOGELMAN:  It's in San Francisco Superior Court,

20   Your Honor.  I have the case number.

21              THE COURT:  Are you the lawyer in that case?

22              MR. POSTMAN:  No.

23              THE COURT:  What, was this some kind of a sweetheart

24   deal?

25              MR. FOGELMAN:  No, Your Honor.  It's, like,
```

1   $40 million.  It's something like that.  It's a dozen or 20

2   cases that are pending that are being resolved.  I forgot the

3   exact number.

4        The person who filed the preliminary approval filed it in

5   Superior Court in the *Marciano* case.

6        I'll tell you the case number.  Give me a second, I'll

7   give that to you here.

8        *Marciano versus DoorDash*, CGC 18-567869.  There will be a

9   hearing on December 17th for preliminary approval.  At that

10  point if it's approved, they will have a chance either

11  participate or opt out.

12       **THE COURT:**  My Law Clerk tells me they have related

13  that case somehow to me.

14       **THE LAW CLERK:**  Not yet.

15       **THE COURT:**  Not yet?  Okay.

16       **MR. FOGELMAN:**  So, Your Honor, on December 17th will

17  be a hearing on preliminary approval.  And at that point if

18  it's approved, which I obviously hope, then I'll have a chance

19  to participate or opt out.

20       It does not make sense in light of that to be doing

21  expedited discovery up until December 15th about a motion to

22  compel arbitration, which I think is both ill-fated because of

23  lack of evidence and likely moot.

24       I would instead ask the Court to take the existing hearing

25  date in January and make it a check-back or a status so we

1   can decide -- we can inform the Court whether or not that

2   settlement was approved, and counsel can indicate whether its

3   clients intend to opt out or not.

4        But it doesn't make any sense to spend all the resources

5   and time on this now in light of that.  That's one of the

6   reasons I brought it up.

7             THE COURT:  Tell me, are your clients going to opt

8   out of that settlement, assuming it gets preliminary approval?

9             MR. POSTMAN:  We haven't seen it yet, so I'd have to

10  look at it.  I think --

11            THE COURT:  Is the 40 million, any of that money

12  comes back to the client?

13            MR. FOGELMAN:  None.

14            THE COURT:  What is it for?  It's 40 million

15  nationwide?

16            MR. FOGELMAN:  I believe it's California and

17  Massachusetts.  It's about 400,000 Dashers.  I don't know the

18  exact number.  Please don't quote me on that.  It's

19  approximately --

20            THE COURT:  Two states.  Two states, 40 million?

21            MR. FOGELMAN:  I believe so, Your Honor.  I don't

22  have the papers in front of me.

23        But it's a substantial settlement, Your Honor.  It's

24  not -- it's not in any way going to be a problem getting it

25  approved.

