GIBSON, DUNN & CRUTCHER LLP
JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:   415.393.8200
Facsimile:    415.393.8306

JAMES FOGELMAN, SBN 161584
  jfogelman@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MICHAEL HOLECEK, SBN 281034
  mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213.229.7000
Facsimile:    213.229.7520

Attorneys for Respondent DOORDASH, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| TERRELL ABERNATHY, et al.,<br><br>        Petitioners,<br><br>    v.<br><br>DOORDASH, INC.,<br><br>        Respondent. | CASE NOS.   3:19-cv-07545-WHA<br>                      3:19-cv-07646-WHA<br><br>**RESPONDENT DOORDASH, INC.'S OPPOSITION TO PETITIONERS' AMENDED MOTION TO COMPEL ARBITRATION**<br><br>[*Declarations of Richard Zitrin, Marta Vovchenko, Andrew Spurchise, Joshua Lipshutz, and Michael Holecek filed concurrently herewith*] |
| CHRISTINE BOYD, et al.,<br><br>        Petitioners,<br><br>    v.<br><br>DOORDASH, INC.,<br><br>        Respondent. | Action Filed:  November 15, 2019<br><br>Hearing Date: February 10, 2020<br>Hearing Time: 2:00 p.m.<br>Hearing Place: Courtroom 12 – 19th Floor<br>Honorable William Alsup |

Gibson, Dunn &
Crutcher LLP

**TABLE OF CONTENTS**

Page

INTRODUCTION ............................................................................................................... 1

STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY ....................................... 4

    A.    Keller Lenkner Seeks A Quick Payout By Threatening DoorDash With Millions Of Dollars In Nonrefundable Arbitration Filing Fees ................................. 4

    B.    DoorDash Pays AAA Filing Fees For 250 Keller Lenkner Arbitrations .................... 5

    C.    Keller Lenkner Files Thousands Of Deficient Arbitration Demands With AAA ......... 6

    D.    Gibson Dunn And Other Law Firms Urge Arbitration Organizations To Develop A Fair, Workable Solution To Mass Arbitration ............................................. 7

    E.    DoorDash Incorporates The CPR Protocol Into Its ICA On A Going-Forward Basis .......................................................................................................................... 10

    F.    Keller Lenkner Files Two Petitions To Compel Thousands of Arbitrations ............. 10

    G.    The Parties Exchange Information And Keller Lenkner Files An Amended Motion That Removes Hundreds Of Petitioners ........................................................... 11

    H.    Petitioners' DocuSign Certificates Raise Even More Questions ................................ 13

LEGAL STANDARD ........................................................................................................... 14

ARGUMENT ...................................................................................................................... 14

    A.    The Evidence So Far Indicates Keller Lenkner May Not Represent Many Petitioners And Has Not Properly Vetted Their Claims ............................................. 15

        1.    Approximately 361 Original Petitioners Have No Conceivable Claim Against DoorDash .......................................................................................... 15

        2.    Approximately 448 Petitioners Appear On Other Firms' Client Lists .......... 16

        3.    869 Petitioners Failed To Submit Declarations Complying With This Court's Order ................................................................................................... 17

        4.    Petitioners' DocuSign Certificates Of Completion Raise More Questions Regarding Who Actually Represents Petitioners ......................... 18

        5.    Any Dispute Over The CPR Protocol Is Not Properly Before This Court ............................................................................................................... 20

    B.    Alternatively, The Court Should Stay This Action Pending Final Approval Of The *Marciano* Settlement ......................................................................................... 21

    C.    S.B. 707 Is Inapplicable To This Case And Preempted By The FAA ....................... 21

        1.    S.B. 707 Does Not Apply Retroactively To Arbitrations Closed In 2019 ...... 22

        2.    S.B. 707 Is Preempted By The FAA .............................................................. 23

CONCLUSION ................................................................................................................... 25

1

# TABLE OF AUTHORITIES

2

Page(s)

3

## Cases

4

*Adams v. Postmates, Inc.*,
   No. 4:19-cv-3042 (N.D. Cal. Oct. 10, 2019) ........................................................................16, 23

5

*AT&T Mobility LLC v. Bernardi*,
6   No. 3:11-cv-03992-CRB (N.D. Cal. Oct. 26, 2011) ....................................................................24

7

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011) ........................................................................................................23, 24, 25

8

*Bernal v. Sw. & Pac. Specialty Fin., Inc.*,
9   2013 WL 5539563 (N.D. Cal. Oct. 8, 2013) ..........................................................................17, 18

10

*Blair v. Rent-A-Ctr., Inc.*,
   928 F.3d 819 (9th Cir. 2019) ......................................................................................................24

11

*Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*,
12   498 U.S. 533 (1991) .....................................................................................................................16

13

*In re: CenturyLink Sales Practices & Sec. Litig.*,
   No. 17-md-2795-MJD-KMM (D. Minn. Jan. 10, 2020) ..........................................................2, 19

14

*Chambers v. NASCO, Inc.*,
15   501 U.S. 32 (1991) .......................................................................................................................15

16

*Cole v. U.S. Dist. Court*,
   366 F.3d 813 (9th Cir. 2004) ......................................................................................................15

17

*Dealer Comput. Serv., Inc. v. Old Colony Motors, Inc.*,
18   588 F.3d 884 (5th Cir. 2009) ................................................................................................16, 23

19

*Doctor's Assocs., Inc. v. Casaratto*,
   517 U.S. 681 (1996) .....................................................................................................................24

20

*Epic Sys. Corp. v. Lewis*,
21   138 S. Ct. 1612 (2018) ...........................................................................................................24, 25

22

*Gelow v. Cent. Pac. Mortg. Corp.*,
   560 F. Supp. 2d 972 (E.D. Cal. 2008) .........................................................................................17

23

*Goldman, Sachs & Co. v. City of Reno*,
24   747 F.3d 733 (9th Cir. 2014) ......................................................................................................17

25

*Graves v. U.S. Coast Guard*,
   692 F.2d 71 (9th Cir. 1982) .........................................................................................................14

26

*Kindred Nursing Ctrs. Ltd. P'ship v. Clark*,
27   137 S. Ct. 1421 (2017) ...........................................................................................................23, 24

28

*King v. AxleHire, Inc.*,
   2019 WL 1925493 (N.D. Cal. Apr. 30, 2019) .............................................................................17

*Kum Tat Ltd. v. Linden Ox Pasture, LLC*,
   845 F.3d 979 (9th Cir. 2017)..............................................................................17

*Landgraf v. USI Film Prods.*,
   511 U.S. 244 (1994)........................................................................................22

*LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*,
   2018 WL 3126389 (N.D. Cal. Jun. 26, 2018).................................................18

*Lifescan, Inc. v. Premier Diabetic Serv., Inc.*,
   363 F.3d 1010 (9th Cir. 2004).....................................................................16, 23

*Marmet Health Care Ctr., Inc. v. Brown*,
   565 U.S. 530  (2012)........................................................................................23

*Mayo v. Dean Witter Reynolds, Inc.*,
   258 F. Supp. 2d 1097 (N.D. Cal. 2003) ..........................................................25

*McClung v. Emp't Dev. Dep't*,
   99 P.3d 1015 (Cal. 2004) ................................................................................22

*Newton v. Am. Debt Servs., Inc.*,
   854 F. Supp. 2d 712 (N.D. Cal. 2012) ............................................................17

*O'Connor v. Uber Techs., Inc.*,
   No. 15-17420, Dkt. 20 (9th Cir. Mar. 25, 2016) .............................................21

*Rich & Whillock, Inc. v. Ashton Dev., Inc.*
   157 Cal. App. 3d 1154 (1984) .........................................................................24

*Rushing v. Viacom Inc.*,
   2018 WL 4998139 (N.D. Cal. Oct. 15, 2018) .................................................18

*Russello v. United States*,
   464 U.S. 16 (1983) ..........................................................................................22

*Sweeney v. Tractor Supply Co.*,
   390 F. Supp. 3d 1152 (N.D. Cal. 2019) ..........................................................14

*VHS Univ. Labs., Inc. v. Local 283 of the Int'l Bhd. of Teamsters, Chauffeurs,*
   *Warehousemen, & Helpers of Am.*,
   54 F. Supp. 3d 827 (E.D. Mich. 2014)........................................................16, 23

**Statutes**

9 U.S.C. § 2 .....................................................................................................23

9 U.S.C. § 4 .....................................................................................................17

Cal. Civ. Proc. Code § 1281.96(g) ..................................................................22

Cal. Civ. Proc. Code § 1281.97.......................................................................22

Cal. Civ. Proc. Code § 1281.97(a) ..................................................................23

Cal. Civ. Proc. Code § 1281.97(b) ..................................................................23

Cal. Civ. Proc. Code § 1281.97(d) ........................................................................................23

Cal. Civ. Proc. Code § 1281.99 ...........................................................................................23

**Rules**

AAA Employment Arbitration Rule 4(b)(i)(1) .................................................................6, 7

AAA Employment Arbitration Rule 43 ..............................................................................25