```
 1            THE COURT:  It does sound like a lot of money for two
 2     states.  What do you say to that?
 3            MR. POSTMAN:  I say we'll learn about it.  We've seen
 4     this movie before, though, with overlapping counsel with
 5     Postmates, where after we brought a large number of
 6     arbitrations they didn't like, several months later they
 7     mediated with another lawyer and proposed a class, which is
 8     fine.
 9         But what is amazing to me is that --
10            THE COURT:  But how can they do that if there is a
11     waiver of class actions?
12            MR. POSTMAN:  Exactly.  So there is a way to do it,
13     but not the way they are doing it.
14            THE COURT:  The agreement says that there will be no
15     class actions.
16            MR. POSTMAN:  Exactly.  And it's a mutual arbitration
17     provision.  So whenever they want to stop a class and not want
18     to be a party in a class, they get to send everyone to
19     individual arbitration.
20         But when someone wants to do individual arbitration, they
21     say:  We've agreed with someone else to do a class, and we're
22     going to drag you in as a party, even though our agreement says
23     we can't make you a party to a class.
24            MR. FOGELMAN:  Your Honor, that --
25            MR. POSTMAN:  I'm sorry.
```

1          **THE COURT:**  I think there should be discovery into

2     this other lawsuit to find out what is -- how can you get

3     around your own agreement that says there won't be any class

4     actions?

5          **MR. FOGELMAN:**  So first, Your Honor, the *Marciano*

6     case is what they call a PAGA case.

7          **THE COURT:**  A what?

8          **MR. FOGELMAN:**  A PAGA case.

9          **THE COURT:**  Yes, I know about PAGA.

10         **MR. FOGELMAN:**  And then there are -- other cases were

11    filed, putative class actions that have not been resolved yet.

12         **THE COURT:**  Well, wait.  What do you mean?  It's only

13    a PAGA case?

14         **MR. FOGELMAN:**  Your Honor, I'm saying that particular

15    case was PAGA.  There were others that were filed as putative

16    class actions, and they haven't been resolved yet.  And then

17    there are a variety of others case that are being affected by

18    this.

19         But my point is it doesn't take discovery because there

20    will be a hearing on a preliminary approval motion on

21    December 17th.  At that point, if there's approval, there will

22    be notice procedures issued by the Court.  Not by me, by the

23    Court.  And notice will go out, and they will have an

24    opportunity to consult with their counsel.

25         The only need discovery for that, and we don't need

 1 | discovery for this.

 2 |        THE COURT:  No, no.  PAGA only affects the penalties.

 3 | It doesn't affect the actual money that will go to the class

 4 | members.

 5 |     And number two, I've just got to believe that at least

 6 | some reasonable number of your 2236 will opt out of that deal,

 7 | and so I will still have a case.  I'll still have to make

 8 | rulings on it.  And then we'll be back here in January, and

 9 | you'll say that counsel can't prove his case, but he --

10 |        MR. FOGELMAN:  Your Honor --

11 |        THE COURT:  -- could have if he had some recovery.

12 |        MR. FOGELMAN:  -- I hear you, but remember where we

13 | are today.  The relief that they are requesting wasn't

14 | necessary, and they claim they've got it.

15 |     The Motion to Compel arbitration has been filed --

16 |        THE COURT:  It was necessary.  It wasn't clear that

17 | the people could go back to AAA if they opted out.  That was

18 | not clear going into this motion.

19 |        MR. FOGELMAN:  Okay, Your Honor.

20 |     My other point, Your Honor, is that the Motion to Compel

21 | arbitration has been filed by a single plaintiff, a petitioner.

22 | Okay?  And it's a person who says essentially, I worked --

23 |        THE COURT:  Wait, wait, wait.  That's not my

24 | understanding.  I thought you had 2236 petitioners.

25 |        MR. POSTMAN:  2,236.  They are all being individually

1    entered on the docket.

2            THE COURT:  And you have okay from all 2236?

3            MR. POSTMAN:  Yes.  And we have individual -- again,

4    we're making a mountain out of an evidentiary molehill here.

5        We, in order to save the Court the burden -- and, you

6    know, we're happy to fix this tomorrow.  We've got every single

7    witness statement right here in a box.  We'll put it on

8    electronically, if the Court wants.

9        These are each individual petitioners.  They have got the

10   evidentiary basis they need.

11           THE COURT:  Look.  Look.  Here is the thing.  If

12   DoorDash is going to be arguing with me in January that they

13   don't have agreements, they don't have a dollar amount,