Fed. R. Civ. P. 11(b)(3) .......................................................................................................16

**Other Authorities**

AAA, *Employment/Workplace Fee Schedule* (Nov. 1, 2019), https://bit.ly/2rWv3V3 ...................6, 8

Alison Frankel, REUTERS, "Ex-judge atop controversial mass arbitration program: Give it a chance to work" (Dec. 23, 2019), https://reut.rs/2thkGMG ................................3

Chandrasekher & Horton, "Arbitration Nation: Data from Four Providers," 107 CAL. L. R. 1 (2019) ................................................................................................................6

Chris Villani, *Ruling on Arbitration Due Soon In DraftKings & FanDuel MDL*, Law360 (Aug. 28, 2019), https://bit.ly/34tCtgc ....................................................................5

CPR, "Former U.S. District Court Judge for the Southern District of New York, Shira Scheindlin, Named Administrative Arbitrator for CPR's Mass Claims Protocol" (Dec. 16, 2019), https://bit.ly/2tYAfIU ..............................................................9, 10, 21

CPR, *More on Mass Individual Arbitration As an Alternative to Class Arbitration* (Feb. 15, 2019), https://bit.ly/35LjXS5 ................................................................................8

Erin Mulvaney, *"Calling Uber on Their Bluff," Plaintiffs Lawyers Strike Back to Compel Arbitration*, Law.com (Dec. 6, 2018), https://bit.ly/2Z2yJkB ............................5

Erin Mulvaney, *Plaintiffs Lawyers Pressure Lyft to Pay Millions in Arbitration Fees*, Law.com (Dec. 14, 2018), https://bit.ly/2Z11iit ....................................................................5

https://bit.ly/2TfT8BI .........................................................................................................14

JAMS, "ADR Frequently Asked Questions," https://bit.ly/2spN92w ...................................6

Pioneer Town Media, "What We Do," https://bit.ly/2Fx8YjD ...............................................13

S.B. 707, 2019-2020 Reg. Sess. (Cal. 2019) .......................................................................22

Gibson, Dunn & Crutcher LLP

## INTRODUCTION

DoorDash stands by its arbitration agreements.  Many of the Petitioners in this case have valid and enforceable arbitration agreements with DoorDash and DoorDash intends to honor them.  Before that happens, however, this Court should ensure that both sides' contractual and due process rights are protected—something AAA has thus far refused to do.  Even though Keller Lenkner tried to force DoorDash into paying nearly $12 million in nonrefundable AAA filing fees for 6,250 claimants, it has become clear that a substantial number of Petitioners have no arbitrable claims against DoorDash, and indeed some never even signed up for a DoorDash account.  Further, the evidence so far calls into question whether Keller Lenkner actually represents many of the Petitioners in this action.  Nearly each day, new facts come to light that support DoorDash's decision not to pay millions of dollars in nonrefundable filing fees to AAA and to seek another arbitration provider for future arbitrations—one that understands the serious due process concerns raised by these types of mass arbitrations and, unlike AAA, is willing to develop procedures to handle them fairly and efficiently.

Now that Keller Lenkner has provided DoorDash with more information about the Petitioners, DoorDash has discovered the following:

- Approximately 104 original Petitioners are entirely unknown to DoorDash, having never signed up for a Dasher[1] account on the DoorDash platform;

- Approximately 39 original Petitioners never completed the Dasher account creation process, meaning they were never eligible to perform any services using the DoorDash platform;

- Approximately 133 original Petitioners completed the Dasher account creation process but never actually performed any work using the DoorDash platform.

Those three groups alone represent over $500,000 in nonrefundable filing fees that a AAA administrator commanded DoorDash to pay, even though the claims being asserted on those Petitioners' behalf would not have satisfied Rule 11.  And, indeed, in its Amended Motion to Compel Arbitration, Keller Lenkner withdrew these and other Petitioners from this case (361 in total), essentially conceding there is no basis to arbitrate their claims.  But there is more:

---

[1]  DoorDash refers to independent contractors who use the DoorDash platform to find delivery opportunities as "Dashers."

Gibson, Dunn & Crutcher LLP

- Approximately 448 of the remaining Petitioners that are supposedly represented by Keller Lenkner in this case appear to be represented by *different law firms*, based on the client lists and arbitration demands that other plaintiffs' firms have submitted to DoorDash;

- Despite being required by this Court to obtain declarations from their clients attesting to the facts necessary to compel arbitration, Keller Lenkner was unable to secure signed declarations from 869 of the remaining Petitioners;

- The declarations that Petitioners did submit contain electronic signatures, and the "certificates of completion" associated with those e-signatures suggest that Petitioners are represented by a solo practitioner in New York named Jeremy Troxel, not by Keller Lenkner. Mr. Troxel has not made any appearance in this case and is not licensed to practice law in California;

- The certificates further indicate that communications with the Petitioners are being handled by a telemarketing company named Pioneer Town Media, raising serious questions about how Keller Lenkner (or Mr. Troxel) procured these "clients" in the first place.

DoorDash's investigation continues. But based on the current record, it would be premature for the Court to grant Keller Lenkner's motion to compel arbitration.

In addition, before compelling arbitration of Petitioners' claims, this Court should protect Petitioners' right to participate in the $39.5 million *Marciano* settlement, which would provide each Petitioner with a substantial sum of money and release their claims. The San Francisco Superior Court is scheduled to hold a preliminary approval hearing on January 30, 2020, and, once the settlement is preliminarily approved, Petitioners will receive notice of the settlement and the ability to opt out. Compelling the parties to arbitrate and triggering nonrefundable fees on both sides makes little sense unless Petitioners confirm that is their desire, based on full knowledge of the offer on the table. In fact, just last week, the parties to a class-action settlement in the District of Minnesota filed a lawsuit asserting that Keller Lenkner is concealing a similar class-wide settlement from its purported clients in order to manufacture thousands of mass-arbitration demands and subvert the settlement. Nationally recognized ethics professor Nancy Moore opined that Keller Lenkner's conduct was both dishonest and contrary to the rules of professional ethics. *See In re: CenturyLink Sales Practices & Sec. Litig.*, No. 17-md-2795-MJD-KMM, Dkt. 510 (D. Minn. Jan. 10, 2020) (attached as Lipshutz Decl. Ex. P). In this case, California ethics expert Richard Zitrin has similarly opined that Keller Lenkner may have violated American Bar Association and California ethics standards designed to protect its clients' interests. *See* Zitrin Decl. ¶¶ 16–17, 29.

DoorDash is—and always has been—willing to arbitrate claims with Dashers who actually entered into arbitration agreements with DoorDash, follow the applicable arbitration-filing rules, and

submit non-frivolous arbitration claims themselves or through their actual lawyers.  Indeed, DoorDash paid $475,000 in filing fees to AAA to arbitrate the first 250 of Keller Lenkner's purported clients in August 2019.  But AAA has made virtually no progress on the initial 250 arbitrations that DoorDash paid for nearly five months ago—it has not even assigned arbitrators to approximately 180 of those cases, and has scheduled an arbitration in only one of the cases.  DoorDash should not be forced to pay millions of dollars in nonrefundable filing fees simply because Keller Lenkner submits a list of names to AAA, without establishing an attorney-client relationship or properly vetting those petitioners' claims—let alone giving DoorDash an opportunity to vet the names and ensure that claimants and their counsel have followed the rules.  When this Court does grant arbitration for certain Petitioners, it should take steps to ensure that AAA protects the parties' contractual and due process rights, rather than simply collecting millions of dollars in administrative fees so the claims can sit on the shelf for months or years on end.

Keller Lenkner also attacks DoorDash's decision to switch to a *new* arbitration provider (CPR) that developed a mass-arbitration protocol aimed at resolving claims efficiently and expediently.  But that issue is not before the Court; DoorDash is not seeking to force any of the Petitioners in this case to use CPR.  In any event, Keller Lenkner's allegations have been thoroughly debunked by CPR's President, who testified under oath that his team (not Gibson Dunn or DoorDash) created the new protocol and refuted Keller Lenkner's theory that DoorDash and Gibson Dunn coerced CPR into doing so.  In fact, CPR retained the Hon. Shira Scheindlin to be in charge of its new mass-arbitration protocol and ensure it is carried out in a fair and equitable manner.  *See* Alison Frankel, REUTERS, "Ex-judge atop controversial mass arbitration program: Give it a chance to work" (Dec. 23, 2019), https://reut.rs/2thkGMG.  As Judge Scheindlin—who "ha[s] credibility with both sides of the bar"— exhorted, "[i]t should at least be tried."  *Id.*

From day one, all DoorDash has wanted is an orderly approach to vetting and arbitrating thousands of claims before it is forced to pay millions of dollars in nonrefundable fees—something it is finally getting in this Court and which should continue until it is clear that Petitioners have arbitrable claims and are properly represented by Keller Lenkner.  Requiring the parties here to proceed in an organized way such that only bona fide claims are pursued in arbitration ensures that: (i) DoorDash's

Gibson, Dunn &
Crutcher LLP

due process rights are protected, (ii) DoorDash will not pay millions of dollars in up-front fees for arbitrations that should never happen either because the Petitioner has no claim or would rather accept the *Marciano* settlement, and (iii) Petitioners are proceeding with this litigation only if they have given informed consent to their counsel of choice.  In contrast, Permitting Keller Lenkner to rush to AAA would harm both DoorDash and Petitioners.