14   whatever those three things were, then you get to go in -- I'm

15   talking to plaintiff now.  You get to go to DoorDash and take

16   discovery so you can prove that.

17       Now, if DoorDash were to say:  Okay, we give up on that

18   picayune point and we concede that you can prove that for all

19   of these people.  Then I'll give up on discovery.

20       But it's unfair to my mind hold that against plaintiffs,

21   to say that they can't point to the specific agreement that

22   they had whenever you know good and well which one it was if

23   you looked at your computer long enough.

24       So I'm going to give them discovery.  If you work that

25   out -- but that's why I'm thinking they get the right to

1   discovery.

2        Now, here is another thing I think you ought to take

3   discovery on, separate from that.  If you're going to -- it's

4   not necessarily so easy to prove that -- for those people who

5   don't opt out in time, you may have to prove unconscionability.

6        Well, you made an accusation that Gibson Dunn had written

7   this thing for CPR.  Well, go take discovery to prove that.

8   Find the CPR people and prove it.  That's true.  I don't know,

9   is it true?

10            MR. FOGELMAN:  Your Honor, we haven't even -- I

11   haven't had a chance to address the 4.2 issue with you, Your

12   Honor, but I completely disagree with any --

13            THE COURT:  I'm not saying it's 4.2.  I'm just saying

14   that it does -- it would be an important fact, to me at least,

15   on unconscionability if in order to get away from the AAA, you

16   ran off to CPR and cooked up some custom made deal, and then --

17   and then you really wrote the terms yourself, and now you're

18   foisting that on to the people who can't opt out within 30

19   days.

20        I'm not saying it's unconscionable yet, but I'm saying

21   there is an issue there --

22            MR. FOGELMAN:  Your Honor --

23            THE COURT:  -- and they ought to take your deposition

24   and the deposition of the people in -- where are they located?

25   Arizona?  Where is CPR located?  Find out if it's true that

1   Gibson Dunn wrote these -- these --

2          **MR. FOGELMAN:**  No one has alleged that, Your Honor.

3          **THE COURT:**  I heard it awhile ago.

4          **MR. FOGELMAN:**  I think he was saying that we helped

5   write the new contract for the client on their terms of

6   service.  I think that --

7          **THE COURT:**  Well, that's not what he --

8          **MR. POSTMAN:**  I'm saying CPR.

9          **THE COURT:**  CPR.

10          **MR. POSTMAN:**  And the reason, there is strong

11  circumstantial evidence, which is the new CPR protocol was

12  announced either on November 4th or 6th.  There is a press

13  release on November 6th.  The rules are dated November 4th.  By

14  Saturday, November 9th, they had already written it into their

15  new agreement and pushed it out the day after the --

16          **MR. FOGELMAN:**  Your Honor --

17          **THE COURT:**  I will give you one deposition.  Go to

18  CPR, do a 30(b)(6).  And then all the communications with

19  Gibson Dunn, with DoorDash, to show how the rule got written.

20          **MR. POSTMAN:**  Thank you, Your Honor.

21          **THE COURT:**  That would be something that might -- it

22  would surely add color to the case.

23      Yes, sir.

24          **MR. FOGELMAN:**  But with all due respect, you're now

25  writing a case for them that hasn't been filed yet, and that's

1   not what --

2           THE COURT:  Well, that's what he told me.

3           MR. FOGELMAN:  Not what --

4           THE COURT:  He told me today.

5           MR. FOGELMAN:  Well, hold on, Your Honor.

6       The Motion to Compel arbitration has a filing already.

7   There is a motion on file.  It doesn't say they need discovery.

8   He doesn't ask for discovery.  It simply says that they have

9   arbitration agreements for the AAA.

10      Our response to that is due in a few weeks, but he will

11  say, among other things, what I told you.  Where is the actual

12  agreement to arbitrate?  It's not attached to the Motion to

13  Compel, and it wasn't attached earlier.

14          THE COURT:  I'm going to let them take discovery to

15  get that.

16          MR. FOGELMAN:  What discovery do they need?  They

17  know they did agree or did not, Your Honor.  They don't even --

18          THE COURT:  I'm overruling that objection.

19          MR. FOGELMAN:  All right, Your Honor.

20          THE COURT:  I'm going to make them -- I'm going to

21  make you go sit in front of a computer screen and call it up

22  and say:  Here is the agreement that he signed.

23          MR. FOGELMAN:  Okay.  Would you also agree then, Your

24  Honor, that as part of that process, that plaintiffs have to

25  provide sufficient information for that search to be done?  It