Alternatively, as set forth in DoorDash's concurrently filed motion to stay, the Court should stay this action pending the $39.5 million *Marciano* settlement, which would resolve nearly all of Petitioners' claims.  A stay would allow the Court and parties time to determine which of the thousands of Petitioners chooses to accept the settlement and release their claims before spending resources initiating unnecessary arbitrations.

## STATEMENT OF RELEVANT FACTS AND PROCEDURAL HISTORY

**A.    Keller Lenkner Seeks A Quick Payout By Threatening DoorDash With Millions Of Dollars In Nonrefundable Arbitration Filing Fees**

In March 2019, Keller Lenkner sent a letter to DoorDash purporting to represent more than 3,000 "Dashers" who allegedly were misclassified as independent contractors.  *See* Dkt. 35-5 Ex. A. The letter expressed an intent to file arbitration demands on behalf of those delivery providers, warning DoorDash of the administrative costs of doing so:

> Although DoorDash's agreement requires individual arbitration, we understand that individual arbitration is expensive.  As you know, DoorDash's agreement requires DoorDash to pay all arbitration-related costs, including arbitration retainers and filing fees. Applying its Employment/Workplace Fee Schedule, AAA will require DoorDash to pay a $2,200 filing fee, a $750 administrative fee, and an arbitrator's retainer of $4,000 or more.

> If we conclude that it is necessary to proceed to arbitration, we believe it is in our clients' interests to proceed with every arbitration simultaneously.  Based on 3,000 drivers, ***proceeding to arbitration would obligate DoorDash to pay AAA more than $20 million***— to say nothing of DoorDash's attorneys' fees and its underlying liability, which we believe is substantial.  ***These numbers will continue to grow***, as several hundred additional DoorDash drivers engage our firm each week.

*Id.* (emphasis added).  The letter went on to explain Keller Lenkner's true intention:  extract a multi-million dollar payment from DoorDash to avoid the administrative costs of these arbitrations, irrespective of the merits of their alleged clients' claims.  "Before we serve demands on AAA that will trigger DoorDash's obligation to pay the costs outlined above, it would be sensible for the parties to

1    explore whether we can agree on an alternative process for resolving our clients' claims."  *Id.*

2          Keller Lenkner has deployed this same strategy against other companies—using social media

3    to generate thousands of "clients" and then extracting a quick settlement by threatening to overwhelm

4    the company with millions of dollars in arbitration filing fees, regardless of the claims' merit.[2]

5          Here, when DoorDash investigated the "client list" that Keller Lenkner submitted with its

6    demand letter, it could not find any record that a substantial number of those clients were delivery

7    providers using the DoorDash platform or had executed an arbitration agreement.  DoorDash raised

8    these concerns with Keller Lenkner.  *See* Dkt. 35-5 ¶ 3; *id.* Ex. C; Dkt. 35-4 ¶ 6.

9    **B.    DoorDash Pays AAA Filing Fees For 250 Keller Lenkner Arbitrations**

10          On July 2, 2019, Keller Lenkner filed its first batch of AAA demands on behalf of 250 purported

11    Dashers.  DoorDash supports arbitration and has successfully utilized AAA to resolve individual

12    disputes with numerous delivery providers.  *See, e.g.*, Dkt. 35-5 ¶ 13.  So even though DoorDash had

13    serious doubts about the validity of Keller Lenkner's initial 250 demands, DoorDash paid $475,000 in

14    AAA filing fees and commenced arbitration of those claims.  *Id.* ¶ 6.

15          DoorDash has continued to expend considerable time and money arbitrating those initial 250

16    claims, despite AAA's difficulties in handling so many simultaneous claims.  On December 11—more

17    than three months after DoorDash paid its filing fees—AAA told the parties that it was having difficulty

18    finding arbitrators for so many claims and asked the parties to, among other things, consent to

19    arbitrators they had previously struck as unacceptable or unqualified.  *Id.*  To date, arbitrators have

20    been selected in only 66 cases.  Spurchise Decl. ¶ 5.  DoorDash has had calls with only five arbitrators

21    regarding 12 cases.  *Id.* ¶ 6.  Only one case has an arbitration date set—for July 16–17, 2020, one year

22    after the demands were filed.  *Id.* ¶ 8.

---

24    [2]  In 2018, for example, Keller Lenkner filed approximately 12,500 arbitration demands against Uber
25    and 3,420 demands against Lyft.  *See* Erin Mulvaney, *Plaintiffs Lawyers Pressure Lyft to Pay
      Millions in Arbitration Fees*, Law.com (Dec. 14, 2018), https://bit.ly/2Z11iit; Erin Mulvaney,
      *"Calling Uber on Their Bluff," Plaintiffs Lawyers Strike Back to Compel Arbitration*, Law.com
26    (Dec. 6, 2018), https://bit.ly/2Z2yJkB.  Recently, Keller Lenkner has filed or threatened to file
      thousands of arbitration demands against Postmates and DraftKings.  *See* Chris Villani, *Ruling on
27    Arbitration Due Soon In DraftKings & FanDuel MDL*, Law360 (Aug. 28, 2019),
      https://bit.ly/34tCtgc.  Keller Lenkner and other law firms have used social media to gather names,
28    hold those names until they have a long list of putative "clients," and then send those lists to
      companies as leverage to extract settlements.  *See* "*Calling Uber*," *supra*.

Gibson, Dunn &
Crutcher LLP

## C.      Keller Lenkner Files Thousands Of Deficient Arbitration Demands With AAA

Despite the fact that AAA had struggled to make progress on the initial 250 arbitrations, Keller Lenkner began filing thousands of additional arbitration demands with AAA.  On August 26, Keller Lenkner filed 2,250 identical demands, and on September 27, Keller Lenkner filed another 4,000. Dkt. 35-5 ¶¶ 7-8.  Each of these carbon-copy demands was facially deficient—none included an email address associated with a Dasher account, any individualized factual allegations supporting the claims, the applicable arbitration agreement, or the amount in controversy.  *See id.* Ex. E.  And, once again, DoorDash could not identify many of those claimants as Dashers.

AAA rules require that arbitration demands must, among other things, "include the applicable arbitration agreement," describe the "nature of the dispute," and state "the amount in controversy." AAA Employment Arbitration Rule 4(b)(i)(1).  These requirements allow defendants to evaluate the allegations against them and decide whether to arbitrate on the merits, enter settlement discussions, or allow a default judgment.  For example, if a claimant seeks only a few hundred dollars from a company, it might make sense for the company to pay that amount without engaging in arbitration *or* litigation. *See, e.g.*, Chandrasekher & Horton, "Arbitration Nation: Data from Four Providers," 107 CAL. L. R. 1, 56 (2019) ("Litigants should be able to value, and thus settle, most disputes."); JAMS, "ADR Frequently Asked Questions," https://bit.ly/2spN92w (explaining that mediation requires "enough information . . . to warrant an interest in settlement, and to assess the dispute's approximate settlement value").  Not a single one of the thousands of arbitration demands filed by Keller Lenkner complied with AAA's rules—leaving DoorDash unable to evaluate whether the claimants had even potentially viable, non-frivolous claims, whether the claimants had actually entered into arbitration agreements with DoorDash, and which defense or settlement strategy to pursue with respect to each of them.

Despite the facial deficiencies of these 6,250 claims, AAA demanded payment from DoorDash of $11,875,000 in nonrefundable filing fees, without which AAA would not initiate arbitrations or even address DoorDash's concerns over the unwarranted fees.  Holecek Decl. ¶ 2; Dkt. 35-5 ¶ 9; AAA Employment/Workplace Fee Schedule, https://bit.ly/2rWv3V3.  DoorDash repeatedly attempted to work with AAA to find a solution—for example, requesting that payments be due on a rolling basis as arbitrators were assigned to each claim. Holecek Decl. ¶ 3.  This was a more-than-reasonable request

given that AAA had made little progress on the first 250 claims for which DoorDash had paid $475,000. Dkt. 35-5 ¶ 9. But according to AAA, so long as claimants' counsel provides "a list of names" even "in crayon," AAA would bill DoorDash $1,900 for each claimant's name provided. Dkt. 144 at p. 4. Indeed, when Gibson Dunn asked hypothetically whether, if claimants' counsel submitted one million names to AAA, AAA would invoice DoorDash $19 billion, the AAA representative responded "yes." *Id.*

DoorDash also told AAA that Keller Lenkner's demands were substantively deficient and violated AAA's own rules. Dkt. 35-5, Ex. J; AAA Employment Rule 4(b)(i)(1). Keller Lenkner sent an email disputing DoorDash's objections and less than two hours later, a regional vice president from AAA emailed her "administrative determination" that all of Keller Lenkner's 6,250 claims were proper and triggered DoorDash's obligation to pay nonrefundable fees. Dkt. 35-5, Ex. J at 3. AAA never asked DoorDash to identify the deficiencies in Keller Lenkner's demands, let alone provide a fair and orderly hearing before making a $12 million determination. Instead, AAA simply asked DoorDash whether it had "a specific question regarding information provided" and punted the issue *to the parties* and asked them to work it out themselves *after declaring the demands to be valid. Id.*

On November 6, DoorDash engaged in a meet and confer with Keller Lenkner and explained the problems with its arbitration demands. But Keller Lenkner—having no incentive to help DoorDash out from under AAA's $12 million invoice—refused to withdraw any of its arbitration demands and instead reported to AAA that the issues between the parties were unresolvable and that AAA should force DoorDash to pay the fees. *Id.* ¶ 10 & Ex. K. When DoorDash did not pay, Keller Lenkner asked AAA to close the 6,250 cases, which AAA did on November 8. *Id.* Ex. L & ¶ 12.