```
 1    isn't just a name in a complaint.

 2              THE COURT:  Well, the name would be enough, in my

 3    judgment.

 4              MR. POSTMAN:  Your Honor, we will stipulate to

 5    provide email address, phone number, address, name.

 6              THE COURT:  All right.

 7              MR. POSTMAN:  We have provided it already.

 8              THE COURT:  I'm telling you in every other -- in

 9    today's environment, this is something that the lawyers would

10    be able to work out and not have to take discovery.

11              MR. POSTMAN:  Four requests.

12              THE COURT:  If it comes to it, I'm going to let him

13    take the deposition.

14         MR. FOGELMAN:  All right, Your Honor.  Hopefully, we

15    will get the information in which that can be done.

16         But even so, the burden of anyone moving to compel

17    arbitration is always on the person moving.

18              THE COURT:  What am I missing here?  He comes in with

19    a showing, plaintiff, for 2236.  Let's say he's got 234 who

20    opted out of the new deal.  They clicked through it, but they

21    opted out of the CPR.  And then they say we, therefore, want to

22    go to AAA.  Compel them to go to AAA.  And then I -- why

23    shouldn't I just say --

24              MR. FOGELMAN:  Let me answer it in three ways.

25         First, I think you're assuming a lot more than the facts
```

 1   will justify.  For example, it might be that 1850 of those

 2   people won't even click on the website between now and the

 3   hearing on this Motion to Compel, whenever it is.  And we don't

 4   know what percentage who clicked through would agree.  And

 5   those who clicked through and agree, how many will opt out.

 6   They will have 30 days from the time they agree, if they

 7   clicked on and agreed.

 8        So that could happen on a rolling basis over the next

 9   year.  That's not going to happen between now and the end of

10   the year.

11            THE COURT:  But we will have some who have not

12   clicked on the new agreement at all and they have the AAA.  And

13   I'm going to probably compel you to arbitrate them.

14        And then we'll have the next group that clicked on to the

15   CPR, but opted out of the CPR.  And probably I'm going to

16   compel you to arbitrate those.  And then we'll have the group

17   that clicked on and forgot to opt out.  That's the harder case.

18   I don't know the answer to that.

19        And I'm not even saying for sure I would -- I'm just

20   saying that's the way I can see this working out, because it

21   can't be that they can't find -- that you can't find the

22   agreements.

23            MR. FOGELMAN:  Your Honor, as I said, if a sufficient

24   information were provided, it would be something that could be

25   found, if they are this the system.

 1          But there were almost a thousand that weren't in the

 2     system originally.  I don't know how many of the 2200 we're

 3     here for today are in the system, and I don't know if we'll

 4     have that information before the end of the year.

 5          All I'm saying, Your Honor, is that between the lack of

 6     information on which of their clients are going to want to go

 7     elsewhere, the lack of information on which their clients are

 8     going to want to settle their claims in the class action, it

 9     doesn't make sense to have either discovery or briefing in

10     anticipation of a January 7th or 9th --

11          **THE COURT:**  I'm not giving up on briefing, and we're

12     going to go ahead with our hearing --

13          **MR. FOGELMAN:**  Very well, Your Honor.

14          **THE COURT:**  -- and reasonable discovery.

15          Now, counsel on the plaintiff's side, if they come across

16     with the documents you need and the admissions that you need,

17     don't just put them to time and pain and suffering --

18          **MR. POSTMAN:**  Of course not.

19          **THE COURT:**  -- for the sake of it.

20          **MR. POSTMAN:**  Your Honor --

21          **THE COURT:**  But when we get to that day, I'm going to

22     want a breakdown of the 2236:  192 fall in this category, 1009

23     fall in that category.  So that we can -- so that maybe relief

24     is only granted as to 1,009.

25          **MR. POSTMAN:**  I understand, Your Honor.  My

```
 1   counterpart has actually, to my knowledge, not been involved in
 2   these matters up until recently.  So he may not be familiar
 3   with this, but I've said it once and I need to correct the
 4   record again.
 5        We have given DoorDash an email, a phone number, an
 6   address for every single one of petitioners.  They have
 7   searched some different lists looking only for email, not tried
 8   anything else.  And they haven't conferred with us despite four
 9   requests.
10        So I appreciate Your Honor giving us the opportunity,
11   given that intransigence, to try to do that.
12        MR. FOGELMAN:  Counsel is correct.  I am new to the
13   matter, Your Honor, but I don't think that's accurate.
14        The email addresses that were the first ones provided, at
15   least, are email addresses that seem to be new and not in our
16   system.  Some are in the system.
17        That said, Your Honor, when we come back on whatever date
18   it's going to be, I'm going to -- if you want to hear this at
19   all, I'm going to ask that you would condition, that's what
20   we're going to include, the bare compliance with AAA rules that
21   every litigant would expect.
22        That is, they have an agreement to arbitrate.  Here is
23   their claim and here is the amount in controversy.  Because if
24   it's a $20 claim, that's going to make a difference on how
25   everyone approaches it.
```

 1          It's not that complicated.  That's why we got stuck in the

 2   AAA in the first place.

 3          **THE COURT:**  I have a comment now for plaintiff.

 4          You have a lot of things possibly going for you in this

 5   case, but you should not jeopardize those by not dotting every

 6   "i" and crossing every "t."

 7          And if the rules require what counsel just said, don't

 8   blow that off.  Don't put yourself in a position where you're

 9   saying:  Oh, we just did ditto for case -- after the first 13,

10   we decided we -- no.  2236 cases have all got to be documented

11   perfectly.

12          Don't bring up some bogus issue that puts me in the

13   position of having to decide, well, he could have done it

14   right, but he didn't do it right.  No.  Do it right.

15          **MR. POSTMAN:**  I appreciate that, Your Honor, and we

16   try every day to do that.

17          If I may, I do want to point out that there is a process

18   for deciding what is required, and we submitted everything we

19   believed that was required to AAA.  AAA, which under their

20   contract is the exclusive determiner of what is required, said

21   it was proper.  They never raised these arguments once through

22   the process.  And then AAA said:  You've done everything right,

23   and -- but they are not paying, so we're closing it.

24          I mean, we could have potentially done things differently

25   had they raised these arguments earlier in the process had AAA