**D. Gibson Dunn And Other Law Firms Urge Arbitration Organizations To Develop A Fair, Workable Solution To Mass Arbitration**

As explained in its December 19 letter to the Court, Dkt. 144, Gibson Dunn discussed AAA's administration of mass arbitrations with several AAA representatives over the course of many months. Holecek Decl. ¶ 3. AAA told Gibson Dunn that it was already aware of certain challenges with mass arbitrations, and that it had a committee looking for solutions. *Id.* Gibson Dunn provided input based on the firm's practical experience with mass arbitrations. *Id.* Gibson Dunn offered several potential

1   solutions, including the deferment of filing fees until arbitrators are assigned, discounted filing fees for

2   both sides (claimants and respondents) when a high volume of similar arbitration demands are filed,

3   and charging companies annual flat fees for administration regardless of the number of arbitrations

4   filed. *Id.* ¶ 4.

5   AAA reported that it had decided to address the challenges of mass arbitrations by publishing

6   a new "group filing-fee schedule." Holecek Decl. ¶ 5. Under AAA's new fee schedule, if 25 or more

7   arbitration demands are filed simultaneously against the same party by claimants represented by the

8   same counsel, discounted and deferred filing fees apply. *Id.* AAA announced that the schedule would

9   be published on July 1, but that rollout was delayed until July 15, then to August 1, and then finally to

10  November 1. *Id.*; *see* AAA, *Employment/Workplace Fee Schedule* (Nov. 1, 2019),

11  https://bit.ly/2rWv3V3.

12  At the same time, Gibson Dunn had multiple discussions with JAMS representatives about their

13  approach to mass arbitration. Holecek Decl. ¶ 6. JAMS stated it was aware of challenges posed by

14  mass arbitration, and openly received Gibson Dunn's thoughts for addressing those challenges. *Id.*

15  Gibson Dunn is currently unaware of any published fee schedules or protocols by JAMS specifically

16  addressing mass arbitrations, but understands that JAMS has been modifying its fee schedules on a

17  case-by-case basis.

18  Gibson Dunn also contacted CPR to discuss these same issues. Holecek Decl. ¶ 7. CPR was

19  already aware of the unique problems associated with mass arbitrations, having published an article on

20  the subject in February 2019—several months *before* Gibson Dunn first contacted it regarding mass

21  arbitrations. *Id.*; *see* CPR, *More on Mass Individual Arbitration As an Alternative to Class Arbitration*

22  (Feb. 15, 2019), https://bit.ly/35LjXS5. CPR was eager to discuss these complex arbitration issues and

23  try to find a solution that would be fair to claimants and respondents. Holecek Decl. ¶ 8. As it did with

24  AAA, Gibson Dunn proposed several ideas for addressing mass arbitration's challenges, including

25  various types of new fee schedules. *Id.* CPR stated that it preferred to create a new mass arbitration

26  protocol, and welcomed Gibson Dunn's input. *Id.*

27  CPR also invited and received input from a variety of stakeholders, including labor-and-

28  employment counsel on both the labor side and the management side, and prominent arbitrators and

1    mediators.  Dkt. 137-2 at 4.  But as CPR's President Alan Waxman testified, CPR drafted the protocol

2    itself and unilaterally decided which suggestions to accept or reject.  Lipshutz Decl. Ex. O at 119–20.

3    CPR ultimately created a protocol that anyone could adopt:  "This was not for DoorDash or Gibson

4    Dunn . . . .  This was for the general marketplace."  *Id.* at 120.

5          At all times, the goal of the CPR Protocol was to create a fair process that would make mass

6    arbitration more administrable and withstand any procedural or substantive challenges.  *E.g.*, *id.* at

7    117–18.  The protocol's express aim is to complete 10–20 bellwether arbitrations in less than six

8    months (by comparison, little progress has been made to date in any of the 250 AAA cases that Keller

9    Lenkner filed six months ago).  Under the CPR Protocol, the claimant nominates the arbitrator for each

10   case from CPR's Master List of arbitrators, and the company/employer is bound to arbitrate with one

11   of the neutrals nominated by the claimant.  Giving claimants unilateral say in arbitrator selection is

12   both worker-friendly and designed to expedite the arbitration process by avoiding rank-and-strike lists.

13   Moreover, after completing the 10–20 bellwether arbitrations and a mediation to determine the best

14   way to resolve the remaining claims, claimants can choose to proceed with individual arbitrations or

15   *opt-out* of arbitration entirely and file claims in court.  *E.g.*, *id.* at 120.  This innovative feature of CPR's

16   protocol provides unprecedented rights and options to claimants.

17        On December 16, CPR announced that former District Judge Shira Scheindlin would become

18   the Administrative Arbitrator for its new protocol.  *See* CPR, "Former U.S. District Court Judge for the

19   Southern District of New York, Shira Scheindlin, Named Administrative Arbitrator for CPR's Mass

20   Claims Protocol" (Dec. 16, 2019), https://bit.ly/2tYAfIU.   Judge Scheindlin is well-prepared to

21   administer the protocol:  "As a United States District Judge in the Southern District of New York for

22   22 years, Judge Scheindlin had significant experience managing a number of cases in which mass (or

23   multiple) individual claims were asserted against the same defendant or defendants.  On five separate

24   occasions, Judge Scheindlin was selected by the Judicial Panel on Multi-District Litigation to manage

25   mass claims in the courts.  Judge Scheindlin was also a member of the American Law Institute (ALI)

26   Working Group on Aggregate Litigation."  *Id.*  Judge Scheindlin explained that CPR's new protocol

27   "offers advantages not only to claimants, whose cases will likely be resolved at the defendant's cost

28   and far more quickly than they would be in court, where mass claims often take years to resolve, but

1  also to defendants, with the greater odds it offers of reaching a prompt global resolution in a more cost-

2  effective manner than the courts would offer." *Id.*[3]

3  **E.     DoorDash Incorporates The CPR Protocol Into Its ICA On A Going-Forward Basis**

4         Gibson Dunn told CPR that DoorDash would like to implement the new CPR Protocol in the

5  next iteration of DoorDash's ICA, which DoorDash periodically updates and amends, and urged CPR

6  to publish the protocol as soon as possible.   Holecek Decl. ¶ 9.   CPR published the protocol on

7  November 4, and DoorDash published the updated ICA on the Dasher mobile app on November 9.   *See*

8  Dkt. 35-3 ¶ 9.   Thus, any delivery provider who has logged onto his or her Dasher account since

9  November 9 has had the opportunity to review the updated ICA and the CPR Protocol and determine

10  whether he or she wants to agree to the new arbitration terms with DoorDash or opt out of arbitration

11  entirely and resolve his or her potential disputes with DoorDash in court.

12         The only contractors who were shown and asked to agree to the updated ICA were those who

13  contacted DoorDash by logging into the DoorDash platform on or after November 9 in order to seek a

14  delivery opportunity.   *Id.* ¶ 11.   Any contractor who did not want to agree to the new ICA was free to

15  stop using the DoorDash platform.   And those who do agree to the updated ICA are permitted to opt

16  out of the arbitration agreement within 30 days.   Dkt. 150-6, § XI.

17  **F.     Keller Lenkner Files Two Petitions To Compel Thousands of Arbitrations**

18         On November 15, Keller Lenkner filed a petition to compel arbitration on behalf of Terrell

19  Abernathy and 2,235 other purported Dashers, seeking an order requiring that DoorDash arbitrate each

20  Petitioner's claims and pay all of AAA's requested arbitration fees and costs.   Dkt. 1, ¶ 34.   That same

21  day, Keller Lenkner filed a motion to compel arbitration, and attached a single declaration from one of

22  the 2,236 Petitioners alleging that he "worked" for DoorDash.   *See* Dkt. 5-2.   Four days later, Keller

23  Lenkner filed a nearly identical case, *Boyd*, in state court on behalf of 3,997 Petitioners.   *Boyd* was

24  removed and related to *Abernathy*.   Dkts. 82, 139.