```
 1   said so.  But we have -- according to the relevant
 2   decision-maker under their contract and their very broad
 3   delegation clause, it's already been determined that we've
 4   dotted of "i" and crossed every "t."  And we're happy to
 5   bring --
 6            THE COURT:  Does your record now prove that?
 7            MR. POSTMAN:  Yes.
 8            THE COURT:  In the record before me?
 9            MR. POSTMAN:  Yes.  5-11, email from the AAA
10   administrator:
11            "We have made an administrative determination the
12        minimum filing requirements have been met by
13        claimants."
14            THE COURT:  Are all 2236?
15            MR. POSTMAN:  Yes.  This is referring to all of them.
16   And I'm happy to walk through in their contract why this
17   finding is conclusive.  And our brief speaks to that to some
18   degree.
19            MR. FOGELMAN:  Your Honor, we're not talking about
20   AAA, where some administrator made a finding based on a limited
21   record.  We're talking about the Motion to Compel before Your
22   Honor.  And we're asking if they can establish that they have a
23   right to arbitrate.  And if so, they comply with the bare
24   minimum that the rules require, which are part of our
25   agreement.
```

 1          We're not here to discuss that.   I was just previewing it

 2     for Your Honor because you were raising it.

 3          **THE COURT:**  All Right.   I'm not going to rule on

 4     this.

 5          Plaintiff, you're not -- I'm not the AAA.   I am being

 6     asked to invoke the equity jurisdiction of the court.   And what

 7     the other side is saying is you've got to prove these certain

 8     prerequisites before you get relief.

 9          **MR. POSTMAN:**  We will prove every single --

10          **THE COURT:**  If you want to gamble on that email from

11     the AAA, you can gamble on it, but I'm not saying you're going

12     to win on that.   I'm not going to say you're going to lose on

13     that.

14          My plea to you is:  Why do you want to put the poor judge

15     in that position?  Why can't you do your job and have a

16     bulletproof record here.   You could.   You could.

17          **MR. POSTMAN:**  We will have a bulletproof record here

18     on every requirement that is required for the Court to compel

19     arbitration.

20          I believe we are going to disagree about what the

21     requirements are, and we can't go back and fix what we

22     submitted to AAA.   We could have done it differently, but

23     AAA --

24          **THE COURT:**  You can fix what you're submitting to me.

25          **MR. POSTMAN:**  Yes.   And we will -- we will submit --

1          **THE COURT:**  You have my permission to beef up your

2    record before the January 6th hearing.

3          This can't be on January 6th because I'm not going to be

4    here that day.  What day is it?  That whole week --

5          **MR. FOGELMAN:**  The 9th, Your Honor.

6          **THE COURT:**  I'm not going to be here that day.  We're

7    going to have to move it the following week.

8          **MR. FOGELMAN:**  Your Honor, I would, if I could, ask

9    that counsel simply confer with us because we're going to need

10   to have a complete motion package to respond to.  So we have to

11   discuss briefing and maybe a better hearing date that will

12   allow for that and allow for you to be here.

13         **THE COURT:**  All right.  You all work that out between

14   yourselves, but I'm going to have to slip it for one week.

15         **MR. FOGELMAN:**  Thank you, Your Honor.  I understand

16   for today's motion, the motion has been withdrawn.

17         **MR. POSTMAN:**  Would you like us to withdraw it, Your

18   Honor?

19         **THE COURT:**  Yes.

20         **MR. POSTMAN:**  The motion is withdrawn.

21         **THE COURT:**  All right.

22         **MR. FOGELMAN:**  Thank you for your time, Your Honor.

23         **THE COURT:**  All right.  Thank you.

24         (Proceedings adjourned.)

25

## CERTIFICATE OF OFFICIAL REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, November 26, 2019