25

26  [3]   Keller Lenkner complains that many claimants may have to wait several months until the bellwether
     arbitrations are complete.   Dkt. 10 at 1–2.   However, 180 of Keller Lenkner's current 246 claimants

27  are still waiting for AAA to select their arbitrators, six months after they served their arbitration
     demands.   Spruchise Decl. ¶¶ 4–5.   Further, Keller Lenkner routinely forces its clients to wait before

28  filing their demands until the firm has gathered a large number of additional claimants, so it can
     threaten companies with a large number of arbitrations all at once.   CPR's new protocol has the
     potential to resolve claims on a much faster schedule.

On November 17, Keller Lenkner moved for a TRO that would enjoin DoorDash and its counsel from "forcing" Petitioners to sign new arbitration agreements.  Dkt. 10 at 22–23.  On November 25, the Court heard argument on Petitioners' TRO motion, and DoorDash explained to the Court that it will permit any Petitioner who filed an arbitration demand with AAA before November 9 to arbitrate with AAA if they opt out of DoorDash's new arbitration agreement.  Lipshutz Decl. Ex. J at 57:10.  In response, Petitioners withdrew their TRO motion.  *Id.* at 75:20.

The day after the hearing, the Court ordered that "[b]efore [it] can grant injunctive relief compelling arbitration as to any petitioner, there must be a sworn declaration from that petitioner at least setting forth his or her name and the identifying information he or she used to register with DoorDash, the approximate dates of service, and at least referencing in an ascertainable way the specific arbitration agreement he or she clicked through."  Dkt. 50.  The Court ordered that "the petitioner himself or herself must sign" the declarations.  *Id.*

## G.   The Parties Exchange Information And Keller Lenkner Files An Amended Motion That Removes Hundreds Of Petitioners

After the hearing, the parties agreed to exchange information informally.  Keller Lenkner provided DoorDash with email addresses and other identifying information for the Petitioners— something DoorDash had long been requesting—and DoorDash was able to compare that data against its own business records.  Vovchenko Decl. ¶ 4.  On December 4, DoorDash sent Keller Lenkner a spreadsheet showing that, based on the data Keller Lenkner provided, DoorDash found that approximately 141 Petitioners had no relationship with DoorDash.  Lipshutz Decl. Ex. A; Vovchenko Decl. ¶ 5.  Another approximately 39 Petitioners accepted the ICA but never completed the Dasher account creation process and thus necessarily completed no deliveries on the DoorDash platform.  Vovchenko Decl. ¶ 6.  And another approximately 133 Petitioners completed the Dasher account creation process but chose not to perform any deliveries.  *Id.* ¶ 7.  Thus, none of these approximately 313 Petitioners possibly could have a valid Labor Code or FLSA claim, despite the fact that Keller Lenkner filed AAA arbitration demands and a petition to compel arbitration on their behalf.

On December 19, Keller Lenkner provided DoorDash with additional information regarding 79 of these original Petitioners.  *Id.* ¶ 5.  DoorDash found approximately 37 of these individuals in its

records only after Keller Lenkner provided this additional, corrected information; however, others still appear not to have completed any deliveries on the DoorDash platform.  *Id.*[4]

On December 23, Keller Lenkner filed an amended motion to compel arbitration on behalf of 5,879 individuals—most (but not all) of whom were part of the original 6,233 *Abernathy* and *Boyd* Petitioners.  Dkt. 151.  In support of its amended motion, Keller Lenkner submitted 5,010 declarations (Dkts. 153-6, 153-7), and 869 "witness statements" (Dkt. 153-8).  The amended motion notably *omits* approximately 361 original Petitioners, including the Petitioners described above.[5]

Keller Lenkner also submitted 5,010 declarations from Petitioners in response to this Court's order.  Dkt. 50.  But, as to the other 869 Petitioners, Keller Lenkner did not procure declarations; rather, it submitted "witness statements" that do not comply with this Court's order.  Specifically, the witness statements were apparently signed months ago and list only the individual's mailing address, length of time they have used the DoorDash platform, state that they have retained Keller Lenkner, and state that they do not recall opting out of arbitration.  *See* Dkt. 153-8.  These statements fail to state "the identifying information he or she used to register with DoorDash, the approximate dates of service," or "at least referenc[e] in an ascertainable way the specific arbitration agreement he or she clicked through."  Dkt. 50.  Moreover, Keller Lenkner's amended petition now asserts an alleged amount in controversy on behalf of each Petitioner, in an attempt to comply with AAA's rules.  But many Petitioners assert grossly unreasonable amounts in controversy.  For example, approximately 920 Petitioners have earned less than $200 on the DoorDash platform.  Vovchenko Decl. ¶ 8.  Yet each of them alleges an amount in controversy in the tens or hundreds of thousands of dollars.

Moreover, hundreds of Petitioners in this action appear to be to be *represented by different counsel*.  DoorDash has received "client lists" from several other plaintiffs' firms purporting to

---

[4]  On December 11 and 12, DoorDash provided Keller Lenkner with information regarding Petitioners who accepted the updated ICA on or after November 9, including information on who opted out of the updated arbitration agreement containing the CPR Protocol.  Lipshutz Decl. Ex. B.

[5]  Keller Lenkner's amended petition omits an additional 48 Petitioners who do not fall into any of the categories described above.  It is unclear why these 48 Petitioners were omitted.  The amended petition also adds 11 *new* Petitioners who were not parties when this action was filed.  Further, four Petitioners originally appeared on both the *Abernathy* and *Boyd* lists; now, these four Petitioners appear on only one list.

represent DoorDash delivery providers seeking to assert misclassification claims.  Approximately 448 Petitioners appear on another firm's client list, and approximately 22 Petitioners appear on more than one other firm's client list, meaning that three different law firms purport to represent the same individual in the same dispute.  Lipshutz Decl. ¶ 13.  Indeed, at least one original Petitioner in this case (Jaysfer Duarte) already filed an arbitration against DoorDash through a different plaintiffs' firm, DoorDash paid the filing fee, and the parties are presently in arbitration.  Spurchise Decl. ¶ 9.  Keller Lenkner's original motion to compel arbitration thus effectively sought to require DoorDash to pay a *second* nonrefundable filing fee to arbitrate that same individual's claims.

## H.     Petitioners' DocuSign Certificates Raise Even More Questions

None of Petitioners' declarations included handwritten signatures; rather, Keller Lenkner submitted "DocuSign" electronic stamps.  DoorDash requested proof that Petitioners actually approved those declarations, and Keller Lenkner produced "DocuSign Certificates of Completion" for 400 of the 5,879 Petitioners on January 9, 2020.  *See* Lipshutz Decl. ¶ 15; Ex. N.

The Certificates of Completion contain several apparent anomalies.  Keller Lenkner is not mentioned anywhere on the Certificates (or in the declarations).  *See* Lipshutz Decl. ¶ 16.  Rather, the "Envelope Originator" is listed as Jeremy Troxel with an address in "Washtington, DC" (misspelling in original).  *Id.* ¶ 16.  Mr. Troxel's law firm does not seem to have a website, but according to his LinkedIn profile, Mr. Troxel appears to be a solo practitioner in New York where he is licensed as an attorney—unlike in Washington, DC or California, where he is not.  *See* https://bit.ly/2TfT8BI.  Each Certificate states that the signer has a "relationship with Troxel Law," without mentioning Keller Lenkner.  Lipshutz Decl. ¶ 16.

In addition, each Certificate states that Petitioners who wish to withdraw their consent to receive electronic notices and disclosures should email jon@pioneertownmedia.com.  *See id.* at 4.  Pioneer Town Media is a telemarketing company, whose website brags about "track[ing] and retarget[ing] visitors who do not convert on the first visit with additional messaging that makes [potential attorneys] sound like a human and not just another lawyer.  With subsequent targeting we continue to lead them down the client conversion funnel of filling out a contact form, replying to our calls/emails/and texts, and ultimately sending back a complete and accurate intake package."  Pioneer Town Media, "What

We Do," https://bit.ly/2Fx8YjD.  It is unclear why Petitioners would need to email a telemarketing company to withdraw consent from communications from a law firm with whom they supposedly have an attorney-client relationship.

## LEGAL STANDARD

As in any litigation, the Court in this case must determine whether the parties are properly before the Court and whether they are actually being represented by the law firm that purports to represent them.  *See Graves v. U.S. Coast Guard*, 692 F.2d 71, 74 (9th Cir. 1982) (appearance of an attorney raises rebuttable presumption of authority to act).  In determining whether to compel arbitration, the court considers "(1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Sweeney v. Tractor Supply Co.*, 390 F. Supp. 3d 1152, 1157 (N.D. Cal. 2019).  As the parties seeking arbitration, Petitioners "bear[] the burden of proving the existence of an arbitration agreement by a preponderance of the evidence." *Id.* (quotation marks omitted).

## ARGUMENT

Petitioners' motion to compel arbitration raises several concerns that should be addressed by this Court before anyone is compelled to arbitration.  *First*, by omitting hundreds of original Petitioners from the amended petition, Keller Lenkner implicitly concedes what the evidence demonstrates—that it filed frivolous arbitration demands and a frivolous petition to compel arbitration as to those individuals.  *Second*, hundreds of *other* Petitioners appear on other law firms' client lists regarding the same underlying misclassification dispute, suggesting that another firm (not Keller Lenkner) may represent them.  *Third*, hundreds *more* Petitioners have not complied with this Court's November 26 order to submit a declaration with particular identifying information.  *Fourth*, a sample set of Petitioners' DocuSign Certificates of Completion raises serious questions about the roles of Troxel Law and Pioneer Town Media, and the nature of Keller Lenkner's true relationship with Petitioners (if any).  In addition, before compelling arbitration before AAA, this Court should take steps to ensure that AAA will protect the parties' contractual and due process rights—something that has not happened so far.  Finally, as set forth in DoorDash's concurrently filed motion to stay, the Court should not compel arbitration until Petitioners are notified of the full details of the *Marciano* settlement and decide

whether to accept it, as Petitioners have the right to make an informed decision before choosing arbitration over settlement.

**A.**     **The Evidence So Far Indicates Keller Lenkner May Not Represent Many Petitioners And Has Not Properly Vetted Their Claims**

There are substantial reasons to question whether Keller Lenkner actually represents each of the thousands of Petitioners involved in this proceeding, and whether Petitioners have given informed consent to be represented by Keller Lenkner in this action.

The Court has the inherent authority to manage the proceedings and conduct of attorneys who appear before it. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991). DoorDash should not be compelled to arbitrate Petitioners' claims until it and the Court (and, indeed, Petitioners themselves) know who (if anyone) represents each Petitioner and is authorized to act on their behalf. Making such a determination will achieve three important aims. *First*, it will protect Petitioners' right to their choice of counsel by ensuring they are in fact represented by their counsel of choice. *See, e.g.*, *Cole v. U.S. Dist. Court*, 366 F.3d 813, 817 (9th Cir. 2004) ("Parties normally have the right to counsel of their choice."). *Second*, it will protect the intended speed and efficiency of the arbitration process. Compelling arbitration before determining Petitioners' representation could lead to duplicative proceedings that will bog down courts and the arbitration process, further delaying the resolution of Petitioners' claims. It also would improperly put the onus on DoorDash to ascertain against whom it is litigating. The best time to address this issue is now, while the Court addresses the other problems with Petitioners' amended petition. *Third*, the Court should ensure there is no gamesmanship by Petitioners or other law firms. Multiple firms purport to represent hundreds of the same individuals for the same legal issues. The only conclusion is that these firms are not taking the necessary care with respect to retaining purported clients.

**1.**     **Approximately 361 Original Petitioners Have No Conceivable Claim Against DoorDash**

Questions surrounding Keller Lenkner's representation of individuals in this action stretch back to when it filed AAA demands and a petition to compel arbitration on behalf of hundreds of individuals who could not possibly have a claim against DoorDash. By signing a pleading, an attorney certifies that "the factual contentions have evidentiary support or, if specifically so identified, will likely have

1  evidentiary support after a reasonable opportunity for further investigation or discovery." Fed. R. Civ.

2  P. 11(b)(3).  Rule 11 thus requires attorneys "to conduct a reasonable inquiry into the facts and the law

3  *before* filing." *Bus. Guides, Inc. v. Chromatic Commc'ns Enterprises, Inc.*, 498 U.S. 533, 551 (1991)

4  (emphasis added).

5      The amended motion contains 361 fewer named Petitioners than the original petition—many

6  of which come from the December 4 spreadsheet DoorDash sent to Keller Lenkner showing (based on

7  information provided by Keller Lenkner) which original Petitioners could not possibly have a valid

8  claim against DoorDash.  Keller Lenkner told this Court that it "put an extensive amount of resources

9  to litigate petitioner's claims because [it] think[s] the claims are incredibly strong."  Lipshutz Decl.

10  Ex. J at 7:1–4.  Keller Lenkner further represented "there is an evidentiary basis to show … [t]hat every

11  single petitioner is a party to a valid arbitration agreement with DoorDash." *Id.* 21:16–21.  Now, with

12  the amended petition, 361 of those "incredibly strong" claims have disappeared.

13      In fact, an investigation revealed that most of these individuals have no conceivable claim

14  against DoorDash because they never performed any work using the DoorDash platform.  Yet these

15  361 Petitioners' claims were filed for arbitration with the AAA, and counsel for Petitioners demanded

16  that DoorDash pay nonrefundable filing fees for these 361 claims—amounting to $685,900.  Such lack

17  of diligence raises serious concerns about the process by which Keller Lenkner vets and files claims.[6]

18      **2.    Approximately 448 Petitioners Appear On Other Firms' Client Lists**

19      Beyond those *original* Petitioners who no longer appear in the amended petition, hundreds of

20  *remaining* Petitioners raise representation concerns.  Keller Lenkner is not the only firm to amass

21  hundreds or thousands of purported plaintiffs and then send a list of names to DoorDash as a way to

22  extract a settlement.  Approximately 448 Petitioners' names appear on client lists sent to DoorDash by

23  three other law firms purporting to represent them regarding the same issue of misclassification.

24  _____

25  [6]  Keller Lenkner has also abandoned its request that the Court "require DoorDash to . . . pay[] the
    arbitration fees and costs that AAA determines are necessary to empanel arbitrators and proceed
    with arbitrations." Dkt. 4 at 19.  And for good reason:  The Court lacks authority to grant such

26  relief.  *See, e.g.*, *Adams v. Postmates, Inc.*, No. 4:19-cv-3042, Dkt. No. 253 (N.D. Cal. Oct. 10,
    2019) (denying Keller Lenkner's "request for an order directing Postmates to tender payment of

27  outstanding and future arbitration fees"); *Dealer Comput. Serv., Inc. v. Old Colony Motors, Inc.*,
    588 F.3d 884, 888 (5th Cir. 2009); *VHS Univ. Labs., Inc. v. Local 283 of the Int'l Bhd. of Teamsters,*
    *Chauffeurs, Warehousemen, & Helpers of Am.*, 54 F. Supp. 3d 827, 839 (E.D. Mich. 2014); *cf.*

28  *Lifescan, Inc. v. Premier Diabetic Serv., Inc.*, 363 F.3d 1010, 1012–13 (9th Cir. 2004).

Lipshutz Decl. ¶ 13 & Ex. L.  In fact, approximately 22 of these Petitioners' names appear on two other firms' client lists.  *Id.*  It is impossible for DoorDash or the Court to know which (if any) of *three different law firms* actually represents these Petitioners, particularly where none of the 5,010 declarations from Petitioners states that the Petitioner has retained Keller Lenkner.

### 3.    869 Petitioners Failed To Submit Declarations Complying With This Court's Order

An additional 869 Petitioners did not comply with this Court's order to submit a personally signed declaration containing certain identifying information.  A court can compel arbitration only "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.  "Although challenges to the validity of a contract within an arbitration clause are to be decided by the arbitrator, challenges to the very existence of the contract are, in general, properly directed to the court."  *Kum Tat Ltd. v. Linden Ox Pasture, LLC*, 845 F.3d 979, 983 (9th Cir. 2017); *accord King v. AxleHire, Inc.*, 2019 WL 1925493, at *2 (N.D. Cal. Apr. 30, 2019) (rejecting argument that issue of contract formation was delegated to arbitrator because "it begs the question of whether the parties formed a contract" and is not "consonant with the law" that challenges to the existence of contracts are properly directed to the court); *Newton v. Am. Debt Servs., Inc.*, 854 F. Supp. 2d 712, 720 (N.D. Cal. 2012) (determining whether an agreement to arbitrate was created before examining its validity); *cf. Goldman, Sachs & Co. v. City of Reno*, 747 F.3d 733, 742 (9th Cir. 2014) ("If the parties contest the *existence* of an arbitration agreement, the presumption of arbitrability does not apply.").

Courts routinely address the existence of a contract when resolving motions to compel arbitration.  *See, e.g.*, *Gelow v. Cent. Pac. Mortg. Corp.*, 560 F. Supp. 2d 972, 978–79 (E.D. Cal. 2008) (refusing to compel arbitration as to two of ten plaintiffs because no contract with them was tendered, they did not acknowledge signing a contract, and the movant's evidence consisted only of "imprecise descriptions and recollections" of them signing contracts with arbitration provisions); *Bernal v. Sw. & Pac. Specialty Fin., Inc.*, 2013 WL 5539563, at *4 (N.D. Cal. Oct. 8, 2013) (denying motion to compel "because a determination that a valid agreement to arbitrate exists is a prerequisite to granting a motion to compel" and later compelling arbitration only after the agreement was submitted).

Here, 869 Petitioners have not complied with this Court's order to submit a personally signed declaration "at least setting forth his or her name and the identifying information he or she used to register with DoorDash, the approximate dates of service, and at least referencing in an ascertainable way the specific agreement he or she clicked through."  Dkt. 50.  Keller Lenkner concedes that the 869 "witness statements" it submitted with its amended motion provide only "some of this information" required by the Court.  Dkt. 151 at 13 n.10; *see also* Dkt. 153-8; *Rushing v. Viacom Inc.*, 2018 WL 4998139 (N.D. Cal. Oct. 15, 2018) (denying motion to compel because proponent of arbitration failed to provide sufficient evidence of notice to prove existence of valid agreement); *LegalForce RAPC Worldwide P.C. v. Trademark Engine LLC*, 2018 WL 3126389, at *2–4 (N.D. Cal. Jun. 26, 2018) (same); *Bernal*, 2013 WL 5539563, at *4 (same).  The absence of declarations from these Petitioners despite Keller Lenkner's efforts to obtain them raises questions about whether those Petitioners were unwilling to sign such declarations for some reason.

Unlike this Court, which ordered Keller Lenkner to provide *proof* that it has real clients with arbitrable claims, AAA has been unwilling to demand or investigate anything before extracting nonrefundable fees.  If and when the Court grants arbitration for certain Petitioners, it should take steps to ensure that AAA protects DoorDash's due process rights, rather than simply collecting millions of dollars in nonrefundable fees based only on Keller Lenkner's boilerplate arbitration demands.

### 4. Petitioners' DocuSign Certificates Of Completion Raise More Questions Regarding Who Actually Represents Petitioners

Petitioners' DocuSign Certificates of Completion, which accompany the declarations Petitioners submitted in response to this Court's order, raise even more questions.  The Certificates do not mention Keller Lenkner and appear to be originated by Jeremy Troxel, a solo practitioner licensed in New York, working out of "Washington, DC" [*sic*].  Each Certificate states that the signer has a "relationship with Troxel Law," not Keller Lenkner.  *See* Lipshutz Decl. ¶ 16; Ex. N.  And to withdraw consent from certain communications from Troxel Law, Petitioners are instructed to email a telemarketing company's address, jon@pioneertownmedia.com.  It is unclear why Petitioners who have a "relationship with Troxel Law" would need to email a telemarketing company to withdraw consent from certain communications from Troxel Law.  It is even more unclear why Keller Lenkner

is not mentioned alongside either Troxel Law or Pioneer Town Media, or why a lawyer barred only in New York is working from Washington D.C. to represent California clients in a California court.

Nothing in the declarations indicates that any of the Petitioners wants Keller Lenkner to represent them, or even that they know who Keller Lenkner is.  It is not clear from the Certificates of Completion or any filing in this case what relationship Petitioners have with Troxel Law or Keller Lenkner—or, for that matter, Pioneer Town Media.  In any event, there is *no* indication that Keller Lenkner represents Petitioners in this action, particularly in light of the hundreds who appear on other firms' client lists and the "relationship with Troxel Law" that each Petitioner apparently has.

Even if Keller Lenkner represents each Petitioner in this action, that representation appears to raise serious ethical concerns, according to two ethics experts.  Although there is no direct evidence of Keller Lenkner's representation in this action (such as a retention agreement), Prof. Nancy Moore recently examined a Keller Lenkner retention agreement in a similar mass action against another company and gave her "professional opinion that the Keller Lenkner lawyers have engaged in numerous violations of their professional responsibilities."  *See In re: CenturyLink Sales Practices & Sec. Litig.*, No. 17-md-2795-MJD-KMM, Dkt. 510, ¶ 8 (D. Minn. Jan. 10, 2020) (Moore Declaration) (attached as Lipshutz Decl. Ex. P); *id.* Dkt. 512, Ex. 4 (D. Minn. Jan. 10, 2020) (retainer agreement) (attached as Lipshutz Decl. Ex. Q).

Professor Moore concluded that Keller Lenkner, through misleading advertisements and retainer agreements, unethically subverted the proposed class settlement in *CenturyLink*—a particularly relevant concern here given the pending *Marciano* class settlement.  Among other things, Prof. Moore found that Keller Lenkner (1) issued misleading advertising that failed to disclose the settlement to prospective clients and instead falsely implied that arbitration was the "sole or primary" method of pursuing claims (Ex. P, ¶ 10); (2) falsely implied that the defendant would pay its clients' legal fees in addition to any damages, which was inconsistent with the proposed settlement (*id.* at ¶¶ 11–12); (3) charged a $750 flat fee for all claims resolved before the commencement of arbitration or litigation, which was unreasonable in light of Keller Lenkner's knowledge of a proposed settlement that would pay its clients less than $750 (*id.* at ¶ 14(d)).  Overall, Prof. Moore concluded that "Keller Lenkner manipulated the clients into choosing arbitration as the objective of the representation," and

Keller Lenkner "requested their clients to authorize them to seek to arbitrate their claims without providing them with *any* information about alternatives to arbitration, including waiting to see if the Tentative Settlement in the Class Action Lawsuit obtained preliminary approval, in which case the clients could decide, when notified, whether to accept the settlement (without having to pay legal fees) or to opt out of the settlement[.]" *Id.* at ¶¶ 15, 16.

In this case, ethics expert Richard Zitrin reviewed the retention agreement at issue in *CenturyLink* and concluded that "unless Keller Lenkner can demonstrate that its engagement agreement in the within cases is materially and substantially different than that in the *CenturyLink* matter, Keller Lenkner's representation of its clients herein falls far below the standards required both by the American Bar Association's ethical standards and those of the state of California." Zitrin Decl. ¶ 29. Professor Zitrin identified several shortcomings stemming from the *CenturyLink* retention agreement, including a fee-splitting arrangement that "does not meet the California requirements," *id.* ¶ 23, a "particularly onerous" clause allowing Keller Lenkner to withdraw representation of any client at any time, *id.* ¶ 25, a "grossly inadequate" disclosure of potential conflicts, *id.* ¶ 26, and an "inappropriately overbroad" power of attorney clause, *id.* ¶ 28.   To the extent any retention agreement signed by Petitioners in this case is substantially similar to that in *CenturyLink*, there are serious concerns with the adequacy of Keller Lenkner's representation of Petitioners here.

### 5.    Any Dispute Over The CPR Protocol Is Not Properly Before This Court

Petitioners attack the CPR Protocol, *see* Dkt. 151 at 21–22, but the enforceability of the CPR Protocol is not at issue in this case, as DoorDash is not seeking to force Petitioners to arbitrate with CPR against their express wishes. *See* Dkts. 153-6  and 153-7 (declarations requesting "to opt-out of that [CPR Employment-Related Mass-Claims Protocol] agreement and remain governed by the prior [AAA] agreement").[7]  In any event, the CPR Protocol is valid and enforceable.  Petitioners' counsel has described CPR alongside AAA and JAMS as "leading arbitration providers," *O'Connor v. Uber*

---

[7]   The deficient witness statements of the 869 Petitioners who did not submit declarations do not request to opt out of the CPR Protocol.  *See* Dkt. 153-8.  If and when the Court considers compelling arbitration as to those Petitioners, DoorDash requests time to determine which, if any, of those Petitioners have chosen CPR by agreeing to the updated terms and not opting out of the arbitration provision within 30 days.  Petitioners who wish to arbitrate with CPR under the updated agreement should not be forced to arbitrate with AAA.

Gibson, Dunn &
Crutcher LLP

*Techs., Inc.*, No. 15-17420, Dkt. 20 at 27 (9th Cir. Mar. 25, 2016) (signed by Warren Postman), and CPR continues to demonstrate its willingness to lead—here, leading efforts to solve a challenging mass-arbitration problem affecting a large number of companies and claimants.  That leadership and innovation should be praised, not attacked.  As Judge Scheindlin has explained, the CPR Protocol "offers advantages not only to claimants, whose cases will likely be resolved at the defendant's cost and far more quickly than they would be in court, where mass claims often take years to resolve, but also to defendants, with the greater odds it offers of reaching a prompt global resolution in a more cost-effective manner than the courts would offer."  CPR, "Former U.S. District Court Judge for the Southern District of New York, Shira Scheindlin, Named Administrative Arbitrator for CPR's Mass Claims Protocol" (Dec. 16, 2019), https://bit.ly/2tYAfIU.

**B.    Alternatively, The Court Should Stay This Action Pending Final Approval Of The *Marciano* Settlement**

Alternatively, the Court should stay this action pending final approval of the *Marciano* class settlement for the reasons set forth in DoorDash's concurrently filed motion to stay.  At the appropriate time after the settlement is preliminarily approved, Petitioners will have an opportunity to choose whether to accept the *Marciano* settlement and release their claims against DoorDash—including the underlying claims giving rise to this action.  Thus, *Marciano* has the potential to substantially reduce the number of parties to this action.  It would be efficient and logical to determine which Petitioners will choose to release their claims after being informed of the settlement terms before compelling arbitration of their claims.

**C.    S.B. 707 Is Inapplicable To This Case And Preempted By The FAA**

In addition to asking the Court to compel arbitration, Petitioners request "substantive remedies" under California S.B. 707, a law that took effect on January 1, 2020 and is codified in relevant part at California Code of Civil Procedure §§ 1281.97 and 1281.99.  *See* Dkt. 151 at 24.  The new law states that when the drafting party of a consumer or employment arbitration agreement does not pay required arbitration fees within thirty days, that party is in default of the agreement, waives its right to compel arbitration, and is subject to automatic sanctions if the employee or consumer proceeds in court.  *See*

Cal. Civ. Proc. Code § 1281.97.  But S.B. 707 is inapplicable for two independent reasons: (i) it cannot apply retroactively to the events at issue here; and (ii) it is preempted by the FAA.

### 1.  S.B. 707 Does Not Apply Retroactively To Arbitrations Closed In 2019

The "presumption against retroactive legislation is deeply rooted in our jurisprudence" and "[e]lementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 265 (1994).  To determine whether a law is given retroactive effect, courts first determine "whether [the legislature] has expressly prescribed the statute's proper reach." *Id.* at 280.  If it has not, courts then determine "whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.*  If so, the presumption against retroactivity applies "absent clear [legislative] intent" favoring retroactivity. *Id.*; *see also McClung v. Emp't Dev. Dep't*, 99 P.3d 1015, 1019 (Cal. 2004) (applying *Landgraf* to a California statute).  This is especially true for "new provisions affecting contractual or property rights, matters in which predictability and stability are of prime importance." *Landgraf*, 511 U.S. at 271.

S.B. 707 does not apply retroactively to the events at issue in this case, all of which took place in 2019.  The California legislature declared that S.B. 707 would not take effect until January 1, 2020. *See* Cal. Civ. Proc. Code § 1281.97 (stating effective date).  There is no evidence of legislative intent that the provision should apply retroactively.  This is highlighted by the fact that another provision of S.B. 707 specifies that it should be applied retroactively. *See* S.B. 707, 2019-2020 Reg. Sess. (Cal. 2019); Cal. Civ. Proc. Code § 1281.96(g) (applying amended provision to arbitrations administered after January 1, 2015).  When a legislature uses a term in one portion of a statute but not another, the omission is presumed to be intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983).

The conduct of which Petitioners complain occurred prior to S.B. 707's effective date.  DoorDash was sent invoices totaling $11,875,000 in AAA fees in September and October 2019, Keller

1    Lenkner asked AAA to close the cases on November 6, 2019, and AAA closed the cases on November

2    8, 2019.  Under the presumption against retroactivity and due process, S.B. 707 does not apply here.[8]

3    ## 2.    S.B. 707 Is Preempted By The FAA

4           Even if S.B. 707 applied retroactively, it is preempted by the FAA.  S.B. 707 provides that a

5    party who drafts an arbitration agreement—unlike any other type of contract—is placing itself at risk

6    of severe punishment by courts for failure to pay certain fees, irrespective of the amount of the unpaid

7    fee, the extent of the delay in paying, or the reason for the failure to pay.  *Any* failure to pay certain

8    upfront arbitration fees within 30 days of a due date set unilaterally by an arbitration organization is

9    deemed to be a "material breach of the arbitration agreement," leaving the drafter "in default of the

10   arbitration" and forcing the drafter to "waive[] its right to compel arbitration."  Cal. Civ. Proc. Code

11   § 1281.97(a).  S.B. 707 further permits the non-drafting party to proceed with his or her claim in court

12   and seek drastic monetary and non-monetary sanctions—including default on the underlying claims

13   and contempt of court—or compel arbitration and seek attorneys' fees and costs.  *See id.* § 1281.97(b),

14   (d); *id.* § 1281.99.  The new law has the obvious intent and effect of discouraging parties from drafting

15   arbitration agreements and is plainly improper under the FAA.

16          "The overarching purpose of the FAA . . . is to ensure the enforcement of arbitration agreements

17   according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 344 (2011).  As the

18   Supreme Court explained just two years ago, the FAA preempts state laws that "flout[] the FAA's

19   command to place [arbitration] agreements on an equal footing with all other contracts."  *Kindred*

20   *Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1426–1427 (2017); *Marmet Health Care Ctr., Inc.*

21   *v. Brown*, 565 U.S. 530, 533 (per curiam) (2012) (FAA preempted West Virginia law that contained "a

22   categorical rule" inconsistent with the FAA).  Rather, under the FAA, arbitration agreements "shall be

23   valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the

24   revocation of any contract."  9 U.S.C. § 2.  The savings clause applies only to generally applicable

---

26   [8]  S.B. 707 is not, as Petitioners imply, merely an extension of common law contract principles
27       whereby courts "may require specific performance by a breaching party."  Dkt. 151 at 24.  Courts
         have recognized that arbitration fee disputes belong with the arbitrator, not courts.  *See Lifescan*,
         363 F.3d at 1012–13; *Adams, supra*, Dkt. No. 253 (Oct. 10, 2019); *Dealer Comput. Serv.*, 588 F.3d
28       at 888; *VHS Univ. Labs.*, 54 F. Supp. 3d at 839.  But S.B. 707 puts courts in the middle of disputes
         traditionally left to arbitrators and overrides the parties' contractual agreements.

contract defenses. *Concepcion*, 563 U.S. at 339. And even state-law rules that could be construed as generally applicable are preempted if they stand "as an obstacle to the accomplishment of the FAA's objectives." *Id.* at 343; *see also Blair v. Rent-A-Ctr., Inc.*, 928 F.3d 819, 825 (9th Cir. 2019) (FAA's savings clause "does not save [contract] defenses that target arbitration either by name or by more subtle methods, such as by interfering with fundamental attributes of arbitration.") (quoting *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1622 (2018)) (quotation marks and brackets omitted).

California's S.B. 707 fails all of these principles of federal law and stands as an obstacle to the FAA's objective by directly targeting and discouraging the drafting of arbitration agreements. Indeed, by its terms, **S.B. 707 applies only to arbitration agreements**, even though "[c]ourts may not . . . invalidate arbitration agreements under state laws applicable *only* to arbitration agreements." *Doctor's Assocs., Inc. v. Casarotto*, 517 U.S. 681, 687 (1996). The law engrafts onto arbitration agreements— and no other type of contract—a highly restrictive and onerous definition of material breach, and then punishes that breach by mandating default, sanctions, waiver of arbitration, and even contempt of court without any opportunity to justify the breach or argue its non-materiality. S.B. 707 thus fails to recognize that "'efficient' breaches" are "acceptable, even desirable, in our economic system." *Rich & Whillock, Inc. v. Ashton Dev., Inc.*, 157 Cal. App. 3d 1154, 1159 (1984). Because S.B. 707 penalizes non-payment by a party to an *arbitration* contract, but does not penalize non-payment outside the arbitration context, it "singles out arbitration agreements for disfavored treatment" and thus "violates the FAA." *Kindred*, 137 S. Ct. at 1425.

S.B. 707 fails to recognize the many perfectly valid reasons a party may determine not to pay filing fees within 30 days of the deadline set by an arbitration organization administrator. For example, when AT&T and T-Mobile attempted to merge, several courts enjoined arbitrations challenging the merger. *See, e.g.*, *AT&T Mobility LLC v. Bernardi*, No. 3:11-cv-03992-CRB, Dkt. 86 (N.D. Cal. Oct. 26, 2011). There would have been no reason to pay fees for arbitrations that federal courts had ruled could not proceed, and the FAA's objective of "facilitat[ing] streamlined proceedings," *Concepcion*, 563 U.S. at 344, would not have been furthered by penalizing AT&T for not paying those fees. Many other valid reasons exist, including many of the concerns raised by this case, as set forth above. The Supreme Court recently cautioned courts to be wary of "new devices and formulas" that fail to put

1   arbitration agreements on the same footing as other contracts.  *Epic Sys.*, 138 S. Ct. at 1623.  Because

2   S.B. 707 is just such a new device, it is preempted by the FAA.

3       Moreover, S.B. 707 stands as an obstacle to the FAA's objectives because it prevents arbitration

4   agreements from being enforced "according to their terms."  *Epic Sys.*, 138 S. Ct. at 1619.  Parties to

5   arbitration agreements agree to certain terms, including, as relevant here, the rules for filing fees and

6   the consequences for failing to pay those fees.  *See* AAA Employment Arbitration Rule 43.  The FAA

7   preempts state laws that (as here) "would impose inconsistent and conflicting procedural rules upon

8   those specifically agreed upon by the parties."  *Mayo v. Dean Witter Reynolds, Inc.*, 258 F. Supp. 2d

9   1097, 1114 (N.D. Cal. 2003).  S.B. 707's usurpation of the procedural rules to which the parties agreed

10  directly impedes the FAA's command.  *Epic Sys.*, 138 S. Ct. at 1619; *Concepcion*, 563 U.S. at 344.

11  ### CONCLUSION

12      This Court should not grant Petitioners' motion until the concerns expressed above have been

13  resolved and the parties' contractual and due process rights are adequately protected.  Alternatively,

14  the Court should stay this action pending final approval of the *Marciano* settlement.

15

16  Dated:  January 16, 2020                  GIBSON, DUNN & CRUTCHER LLP

17

18                                           By:_____/s/  Joshua Lipshutz_____

19                                                        Joshua Lipshutz

20                                           Attorneys for Respondent DoorDash, Inc.

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP