1   GIBSON, DUNN & CRUTCHER LLP
    JOSHUA S. LIPSHUTZ, SBN 242557
2     jlipshutz@gibsondunn.com
    555 Mission Street, Suite 3000
3   San Francisco, CA 94105-0921
    Telephone:    415.393.8200
4   Facsimile:    415.393.8306

5   JAMES FOGELMAN, SBN 161584
      jfogelman@gibsondunn.com
6   THEANE EVANGELIS, SBN 243570
      tevangelis@gibsondunn.com
7   MICHAEL HOLECEK, SBN 281034
      mholecek@gibsondunn.com
8   333 South Grand Avenue
    Los Angeles, CA 90071-3197
9   Telephone:    213.229.7000
    Facsimile:    213.229.7520
10
    Attorneys for Defendant DOORDASH, INC.
11

12              **UNITED STATES DISTRICT COURT**

13            **NORTHERN DISTRICT OF CALIFORNIA**

14                **SAN FRANCISCO DIVISION**

15

16

17  TERRELL ABERNATHY, et al.,         CASE NOS.   3:19-cv-07545-WHA
                                                   3:19-cv-07646-WHA
18                 Petitioners,
                                       **DECLARATION OF JOSHUA LIPSHUTZ IN**
19          v.                         **SUPPORT OF RESPONDENT DOORDASH,**
                                       **INC.'S OPPOSITION TO PETITIONERS'**
20  DOORDASH, INC.,                    **AMENDED MOTION TO COMPEL**
                                       **ARBITRATION**
21                 Respondent.
                                       Action Filed:  November 15, 2019
22  _____

23  CHRISTINE BOYD, et al.,            Hearing Date: February 10, 2020
                                       Hearing Time: 2:00 p.m.
24                 Petitioners,        Hearing Place: Courtroom 12 – 19th Floor
                                       Honorable William Alsup
25          v.

26  DOORDASH, INC.,

27                 Respondent.

28

Gibson, Dunn &
Crutcher LLP

DECLARATION OF JOSHUA LIPSHUTZ IN SUPPORT OF RESPONDENT DOORDASH, INC.'S RESPONSE TO
PETITIONERS' AMENDED MOTION TO COMPEL ARBITRATION
CASE NOS. 3:19-CV-07545-WHA & 3:19-CV-07646-WHA

I, Joshua Lipshutz, declare as follows:

1. I am an attorney admitted to practice law before this Court and all of the Courts of the State of California. I am a partner at the law firm of Gibson, Dunn & Crutcher LLP, counsel of record for Respondent DoorDash, Inc. ("DoorDash") in the above-captioned action. I offer this declaration in support of DoorDash's Response to Petitioners' Amended Motion To Compel Arbitration. I have personal knowledge of all the facts set forth in this declaration (unless otherwise noted), and, if called to testify, I could and would competently testify to them.

2. On December 4, 2019, DoorDash sent Keller Lenkner a spreadsheet showing that, based on the information Keller Lenkner provided, hundreds of Petitioners were not in DoorDash's database, never completed the DoorDash application and thus could not have performed any deliveries, or otherwise never completed any deliveries. A true and correct copy of that email is attached hereto as **Exhibit A**.

3. On December 11 and 12, 2019, DoorDash provided Keller Lenkner with information regarding original Petitioners who accepted the updated ICA on or after November 9, including information regarding who opted out of the updated arbitration agreement containing the CPR Protocol. A true and correct copy of the emails relaying this information is attached hereto as **Exhibit B**.

4. On December 19, 2019, Keller Lenkner provided DoorDash with additional information regarding 79 Petitioners who DoorDash was unable to confirm completed any deliveries. A true and correct copy of that email is attached hereto as **Exhibit C**.

5. A true and correct copy of *Harriman v. DoorDash, Inc.*, No. 19-cv-06411, Dkt. 17 (N.D. Cal. Dec. 16, 2019) is attached hereto as **Exhibit D**.

6. The proposed class settlement in *Marciano v. DoorDash, Inc.*, No. 18-CGC-678969 (S.F. Super. Ct.), would release, among other things, claims that DoorDash has misclassified its delivery providers as independent contractors, including claims under the FLSA, California Labor Code, IWC Wage Orders, and local municipal codes. A true and correct copy of the proposed settlement agreement is attached hereto as **Exhibit E.**

7. A true and correct copy of the Court's order in *Brown v. DoorDash, Inc.*, No. B295813 (Cal. Ct. App. Dec. 12, 2019), is attached hereto as **Exhibit F**.

Gibson, Dunn &
Crutcher LLP

DECLARATION OF JOSHUA LIPSHUTZ IN SUPPORT OF RESPONDENT DOORDASH, INC.'S RESPONSE TO
PETITIONERS' AMENDED MOTION TO COMPEL ARBITRATION
CASE NOS. 3:19-cv-07545-WHA & 3:19-cv-07646-WHA

8.      A true and correct copy of *Lowe v. DoorDash, Inc.*, No. B298535 (Cal. Ct. App. Dec. 23, 2019), is attached hereto as **Exhibit G**.

9.      Approximately 361 original Petitioners have not submitted a declaration or witness statement in this case, and they are not listed as Petitioners on the amended petition to compel arbitration.   A true and correct copy of a list of those original Petitioners who do not appear on the amended petition is attached hereto as **Exhibit H**.

10.     Approximately 11 Petitioners on the amended petition to compel arbitration were not listed as Petitioners on the original petition.   A true and correct copy of a list of these new Petitioners who do not appear on the original petition to compel arbitration is attached hereto as **Exhibit I**.

11.     A true and correct copy of the transcript of the November 25, 2019 TRO hearing in this action is attached hereto as **Exhibit J**.

12.     A true and correct copy of the AAA Employment Arbitration Rules are attached hereto as **Exhibit K**.

13.     DoorDash has received "client lists" from several other plaintiffs' firms purporting to represent DoorDash delivery providers seeking to assert misclassification claims.   Approximately 448 Petitioners' names appear on client lists sent to DoorDash by other law firms threatening to bring the same misclassification claims on their behalf.   Of these Petitioners' names appearing on the client lists of other firms, approximately 22 names appear on more than one other client list.   A true and correct copy of a list of those Petitioners is attached hereto as **Exhibit L**.

14.     On January 7, 2020, AAA sent a single invoice to DoorDash totaling $178,500 for $750 in case management fees per arbitration for 238 arbitrations.   DoorDash intends to pay this invoice.   A true and correct copy of this invoice is attached hereto as **Exhibit M**.

15.     On January 9, 2020, at DoorDash's request, Keller Lenkner provided DocuSign Certificates of Completion for 400 Petitioners selected by DoorDash.   True and correct redacted copies of five of these Certificates of Completion are attached hereto as **Exhibit N**.   As explained in paragraph 16, this Certificate is representative of the other 395 Certificates in form and content.   Petitioners' email addresses and IP addresses have been redacted from **Exhibit N**.

Gibson, Dunn &
Crutcher LLP

16.     Each Certificate of Completion provided by Keller Lenkner on January 9, 2020 shares certain characteristics, including:

a)  Each lists the "Envelope Originator" as Jeremy Troxel.

b)  Each lists Mr. Troxel's address as "910 17th Street, NW Washtington, DC 20006."

c)  Each notifies the signer that if he or she "no longer wish[es] to receive future notices and disclosures in electronic format," the signer must either (i) "decline to sign" the document and "select the check-box indicating that you wish to withdraw your consent," or (ii) "send us an email to jon@pioneertownmedia.com" with certain information.

d)  Each indicates that the signer has a "relationship with Troxel Law."

e)  Each contains no reference to Keller Lenkner.

17.     A true and correct copy of excerpts of the transcript of the deposition of Allen Waxman held on December 27, 2019 is attached hereto as **Exhibit O**.

18.     A true and correct copy of the declaration of Professor Nancy J. Moore in the case of *In re CenturyLink Sales Practices and Sec. Litig.*, No. 17-md-02795-MJD-KMM, Dkt. 510 (D. Minn. Jan. 10, 2020), is attached hereto as **Exhibit P**.

19.     A true and correct copy of the engagement agreement at issue in *In re CenturyLink Practices and Sec. Litig.*, No. 17-md-02795-MJD-KMM (D. Minn. Jan. 10, 2020), is attached hereto as **Exhibit Q**.


I declare under penalty of perjury pursuant to the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed at Washington, D.C., on this 16th day of January, 2020.


                                        */s/ Joshua Lipshutz*
                                        Joshua Lipshutz

Gibson, Dunn &
Crutcher LLP

# EXHIBIT A

**From:**       Lipshutz, Joshua S.
**To:**         wdp@kellerlenkner.com; ack@kellerlenkner.com; tdl@kellerlenkner.com; mpr@kellerlenkner.com
**Cc:**         Fogelman, James P.; Holecek, Michael; Wilhelm, Andrew
**Subject:**    Data for Abernathy/Boyd
**Date:**       Wednesday, December 4, 2019 11:08:54 PM
**Attachments:** KL DATA 2019.12.04.xlsx
                ATT00001.htm

Warren et al.,
Attached is a spreadsheet containing the data we discussed.  The first two tabs replace the spreadsheet I sent a few days ago and reflect amended sets of the same data.  The third tab contains data regarding the Petitioners who are in the DoorDash system and completed the application process.

Best,
Josh

# EXHIBIT B

| | |
|---|---|
| **From:** | Holecek, Michael |
| **To:** | Warren Postman; Lipshutz, Joshua S.; Ashley Keller; Travis Lenkner; Marquel Reddish |
| **Cc:** | Fogelman, James P.; Wilhelm, Andrew |
| **Subject:** | RE: Data for Abernathy/Boyd |
| **Date:** | Thursday, December 12, 2019 11:26:57 PM |
| **Attachments:** | Opt Out List.xlsx |

Warren,

Here is a spreadsheet listing the Boyd/Abernathy Dashers who submitted opt outs before November 9, 2019.

Best,

**Michael J. Holecek**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7018 • Fax +1 213.229.6018
MHolecek@gibsondunn.com • www.gibsondunn.com

---

**From:** Holecek, Michael
**Sent:** Wednesday, December 11, 2019 6:47 PM
**To:** 'Warren Postman' <wdp@kellerlenkner.com>; Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>; Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Wilhelm, Andrew <AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,

Attached is the spreadsheet that lists the date on which each Boyd/Abernathy Dasher who has made a delivery since November 9, 2019 accepted the current ICA.

We expect to have the opt-out information tomorrow or by Friday.

We will target 12/20 for an update on the list of Boyd/Abernathy Dashers who have completed a delivery since November 9, 2019, along with the dates on which they accepted the new terms.

Best,
Michael


**Michael J. Holecek**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP

333 South Grand Avenue, Los Angeles, CA 90071-3197

Tel +1 213.229.7018 • Fax +1 213.229.6018

MHolecek@gibsondunn.com • www.gibsondunn.com

---

**From:** Warren Postman <wdp@kellerlenkner.com>
**Sent:** Wednesday, December 11, 2019 12:47 PM
**To:** Holecek, Michael <MHolecek@gibsondunn.com>; Lipshutz, Joshua S.
<JLipshutz@gibsondunn.com>; Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner
<tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Wilhelm, Andrew
<AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

[External Email]
Thank you Michael,

Please let us know when DoorDash will provide the information regarding opt outs and when
Petitioners have signed the CPR agreement.

Regarding updates, we think it would make sense for DoorDash to provide updates on December 20,
so that we can provide up-to-date information in our amended motion to compel, and then again
several days before the hearing on the motion.  Please let me know if that works for you.

Your response below has convinced us that we do not need to seek discovery regarding amount in
controversy.

Sincerely,

**Warren D. Postman**
Partner

## Keller | Lenkner

1300 I Street, N.W., Suite 400E | Washington, D.C. 20005

202.749.8334 | Website | Email

---

**From:** Holecek, Michael <MHolecek@gibsondunn.com>
**Sent:** Monday, December 9, 2019 5:30 PM
**To:** Warren Postman <wdp@kellerlenkner.com>; Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>;
Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish
<mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Wilhelm, Andrew
<AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,

We are willing to try to identify the plaintiffs who have already submitted opt-outs, and the dates of those opt-outs.  For the Dashers who have made a delivery after November 9, we are willing to provide the date on which they assented to the updated ICA agreement.

We can also send you updated information at a future date, although we cannot commit to weekly updates, which we do not believe is reasonable.

We do not believe that discovery is necessarily in order for you to comply with AAA's requirement to allege an amount in controversy.  The amount in controversy is simply the plaintiff's best estimate of the amount at issue, based on the information available to the plaintiff at the time he/she files a complaint or arbitration demand.  There is no basis for compelling discovery simply so that a plaintiff can make a good-faith, initial allegation of an amount in controversy.

**Michael J. Holecek**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7018 • Fax +1 213.229.6018
MHolecek@gibsondunn.com • www.gibsondunn.com

---

**From:** Warren Postman <wdp@kellerlenkner.com>
**Sent:** Sunday, December 8, 2019 8:02 AM
**To:** Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>; Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Holecek, Michael <MHolecek@gibsondunn.com>; Wilhelm, Andrew <AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

[External Email]
Thank you Josh,

Please see our responses inline below.

Sincerely,

**Warren D. Postman**
Partner

## Keller | Lenkner

1300 I Street, N.W., Suite 400E | Washington, D.C. 20005
202.749.8334 | Website | Email

---

**From:** Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>
**Sent:** Friday, December 6, 2019 4:25 PM

**To:** Warren Postman <wdp@kellerlenkner.com>; Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Holecek, Michael <MHolecek@gibsondunn.com>; Wilhelm, Andrew <AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,
Responses to your questions are below.

- We had requested a complete library of DoorDash's past ICAs and the date on which each was rolled out.  Are you planning to provide that?
  Attached is a collection of past ICAs.  We reserve the right to supplement this collection in the future.
- In the spreadsheet you attached, there are 650 rows for which the "Last Delivery" column is blank.  Is it DoorDash's position that no delivery was ever made under those accounts?  If so, is DoorDash confident of that position, or is it still reviewing records such that it may find additional deliveries?
  We have not found any record of deliveries for those accounts.  We are confident in that assessment and we are not still reviewing our records.
- For the Dashers you found, please identify any who have already submitted opt-outs from any arbitration agreement and the date of the opt-out.
  If your clients believe they opted out of any of the DoorDash arbitration agreements, then your clients should have that information.  This is information you should have collected from your clients before asserting arbitration demands against DoorDash.
  We did collect this information from our clients. But Judge Alsup asked for a precise accounting of who is subject to what arbitration agreement, and he said that if DoorDash is going to hide the ball on this issue, we can get the information in discovery. Although we do not expect any inconsistency, we simply want to confirm that your records match our clients' recollections. That is not a burdensome request and is consistent with Judge Alsup's instructions.
- For the 1,609 Dashers who have made a delivery after November 9, please identify the date on which they assented to the CPR agreement.  Given the questions Judge Alsup may have over time, we think it would make sense for DoorDash to provide weekly updates regarding additional Dashers who have assented to the CPR agreement.
  This is not among the information we discussed.  Please explain why it is necessary for purposes of responding to Judge Alsup's order.
  As noted, Judge Alsup asked for a precise accounting of who is subject to what arbitration agreement, including who has opted out of the CPR agreement. As we continue to collect opt-outs, the validity of those opt outs may depend on when each Petitioner first signed the CPR agreement. We are collecting this information from our clients but, again, want to confirm that your records match our clients' recollections. This is not a burdensome request and is consistent with Judge Alsup's instructions.
  As to weekly updates, our informal exchange is intended to be a substitute for

formal discovery. If we served formal discovery, DoorDash would have an obligation to supplement its responses, so we are asking for the informal equivalent.

- Will DoorDash be opposing Petitioners' motion to compel on the ground that they did not provide an amount in controversy in their demand?  If so, we need to know this week, as we will request driving data for each Petitioner.  If not, we will not request that information at this time.

Providing the amount in controversy as part of your clients' arbitration demands is required under the parties' ICA and AAA rules.  Based on the information you should have received from your clients before asserting claims against DoorDash, and other information within your clients' possession, you should be able to include in your demands a reasonable estimate of the amount in controversy.  If you are unable to do so, please explain why such information is not in your clients' possession and why you believe you need data from DoorDash to make such an estimate.  We can then discuss whether DoorDash is willing to waive the requirement for Petitioners.

DoorDash's app does not provide all the data needed to estimate a Dasher's damages. For example, it does not disclose total mileage or total hours on the app. What data the app does provide is available only in a cumbersome format that would require hundreds or thousands of individual screenshots to collect. DoorDash is under no obligation to waive what it believes to be a requirement under the ICA or AAA rules. (And of course, AAA already determined that our clients satisfied all of their filing obligations.) But if DoorDash intends to contest this issue in connection with the motion to compel, Judge Alsup made clear that we are entitled to the underlying information. If DoorDash will not agree to provide the information through this informal process, we will serve discovery on this point at the end of the day Monday.

- We are collecting a significant number of opt-outs from the CPR agreement.  For everyone's convenience, will DoorDash accept electronic delivery of those opt-outs?  If so, we would provide individual, signed opt-outs for each client together with a master spreadsheet summarizing who has submitted signed opt-outs.

No.  Opt outs are effective only if they comply with the requirements of the ICA.  As we have discussed before, if there are individual circumstances in which Petitioners are unable to comply with those requirements, we are willing to consider waiving those requirements on a case-by-case basis.

That's fine. The suggestion was as much for DoorDash's convenience as ours. If DoorDash later decides that it would prefer electronic copies, just let me know.

**Joshua S. Lipshutz**
**Partner**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.955.8217 • Fax +1 202.530.9614

555 Mission Street, San Francisco, CA 94105-0921

Tel +1 415.393.8233 • Fax +1 415.374.8469
JLipshutz@gibsondunn.com • www.gibsondunn.com

---

**From:** Warren Postman <wdp@kellerlenkner.com>
**Sent:** Thursday, December 5, 2019 11:39 AM
**To:** Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>; Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Holecek, Michael <MHolecek@gibsondunn.com>; Wilhelm, Andrew <AWilhelm@gibsondunn.com>
**Subject:** Re: Data for Abernathy/Boyd

[External Email]
Josh,

Thank you for this information.  Below are our follow-up requests/questions:

- We had requested a complete library of DoorDash's past ICAs and the date on which each was rolled out.  Are you planning to provide that?
- In the spreadsheet you attached, there are 650 rows for which the "Last Delivery" column is blank.  Is it DoorDash's position that no delivery was ever made under those accounts?  If so, is DoorDash confident of that position, or is it still reviewing records such that it may find additional deliveries?
- For the Dashers you found, please identify any who have already submitted opt-outs from any arbitration agreement and the date of the opt-out.
- For the 1,609 Dashers who have made a delivery after November 9, please identify the date on which they assented to the CPR agreement.  Given the questions Judge Alsup may have over time, we think it would make sense for DoorDash to provide weekly updates regarding additional Dashers who have assented to the CPR agreement.
- Will DoorDash be opposing Petitioners' motion to compel on the ground that they did not provide an amount in controversy in their demand?  If so, we need to know this week, as we will request driving data for each Petitioner.  If not, we will not request that information at this time.
- We are collecting a significant number of opt-outs from the CPR agreement.  For everyone's convenience, will DoorDash accept electronic delivery of those opt-outs?  If so, we would provide individual, signed opt-outs for each client together with a master spreadsheet summarizing who has submitted signed opt-outs.

Please let us know your position on each of the above points.  If it would be helpful to talk these through live, we can be available this afternoon at  4pm ET or later.

Sincerely,

**Warren D. Postman**
Partner

## Keller | Lenkner

1300 I Street, N.W., Suite 400E | Washington, D.C. 20005

202.749.8334 | Website | Email

---

**From:** "Lipshutz, Joshua S." <JLipshutz@gibsondunn.com>
**Date:** Wednesday, December 4, 2019 at 11:09 PM
**To:** Warren Postman <wdp@kellerlenkner.com>, Ashley Keller <ack@kellerlenkner.com>, Travis Lenkner <tdl@kellerlenkner.com>, Marquel Reddish <mpr@kellerlenkner.com>
**Cc:** "Fogelman, James P." <JFogelman@gibsondunn.com>, "Holecek, Michael" <MHolecek@gibsondunn.com>, "Wilhelm, Andrew" <AWilhelm@gibsondunn.com>
**Subject:** Data for Abernathy/Boyd

Warren et al.,

Attached is a spreadsheet containing the data we discussed.  The first two tabs replace the spreadsheet I sent a few days ago and reflect amended sets of the same data.  The third tab contains data regarding the Petitioners who are in the DoorDash system and completed the application process.

Best,
Josh

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or our privacy policy.

---

This message may contain confidential and privileged information for the sole use of the intended recipient. Any review, disclosure, distribution by others or forwarding without express permission is strictly prohibited. If it has been sent to you in error, please reply to advise the sender of the error and then immediately delete this message.

Please see our website at https://www.gibsondunn.com/ for information regarding the firm and/or

our privacy policy.

# EXHIBIT C

| | |
|---|---|
| **From:** | Marquel Reddish |
| **To:** | Holecek, Michael; Warren Postman; Lipshutz, Joshua S.; Ashley Keller; Travis Lenkner |
| **Cc:** | Fogelman, James P.; Wilhelm, Andrew |
| **Subject:** | RE: Data for Abernathy/Boyd |
| **Date:** | Thursday, December 19, 2019 6:20:39 PM |

[External Email]

Counsel,

Here (password to follow) is supplementary information for 79 Petitioners for whom DoorDash stated it either could not locate their account or located an account but DoorDash claims that the Petitioner either (i) did not complete the paperwork necessary to make deliveries for DoorDash; or (ii) completed the paperwork but never performed a delivery. Tab 1 of the spreadsheet (PET0000002) provides the updated information for these 79 Petitioners. The PDF portfolio (PET0000003) provides screenshots and other documentary proof of Petitioners' Dasher accounts and their corresponding deliveries.

Based on our review of the supplementary information Petitioners have provided, we have some concerns about the process by which DoorDash has searched for Petitioners' Dasher accounts. On December 6, DoorDash confirmed it had completed its search and was comfortable with the data it provided. Yet several Petitioners have submitted documentary proof that they have a Dasher account with deliveries and that the account is associated with the same information that we provided to DoorDash. For example, DoorDash's search showed that Cornell Thompson (5550777) did not complete any deliveries for DoorDash. The email provided to DoorDash for it to conduct its search was warkry77@gmail.com. Based on the documentation Mr. Thompson provided, that email is the same associated with his Dasher account, and Mr. Thompson made deliveries on that account. Similarly, for Marquise Chopra (5724529), we provided you with the email marquise.rideshare@yahoo.com. Based on that information, DoorDash stated it could not find a Dasher account for Mr. Chopra. But screenshots from Mr. Chopra's Dasher account clearly show an account associated with that email. The same thing occurred for Rodolfo Molina (5501497).

Could DoorDash please explain how these discrepancies occurred and the process by which it searched for Petitioners' Dasher accounts? We would also request that DoorDash conduct a manual search for each Dasher it claims never had an account, never completed their paperwork, or never completed any deliveries to catch similar occurrences. We will also continue to collect information from Petitioners and supplement on a rolling basis.

Finally, based on the data DoorDash provided, there are seven Petitioners for whom DoorDash indicated their last delivery was after DoorDash rolled out the new CPR agreement but for whom DoorDash did not provide a CPR signature date. Those Petitioners are on Tab 2 of PET0000002. Were these Petitioners not prompted to sign the CPR agreement when they logged on to complete a delivery? If so, why not? If they were prompted, can DoorDash please explain why these Petitioners were not flagged as having signed the CPR agreement.

Regards,

Marquel

**Marquel Reddish**
Associate
Keller | Lenkner
150 N. Riverside Plaza, Suite 4270 | Chicago, IL 60606
w: 312-948-8468 | m: 312-248-9848
Website | Email

---

**From:** Holecek, Michael <MHolecek@gibsondunn.com>
**Sent:** Thursday, December 12, 2019 22:27
**To:** Warren Postman <wdp@kellerlenkner.com>; Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>;
Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish
<mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Wilhelm, Andrew
<AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,

Here is a spreadsheet listing the Boyd/Abernathy Dashers who submitted opt outs before November
9, 2019.

Best,

**Michael J. Holecek**

GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7018 • Fax +1 213.229.6018
MHolecek@gibsondunn.com • www.gibsondunn.com

---

**From:** Holecek, Michael
**Sent:** Wednesday, December 11, 2019 6:47 PM
**To:** 'Warren Postman' <wdp@kellerlenkner.com>; Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>;
Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish
<mpr@kellerlenkner.com>
**Cc:** Fogelman, James P. <JFogelman@gibsondunn.com>; Wilhelm, Andrew
<AWilhelm@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,

Attached is the spreadsheet that lists the date on which each Boyd/Abernathy Dasher who has made
a delivery since November 9, 2019 accepted the current ICA.

# EXHIBIT D

GIBSON, DUNN & CRUTCHER LLP
JOSHUA S. LIPSHUTZ, SBN 242557
  jlipshutz@gibsondunn.com
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Telephone:   415.393.8200
Facsimile:   415.393.8306

THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
MICHAEL HOLECEK, SBN 281034
  mholecek@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:   213.229.7000
Facsimile:   213.229.7520

Attorneys for Defendant DOORDASH, INC.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| R. HARRIMAN,<br><br>                    Plaintiff,<br><br>        v.<br><br>DOORDASH, INC.,<br><br>                    Defendant. | CASE NO. 3:19-cv-06411-LB<br><br>**[PROPOSED] ORDER GRANTING DEFENDANT'S ADMINISTRATIVE MOTION TO STAY PENDING FINAL APPROVAL OF CLASS SETTLEMENT**<br><br>Action Filed:  October 7, 2019<br><br>Honorable Magistrate Judge Laurel Beeler |

Gibson, Dunn &
Crutcher LLP

[PROPOSED] ORDER GRANTING DEFENDANT'S ADMINISTRATIVE MOTION
TO STAY PENDING FINAL APPROVAL OF CLASS SETTLEMENT
CASE NO. 3:19-CV-06411-LB

1    This matter is before the Court on DoorDash, Inc.'s Administrative Motion to Stay Pending

2 Final Approval of Class Settlement.  After full consideration of the arguments, the Court finds that a

3 stay is in the best interests of judicial efficiency and comity.  Accordingly, the Court hereby GRANTS

4 DoorDash's Motion and STAYS this case pending final approval of the class settlement in *Marciano*

5 *v. DoorDash, Inc.*, No. CGC-18-567869 (S.F. Superior Court).

6    **IT IS SO ORDERED.**

7

8

DATED:  December 16, 2019

9                                                     _____

10                                                    Honorable Laurel Beeler
                                                      United States Magistrate Judge

Gibson, Dunn &
Crutcher LLP

# EXHIBIT E

1   JOSHUA S. LIPSHUTZ, Bar No. 242557
    GIBSON DUNN & CRUTCHER LLP
2   555 Mission Street, Suite 3000
    San Francisco, CA 94105-092
3   Telephone: 415.393.8200
    Facsimile: 415.393.8306
4
5   ANDREW M. SPURCHISE, Bar No. 245998
    LITTLER MENDELSON, P.C.
6   900 Third Avenue
    New York, New York 10022-3298
7   Telephone:    212.583.9600
    Fax No.:      212.832.2719
8
    Attorneys for Defendant
9   DOORDASH, INC.

10  SHANNON LISS-RIORDAN
    LICHTEN & LISS-RIORDAN, P.C.
11  729 Boylston Street, Suite 2000
    Boston, MA 02116
12  Telephone:    617.994.5800
    Fax No.:      617.994.5801
13
    Attorneys for Plaintiffs
14  CYNTHIA MARCIANO, DAVID CRISTINI,
    DARNELL AUSTIN, MANUEL MAGANA, and
15  JARED ROUSSEL

16              SUPERIOR COURT OF THE STATE OF CALIFORNIA

17                  FOR THE COUNTY OF SAN FRANCISCO

18

19
    CYNTHIA MARCIANO, DAVID              Case No.  CGC-18-567869
20  CRISTINI, DARNELL AUSTIN,
    MANUEL MAGANA, and
21  JARED ROUSSEL                        **CLASS ACTION SETTLEMENT
                                         AGREEMENT AND RELEASE**
22
            Plaintiffs,
23  v.

24
    DOORDASH, INC.,
25
            Defendant.
26

27

28

                                      1.

DocuSign Envelope ID: 480E6B67-260B-4467-A905-7FD57DA1F06A

This Class Action Settlement Agreement and Release, including Exhibits 1 - 3 hereto ("Settlement Agreement" or "Agreement"), is made and entered into by, between, and among Plaintiffs Cynthia Marciano, David Cristini, Darnell Austin, Manuel Magana, and Jared Roussel ("Plaintiffs") on behalf of themselves and the Settlement Class and the State of California as defined below, on the one hand, and Defendant DoorDash, Inc. ("Defendant" or "DoorDash") on the other hand.  Plaintiffs and Defendant (collectively, the "Parties") enter into this Agreement to effect a full and final settlement and preclusive judgment resolving all claims brought or that could have been brought against DoorDash in the consolidated cases *Marciano v. DoorDash, Inc.*, CGC-18-567869 (San Francisco Super. Ct.) ("*Marciano*"), and *Austin v. DoorDash, Inc.*, No. 1:17-cv-12498 (D. Mass.) ("*Austin*"), including as amended pursuant to this Agreement (collectively, the "Action"), and all claims based on or reasonably related thereto.  This Agreement is intended to fully and finally compromise, resolve, discharge, and settle the Released Claims, as defined and on the terms set forth below, and to the full extent reflected herein, subject to the approval of the Court.

## I.    RECITALS

This Agreement is made in consideration of the following facts:

1.1    WHEREAS, on July 5, 2018, Plaintiff Cynthia Marciano and David Cristini filed a Private Attorneys General Act, Labor Code §§ 2698, *et seq.* ("PAGA") representative action complaint in San Francisco County Superior Court (Case No. CGC-18-567869) asserting various Labor Code claims against DoorDash arising from DoorDash's alleged misclassification of delivery drivers in California as independent contractors on behalf of the State of California Labor and Workforce Development Agency ("LWDA"), herself, and all delivery drivers in California treated by DoorDash as independent contractors (the "*Marciano* Action");

1.2    WHEREAS, on May 8, 2018, Plaintiff Manuel Magana brought class claims based on the same theory of misclassification and Labor Code violations on behalf of a proposed class consisting of all delivery drivers in California treated by DoorDash as independent contractors, which was removed to federal court where it proceeded as *Magana v. DoorDash Inc.,* Civ. A. No. 4:18-cv-03395-PJH (N.D. Cal.);

2.

1.3    WHEREAS, on September 26, 2017, Plaintiff Darnell Austin brought class claims based on the same theory of misclassification and wage violations on behalf of a proposed class consisting of all delivery drivers in Massachusetts treated by DoorDash as independent contractors, which was removed to federal court where it proceeded as *Austin v. DoorDash Inc.,* Civ. A. No. 4 No. 1:17-cv-12498-IT (D. Mass.);

1.4    WHEREAS, on March 12, 2019, Plaintiff Jared Roussel, who opted out of DoorDash's arbitration clause, brought PAGA claims based on the same theory of misclassification and Labor Code violations on behalf of a proposed class consisting of all delivery drivers in California treated by DoorDash as independent contractors in San Francisco County Superior Court (Case No. CGC-19-572934);

1.5    WHEREAS, Plaintiffs allege generally that DoorDash improperly classified them and all putative Settlement Class Members as independent contractors rather than employees, and assert derivative claims related thereto;

1.6    WHEREAS, DoorDash denies the allegations in the Action; maintains each and any delivery driver's claims must be individually arbitrated pursuant to that delivery driver's arbitration agreement; denies that it has engaged in any wrongdoing; denies that any Settlement Class Member was ever an employee of DoorDash; denies that Plaintiffs' allegations state valid claims; denies that a litigation class could properly be certified in the Action; denies that Plaintiffs' claims could properly be maintained as a representative action; and states that it is entering into this Settlement Agreement solely to eliminate the burden, expense, and delay of further arbitrations and litigation, and on the express conditions that (a) if for any reason the Settlement is not finalized according to the terms of this Agreement, the Settlement and the documents generated as a result of the Settlement shall not be usable for any purpose in any of the Actions or Arbitration, and (b) this Settlement and the documents generated as a result of the Settlement are not admissible or usable in any other proceeding or arbitration, except to the extent necessary to enforce this Settlement and the orders, judgment and agreements arising from this Settlement or as may be required to be cited and offered in support of a request to stay or dismiss

3.

DocuSign Envelope ID: 480B6B57-0A0B-4167-A9D5-7FD57DA1E06A

other legal proceedings involving DoorDash raising similar issues, including but limited to pending litigations, arbitrations, and agency proceedings.

1.7     WHEREAS, a bona fide dispute exists as to whether any amount of wages or penalties are due from Defendant to any putative Settlement Class Member or to the LWDA;

1.8     WHEREAS, in preparation for mediation, the Parties engaged in informal discovery, exchanging information, documents and reviewing and analyzing extensive data made available by DoorDash, which enabled Plaintiffs and the mediator to thoroughly evaluate Plaintiffs' claims and the claims of the putative class, and the likely outcomes, risks and expense of pursuing litigation;

1.9     WHEREAS, the Parties attended an in-person mediation session on September 10, 2019, with professional mediator Mark Irvings, and continued to discuss settlement terms at length with the mediator following the mediation session, before agreeing to the terms of this arm's-length Settlement;

1.10    WHEREAS, as a result of the mediation, Plaintiffs and Class Counsel believe that the Settlement provides a favorable recovery for the Settlement Class, based on the claims asserted, the evidence developed, and the damages that might be proven against DoorDash in the Action.  The Plaintiffs and Class Counsel further recognize and acknowledge the expense and length of continued proceedings necessary to prosecute the Action against DoorDash through trial and appeals.  They also have considered the uncertain outcome and the risk of any litigation, especially in complex litigation such as the Action, as well as the difficulties and delays inherent in any such litigation.  They are also mindful of the inherent challenges of proof and the strength of the defenses to the alleged claims, and therefore believe that it is desirable that the Released Claims be fully and finally compromised, settled, and resolved with prejudice as set forth herein, subject to the approval of the Court;

1.11    WHEREAS, Class Counsel agrees to take any and all steps necessary to dismiss pending cases before the American Arbitration Association brought by her firm on behalf of Settlement Class Members;

1.12    WHEREAS, Plaintiffs and Class Counsel, based on their own independent investigations and evaluations, have examined the benefits to be obtained under the terms of this Settlement Agreement, have considered the claims of the Plaintiffs, the claims of the average Settlement Class

4.

Member, the risks associated with the continued prosecution of the Action, and the likelihood of success on the merits of the Action, and believe that, after considering all the circumstances, including the uncertainties surrounding the risk of further litigation and the defenses that DoorDash has asserted and could assert, the proposed Settlement set forth in this Agreement is fair, reasonable, adequate, in the best interests of the Plaintiffs and the Settlement Class, and confers substantial benefits upon the Settlement Class;

1.13    WHEREAS, Plaintiffs warrant and represent that they are competent to enter into this Settlement and are effecting this Settlement and executing this Agreement after having received full legal advice as to their respective rights and have had the opportunity to obtain independent counsel to review this Agreement;

1.14    WHEREAS, the Parties further agree that the Agreement, the fact of this Settlement, and any of the terms of this Agreement, and any documents filed in connection with the Settlement shall not constitute, or be offered, received, claimed, construed, or deemed as, an admission, finding, or evidence of: (i) any wrongdoing, (ii) any violation of any statute or law, (iii) any liability on the claims or allegations in the Action on the part of any Released Parties, or (iv) any waiver of DoorDash's right to arbitration or enforceability of any DoorDash arbitration agreement, or (v) the propriety of certifying a litigation class or pursuing representative relief under the PAGA in the Action or any other proceeding; and shall not be used by any Person for any purpose whatsoever in any legal proceeding, including but not limited to arbitrations or agency proceedings, other than a proceeding to enforce the terms of the Agreement; provided, however, that this settlement may be cited and offered in support of a request to stay or dismiss other legal proceedings involving DoorDash raising similar issues, including but limited to pending litigations, arbitrations, and agency proceedings.  Nothing in this settlement alters the classification of the delivery providers as independent contractors.  There has been no final determination by any court as to the merits of the claims asserted by Plaintiffs against DoorDash, nor has there been any final determination as to whether a class should be certified or whether representative claims may properly be pursued, other than for settlement purposes only;

5.

1.15    WHEREAS, for settlement purposes only, DoorDash will stipulate to the certification of class claims that are subject to the certification requirements of California Code of Civil Procedure Section 382.  DoorDash disputes that certification is proper for the purposes of litigating the class claims proposed in or flowing from the claims asserted in the *Marciano*, *Magana*, *Roussel*, or *Austin* Actions. DoorDash expressly reserves the right to oppose certification of any purported class should the Settlement fail to become final and effective;

1.16    WHEREAS, the Parties desire to compromise and settle all issues and claims that have been, could have been, or should have been brought against DoorDash or related persons in the Action, including all claims brought on a putative class and representative basis in the *Marciano* Action;

1.17    NOW, THEREFORE, IT IS HEREBY STIPULATED, CONSENTED TO, AND AGREED, by the Plaintiffs for themselves and on behalf of the Settlement Class, and by DoorDash that, subject to the approval of the Court, the *Marciano*, *Magana*, *Roussel*, or *Austin* Actions shall be settled, compromised, and dismissed, on the merits and with prejudice, and the Released Claims shall be finally and fully compromised, settled and dismissed as to the Released Parties, in the manner and upon the terms and conditions hereafter set forth in this Agreement.

## II.    DEFINITIONS

Unless otherwise defined herein, capitalized terms used in this Agreement shall have the meanings set forth below:

2.1    "California Settlement Class" means all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California during the Relevant Period and performed at least one delivery in California from August 30, 2016 through February 29, 2020 or the date of preliminary approval of the settlement, whichever comes first.

2.2    "Claim Form" means the document included in the Class Notice which Settlement Class Members must complete and return to receive Settlement Payments.

2.3    "Class Counsel" means Lichten & Liss-Riordan, P.C. and The Law offices of Todd M. Friedman, P.C., who will share in the Class Counsel Award.

6.

DocuSign Envelope ID: 480B6B67-0A0B-4162-A9D5-7BB57DA1F06A

2.4   "Class Counsel Award" means (i) the attorneys' fees for Class Counsel's litigation and resolution of the Action, and all arbitrations and claims resolved by this Settlement, as awarded by the Court, which may not exceed one third (1/3) of the Total Settlement Amount and (ii) all expenses and costs incurred by Class Counsel in litigation and resolution of the Action, and all arbitrations and claims resolved by this Settlement, as awarded by the Court.

2.5   "Class Information" means information regarding Settlement Class Members that Defendant will in good faith compile from its records and provide to the Settlement Administrator. Class Information shall be provided in a Microsoft Excel spreadsheet and shall include, if possible, for each Settlement Class Member: full name, last known address, email address and other data necessary to determine, pursuant to an agreed-upon formula, the payment the Settlement Class Member shall receive. Because Settlement Class Members' private information is included in the Class Information, Class Counsel and the Settlement Administrator shall maintain the Class Information in confidence and shall use and disclose Class Information only for purposes of this Settlement and for no other purpose; access shall be limited to employees of the Class Counsel and the Settlement Administrator with a need to use the Class Information as part of the administration of the Settlement.

2.6   "Class Notice" means the notice of class action settlement to be provided to Settlement Class Members, without material variation from Exhibit 1.

2.7   "Court" means San Francisco County Superior Court.

2.8   "Delivery Miles" means the total number of miles between the location where orders are received and accepted by the driver and the location where orders are delivered (which includes distance spent driving to the restaurant and distance spent driving from the restaurant to the customer), for each Settlement Class Member during the Settlement Class Period, as determined by DoorDash's records.

2.9   "Dispute Resolution Fund" means the fund consisting of $350,000 set aside from the Global Settlement Fund to be used: (i) to resolve any bona fide disputes that may arise regarding the calculation and disbursement of Settlement Payments according to the Plan of Allocation; and (ii) to

disburse Settlement Payments to individuals mistakenly excluded from the Settlement Class. The Dispute Resolution Fund shall be paid from the Global Settlement Fund.

2.10 "Effective Date" means seven (7) days after which both of the following events have occurred: (i) the Court's Final Approval order has been entered and (ii) the Court's Final Approval order and Judgment have become Final.

2.11 "Exclusion/Written Objection Deadline" means the final date by which a Settlement Class Member may either (i) object to any aspect of the Settlement, or (ii) request to be excluded from the Settlement. The Exclusion/Written Objection Deadline shall be sixty (60) days after the Notice Date, and shall be specifically identified and set forth in the Preliminary Approval Order and the Class Notice.

2.12 "Final" when referring to a judgment or order, means that (i) the judgment is a final, appealable judgment; and (ii) either (a) no appeal has been taken from the judgment as of the date on which all times to appeal therefrom have expired, or (b) an appeal or other review proceeding of the judgment having been commenced, such appeal or other review is finally concluded and no longer is subject to review by any court, whether by appeal, petitions for rehearing or re-argument, petitions for re-hearing en banc, petitions for writ of certiorari, or otherwise, and such appeal or other review has been finally resolved in such manner that affirms the judgment order in its entirety.

2.13 "Final Approval" means the Court's entry of a Final Approval order finally approving this Settlement.

2.14 "Final Approval Hearing" means the hearing at or after which the Court will make a final decision as to whether the Settlement is fair, reasonable, and adequate, and therefore, finally approved by the Court.

2.15 "Judgment" means the judgment to be entered in the Action on Final Approval of this Settlement.

2.16 "Legally Authorized Representatives" means an administrator/administratrix, personal representative, or executor/executrix of a deceased Settlement Class Member's estate; a guardian,

8.

conservator, or next friend of an incapacitated Settlement Class Member; or any other legally appointed person responsible for handling the business affairs of a Settlement Class Member.

2.17    "Massachusetts Settlement Class" means all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts during the Relevant Period and performed at least one delivery in Massachusetts from September 26, 2014 through February 29, 2020 or the date of preliminary approval of the settlement, whichever comes first.

2.18    "Named Plaintiffs' General Released Claims" means any and all past, present, and future claims, actions, demands, causes of action, suits, debts, obligations, damages, penalties, rights or liabilities, of any nature and description whatsoever, known or unknown, contingent or accrued, existing or potential, recognized now or hereafter, expected or unexpected, pursuant to any theory of recovery (including but not limited to those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, or regulation, and for claims for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs or disbursements), against the Released Parties, including unknown claims covered by California Civil Code section 1542, as quoted below in Paragraph 9.4, by the Plaintiffs, arising during the period from the beginning of the Plaintiffs' first interaction with DoorDash to the date on which the Court enters the order of Final Approval of this Settlement, for any type of relief that can be released as a matter of law, including, without limitation, claims for wages, damages, unpaid costs, penalties (including civil and waiting time penalties), liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief with the exception of any claims which cannot be released as a matter of law.  Plaintiffs will generally release all known and unknown claims against DoorDash, and waive the application of section 1542 of the California Civil Code.  The claims released pursuant to this paragraph include but are not limited to the Settlement Class Members' Released Claims, as well as any other claims under any provision of the FLSA, the California Labor Code (including sections 132a, 4553 *et seq.*) or any applicable California Industrial Welfare Commission Wage Orders, Massachusetts General Laws, and claims under state or federal discrimination statutes, including,

9.

without limitation, the California Fair Employment and Housing Act, California Government Code section 12940 *et seq.*; the California Business and Professions Code sections 17200 *et seq*; the Unruh Civil Rights Act, California Civil Code section 51 *et seq.*; the California Constitution; the Massachusetts Constitution; the Massachusetts Civil Rights Act; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 *et seq.*; the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*; the Age Discrimination in Employment Act of 1967, as amended; the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*; and all of their implementing regulations and interpretive guidelines, as well as any other similar state, federal, local, or common law claims for unpaid wages, minimum wages, regular wages, tips, gratuities, overtime wages (including but not limited to calculation of the correct overtime or regular rate), working more than six days in seven, expense reimbursement, wage statements, payroll recordkeeping, reporting time, improper deduction of wages, failure to provide workers' compensation insurance, meal periods, rest breaks, sick leave, final pay, penalties for timely payment of wages upon discharge, waiting time penalties, PAGA penalties, unfair business practices, the alleged use of tips to meet any minimum-pay guarantees, all claims in the pending arbitration demands filed with AAA concerning the alleged misclassification of Dashers.

2.19    "Notice Date" means the date of the initial distribution of the Class Notice to Settlement Class Members, as set forth in Section III.

2.20    "Opt Out List" means the Court-approved list of all persons who timely and properly request exclusion from the Settlement Class.

2.21    "Plaintiffs" means Cynthia Marciano, David Cristini, Darnell Austin, Manuel Magana, and Jared Roussel.

2.22    "PAGA Claims" means the Plaintiffs' representative claims seeking penalties pursuant to PAGA, as alleged in the Complaint and/or based on any other provision of the Labor Code, Wage Orders or any other statute or regulation (whether identified in the Complaint or not) to the fullest extent permitted by law.

2.23    "PAGA Payment" means a total payment of $750,000 to settle all claims under the PAGA. From this amount, 75% will be paid to the LWDA for civil penalties pursuant to the PAGA and 25% will be distributed to Responding Settlement Class Members from California.

2.24    "Plan of Allocation" means the plan for allocating the Settlement Payment Fund and between and among Responding Settlement Class Members as approved by the Court.

2.25    "Preliminary Approval Date" means the date that the Court enters the Preliminary Approval Order and thus: (i) preliminarily approves the Settlement, and the exhibits thereto, and (ii) enters an order providing for notice to the Settlement Class, an opportunity to opt out of the Settlement Class, an opportunity to submit timely and proper objections to the Settlement, and setting a hearing on the fairness of the terms of Settlement, including approval of the Class Counsel Award.

2.26    "Preliminary Approval Order" means the order that the Plaintiffs and DoorDash will seek from the Court, without material variation from Exhibit 2. Entry of the Preliminary Approval Order shall constitute preliminary approval of the Settlement Agreement.

2.27    "Released Claims" means (i) Settlement Class Members' Released Claims and (ii) Named Plaintiffs' General Released Claims.

2.28    "Released Parties" means (i) DoorDash, Inc. and its past, present, and future parents, subsidiaries, affiliates, divisions, joint ventures, licensees, franchisees, and any other legal entities, whether foreign or domestic, that are owned or controlled by DoorDash (but not including delivery drivers who use the DoorDash software), and (ii) the past, present, and future shareholders, officers, directors, members, investors, agents, employees, independent contractors, vendors, agents, consultants, representatives, fiduciaries, insurers, attorneys, legal representatives, predecessors, successors, and assigns of the entities listed in (i).

2.29    "Responding Settlement Class Member" means any Settlement Class Member who timely returns a Claim Form to the Settlement Administrator, pursuant to Sections V and X herein.

2.30    "Settlement Payment" means the amount payable to each Responding Settlement Class Member who does not opt out. The Settlement Payment shall be calculated pursuant to Section V herein.

CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE (Case Nos. CGC-18-567869)

DocuSign Envelope ID: 480B6B57-2A0B-4163-A9D5-7DD57DA1E06A

2.31    "Settlement Payment Fund" means the funds paid to Settlement Class Members after deducting Attorneys' Fees & Costs, Service Awards, Settlement Administrator Expenses, and payments to the Labor & Workforce Development Agency (LWDA).

2.32    "Settlement" means the settlement of the Action between and among Plaintiffs and DoorDash, as set forth in this Settlement Agreement.

2.33    "Settlement Administrator" means Simpluris, the neutral, third-party settlement administrator to be appointed by the Court.

2.34    "Settlement Administrator Expenses" means the amount to be paid to the Settlement Administrator from the Settlement Payment Fund, including the total costs, expenses, and fees of the Settlement Administrator.  The amount may not exceed the amount estimated by the agreed upon Settlement Administrator.

2.35    "Settlement Class" means all members of the California Settlement Class and the Massachusetts Settlement Class, as defined herein.

2.36    "Settlement Class Member" means any member of the Settlement Class.

2.37    "Settlement Class Members' Released Claims" means any and all past and present claims, actions, demands, causes of action, suits, debts, guarantees, obligations, damages, penalties, rights or liabilities, of any nature and description whatsoever, known or unknown, existing or potential, recognized now or hereafter, contingent or accrued, expected or unexpected, pursuant to any theory of recovery (including but not limited to those based in contract or tort, common law or equity, federal, state, or local law, statute, ordinance, or regulation, and for claims for compensatory, consequential, punitive or exemplary damages, statutory damages, penalties, interest, attorneys' fees, costs or disbursements) including but not limited to those incurred by Class Counsel or any other counsel representing the Plaintiffs or any Settlement Class Members (other than those expressly awarded by the Court in the Class Counsel Award authorized by this Agreement), that are based on or are reasonably related to the claims alleged in the Marciano SAC, including any allegations in the "Related Actions" (as defined in Attachment 1), and all claims arising out of or relating to the alleged misclassification of Dashers, and specifically including: claims pursuant to the Fair Labor Standards

12.

Act ("FLSA"), 29 U.S.C. § 201, *et seq.*; California Labor Code sections 132a, 201-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221-224, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.4, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2753, 2802, 2804, 2810.5, and 4553 *et seq.*; the Private Attorneys General Act ("PAGA"), California Labor Code section 2698 *et seq.*; California Code of Civil Procedure section 1021.5; California Code of Regulations, title 8, sections 11010 and 11040; Industrial Welfare Commission Wage Orders; the Los Angeles Office of Wage Standards Ordinance, the San Francisco Admin. Code Minimum Wage Ordinance, and any similar state or local ordinances; California Business and Professions Code sections 17200 *et seq.*; Massachusetts General Law ch. 149, §§ 148, 148B; Massachusetts General Law ch. 151, §§ 1, 7; and any other similar state, federal, local, or common law, for unpaid wages, minimum wages, regular wages, tips, gratuities, overtime wages (including but not limited to calculation of the correct overtime or regular rate), working more than six days in seven, expense reimbursement, wage statements, payroll recordkeeping, reporting time, improper deduction of wages, failure to provide workers' compensation insurance, meal periods, rest breaks, sick leave, final pay, penalties for timely payment of wages upon discharge, waiting time penalties, PAGA penalties, unfair business practices, the alleged use of tips to meet any minimum-pay guarantees, all claims arising out of or relating to the statutory causes of action described herein, restitution, interest, costs and expenses, attorneys' fees, declaratory relief, injunctive relief, liquidated damages, exemplary or punitive damages, civil penalties, equitable remedies, and/or pre- or post-judgment interest at any time during the Relevant Period, and all claims included in the pending arbitration demands filed with AAA concerning the alleged misclassification of Dashers. The release does not include claims that, as a matter of law, cannot be released and does not include claims for retaliation, discrimination, wrongful termination, and individual claims filed with the appropriate agency for the recovery of workers' compensation benefits. "Settlement Class Members' Released Claims" are released through the Preliminary Approval Date or February 29, 2020, whichever occurs first.

13.

2.38    "Settlement Class Period" means August 30, 2016 through the Preliminary Approval Date or February 29, 2020, whichever occurs first (with respect to California Class Members) or September 26, 2014, through the Preliminary Approval Date or February 29, 2020, whichever occurs first (with respect to Massachusetts Class Members).

2.39    "Service Awards" means the amount approved by the Court to be paid to each Plaintiff, in addition to their respective Individual Settlement Payments, in recognition of their efforts in coming forward as named plaintiffs and as consideration for a full, general, and comprehensive release of the General Released Claims.  The Service Award amount payable to Plaintiffs is not to exceed $5,000 each.

2.40    "Total Settlement Amount" means Thirty-Nine Million Five-Hundred Thousand Dollars ($39,500,000) for payment of all claims, which is the maximum amount that DoorDash is obligated to pay under this Settlement Agreement under any circumstances in order to resolve and settle the Action, subject to Court approval.  The Total Settlement Amount shall be inclusive of all costs and fees, including, but not limited to, Class Counsel Award, applicable Settlement Administrator Expenses, escrow costs and expenses, Service Awards, PAGA Payment, interest, and taxes and tax expenses.

2.41    "Void Date" means the date by which any checks issued to Responding Settlement Class Members shall become void, *i.e.* on the 181st day after mailing.

## III.    SUBMISSION OF THE SETTLEMENT AGREEMENT TO THE COURT FOR PRELIMINARY AND FINAL APPROVAL

3.1    Upon execution of this Settlement Agreement, the Plaintiffs shall submit to the Court a motion for preliminary approval of the Settlement.  The motion for preliminary approval shall include a proposed plan for filing the Second Amended Complaint (Exhibit 3 hereto), for sending of the Class Notice to Settlement Class Members within forty-five (45) days after the Preliminary Approval Date (the Notice Date), and establishing a period of sixty (60) days from the Notice Date within which any Settlement Class Member may (i) request exclusion from the Settlement Class, (ii) submit written objections to the proposed Settlement, or (iii) submit written objections to Class

14.

Counsel's request for the Class Counsel Award and for Service Awards to the Plaintiffs (the Exclusion/Written Objection Deadline).

3.2    The Parties stipulate to certification under California Code of Civil Procedure Section 382, for settlement purposes only, of the Settlement Class, excluding the Settlement Class's PAGA Claims.  The Parties agree that this stipulation shall not be admissible in, and may not be used by any person for any purpose whatsoever in any legal proceeding, including but not limited to any arbitrations and/or any civil and/or administrative proceedings, other than a proceeding to enforce the terms of the Agreement, as further set forth in this Agreement or as may be required to be cited and offered in support of a request to stay or dismiss other legal proceedings involving DoorDash raising similar issues, including but limited to pending litigations, arbitrations, and agency proceedings.

3.3    Class Counsel agrees to keep any and all data related to the Settlement Class's use of the DoorDash platform in the strictest confidence, and shall not disclose that data.  Any such data provided to Class Counsel shall be treated as privileged mediation communications under Cal. Evid. Code §§ 1115 *et seq.* and designated "Confidential—Attorneys' Eyes Only," except to the extent absolutely necessary (as agreed between the Parties) for approval of the Settlement.  Class Counsel agrees to submit such necessary data to the Court under seal to the extent appropriate under governing law.

3.4    Class Counsel and Plaintiffs agree to use their best efforts, in cooperation with defense counsel, to keep the *Magana*, *Roussel*, *Austin, Marciano* (with the exception of settlement approval proceedings) and all pending American Arbitration Association actions brought by Class Counsel stayed pending Final Approval of the Settlement, and upon Final Approval of the Settlement, Class Counsel and Plaintiffs agree to dismiss these Actions with prejudice.  Further, all of the plaintiffs in *Marciano*, *Austin*, *Roussel*, and *Magana* Plaintiffs (and Class Counsel) agree not to oppose any efforts by DoorDash to stay the Related Actions or other pending arbitrations pending Final Approval of this Settlement.

3.5    The Parties stipulate to the form of, and agree to submit to the Court for its consideration this Settlement Agreement, and the following Exhibits to this Settlement Agreement:

15.

[Proposed] Preliminary Approval Order (Exhibit 2); Class Notice (Exhibit 1); and Second Amended Complaint (Exhibit 3).

3.6    Solely for purposes of implementing this Agreement and effectuating the proposed Settlement, the Parties agree and stipulate that:

3.6.1    The Court may enter the Preliminary Approval Order, without material variation from Exhibit 2, preliminarily approving the Settlement and this Agreement.  Among other things, the Preliminary Approval Order shall grant leave to preliminarily certify the Settlement Class for settlement purposes only; approve the Plaintiffs as class representatives, appoint Class Counsel to represent the Settlement Class, and appoint the Settlement Administrator; approve the Class Notice, and the class notice plan embodied in the Settlement Agreement, and approve them as consistent with California Rules of Court 3.766(d) and 3.769(f) and due process; set out the requirements for disputing the information upon which Settlement Class Members' share of the Settlement will be calculated, objecting to the Settlement, excluding Settlement Class Members who timely and properly request to be excluded from the Settlement Class, all as provided in this Agreement; and provide that certification and all actions associated with certification are undertaken on the condition that the certification and other actions shall be automatically vacated and of no force or evidentiary effect if this Agreement is terminated or disapproved, as provided in this Agreement.

3.7    Within 10 days of the Preliminary Approval Date, Class Counsel will notify the LWDA of the Preliminary Approval Order.

3.8    At the Final Approval Hearing, the Plaintiffs shall request entry of a Final Approval order and a Judgment, to be agreed upon by the Parties, the entry of which is a material condition of this Settlement and that, among other things:

3.8.1    Finally approves the Settlement as fair, reasonable, and adequate and directs its consummation pursuant to the terms of the Settlement Agreement;

3.8.2    Finds that Class Counsel and Plaintiffs adequately represented the Settlement Class for the purpose of entering into and implementing the Agreement;

CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE (Case Nos. CGC-18-567869)

3.8.3    Re-confirms the appointment of the Settlement Administrator and finds that the Settlement Administrator has fulfilled its duties under the Settlement to date;

3.8.4    Finds that the Class Notice (i) constituted the best practicable notice; (ii) constituted notice that was reasonably calculated, under the circumstances, to apprise Settlement Class Members of the pendency of the Action, and their right to exclude themselves from or object to the proposed settlement and/or to appear at the Final Approval Hearing; (iii) was reasonable and constituted due, adequate, and sufficient notice to all persons entitled to receive notice; and (iv) met all applicable requirements of California Rules of Court 3.766(d) and 3.769(f), due process, and any other applicable rules or law;

3.8.5    Approves the Opt-Out List and determines that the Opt-Out List is a complete list of all Settlement Class Members who have timely and properly requested exclusion from the Settlement Class and, accordingly, shall neither share in nor be bound by the Final Approval order and Judgment;

3.8.6    Directs that the Final Approval order and Judgment of dismissal shall be final and entered forthwith;

3.8.7    Without affecting the finality of the Final Approval order and Judgment, directs that either the presiding Law and Motion Department Judge or Judge of the Complex Department of San Francisco Superior Court retains continuing jurisdiction over the Plaintiffs, the Settlement Class, and DoorDash as to all matters concerning the administration, consummation, and enforcement of this Settlement Agreement;

3.8.8    Adjudges that, as of the Final Approval Date, the Plaintiffs, and all Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List approved by the Court, and their heirs, estates, trustees, executors, administrators, principals, beneficiaries, representatives, agents, assigns, and successors, and/or anyone claiming through them or acting or purporting to act for them or on their behalf, regardless of whether they have received actual notice of the proposed Settlement, have conclusively compromised, settled, discharged, and released the Named Plaintiffs' General Released Claims (in the case of the Plaintiffs) and Settlement

17.

DocuSign Envelope ID: 480BCB67-2D0B-4162-A9D5-7DD57DA1E06A

Class Members' Released Claims (in the case of the Settlement Class Members) against DoorDash and the Released Parties, and are bound by the provisions of this Agreement;

3.8.9    Affirms that, notwithstanding the submission of a timely and proper request for exclusion, Settlement Class Members will still be bound by the settlement and release of the PAGA Claims or remedies under the Final Judgment pursuant to *Arias v. Superior Court*, 46 Cal. 4th 969 (2009) as requests for exclusion do not apply to the PAGA Claims, and further affirms that the LWDA's claims for civil penalties pursuant to PAGA are also extinguished;

3.8.10   Declares this Agreement and the Final Approval order and Judgment to be binding on, and have res judicata and preclusive effect as to all pending and future lawsuits or other proceedings: (i) that encompass the Named Plaintiffs' General Released Claims and that are maintained by or on behalf of the Plaintiffs and/or their heirs, estates, trustees, executors, administrators, principals, beneficiaries, representatives, agents, assigns, and successors, and/or anyone claiming through them or acting or purporting to act for them or on their behalf, and (ii) that encompass the Settlement Class Members' Released Claims and that are maintained by or on behalf of any Settlement Class Member who has not been excluded from the Settlement Class as provided in the Opt-Out List approved by the Court and/or his or her heirs, estates, trustees, executors, administrators, principals, beneficiaries, representatives, agents, assigns, and successors, and/or anyone claiming through them or acting or purporting to act for them or on their behalf, regardless of whether the Settlement Class Member previously initiated or subsequently initiates individual litigation, arbitration, or other proceedings encompassed by the Settlement Class Members' Released Claims, and even if such Settlement Class Member never received actual notice of the Action or this proposed Settlement;

3.8.11   Determines that the Agreement and the Settlement provided for herein, and any proceedings taken pursuant thereto, are not, and should not in any event be offered, received, or construed as evidence of, a presumption, concession, or an admission by any Party of liability or non-liability or of the certifiability or non-certifiability of a litigation class, or that PAGA representative claims may validly be pursued, or of any misrepresentation or omission in any statement or written

DocuSign Envelope ID: 480BCB67-2A0B-44C7-A9D5-7DD57DA1E06A

document approved or made by any Party; provided, however, that reference may be made to this Agreement and the Settlement provided for herein in such proceedings as may be necessary to effectuate the provisions of this Agreement, as further set forth in this Agreement;

3.8.12  Directs Class Counsel to seek dismissal of all pending actions before the American Arbitration Association brought against DoorDash by Settlement Class Members in which they are represented by Class Counsel with prejudice within 15 days of the Effective Date;

3.8.13  Orders that the preliminary approval of the Settlement, certification of the Settlement Class and final approval of the proposed Settlement, and all actions associated with them, are undertaken on the condition that they shall be vacated if the Settlement Agreement is terminated or disapproved in whole or in part by the Court, or any appellate court and/or other court of review, in which event the Agreement and the fact that it was entered into shall not be offered, received, or construed as an admission or as evidence for any purpose, including but not limited to an admission by any Party of liability or non-liability or of any misrepresentation or omission in any statement or written document approved or made by any Party, or of the certifiability of a litigation class or the appropriateness of maintaining a PAGA representative action, as further provided in this Settlement Agreement;

3.8.14  Authorizes the Parties, without further approval from the Court, to agree to and adopt such amendments, modifications, and expansions of this Agreement, including all Exhibits hereto, as (i) shall be consistent in all material respects with the Final Approval order and (ii) do not limit the rights of Settlement Class Members; and

3.8.15  Contains such other and further provisions consistent with the terms of this Settlement Agreement to which the Parties expressly consent in writing.

3.9     At the Final Approval Hearing and as a part of the final approval of this Settlement, Class Counsel will also request approval of the Plan of Allocation set forth in Section V.  Any modification to the Plan of Allocation by the Court shall not (i) affect the enforceability of the Settlement Agreement, (ii) provide any of the Parties with the right to terminate the Settlement

19.

Agreement, or (iii) impose any obligation on the Defendant or any Released Party to increase the consideration paid in connection with the Settlement.

3.10    At the Final Approval Hearing, Class Counsel may also request entry of an Order approving the Class Counsel Award and for the Service Awards to the Plaintiffs, which shall be paid exclusively from the Total Settlement Amount and in accordance with the distribution plan described in Section V.  In no event shall any Released Party otherwise be obligated to pay for any attorneys' fees and expenses or Service Awards.  The disposition of Class Counsel's application for a Class Counsel Award, and for Service Awards, is within the sound discretion of the Court and is not a material term of this Settlement Agreement, and it is not a condition of this Settlement Agreement that such application be granted.  Any disapproval or modification of such application by the Court shall not (i) affect the enforceability of the Settlement Agreement, (ii) provide any of the Parties with the right to terminate the Settlement Agreement, or (iii) increase the consideration Defendant or any Released Party pays in connection with the Settlement.  Released Parties shall have no liability to Class Counsel arising from any claim regarding the division of any Attorney Fee/Litigation Cost Award between and among Class Counsel or any other counsel representing Plaintiffs or the Settlement Class Members.

3.11    In no event shall any Released Party be obligated to pay Settlement Administration Expenses beyond those provided for in this Agreement.

3.12    Within 10 days after entry of Judgment, Class Counsel will provide a copy of the Judgment to the LWDA.

3.13    The Parties agree to cooperate in reaching agreement regarding reasonable responses to media inquiries that will support the approval and implementation of this agreement.  Nothing herein shall be construed to violate any applicable ethical rules for attorneys.

## IV.    SETTLEMENT CONSIDERATION

4.1    The total monetary component of the Settlement from DoorDash is the Total Settlement Amount ($39,500,000.00).  This is an "all in" number that includes, without limitation, all monetary benefits and payments to the Settlement Class, Service Awards, Class Counsel Award, Settlement

20.

DocuSign Envelope ID: 480BGB67-2A0B-4167-A9D5-TFD57DA1E06A

Administrator Expenses and the PAGA Payment, and all claims for interest, fees, and costs. Under no circumstances shall DoorDash be required to pay anything more than the Total Settlement Amount. In no event shall DoorDash be liable for making any payments under this Settlement, or for providing any relief to Settlement Class Members, before the deadlines set forth in this Agreement.

4.2 The Plaintiffs and all Settlement Class Members who receive a payment of any kind from the Total Settlement Amount (including, in the case of the Plaintiffs, Service Awards) expressly acknowledge that such payments shall be considered non-wages for which an IRS Form 1099 will be issued, if required. The Plaintiffs and all Settlement Class Members who receive a payment of any kind from the Total Settlement Amount agree to timely pay in full all of the federal, state, and municipal income taxes owed on such payments.

4.3 The terms of this Agreement relating to the Service Awards and Class Counsel Award were not negotiated by the Parties before full agreement was reached as to all other material terms of the proposed Settlement, including, but not limited to, any terms relating to the relief to the Settlement Class. DoorDash agrees not to oppose a request for Service Awards for Plaintiffs, as awarded by the Court, up to a maximum of Five Thousand Dollars ($5,000) each. The Plaintiffs and Class Counsel agree not to seek Service Awards in excess of the above amount.

4.4 Class Counsel agrees not to seek an award of attorneys' fees, costs and expenses from the Court in excess of one third (1/3) of the Total Settlement Amount. DoorDash agrees not to oppose a request for attorneys' fees, costs and expenses up to one third (1/3) of the Total Settlement Amount. Any amount awarded as the Class Counsel Award shall be inclusive of any and all amounts due to all Plaintiffs' Counsel. Class Counsel shall be solely responsible for allocation and payment of any portion of any Class Counsel Award to any Plaintiffs' Counsel other than Class Counsel. Released Parties and Class Members shall have no obligation regarding or liability for allocation or payment of any Class Counsel Award to Plaintiffs' Counsel.

4.5 If no timely objection to the Settlement is made, the payment of the Class Counsel Award, the Service Awards, the Settlement Administrator Expenses, the Settlement Payments and the PAGA Payment shall be made by the Settlement Administrator within fourteen (14) days of the Effective Date.

DocuSign Envelope ID: 480BCB67-260B-4167-A9D5-7FD57DA1E06A

4.6     The Settlement Administrator shall pay the Class Counsel Award by check, payable to "Lichten & Liss-Riordan, P.C." Class Counsel shall provide the Settlement Administrator notice of receipt of the Class Counsel Award. Released Parties shall have no liability to Class Counsel or Plaintiffs' Counsel arising from any claim regarding the division of any Attorney Fee/Litigation Cost Award between and among Class Counsel and Plaintiffs' Counsel.

V.      FUNDING AND ALLOCATION OF THE SETTLEMENT

5.1     Within thirty (30) calendar days following Final Judgment, DoorDash shall fund the Settlement by providing the Settlement Fund ($39,500,000) to the Settlement Administrator. The Settlement Administrator shall thereafter distribute the funds in the manner and at the times set forth in this Agreement.

5.2     To receive a payment from the Settlement, a Settlement Class Member must (1) have submitted a Claim Form, making him or her a Responding Settlement Class Member, and (2) not have submitted a request for exclusion from the Settlement.

5.3     The amount of each Responding Settlement Class Member's Settlement Payment will be calculated in proportion to DoorDash's best estimate of each Responding Settlement Class Member's Delivery Miles, as determined from the Class Information provided to the Settlement Administrator by DoorDash except that class members who opted out of arbitration or who have filed an arbitration demand, or expressed an intent to do so by October 24, 2019, will get their mileage doubled. Class Counsel will be permitted to review and approve the calculation of settlement funds to be distributed. If under the Plan of Allocation a responding Settlement Class Member will be distributed $10 or more, then he or she will receive the entitled amount. If, however, the Responding Settlement Class Member is due less than $10, then his or her Settlement Payment will be for $10.

5.4     Following distribution of the Settlement Payments to Settlement Class Members, all funds not claimed prior to the Void Date (*i.e.* all funds from uncashed checks) shall be redistributed to the Settlement Class Members who received and cashed their first Settlement Payments and whose residual share would be more than $50.00. These unclaimed funds shall be redistributed pursuant to the same formula described in Paragraphs 5.3.

22.

5.5     As described in Section VI, each Settlement Class Member will have the opportunity, should he or she disagree with DoorDash's calculation of his or her Delivery Miles, to provide documentation to establish the appropriate number.  There will be a presumption that DoorDash's records are correct, absent evidence produced by a Settlement Class Member to the contrary.

5.6     The Settlement Administrator shall issue the Settlement Payments to each Settlement Class Member who does not opt out.  The Settlement Payments shall be reported by the Settlement Administrator to the applicable governmental authorities on IRS Form 1099s.  The portions allocated to Service Awards shall likewise be reported on IRS Form 1099s by the Settlement Administrator. The Settlement Administrator shall be responsible for issuing copies of IRS Form 1099s for the Plaintiffs and Settlement Class Members.

## VI.     CLASS NOTICE PROCEDURES

6.1     No more than thirty (30) calendar days after entry of the Preliminary Approval Order, Defendant shall provide the Settlement Administrator with the Class Information for purposes of sending the Class Notice to Settlement Class Members.

6.2     The Class Notice will inform Settlement Class Members of their right to request exclusion from the Settlement, of their right to object to the Settlement, and of their right to dispute the information upon which their share of the Settlement will be calculated and the claims to be released. The Class Notice shall also provide each potential Settlement Class Member with a best estimate of his or her miles on delivery and/or Active Weeks.

6.3     Within fifteen (15) days after receiving the Class Information from Defendant, the Settlement Administrator shall send a copy of the Class Notice by electronic mail to each potential Settlement Class Member.

6.4     If any Class Notice sent via electronic mail to any potential Settlement Class Member is undeliverable, the Settlement Administrator shall then send the Class Notice to the potential Settlement Class Member's postal mailing address on file via first-class mail, to the extent such a mailing address is on file.  If any Class Notice sent to any potential Settlement Class Member via first-class mail is returned to the Settlement Administrator with a forwarding address, the Settlement Administrator shall

forward the postal mailing to that address.  For any remaining returned postal mailings or for any Settlement Class Member for whom there is no mailing address on file, the Settlement Administrator shall made a good-faith search of an appropriate database, and postal mailings shall be forwarded to any new postal mail address obtained through such a search.  In the event that any Class Notice is returned as undeliverable a second time, no further postal mailing shall be required.   The Settlement Administrator shall maintain a log detailing the instances Class Notices are returned as undeliverable.

6.5     To the extent that sending the Class Notice via postal mail is necessary under the terms of Paragraph 6.4, before any mailing, the Settlement Administrator shall make a good-faith attempt to obtain the most-current names and postal mail addresses for all potential Settlement Class Members to receive such postal mail, including cross-checking the names and/or postal mail addresses it received from DoorDash, as well as any other sources, with appropriate databases (e.g., the National Change of Address Database) and performing further reasonable searches (e.g., through Lexis/Nexis) for more-current names and/or postal mail addresses for Settlement Class Members. All Settlement Class Members' names and postal mail addresses obtained through these sources shall be protected as confidential and not used for purposes other than the notice and administration of this Settlement. The Settlement Administrator shall exercise its best judgment to determine the current mailing address for each Settlement Class Member. The address determined by the Settlement Administrator as the current mailing address shall be presumed to be the best mailing address for each Settlement Class Member.

6.6     As set forth in the Class Notice, Settlement Class Members will be asked to submit a Claim Form to the Settlement Administrator within sixty (60) days.  Any Settlement Class Member who does not submit a Claim Form will not receive any distribution from the Settlement Fund.  However, any Settlement Class Members who do not submit a Claim Form will nevertheless be bound by the release of the Settlement Members' Released Claims as provided in Section IX, and precluded from bringing any such claims against DoorDash. Claim Forms will be accepted up until the final distribution.

6.7     The number and manner of any reminder to be sent to the Settlement Class Members, beyond that described in Paragraph 6.3, following the initial Class Notice mailing is to be determined by Class Counsel and the Settlement Administrator.

24.

6.8     The Parties agree that the procedures set forth in this Section constitute reasonable and the best practicable notice under the circumstances and an appropriate and sufficient effort to locate current addresses for Settlement Class Members such that no additional efforts to do so shall be required.

6.9     The Settlement Administrator will provide Class Notice by, at a minimum, (i) electronic mail notice without material variation from the form attached as Exhibit 1; (ii) if necessary in accordance with Paragraph 6.4, first-class mail notice; and (iii) a content-neutral settlement website managed by the Settlement Administrator, and approved by counsel for the Parties, which will contain further information about the Settlement, including relevant pleadings.  The Class Notice shall comply with California Rules of Court 3.766(d), 3.769(f) and due process.

6.10     The Settlement Administrator shall prepare a declaration of due diligence and proof of dissemination with regard to the mailing of the Class Notice, and any attempts by the Settlement Administrator to locate Settlement Class Members, its receipt of valid requests for exclusion, and its inability to deliver the Notice of Settlement to Settlement Class Members due to invalid addresses ("Due Diligence Declaration"), to Class Counsel and counsel for DoorDash for presentation to the Court.  Class Counsel shall be responsible for filing the Due Diligence Declaration with the Court contemporaneous with the filing of the Motion for Final Approval of Class Action Settlement.

6.11     If any individual whose name does not appear in the Class Information that DoorDash provides the Settlement Administrator (and who has not previously opted out of the Settlement Class), believes that he or she is a Settlement Class Member, he or she shall have the opportunity to dispute his or her exclusion from the Settlement Class.  If an individual believes he or she is a Settlement Class Member, he or she must notify the Settlement Administrator within a reasonable amount of time after the Notice Date.  The Parties will meet and confer regarding any such individuals in an attempt to reach an agreement as to whether any such individual should be regarded as a Settlement Class Member. If the Parties so agree, the Settlement Administrator will mail a Class Notice to the individual, and treat the individual as a Settlement Class Member for all other purposes.  Such an individual will have all of the same rights as any other Settlement Class Member under this Agreement.  In the event that the disbursement of the Settlement Payments has begun (in accordance with this Settlement Agreement) at

DocuSign Envelope ID: 480BCB67-0A0B-4162-A9D5-7DD57DA1F06A

the time that the Parties agree that such individual should be regarded as a Settlement Class Member and that such individual does not exercise his or her right to opt out of the Settlement, the Settlement Payment to such individual shall be disbursed from the Dispute Resolution Fund, as long as sufficient money is left in the Dispute Resolution Fund.  Alternatively, such payment may be remitted from funds remitted back to the Payment Fund (*i.e.* from settlement checks that remain uncashed beyond the Void Date).

6.12   The Settlement Administrator shall send any Settlement Class Member who has initiated arbitration as of the signing date of this agreement, in which the Settlement Class Member is asserting claims substantially similar to the Settlement Class Members' Released Claims, up to two additional notices.

## VII.    PROCEDURES FOR REQUESTS FOR EXCLUSION

7.1    Settlement Class Members (with the exception of the Plaintiffs) may opt out of the Settlement.  Those who wish to exclude themselves (or "opt out") from the Settlement Class must submit timely, written requests for exclusion.  To be effective, such a timely request must include the Settlement Class Member's name, address, and telephone number; a clear and unequivocal statement that the Settlement Class Member wishes to be excluded from the Settlement Class and that the Settlement Class Member understands that he or she is still bound by the release of the PAGA Claims upon Final Approval of the Settlement and Final Judgment; and the physical ("wet ink") signature of the Settlement Class Member or the Legally Authorized Representative of the Settlement Class Member (who is not the class member's counsel).  The request must be mailed to the Settlement Administrator at the address provided in the Class Notice and must be postmarked no later than the Exclusion/Objection Deadline. The date of the postmark shall be the exclusive means used to determine whether a request for exclusion has been timely submitted.  Requests for exclusion must be exercised individually by the Settlement Class Member (or their Legally Authorized Representative who is not the settlement class member's counsel), even if the settlement class member is represented by counsel.  Attempted collective group, class, or subclass requests for exclusions shall be ineffective and disregarded by the Settlement Administrator.

7.2     The Settlement Administrator shall promptly log each request for exclusion that it receives and provide copies of the log and all such requests for exclusion to Class Counsel and counsel for DoorDash, as requested.

7.3     The Settlement Administrator shall prepare a list of all persons who timely and properly requested exclusion from the Settlement Class (the Opt-Out List) and shall, before the Final Approval Hearing, submit an affidavit to the Court attesting to the accuracy of the list.

7.4     All Settlement Class Members who are not included in the Opt-Out List approved by the Court shall be bound by this Agreement, and all their claims shall be dismissed with prejudice and released as provided for herein, even if they never received actual notice of the Action or this proposed Settlement.

7.5     The Settlement Administrator, in its sole discretion, shall determine whether a request for exclusion was timely and properly submitted. The Settlement Administrator's decision shall be final, binding, and nonappealable.

7.6     The Plaintiffs agree not to request exclusion from the Settlement Class.

7.7     Settlement Class Members may object to or opt out of the Settlement, but may not do both. Any Settlement Class Member who submits a timely request for exclusion may not file an objection to the Settlement or receive a Settlement Payment, and shall be deemed to have waived any rights or benefits under the Settlement Agreement.

7.8     Notwithstanding the submission of a timely request for exclusion, Class Members will still be bound by the settlement and release of the PAGA Claims or remedies under the Final Judgment pursuant to *Arias v. Superior Court*, 46 Cal. 4th 969 (2009).  Requests for exclusion do not apply to the PAGA Claims, and will not be effective to preclude the release of the PAGA Claims.

7.9     No later than three (3) business days after the Exclusion/Objection Deadline, the Settlement Administrator shall provide to Class Counsel and counsel for DoorDash the Opt-Out List together with copies of the opt-out requests. Notwithstanding any other provision of this Settlement Agreement, if more than one thousand (1,000) Settlement Class Members exercise their right to opt out of the Settlement, DoorDash at its sole and absolute discretion may elect to rescind, void, and revoke

27.

the entire Settlement Agreement by sending written notice that it revokes the Settlement pursuant to this Paragraph to Class Counsel within ten (10) business days following receipt of the Opt-Out List.

Named Plaintiffs and their counsel shall support the settlement and take such steps as are reasonably necessary to effectuate the settlement. Plaintiffs' counsel shall recommend the settlement to settlement class members, and Plaintiffs' counsel agree to use their best efforts to resolve any objections to the release of all claims described in the Scope of Release, including all class actions, putative class actions, individual-plaintiff actions, and arbitrations. DoorDash, in turn, agrees to use its best efforts to cooperate with Plaintiffs' counsel's efforts in this regard. Named Plaintiffs shall not opt out of or object to the settlement, nor shall their counsel directly or indirectly encourage settlement class members to opt out of or object to the settlement.

## VIII.   PROCEDURES FOR OBJECTIONS

8.1    Any Settlement Class Member that wishes to object to the fairness, reasonableness, or adequacy of this Agreement or the proposed Settlement must provide to the Settlement Administrator (who shall forward it to Class Counsel and counsel for DoorDash), and file with the Court, a timely statement of the objection, as set forth below.

8.2    To be timely, the objection must be postmarked and mailed to the Settlement Administrator, and filed with the Court, no later than the Exclusion/Objection Deadline. The date of the postmark on the return-mailing envelope shall be the exclusive means used to determine whether objection has been timely submitted.

8.3    The objection must contain at least the following: (i) the objector's full name, address, telephone, and signature; (ii) a clear reference to the Action; (iii) a statement of the specific legal and factual basis for each objection argument; and (iv) a statement whether the objecting person or entity intends to appear at the Final Approval Hearing, either in person or through counsel and, if through counsel, a statement identifying that counsel by name, bar number, address, and telephone number. All objections shall be signed by the objecting Settlement Class Member (or his Legally Authorized Representative), even if the Settlement Class Member is represented by counsel.

DocuSign Envelope ID: 480B6B67-2A0B-4167-A9D5-7BD57DA1F06A

8.4     Any Settlement Class Member (and/or his/her attorney), or any attorney working for a governmental entity or other third party, who wishes to appear in the Action to object to the Settlement or who is representing or assisting a Settlement Class Member in connection with any objection to the Settlement (including, but not limited to, by drafting or preparing papers for an objection on behalf of a Settlement Class Member) must provide to the Settlement Administrator (who shall forward it to Class Counsel and counsel for DoorDash) and file with the Clerk of the Court a notice of appearance no later than the Exclusion/Objection Deadline.

8.5     The right to object to the proposed Settlement must be exercised individually by a Settlement Class Member or his attorney.  Attempted collective, group, class, or subclass objections shall be ineffective and disregarded.  Individual objections may be submitted by a Settlement Class Member's Legally Authorized Representative.

8.6     Any Settlement Class Member who does not file a timely notice of intent to object in accordance with this Section shall waive the right to object or to be heard at the Final Approval Hearing and shall be forever barred from making any objection to the proposed Settlement, the Plan of Allocation, the Class Counsel Award and the Service Awards.  Settlement Class Members who object to the proposed Settlement shall remain Settlement Class Members, and shall be deemed to have voluntarily waived their right to pursue an independent remedy against DoorDash and the Released Parties. To the extent any Settlement Class Member objects to the proposed Settlement, and such objection is overruled in whole or in part, such Settlement Class Member will be forever bound by the Final Approval order and Judgment.

8.7     It shall be Class Counsel's sole responsibility to respond to any objections made with respect to any application for the Class Counsel Award and Service Awards.

## IX.     RELEASES

9.1     The Released Claims against each and all of the Released Parties shall be released and dismissed with prejudice and on the merits (without an award of costs to any party other than as provided in this Agreement) upon entry of the Final Approval order and Judgment.

29.

9.1    As of the Final Approval Date, the Plaintiffs, and all Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List, individually and on behalf of their heirs, estates, trustees, executors, administrators, representatives, agents, successors, and assigns, and anyone claiming through them or acting or purporting to act on their behalf, agree to forever release, discharge, hold harmless, and covenant not to sue each and all of the Released Parties from each and all of the Named Plaintiffs' General Released Claims (in the case of the Plaintiffs) and the Settlement Class Members' Released Claims (in the case of the Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List), and by operation of the Final Judgment shall have fully and finally released, relinquished, and discharged all such claims against each and all of the Released Parties; and they further agree that they shall not now or hereafter initiate, maintain, or assert any Named Plaintiffs' General Released Claims (in the case of Plaintiffs) and any Settlement Class Members' Released Claims (in the case of the Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List), against the Released Parties in any other court action or before any administrative body, tribunal, arbitration panel, or other adjudicating body.  Without in any way limiting the scope of the release described in Paragraphs 2.16 and 2.35, as well as the remainder of this Section, this release covers, without limitation, any and all claims for attorneys' fees, costs or disbursements incurred by Class Counsel or any other counsel representing the Plaintiffs or Settlement Class Members, or by the Plaintiffs or Settlement Class Members, or any of them, in connection with or related in any manner to the Action, the Settlement of the Action, the administration of such Settlement, and/or the Released Claims, except to the extent otherwise specified in the Agreement.

9.2    As of the Final Approval Date, the Plaintiffs, and all Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List, shall be permanently barred and enjoined from initiating, asserting, or prosecuting against the Released Parties in any federal or state court or tribunal any and all Named Plaintiffs' General Released Claims (in the case of Plaintiffs) and any Settlement Class Members' Released Claims (in the case of the Settlement

DocuSign Envelope ID: 480BCB67-080B-4462-A9D5-7D057DA1F06A

Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List), as further provided in Paragraphs 2.16 and 2.35, as well as this Section.

9.3     The Plaintiffs and the Settlement Class Members expressly acknowledge that they are familiar with principles of law such as Section 1542 of the California Civil Code, which provides:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

9.4     With respect to the Settlement Class Members' Released Claims, as described in Paragraph 2.36, each Settlement Class Member who has not been excluded from the Settlement Class as provided in the Opt-Out List shall be deemed to have expressly, knowingly, and voluntarily waived and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits he or she may otherwise have had pursuant to Section 1542 of the California Civil Code and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein. In connection with the release, the Settlement Class Members acknowledge that they are aware that they may hereafter discover claims presently unknown and unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to matters released herein. Nevertheless, the Settlement Class Members acknowledge that a portion of the consideration received herein is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and state that it is the intention of the Settlement Class Members in agreeing to this release to fully, finally, and forever to settle and release all matters and all claims that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action), constituting Settlement Class Members' Released Claims.

9.5     With respect to the Named Plaintiffs' General Released Claims, as described in Paragraph 2.17, each Plaintiff shall be deemed to have expressly, knowingly, and voluntarily waived

31.

and relinquished, to the fullest extent permitted by law, the provisions, rights, and benefits he or she may otherwise have had pursuant to Section 1542 of the California Civil Code and all similar federal or state laws, rights, rules, or legal principles of any other jurisdiction that may be applicable herein. In connection with the release, the Plaintiffs acknowledge that they are aware that they may hereafter discover claims presently unknown and unsuspected or facts in addition to or different from those which they now know or believe to be true with respect to matters released herein. Nevertheless, the Plaintiffs acknowledge that a portion of the consideration received herein is for a release with respect to unknown damages and complaints, whether resulting from known injuries and consequences or from unknown injuries or unknown consequences of known or unknown injuries, and state that it is the intention of the Plaintiffs in agreeing to this release to fully, finally, and forever to settle and release all matters and all claims that exist, hereafter may exist, or might have existed (whether or not previously or currently asserted in any action), constituting Named Plaintiffs' General Released Claims.

9.6     Each Plaintiff further acknowledges, agrees, and understands that: (i) he or she has read and understands the terms of this Agreement; (ii) he or she has been advised in writing to consult with an attorney before executing this Agreement; (iii) he or she has obtained and considered such legal counsel as he or she deems necessary; (iv) he or she has been given twenty-one (21) days to consider whether or not to enter into this Agreement (although he or she may elect not to use the full 21 day period at his or her option).

9.7     Subject to Court approval, the Plaintiffs, and all Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List, shall be bound by this Settlement Agreement, and all of their claims shall be dismissed with prejudice and released, even if they never received actual notice of the Action or this Settlement.

9.8     Class Counsel will also make a good faith effort to secure a general release from Daniel Marko and Mr. Marko's dismissal of his claims in *Marko v. DoorDash, Inc.* (L.A. Super. Ct., No. BC659841) with prejudice as part of the settlement. If Class Counsel is unable to secure the release

DocuSign Envelope ID: 480B6B67-260B-4467-A9D5-7DD57DA1F06A

and dismissal of Mr. Marko's claims, DoorDash has the option, in its sole discretion of rescinding or voiding this agreement.

## X.     ADMINISTRATION OF THE SETTLEMENT FUND

10.1    The Settlement Administrator or its authorized agents in consultation with the Parties and subject to the supervision, direction, and approval of the Court, shall calculate the allocation of and oversee the distribution of the Settlement Fund.

10.2    The Settlement Payment Fund shall be applied as follows:

10.2.1  To pay the total costs, expenses, and fees of the Settlement Administrator incurred in connection with providing Class Notice to potential Settlement Class Members, and the management and distribution of the Settlement Payments to Responding Settlement Class Members;

10.2.2  Subject to the approval and further order(s) of the Court, to pay Plaintiffs' Service Awards based on contributions and time expended assisting in the litigation, up to a maximum of $5,000 for each of the named plaintiffs;

10.2.3  Subject to the approval and further order(s) of the Court, to pay the Class Counsel Award as ordered by the Court;

10.2.4  Subject to the approval and further order(s) of the Court, to distribute 75% of the PAGA Payment to the LWDA and 25% of the PAGA Payment to the Responding Settlement Class Members from the state of California;

10.2.5  After the Effective Date and subject to the approval and further order(s) of the Court, to distribute the Settlement Payments from the Settlement Payment Fund for the benefit of the Responding Settlement Class pursuant to the Plan of Allocation, or as otherwise ordered by the Court.

10.3    In the distribution of the Settlement Payments, the Settlement Administrator will include a statement to each Responding Settlement Class Member containing a best estimate of his or her number of total Delivery Miles being used to calculate the amount of his or her Settlement Payment as well as any indication as to whether those miles are being doubled because they opted out of arbitration or expressed an intent to file an arbitration prior to October 24, 2019, as described in Paragraphs 5.3.

DocuSign Envelope ID: 480BCB67-2A0B-4467-A9D5-7BD57DA1F06A

10.4    As set forth in the Class Notice, Responding Settlement Class Members will be provided thirty (30) days after their receipt of the Settlement Payment and accompanying statement to disagree with DoorDash's calculation of his or her total Delivery Miles by providing documentation to show contrary miles. The Settlement Administrator shall review any documentation submitted by a Responding Settlement Class Member and consult with the Parties to determine whether an adjustment is warranted. The Settlement Administrator's determination of the amount of any Responding Settlement Class Member's Delivery Miles shall be binding upon the Responding Settlement Class Member and the Parties. There will be a presumption that DoorDash's records are correct, absent evidence produced by a Responding Settlement Class Member to the contrary. Any payment issued beyond the Settlement Payment as a result of a determination under this paragraph shall be issued from those funds in the Dispute Resolution Fund, and if the Dispute Resolution Fund has been exhausted, from funds remaining in the Settlement Distribution Fund after the Void Date but before any residual distribution or payment to *cy pres*.

10.5    If any portion of the Settlement Payment Fund (including the Dispute Resolution Fund) is not successfully redistributed to Responding Settlement Class Members after the initial Void Date (*i.e.* checks are not cashed or checks are returned as undeliverable after the second distribution), then after the Void Date for redistributed checks, the Settlement Administrator shall void the check and shall direct such unclaimed funds to be redistributed to the Responding Settlement Class Members who (1) received and cashed their initial Settlement Payments, and (2) would receive a redistribution amount greater than or equal to $50.00, calculated pursuant to the same formula used to calculate the amounts of the initial Settlement Payments. If any portion thereafter remains unclaimed (*i.e.* checks are not cashed or checks are returned as undeliverable after the second distribution), then after the Void Date for redistributed checks, the Settlement Administrator shall void the check and shall direct such unclaimed funds to be paid to the *cy pres* recipients -- the Workers' Rights Clinic of Legal Aid at Work (in the case of California Settlement Class Members' uncashed checks) or Greater Boston Legal Services (in the case of Massachusetts Settlement Class Members' uncashed checks).

10.6     Settlement Class Members who are not on the Opt-Out List approved by the Court shall be subject to and bound by the provisions of the Settlement Agreement, the releases contained herein, and the Judgment with respect to all Settlement Class Members' Released Claims, regardless of whether they submitted a Claim Form or obtain any distribution from the Settlement Payment Fund.

10.7     Payment from the Settlement Payment Fund made pursuant to and in the manner set forth herein shall be deemed conclusive of compliance with this Settlement Agreement as to all Settlement Class Members.

10.8     No Settlement Class Member shall have any claim against the Plaintiffs, Class Counsel, or the Settlement Administrator based on distributions made substantially in accordance with this Settlement Agreement and/or orders of the Court.  No Settlement Class Member shall have any claim against DoorDash or its counsel relating to distributions made under this Settlement.

## XI.     EFFECT OF DISAPPROVAL, CANCELLATION, OR TERMINATION OF SETTLEMENT AGREEMENT

11.1     If the Court does not approve the Settlement as set forth in this Settlement Agreement, or does not enter the Final Approval order and Judgment on the terms described herein, or if the Court enters the Judgment and appellate review is sought, and on such review, the entry of Judgment is vacated, modified in any way, or reversed, or if the Final Approval order does not otherwise become Final, then this Settlement Agreement shall be cancelled and terminated, unless all Parties, in their sole discretion within thirty (30) days from the date such ruling becomes final, provide written notice to all other Parties hereto of their intent to proceed with the Settlement under the terms of the Judgment as it may be modified by the Court or any appellate court.

11.2     DoorDash shall have the right to withdraw from the Settlement if the number of Settlement Class Members who attempt to exclude themselves from the Settlement Class equals or exceeds one thousand (1,000) potential Settlement Class Members.  If DoorDash chooses, pursuant to its sole and absolute discretion, to exercise this right, it must do so within ten (10) days of receipt of the Opt-Out List as provided in Paragraph 7.9, by providing written notice to Class Counsel.

11.3     In the event that: (i) the Settlement is not approved, is overturned, or is modified by the Court or on appeal, (ii) the Judgment does not become Final, or (iii) this Settlement Agreement is

35.

terminated, cancelled, or fails to become effective for any reason, then: (a) the Parties stipulate and agree the Settlement, this Agreement, the Second Amended Complaint, the Class Information, the Opt-Out List, and all documents exchanged and filed in connection with the Settlement shall be treated as privileged mediation communications under Cal. Evid. Code §§ 1115 *et seq.*; (b) the Settlement shall be without force and effect upon the rights of the Parties hereto, and none of its terms shall be effective or enforceable, with the exception of this paragraph, which shall remain effective and enforceable; (c) the Parties shall be deemed to have reverted nunc pro tunc to their respective status prior to execution of this Agreement, including with respect to any Court-imposed deadlines; (d) all Orders entered in connection with the Settlement, including the certification of the Settlement Class, shall be vacated without prejudice to any Party's position on the issue of class certification, the issue of amending the complaint, or any other issue, in the Action or any other action, and the Parties shall be restored to their litigation positions existing on the date of execution of this Agreement; and (e) the Parties shall proceed in all respects as if the Settlement Agreement and related documentation and orders had not been executed, and without prejudice in any way from the negotiation or fact of the Settlement or the terms of the Settlement Agreement.  The Settlement Agreement, the Settlement, all documents, orders, and evidence relating to the Settlement, the fact of their existence, any of their terms, any press release or other statement or report by the Parties or by others concerning the Settlement Agreement, the Settlement, their existence, or their terms, any negotiations, proceedings, acts performed, or documents executed pursuant to or in furtherance of the Settlement Agreement or the Settlement shall not be admissible in any proceeding, and shall not be offered, received, or construed as evidence of a presumption, concession, or an admission of liability, of unenforceability of any arbitration agreement, of the certifiability of a litigation class, or of any misrepresentation or omission in any statement or written document approved or made, or otherwise used by any Person for any purpose whatsoever, in any trial of the Action or any other action or proceedings.  Plaintiffs, Class Counsel and the Settlement Administrator shall return to counsel for DoorDash all copies of Class Information and Opt-Out Lists and shall not use or disclose the Class Information or Opt-Out List for any purpose or in any proceeding.

DocuSign Envelope ID: 480B6B67-2A0B-4467-A9C5-7BD57DA1E06A

11.4    DoorDash does not agree or consent to certification of the Settlement Class for any purpose other than to effectuate the Settlement of the Action. If this Settlement Agreement is terminated pursuant to its terms, or the Effective Date for any reason does not occur, all Orders certifying the Settlement Class for purposes of effecting this Settlement Agreement, and all preliminary and/or final findings regarding the Settlement Class certification order, shall be automatically vacated upon notice to the Court, the Action shall proceed as though the Settlement Class had never been certified pursuant to this Settlement Agreement and such findings had never been made, and the Action shall revert nunc pro tunc to the procedural status quo as of the date and time immediately before the execution of the Settlement Agreement, in accordance with this Settlement Agreement.

## XII.    ADDITIONAL PROVISIONS

12.1    All of the Exhibits to this Agreement are an integral part of the Settlement and are incorporated by reference as though fully set forth herein.

12.2    The Plaintiffs and Class Counsel acknowledge that an adequate factual record has been established that supports the Settlement and, apart from the limited discovery described in the next sentence, hereby waive any right to conduct further discovery to assess or confirm the Settlement. Notwithstanding the prior sentence, the Parties agree to reasonably cooperate with respect to limited confirmatory discovery to facilitate approval of the settlement and related to the last-known addresses of Settlement Class Members.

12.3    Unless otherwise noted, all references to "days" in this Agreement shall be to calendar days.  In the event any date or deadline set forth in this Agreement falls on a weekend or federal legal holiday, such date or deadline shall be on the first business day thereafter.

12.4    This Agreement constitutes the full and complete agreement of the Parties hereto, and supersedes all prior negotiations and agreements, whether oral, written or otherwise, and may be amended or modified only by a written instrument signed by counsel for all Parties or the Parties' successors-in-interest.

CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE (Case Nos. CGC-18-567869)

12.5    The Parties reserve the right, subject to the Court's approval, to make any reasonable extensions of time that might be necessary to carry out any of the provisions of this Agreement. Such extensions must be in writing to be enforceable.

12.6    The Settlement Agreement, the Settlement, the fact of the Settlement's existence, any of terms of the Settlement Agreement, any press release or other statement or report by the Parties or by others concerning the Settlement Agreement or the Settlement, and any negotiations, proceedings, acts performed, or documents executed pursuant to or in furtherance of the Settlement Agreement or the Settlement: (i) may not be deemed to be, may not be used as, and do not constitute an admission or evidence of the validity of any Released Claims or of any wrongdoing or liability of DoorDash; (ii) may not be deemed to be, may not be used as, and do not constitute an admission or evidence of any fault, wrongdoing, or omission by DoorDash in any trial, civil, arbitration, criminal, or administrative proceeding of the Action or any other action or proceedings in any court, administrative agency, arbitration or other tribunal; (iii) may not be used as evidence of any waiver of, unenforceability of, or as a defense to any DoorDash arbitration agreement; and (iv) may not be used as evidence on any class certification proceeding.

12.7    The Released Parties shall have the right to file the Settlement Agreement, the Final Approval order and Judgment, and any other documents or evidence relating to the Settlement in any action that may be brought against them in order to support a defense or counterclaim based on principles of res judicata, collateral estoppel, release, good-faith settlement, judgment bar, reduction, or any other theory of claim preclusion or issue preclusion or similar defense or counterclaim.

12.8    The Parties to the Settlement Agreement agree that the Total Settlement Amount and the other terms of the Settlement were negotiated at arm's length and in good faith by the Parties, resulted from an arm's-length mediation session facilitated by Mark Irvings, and reflect a settlement that was reached voluntarily based upon adequate information and sufficient discovery and after consultation with experienced legal counsel.

12.9    The Plaintiffs and Class Counsel have concluded that the Settlement set forth herein constitutes a fair, reasonable, and adequate resolution of the claims that the Plaintiffs asserted against

DoorDash, including the claims on behalf of the Settlement Class, and that it promotes the best interests of the Settlement Class.

12.10   To the extent permitted by law, all agreements made and orders entered during the course of the Action relating to the confidentiality of information shall survive this Settlement Agreement.

12.11   The waiver by one Party of any breach of this Settlement Agreement by any other Party shall not be deemed a waiver of any other prior or subsequent breach of this Settlement Agreement.

12.12   This Settlement Agreement, including its Exhibits, constitutes the entire agreement among the Parties, and no representations, warranties, or inducements have been made to any Party concerning this Settlement Agreement or its Exhibits, other than the representations, warranties, and covenants contained and memorialized in this Settlement Agreement and its Exhibits.

12.13   This Settlement Agreement may be executed in one or more counterparts. All executed counterparts and each of them shall be deemed to be one and the same instrument provided that counsel for the Parties to this Settlement Agreement shall exchange among themselves original signed counterparts.

12.14   The Parties hereto and their respective counsel agree that they will use their best efforts to obtain all necessary approvals of the Court required by this Settlement Agreement and to resolve any objections to the release of all Claims.

12.15   This Settlement Agreement shall be binding upon and shall inure to the benefit of the successors and assigns of the Parties hereto, including any and all Released Parties and any corporation, partnership, or other entity into or with which any Released Party hereto may merge, consolidate, or reorganize.

12.16   This Settlement Agreement shall not be construed more strictly against one Party than another merely because of the fact that it may have been prepared by counsel for one of the Parties, it being recognized that because of the arm's-length negotiations resulting in the Settlement Agreement, all Parties hereto have contributed substantially and materially to the preparation of the Settlement Agreement.

12.17  Except where this Settlement Agreement itself provides otherwise, all terms, conditions, and Exhibits are material and necessary to this Settlement Agreement and have been relied upon by the Parties in entering into this Settlement Agreement.

12.18  This Settlement Agreement shall be governed by California law.  Any dispute regarding the Settlement Agreement shall first be presented to the mediator Mark L. Irving to provide guidance to the parties before the parties seek any party seeks other recourse.  Following this initial guidance, any action based on this Settlement Agreement, or to enforce any of its terms, shall be venued in San Francisco County Superior Court, which shall retain jurisdiction over all such disputes; except however that all Parties to this Settlement Agreement shall be subject to the jurisdiction of San Francisco County Superior Court for all purposes related to this Settlement Agreement.  This paragraph relates solely to the law governing this Settlement Agreement and any action based thereon, and nothing in this paragraph shall be construed as an admission or finding that California law applies to the Released Claims of any Plaintiffs or Settlement Class Members who reside outside of the state.

12.19  The Court shall retain continuing and exclusive jurisdiction over the Parties to this Settlement Agreement for the purpose of the administration and enforcement of this Settlement Agreement.

12.20  The headings used in this Settlement Agreement are for the convenience of the reader only, and shall not affect the meaning or interpretation of this Settlement Agreement.

12.21  In construing this Settlement Agreement, the use of the singular includes the plural (and vice-versa) and the use of the masculine includes the feminine (and vice-versa).

12.22  Each Party to this Settlement Agreement warrants that he, she, or it is acting upon his or its independent judgment and upon the advice of his or its counsel, and not in reliance upon any warranty or representation, express or implied, of any nature of any kind by any other Party, other than the warranties and representations expressly made in this Settlement Agreement.

12.23  Each counsel signing this Settlement Agreement on behalf of his/her clients who are unable to sign the Agreement on the date that it is executed by other Parties represents that such counsel is fully authorized to sign this Settlement Agreement on behalf of his/her clients; provided,

however, that all Parties who have not executed this Agreement on the date that it is executed by the other Parties shall promptly thereafter execute this Agreement and in any event no later than one (1) week after the Agreement has been executed by counsel.

Dated: November 21 20, 2019

By: _Cynthia marciano_
CYNTHIA MARCIANO
PLAINTIFF

Dated: November 21, 2019

By: _David Cristini_
DAVID CRISTINI
PLAINTIFF

Dated: November 21, 2019

By: _[signature]_
DARNELL AUSTIN
PLAINTIFF

Dated: November 21, 2019

By: _[signature]_
MANUEL MAGANA
PLAINTIFF

Dated: November 21, 2019

By: _Jared Roussel_
JARED ROUSSEL
PLAINTIFF

Dated: November 21, 2019

By: _[DocuSigned signature]_
DA803C692E1945F...
VICE PRESIDENT, LEGAL,
DOORDASH, INC.
DEFENDANT

41.

DocuSign Envelope ID: 480BCB67-2A0B-4132-A9CF-75D57DA1E06A

Dated: November 21
2019

By: _Joshua Lipshutz_
Joshua S. Lipshutz
GIBSON DUNN & CRUTCHER LLP

Attorneys for Defendant
DOORDASH, INC.
(Approved As to Form Only)

Dated: November 21 , 2019

By: _Shannon Liss-Riordan_
Shannon Liss-Riordan
LICHTEN & LISS-RIORDAN, P.C.

Attorney for Plaintiffs

CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE (Case Nos. CGC-18-567869)

# Exhibit 1
# to Settlement Agreement

## NOTICE OF PROPOSED CLASS ACTION SETTLEMENT
## AND FINAL APPROVAL HEARING

*Marciano v. DoorDash, Inc.*, Case No. CGC-18-567869 (S.F. Sup. Ct.)

**The Court authorized this notice.  This is not a solicitation from a lawyer.**

Pursuant to the Order of the Superior Court for the State of California for the County of San Francisco, you are hereby notified that a proposed settlement has been reached in the above-referenced cases brought on behalf of the following individuals:

> All individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California from August 30, 2016 through DATE and performed at least one delivery in California from August 30, 2016 through DATE;

> All individuals in Massachusetts who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts from September 26, 2014 through DATE and performed at least one delivery in Massachusetts from September 26, 2014 through DATE.

You have been identified by DoorDash records as a member of the Settlement Class.  Please read this entire notice carefully.  It may affect your legal rights to money you may be owed.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **Participate in the Settlement** | If you wish to receive a share of the Settlement proceeds, **you must submit a Claim, which you can do electronically or by mail, as explained below in paragraph 11.**  [A hyperlink will be included here that will take class members down to paragraph 11.] *In order to receive your share of the Settlement if the Court grants final approval of the Settlement, please return this form no later than _____, 2019.* |
| **Exclude Yourself from the Settlement (Opt-Out)** | If you do not want to participate in the Settlement, you must mail a written Request for Exclusion to the Settlement Administrator postmarked no later than _____, 2019, or else you will be bound by the Settlement and the Release if the Court grants final approval of the Settlement. Please refer to pages 6-7 below for instructions on excluding yourself. |
| **Object to the Settlement** | If you wish to object to the Settlement, you may mail a written objection to the Settlement Administrator postmarked no later than _____, 2019, or make your objection at the Fairness Hearing. Please refer to pages 7-9 below for instructions on objecting. |
| **Participate in the Hearing** | If you submit a written objection to the Settlement, you may also indicate in the objection whether you wish to appear and be heard at the time of the Fairness Hearing. You may also appear and be heard at the Fairness Hearing without submitting a written objection. |

**Which option you choose is entirely up to you.  No matter your choice, it will not impact your relationship with DoorDash.**

**THESE RIGHTS AND OPTIONS, INCLUDING THE DEADLINES BY WHICH TO EXERCISE THEM, ARE EXPLAINED IN THIS NOTICE.**

www.[WEBSITE].com

| **Do Nothing** | If you do nothing with respect to this notice, and the Court grants final approval of the Settlement, you will <u>not</u> receive a share of the Settlement and you will be bound by the terms of the Settlement. |
|---|---|

## <u>TABLE OF CONTENTS</u>

**GENERAL INFORMATION REGARDING THIS NOTICE**....................................................3

    What Is This Notice About? ..........................................................................3

    What Is This Lawsuit About? ........................................................................3

**SUMMARY OF THE SETTLEMENT** ....................................................................................4

    Who Is Included in the Settlement? ...........................................................4

    What Are the Important Terms of the Settlement? ..................................4

    What Are My Rights as a Settlement Class Member? .............................6

    Class Counsel ..............................................................................................8

    Final Settlement Approval Hearing ...........................................................8

    Getting More Information ...........................................................................9

## GENERAL INFORMATION REGARDING THIS NOTICE

**WHAT IS THIS NOTICE ABOUT?**

A proposed settlement (the "Settlement") has been reached in the cases *Marciano v. DoorDash, Inc.*, Case No. CGC-18-567869 (S.F. Sup. Ct.) and *Austin v. DoorDash, Inc.*, No. 1:17-cv-12498 (D. Mass.) ("*Austin*"). These cases have been consolidated for settlement purposes and are proceeding as part of the *Marciano v. DoorDash, Inc.* case. The Court has preliminarily approved the Settlement and has directed the parties to notify the Settlement Class of the Settlement.

You have received this notice because DoorDash's records indicate that you are a Settlement Class Member. This notice is designed to inform you of how you can claim a share of the settlement payment, elect not to participate in the Settlement, or object to the Settlement.

**WHAT IS THIS LAWSUIT ABOUT?**

Plaintiffs claim they and others who used the DoorDash platform to complete deliveries have been improperly classified as independent contractors by DoorDash, and have sought relief under various California Labor Code provisions and Section 17200 of the California Business and Professions Code and the Massachusetts wage laws. Plaintiffs primarily seek reimbursement of their necessary business expenses, which they contend is required by both California and Massachusetts law. Plaintiffs have also asserted claims on a representative basis, seeking penalties under the Private Attorneys General Act of 2004 ("PAGA") on behalf of the state of California and California DoorDash delivery drivers.

DoorDash denies Plaintiffs' allegations and instead contends, among other things, that those who used the DoorDash platform to complete deliveries were correctly classified as independent contractors.

The Court has not ruled whether either party is correct.

After good-faith negotiations with an experienced, neutral mediator, in which both sides recognized the substantial risk of an uncertain outcome, the parties agreed to settle their dispute pursuant to the terms and conditions of a negotiated Settlement. The parties and their counsel have concluded that the Settlement is advantageous, considering the risks and uncertainties of continued litigation. The parties and their counsel have determined that the Settlement is fair, reasonable, and adequate and is in the best interests of the members of the Settlement Class.

The Settlement represents a compromise and settlement of disputed claims. Nothing in the Settlement is intended to be or will be construed as an admission by DoorDash that Plaintiff's claims have merit or that it has any liability to Plaintiff or the proposed class on the claims in the Action.

## SUMMARY OF THE SETTLEMENT

**WHO IS INCLUDED IN THE SETTLEMENT?**

You have received this notice and are included in the Settlement because DoorDash's records show that you fall within the following definition:

> All individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California from August 30, 2016 through DATE and performed at least one delivery, as well as all individuals who used or attempted to use the DoorDash mobile application to offer delivery services to customers in California from August 30, 2016 through DATE;

> All individuals in Massachusetts who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts from September 26, 2014 through DATE and performed at least one delivery, as well as all individuals who used or attempted to use the DoorDash mobile application to offer delivery services to customers in Massachusetts from September 26, 2014 through DATE.

**WHAT ARE THE IMPORTANT TERMS OF THE SETTLEMENT?**

1.  The Settlement Fund is $39,500,000.  The Settlement Fund will fund payments to Class Members who submit a valid Class Member Claim.

2.  From this Settlement Fund, amounts will be deducted for attorneys' fees and costs in the amount that the Court approves, up to one-third of the total Settlement Fund ($13,1666,665); incentive payments for the named plaintiffs, in the amount the Court approves, estimated to be $5,000 each for named plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Darnell Austin, Daniel Marko, Jesus Corona, and Jared Roussel (for a total of $35,000); a payment to the Settlement Administrator for the costs of administering the settlement, estimated to be approximately $640,000; and a payment to the State of California for PAGA penalties, in the amount of $562,500.

3.  The remaining approximately $28,537,500 will be distributed to those Settlement Class Members who submit a Claim.  Only those who submit a valid Claim will receive payment from the Settlement Fund.  The Settlement Fund will be allocated to Class Members proportionally to their miles driven or traveled while completing deliveries on the DoorDash platform, with no claimant who submits a claim receiving less than $10.  Settlement Class Members who opted out of the arbitration agreement or who have already filed or taken steps to file individual arbitrations prior to October 24, 2019, will have their mileage amounts doubled.  **If you want to participate in the settlement and receive your payment, be sure to file your claim!**

4.  Unclaimed funds will be re-distributed to those who submit Claims and whose second payment would be more than $50; no amount of the settlement funds will revert to DoorDash.  Any funds that are not claimed (for example, if an individual does not timely cash his or her check), will be donated to Legal Aid at Work or Greater Boston Legal

Services, two non-profit organizations that advocates for employees' rights in the workplace.

5.      In addition to this monetary payment, DoorDash has agreed to the following non-monetary terms as part of the settlement:

     i.   DoorDash agrees to implement a pay model for California and Massachusetts Dashers that ensures that every dollar that a customer tips will be on top of DoorDash's contribution for that delivery, and the amount DoorDash pays to a Dasher for a delivery will not vary based on the tip amount.

6.      You **will be bound** by this Settlement if it is given final approval by the Court unless you submit a written Request for Exclusion to the Settlement Administrator, postmarked by the deadline of _____ __, 2019.  If you do mail a Request for Exclusion by the deadline in accordance with the instructions for submitting a Request for Exclusion, you will be excluded from the Settlement and will not receive a Settlement Share, but you will retain the right you may have, if any, to pursue a claim against DoorDash.

7.      If the Court does not grant final approval of the Settlement, or does not enter the Final Approval Order or if the Court's Final Approval Order is reversed in whole or in part on appeal, the parties have no obligations under the Settlement, and Class Members will not receive payments.

8.      The Court has appointed Simpluris to act as the Settlement Administrator to administer the Settlement.

9.      The Settlement, if given final approval by the Court, includes a release from all liability arising from claims that were or reasonably could have been asserted in this case related to allegations of independent contractor misclassification (the "Released Claims"). If you wish to review the Released Claims, please click this link or inquire with the Settlement Administrator.

10.     Plaintiffs, as Class Representatives, and Class Counsel, support the Settlement.  Their reasons include the risk of being unable to pursue this case as a class action on behalf of all Class Members, the risk of a trial on the merits, the inherent delays and uncertainties associated with litigation, and the possibility that the Class is not entitled to any recovery. Based on their experience litigating similar cases, Class Counsel believes that further proceedings in this case would be uncertain.  Many courts have already enforced DoorDash's arbitration agreement, which creates significant obstacles for most Class Members to bring actions in court to recover any damages for the violations alleged here. Therefore, upon careful consideration of all the facts and circumstances of this case, as well as the potential damages that could be recovered, Class Counsel believes that the Settlement is fair, reasonable, and adequate.

## WHAT ARE MY RIGHTS AS A SETTLEMENT CLASS MEMBER?

11.     **Participating in the Settlement:**

     To submit a claim electronically, **click on this link**, or go to **www.[WEBSITE].com** and enter your Claimant ID and Verification Number, provided below.  [Website name will be linked to website where claims can be submitted; Claimant ID and Verification Number will be automatically entered for Class Members

6

who enter the website through this link.]

Claimant ID: [___]
Verification Number: [___]

To submit a claim by paper, please complete and return the enclosed claim form (which you will have received if you are receiving this notice by mail). If you need a paper claim form, please contact the Settlement Administrator at (8XX) [___-____] or [___]@[___].com.

**In order to receive a monetary payment from this settlement, please submit your claim no later than [___].**

12. **Receiving a Settlement Payment:** If you wish to receive payment from this Settlement, please submit a valid and timely Claim no later than _____ __, 2019.

13. **Excluding Yourself from the Settlement (Opt-Out):** If you do not wish to participate in the Settlement, you must mail a written Request for Exclusion to the Settlement Administrator. The Request for Exclusion must include: (1) the Settlement Class Member's name, address, and telephone number; (2) a clear and unequivocal statement that the Settlement Class Member wishes to be excluded from the Settlement Class and that the Settlement Class Member understands that he or she is still bound by the release of the PAGA Claims upon Final Approval of the Settlement and Final Judgment; and (3) the physical ("wet ink") signature of the Settlement Class Member or the Legally Authorized Representative of the Settlement Class Member (who is not the class member's counsel). The Request for Exclusion must be completed, signed, and mailed to the Settlement Administrator at the address identified below, postmarked no later than _____ __, 2019. A Settlement Class Member who fails to return a Request for Exclusion in the manner and by the deadline specified above will be bound by all terms and conditions of the Settlement and the Judgment, regardless of whether he or she has objected to the Settlement. Requests for exclusion must be exercised individually by the Settlement Class Member (or their Legally Authorized Representative who is not the Settlement Class Member's counsel), even if the Settlement Class Member is represented by counsel. Attempted collective group, class, or subclass requests for exclusions shall be ineffective and disregarded by the Settlement Administrator.

Any person who files a complete and timely Request for Exclusion will, upon receipt, no longer be a member of the Settlement Class and will not be eligible to receive a payment. Any such person will retain the right, if any, to pursue at his or her own expense a claim against DoorDash. A Request for Exclusion that does not fulfill the requirements above will be deemed invalid.

If a Settlement Class Member submits both an objection and a valid and timely Request for Exclusion, the Request for Exclusion will be accepted and the objection will be rejected. If a Settlement Class Member submits both a Claim and a Request for Exclusion from the Settlement, the Settlement Class Member will be given an opportunity to clarify his or her response.

Please note that Requests for Exclusion do not apply to the release of PAGA claims contemplated by the Settlement. Settlement Class Members who validly and timely submit a Request for Exclusion will nevertheless be bound by the settlement and release of PAGA claims, and therefore any PAGA claims that any Settlement Class Member may possess for the Settlement Class Period shall be extinguished if the Court approves the

Settlement.
**There will be no retaliation or adverse action taken against any Class Member who participates in the Settlement, elects not to participate in the Settlement, or objects to the settlement.**

14.    **Objecting to the Settlement:** If you think the settlement is unfair and should not be given final approval, you may mail an objection to the Settlement Administrator. You may also attend the Fairness Hearing and make your objection to the Court at that time, without submitting an objection to the Settlement Administrator.

If the Court does not give final approval to the settlement, no settlement payments will be sent out and the lawsuit will continue.

If a Settlement Class Member submits both an objection and a valid and timely Request for Exclusion, the Request for Exclusion will be accepted and the objection will be rejected.

All written objections and supporting papers must be mailed to the Settlement Administrator at the Settlement Administrator's address below and be postmarked on or before _____, 2019.

15.    **Participating in the Final Approval Hearing:** You may appear and object at the Final Approval Hearing in person or appear through counsel of your choice, paid at your own expense, and be heard at the time of the Final Approval Hearing, if you wish to do so. If the Court overrules your objection and gives final approval to the Settlement, you will be bound by the terms of the Settlement and receive a Settlement Payment if you submitted a Claim.

16.    **Keep Your Information Up to Date:** It is your obligation to keep the Settlement Administrator informed of any changes in your mailing address until your Settlement Payment is received, should final approval of the Settlement be granted. Failing to provide the Settlement Administrator with any change of your mailing address may prevent you from receiving your Settlement Payment.

17.    **The Settlement Administrator's Address.** You may send a paper Claim, Request for Exclusion, or Objection to the Settlement Administrator at the following mailing address:

[Address]
[Address]

| CLASS COUNSEL |
| --- |

Contact information for Class Counsel is provided below:

Shannon Liss-Riordan
Lichten & Liss-Riordan, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
www.llrlaw.com
Phone: (617) 994-5800
claims@llrlaw.com, Firm Settlement Administrator

**FINAL SETTLEMENT APPROVAL HEARING**

The Court has scheduled the Settlement Fairness Hearing for [ ] on [ ], 2019, in the Superior Court for the County of San Francisco, Department 302, 400 McAllister St., San Francisco, California, 94102 to determine whether the Settlement should be finally approved as fair, reasonable, and adequate.  The Court will also be asked to approve the requests for the Class Representative Enhancement Payment and the Class Counsel Award and Costs.

The hearing may be postponed without further notice to the Class.  **It is not necessary for you to appear at this hearing.**  If you plan to attend the Fairness Hearing, you may contact Class Counsel to confirm the date and time, as the hearing may be rescheduled without further notice.

**GETTING MORE INFORMATION**

This notice summarizes the proposed settlement.  For more precise terms and conditions of the Settlement, please contact Class Counsel (contact information above), visit the Settlement website at www.[WEBSITE].com, or contact the Settlement Administrator at XXX-XXX-XXXX.  You may also visit the office of the Clerk of Court for the San Francisco County Superior Court located at 400 McAllister St., San Francisco, California 94102, between 8:30 a.m. and 4:00 p.m., Monday through Friday, excluding Court holidays.

**PLEASE DO NOT TELEPHONE THE COURT, DOORDASH OR DOORDASH'S COUNSEL FOR INFORMATION!  YOU MAY CALL THE SETTLEMENT ADMINISTRATOR OR CLASS COUNSEL LISTED ABOVE.**

Dated: _____, 2019.
By Order of the Court

9

# Exhibit 2
# to Settlement Agreement

1  SHANNON LISS-RIORDAN (SBN 310719)
   sliss@llrlaw.com
2  ANNE KRAMER (SBN 315131)
   (akramer@llrlaw.com)
3  LICHTEN & LISS-RIORDAN, P.C.
   729 Boylston Street, Suite 2000
4  Boston, MA 02116
   Telephone:    (617) 994-5800
5  Facsimile:    (617) 994-5801
6
7  *Attorney for Plaintiffs Cynthia Marciano*
   *and David Cristini in their capacity as Private*
8  *Attorney General Representatives*
9
10              SUPERIOR COURT OF THE STATE OF CALIFORNIA
11                     COUNTY OF SAN FRANCISCO
12  CYNTHIA MARCIANO, DAVID          Case No.:  CGC-18-567869
    CRISTINI, DARNELL AUSTIN,
13  MANUEL MAGANA, and JARED         **[PROPOSED] ORDER GRANTING**
    ROUSSEL,                         **PRELIMINARY APPROVAL OF CLASS**
14                                   **ACTION SETTLEMENT**
15           Plaintiffs,
16  v.                               Hearing Date: December 17, 2019
                                     Hearing Time: 8:30 am
17  DOORDASH, INC.,                  Dept.:  302
18           Defendant.
19                                   Trial Date:  None Set
20
21
22
23
24
25
26
27
28

Plaintiffs have filed a Motion for Preliminary Approval of the class action settlement reached with Defendant DoorDash, Inc.  A preliminary approval hearing was held on December 17, 2019.  The Court has carefully considered the Settlement Agreement together with all exhibits thereto, all the filings related to the Settlement, the arguments of counsel, and the record in this case.  The Court hereby gives its preliminary approval of the Settlement; finds that the Settlement and Settlement Agreement are sufficiently fair, reasonable and adequate to allow dissemination of notice of the Settlement to the Settlement Class and to hold a Fairness Hearing; orders the Class Notice be sent to the Settlement Class in accordance with the Settlement Agreement and this Order; and schedules a Fairness Hearing to determine whether the proposed Settlement is fair, adequate and reasonable.

**IT IS HEREBY ORDERED THAT:**

1. The Settlement Agreement is hereby incorporated by reference in this Order, and all terms or phrases used in this Order shall have the same meaning as in the Settlement Agreement.

2. The Court finds that the terms of the Settlement Agreement preliminarily appear to be fair, reasonable, and adequate, and within the range of possible approval and sufficient to warrant providing notice to the Settlement Class, when balanced against the probable outcome of further litigation, given the risks relating to liability and damages. It further appears that investigation and research has been conducted such that counsel for the Parties are reasonably able to evaluate their respective positions.  It further appears to the Court that the Settlement will avoid substantial additional costs by all parties, as well as the delay and risks that would be presented by the further prosecution of the Action, and that it will provide substantial benefits to Class Members going forward.  It appears that the Settlement has been reached as a result of intensive, arm's-length negotiations utilizing an experienced third party neutral mediator.

3. The Court certifies, for settlement purposes only, the following Settlement Class: "All individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California from August 30, 2016

through the date of this Order and performed at least one delivery in California from August 30, 2016 through the date of this Order; All individuals in Massachusetts who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts from September 26, 2014 through the date of this Order and performed at least one delivery in Massachusetts from September 26, 2014 through the date of this Order."

4.   The Court appoints as class representatives, for settlement purposes only, Named Plaintiffs Cynthia Marciano, David Cristini, Darnell Austin, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel. The Court finds, for settlement purposes only, that the Named Plaintiffs will adequately represent the Settlement Class.

5.   Pursuant to the Parties' Agreement, the Second Amended Complaint attached as Exhibit 3 to the Parties' Class Action Settlement Agreement is hereby deemed filed.

6.   For settlement purposes only, the Court designates as Class Counsel the law firm of Lichten & Liss-Riordan, P.C.  The Court preliminarily finds that, based on the work Class Counsel have done identifying, investigating, and prosecuting the claims in this action; Class Counsel's experience in handling class actions and claims of this type asserted in this Action; Class Counsel's knowledge of the applicable law; and the resources Class Counsel have and will commit to representing the class, that Class Counsel have represented and will represent the interests of the Settlement Class fairly and adequately.

7.   Simpluris shall administer the Settlement in accordance with the terms and conditions of this Order and the Settlement Agreement.

8.   The Court hereby conditionally certifies the proposed Settlement Class and conditionally finds that, solely for the purposes of approving this Settlement and for no other purpose and with no other effect on this litigation, the proposed Settlement Class meets the requirement for certification under section 382 of the California Code of Civil Procedure including that: (a) the proposed Settlement Class is ascertainable and so numerous that joinder of all members is impracticable; (b) there are predominant questions of law or fact

common to the Settlement Class, and there is a well-defined community of interest amongst the Settlement Class with respect to the subject matter of the litigation; (c) the claims of the Named Plaintiffs are typical of the claims of the members of the Settlement Class; (d) the Named Plaintiffs will fairly and adequately protect the interests of the members of the class; (e) a class action is superior to other available methods for an efficient method of adjudication of this controversy through settlement; and (f) Class Counsel is qualified to act as counsel for the Named Plaintiffs in their individual and representative capacities.

9.    The Court hereby approves, as to form and content, the Notice of Class Action Settlement attached as Exhibit 1 to the Settlement Agreement.  The Court finds that the mailing and distribution of the Notice of Class Action Settlement in accordance with the Settlement Agreement meets the requirements of due process and are the best notice practicable under the circumstances and shall constitute due and sufficient notice to all persons entitled thereto.

10.   The Court approves the procedures set forth in the Settlement Agreement and the Notice of Settlement of Class Action for exclusions from and objections to the Settlement.

11.   Any Settlement Class Members who wishes to opt out from the Agreement must do so within 45 days of the Notice Date and in accordance with the terms of the Agreement.

12.   Any Settlement Class Member who wishes to object to the Agreement may submit a written objection to the Settlement Administrator within 45 days of the Notice Date and in accordance with the terms of the Agreement.

13.   Reasonable attempts will be made to update the address of any Class Member whose notice is returned as undeliverable.

14.   The Court directs that a hearing be scheduled for April ___, 2020, at 9:30 a.m. (the "Fairness Hearing") to assist the Court in determining whether the Settlement is fair, reasonable and adequate; whether Final Judgment should be entered in this Action; whether Class Counsel's application for fees and expenses should be approved; and

whether Class Counsel's request for enhancement payments to the Named Plaintiffs should be approved.  Plaintiffs shall file a Motion for Final Approval of Class Action Settlement (including a request for attorneys' fees, costs, and class representative service awards) no later than 10 court days before the hearing.

15.   The Court hereby preliminarily approves the plan of allocation of the Settlement Fund as described in the Settlement.

16.   Neither the Settlement, nor any exhibit, document or instrument delivered thereunder shall be construed as or deemed to be evidence of an admission or concession by DoorDash of an interpretation of, any liability or wrongdoing by DoorDash, or of the truth of any allegations asserted by Plaintiffs, Settlement Class Members or any other person.

17.   If the Settlement is not finally approved, or the Effective Date does not occur, or the Settlement is terminated under its terms, or the Settlement is overturned or modified by the Court or on appeal, then: (a) the Settlement shall be without force and effect upon the rights of the Parties hereto, and none of its terms shall be effective or enforceable; (b) the Parties shall be deemed to have reverted nunc pro tunc to their respective status as of the day immediately before the Parties entered into the Agreement, with the Parties to meet and confer regarding any discovery or case management deadlines that were pending at the time the Parties stayed litigation, arbitration, or other proceedings; (c) DoorDash shall be refunded any amounts paid pursuant to this Agreement but not yet spent or disbursed; (d) all Orders entered in connection with the Settlement, including the certification of the Settlement Class, shall be vacated without prejudice to any Party's position on the issue of class certification, or any other issue, in this Action or any other action, and the Parties shall be restored to their litigation positions existing on the date of execution of Settlement Agreement; and (e) the Parties shall proceed in all respects as if the Settlement Agreement and related documentation and orders had not been executed, and without prejudice in any way from the negotiation or fact of the Settlement or the terms of the Settlement Agreement.  In such an event, this Court's orders regarding the Settlement, including this

Preliminary Approval Order, shall not be used or referred to in litigation, arbitration, or other proceedings for any purpose. Nothing in the foregoing paragraph is intended to alter the terms of the Settlement Agreement with respect to the effect of the Settlement Agreement if it is not approved.

18. The Court directs that the following deadlines are established by this Preliminary Approval Order:

    a. Notice to be Provided to Class Members: within forty-five (45) days of this Preliminary Approval Order.

    b. Opt-Out Deadline: sixty (60) days after the Notice Date.

    c. Written Objection Deadline: sixty (60) days after the Notice Date. Class Members may also appear and object at the Fairness Hearing without having submitted a written objection.

    d. Claim Deadline: sixty (60) days after the Notice Date.

    e. Fairness Hearing: April ___, 2019, at 9:30 a.m.

**IT IS SO ORDERED.**

Date: _____

_____
Superior Court Judge

# Exhibit 3
# to Settlement Agreement

1  SHANNON LISS-RIORDAN (SBN 310719)
   (sliss@llrlaw.com)
2  ANNE KRAMER (SBN 315131)
   (akramer@llrlaw.com)
3  LICHTEN & LISS-RIORDAN, P.C.
4  729 Boylston Street, Suite 2000
   Boston, MA 02116
5  Telephone:     (617) 994-5800
   Facsimile:     (617) 994-5801
6
7  *Attorneys for Plaintiffs*

8

9

10         **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11            **FOR THE COUNTY OF SAN FRANCISCO**

12

13

14                                          | Case No. 18-567869

15  CYNTHIA MARCIANO, DAVID CRISTINI,
    JARED ROUSSEL, MANUEL MAGANA,          | **SECOND AMENDED CLASS ACTION**
16  DARNELL AUSTIN, DANIEL MARKO, and       | **AND PRIVATE ATTORNEYS GENERAL**
    JESUS CORONA, *on behalf of themselves and* | **ACT COMPLAINT**
17  *others similarly situated and in their capacity as*
    *Private Attorneys General Representatives*,
18
19                    Plaintiffs,

20            v.

21  DOORDASH INC.,

22
                      Defendant.
23

24

25

26

27

28

## I.    **INTRODUCTION**

1.    This case is brought on behalf of the state of California and other similarly situated aggrieved individuals who have worked for DoorDash as delivery drivers in California and on behalf of individuals who have worked for DoorDash as delivery drivers in Massachusetts.  DoorDash Inc. ("DoorDash") provides on-demand takeout food delivery to customers at their homes and businesses through its mobile phone application and website. DoorDash is based in San Francisco, California, but it does business across the United States and extensively throughout California and Massachusetts.

2.    As described further below, DoorDash has willfully misclassified its delivery drivers including Plaintiffs in violation of Cal. Labor Code § 226.8.  Additionally, because of delivery drivers' misclassification as independent contractors, DoorDash has unlawfully required delivery drivers to pay business expenses (including expenses to own or lease a vehicle and maintain and fuel it, as well as phone/data expenses) in violation of Cal. Lab. Code § 2802 and has also failed to pay required minimum wage and overtime for all hours worked in violation of Cal. Lab. Code §§ 1194, 1197, 1198, 510 and 554.  Likewise, DoorDash has failed to provide proper itemized wage statements in violation of Cal. Lab. Code § 226(a) because it does not explain the piece-rate basis on which drivers are paid and does not break out the amount of drivers' wages and tips, among other reasons.  Plaintiffs bring their claims on a class-wide basis and pursuant to the Private Attorney General Act ("PAGA"), Cal. Lab. Code§ 2699, *et seq.,* on behalf of the state of California and all other similarly situated aggrieved employees who have been misclassified by DoorDash in California since April 30, 2017.

3.    As also described further below, DoorDash has misclassified Massachusetts delivery drivers under Mass. Gen. L. c. 149 § 148B and has violated the Massachusetts Wage Act by failing to pay drivers the state minimum wage and unlawfully requiring drivers to pay business expenses (including expenses to own or lease a vehicle and maintain and fuel it, as well as phone/data expenses).

4.      As also described further below, DoorDash has violated the federal Fair Labor Standards Act by failing to pay drivers the federal minimum wage.

## II.    PARTIES

5.      Plaintiff Cynthia Marciano is an adult resident of Santa Clara, California, where he has worked as a delivery driver for DoorDash since September 2014.

6.      Plaintiff David Cristini is an adult resident of Huntington Beach, California, where he has worked as a delivery driver for DoorDash since June 2015.

7.      Plaintiff Manuel Magana is an adult resident of San Jose, California, where he has worked as a delivery driver for DoorDash since May 2014.

8.      Plaintiff Jared Roussel is an adult resident of San Francisco, California, where he has worked as a delivery driver for DoorDash since May 2018.

9.      Plaintiff Darnell Austin is an adult resident of Whitman, Massachusetts, where has worked as a delivery driver for DoorDash since October 2016.

10.     Plaintiff Daniel Marko is an adult resident of Los Angeles County, California, where he has worked as a delivery driver for DoorDash.

11.     Plaintiff Jesus Corona is an adult resident of Los Angeles County, California where he has worked as a delivery driver for DoorDash.

12.     Defendant DoorDash, Inc. ("DoorDash") is headquartered in San Francisco, California.

## III.   JURISDICTION

13.     This Court has jurisdiction over Plaintiffs Marciano, Cristini, Magana, Marko, and Roussel's California Labor Code claims pursuant to California Code of Civil Procedure § 410.10.

14.     This Court has jurisdiction over Plaintiffs Marciano, Cristini, Marko, and Roussel's PAGA claims pursuant to California Code of Civil Procedure § 410.10.  The monetary relief which Plaintiffs seek is in excess of the jurisdictional minimum required by this Court and will be established according to proof at trial.

15.     This Court has jurisdiction over Plaintiff Austin's Massachusetts Wage Act claims pursuant to California Code of Civil Procedure § 410.10.

16.     This Court has jurisdiction over Plaintiffs' Fair Labor Standards Act claims pursuant to California Code of Civil Procedure § 410.10.

17.     Venue is proper in this Court pursuant to Code of Civ. P. §§ 395 and 395.5 because DoorDash has its principal place of business in San Francisco County.  Furthermore, Defendant engages in business activities in and throughout the State of California, including San Francisco County.

## IV.     STATEMENT OF FACTS

18.     DoorDash is a food delivery service, based in San Francisco, which engages delivery drivers across the state of California to deliver food to its customers at their homes and businesses.

19.     DoorDash offers customers the ability to request a driver on a mobile phone application or online through its website, who will go to the restaurant and pick up their food, then deliver it to the customer at their home or business.

20.     DoorDash holds itself out to the public as a food delivery service.  Its tagline is "Delivering Good", and its website advertises, "[w]ith your favorite restaurants at your fingertips, DoorDash satisfies your cravings and connects you with possibilities — more time and energy for yourself and those you love."

21.     Plaintiffs have driven for DoorDash at various times, including over the last year, and continue to drive for DoorDash.

22.     DoorDash classifies its delivery drivers as "independent contractors," but under California law, they should be classified as employees.

23.     DoorDash drivers perform services within DoorDash's usual course of business as a food delivery service.  The delivery drivers' services are fully integrated into DoorDash's business.  Without delivery drivers to perform deliveries, DoorDash would not exist.

24.     DoorDash delivery drivers are not typically engaged in their own food delivery business. When delivering items for DoorDash customers, they wear the "hat" of DoorDash.

25.     In addition, DoorDash maintains the right of control over the delivery drivers' performance of their jobs and exercises detailed control over them.

26.     For example, drivers must follow DoorDash's instructions regarding where to report for their shifts and where to go to pick up or await deliveries.  Drivers can be penalized or terminated for missing scheduled shifts or cancelling their shifts too close to the start time. DoorDash has collected various metrics regarding its drivers' performance, including: (1) drivers' customer rating (out of five stars, with five being the highest), which is used to gauge customers' satisfaction with a delivery; (2) drivers' acceptance rating, which gauges how many deliveries drivers were assigned and accepted over the last 100 deliveries; and (3) drivers' completion rating, which gauges the number of deliveries drivers completed that they accepted. If drivers' ratings fall below DoorDash's minimum thresholds they may be terminated.

27.     DoorDash communicates directly with customers and follows up with delivery drivers if the customer complains that something was not delivered or that the delivery otherwise failed to meet their expectations.  Based on any customer feedback, DoorDash may suspend or terminate delivery drivers.

28.     DoorDash unilaterally sets the pay scheme and rate of pay for delivery drivers' services and changes the rate of pay in its sole discretion.

29.     DoorDash does not reimburse delivery drivers for any expenses they may incur while working for DoorDash, including, but not limited to the cost of maintaining their vehicles, gas, insurance, and phone and data expenses for running the DoorDash Application.  Delivery drivers incur these costs as a necessary expenditure to work for DoorDash, which California law requires employers to reimburse.

30.     DoorDash pays its drivers a guaranteed delivery fee for each delivery plus tips they receive from customers.  DoorDash has failed to ensure that its delivery drivers receive the applicable state minimum wage for all hours worked, and delivery drivers frequently do not

receive minimum wage for all hours worked, particularly given that customers' tips cannot count toward DoorDash's minimum wage obligations.

31.     Furthermore, DoorDash does not provide transparent itemized wage statements to drivers with information regarding how their pay is calculated or what portion of pay is attributable to tips as opposed to wages from DoorDash.

32.     On April 30, 2018, the California Supreme Court issued its decision in <u>Dynamex Operations W., Inc. v. Superior Court</u>, 4 Cal. 5th 903, 416 P.3d 1 (2018), which makes clear that DoorDash delivery drivers should be classified as employees rather than as independent contractors under California law for purposes of wage-and-hour statutes like the ones at issue here.  Under the "ABC" test adopted in <u>Dynamex</u>, in order to justify classifying the delivery drivers as independent contractors, DoorDash would have to prove that its delivery drivers perform services outside its usual course of business, which it cannot do.  Notwithstanding this decision, DoorDash has willfully continued to misclassify its delivery drivers as independent contractors.

## V.   <u>CALIFORNIA SUB-CLASS ALLEGATIONS</u>

33.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel bring this case as a class action pursuant to California Code of Civil Procedure § 382 on behalf of all individuals who used the DoorDash platform and have completed at least one delivery in California since August 30, 2016.

34.     Plaintiffs and other class members have uniformly been deprived reimbursement of their necessary business expenditures

35.     The members of the class are so numerous that joinder of all class members is impracticable.

36.     Common questions of law and fact regarding DoorDash's conduct in classifying drivers as independent contractors, failing to reimburse them for business expenditures, and failing to ensure they are paid at least minimum wage and overtime for all weeks, exist as to all

members of the class and predominate over any questions affecting solely any individual members of the class. Among the questions of law and fact common to the class are:

    a.   Whether the work performed by class members—providing delivery services to customers—is within DoorDash's usual course of business;

    b.   Whether class members are typically engaged in their own businesses or whether they wear the "hat" of DoorDash when performing delivery services;

    c.   Whether class members have been required to follow uniform procedures and policies regarding their work for DoorDash;

    d.   Whether these class members have been required to bear the expenses of their employment, such as expenses for maintaining their vehicles and expenses for gas, insurance, phone and data plan.

37.    Named plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel are class members who suffered damages as a result of DoorDash's conduct and actions alleged herein.

38.    The named plaintiffs' claims are typical of the claims of the class, and the named plaintiffs have the same interests as the other members of the class.

39.    The named plaintiffs will fairly and adequately represent and protect the interests of the class.  The named plaintiffs have retained able counsel experienced in class action litigation.  The interests of the named plaintiffs are coincident with, and not antagonistic to, the interests of the other class members.

40.    The questions of law and fact common to the members of the class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

41.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impractical. Moreover, since the damages suffered by individual members of the class may be relatively small, the expense and burden of individual litigation makes it practically impossible for the members of the class individually to redress the wrongs done to them. The class is readily definable as

DoorDash knows which drivers have signed up to use the DoorDash platform as drivers and have completed at least one delivery since August 30, 2016.  Further, prosecution of this action as a class action will eliminate the possibility of repetitive litigation. There will be no difficulty in the management of this action as a class action.

## V.  MASSACHUSETTS SUB-CLASS ALLEGATIONS

42.     Plaintiff Darnell Austin brings this case on behalf of all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts since September 26, 2014 and performed at least one delivery.

43.     This claim is brought pursuant to Mass. Gen. L. ch. 149 § 150 and California Code of Civil Procedure § 382.

44.     Plaintiff Austin and other class members have uniformly been deprived reimbursement of their necessary business expenditures.

45.     The members of the class are so numerous that joinder of all class members is impracticable.

46.     Common questions of law and fact regarding DoorDash's conduct in classifying drivers as independent contractors, failing to reimburse them for business expenditures, and failing to ensure they are paid at least minimum wage and overtime for all weeks, exist as to all members of the class and predominate over any questions affecting solely any individual members of the class. Among the questions of law and fact common to the class are:

      e.   Whether the work performed by class members—providing delivery services to customers—is within DoorDash's usual course of business;

      f.   Whether class members are typically engaged in their own businesses or whether they wear the "hat" of DoorDash when performing delivery services;

      g.   Whether class members have been required to follow uniform procedures and policies regarding their work for DoorDash;

1

2
     h.  Whether these class members have been required to bear the expenses of their employment, such as expenses for maintaining their vehicles and expenses for gas, insurance, phone and data plan.

3

4
47.     Named plaintiff Darnell Austin is a class member who suffered damages as a

5
result of DoorDash's conduct and actions alleged herein.

6
48.     The named plaintiff's claims are typical of the claims of the class, and the named

7
plaintiff has the same interests as the other members of the class.

8
49.     The named plaintiff will fairly and adequately represent and protect the interests

9
of the class.  The named plaintiff has retained able counsel experienced in class action litigation.

10
The interests of the named plaintiff are coincident with, and not antagonistic to, the interests of

11
the other class members.

12
50.     The questions of law and fact common to the members of the class predominate

13
over any questions affecting only individual members, including legal and factual issues relating

14
to liability and damages.

15
51.     A class action is superior to other available methods for the fair and efficient

16
adjudication of this controversy because joinder of all class members is impractical. Moreover,

17
since the damages suffered by individual members of the class may be relatively small, the

18
expense and burden of individual litigation makes it practically impossible for the members of

19
the class individually to redress the wrongs done to them. The class is readily definable as

20
DoorDash knows which drivers entered into an agreement with DoorDash to use the DoorDash

21
mobile application to offer delivery services to customers in Massachusetts since September 26,

22
2014 and performed at least one delivery.  Further, prosecution of this action as a class action

23
will eliminate the possibility of repetitive litigation. There will be no difficulty in the

24
management of this action as a class action.

25

26

27

28

## VI. PAGA REPRESENTATIVE ACTION ALLEGATIONS

52.    Plaintiffs Marciano, Cristini, and Roussel allege that DoorDash violated the Labor Code as follows: (1) failure to reimburse delivery driver employees for all necessary expenditures incurred in performing their duties, including but not limited to owning or leasing and maintaining their vehicles, fuel, phones, and data and by requiring drivers to enter into contracts that impermissibly waive their right to reimbursement of these expenses, in violation of Cal. Lab. Code §§ 2802, 2804, and 450; (2) the willful misclassification of delivery workers as independent contractors in violation of Cal. Lab. Code §§ 226.8 and 2753; (3) failure to assure that all delivery drivers received the appropriate overtime premium for all overtime hours worked beyond forty per week or eight hours per day in violation of Cal. Lab. Code §§ 1194, 1198, 510, and 554; (4) failure to provide proper itemized wage statements in violation of Cal. Lab. Code § 226(a), 226.3, and Wage Order 9-2001; (5) failure to pay the appropriate minimum wage for all hours worked in violation of Cal. Lab. Code §§ 1197, 1194, 1194.3, 1182.12, 1194.2, 1197.1, 1199 and Wage Order 9-2001; (6) collecting and/or withholding gratuities and failure to keep accurate records of gratuities in violation of Cal. Lab. Code § 351, 353; (7) failure to pay for meal and rest periods in violation of Cal. Lab. Code §§ 226.7, 512, 558, and 1198; (8) failure to timely pay all earned wages during employment and upon termination and failing to conspicuously post notice of regular pay days in violation of Cal. Lab. Code §§ 201-204, 207 and 208; (9) requiring drivers to release claims as a condition to receiving paychecks in violation of Cal. Lab. Code § 206.5; (10) collecting and receiving wages already paid in violation of Cal. Lab. Code § 221, 224; (11) failing to pay the costs of mandatory drug testing and/or physical examinations in violation of Cal. Lab. Code § 222.5; (12) secretly paying wages lower than required by statute in violation of Cal. Lab. Code § 223; (13) failing to provide sick leave benefits and failing to provide written notice of paid sick leave or paid time off to its delivery drivers in violation of Cal. Lab. Code §§ 245-49; (14) failure to provide one day's rest in seven in violation of Cal. Lab. Code § 551, 552; (15) failure to provide written notice of material terms of employment in violation of Cal. Lab. Code §§ 2810.5 and 432.5; (16) failure to keep accurate

records of hours worked and drivers' personal information in violation of Cal. Lab. Code § 1174, 1174.5, and 1175; (17) willfully refusing to pay wages in violation of Cal. Labor Code §§ 216, 218, 218.5, 218.6, and 225.5; (18) failing to pay out vested vacation time to drivers in violation of Cal. Labor Code § 227.3; (19) causing delivery drivers to be injured on the job through the serious and willful misconduct of the company in violation of Cal. Labor Code § 4553; and (20) failing to remit wages that it has withheld to benefit plans in violation of Cal. Labor Code § 227.

53. On April 30, 2018, Plaintiff Marciano gave written notice of DoorDash's violations to the California Labor Code as alleged in this complaint to the Labor and Workforce Development Agency ("LWDA") via online filing and to Defendant DoorDash's general counsel via certified mail. On May 7, 2018, Plaintiff Cristini gave written notice of DoorDash's violations to the California Labor Code as alleged in this complaint to the Labor and Workforce Development Agency ("LWDA") via online filing and to Defendant DoorDash's general counsel via certified mail. On December 3, 2018, Plaintiff Roussel gave written notice of DoorDash's violations to the California Labor Code as alleged in this complaint to the Labor and Workforce Development Agency ("LWDA") via online filing and to Defendant DoorDash's general counsel via certified mail. On November 21, 2019, Plaintiffs Marciano, Cristini and Roussel amended their prior PAGA letters and gave written notice of DoorDash's additional violations of the California Labor Code as alleged in this complaint to the Labor and Workforce Development Agency ("LWDA") via online filing and to Defendant DoorDash's general counsel via certified mail.

## VI. FAIR LABOR STANDARDS ACT COLLECTIVE ACTION ALLEGATIONS

54. Plaintiffs bring this lawsuit pursuant to 29 U.S.C. § 216(b) as a collective action on behalf of all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery and who have been paid less than the federal minimum wage in violation of 29 U.S.C. § 206. Plaintiffs also brings this lawsuit pursuant to 29 U.S.C. § 216(b)

as a collective action on behalf of all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts since September 26, 2014, and performed at least one delivery and who have been paid less than the federal minimum wage in violation of 29 U.S.C. § 206.

55.     Plaintiffs bring this count under 29 U.S.C. § 216(b) of the Fair Labor Standards Act. Plaintiffs and other DoorDash delivery drivers are similarly situated in that they are all subject to DoorDash's common plan or practice of classifying delivery drivers as independent contractors, not reimbursing them for necessary business expenses (thereby lowering their hourly wages), not paying them overtime for all hours worked beyond forty (40) in a given week, and not ensuring that they receive at least the federal minimum wage for all weeks worked.

## COUNT I
### Expense Reimbursement
### Violation of Cal. Lab. Code § 2802

56.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Defendant's conduct, as set forth above, in misclassifying Plaintiffs as independent contractors and failing to reimburse them for expenses that they paid that should have been borne by their employer, constitutes a violation of California Labor Code § 2802.

57.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COUNT II**
**Willful Misclassification**
**Violation of Cal. Lab. Code § 226.8**

58.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Defendant's conduct, as set forth above, in continuing to classify drivers as independent contractors notwithstanding the California Supreme Court's decision in <u>Dynamex Operations W. v. Superior Court</u>, 4 Cal. 5th 903, 416 P.3d 1 (2018), <u>reh'g denied</u> (June 20, 2018), which makes clear that delivery drivers are its employees under California law, violates Cal. Lab. Code §226.8 and constitutes willful misclassification.

59.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

**COUNT III**
**Minimum Wage**

**Violation of Cal. Lab. Code §§ 1197 and 1194, Cal. Wage Order No. 9-2001**

60.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Defendant's conduct, as set forth above, in failing to pay Plaintiffs minimum wage for all hours worked as required by California law, violates Cal. Lab. Code §§ 1197 and 1194 and Wage Order 9-2001.

61.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile

application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

### COUNT IV
### Overtime
### Violation of Cal. Lab. Code §§ 510, 1194, 1198, Cal. Wage Order No. 9-2001

62.      Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Defendant's conduct, as set forth above, in failing to pay Plaintiffs minimum wage for all hours worked as required by California law, violates Cal. Lab. Code §§ 510, 1194, and 1198 and Wage Order 9-2001.

63.      This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

### COUNT V
### Pay Statements
### Violation of Cal. Lab. Code § 226(a)

64.      Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. DoorDash's conduct, as set forth above, in failing to provide proper itemized wage statements to Plaintiffs, as required by California state law, violates Cal. Lab. Code § 226(a).

65.      This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile

application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

## COUNT VI
### Meal and Rest Period Violations
### Violation of Cal. Wage Order No. 9-2001; Cal. Labor Code §§ 226.7 & 512

66.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference all other paragraphs as if they were set forth again herein.  DoorDash's conduct in denying drivers at least a half-hour meal break during shifts in excess of five hours and one ten-minute rest break per four hours of work performed violates Cal. Wage Order No. 9-2001; Cal. Labor Code §§ 226.7 & 512.

67.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

## COUNT VII
### Failure to Pay All Regular Wages
### Violation of Cal. Labor Code § 204

68.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Door Dash's conduct, as set forth above, in failing to pay drivers the proper wages for all hours worked violates Cal. Labor Code § 204.

69.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile

application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

## COUNT VIII
### Waiting Time Penalties
### Violation of Cal. Labor Code §§ 201-203

70.     Plaintiffs Marciano, Cristini, Magana, Marko, Corona, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Door Dash failed to pay drivers their final wages pursuant to Cal. Labor Code §§ 201-203 and accordingly owes waiting time penalties pursuant to Cal. Labor Code § 203.

71.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

## COUNT IX
### Unfair Business Practices
### Violation of Cal. Bus. & Prof. Code §17200, *et seq.*

72.     Defendant's conduct, as set forth above, violates the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq*. ("UCL"). Defendant's conduct constitutes unlawful business acts or practices, in that Defendant has violated the California Labor Code as described above.  As a result of Defendant's unlawful conduct, Plaintiffs suffered injury in fact and lost money and property, including, but not limited to business expenses they were required to pay (and was not reimbursed for) and wages that they were due. Pursuant to California Business and Professions Code § 17203, Plaintiff seeks declaratory and injunctive relief for Defendant's unlawful conduct and to recover restitution.  The nature of this relief is in the public interest, since Defendant's violation of the Labor Code in misclassifying drivers

across California like Plaintiffs, and failing to provide them with protections of the Labor Code, harms the public interest (and not just DoorDash drivers like Plaintiffs), in that it burdens the government and taxpayers, as well as complying competitors, and also negatively harms the labor market as a whole, particularly in the delivery industry.  Pursuant to California Code of Civil Procedure § 1021.5, Plaintiffs are entitled to recover reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

73.     This claim is brought by Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel, on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery.

## COUNT X
### Penalties Pursuant to Labor Code Private Attorneys General Act of 2004
### Violation of Cal. Lab. Code §§ 2698, *et seq.*, 558

74.     Plaintiffs Marciano, Cristini, and Roussel reallege and incorporate by reference the allegations in the preceding paragraphs as if fully alleged herein. Plaintiffs are aggrieved employees as defined by Cal. Lab. Code § 2699(c) as they were employed by DoorDash during the applicable statutory period and suffered injury as a result of DoorDash's Labor Code violations. Accordingly, Plaintiffs seek to recover on behalf of the State of California, as well as themselves and all other current and former aggrieved employees of DoorDash who have worked in California, the civil penalties provided by PAGA, plus reasonable attorney's fees and costs.

75.     DoorDash delivery drivers are entitled to penalties for DoorDash's violations of Cal. Lab. Code §§ 132a, 201-204, 206.5, 207, 208, 210-214, 216, 218, 218.5, 218.6, 221-224, 225.5, 226, 226.3, 226.7, 226.8, 227, 227.3, 245-249, 351, 353, 432.4, 432.5, 450, 510, 512, 551-552, 558, 1174, 1174.5, 1182.12, 1194, 1194.2, 1194.3, 1197, 1197.1, 1198, 2753, 2802, 2804, 2810.5, and 4553 *et seq.*  Plaintiffs seek civil penalties pursuant to PAGA for: (1) failure to

reimburse delivery driver employees for all necessary expenditures incurred in performing their duties, including but not limited to owning or leasing and maintaining their vehicles, fuel, phones, and data and by requiring drivers to enter into contracts that impermissibly waive their right to reimbursement of these expenses, in violation of Cal. Lab. Code §§ 2802, 2804, and 450; (2) the willful misclassification of delivery workers as independent contractors in violation of Cal. Lab. Code §§ 226.8 and 2753; (3) failure to assure that all delivery drivers received the appropriate overtime premium for all overtime hours worked beyond forty per week or eight hours per day in violation of Cal. Lab. Code §§ 1194, 1198, 510, and 554; (4) failure to provide proper itemized wage statements in violation of Cal. Lab. Code § 226(a), 226.3, and Wage Order 9-2001; (5) failure to pay the appropriate minimum wage for all hours worked in violation of Cal. Lab. Code §§ 1197, 1194, 1194.3, 1182.12, 1194.2, 1197.1, 1199 and Wage Order 9-2001; (6) collecting and/or withholding gratuities and failure to keep accurate records of gratuities in violation of Cal. Lab. Code § 351, 353; (7) failure to pay for meal and rest periods in violation of Cal. Lab. Code §§ 226.7, 512, 558, and 1198; (8) failure to timely pay all earned wages during employment and upon termination and failing to conspicuously post notice of regular pay days in violation of Cal. Lab. Code §§ 201-204, 207 and 208; (9) requiring drivers to release claims as a condition to receiving paychecks in violation of Cal. Lab. Code § 206.5; (10) collecting and receiving wages already paid in violation of Cal. Lab. Code § 221, 224; (11) failing to pay the costs of mandatory drug testing and/or physical examinations in violation of Cal. Lab. Code § 222.5; (12) secretly paying wages lower than required by statute in violation of Cal. Lab. Code § 223; (13) failing to provide sick leave benefits and failing to provide written notice of paid sick leave or paid time off to its delivery drivers in violation of Cal. Lab. Code §§ 245-49; (14) failure to provide one day's rest in seven in violation of Cal. Lab. Code § 551, 552; (15) failure to provide written notice of material terms of employment in violation of Cal. Lab. Code §§ 2810.5 and 432.5; (16) failure to keep accurate records of hours worked and drivers' personal information in violation of Cal. Lab. Code § 1174, 1174.5, and 1175; (17) willfully refusing to pay wages in violation of Cal. Labor Code §§ 216, 218, 218.5, 218.6, and 225.5; (18) failing to pay out vested vacation time to

drivers in violation of Cal. Labor Code § 227.3; (19) causing delivery drivers to be injured on the job through the serious and willful misconduct of the company in violation of Cal. Labor Code § 4553; and (20) failing to remit wages that it has withheld to benefit plans in violation of Cal. Labor Code § 227.

76.     Cal. Lab. Code § 2699(f) provides for civil penalties for violation of all Labor Code provisions for which no civil penalty is specifically provided. There is no specified civil penalty for violations of Cal. Lab. Code §§ 206.5, 351, 353, 2802, 2810.5.  With respect to minimum wage violations under Cal. Lab. Code §§ 1197 and 1194, § 1197.1 imposes a civil penalty in addition to any other penalty provided by law of one hundred ($100) for each underpaid employee for each pay period for which the employee is underpaid in addition to an amount sufficient to recover underpaid wages and liquidated damages, and, for each subsequent violation of Labor §§1197 and 1194, two hundred and fifty dollars ($250) for each underpaid employee for each pay period for which the employee is underpaid in addition to an amount sufficient to recover underpaid wages and liquidated damages. With respect to overtime violations under Labor Code §§ 510 and 558, the statute imposes a civil penalty in addition to any other penalty provided by law of fifty dollars ($50) for initial violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover unpaid wages, and one hundred dollars ($100) for subsequent violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages. With respect to violations of Labor Code § 226(a), Labor Code § 226.3 imposes a civil penalty in addition to any other penalty provided by law of two hundred fifty dollars ($250) per aggrieved employee for the first violation, and one thousand dollars ($1,000) per aggrieved employee for each subsequent violation of Labor Code § 226(a).   With respect to violations of Labor Code § 226.8, Labor Code § 226.8(b) imposes a civil penalty of not less than five thousand dollars ($5,000) and not more than fifteen thousand dollars ($15,000) for each violation.  With respect to violations under Labor Code § 512, the statute imposes a civil penalty in addition to any other penalty provided by law of fifty dollars

($50) for initial violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover unpaid wages, and one hundred dollars ($100) for subsequent violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages.  With respect to violations of Labor Code § 204, the statute imposes a civil penalty in addition to any other penalty of one hundred dollars ($100) for initial violations for each underpaid employee and two hundred dollars ($200) for subsequent violations for each underpaid employee, plus 25% of the amount unlawfully withheld.  With respect to violations of Labor Code §§ 221, 223, the statute imposes a civil penalty in addition to any other penalty of one hundred dollars ($100) for initial violations for each underpaid employee and two hundred dollars ($200) for subsequent violations for each underpaid employee, plus 25% of the amount unlawfully withheld.  With respect to violations of Labor Code §§ 551, 552, the statute imposes a civil penalty in addition to any other penalty provided by law of fifty dollars ($50) for initial violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover unpaid wages, and one hundred dollars ($100) for subsequent violations for each underpaid employee for each pay period for which the employee was underpaid in addition to an amount sufficient to recover underpaid wages.  With respect to violations of Labor Code § 1174, the statute imposes a civil penalty of five hundred dollars ($500).  With respect to violations of Labor Code § 246, the statute imposes a civil penalty of the dollar amount of paid sick days withheld multiplied by three, or two hundred fifty dollars ($250) but not to exceed four thousand dollars ($4000).

77.     Plaintiffs complied with the notice requirement of Cal. Lab. Code §2699.3 and served a written notice to the California Labor & Workforce Development Agency ("LWDA") through its website's online filing portal, and on Defendant DoorDash via Certified Mail, return receipt requested, on April 30, 2018, May 7, 2018, and December 3, 2018, respectively.  They filed a consolidated amended PAGA letter on November 21, 2019, for settlement purposes.  It has been 65 days or more since the LWDA was notified of the Labor Code violations asserted in

this Complaint, and the LWDA has not provided any notice that it will or will not investigate the alleged violations.

**COUNT XI**
**Massachusetts Wage Act**
**M.G.L. ch. 149 §§ 148, 148B**

78.     Plaintiff Austin realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.  DoorDash has violated the Wage Act by misclassifying its drivers as independent contractors pursuant to § 148B and by failing to reimburse them for their business expenses necessary to perform their work, such as gas and car maintenance, smartphones and phone data plans in violation of Gen. L. c. 149 § 148.  This claim is asserted pursuant to Mass. Gen. L. c. 149 §150 on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts since September 26, 2014 and performed at least one delivery.

**COUNT XII**
**Minimum Wage**
**M.G.L. ch. 151 §§ 1,7**

79.     Plaintiff Austin realleges and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.  DoorDash has violated the Massachusetts Minimum Wage Law, M.G.L. c. 151, §§ 1 and 7, by failing to ensure that its delivery drivers are paid at least the full state minimum wage.  This claim is brought pursuant to M.G.L. c. 151, § 20. This claim is asserted pursuant to Mass. Gen. L. c. 149 §150 on behalf of a class of all similarly situated individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts since September 26, 2014 and performed at least one delivery.

**COUNT XIII**
**Unpaid Minimum Wage in Violation of FLSA**
**29 U.S.C. § 207**

80.     Plaintiffs reallege and incorporates by reference the allegations in the preceding paragraphs as if fully alleged herein.  DoorDash's conduct, as set forth above, in failing to pay Plaintiffs minimum wage for all hours worked and in failing to pay Plaintiffs time-and-a-half their regular hourly rate for all hours worked beyond forty per week as required by federal law, violates 29 U.S.C. § 207.

WHEREFORE, Plaintiffs request that this Court enter the following relief:

a.   Declare and find that the Defendant violated Wage Order 9, the UCL, Cal. Lab. Code §§ 201-204, 226(a), 226.7, 2802, 1194, 1197, 1198, 510, 554, M.G.L. ch. 149 §§ 148, 148B; M.G.L. ch. 151 §§ 1, 7, and the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.;

b.   Certify a California subclass under Counts I through IX and appoint Plaintiffs Cynthia Marciano, David Cristini, Manuel Magana, Daniel Marko, Jesus Corona, and Jared Roussel and their counsel to represent a class of all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in California since August 30, 2016 and performed at least one delivery;

c.   Certify a Massachusetts subclass under Counts XI and XII and appoint Plaintiff Darnell Austin and his counsel to represent a class of all individuals who entered into an agreement with DoorDash to use the DoorDash mobile application to offer delivery services to customers in Massachusetts since September 26, 2014 and performed at least one delivery;

d.   Certify this case as a collective action pursuant to 29 U.S.C. § 216(b);

e.  Award compensatory damages, including all expenses and wages owed and all damages stemming from the alleged use of tips to meet minimum-pay guarantees, in an amount according to proof;

f.  Award restitution for unfair business practices and for all claims arising out of or relating to the statutory causes of action described herein;

g.  Enter Judgment in Plaintiffs' favor on their PAGA claim pursuant to Cal. Lab. Code §2699(c);

h.  Award penalties, including penalties for timely payment of wages upon discharge, waiting time penalties, and PAGA penalties in an amount according to proof;

i.  Award liquidated damages and exemplary and/or punitive damages;

j.  Award pre- and post-judgment interest;

k.  Award reasonable attorneys' fees, interest, costs, and expenses;

l.  Award declaratory and injunctive relief (including public injunctive relief) in the form of an order requiring Defendant to comply with the California Labor Code; and

m.  Award any equitable remedies or any other relief to which the Plaintiffs may be entitled.

Respectfully submitted,

CYNTHIA MARCIANO, DAVID CRISTINI,
MANUEL MAGANA, JARED ROUSSEL,
DANIEL MARKO, JESUS CORONA, and
DARNELL AUSTIN, on behalf of themselves and
others similarly situated and in their capacities as
Private Attorney General Representatives,

By their attorneys,

_____
Shannon Liss-Riordan, SBN 310719
Anne Kramer, SBN 315131
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA 02116
(617) 994-5800
Email:  sliss@llrlaw.com

Dated:        November        , 2019

# EXHIBIT F

Court of Appeal, Second Appellate District
Daniel P. Potter, Clerk
Electronically RECEIVED on 12/5/2019 by Candace Mortelliti, Deputy Clerk

**COURT OF APPEAL – SECOND DIST.**

**F I L E D**

Dec 12, 2019

DANIEL P. POTTER, **Clerk**

cmortelliti          **Deputy Clerk**

No. B295813

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT, DIVISION 8

---

### DAMONE BROWN,

*Plaintiff-Respondent,*

v.

### DOORDASH, INC.,

*Defendant-Appellant.*

---

Appeal from the Superior Court of the State of California
for the County of Los Angeles
The Honorable Holly J. Fujie Presiding
Superior Court Case No. BC712973

---

### ORDER GRANTING
### MOTION TO STAY APPEAL PENDING
### FINAL APPROVAL OF CLASS SETTLEMENT

---

Joshua S. Lipshutz (SBN 242557)*
Andrew Wilhelm (SBN 302849)
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, CA 94105-0921
Tel.: 415.393.8200
Fax: 415.393.8306

Theane Evangelis (SBN 243570)
Michael Holecek (SBN 281034)
Stephanie Balitzer (SBN 316133)
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071-3197
Tel.:  213.229.7000
Fax:  213.229.7520

*Attorneys for Defendant-Appellant DoorDash, Inc.*

**IT IS HEREBY ORDERED** that, for good cause shown,  Defendant-Appellant DoorDash, Inc.'s Motion to Stay Pending Final Approval of Class Settlement is granted until January 13, 2020 pending further status update from parties.

ORDERED this  12 day of December, 2019.

**BIGELOW, P.J.**

# EXHIBIT G

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

**COURT OF APPEAL – SECOND DIST.**

**F I L E D**

Dec 23, 2019

**DANIEL P. POTTER, Clerk**

S. Lui                              **Deputy Clerk**

| | |
|---|---|
| DANA LOWE, | B298535 |
| Plaintiff and Respondent, | (Super. Ct. No. BC715425) Los Angeles County |
| v. | O R D E R |
| DOORDASH, INC., | |
| Defendant and Appellant. | |

The court has read and considered appellant's December 5, 2019 motion for stay appeal pending final approval of class settlement and respondent's response filed December 20, 2019. Good cause appearing therefor,

IT IS HEREBY ORDERED that appellant's motion to stay is granted for 60 days.  Appellant is ordered to submit a status report on or before the conclusion of the stay in the event it requests for further stay.

**BIGELOW, P.J.**

Presiding Justice

# EXHIBIT H

Original Petitioners Who Have Not Submitted A Declaration Or Witness Statement

| First Name | Last Name | City | State |
|---|---|---|---|
| Medina | Abdullah | Bakersfield | CA |
| Luis | Acosta | Rancho Cucamonga | CA |
| Thomas | Adams | Turlock | CA |
| Trevon | Adams | Los Banos | CA |
| Esther | Agwu | Long Beach | CA |
| Mahmood | Al Ghazawi | Sacramento | CA |
| Omar | Alaya | Sacramento | CA |
| Sam | Alhaddaden | Hawaiian Gardens | CA |
| Jean | Alvarez | Granada Hills | CA |
| Cole | Anderson | San Mateo | CA |
| Latoya | Anderson | Dublin | CA |
| Nicholas | Aranda | Castro Valley | CA |
| Jeanette | Armstrong | Inglewood | CA |
| Gloria | Arzu | Los Angeles | CA |
| Lavonda | Atkinson-Sweat | Oakland | CA |
| Romaine | Augustine | Van Nuys | CA |
| John | Badilla | Modesto | CA |
| Lena | Bagwell | San Leandro | CA |
| Phillisha | Bailey | Stockton | CA |
| Gregory | Bandemer | Long Beach | CA |
| Michael | Barber | Sonoma | CA |
| Carlos | Barbosa | San Diego | CA |
| Cassandra | Barranco | Sacramento | CA |
| Rebecca | Barron | Stockton | CA |
| Isiah | Bartolome | Fresno | CA |
| Jonathan | Beasley | Livermore | CA |
| Torryeona | Beckwith | Palmdale | CA |
| Brianne | Bell | Torrance | CA |
| Hunter | Bell | Jurupa Valley | CA |
| Miguel | Beltran | Rialto | CA |
| William | Bey | San Pablo | CA |
| Jonathan | Bird | San Francisco | CA |
| Brett | Birmingham | Big pine | CA |
| Samantha | Black | Anderson | CA |
| Stephen | Blake | Carlsbad | CA |
| Alicia | Bodway | Winton | CA |
| Paul | Bosley-pittman | Stockton | CA |
| Joshua | Bradehorst | Adelanto | CA |
| Ja'sawn | Bragg | Lancaster | CA |
| Yaquii | Branch | Lynwood | CA |
| Georgina | Bravo | Concord | CA |
| Gayla | Brookins | Stockton | CA |
| Andrea | Brooks | Carpinteria | CA |
| Danae | Brown | San Jose | CA |
| Barbara | Brown | Los Angeles | CA |
| Kathryn | Bruno | Pittsburg | CA |
| Roman | Bruno | Hayward | CA |
| Miguel | Burgueno | Pasadena | CA |
| Janelle | Busch | Whittier | CA |
| Cardell | Calloway | Lancaster | CA |
| Carol | Campo | Glendora | CA |
| Dennis | Cancino | San Jose | CA |

| | | | |
|---|---|---|---|
| Amanda | Cantrell | Los Angeles | CA |
| Christopher | Cardinelli | Martinez | CA |
| Angela | Carl | Marysville | CA |
| Judith | Carr | Los Angeles | CA |
| Jerry | Carr | Tulare | CA |
| Vondetrick | Carr | Los Angeles | CA |
| Brittany | Carter | Fontana | CA |
| Brandon | Carter | Stockton | CA |
| Craig | Carter | Gardena | CA |
| Terrence | Castille | Hemet | CA |
| Marcos | Castro | Burlingame | CA |
| Kendra | Cato | Los Angeles | CA |
| Sergio | Chavez | Merced | CA |
| Rajay | Childs | Manteca | CA |
| Marquise | Chopra | San Diego | CA |
| Nicholas | Christiansen | Walnut Creek | CA |
| Richard | Chung | Walnut | CA |
| Natallie | Ciraulo | Whittier | CA |
| Conrad | Clark | Orange | CA |
| Tera | Clark | Hayward | CA |
| Ashton | Collins | Sacramento | CA |
| Amber | Collins | Simi Valley | CA |
| Kiara | Conley | Murrieta | CA |
| Ryan | Conn | Tracy | CA |
| Tracy | Cooper | Citrus Heights | CA |
| John | Cordova | Covina | CA |
| Cassandra | Cortright | Sherman Oaks | CA |
| Sheliya | Cosby | Antioch | CA |
| Dixie | Cruz | Lancaster | CA |
| Sabrina | Dacosta | San Diego | CA |
| Shaunda | Davis | North Highlands | CA |
| Victoria | Davis | Fairfield | CA |
| Jonathan | Davis | Hayward | CA |
| Peter | Delatorre | Desert Hot Springs | CA |
| Jennifer | Deleon | Riverside | CA |
| Jazmine | Delifus | San Bernardino | CA |
| Kristine | Delrosario | Daly City | CA |
| Alejandro | Diaz | Yuba City | CA |
| Julia | Dietrich | Hayward | CA |
| Taylor | Dillon | Morongo Valley | CA |
| Katrina | Dimacali | Chula Vista | CA |
| Jaysfer | Duarte | Modesto | CA |
| Ryan | Ducusin | Vallejo | CA |
| Yaroslav | Dukal | Anaheim | CA |
| Katarine | Dunning | San Bernardino | CA |
| Nghia Nhan | Duong | Newport Beach | CA |
| Lauren | Each | Anaheim | CA |
| Andrea | Eddy | Vallejo | CA |
| Paul | Elzie | Los Angelesis | CA |
| Beshoy | Eskarous | Pleasanton | CA |
| Erika | Espericueta | San Jose | CA |
| Rodrigo | Espinoza | Downey | CA |
| Mele | Eteaki | Patterson | CA |

| Anthony | Fairbanks | San Jose | CA |
|---|---|---|---|
| Farzad | Fazel | Tracy | CA |
| Jessica | Feeney | Vista | CA |
| Ruben | Flores | Fresno | CA |
| Amanda | Flores | Claremont | CA |
| Donica | Foreman | Los Angeles | CA |
| Yvonna | Francis | Fresno | CA |
| Brianna | Gaeta | Fresno | CA |
| Kaitlin | Gale | Temecula | CA |
| Antonique | Gantt | Elk Grove | CA |
| Francisca | Garcia | Napa | CA |
| Julian | Garcia | El Dorado Hills | CA |
| Alondra | Garcia | Longbeach | CA |
| Amado | Garcia | Richmond | CA |
| Natalia | Garcia | Redwood City | CA |
| Alex | Garcia-robles | Ripon | CA |
| Akeem | Gardner | Palmdale | CA |
| Gilbert | Gaw | Playa Del Rey | CA |
| Cherie Danielle | Gendron | Los Angeles | CA |
| Adam | Gintz | Atwater | CA |
| David | Gonzalez | Indio | CA |
| Diana | Gonzalez | Palmdale | CA |
| Caitlyn | Gonzalez-sainz | San Diego | CA |
| Angel | Grant | Oakland | CA |
| Latasha | Gray | Cerritos | CA |
| Ciara | Green | Long Beach | CA |
| Stephanie | Grover | Ca | CA |
| Marc | Gulchenko | Gold River | CA |
| Martha | Guttierrez | Fresno | CA |
| dominic | Hamilton | compton | CA |
| Alajah | Harper | Victorville | CA |
| Kayle | Harper | Simi Valley | CA |
| Alyssa | Harrison | Castro Valley | CA |
| Toi | Harvey | Inglewood | CA |
| Kayla | Haverkorn | Upland | CA |
| Ennaoj | Hawthorne | San Jose | CA |
| Leticia | Haynes | San Francisco | CA |
| Myles | Hecht | Oakland | CA |
| Noah | Hendrickson | Oceanside | CA |
| Yonel | Henri | Fresno | CA |
| Joel | Hernandez | La Puente | CA |
| Michael | Hernandez | Hemet | CA |
| Robert | Hoffman | North Highlands | CA |
| Jasmine | Holiday | Oakland | CA |
| Holly | Hollingsworth | Fresno | CA |
| Alexa | Hudson | Morgan Hill | CA |
| Tiffany | Hughes | Vallejo | CA |
| Kayone | Humphrey | Sacramento | CA |
| Cheri | Hyatt | Beaumont | CA |
| Meeker | Hymes | Moreno Valley | CA |
| Toetu | Ilalio | Long Beach | CA |
| Emily | Ingrao | Garden Grove | CA |
| Leonda | Irvin | Beaumont | CA |

| | | | |
|---|---|---|---|
| Joanne | Ivy | Pomona | CA |
| Emoni | Jahsway | Corona | CA |
| Angelo | Jaramillo | Brentwood | CA |
| Cassandra | Jenkins | Sacramento | CA |
| Breeana | Jimenez | Rancho Cucamonga | CA |
| Jasmine | Johnson | Los Angeles | CA |
| Kadejah | Johnson | Stockton | CA |
| Lashona | Johnson | Torrance | CA |
| Lekeisha | Johnson | Long Beach | CA |
| Mariah | Johnson | Santa Rosa | CA |
| Marvin | Johnson | Sacramento | CA |
| Marree | Jones | Oakland | CA |
| Debra | Kaestner | Redding | CA |
| Balaji | Kangadharan | Sunnyvale | CA |
| Kyle | Keast | Chico | CA |
| Leslie | Ketcham | Beaumont | CA |
| Jevonah | Khakbaz | Huntington Beach | CA |
| Marie | Kimberly | San Jose | CA |
| Amanda | Kolar | Sacramento | CA |
| Adam | Lafferty | Modesto | CA |
| Kevin | Lane | Elk Grove | CA |
| Carlos | Lechuga | La | CA |
| Keith | Lee | Rancho Cordova | CA |
| Zachary | Lewis | Sacramento | CA |
| Alex | Leyva | Pasadena | CA |
| Johnathan | Lilly | Sacramento | CA |
| Antoinette | Lincoln | Vallejo | CA |
| Christina | Lizarraga | North Hollywood | CA |
| Earnest | Lockhart | Oakland | CA |
| Gilbert | Lopez | Palm Springs | CA |
| Tammi | Lopez | Modesto | CA |
| Tamysha | Lott | Vallejo | CA |
| Corrales | Luis | Downey | CA |
| Miguel | Madrigal | Daly City | CA |
| John | Mahlmeister | Burbank | CA |
| Nadeem | Malki | Rowland Heights | CA |
| Lawrence | Maloney | Los Angeles | CA |
| Celisse | Manier | Oakland | CA |
| Kenneth | Manning | Long Beach | CA |
| Siune | Mansoorian | Tujunga | CA |
| Chalise | Manuel | Los Angeles | CA |
| Jasmine | Martin | Los Angeles | CA |
| Luis | Martinez | Santa Barbara | CA |
| Miguel | Martinez | Azusa | CA |
| Jonathan | Martinez | Oceanside | CA |
| Dwight | Maxwell | Los Angeles | CA |
| Michelle | Mayers | Apple Valley | CA |
| Shonte | Mcbride | Chino | CA |
| Marquita | Mccain | Richmond | CA |
| Alexis | Mccloskey | Oakland | CA |
| Cameron | Mcdougle | Walnut | CA |
| Michelle | Mcgovern | Concord | CA |
| Katie | Mcintyre | Redding | CA |

| | | | |
|---|---|---|---|
| Anastasia | McLelland | Riverside | CA |
| Shelley | Meredith | Sacramento | CA |
| Zoe | Merino | Rocklin | CA |
| Luke | Meyers | Murrieta | CA |
| Jermaine | Miles | Pacific Grove | CA |
| Daniel | Miller | San Diego | CA |
| Joshua | Minor | Los Angeles | CA |
| Rodolfo | Molina | Pacoima | CA |
| Dawn | Montanez | El Monte | CA |
| Carmell | Moore | Stockton | CA |
| John | Morales | Oceanside | CA |
| Michelle | Morehouse | Merced | CA |
| Robert | Morrison | Los Angeles | CA |
| Susan | Morrow | Gardena | CA |
| Selina | Munoz | Turlock | CA |
| Margarita | Napoles | Victorville | CA |
| Rachel | Narvaez Cantu | Bakersfield | CA |
| Kamran | Nejad | Laguna Niguel | CA |
| Tinisha | Nelson | Brentwood | CA |
| Richard | Nguyen | Seaside | CA |
| Terry | Norris | Oakland | CA |
| Wynette | Norwood | Glendale | CA |
| Daisy | Nunez | Garden Grove | CA |
| Chandra | Olazaba | Ontario | CA |
| Josh | Orlando | Daly City | CA |
| Roberta | Osako | Sacramento | CA |
| Amire | Othman | San Jose | CA |
| Norris | Owens | Sonoma | CA |
| Sheilacy | Owens | Hayward | CA |
| Spencer | Oxholm | Newport Beach | CA |
| Jeniffer | Padda | Van Nuys | CA |
| John | Pandza | San Diego | CA |
| Alex | Panzera | Hanford | CA |
| Brittney | Parks | Van Nuys | CA |
| Miguel | Patterson | Sacramento | CA |
| Tiana | Pearson | Carson | CA |
| Jason | Peddicord | Lodi | CA |
| Sarah | Peet | Ventura | CA |
| Daniel | Pendergast | Lancaster | CA |
| Matthew | Peters | Benicia | CA |
| Unique | Petite | Sacramento | CA |
| Tin | Pham | San Jose | CA |
| Pamela | Phillips | Grass Valley | CA |
| Curtis | Pierce | San diego | CA |
| Ryan | Pita | Santa Maria | CA |
| Jerry | Pledger | San Jose | CA |
| Forrest | Powers | Mtn View | CA |
| Marissa | Prater | Pacheco | CA |
| Zak | Priolo | Mission viejo | CA |
| Kelan | Pruitt | Lancaster | CA |
| Dana | Purvis | Chula Vista | CA |
| Shahbandari | Ramella | Burbank | CA |
| Valerie | Ramirez | Fresno | CA |

| | | | |
|---|---|---|---|
| Ashlee | Ray | San Diego | CA |
| Welsi | Renaud | Stockton | CA |
| Bryant | Reyna Sanchez | East Palo Alto | CA |
| Gary | Reynolds | Oakland | CA |
| Cody | Richey | Carlsbad | CA |
| Lanora | Richmond | Manteca | CA |
| Heather | Ridgill | Fullerton | CA |
| Bianca | Rinehart | Los Angeles | CA |
| Diana | Rivas | Hesperia | CA |
| John | Roberts | San Pablo | CA |
| Steven | Roberts | Paradise | CA |
| Tiana | Robertson | Fresno | CA |
| Robin | Robinson | Sacramento | CA |
| Richard | Rodriguez | Long Beach | CA |
| David | Rodriguez | Montebello | CA |
| Gilbert | Rodriguez | Ontario | CA |
| Ian | Rodriquez | Sunnyvale | CA |
| Candace | Rogers | Sacramento | CA |
| Brittany | Romano | Rocklin | CA |
| Erica | Rothstein | Modesto | CA |
| Laura | Runiyon | Crescent City | CA |
| Bryan | Rupe | Northridge | CA |
| Acamie | Salter | Los Angeles | CA |
| Matilyn | Sandoval | Victorville | CA |
| Ruth | Santiago | Oakland | CA |
| Alfredo | Santillan | Norwalk | CA |
| Johanna | Santolalla | North Hills | CA |
| Manuel | Santos | Huntington Beach | CA |
| Robin | Savage | Ladera Ranch | CA |
| Scott | Schneider | Daggett | CA |
| Jason | Segura | Lompoc | CA |
| Kori | Sexton | Oceanside | CA |
| Hamza | Shakir | San Jose | CA |
| Lakel | Slaughter | Oakland | CA |
| Donna | Smith | Mv | CA |
| Ricardo | Sotovando | San Mateo | CA |
| Kevin | Stater | San Luis Obispo | CA |
| Russell | Stephen | Sacramento | CA |
| Tony | Stephens | Long Beach | CA |
| Kiyana | Stevens | Sacramento | CA |
| Melanie | Stevenson | Los Angeles | CA |
| Tamara | Stovall | Colton | CA |
| Yvonne | Street | Oxnard | CA |
| Kimberly | Summers | Fairfield | CA |
| Sean | Sundermeyer | Oakley | CA |
| Michael | Supnet | San Diego | CA |
| Laura | Sutton | Fremont | CA |
| Saundra | Sutton | San Diego | CA |
| Irma | Tamayo | San Diego | CA |
| Torrie | Taylor | Palmdale | CA |
| Marquita | Tharpe | Adelanto | CA |
| Michael | Thevenot | Vacaville | CA |
| Every | Thomas Campbell | Los Angeles | CA |

| Cornell | Thompson | Perris | CA |
|---|---|---|---|
| Terry | Toler | Richmond | CA |
| Henry | Trang | San Jose | CA |
| Jamal | Tsoukalas | Los Angeles | CA |
| Christina | Turcios | Salinas | CA |
| Zachary | Tyer | Palm Desert | CA |
| Joseph | Uphoff | La Jolla | CA |
| Stephen | Urquidez | Lancaster | CA |
| Issack | Vaid | Los Angeles | CA |
| Reynaldo | Valdez | Fullerton | CA |
| Sean | Van | Long Beach | CA |
| Sebastien | Van Pelt | Oceanside | CA |
| Ralph | Viray | Milpitas | CA |
| Joel | Walker | Compton | CA |
| Jeanina | Ward | Antioch | CA |
| Joshua | Ward | Fullerton | CA |
| LeAnna | Ward | Sacramento | CA |
| Lawanna | Washington | Dunlin | CA |
| Bertha | Wauls | Long Beach | CA |
| Joel | West | Bakersfield | CA |
| Jacob | Wetherbee | San Mateo | CA |
| Tasha | White | Palm springs | CA |
| Terian | White | Los Angeles | CA |
| Marcalett | Wideman | Los Angeles | CA |
| Desiree | Wilbon | Antelope | CA |
| Gilbert | Wilburn | Los Angeles | CA |
| James | Wiley | Stockton | CA |
| Felicia | Williams | Sacramento | CA |
| Kori | Williams | Long Beach | CA |
| Chastity | Williams | Oakland | CA |
| Eric | Williams | Bakersfield | CA |
| Ladonna | Williams | Vallejo | CA |
| Mackenzie | Williamson | North Hollywood | CA |
| Courtney | Willis | Murrieta | CA |
| Darius | Wiseman | El Cajon | CA |
| David | Witcher | South Lake Tahoe | CA |
| Paul | Wong | San Diego | CA |
| Michael | Wood | Chandler | CA |
| Ashley | Woodbridge | Lake Elsinore | CA |
| Rashid | Woodland | Oakland | CA |
| Daniel | Wright | Oakland | CA |
| D'ajane | Wright | Oakland | CA |
| Jessica | Yanez | Modesto | CA |
| Martin | Zaragoza | Merced | CA |

# EXHIBIT I

New Petitioners Who Do Not Appear On The Original Petition To Compel Arbitration

| First Name | Last Name | City | State |
|---|---|---|---|
| Won | Cho | San Diego | CA |
| Marina | Garcia | San Jose | CA |
| Brian | Holland | Kentfield | CA |
| Kristina | McCarty | Orangevale | CA |
| Samantha | Myers | Sacramento | CA |
| Jean | Owono | Los Angeles | CA |
| Vince | Samson | Thousand Oaks | CA |
| Tonya | Scheidecker | Corona | CA |
| Linda | Smith | Antioch | CA |
| Patricia | Wilkins | Norwalk | CA |
| Annie | Wong | San Francisco | CA |

# EXHIBIT J

Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP

TERRELL ABERNATHY, et al,          )
                                   )
            Petitioners,           )
   vs.                             ) No. C 19-7545 WHA
                                   )
DOORDASH, INC.,                    )
                                   )  San Francisco, California
            Respondent.            )  Monday
                                   )  November 25, 2019
_____)  1:45 p.m.

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Petitioner:          KELLER LENKNER LLC
                         1300 I Street N.W.
                         Suite 400E
                         Washington, DC 20005
                    BY:  **WARREN D. POSTMAN, ESQ.**


                         KELLER LENKNER LLC
                         150 N. Riverside Plaza.
                         Suite 4270
                         Chicago, Illinois 60606
                    BY:  **TRAVIS D. LENKNER, ESQ.**
                         **MARQUEL P. REDDISH, ESQ.**


For Respondent:          GIBSON DUNN & CRUTCHER LLP
                         333 South Grand Avenue
                         Los Angeles, California 90071
                    BY:  **JAMES P. FOGELMAN, ESQ.**


                         GIBSON DUNN & CRUTCHER LLP
                         555 Mission Street.
                         Suite 3000
                         San Francisco, California 94105.
                    BY:  **JOSHUA DAVID DICK, ESQ.**


*Reported By:*   *Debra L. Pas, CSR 11916, CRR, RMR, RPR*
                 Official Reporter - US District Court
                 Computerized Transcription By Eclipse

| | |
|---|---|
| 1 | <u>**Monday - November 25, 2019**</u>                              <u>**1:50 p.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | **---000---** |
| 4 | **THE CLERK:**  Calling Civil Action 19-7545, Abernathy, |
| 5 | et al versus DoorDash, Inc. |
| 6 | Counsel, please step forward and state your appearances |
| 7 | for the record for the record. |
| 8 | **MR. POSTMAN:**  Good afternoon, your Honor.  Warren |
| 9 | Postman of Keller Lenkner for the petitioners and movants. |
| 10 | **MR. FOGELMAN:**  Good afternoon, your Honor.  James |
| 11 | Fogelman, with me is Josh Dick, of Gibson Dunn for the |
| 12 | defendant. |
| 13 | **THE COURT:**  Thank you.  Welcome to you. |
| 14 | **MR. FOGELMAN:**  Thank you. |
| 15 | **THE COURT:**  So we're here on a TRO mediation. |
| 16 | Mr. Postman, please go ahead. |
| 17 | **MR. POSTMAN:**  Thank you, your Honor. |
| 18 | We're here because DoorDash is engaging in an |
| 19 | unprecedented attempt to change the rules of arbitration in the |
| 20 | middle of the process, and they are doing it in circumvention |
| 21 | of the right to counsel.  That violates Rule 4.2.  It violates |
| 22 | the covenant of good faith and fair dealing.  And it violates |
| 23 | the Labor Code. |
| 24 | Each of those violations independently is causing our |
| 25 | clients irreparable injury and each of them is an independent |

```
1    ground to grant temporary relief while the Court decides the
2    pending Motion to Compel that we filed.
3         On the other side of the balance, DoorDash attacks the
4    strawman that we're asking for them to not be able to contact
5    any of their Dashers.  We're obviously not.
6         All we're asking is that DoorDash not try to change the
7    terms of the arbitration agreements that we are litigating over
8    in this action.  They have not identified any harm to them that
9    will occur --
10             THE COURT:  When you say "change the terms," do you
11   mean change the terms as to the petitioners, who are -- what is
12   it, 3,000 in this case?
13             MR. POSTMAN:  2,236.
14             THE COURT:  As to those individuals, or do you mean
15   as to people who have not yet filed a petition?
16             MR. POSTMAN:  Well, we think what they are doing is
17   improper as to all parties who have retained counsel and
18   represented that they are proceeding with arbitration.
19        You know, it's up to Your Honor in structuring the scope a
20   remedy whether -- how to craft the order, whether to tell them
21   to stop what you think is the violation --
22             THE COURT:  This is not a class action.
23             MR. POSTMAN:  Correct.
24             THE COURT:  So I can only give relief as to your
25   petitioners.
```

 1            **MR. POSTMAN:**  And we're fine with that, Your Honor.

 2            **THE COURT:**  All right.  So let's focus on it from the

 3    point of view of the petitioners and what the injury is to

 4    them.  What is the injury to them?

 5            **MR. POSTMAN:**  So there's two injuries.  Two groups of

 6    injuries, I would say.

 7        One is having the right to have the advice of their lawyer

 8    at the time they are being asked to agree to change the terms.

 9    That's what Rule 4.2 is supposed to protect, that interest, and

10    we think that right is per se irreparable.

11            **THE COURT:**  4.2 of what?

12            **MR. POSTMAN:**  The California Rules of Professional

13    Conduct.

14        They represent the public policy of California and

15    generally of professional ethics; that when a client is

16    represented and seeking to bring a claim, for a lawyer to reach

17    out directly or indirectly and try to gain an advantage in

18    litigation by contacting the client outside the presence of

19    their lawyer, that is improper.

20        And in doing that here, you know, our clients are getting

21    this requirement that in order to -- the way it happens, and

22    this is in the Jackson declaration that we submitted, the

23    clients see this when they start their shift.  They have an

24    assigned shift.  And when they open up their app to start work,

25    they get the pop up.

```
 1          It says nothing about affecting their pending claim.  It
 2     says nothing about talking to a lawyer.  It says:  By signing
 3     you've represented that you've done everything you need to get
 4     assistance to understand the agreement.  But it doesn't mention
 5     the pending action or the lawyer.
 6          And there is, you know, scroll down through a lot of stuff
 7     and you hit "Accept."  And you have to do that in order to
 8     start your shift.
 9          As the Jackson declaration described, there's only a few
10     minutes before you miss your window and then you don't get paid
11     for that shift.  And that creates a lot of pressure that is not
12     there if we can communicate to our client:  Here are the
13     implications of this, and here is -- you know, here is what we
14     would advise.
15          That's one set of irreparable injuries.
16          The other is that, as we describe in our brief, we think
17     this is a textbook violation of the covenant of good faith and
18     fair dealing.  DoorDash doesn't dispute that that applies to
19     arbitration agreements.  And to say that once you've started
20     down with arbitrations and you get rulings you don't like, you
21     can sabotage the process, force AAA to close it, and then the
22     very next day on a Saturday force the client to sign a new
23     agreement shifting to another gravely inferior process.  That
24     is not in keeping with the spirit of the bargain.
25              THE COURT:  How far did it get with the AAA?
```

```
 1              MR. POSTMAN:  We filed demands.  We advanced over

 2    $1.2 million in filing fees for our clients.  We met every

 3    requirement, and that's what AAA determined.  They make a lot

 4    of statements about the improper nature of the demands, but

 5    they know full well that under the delegation clause in their

 6    contract, all those issues are delegated to AAA and the

 7    arbitrator.

 8         So AAA made the threshold administrative determination --

 9    I'm sorry, I'll slow down -- that each claimant had met their

10    filing requirements and had a right to proceed.

11         They invoiced DoorDash for their filing fees and AAA has

12    no ability and will not proceed with an arbitration unless the

13    respondent pays their fees.  DoorDash flatly refused.

14         AAA has no remedy at that point.  An arbitrator has not

15    been appointed, so they can't issue any -- any award or

16    sanctions.

17              THE COURT:  I misunderstood then.  I thought you said

18    that they got an adverse ruling they didn't like, so they gave

19    up on AAA.  What was that adverse ruling?

20              MR. POSTMAN:  That they have to proceed with all of

21    our clients' claims individually at the same time.

22         If I can zoom out for a little bit to speak to that

23    context, because I think this really informs the obvious

24    purpose of what they were doing, why it's related to the

25    representation, a lot of the harms here.
```

```
 1            Keller Lenkner has put an extensive amount of resources in
 2     preparing to litigate petitioner's claims because we think the
 3     claims are incredibly strong.  Under California law DoorDash
 4     employees have very strong claims.
 5            We've got over 80 people working on these matters now.  We
 6     partnered with Quinn Emanuel.  They have over 800 lawyers.
 7     They have the largest law firm in the world dedicated just to
 8     litigation.
 9            As I said, we've advanced all those filings fees.  We did
10     that because we believe in the claims and we thought it was
11     time to bring resources to sort of overcome the obstacles that
12     DoorDash's class waiver puts in way of litigating these claims.
13            When we did that, DoorDash, they -- well, and I explained
14     the AAA process that we went through.  DoorDash's response,
15     what I think is remarkable about it, is they concede that they
16     switched agreements to address that problem they had.
17            Now, they frame it as wreaking havoc on the arbitration
18     program and wobble out of epithets that we think are neither
19     relevant or are completely baseless.
20            But the core theme running through their brief is -- and
21     they say expressly -- the CPR rules that they adopted in the
22     November 9th agreement were a reaction to Keller Lenkner's,
23     quote, scheme.
24            So when we brought up all these individual actions, they
25     no longer could bring superior resources to bear on three,
```

```
 1   four, five individual employees.
 2        There is, you know, something I didn't realize until I
 3   started working on arbitrations.  I've done a lot of work on
 4   enforcing arbitration agreements.  I never realized that even
 5   though they are defended on the premise that arbitration is
 6   speedy and informal and less litigious, that's the whole
 7   trade-off in ATT v Concepcion.  Right?  You give up the class,
 8   but you get this informality and speed.
 9        When you actually get into arbitration as a single
10   employee, these companies turn it into full-fledged bloody
11   knuckle federal court style litigation.  There is depositions,
12   lots of them.  There is protective orders.  Fights about
13   discovery.  Dispositive motions.
14        And so if you're a small law firm, you can't get more than
15   a few of these done in a year.  And it's great.  The class
16   action waiver becomes a liability waiver, because you can only
17   fit a few employees through that pipe.  And we saw that and we
18   said:  We're going to bring the resources to bear and we'll do
19   them all.
20        You know, they have this thing, this statement in their
21   brief that I really -- I have to address.  They say -- and this
22   is on page three.
23             "Keller Lenkner had no intention nor the
24        practical ability to proceed with 3,000 arbitrations
25        simultaneously."
```

```
 1        And based on that statement, they accuse us of a shakedown
 2   and extortion.  What do they cite for that?  Nothing.  They
 3   don't have a citation.  And as I've described the resources we
 4   brought to bear, it's totally false.
 5        THE COURT:  What are the resources?
 6        MR. POSTMAN:  So we have, as I said, over 80 lawyers,
 7   you know --
 8        THE COURT:  How many?
 9        MR. POSTMAN:  I'm sorry.  Not 80 lawyers.  Sorry.
10   Over 80 personnel, combination of paralegals and lawyers.  We
11   have partnered with Quinn Emanuel, who has 800-plus lawyers and
12   is committed to litigating these.  And, you know, we've
13   advanced a lot of money.
14        The key point I was going to make, though, is we will
15   litigate them the way arbitration was intended.  And I don't
16   want to get too far into our litigation strategy, but the rules
17   of arbitration have processes to do this.  You can do them on
18   the papers.  You don't need to do all of that fighting that
19   wasn't supposed to be part of arbitration.  We can and we will
20   arbitrate these.
21        What DoorDash is so upset about is that by having them to
22   do them all at once, instead of staging them in five, ten,
23   claimant chunks, they have to face all these claims.
24        You look at the CPR agreement, which was the big switch in
25   the November 9th agreement.  They say it's innovative.  It's
```

```
 1    innovative because it's the first set of arbitrable rules that
 2    I'm aware of where even though everyone is purportedly bringing
 3    in an individual claim, there is a queue.  If there is more
 4    than 30 that the defendant is dealing with, they will take ten,
 5    the parties litigate that.  And, of course, that will be
 6    full-on, complex, all the sort of hard-fought litigation that
 7    Concepcion was saying you get from class actions; right?
 8    Because if it's essentially a bellwether, parties are going to
 9    fight like crazy.
10         But you don't get the benefit of the class action because
11    once that happens, the company isn't bound to anything.  They
12    can settle if they want; but if they don't want to, under the
13    CPR rules, everyone gets a number and you get in line.  And
14    they'll do it sequentially.
15         And as far as we can tell, there is 63 employment
16    arbitrators at CPR.  There is well over a thousand -- I don't
17    know the exact number, but there is orders of magnitude more at
18    AAA.
19         And it's really good for defendants, again, to be able to
20    have a class waiver become a liability waiver.  If you only
21    have to deal with a handful of claimants each year, you can
22    keep violating the law and, you know, you settle a few, you
23    take a few to an award.  Nobody can get a large amount of -- of
24    the claims against you.  So that's the context we are dealing
25    with.
```

1    And DoorDash's counsel is also counsel to Postmates.  We,

2  in our motion, which you may not have read yet, talked about

3  *Adams v Postmates*, where there was a related occurrence.

4  DoorDash's counsel here, Gibson Dunn, Ms. Evangelis, is counsel

5  for them.

6    They complained about AAA's failure to do everything the

7  CPR rules do.  They fought with AAA to get them to stage the

8  arbitrations.  They didn't want to proceed with them all at

9  once, like we were ready to.  And when they lost that argument,

10  AAA said:  No, everyone has got an individual right, and we

11  can't depart from that.  The contract is the contract.

12    The Supreme Court has said for years that an agreement to

13  arbitrate must be enforced according to its terms.  The

14  agreement calls for the commercial -- for the AAA rules.  We

15  have to go ahead, absent agreement from the parties to change

16  it.

17    And they were so upset about that because it put them

18  finally in the spot where they had to face a lot of claims that

19  they -- they don't dispute.  They worked behind the scenes

20  before the CPR rules were public with CPR to write into those

21  rules exactly the relief they couldn't get administratively

22  from AAA.

23    And they also don't dispute that it was DoorDash's lawyers

24  who masterminded this plan, who helped write the agreement.

25  And, of course, it was because we're dealing here with really

```
 1   complex questions of arbitration and procedure.  DoorDash's CFO

 2   didn't come up with the idea to change the rules of AAA.

 3       And so in that context I think it's really easy to walk

 4   through the elements of the claims we're alleging and show why

 5   we're very likely to succeed on the merits of that.

 6       So first question under Professional Rule of Conduct 4.2.

 7   Does the change relate to the representation?

 8       The whole point of the change was to address our

 9   representation.  They say we wreaked havoc on their arbitration

10   system.  As I said, the rules specifically undo AAA's

11   conclusion that we can proceed at once.

12       Another way of saying it is if they don't relate to the

13   representation, will they stipulate here that they won't rely

14   on or mention the new rules in this action?

15           THE COURT:  Say that again?

16           MR. POSTMAN:  The new rules, the change, is not

17   related to this representation.  Keller Lenkner's

18   representation.  Well, they stipulate that they won't refer to

19   or rely on the new rules in the course of our representation.

20       The whole point is they are going to bring up these rules

21   to say that we can't go to AAA.

22           THE COURT:  I thought the -- I thought you said that

23   AAA had dismissed all the cases because they --

24           MR. POSTMAN:  Well --

25           THE COURT:  Because fees were not paid.
```

1          **MR. POSTMAN:**  Sorry.

2      Right.  They have administratively closed them.  And what

3  happens next, and DoorDash is well aware of the process here,

4  is that that's a breach of the arbitration agreement.

5      So under Section 4 of the FAA when a party breaches an

6  arbitration agreement -- and here the breach was refusal to

7  comply with their end, which was comply with AAA's

8  determination of how to move forward -- the Court can compel

9  them to arbitrate and enforce according in the manner provided

10  for in the agreement, the arbitration agreement.  That's

11  Section 4 of the FAA.

12      So what we're asking Your Honor in the Petition to Compel

13  Arbitration and the Motion to Compel arbitration, the permanent

14  relief we're asking for is to find that by just refusing to

15  comply with AAA's determination and forcing AAA to close,

16  administratively close the proceedings, because it has no

17  alternative, they have breached their agreement, and the remedy

18  for that is specific performance, as often in a breach, which

19  is to order them to comply with AAA's determinations and move

20  forward.

21          **THE COURT:**  Did AAA refund your 1.2 million?

22          **MR. POSTMAN:**  Yes.

23          **THE COURT:**  When you have say "administratively

24  closed," can they be administratively reopened?

25          **MR. POSTMAN:**  I believe so.  It's up to AAA whether

```
 1   they ask us to refile the same demands exactly as they were or

 2   they will just administratively reopen them.  They can choose

 3   to do it either way.

 4        But I think at the end of the day this Court must and

 5   does -- I mean, Courts have ordered, as we cite in our Motion

 6   to Compel, parties to pay the fees to go ahead with

 7   arbitration.

 8        Were it otherwise, any time a party didn't want to

 9   arbitrate, they could just refuse to pay the fees at the front

10   end and they wouldn't have to.  That can't be the rule under

11   the FAA and that's not the rule in our Motion to Compel.  We

12   explained Your Honor can, and we argue should, remedy the

13   breach by ordering them to move forward.

14        So we're going to be in front of you, we believe, on that

15   motion, and we're going to be saying there is a clear agreement

16   to arbitrate.  Any questions they may have, any fights about

17   how arbitration should proceed under their clear delegation

18   clause has to go to AAA and the arbitrator.  They have been

19   enforcing delegation clauses for years and they know that

20   that's the case.

21        And so we'd like you to send it to AAA.  And what they are

22   going to say, I believe, they are free to correct me, is:  Oh,

23   no.  They have signed a different agreement.  They've agreed to

24   go elsewhere.  You judge, Your Honor, can't force them to go to

25   AAA.
```

```
 1        The entire right we're here in this action to enforce is
 2   the right under the contract to go to AAA.  Their new agreement
 3   effectively releases that right.  It says once you sign this,
 4   you no longer have it.  And if I'm wrong about that, they
 5   simply need to say that they won't come in and invoke that
 6   agreement when we're trying to remedy the breach of the AAA
 7   agreement.  To say it's not represented blinks reality.  They
 8   are doing it specifically, they say, as a reaction to our
 9   clients' claims.
10        So the related to representation thing I think just
11   doesn't hold water.
12        They make a related point.  They say over and over:  It's
13   just a procedural requirement we're changing.  We're not
14   extinguishing any rights.  We can't cite any unfair advantage.
15        Well --
16            THE COURT:  Tell me this.  What in the record proves
17   that AAA could hear these 3,000 -- give me the exact number
18   again.  I'm sorry.
19            MR. POSTMAN:  2,236.
20            THE COURT:  2,000-?
21            MR. POSTMAN:  -236.
22            THE COURT:  All right, 2236.  What in the record
23   shows us that AAA could hear these all at once, but CPR would
24   refuse to do so?
25            MR. POSTMAN:  AAA made an administrative
```

```
 1   determination that they all had to move forward.  And I can
 2   give you the cite for that.
 3           THE COURT:  Does that mean AAA refused to adopt some
 4   kind of class action procedure?
 5           MR. POSTMAN:  Exactly, exactly.  So that was on
 6   September 23rd, and it's Exhibit D to the Keller declaration in
 7   support of this motion.
 8           THE COURT:  Has AAA changed its mind on that?
 9           MR. POSTMAN:  I don't believe so.  So we've -- again,
10   once a party refuses to pay, AAA has no ability to make them.
11   They are an administrator.  It's like if you don't pay the
12   docketing fee to a clerk, they can't docket it.
13       But Your Honor can remedy that breach.  And when you do,
14   AAA will move forward individually with them.
15           THE COURT:  What is the dollar amount that DoorDash
16   would have to put up with AAA?
17           MR. POSTMAN:  Their invoice was 4.275 million.
18           THE COURT:  How come yours was only 1.2?
19           MR. POSTMAN:  That's the structure --
20           THE COURT:  So the --
21           MR. POSTMAN:  Excuse me.
22           THE COURT:  I'm sorry.  Please go ahead.
23           MR. POSTMAN:  That's the structure of the fee
24   schedule set by AAA.
25       So under the fee schedule the claimant in an employment --
```

1    under the employment fee schedule, which applies here, pays

2    $300 per person to move forward, and the respondent pays 1,900.

3          **THE COURT:**  Is that the filing fee?

4          **MR. POSTMAN:**  Correct.

5          **THE COURT:**  In addition, are there fees for the

6    arbitrator?

7          **MR. POSTMAN:**  There are.  Those are assessed after an

8    arbitrator is assigned and does a preliminary conference and

9    gets an understanding of the case.  They set a retainer that

10   has to be paid.  And then there is also --

11         **THE COURT:**  By DoorDash?

12         **MR. POSTMAN:**  Correct.  And this is all a result of

13   the *AT&T v. Concepcion* line and arguments by defendants that

14   their agreements are not unconscionable because they don't

15   force claimants to pay more to proceed in arbitration than they

16   do to court.

17       Plaintiffs had long argued that arbitration agreements

18   with class waivers were unenforceable because of the

19   prohibitive fees.

20       And the respondents essentially wrote their agreements to

21   say:  Well, we'll cover those, because in exchange for giving

22   up a class waiver -- I'm sorry, in exchange for losing the

23   right to bring a class action, you get the right to move

24   forward in this informal process and we'll pay the bulk of the

25   fees.

```
 1        Again, under the FAA contracts must be enforced according
 2   to their terms.  The contracts incorporate the AAA rules.  The
 3   AAA rules say AAA makes these administrative determinations.
 4        We're happy to -- I'm happy to discuss why we believe
 5   there is an overwhelming case that they have breached their AAA
 6   agreement and that you should compel them to fix it by moving
 7   forward.
 8        I think what is clear, though, is that these are important
 9   rights.  DoorDash has been litigating to compel arbitration
10   speaking about how important the rights to arbitrate are.  They
11   are not procedural.  They are a right under a contract.
12        And the Supreme Court in Moses H. Cone said:
13             "Section 2 is a declaration of a liberal policy
14        favoring arbitration notwithstanding any state's
15        substantive policies to the contrary.  The effect of
16        Section 2 is to create a body of federal substantive
17        law applicable to any arbitration agreement within the
18        coverage."
19        Federal law makes these important substantive rights.
20   That's what we are asserting in this Motion to Compel.  And the
21   agreement they are forcing our clients to sign without the
22   involvement of counsel --
23        THE COURT:  I -- I let us get off the -- I had a
24   question though.  What in the record shows us that CPR would be
25   a much longer period of time?
```

```
 1              MR. POSTMAN:  Sure.  So I've given you the citation

 2     for AAA.  CPR is document No. 1114, and this is just the

 3     protocol where it describes, as I did, that once there are more

 4     than 30 claims facing a defendant, they will proceed --

 5     everyone waits and they will proceed with ten.  And then after

 6     that, they will give everyone a number and proceed

 7     sequentially.

 8              THE COURT:  How long will it take to go through that,

 9     for 2,236 to go through that process?

10              MR. POSTMAN:  We state in our motion just -- just a

11     hypothetical.  I don't know how fast they will move these.  I

12     can't know that for sure, but we state -- there's numbers in

13     the brief that if each of the CPR arbitrators heard ten a year,

14     and that's on top of their other case loads, it would be four

15     years before some of these petitioners would get to start.

16          And we have other petitioners, other claims as well.  So

17     it's -- it's a very important substantive right to be able to

18     move forward with your claim.

19          I think everyone understands that if the agreement they

20     had written said:  New agreement.  Instead of going to AAA,

21     like you want, everyone can do -- there can be one arbitration

22     a year.  That's it.  That's obviously important.

23          Now, what we've done is a difference in degree, but not in

24     kind.  And they have done it in the middle of the process.

25     They forced AAA to close administratively the arbitrations --
```

```
 1              THE COURT:  2,236?

 2              MR. POSTMAN:  Yes.

 3              THE COURT:  All 2,236 had filed?

 4              MR. POSTMAN:  Correct.  And they didn't pay a single

 5    fee on their end.

 6              THE COURT:  How many of your 2,236 have signed or

 7    clicked through and approved the agreement and/or opted out of

 8    it?

 9              MR. POSTMAN:  Every single one has signed and clicked

10    through the agreement, and nobody that we're aware of has opted

11    out.

12         And I'd like to, if I could, address a statement in their

13    brief that suggests we haven't established that.  That is just

14    not true.

15         The reason it's not true, they say we only attached a

16    general copy of the independent contractor agreement.  Well,

17    they don't make unique copies of the independent contractor

18    agreement.

19         The way it works when you sign up, as you said, Your

20    Honor, is you -- you're signing up.  There is a link where you

21    could see a general copy, and then you click on "Accept" and

22    you're deemed bound.  There is no signature, signed version.

23         And so in every case where they have moved to compel

24    arbitration against a plaintiff, what they do -- and you can

25    look at the Tang declaration, Docket 35-3, Paragraph 4 that
```

1    speaks to.

2         They say this person is driving for DoorDash.  That's the

3    nature of the claim.  And I'm quoting the declaration:

4              "Contractors are not able to use the DoorDash

5         platform or accept or perform delivery opportunities

6         without agreeing to the ICA."

7         So we've proved it the same way they've proved it, which

8    is to say -- we establish that they have driven for DoorDash

9    and that, as they said, you can't deliver without it.

10        We noted in footnote two of the Keller declaration that we

11   were providing one witness statement to save judicial

12   resources.  They are all identical.  We have every witness

13   statement in a box.  If DoorDash or Your Honor would like me

14   to, we can file them electronically.  We can give physical

15   copies.

16        But, you know, I can make the representation to the Court

17   that there is an evidentiary basis to show this.

18             **THE COURT:**  To show what?

19             **MR. POSTMAN:**  That every single petitioner is a party

20   to a valid arbitration agreement with DoorDash.  We proved it

21   the same way they do.

22             **THE COURT:**  You mean, the AAA one or the --

23             **MR. POSTMAN:**  The AAA one.

24             **THE COURT:**  All right.  Well, how about the CPR one?

25   How many of them have signed the CPR one -- not signed, but

```
 1   approved and clicked through there?

 2            MR. POSTMAN:  This was just rolled out a couple weeks

 3   ago, so we don't know the exact numbers.  They may have a live

 4   tally, but we don't know the exact numbers.

 5       But, you know, we're familiar with our clients.  We talk

 6   to them a lot.  Some drive every day full-time.  Some drive

 7   more sporadically.

 8            THE COURT:  Give me an estimate.  Is it more than

 9   half, less than half of your clients have clicked through the

10   new agreement?

11            MR. POSTMAN:  With full caveats that I'm really

12   estimating --

13            THE COURT:  Just a guess.

14            MR. POSTMAN:  -- I think it is about a third.

15            THE COURT:  Okay.  And of that one-third have any of

16   those opted out of the CPR agreement?

17            MR. POSTMAN:  We're in the -- yes.  We're in the

18   process of collecting statements.  We've suggested they opt

19   out, and we're in the process of collecting those.

20       We have a number.  We don't have them tied specifically to

21   petitioners.  It's developing as we speak.

22       I think the point we -- the reason we moved is these

23   rights -- and we're happy to walk through in total detail.  We

24   do it, I think, more in the Motion to Compel.  These rights are

25   intimately wrapped up with this Motion to Compel arbitration.
```

And for the defendant to be changing them by presenting an
agreement to our clients that they have to sign to start work,
that doesn't say it's going to affect this action, that doesn't
say consult a lawyer, it's improper and they have no interest
in it.

I mean, they could easily -- if they have -- they have put
nothing in the record.  There is no evidence in the record to
suggest it would be technologically hard for them to stop
sending our clients this new agreement.  So there is no -- no
technological problem with an evidentiary basis.

Absent that, what interests do they have in changing the
agreement for this action?  The only interest they could have
would be a litigation advantage.  But trying to get a
litigation advantage by reaching out to our clients is exactly
the thing you can't do.  And trying to get a litigation
advantage after the arbitration process has commenced by
changing the process is what the covenant of good faith and
fair dealing says you can't do.

I mean, the *Penet* case (phonetic spelling) says this very
expressly.  You can't change it once the claim has accrued.
Here it's not just accrued.  We've -- we've told them our
clients have retained counsel and we're pursuing actions.

So we're really just asking the Court to freeze the
status quo so that as we -- Your Honor can decide whether we
can compel arbitration before AAA or, you know, whether there

1    is some reason not to.

2         I will note the arbitration agreement that we're moving to

3    compel under expressly says that we can move in court to seek

4    temporary injunctive relief and that's -- you know, the one

5    exception under the agreement to having to send everything to

6    the arbitrator is that if the phrase is without that temporary

7    relief, the arbitration provided in this paragraph may be

8    rendered ineffectual.

9         If that's the case, we can come to the Court and say:

10   Hold on.  We're in the process of moving to compel.  You need

11   to issue temporary relief so we get to have this right.

12        So we're asking to freeze the status quo.  Really don't

13   think they have any legitimate interest in this action in

14   trying to stop us -- or, I'm sorry, in trying to reach out to

15   our clients and change the rules.

16        And, you know, in Rule 4.2 when this process is driven by

17   the lawyers to do this, as it obviously was, it's just plainly

18   improper.

19        There is another misleading, frankly, statement in the

20   brief that I do want to correct.  Let me...

21        (Brief pause.)

22        They say that they can't find 936 of our clients in their

23   DoorDash system, and they use this to suggest that we're

24   bringing claims for people who have not -- who aren't DoorDash

25   drivers.  That's opposition Page 3.

1          It's at best a half truth.  If you look at the Cao

2    declaration, which is Docket 35-4, it concedes that when they

3    ran this search, it was a list of 5,000 people.  They only

4    checked emails.  They didn't check for people's names.  They

5    didn't check for phone number.  They didn't check for address.

6    All of which they have.

7          So the point to that is evident.  They didn't really do a

8    full search.  The point to that is evidence that we're somehow

9    misrepresenting is entirely unfounded.

10         And there is another thing they do.  They put in the

11   record -- and this is ECF 35-5 -- an email where they have told

12   us about this, and they say:  We've told them.  We've told

13   Keller Lenkner that there are these people we can't find.

14         Well, they don't include the reply to the email.  In the

15   reply to the email we said:  People often have different

16   emails.  If you tell us who the people are, we'll give you

17   additional information so you can track them down.

18         We didn't know at this point they hadn't searched any of

19   the other identifying information.  They refused.  We renewed

20   that suggestion at least three other times.

21         In a good faith informal non-litigious arbitration process

22   parties confer like that.  They refused.  And then after not

23   really looking and refusing to confer, accuse us of bringing

24   claims on behalf of people who aren't Dashers.

25         Not only that, the list they are talking about is not a

 1    list of petitioners.  It's a separate list we gave them to

 2    request employment records under California Labor Code.  We

 3    found about five petitioners that are on that list.  But to

 4    point to that to suggest petitioners aren't DoorDashers is

 5    particularly misleading.

 6        And what's more, they have the list of petitioners'

 7    information.  Presumably they have checked.  We have put in

 8    evidence in the record saying that -- showing that they are

 9    Dashers.  They have not disputed it as to a single person.

10    They, to date, have never identified a single petitioner who

11    they even assert is not a DoorDasher.

12        So under the classic *Celotex* standard, we have record

13    evidence.  They won't dispute it.  They point to some other

14    evidence where they did a partial search.  I don't think

15    that -- that counts, if they are not even petitioners, as

16    rebutting.

17            **THE COURT:**  All right.  I need to let the -- you'll

18    get a rebuttal.  I want to hear from the other side.

19            **MR. FOGELMAN:**  Thank you, Your Honor.

20        I heard your questions.  I think they are excellent

21    questions.  And I heard your comment this is not a class

22    action, which I think actually is quite important here.

23        I also heard counsel say that -- I'm trying to quote

24    here -- they are very familiar with their clients and talk to

25    them a lot.

1    So why are we here?  According to the petitioners, all

2   that's happened is that they have some, one person, that's all

3   we know, because the only evidence --

4           THE COURT:  We're here because you had a -- your

5   client had an agreement to go to AAA.  And when it came time to

6   pay the fee, you backed out and reneged on the agreement.

7           MR. FOGELMAN:  Your Honor, I --

8           THE COURT:  That's why we're here.

9           MR. FOGELMAN:  I hear you, and I have an answer to

10  that, but I wanted to --

11          THE COURT:  You made the agreement.  Your law firm

12  and all the defense law firms have tried for 30 years to keep

13  plaintiffs out of court in employment cases.  And you've gotten

14  a lot of success in the courts.

15      After so finally somebody says:  Okay, we'll take you to

16  arbitration.  And suddenly it's not in your interest any more.

17  And now you're wiggling around trying to figure some way to

18  squirm out of your own agreement.

19      I am not -- you know, I'm a little older than you and

20  there is a lot of poetic justice here.

21          MR. FOGELMAN:  Your Honor, I don't think you look

22  older than me, and I appreciate that, but I will tell you this

23  much.

24      First of all, we have a valid defense to the Motion to

25  Compel arbitration.  I'm going to walk through that, but I

```
 1   would like to do that at the end, if you don't mind, because I
 2   do have --
 3            THE COURT:  I read the agreement.  There is no
 4   possible way to say that you don't have a valid defense -- I
 5   mean, that you do have a valid -- I mean, maybe on the merits,
 6   but that's what the arbitration is for.
 7            MR. FOGELMAN:  Well, I hear you, Your Honor.  Let me
 8   walk through what the merits are of both today's motion and
 9   that one, since the only tie between the two is they have both
10   been argued today, but today's relief is not related to the
11   Motion to Compel arbitration on the schedule --
12            THE COURT:  Let me ask you some questions about the
13   -- let's say that somebody opts out of the CPR agreement.
14   Let's say they click through it, but then they send you the
15   opt-out letter.
16       Does that then mean that the AAA arbitration agreement is
17   back in force?  Your brief was very cleverly written to avoid
18   answering that question.
19            MR. FOGELMAN:  I'll answer it directly.
20            THE COURT:  Answer it.
21            MR. FOGELMAN:  If someone either doesn't sign on to
22   the app, which they don't have to do, and we don't --
23            THE COURT:  Let's say they do sign on.
24            MR. FOGELMAN:  I'm with you.  Right.  I'm going to
25   answer every possibility.  I'm going to walk through them.
```

```
 1              THE COURT:  All right.

 2              MR. FOGELMAN:  If they don't sign on or they sign on

 3   and agree to the new terms, but opt out, they are exactly where

 4   they are today on every level.  They can pursue arbitrations in

 5   AAA.  But although I have another comment about that, I'll wait

 6   until the end.  But there is no --

 7              THE COURT:  Wait.  Just a second.  They can pursue or

 8   that you will agree that it's proper.

 9         See, you said in your brief "attempt."  I understand how

10   your firm can use words like "attempt."

11              MR. FOGELMAN:  I --

12              THE COURT:  All lawyers -- but you will then come

13   back and say:  Oh, no.  There's some other reason why we won't.

14         Will you submit to arbitration in the AAA in those

15   circumstances?  You won't answer that question.

16              MR. FOGELMAN:  I'm answering every question --

17              THE COURT:  Answer that question.

18              MR. FOGELMAN:  So what's happened as of Friday, Your

19   Honor, is that a class, a putative class has actually been

20   settled.  I don't know if any of those people will wind up

21   wanting to go forward.  There will be --

22              THE COURT:  There is no class.  You've got a class

23   action waiver.

24              MR. FOGELMAN:  I hear you, Your Honor, but I'm

25   telling you --
```

```
 1              THE COURT:  You, yourself --

 2              MR. FOGELMAN:  On Friday -- on Friday, Your Honor, in

 3  another case a putative class action, motion for preliminary

 4  approval, was filed in another case --

 5              THE COURT:  DoorDash?  Involving DoorDash?

 6              MR. FOGELMAN:  Yes, Your Honor.  And the --

 7              THE COURT:  Who was the judge in that case?

 8              MR. FOGELMAN:  I have a case number.  I don't have

 9  the judge.  It was just filed on Friday.

10              THE COURT:  I'm not going to get into some other

11  judge.

12              MR. FOGELMAN:  Your Honor --

13              THE COURT:  That's an old -- I'm not -- I want to

14  solve my problem on my record.

15              MR. FOGELMAN:  Your Honor, I only --

16              THE COURT:  And I --

17              MR. FOGELMAN:  -- say that --

18              THE COURT:  If they --

19         (Simultaneous crosstalk.)

20              THE COURT:  Wait a minute.

21      So if they -- if they -- if the person opts out of the CPR

22  agreement, you say yes, they can go to AAA and arbitrate their

23  case, but will you submit to jurisdiction there?

24              MR. FOGELMAN:  Your Honor, the only reason I

25  mentioned the settlement is because I want that to be a caveat.
```

```
 1  They will have an opportunity to participate in that.  If they

 2  opt out, then these answers will apply.

 3       But here are the answers to every question I think you've

 4  asked.

 5       We've already agreed to AAA arbitration.  All the client

 6  was asking for is that they comply with the AAA rules, which

 7  are very minimal.  You attach an agreement to arbitrate.  You

 8  identify what your claim is.  And you identify what the amount

 9  in controversy is.  Some of these people have zero claims.

10  Some have $20.

11       And if they had done that -- which 250, by the way, are

12  going forward right now.  Separate issue, but there are people

13  going forward and there are court cases going forward.

14            THE COURT:  At the AAA?

15            MR. FOGELMAN:  AAA.  250 going forward at the AAA.

16            THE COURT:  Represented by the Keller law firm?

17            MR. FOGELMAN:  I think so, Your Honor.  Yeah.  Yeah.

18  I think so.  I think so.

19            THE COURT:  Okay.

20            MR. FOGELMAN:  Those are still going forward.  These

21  were a chunk of two sets of 2,000, where 4,000 were filed at

22  once.  Now they have been divided in two cases:  One before us

23  today and one that was removed from state court.  I don't know

24  what court has that at the moment, but it's here in the

25  courthouse.  Okay?
```

```
 1        For the 2,200 here today, assuming that they -- there is
 2   approval of the settlement and they opt out, they will have the
 3   answer to do whatever they want.  The agreement that they
 4   signed is just a new version, updated version of the terms of
 5   service, the independent contractor agreement on a
 6   going-forward basis.
 7             THE COURT:  AAA is out.  CPR is in.  And some of the
 8   other language has been changed.
 9             MR. FOGELMAN:  Well, I --
10             THE COURT:  I read the difference.  I saw the red
11   line version.
12             MR. FOGELMAN:  If you saw Exhibit C to the Tang
13   declaration, you'll have seen in all capital, all black type
14   face it says, the first page, that anyone who signs on
15   permanently to the app.  No one is contacted unless they sign
16   in.  And he did not tell you how many people have signed in.
17   We'll get to that in a moment.
18             "Important please review this agreement
19        carefully.  In particular, please review the mutual
20        arbitration provision in Section 11, as it requires
21        the parties" -- this is the part he didn't talk about
22        -- "(unless you validly opt out of arbitration, as
23        provided below) to resolve disputes on an individual
24        basis to the fullest extent permitted by law through
25        final and binding arbitration.  By accepting this
```

```
 1        agreement, you acknowledge that you've read and

 2        understood all the terms, including Section 11, and

 3        have taken the time and sought any assistance needed

 4        to comprehend the consequences of accepting this

 5        agreement."

 6             THE COURT:  But if they don't click on that, then

 7   they don't get a job for that day; right?

 8             MR. FOGELMAN:  Your Honor, that -- we don't know how

 9   many people have clicked on it as of today.  There has been no

10   evidence in the record that more than this one person has

11   clicked on it.

12             THE COURT:  Well, but you're the company.  You ought

13   to know immediately.  You can look at the computer and it will

14   tell you.

15             MR. FOGELMAN:  It does not, Your Honor.  It takes

16   time to figure out who they are.  We cannot put their names in

17   the complaint --

18             THE COURT:  I'm going to say there are people out

19   there who are desperate, living paycheck to paycheck, and they

20   said:  What the hell, I've got no choice.  I better click on

21   this.

22        I have --

23             MR. FOGELMAN:  I understand what you're saying, Your

24   Honor --

25             THE COURT:  I have no --
```

1          **MR. FOGELMAN:**  I'm not disagreeing with you on

2    whether it's important to people or not.  You can assume it's

3    extremely important to people.  That's not going to change why

4    we're here today.

5          All that happens today is they -- if they click on -- and

6    the only evidence in the record is that one person clicked on.

7    That's all that's in the record.  If they click on, they read

8    the information that I just read to you and the actual

9    arbitration provision, and they can consult with their counsel.

10         This is not a class action where they are unrepresented.

11   They have a close connection to people who are their counsel.

12   They are familiar with their clients and talk to them a lot.

13   They can then ask them for advice and whether these are

14   actually better or not.

15         I think, Your Honor, there is a very good record in the

16   community-at-large that this is a faster and more efficient way

17   to arbitrate for everyone.  Counsel may disagree.

18         As you just heard him tell you, they have advised their

19   clients on their opinion on whether this is a better or worse

20   arbitration than the one they currently have a right to pursue.

21   At that point their client has got to make an informed

22   decision.

23         A, they don't have to agree at all to anything.  If that's

24   the case, they are still free to arbitrate in AAA, subject to

25   their decision of the settlement issue we talked about.

1          If they click on this, they still don't have to arbitrate.

2    They still don't have to arbitrate in the new arbitration form.

3    This is a new term on going-forward basis.  They could opt out

4    of the new provision by just mailing a letter.

5          Now, all I have in this record, Your Honor, for today is

6    the essentially one-page declaration of Ms. Jackson, which says

7    that she logged on on November 11th and she didn't realize that

8    it could be something that could affect her case, and she

9    didn't have enough time to thoroughly read through it.

10          This opt out is not immediate.  Each person has 30 days in

11    which to consult with their counsel -- and according to counsel

12    of record, they are in contact with them frequently -- and

13    decide for themselves if they like the AAA better or the new

14    one better.  If they opt out, they can do the AAA.  If they

15    decide to opt in, they can do the new one.  But that informed

16    decision is before them.  No one is forcing them to do anything

17    on that particular issue.

18          This is simply the fourth change, I think, in three years

19    to the standard agreement and many of these relate to the

20    arbitration agreement on a going-forward basis.  They are not

21    required to either agree to the new terms or, if they agree, to

22    enter into the new arbitration provisions.

23          Counsel has now said that a third, perhaps, have opted out

24    already.  Well, does that mean that two-thirds have made a

25    decision --

1          **THE COURT:**  No.  He said a third had clicked through

2     it.

3          **MR. FOGELMAN:**  Okay.

4          **THE COURT:**  I think that's what he said.

5          **MR. FOGELMAN:**  So a third had clicked through it.

6     And he said that some, perhaps all -- I don't know, there is

7     nothing in the record.  Some have opted out.  Not this person,

8     yet.  But this person has 30 days from November 11th, according

9     to her statement, to opt out.

10         So why did we have to come here today?  What is the relief

11    they are seeking when if this person, rather than filling out

12    this declaration and jumping into an emergency motion, is

13    talking to counsel of record.  If she doesn't like the new

14    one -- I like it, maybe they would like it -- she doesn't have

15    to agree.  She can opt out, and some have.

16         What is the emergency relief and what is the emergency

17    they are asking the Court to engage in?

18         Walk me through this one hypothetical, Your Honor.  What

19    if there's a person who read the new terms, is not happy with

20    how AAA was going, wants to try the new provision because they

21    think it's better for them even after hearing the advice of

22    counsel.  Is Your Honor going to tell them that they can't make

23    an informed decision, even after speaking with their counsel,

24    of choosing the new form?  It's their right.  They can go to

25    the old form or the new one.  It's their choice.

1          But the injunction they are seeking today, Your Honor, is

2     really not just enjoining our client's speech and not just

3     enjoining our client's change of business practices, which is

4     in this case a contract for hundreds of thousands of

5     Californians, of which they are just a small part, but in many

6     ways they are asking for an injunction against their own

7     clients to prevent them from deciding on their own, with their

8     advice of counsel, to choose the new form.  That's not right.

9          All we have in this record is one person saying she

10    clicked through, and it doesn't even say she's opted out or is

11    going to opt out or she liked it or didn't like it.  She simply

12    says she wished she had more time.

13         Well, the contract gives her 30 days.  And if they are in

14    contact frequently with her, as they say they are, she's got

15    plenty of time after today to opt out.

16         **THE COURT:**  It may be that they clicked through it

17    and they don't know they even have to get a hold of the lawyer.

18    There may be some lag time before events catch up with it and

19    they may be on day 27 or 28.

20         **MR. FOGELMAN:**  Your Honor, the --

21         **THE COURT:**  Thirty days is not a very long period of

22    time.

23         **MR. FOGELMAN:**  Well, with all due respect, Your

24    Honor, it's 30 days from the time they click through.  All we

25    know is that one person has clicked through.  That's all that's

 1   the record.  If the next person clicks through today, they have

 2   30 days from today.  If the next person clicks through a month

 3   from now, they have 30 days from that month.  If they click

 4   through in February, et cetera, 30 days.  It's a rolling 30

 5   days, Your Honor.  And they have counsel in frequent contact

 6   with them.

 7            THE COURT:  What date did you start rolling out the

 8   new agreement?

 9            MR. FOGELMAN:  November 9th, Your Honor.  So even

10   that date, there is still two weeks left for the first person.

11   She's not that person.  She says she clicked in on

12   November 11th.

13        But even two days earlier when they were rolled out, that

14   person still has two more weeks to opt out and they have

15   counsel in frequent contact with them.  You don't have to get

16   involved here and offer an injunction.

17            THE COURT:  Is counsel able to -- I saw in your

18   agreement.  It can't be counsel opting out on behalf of

19   everyone.  It has to be an individualized agreement.  Can

20   counsel deliver those agreements to your office?

21            MR. FOGELMAN:  Your Honor, it's spelled out in the

22   agreement if they want to sign up, how to opt out.  I believe

23   it's an address they mail it to and they have to sign it

24   themselves.

25            THE COURT:  Does it have to be postmarked that day,

1    or can it be -- have to be received that day?

2              MR. FOGELMAN:  I believe it's received within 30

3    days, Your Honor, but I don't think that's in the record, that

4    they are having trouble having it received.

5              THE COURT:  So we've got the postal system.  It's at

6    the mercy of the postal system.

7              MR. FOGELMAN:  Your Honor, I have to say I'm not

8    aware of anything in the record which suggests that they are

9    having trouble getting it mailed or they have asked us to get

10   involved in waiving the term for specific people because it got

11   mailed late.  There is nothing in the record on that.

12        And I would say on this one, the AAA didn't close the

13   cases because we told them to.  What's in this record is that

14   plaintiff's counsel told them to close the file.

15             THE COURT:  Tell me, what was it.  DoorDash refused

16   to pay the filing fee, so AAA closed the cases

17   administratively.

18             MR. FOGELMAN:  Your Honor, it's not as nefarious as

19   that was brought to you at all.

20             THE COURT:  Tell me what happened.

21             MR. FOGELMAN:  They filed claims all at once without

22   any arbitration agreements, without identifying what their

23   claim is, and without identifying what the amount in

24   controversy is.  Those are the AAA rules that are part of our

25   agreement.

 1      All we asked them to do -- that DoorDash asked them to do

 2  was comply with those terms and they could arbitrate.  In fact,

 3  there are 250 going forward right now.  That's all.

 4      They decided that they didn't want to present an actual

 5  agreement to arbitrate or identify the amount.  Why would you

 6  do that?

 7      I'll just walk you through one potential possibility here.

 8  A person has a $20 claim.  If they put a $20 demand in there,

 9  every defendant who receives that is going to go through the

10  same thought process every single time.  Should I just pay them

11  the $20, as opposed to paying $1,900 for a filing fee?  Should

12  I offer them $10 to compromise?  Should I fight this one, or

13  should I just let them take a default because they are not

14  taking the $20 and I'm not going to pay $1900 to save 20.

15      Those are the things that everyone who is sued in a

16  particular forum will always go through.  And that's all we

17  asked here, is that they comply with the agreement, which is

18  file the agreement that you have to arbitrate.

19          **THE COURT:**  The agreement requires that, or do the

20  rules require that?

21          **MR. FOGELMAN:**  Both.  Because the agreement requires

22  you to comply with the rules, and the rules expressly state

23  that's what AAA requires.  So if they had done that, they would

24  have been arbitrating right now.

25      The fact that the rules --

1    THE COURT:  Wait, wait.  Hold that thought.

2        Counsel, come back up here just on that one point.  I'm

3    not going to interrupt you long.

4        Now, what counsel is telling me is vastly different than

5    what you represented.

6        MR. POSTMAN:  Yes.

7        THE COURT:  What you represented to me was that AAA

8    closed the files administratively because DoorDash refused to

9    pay the filing fee.

10       MR. POSTMAN:  Yes.

11       THE COURT:  Is that right?  That's what you told me;

12   right?

13       MR. POSTMAN:  Yes.

14       THE COURT:  Now, what counsel is now telling me is

15   that's false and that what happened was that the AAA closed the

16   files because AAA requires that a copy of the agreement be

17   attached; that the dollar amount be stated.  And I forgot what

18   the third thing was.  And that you failed to do that, and

19   that's why they were closed.

20       MR. FOGELMAN:  Your Honor, I think you are

21   misunderstanding what I said.  That's not what I said or meant.

22       THE COURT:  All right.  Then you rephrase what you

23   said.

24       MR. FOGELMAN:  You correctly repeated what I said,

25   but I did not say that was the reason they closed.  I said it

```
 1   was closed because the plaintiffs asked them to close the file
 2   instead of complying with the AAA rules in our agreement.
 3   That's what I said.
 4              THE COURT:  All right.  Is that true?
 5              MR. POSTMAN:  Absolutely not.  Docket 5-12, email
 6   from Heather -- from AAA to the parties:
 7              "Respondent has failed to submit the previously
 8          requested filing fees.  Accordingly, we have
 9          administratively closed our files."
10   That's their closure notice.
11              THE COURT:  Show that to counsel, and then hand it up
12   to me so I can see it.
13              MR. FOGELMAN:  Your Honor --
14              THE COURT:  Wait --
15              MR. FOGELMAN:  -- there was a separate request by
16   plaintiff's counsel that preceded the closing, which is not
17   part of that email.
18        (Whereupon document was tendered to the Court.)
19              MR. POSTMAN:  That was my next point that I was about
20   to make.
21              THE COURT:  Just a minute.
22              MR. FOGELMAN:  I have that in my hand, too, if you'd
23   like to see that, Your Honor.  It's actually the Lipshutz
24   declaration.
25              THE COURT:  All right.  Say it again.
```

1          **MR. FOGELMAN:**  This is an email.  It says:

2          "We have conferred with counsel for DoorDash and

3      the parties are not able to come to a mutual agreement

4      to depart from the process or deadline that you

5      outlined in your email below.  Claimants accordingly

6      agree that if DoorDash has not paid the fees it owes

7      by November 7, 2019, AAA should close Claimants' cases

8      due to DoorDash's refusal to proceed so that Claimants

9      may seek additional remedies."

10     This is a request by them to close it so they could come

11 to court.

12     And what I'm saying to you, Your Honor, is that all

13 DoorDash asked was that they do what's required in court, which

14 is, in part, even here.  You've got to have an agreement to

15 arbitrate on which to base a Motion to Compel arbitration,

16 which they don't put before Your Honor.  They put one.

17         **THE COURT:**  But did AAA ever say that the reason it

18 was closing any file was because the agreement had not been

19 attached?

20         **MR. FOGELMAN:**  No, Your Honor.  That's -- I'm just

21 saying why DoorDash was not going to pay $11 million without at

22 least confirming they had an agreement with the people who were

23 claiming they had an agreement; that they knew what the claim

24 was and they knew what the amount in controversy was, which is

25 what the AAA rules require.

1       THE COURT:  Is it true that you did not attach the

2   agreements?

3       MR. POSTMAN:  No.  We filed each demand

4   electronically, as we're permitted to do, as they consented to

5   do.  They consented to accept electronic service.  We did that

6   by uploading each claimant's individual demand into an online

7   portal --

8       THE COURT:  By individual contract?

9       MR. POSTMAN:  And what we did is we attached the

10  relevant contract, arbitration agreement.  We did not attach

11  2,236 copies of the identical agreement online.  We attached

12  the agreement.

13      They never said that this was a problem.  They never in

14  the whole course of this --

15      THE COURT:  Well, wait, wait, wait.  For all 2,236

16  did you individually attach the agreement that corresponded to

17  that individual with their arbitration demand?

18      MR. POSTMAN:  No.  We attached -- we attached the

19  multiple agreements and designated which responded to which.

20  We didn't reattach thousands of the same agreement over and

21  over, but we did --

22      THE COURT:  If it's electronic, who cares.

23      MR. POSTMAN:  Going through folders.  I mean, we

24  easily could.

25      The silly thing about this is they never raised this, Your

```
 1    Honor.
 2            THE COURT:  But, wait.  I'm just trying to find out.
 3    I'm not saying it's right or wrong, but I'm trying to find out
 4    is it true.
 5        It sounds like counsel for DoorDash is correct when he
 6    says that you did not attach the individual contract to each
 7    individual claim.
 8            MR. POSTMAN:  I want to reiterate, there is no unique
 9    contract.  That doesn't exist.  There is a generic contract
10    that is online that when you click through, you are deemed to
11    have accepted.
12        So you can't attach, you know, Warren Postman's contract.
13    It's not -- it doesn't exist.  So it's correct.  What happened
14    is we attached a single version of the general contract that
15    applied.
16        But very importantly here, here is what the key point is.
17    They didn't raise that dispute.  Had they raised it, that is
18    exclusively committed to AAA's determination and the
19    arbitrator's determination.  They don't get to decide
20    themselves whether they get to go forward.
21        AAA, and this is document 5-11 Page 2, said:
22            "We have made an administrative determination
23            that the minimum filing requirements have been met by
24            claimants."
25        Their contract says the AAA rules apply.  It says that:
```

1          "All other disputes, except for whether a class

2      waiver is invalid, with respect to this mutual

3      arbitration provision shall be determined exclusively

4      by an arbitrator and not any court."

5      And the AAA rules likewise say that AAA makes that

6  decision and an arbitrator makes that decision.

7          **THE COURT:**  Look.  Let me go back to DoorDash.

8      Since all of these are form contracts and you click

9  through them, there is never a signature; right?  There is

10  never a signature.

11      So why would you insist on seeing the electronic version?

12  You're the only one that has the electronic version anyway.  So

13  how could these individuals even -- I don't get your point.

14  Why did you insist on seeing the contracts?  They are not --

15  they are all the same.

16          **MR. FOGELMAN:**  For the same reason we insist on

17  seeing them at this Motion to Compel arbitration being heard in

18  January.  Because at a minimum we have to know we have an

19  agreement to arbitrate with them before you can go forward.

20          **THE COURT:**  You can look at your own records to see.

21          **MR. FOGELMAN:**  We could not do that, Your Honor.

22  That was the whole point.  We've asked them to -- first of

23  all --

24          **THE COURT:**  Maybe it's unconscionable that you would

25  have a system where no one could even tell if they have got

```
1    a -- because you're the one that -- they click on it, but do
2    you automatically send them an electronic copy?
3         To me, it's a screwed up system if you can't even tell who
4    you've got an agreement with.
5              MR. FOGELMAN:  Your Honor, I didn't say we couldn't
6    tell with sufficient information.  They didn't give us the
7    information.
8              THE COURT:  They gave you the name.  Look up Joe
9    Jones and --
10             MR. FOGELMAN:  All right.  How --
11             THE COURT:  -- see if there is --
12             MR. FOGELMAN:  All right.  So how many Joe Joneses
13   are there in --
14             THE COURT:  Including Ohio, probably one that works
15   for DoorDash.
16             MR. FOGELMAN:  We're only talking about California
17   right now, by the way.
18        But how many Joe Joneses are there, and how do I know
19   that's the Joe Jones in our system, if there is one.  We asked
20   for email addresses that they link to their account and were
21   not provided those with these claimants.
22        Even today, Your Honor, for the 2,236 plaintiffs they have
23   not attached the agreement, which they can print out
24   themselves, to a declaration saying:  I agreed to these terms
25   on this date.  Here is the email address that's linked to my
```

```
 1    account, and I didn't opt out of arbitration.

 2         Instead they treat it like a class action, which they

 3    cannot do, and have one person say, I -- well, actually, she

 4    doesn't mention her original agreement, but she says she read

 5    the -- today, her declarant, Ms. Jackson, she read the new

 6    ones.  That's all she says.

 7         But, Your Honor, if you -- if you eliminate the obligation

 8    to establish that you have an agreement to arbitrate, you put

 9    the cart before the horse.

10         THE COURT:  I don't figure that at all, because you

11    set up this -- this Draconian system.  You get up at 5:00 a.m.,

12    and you're starting your work, and before you can get your

13    first job you've got to click through.  And now you expect

14    seven or eight months later that the poor guy is going to

15    remember the day that he clicked through it and be able to

16    somehow keep a -- get an electronic copy?  You're the one that

17    has all the click-through information.

18         MR. FOGELMAN:  It wouldn't be difficult --

19         THE COURT:  All they've got to do is give the name,

20    the name, and say:  I work for you, DoorDash.  Don't you

21    remember me?  I'm the poor guy who -- like Tiny Tim, who is

22    begging at Christmas for money --

23         MR. FOGELMAN:  Your Honor --

24         THE COURT:  -- and DoorDash -- come on.  This is so

25    Draconian.
```

```
 1            MR. FOGELMAN:  Your Honor, I could tell you we're not
 2   beating up on poor Tiny Tim.  What we're here to talk about
 3   today are two things.
 4        Primarily one is the relief they are asking for.  Why is
 5   it an emergency?  Why is it irreparable?
 6        And secondarily, although it's untethered with the relief
 7   today, they are not linked to the petition to compel
 8   arbitration, what is the likelihood they would prevail on that
 9   one?
10        Now that we're on that topic, it's not difficult or
11   Draconian and it doesn't have to be done at 5:00 in the
12   morning.
13            THE COURT:  Let me --
14            MR. FOGELMAN:  May I --
15            THE COURT:  All right.  There is a point you raise
16   that I do want to ask counsel for plaintiffs.
17        Look.  Let's assume that this is Draconian; that it's
18   unconscionable and all of those things.  You are the lawyer and
19   you are in contact with 2236.  This is not a class action.  So
20   forget that class action analogy.  This is a -- you've got 2236
21   clients.  You can get on the phone tonight and call every one
22   of them or email them en masse and say:  Hey, don't click
23   through this thing.  And if you do click through it, my advice
24   to you is opt out and we will go to AAA.
25        Why isn't that enough of a remedy for you?  You have the
```

```
 1   remedy in your own hands.
 2            MR. POSTMAN:  Your Honor, we may have made a huge
 3   amount of progress today because it's most of the remedy.  And
 4   if I can explain why we're here, and I'm surprised about
 5   this --
 6            THE COURT:  You're not answering my question.
 7            MR. POSTMAN:  I'm saying --
 8            THE COURT:  You're sliding off, just like all the
 9   lawyers.  Always slide off.
10       Go ahead.  What is it you want to say?
11            MR. POSTMAN:  I apologize, Your Honor.
12       Docket document 11-13, which is the new November 9th
13   agreement.  And what I'm about to say is it's very surprising
14   to us that DoorDash's position is if you opt out, you get to
15   keep the right to go to AAA.  We're very happy with that and --
16            THE COURT:  That's what they said?  That's what they
17   said?
18            MR. POSTMAN:  Well, we're not -- there's the wiggle
19   words of the "attempts" and the he didn't quite answer the
20   question that you asked.
21            THE COURT:  I'll tell you this.  The word "attempts"
22   in my court will get you nowhere.
23       What he has said to me today is enough.  If somebody opts
24   out, they are going to be compelled to go to AAA, period.  And
25   no gimmicks by DoorDash.
```

 1            **MR. POSTMAN:**  Thank you, Your Honor.

 2            **THE COURT:**  That's the way I feel about it.

 3       That's what you said.  I'm going to give you a chance now.

 4  If you want to wiggle off of that, this is your time and place

 5  to wiggle.

 6            **MR. FOGELMAN:**  Your Honor, I have not been known as a

 7  wiggler.

 8            **THE COURT:**  Yes.  The word "attempt" was a wiggle

 9  word.

10            **MR. FOGELMAN:**  Your Honor, all I was saying was that

11  the agreement prior to the new one.  And that's what would

12  apply to people who don't click on it voluntary or agree to it

13  and don't opt out.  I don't know what percentage that could be.

14  It could be zero.

15       But whenever people either don't sign on or opt out and

16  then don't participate in the settlement, are allowed to go

17  back to AAA.  But we're still allowed to defend ourselves.

18  First and foremost, just establish you are, in fact, a person

19  we have an agreement with.

20            **THE COURT:**  But that agreement, that prior -- if they

21  opt out of the CPR, then you're telling me that the AAA

22  agreement comes back into place for all of those people for

23  whom there was such an agreement.

24            **MR. FOGELMAN:**  Yes.  If they have an agreement, they

25  have an agreement.  And if they don't click on it, it's still

```
 1    the agreement.  In they opt out after clicking on it, it's
 2    still the agreement.
 3           THE COURT:  But now you say "if they have an
 4    agreement."  They may not have an electronic -- you're the one
 5    with the copy.
 6           MR. FOGELMAN:  But they have a pen.  They can say:
 7    I agree to the terms on this date.  Here is the email address I
 8    use.  At least give us something.
 9           THE COURT:  I'm not going to require them to remember
10    the exact date.  No.
11           MR. FOGELMAN:  How about approximate, Your Honor?
12           THE COURT:  Maybe approximate.  What I would do is
13    allow Mr. Keller to march through your files, over the
14    Christmas holidays if need be, and to find their names as proof
15    that they, in fact, did it instead of -- no.  You're not going
16    to be able to get away with saying:  Oh, the poor guy, he
17    didn't keep a copy.  Oh, too bad for him.  No, it's not going
18    to work that way.
19           MR. FOGELMAN:  You can print out the copy from the
20    app and say:  This is what I agreed to.
21        Or you could -- you could do the minimum that the AAA
22    rules require, which are part of our agreement.
23        It is not asking for Draconian relief to say:  I am the
24    person who signed up.  Here is approximately when I did it.
25    And if I can, show you a copy of what I signed on to.  It looks
```

```
 1   like they have it.

 2        Counsel has it, that's what they say.  Just attach it to

 3   their declaration, say this is it --

 4            THE COURT:  All right.

 5            MR. FOGELMAN:  -- and say how much you're seeking --

 6            THE COURT:  All right.  Look --

 7            MR. FOGELMAN:  -- but we're not there.

 8            THE COURT:  Mr. Keller -- okay.  A lot of -- I don't

 9   know if this makes a lot of progress or not, but why isn't it

10   enough for you to get in touch with your clients and just say:

11   Please, I advise you to opt out of this thing.  Here is how you

12   do it.  Send a letter, so forth.

13            MR. POSTMAN:  So in classic lawyer fashion, I will

14   say that it's mostly enough.  It really is a lot.

15        The reason it's not all the way there is because getting

16   the message from their lawyer and the advice from a lawyer at

17   the same time instead of at 5:00 in the morning when you've got

18   to sign on, even if they have got an email and text message and

19   a phone call from us, is not as good.  And I think there is no

20   interest on the other side in doing it that way.

21        But I'm not going to fight for that last 5 percent.  I

22   would like to just clarify a couple points.

23        It is just not true that you can print the agreement from

24   your app, at least not so far as we have been able to figure

25   out.
```

 1           THE COURT:  I can't print anything on my iPhone.

 2           MR. POSTMAN:  It is also not true that we didn't give

 3    them email addresses.  We have given them lists with the email

 4    address, home address, phone number, name, city and state for

 5    every one of these petitioners.

 6        We've got a declaration from every one of them that

 7    establishes they were party to an agreement, exactly the same

 8    way DoorDash establishes it in court.  It's a declaration that

 9    they drove for DoorDash, which can't happen unless you're a

10    party to the agreement.  And DoorDash has simply not tried to

11    search fully and when they have, they won't tell us who.  They

12    won't even let us -- and this is during arbitration.

13           THE COURT:  Well, maybe effective tomorrow you're

14    going to get a big deposition or two.  Because if this is the

15    kind of hide-the-ball we're going to get, then you get to do a

16    little discovery.

17        All right.  So you've got 95 percent of what you need

18    already, at least in terms of preliminary relief; is that true?

19           MR. POSTMAN:  Yes.

20           THE COURT:  All right.

21           MR. FOGELMAN:  Just to follow up, Your Honor, on the

22    idea of any Draconian issue of printing the agreement.

23        I have what they have attached to their papers.  It's the

24    blank version of the agreement they claim people have signed.

25    It's somewhere in one of these.  This is the arbitration

1    agreement.  And my theory is they could attach it to someone

2    and say:  Yes, I signed this and agreed or not.

3         They haven't done that to AAA, and they haven't done it

4    today, and they haven't done it for the hearing scheduled in

5    January.

6         This is not a class.  They are individuals.  It's not too

7    much to ask for them to say individually:  This is my lawyer.

8    Here is my declaration.  Here is my demand to arbitrate.  Here

9    is my demand for money.  It's not that complicated.

10        I know Your Honor thinks that we're wiggling.  I want to

11   set the record straight.  It's not a Herculean effort to do

12   that.

13             THE COURT:  All right.

14             MR. POSTMAN:  May I add one thing just for clarity,

15   Your Honor?

16             THE COURT:  Of course.

17             MR. POSTMAN:  I appreciate the stipulation about

18   being able to go back to AAA.

19        The reason I was surprised by it is because the CPR

20   agreement really looks differently.  It says that that

21   agreement:

22             "...supersedes any prior contract between the

23        parties and shall constitute the entire agreement and

24        understanding between the parties."

25        And then it says, again, in the arbitration provision

```
 1   that:

 2            "This mutual arbitration provision" -- the

 3        November 9th one -- "is the full and complete

 4        agreement relating to the formal resolution of

 5        disputes covered by this mutual arbitration

 6        agreement."

 7        And it says:

 8            "If the contractor opts out, the contractor will

 9        not be subject to this provision."

10        So that doesn't say you get to go back to AAA.  It says

11   the one agreement, the CPR one, no longer applies.

12        I respectfully -- I think they got caught with their hand

13   in the cookie jar and they are trying to give it back.  I'll

14   take it.  But I don't want any confusion later that --

15            THE COURT:  Well, all right.  I have a question on

16   that, too.

17        When I was looking at this, admittedly on a hurry-up

18   basis, because this was an emergency motion, I said to myself:

19   Well, one way to read all this is just the way you described it

20   for DoorDash, is that AAA comes back to life for those people

21   who opt out if they, in fact, had a AAA agreement to begin

22   with.

23        And then it occurred to me, well, it could be that that's

24   what DoorDash wants us to believe, but then they are going to

25   play a trick on me.  I'm being a little cynical here.  After 20
```

 1  years on this job, forgive me, I am a little cynical.

 2      And the cynical thing would be to say, just like counsel

 3  just said, the new DoorDash agreement with CPR that refers to

 4  CPR, yes, you can opt out of it, but if you opt out of it, then

 5  you get to go to court.  But since there is a class action

 6  waiver, it will still be an individual case.

 7      Now, you're telling me that that is not your

 8  interpretation; that your interpretation is if you opt out of

 9  it, you get to go to AAA, if you had a prior agreement on AAA.

10          **MR. FOGELMAN:**  Yes.

11          **THE COURT:**  All right.  With that statement, I don't

12  think there is any need for emergency relief today.

13      However, I'm going to allow expedited discovery effective

14  immediately.  You can get in there and start taking depositions

15  on both sides and limited document requests, but you can take

16  document requests.  Don't do 35.

17      I'll give each side ten document requests, and I'll give

18  each side four depositions, all to be -- when is this hearing

19  in January?

20          **MR. FOGELMAN:**  Your Honor, I think it's mid January.

21  The 17th maybe?

22          **THE COURT:**  I know that this may wreck your holidays.

23  It's too bad.  That's the way it is.  You big firms, you get

24  big pay.  You get big -- that's why you're here.  It's part of

25  the burden.  You don't --

```
 1              MR. DICK:  January 9th, Your Honor.

 2              MR. FOGELMAN:  What is it?

 3              MR. DICK:  January 9th.

 4              MR. FOGELMAN:  January 9th, Your Honor.

 5              THE COURT:  So I think all this discovery ought to be

 6   done by December 15th.

 7              MR. FOGELMAN:  Your Honor, if I may just briefly.

 8              THE COURT:  Please, go ahead.

 9              MR. FOGELMAN:  As I mentioned at the beginning, just

10   so it was clear, there was a motion for preliminary class

11   settlement approval filed on Friday or Thursday at midnight, I

12   forget what, and these people are all going to have an

13   opportunity to participate in that resolution.

14              THE COURT:  Tell me about that case.  I don't even

15   know what case you're talking about.

16              MR. FOGELMAN:  It's the *Marciano* case.  I forget the

17   case number.

18              THE COURT:  What court is it in?

19              MR. FOGELMAN:  It's in San Francisco Superior Court,

20   Your Honor.  I have the case number.

21              THE COURT:  Are you the lawyer in that case?

22              MR. POSTMAN:  No.

23              THE COURT:  What, was this some kind of a sweetheart

24   deal?

25              MR. FOGELMAN:  No, Your Honor.  It's, like,
```

1   $40 million.  It's something like that.  It's a dozen or 20

2   cases that are pending that are being resolved.  I forgot the

3   exact number.

4        The person who filed the preliminary approval filed it in

5   Superior Court in the *Marciano* case.

6        I'll tell you the case number.  Give me a second, I'll

7   give that to you here.

8        *Marciano versus DoorDash*, CGC 18-567869.  There will be a

9   hearing on December 17th for preliminary approval.  At that

10  point if it's approved, they will have a chance either

11  participate or opt out.

12          **THE COURT:**  My Law Clerk tells me they have related

13  that case somehow to me.

14          **THE LAW CLERK:**  Not yet.

15          **THE COURT:**  Not yet?  Okay.

16          **MR. FOGELMAN:**  So, Your Honor, on December 17th will

17  be a hearing on preliminary approval.  And at that point if

18  it's approved, which I obviously hope, then I'll have a chance

19  to participate or opt out.

20       It does not make sense in light of that to be doing

21  expedited discovery up until December 15th about a motion to

22  compel arbitration, which I think is both ill-fated because of

23  lack of evidence and likely moot.

24       I would instead ask the Court to take the existing hearing

25  date in January and make it a check-back or a status so we

```
1   can decide -- we can inform the Court whether or not that
2   settlement was approved, and counsel can indicate whether its
3   clients intend to opt out or not.
4        But it doesn't make any sense to spend all the resources
5   and time on this now in light of that.  That's one of the
6   reasons I brought it up.
7             THE COURT:  Tell me, are your clients going to opt
8   out of that settlement, assuming it gets preliminary approval?
9             MR. POSTMAN:  We haven't seen it yet, so I'd have to
10  look at it.  I think --
11            THE COURT:  Is the 40 million, any of that money
12  comes back to the client?
13            MR. FOGELMAN:  None.
14            THE COURT:  What is it for?  It's 40 million
15  nationwide?
16            MR. FOGELMAN:  I believe it's California and
17  Massachusetts.  It's about 400,000 Dashers.  I don't know the
18  exact number.  Please don't quote me on that.  It's
19  approximately --
20            THE COURT:  Two states.  Two states, 40 million?
21            MR. FOGELMAN:  I believe so, Your Honor.  I don't
22  have the papers in front of me.
23       But it's a substantial settlement, Your Honor.  It's
24  not -- it's not in any way going to be a problem getting it
25  approved.
```

```
 1              THE COURT:  It does sound like a lot of money for two
 2     states.  What do you say to that?
 3              MR. POSTMAN:  I say we'll learn about it.  We've seen
 4     this movie before, though, with overlapping counsel with
 5     Postmates, where after we brought a large number of
 6     arbitrations they didn't like, several months later they
 7     mediated with another lawyer and proposed a class, which is
 8     fine.
 9          But what is amazing to me is that --
10              THE COURT:  But how can they do that if there is a
11     waiver of class actions?
12              MR. POSTMAN:  Exactly.  So there is a way to do it,
13     but not the way they are doing it.
14              THE COURT:  The agreement says that there will be no
15     class actions.
16              MR. POSTMAN:  Exactly.  And it's a mutual arbitration
17     provision.  So whenever they want to stop a class and not want
18     to be a party in a class, they get to send everyone to
19     individual arbitration.
20          But when someone wants to do individual arbitration, they
21     say:  We've agreed with someone else to do a class, and we're
22     going to drag you in as a party, even though our agreement says
23     we can't make you a party to a class.
24              MR. FOGELMAN:  Your Honor, that --
25              MR. POSTMAN:  I'm sorry.
```

1          **THE COURT:**  I think there should be discovery into

2     this other lawsuit to find out what is -- how can you get

3     around your own agreement that says there won't be any class

4     actions?

5          **MR. FOGELMAN:**  So first, Your Honor, the *Marciano*

6     case is what they call a PAGA case.

7          **THE COURT:**  A what?

8          **MR. FOGELMAN:**  A PAGA case.

9          **THE COURT:**  Yes, I know about PAGA.

10          **MR. FOGELMAN:**  And then there are -- other cases were

11     filed, putative class actions that have not been resolved yet.

12          **THE COURT:**  Well, wait.  What do you mean?  It's only

13     a PAGA case?

14          **MR. FOGELMAN:**  Your Honor, I'm saying that particular

15     case was PAGA.  There were others that were filed as putative

16     class actions, and they haven't been resolved yet.  And then

17     there are a variety of others case that are being affected by

18     this.

19          But my point is it doesn't take discovery because there

20     will be a hearing on a preliminary approval motion on

21     December 17th.  At that point, if there's approval, there will

22     be notice procedures issued by the Court.  Not by me, by the

23     Court.  And notice will go out, and they will have an

24     opportunity to consult with their counsel.

25          The only need discovery for that, and we don't need

 1  discovery for this.

 2          **THE COURT:**  No, no.  PAGA only affects the penalties.

 3  It doesn't affect the actual money that will go to the class

 4  members.

 5      And number two, I've just got to believe that at least

 6  some reasonable number of your 2236 will opt out of that deal,

 7  and so I will still have a case.  I'll still have to make

 8  rulings on it.  And then we'll be back here in January, and

 9  you'll say that counsel can't prove his case, but he --

10          **MR. FOGELMAN:**  Your Honor --

11          **THE COURT:**  -- could have if he had some recovery.

12          **MR. FOGELMAN:**  -- I hear you, but remember where we

13  are today.  The relief that they are requesting wasn't

14  necessary, and they claim they've got it.

15      The Motion to Compel arbitration has been filed --

16          **THE COURT:**  It was necessary.  It wasn't clear that

17  the people could go back to AAA if they opted out.  That was

18  not clear going into this motion.

19          **MR. FOGELMAN:**  Okay, Your Honor.

20      My other point, Your Honor, is that the Motion to Compel

21  arbitration has been filed by a single plaintiff, a petitioner.

22  Okay?  And it's a person who says essentially, I worked --

23          **THE COURT:**  Wait, wait, wait.  That's not my

24  understanding.  I thought you had 2236 petitioners.

25          **MR. POSTMAN:**  2,236.  They are all being individually

```
 1   entered on the docket.

 2              THE COURT:  And you have okay from all 2236?

 3              MR. POSTMAN:  Yes.  And we have individual -- again,

 4   we're making a mountain out of an evidentiary molehill here.

 5        We, in order to save the Court the burden -- and, you

 6   know, we're happy to fix this tomorrow.  We've got every single

 7   witness statement right here in a box.  We'll put it on

 8   electronically, if the Court wants.

 9        These are each individual petitioners.  They have got the

10   evidentiary basis they need.

11              THE COURT:  Look.  Look.  Here is the thing.  If

12   DoorDash is going to be arguing with me in January that they

13   don't have agreements, they don't have a dollar amount,

14   whatever those three things were, then you get to go in -- I'm

15   talking to plaintiff now.  You get to go to DoorDash and take

16   discovery so you can prove that.

17        Now, if DoorDash were to say:  Okay, we give up on that

18   picayune point and we concede that you can prove that for all

19   of these people.  Then I'll give up on discovery.

20        But it's unfair to my mind hold that against plaintiffs,

21   to say that they can't point to the specific agreement that

22   they had whenever you know good and well which one it was if

23   you looked at your computer long enough.

24        So I'm going to give them discovery.  If you work that

25   out -- but that's why I'm thinking they get the right to
```

 1   discovery.

 2       Now, here is another thing I think you ought to take

 3   discovery on, separate from that.  If you're going to -- it's

 4   not necessarily so easy to prove that -- for those people who

 5   don't opt out in time, you may have to prove unconscionability.

 6       Well, you made an accusation that Gibson Dunn had written

 7   this thing for CPR.  Well, go take discovery to prove that.

 8   Find the CPR people and prove it.  That's true.  I don't know,

 9   is it true?

10       MR. FOGELMAN:  Your Honor, we haven't even -- I

11   haven't had a chance to address the 4.2 issue with you, Your

12   Honor, but I completely disagree with any --

13       THE COURT:  I'm not saying it's 4.2.  I'm just saying

14   that it does -- it would be an important fact, to me at least,

15   on unconscionability if in order to get away from the AAA, you

16   ran off to CPR and cooked up some custom made deal, and then --

17   and then you really wrote the terms yourself, and now you're

18   foisting that on to the people who can't opt out within 30

19   days.

20       I'm not saying it's unconscionable yet, but I'm saying

21   there is an issue there --

22       MR. FOGELMAN:  Your Honor --

23       THE COURT:  -- and they ought to take your deposition

24   and the deposition of the people in -- where are they located?

25   Arizona?  Where is CPR located?  Find out if it's true that

```
 1   Gibson Dunn wrote these -- these --

 2           MR. FOGELMAN:  No one has alleged that, Your Honor.

 3           THE COURT:  I heard it awhile ago.

 4           MR. FOGELMAN:  I think he was saying that we helped

 5   write the new contract for the client on their terms of

 6   service.  I think that --

 7           THE COURT:  Well, that's not what he --

 8           MR. POSTMAN:  I'm saying CPR.

 9           THE COURT:  CPR.

10           MR. POSTMAN:  And the reason, there is strong

11   circumstantial evidence, which is the new CPR protocol was

12   announced either on November 4th or 6th.  There is a press

13   release on November 6th.  The rules are dated November 4th.  By

14   Saturday, November 9th, they had already written it into their

15   new agreement and pushed it out the day after the --

16           MR. FOGELMAN:  Your Honor --

17           THE COURT:  I will give you one deposition.  Go to

18   CPR, do a 30(b)(6).  And then all the communications with

19   Gibson Dunn, with DoorDash, to show how the rule got written.

20           MR. POSTMAN:  Thank you, Your Honor.

21           THE COURT:  That would be something that might -- it

22   would surely add color to the case.

23      Yes, sir.

24           MR. FOGELMAN:  But with all due respect, you're now

25   writing a case for them that hasn't been filed yet, and that's
```

1   not what --

2           THE COURT:  Well, that's what he told me.

3           MR. FOGELMAN:  Not what --

4           THE COURT:  He told me today.

5           MR. FOGELMAN:  Well, hold on, Your Honor.

6       The Motion to Compel arbitration has a filing already.

7   There is a motion on file.  It doesn't say they need discovery.

8   He doesn't ask for discovery.  It simply says that they have

9   arbitration agreements for the AAA.

10      Our response to that is due in a few weeks, but he will

11  say, among other things, what I told you.  Where is the actual

12  agreement to arbitrate?  It's not attached to the Motion to

13  Compel, and it wasn't attached earlier.

14          THE COURT:  I'm going to let them take discovery to

15  get that.

16          MR. FOGELMAN:  What discovery do they need?  They

17  know they did agree or did not, Your Honor.  They don't even --

18          THE COURT:  I'm overruling that objection.

19          MR. FOGELMAN:  All right, Your Honor.

20          THE COURT:  I'm going to make them -- I'm going to

21  make you go sit in front of a computer screen and call it up

22  and say:  Here is the agreement that he signed.

23          MR. FOGELMAN:  Okay.  Would you also agree then, Your

24  Honor, that as part of that process, that plaintiffs have to

25  provide sufficient information for that search to be done?  It

```
 1    isn't just a name in a complaint.

 2            THE COURT:  Well, the name would be enough, in my

 3    judgment.

 4            MR. POSTMAN:  Your Honor, we will stipulate to

 5    provide email address, phone number, address, name.

 6            THE COURT:  All right.

 7            MR. POSTMAN:  We have provided it already.

 8            THE COURT:  I'm telling you in every other -- in

 9    today's environment, this is something that the lawyers would

10    be able to work out and not have to take discovery.

11            MR. POSTMAN:  Four requests.

12            THE COURT:  If it comes to it, I'm going to let him

13    take the deposition.

14            MR. FOGELMAN:  All right, Your Honor.  Hopefully, we

15    will get the information in which that can be done.

16        But even so, the burden of anyone moving to compel

17    arbitration is always on the person moving.

18            THE COURT:  What am I missing here?  He comes in with

19    a showing, plaintiff, for 2236.  Let's say he's got 234 who

20    opted out of the new deal.  They clicked through it, but they

21    opted out of the CPR.  And then they say we, therefore, want to

22    go to AAA.  Compel them to go to AAA.  And then I -- why

23    shouldn't I just say --

24            MR. FOGELMAN:  Let me answer it in three ways.

25        First, I think you're assuming a lot more than the facts
```

```
 1   will justify.  For example, it might be that 1850 of those
 2   people won't even click on the website between now and the
 3   hearing on this Motion to Compel, whenever it is.  And we don't
 4   know what percentage who clicked through would agree.  And
 5   those who clicked through and agree, how many will opt out.
 6   They will have 30 days from the time they agree, if they
 7   clicked on and agreed.
 8       So that could happen on a rolling basis over the next
 9   year.  That's not going to happen between now and the end of
10   the year.
11           THE COURT:  But we will have some who have not
12   clicked on the new agreement at all and they have the AAA.  And
13   I'm going to probably compel you to arbitrate them.
14       And then we'll have the next group that clicked on to the
15   CPR, but opted out of the CPR.  And probably I'm going to
16   compel you to arbitrate those.  And then we'll have the group
17   that clicked on and forgot to opt out.  That's the harder case.
18   I don't know the answer to that.
19       And I'm not even saying for sure I would -- I'm just
20   saying that's the way I can see this working out, because it
21   can't be that they can't find -- that you can't find the
22   agreements.
23           MR. FOGELMAN:  Your Honor, as I said, if a sufficient
24   information were provided, it would be something that could be
25   found, if they are this the system.
```

```
 1        But there were almost a thousand that weren't in the
 2   system originally.  I don't know how many of the 2200 we're
 3   here for today are in the system, and I don't know if we'll
 4   have that information before the end of the year.
 5        All I'm saying, Your Honor, is that between the lack of
 6   information on which of their clients are going to want to go
 7   elsewhere, the lack of information on which their clients are
 8   going to want to settle their claims in the class action, it
 9   doesn't make sense to have either discovery or briefing in
10   anticipation of a January 7th or 9th --
11        THE COURT:  I'm not giving up on briefing, and we're
12   going to go ahead with our hearing --
13        MR. FOGELMAN:  Very well, Your Honor.
14        THE COURT:  -- and reasonable discovery.
15        Now, counsel on the plaintiff's side, if they come across
16   with the documents you need and the admissions that you need,
17   don't just put them to time and pain and suffering --
18        MR. POSTMAN:  Of course not.
19        THE COURT:  -- for the sake of it.
20        MR. POSTMAN:  Your Honor --
21        THE COURT:  But when we get to that day, I'm going to
22   want a breakdown of the 2236:  192 fall in this category, 1009
23   fall in that category.  So that we can -- so that maybe relief
24   is only granted as to 1,009.
25        MR. POSTMAN:  I understand, Your Honor.  My
```

```
 1   counterpart has actually, to my knowledge, not been involved in

 2   these matters up until recently.  So he may not be familiar

 3   with this, but I've said it once and I need to correct the

 4   record again.

 5        We have given DoorDash an email, a phone number, an

 6   address for every single one of petitioners.  They have

 7   searched some different lists looking only for email, not tried

 8   anything else.  And they haven't conferred with us despite four

 9   requests.

10        So I appreciate Your Honor giving us the opportunity,

11   given that intransigence, to try to do that.

12        MR. FOGELMAN:  Counsel is correct.  I am new to the

13   matter, Your Honor, but I don't think that's accurate.

14        The email addresses that were the first ones provided, at

15   least, are email addresses that seem to be new and not in our

16   system.  Some are in the system.

17        That said, Your Honor, when we come back on whatever date

18   it's going to be, I'm going to -- if you want to hear this at

19   all, I'm going to ask that you would condition, that's what

20   we're going to include, the bare compliance with AAA rules that

21   every litigant would expect.

22        That is, they have an agreement to arbitrate.  Here is

23   their claim and here is the amount in controversy.  Because if

24   it's a $20 claim, that's going to make a difference on how

25   everyone approaches it.
```

```
 1          It's not that complicated.  That's why we got stuck in the
 2   AAA in the first place.
 3          THE COURT:  I have a comment now for plaintiff.
 4          You have a lot of things possibly going for you in this
 5   case, but you should not jeopardize those by not dotting every
 6   "i" and crossing every "t."
 7          And if the rules require what counsel just said, don't
 8   blow that off.  Don't put yourself in a position where you're
 9   saying:  Oh, we just did ditto for case -- after the first 13,
10   we decided we -- no.  2236 cases have all got to be documented
11   perfectly.
12          Don't bring up some bogus issue that puts me in the
13   position of having to decide, well, he could have done it
14   right, but he didn't do it right.  No.  Do it right.
15          MR. POSTMAN:  I appreciate that, Your Honor, and we
16   try every day to do that.
17          If I may, I do want to point out that there is a process
18   for deciding what is required, and we submitted everything we
19   believed that was required to AAA.  AAA, which under their
20   contract is the exclusive determiner of what is required, said
21   it was proper.  They never raised these arguments once through
22   the process.  And then AAA said:  You've done everything right,
23   and -- but they are not paying, so we're closing it.
24          I mean, we could have potentially done things differently
25   had they raised these arguments earlier in the process had AAA
```

```
 1   said so.  But we have -- according to the relevant
 2   decision-maker under their contract and their very broad
 3   delegation clause, it's already been determined that we've
 4   dotted of "i" and crossed every "t."  And we're happy to
 5   bring --
 6           THE COURT:  Does your record now prove that?
 7           MR. POSTMAN:  Yes.
 8           THE COURT:  In the record before me?
 9           MR. POSTMAN:  Yes.  5-11, email from the AAA
10   administrator:
11               "We have made an administrative determination the
12           minimum filing requirements have been met by
13           claimants."
14           THE COURT:  Are all 2236?
15           MR. POSTMAN:  Yes.  This is referring to all of them.
16   And I'm happy to walk through in their contract why this
17   finding is conclusive.  And our brief speaks to that to some
18   degree.
19           MR. FOGELMAN:  Your Honor, we're not talking about
20   AAA, where some administrator made a finding based on a limited
21   record.  We're talking about the Motion to Compel before Your
22   Honor.  And we're asking if they can establish that they have a
23   right to arbitrate.  And if so, they comply with the bare
24   minimum that the rules require, which are part of our
25   agreement.
```

 1         We're not here to discuss that.  I was just previewing it

 2    for Your Honor because you were raising it.

 3              THE COURT:  All Right.  I'm not going to rule on

 4    this.

 5         Plaintiff, you're not -- I'm not the AAA.  I am being

 6    asked to invoke the equity jurisdiction of the court.  And what

 7    the other side is saying is you've got to prove these certain

 8    prerequisites before you get relief.

 9              MR. POSTMAN:  We will prove every single --

10              THE COURT:  If you want to gamble on that email from

11    the AAA, you can gamble on it, but I'm not saying you're going

12    to win on that.  I'm not going to say you're going to lose on

13    that.

14         My plea to you is:  Why do you want to put the poor judge

15    in that position?  Why can't you do your job and have a

16    bulletproof record here.  You could.  You could.

17              MR. POSTMAN:  We will have a bulletproof record here

18    on every requirement that is required for the Court to compel

19    arbitration.

20         I believe we are going to disagree about what the

21    requirements are, and we can't go back and fix what we

22    submitted to AAA.  We could have done it differently, but

23    AAA --

24              THE COURT:  You can fix what you're submitting to me.

25              MR. POSTMAN:  Yes.  And we will -- we will submit --

```
 1              THE COURT:  You have my permission to beef up your

 2    record before the January 6th hearing.

 3         This can't be on January 6th because I'm not going to be

 4    here that day.  What day is it?  That whole week --

 5              MR. FOGELMAN:  The 9th, Your Honor.

 6              THE COURT:  I'm not going to be here that day.  We're

 7    going to have to move it the following week.

 8              MR. FOGELMAN:  Your Honor, I would, if I could, ask

 9    that counsel simply confer with us because we're going to need

10    to have a complete motion package to respond to.  So we have to

11    discuss briefing and maybe a better hearing date that will

12    allow for that and allow for you to be here.

13              THE COURT:  All right.  You all work that out between

14    yourselves, but I'm going to have to slip it for one week.

15              MR. FOGELMAN:  Thank you, Your Honor.  I understand

16    for today's motion, the motion has been withdrawn.

17              MR. POSTMAN:  Would you like us to withdraw it, Your

18    Honor?

19              THE COURT:  Yes.

20              MR. POSTMAN:  The motion is withdrawn.

21              THE COURT:  All right.

22              MR. FOGELMAN:  Thank you for your time, Your Honor.

23              THE COURT:  All right.  Thank you.

24         (Proceedings adjourned.)

25
```

**CERTIFICATE OF OFFICIAL REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

_____

Debra L. Pas, CSR 11916, CRR, RMR, RPR

Tuesday, November 26, 2019

# EXHIBIT K

# Employment

Arbitration Rules and Mediation Procedures



AMERICAN ARBITRATION ASSOCIATION®

Available online at **adr.org/employment**

Rules Amended and Effective November 1, 2009
Fee Schedule Amended and Effective July 1, 2016

## Regional Vice Presidents and Assistant Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, West Virginia**
Kenneth Egger
Vice President
Phone: 215.731.2281
Email: EggerK@adr.org

**States: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming**
John English
Vice President
Phone: 619.239.3051
Email: EnglishJ@adr.org

**States: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee, Wisconsin**
Jan Holdinski
Vice President
Phone: 248.352.5509
Email: HoldinskiJ@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, New York, Vermont**
Ann Lesser, Esq.
Vice President
Phone: 212.484.4084
Email: LesserA@adr.org

**States: Alabama, Arkansas, Florida, Georgia, Mississippi, North Carolina, South Carolina, Virginia**
Charles Dorsey
Assistant Vice President
Phone: 866.686.6024
Email: DorseyC@adr.org

**States: Rhode Island**
Heather Santo
Assistant Vice President
Phone: 866.293.4053
Email: SantoH@adr.org

**States: Louisiana, New Mexico, Oklahoma, Texas**
Patrick Tatum
Vice President
Phone: 559.490.1905
Email: TatumP@adr.org

## Case Management Vice President and Assistant Vice Presidents

Charles Dorsey
Assistant Vice President
Phone: 866.686.6024
Email: DorseyC@adr.org
**Administers cases in FL, GA**

Heather Santo
Assistant Vice President
Phone: 866.293.4053
Email: SantoH@adr.org
**Administers cases in AL, CT, DE, DC, IN, KY, ME, MD, MA, MI, NH, NJ, NY, NC, OH, PA, RI, SC, TN, VT, VA, WV**

Patrick Tatum
Vice President
Phone: 559.490.1905
Email: TatumP@adr.org
**Administers cases in AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

# Table of Contents

Introduction ........................................................................ 7

Role of the American Arbitration Association .................................. 7

Legal Basis of Employment ADR ............................................... 8

The Fairness Issue: The Due Process Protocol ............................... 9

AAA's Employment ADR Rules ................................................. 9

AAA's Policy on Employment ADR ............................................ 10

Notification ....................................................................... 10

Costs of Employment Arbitration ............................................. 10

Designing an ADR Program .................................................... 11


Alternative Dispute Resolution Options ...................................... 13

    Open Door Policy .......................................................... 13

    Ombuds ................................................................... 13

    Peer Review ............................................................... 13

    Internal Mediation ........................................................ 13

    Fact-Finding .............................................................. 13

    Arbitration ................................................................ 13


Types of Disputes Covered .................................................... 14


Employment Arbitration Rules and Mediation Procedures .................. 15

    1. Applicable Rules of Arbitration ....................................... 15

    2. Notification ............................................................ 15

    3. AAA as Administrator of the Arbitration ............................. 16

    4. Initiation of Arbitration ............................................... 16

    5. Changes of Claim ..................................................... 17

    6. Jurisdiction ............................................................ 17

    7. Administrative and Mediation Conferences .......................... 17

    8. Arbitration Management Conference .................................. 18

    9. Discovery .............................................................. 19

    10. Fixing of Locale (the city, county, state, territory, and/or country of the Arbitration). 19

    11. Date, Time and Place (the physical site of the hearing within the designated locale) of Hearing. ......................................................... 19

    12. Number, Qualifications and Appointment of Neutral Arbitrators. ... 20

    13. Party Appointed Arbitrators .......................................... 21

14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties . . . . . . . . . 21

15. Disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

16. Disqualification of Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

17. Communication with Arbitrator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

18. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

19. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

20. Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

21. Interpreters . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

22. Attendance at Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

23. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

24. Postponements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

25. Oaths . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

26. Majority Decision . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

27. Dispositive Motions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

28. Order of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

29. Arbitration in the Absence of a Party or Representative . . . . . . . . . . . . . . . . . . . . . 26

30. Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

31. Inspection . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

32. Interim Measures . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

33. Closing of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

34. Reopening of Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

35. Waiver of Oral Hearing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

36. Waiver of Objection/Lack of Compliance with These Rules . . . . . . . . . . . . . . . . . . 28

37. Extensions of Time . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

38. Serving of Notice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

39. The Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

40. Modification of Award . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

41. Release of Documents for Judicial Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

42. Applications to Court . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

43. Administrative Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

44. Neutral Arbitrator's Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

45. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

46. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

47. Suspension for Non-Payment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

48. Interpretation and Application of Rules . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Costs of Arbitration (including AAA Administrative Fees) . . . . . . . . . . . . . . . . . . . . . . . 31

**For Disputes Arising Out of Employer Plans:** ................................... 33

   (i) Filing Fees ................................................... 33

   (ii) Hearing Fees ................................................. 34

   (iii) Postponement/Cancellation Fees .............................. 34

   (iv) Hearing Room Rental ......................................... 35

   (v) Abeyance Fee ................................................ 35

   (vi) Expenses ................................................... 35


**For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:** .................................................. 35


**Administrative Fee Schedules** ...................................... 36

   Standard Fee Schedule ........................................... 37

   Refunds—Standard Fee Schedule: ................................. 38

   Flexible Fee Schedule ........................................... 39

   Refunds—Flexible Fee Schedule: ................................. 40

   Additional Fees Applicable to the Standard Fee and Flexible Fee Schedules ........ 40

   Expenses ....................................................... 41


**For Disputes Proceeding Under the Supplementary Rules for Class Action Arbitration ("Supplementary Rules"):** ............................ 41


**Optional Rules for Emergency Measures of Protection** ................. 42

   O-1. Applicability ............................................... 42

   O-2. Appointment of Emergency Arbitrator ......................... 42

   O-3. Schedule .................................................. 42

   O-4. Interim Award .............................................. 42

   O-5. Constitution of the Panel .................................... 43

   O-6. Security ................................................... 43

   O-7. Special Master ............................................. 43

   O-8. Costs ..................................................... 43

**Employment Mediation Procedures** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-1. Agreement of Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-2. Initiation of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

M-3. Fixing of Locale (the city, county, state, territory and, if applicable, country of the mediation) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-4. Representation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-5. Appointment of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

M-6. Mediator's Impartiality and Duty to Disclose . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-7. Vacancies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-8. Duties and Responsibilities of the Mediator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

M-9. Responsibilities of the Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-10. Privacy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

M-11. Confidentiality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-12. No Stenographic Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-13. Termination of Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

M-14. Exclusion of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-15. Interpretation and Application of Procedures . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-16. Deposits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-17. Expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

M-18. Cost of the Mediation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

# Employment Arbitration Rules and Mediation Procedures



## Introduction

Federal and state laws reflecting societal intolerance for certain workplace conduct, as well as court decisions interpreting and applying those statutes, have redefined responsible corporate practice and employee relations. Increasingly, employers and employees face workplace disputes involving alleged wrongful termination, sexual harassment, or discrimination based on race, color, religion, sex, national origin, age and disability.

As courts and administrative agencies become less accessible to civil litigants, employers and their employees now see alternative dispute resolution ("ADR") as a way to promptly and effectively resolve workplace disputes. ADR procedures are becoming more common in contracts of employment, personnel manuals, and employee handbooks.

Increasingly, corporations and their employees look to the American Arbitration Association® as a resource in developing prompt and effective employment procedures for employment-related disputes.

These Rules have been developed for employers and employees who wish to use a private alternative to resolve their disputes, enabling them to have complaints heard by an impartial person with expertise in the employment field. These procedures benefit both the employer and the individual employee by making it possible to resolve disputes without extensive litigation.

## Role of the American Arbitration Association

The American Arbitration Association, founded in 1926, is a not-for-profit, public service organization dedicated to the resolution of disputes through mediation, arbitration, elections and other voluntary dispute resolution procedures. Millions of workers are now covered by employment ADR plans administered by the AAA®.

In addition, the AAA provides education and training, specialized publications, and research on all forms of dispute settlement. With 30 offices worldwide and cooperative agreements with arbitral institutions in 63 other nations, the American Arbitration Association is the nation's largest private provider of ADR services.

For over 80 years, the American Arbitration Association has set the standards for the development of fair and equitable dispute resolution procedures. The development of the *Employment Arbitration Rules and Mediation Procedures* and the reconstitution of a select and diverse roster of expert neutrals to hear and resolve disputes, are the most recent initiatives of the Association to provide private, efficient and cost-effective procedures for out-of-court settlement of workplace disputes.

## Legal Basis of Employment ADR

Since 1990, Congress has twice re-affirmed the important role of ADR in the area of employment discrimination—in the Americans with Disabilities Act in 1990, and a year later in Section 118 of the Civil Rights Act of 1991.

The United States Supreme Court has also spoken on the importance of ADR in the employment context. In *Gilmer v. Interstate/Johnson Lane,* 500 U.S. 20, 111 S.Ct. 1647 (1991), the Supreme Court refused to invalidate Gilmer's agreement with the New York Stock Exchange that he would arbitrate disputes with his employer (Interstate/Johnson Lane) simply because he was obliged to sign it in order to work as a securities dealer whose trades were executed on the Exchange. Although the *Gilmer* Court found that the Age Discrimination in Employment Act did not preclude arbitration of age discrimination claims, it specifically declined to decide whether employment arbitration agreements were "contracts of employment" excluded under the Federal Arbitration Act.

The specific issue left open by *Gilmer* was decided 10 years later by the United States Supreme Court in *Circuit City Stores, Inc. v. Adams,* 532 U.S. 105, 121 S. Ct. 1302, 149 L. Ed. 2d 234 (2001). In Circuit City, the Supreme Court concluded that except for transportation workers such as seamen or railroad workers, the FAA covers all contracts of employment and that the Act may be used to compel arbitration of employment-related claims. While Circuit City involved only state law claims, the Supreme Court had determined previously in Gilmer that federal age discrimination claims (and presumably other federal civil rights claims) were arbitrable under the FAA.

## The Fairness Issue: The Due Process Protocol

*The Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* was developed in 1995 by a special task force composed of individuals representing management, labor, employment, civil rights organizations, private administrative agencies, government, and the American Arbitration Association. The *Due Process Protocol*, which was endorsed by the Association in 1995, seeks to ensure fairness and equity in resolving workplace disputes. The *Due Process Protocol* encourages mediation and arbitration of statutory disputes, provided there are due process safeguards. It conveys the hope that ADR will reduce delays caused by the huge backlog of cases pending before administrative agencies and the courts. The *Due Process Protocol* "recognizes the dilemma inherent in the timing of an agreement to mediate and/or arbitrate statutory disputes" but does not take a position on whether an employer can require a pre-dispute, binding arbitration program as a condition of employment.

The *Due Process Protocol* has been endorsed by organizations representing a broad range of constituencies. They include the American Arbitration Association, the American Bar Association Labor and Employment Section, the American Civil Liberties Union, the Federal Mediation and Conciliation Service, the National Academy of Arbitrators, and the National Society of Professionals in Dispute Resolution. The National Employment Lawyers Association has endorsed the substantive provisions of the *Due Process Protocol*.

It has been incorporated into the *Report of the United States Secretary of Labor's Task Force in Excellence in State and Local Government* and cited with approval in numerous court opinions.

## AAA's Employment ADR Rules

On June 1, 1996, the Association issued *National Rules for the Resolution of Employment Disputes* (now known as the *Employment Arbitration Rules and Mediation Procedures).* The rules reflected the guidelines outlined in the *Due Process Protocol* and were based upon the AAA's *California Employment Dispute Resolution Rules,* which were developed by a committee of employment management and plaintiff attorneys, retired judges and arbitrators, in addition to Association executives. The revised rules were developed for employers and employees who wish to use a private alternative to resolve their disputes. The rules enabled parties to have complaints heard by an impartial person of their

joint selection, with expertise in the employment field. Both employers and individual employees benefit by having experts resolve their disputes without the costs and delay of litigation. The rules included procedures which ensure due process in both the mediation and arbitration of employment disputes. After a year of use, the rules were amended to address technical issues.

## AAA's Policy on Employment ADR

The AAA's policy on employment ADR is guided by the state of existing law, as well as its obligation to act in an impartial manner. In following the law, and in the interest of providing an appropriate forum for the resolution of employment disputes, the Association administers dispute resolution programs which meet the due process standards as outlined in its *Employment Arbitration Rules and Mediation Procedures* and the *Due Process Protocol*. If the Association determines that a dispute resolution program on its face substantially and materially deviates from the minimum due process standards of the *Employment Arbitration Rules and Mediation Procedures* and the *Due Process Protocol*, the Association may decline to administer cases under that program. Other issues will be presented to the arbitrator for determination.

## Notification

If an employer intends to utilize the dispute resolution services of the Association in an employment ADR plan, it shall, at least 30 days prior to the planned effective date of the program: (1) notify the Association of its intention to do so; and (2) provide the Association with a copy of the employment dispute resolution plan. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services. Copies of all plans should be sent to the American Arbitration Association, 725 South Figueroa Street, Suite 2400, Los Angeles, CA 90017; FAX: 213.622.6199.

## Costs of Employment Arbitration

These Rules contain two separate and distinct arbitration costs sections; one for disputes arising out of employer plans and the other for disputes arising out of individually-negotiated employment agreements and contracts. When the arbitration is filed, the AAA makes an initial administrative determination as to whether the dispute arises from an employer plan or an individually-negotiated employment agreement or contract. This determination is made by reviewing the documentation provided to the AAA by the parties, including, but not limited to,

the demand for arbitration, the parties' arbitration program or agreement, and any employment agreements or contracts between the parties.

When making its determination on the applicable costs of arbitration section in a given arbitration, the AAA's review is focused on two primary issues. The first component of the review focuses on whether the arbitration program and/or agreement between the individual employee and the employer is one in which it appears that the employer has drafted a standardized arbitration clause with its employees. The second aspect of the review focuses on the ability of the parties to negotiate the terms and conditions of the parties' agreement.

If a party disagrees with the AAA's initial determination, the parties may bring the issue to the attention of the arbitrator for a final determination.

## Designing an ADR Program

The guiding principle in designing a successful employment ADR system is that it must be fair in fact and perception. The American Arbitration Association has considerable experience in administering and assisting in the design of employment ADR plans, which gives it an informed perspective on how to effectively design ADR systems, as well as the problems to avoid. Its guidance to those designing employment ADR systems is summarized as follows:

» The American Arbitration Association encourages employers to consider the wide range of legally-available options to resolve workplace disputes outside the courtroom.

» A special emphasis is placed by the Association on encouraging the development of in-house dispute resolution procedures, such as open door policies, ombuds, peer review and internal mediation.

» The Association recommends an external mediation component to resolve disputes not settled by the internal dispute resolution process.

» Programs which use arbitration as a final step may employ:

  • pre-dispute, voluntary final and binding arbitration;

  • pre-dispute, mandatory nonbinding arbitration;

  • pre-dispute, mandatory final and binding arbitration; or

  • post-dispute, voluntary final and binding arbitration.

» Although the AAA administers binding arbitration systems that have been required as a condition of initial or continued employment, such programs must be consistent with the Association's *Employment Arbitration Rules and Mediation Procedures*.

Specific guidance on the responsible development and design of employment ADR systems is contained in the Association's publication, *Resolving Employment Disputes: A Practical Guide,* which is available from the AAA's website, **www.adr.org.**

# Alternative Dispute Resolution Options

## Open Door Policy

Employees are encouraged to meet with their immediate manager or supervisor to discuss problems arising out of the workplace environment. In some systems, the employee is free to approach anyone in the chain of command.

## Ombuds

A neutral third party (either from within or outside the company) is designated to confidentially investigate and propose settlement of employment complaints brought by employees.

## Peer Review

A panel of employees (or employees and managers) works together to resolve employment complaints. Peer review panel members are trained in the handling of sensitive issues.

## Internal Mediation

A process for resolving disputes in which a neutral third person from within the company, trained in mediation techniques, helps the disputing parties negotiate a mutually acceptable settlement. Mediation is a nonbinding process in which the parties discuss their disputes with an impartial person who assists them in reaching a settlement. The mediator may suggest ways of resolving the dispute but may not impose a settlement on the parties.

## Fact-Finding

The investigation of a complaint by an impartial third person (or team) who examines the complaint and the facts and issues a nonbinding report. Fact-finding is particularly helpful for allegations of sexual harassment, where a fact-finding team, composed of one male and one female neutral, investigates the allegations and presents its findings to the employer and the employee.

## Arbitration

Arbitration is generally defined as the submission of disputes to one or more impartial persons for final and binding determination. It can be the final step in

a workplace program that includes other dispute resolution methods. There are many possibilities for designing this final step.

They include:

» **Pre-Dispute, Voluntary Final and Binding Arbitration**
The parties agree in advance, on a voluntary basis, to use arbitration to resolve disputes and they are bound by the outcome.

» **Pre-Dispute, Mandatory Nonbinding Arbitration**
The parties must use the arbitration process to resolve disputes, but they are not bound by the outcome.

» **Pre-Dispute, Mandatory Final and Binding Arbitration**
The parties must arbitrate unresolved disputes and they are bound by the outcome.

» **Post-Dispute, Voluntary Final and Binding Arbitration**
The parties have the option of deciding whether to use final and binding arbitration after a dispute arises.

## Types of Disputes Covered

The dispute resolution procedures contained in this booklet were developed for arbitration agreements contained in employee personnel manuals, an employment application of an individual employment agreement, other types of employment agreements, or can be used for a specific dispute. They do not apply to disputes arising out of collective bargaining agreements or independent contractor agreements.

# Employment Arbitration Rules and Mediation Procedures

## 1. Applicable Rules of Arbitration

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter "AAA") or under its *Employment Arbitration Rules and Mediation Procedures* or for arbitration by the AAA of an employment dispute without specifying particular rules*. If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules.

If, within 30 days after the AAA's commencement of administration, a party seeks judicial intervention with respect to a pending arbitration and provides the AAA with documentation that judicial intervention has been sought, the AAA will suspend administration for 60 days to permit the party to obtain a stay of arbitration from the court. These rules, and any amendment of them, shall apply in the form in effect at the time the demand for arbitration or submission is received by the AAA.

*   *The National Rules for the Resolution of Employment Disputes have been re-named the Employment Arbitration Rules and Mediation Procedures. Any arbitration agreements providing for arbitration under its National Rules for the Resolution of Employment Disputes shall be administered pursuant to these Employment Arbitration Rules and Mediation Procedures.*

## 2. Notification

An employer intending to incorporate these rules or to refer to the dispute resolution services of the AAA in an employment ADR plan, shall, at least 30 days prior to the planned effective date of the program:

i.   notify the Association of its intention to do so and,

ii.  provide the Association with a copy of the employment dispute resolution plan.

Compliance with this requirement shall not preclude an arbitrator from entertaining challenges as provided in Section 1. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services.

### 3. AAA as Administrator of the Arbitration

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

### 4. Initiation of Arbitration

Arbitration shall be initiated in the following manner.

**a.** The parties may submit a joint request for arbitration.

**b.** In the absence of a joint request for arbitration:

**(i)** The initiating party (hereinafter "Claimant[s]") shall:

**(1)** File a written notice (hereinafter "Demand") of its intention to arbitrate at any office of the AAA, within the time limit established by the applicable statute of limitations. Any dispute over the timeliness of the demand shall be referred to the arbitrator. The filing shall be made in duplicate, and each copy shall include the applicable arbitration agreement. The Demand shall set forth the names, addresses, and telephone numbers of the parties; a brief statement of the nature of the dispute; the amount in controversy, if any; the remedy sought; and requested hearing location.

**(2)** Simultaneously provide a copy of the Demand to the other party (hereinafter "Respondent[s]").

**(3)** Include with its Demand the applicable filing fee, unless the parties agree to some other method of fee advancement.

**(ii)** The Respondent(s) may file an Answer with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the Demand. The Answer shall provide the Respondent's brief response to the claim and the issues presented. The Respondent(s) shall make its filing in duplicate with the AAA, and simultaneously shall send a copy of the Answer to the Claimant. If no answering statement is filed within the stated time, Respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

**(iii)** The Respondent(s):

**(1)** May file a counterclaim with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the Demand. The filing shall be made in duplicate. The counterclaim shall set forth the nature of the claim, the amount in controversy, if any, and the remedy sought.

    **(2)** Simultaneously shall send a copy of any counterclaim to the Claimant.

    **(3)** Shall include with its filing the applicable filing fee provided for by these rules.

**(iv)** The Claimant may file an Answer to the counterclaim with the AAA within 15 days after the date of the letter from the AAA acknowledging receipt of the counterclaim. The Answer shall provide Claimant's brief response to the counterclaim and the issues presented. The Claimant shall make its filing in duplicate with the AAA, and simultaneously shall send a copy of the Answer to the Respondent(s). If no answering statement is filed within the stated time, Claimant will be deemed to deny the counterclaim. Failure to file an answering statement shall not operate to delay the arbitration.

**c.** The form of any filing in these rules shall not be subject to technical pleading requirements.

## 5. Changes of Claim

Before the appointment of the arbitrator, if either party desires to offer a new or different claim or counterclaim, such party must do so in writing by filing a written statement with the AAA and simultaneously provide a copy to the other party(s), who shall have 15 days from the date of such transmittal within which to file an answer with the AAA. After the appointment of the arbitrator, a party may offer a new or different claim or counterclaim only at the discretion of the arbitrator.

## 6. Jurisdiction

**a.** The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

**b.** The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

**c.** A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## 7. Administrative and Mediation Conferences

Before the appointment of the arbitrator, any party may request, or the AAA, in its discretion, may schedule an administrative conference with a representative

of the AAA and the parties and/or their representatives. The purpose of the administrative conference is to organize and expedite the arbitration, explore its administrative aspects, establish the most efficient means of selecting an arbitrator, and to consider mediation as a dispute resolution option. There is no administrative fee for this service.

At any time after the filing of the Demand, with the consent of the parties, the AAA will arrange a mediation conference under its Mediation Procedures to facilitate settlement. The mediator shall not be any arbitrator appointed to the case, except by mutual written agreement of the parties. There is no additional filing fee for initiating a mediation under the AAA Mediation Procedures for parties to a pending arbitration.

## 8. Arbitration Management Conference

As promptly as practicable after the selection of the arbitrator(s), but not later than 60 days thereafter, an arbitration management conference shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the Arbitration Management Conference will be conducted by telephone conference call rather than in person. At the Arbitration Management Conference the matters to be considered shall include, without limitation:

    **i.**   the issues to be arbitrated;

    **ii.**   the date, time, place, and estimated duration of the hearing;

    **iii.**  the resolution of outstanding discovery issues and establishment of discovery parameters;

    **iv.**  the law, standards, rules of evidence and burdens of proof that are to apply to the proceeding;

    **v.**   the exchange of stipulations and declarations regarding facts, exhibits, witnesses, and other issues;

    **vi.**  the names of witnesses (including expert witnesses), the scope of witness testimony, and witness exclusion;

    **vii.** the value of bifurcating the arbitration into a liability phase and damages phase;

    **viii.**the need for a stenographic record;

    **ix.**  whether the parties will summarize their arguments orally or in writing;

    **x.**   the form of the award;

    **xi.**  any other issues relating to the subject or conduct of the arbitration;

**xii.** the allocation of attorney's fees and costs;

**xiii.** the specification of undisclosed claims;

**xiv.** the extent to which documentary evidence may be submitted at the hearing;

**xv.** the extent to which testimony may be admitted at the hearing telephonically, over the internet, by written or video-taped deposition, by affidavit, or by any other means;

**xvi.** any disputes over the AAA's determination regarding whether the dispute arose from an individually-negotiated employment agreement or contract, or from an employer plan (see Costs of Arbitration section).

The arbitrator shall issue oral or written orders reflecting his or her decisions on the above matters and may conduct additional conferences when the need arises.

There is no AAA administrative fee for an Arbitration Management Conference.

## 9. Discovery

The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration.

The AAA does not require notice of discovery related matters and communications unless a dispute arises. At that time, the parties should notify the AAA of the dispute so that it may be presented to the arbitrator for determination.

## 10. Fixing of Locale (the city, county, state, territory, and/or country of the Arbitration)

If the parties disagree as to the locale, the AAA may initially determine the place of arbitration, subject to the power of the arbitrator(s), after their appointment to make a final determination on the locale. All such determinations shall be made having regard for the contentions of the parties and the circumstances of the arbitration.

## 11. Date, Time and Place (the physical site of the hearing within the designated locale) of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in

scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

## 12. Number, Qualifications and Appointment of Neutral Arbitrators

**a.** If the arbitration agreement does not specify the number of arbitrators or the parties do not agree otherwise, the dispute shall be heard and determined by one arbitrator.

**b.** Qualifications

  **i.** Neutral arbitrators serving under these rules shall be experienced in the field of employment law.

  **ii.** Neutral arbitrators serving under these rules shall have no personal or financial interest in the results of the proceeding in which they are appointed and shall have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias.

  **iii.** The roster of available arbitrators will be established on a non-discriminatory basis, diverse by gender, ethnicity, background, and qualifications.

  **iv.** The AAA may, upon request of a party within the time set to return their list or upon its own initiative, supplement the list of proposed arbitrators in disputes arising out of individually-negotiated employment contracts with persons from the Commercial Roster, to allow the AAA to respond to the particular need of the dispute. In multi-arbitrator disputes, at least one of the arbitrators shall be experienced in the field of employment law.

**c.** If the parties have not appointed an arbitrator and have not provided any method of appointment, the arbitrator shall be appointed in the following manner:

  **i.** Shortly after it receives the Demand, the AAA shall send simultaneously to each party a letter containing an identical list of names of persons chosen from the Employment Dispute Resolution Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

  **ii.** If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable.

  **iii.** From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the power to make the appointment from among other members of the panel without the submission of additional lists.

## 13. Party Appointed Arbitrators

**a.** If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed.

**b.** Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-16 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-16(a) that the party-appointed arbitrators are to be non-neutral and need not meet those standards. The notice of appointment, with the name, address, and contact information of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

**c.** If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

**d.** If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

## 14. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

**a.** If, pursuant to Section R-13, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

**b.** If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

**c.** If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-12, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

## 15. Disclosure

**a.** Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the

parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

**b.** Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

**c.** In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-15 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

## 16. Disqualification of Arbitrator

**a.** Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for:

   **i.** partiality or lack of independence,

   **ii.** inability or refusal to perform his or her duties with diligence and in good faith, and

   **iii.** any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-13 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

**b.** Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

## 17. Communication with Arbitrator

**a.** No party and no one acting on behalf of any party shall communicate *ex parte* with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate *ex parte* with a candidate for direct appointment pursuant to Section R-13 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

**b.** Section R-17(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-16(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-16(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-17(a) should nonetheless apply prospectively.

## 18. Vacancies

**a.** If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with applicable provisions of these Rules.

**b.** In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

**c.** In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

## 19. Representation

Any party may be represented by counsel or other authorized representatives. For parties without representation, the AAA will, upon request, provide reference to institutions which might offer assistance. A party who intends to be represented shall notify the other party and the AAA of the name and address of the representative at least 10 days prior to the date set for the hearing or conference at which that person is first to appear. If a representative files a Demand or an Answer, the obligation to give notice of representative status is deemed satisfied.

## 20. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcripts agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

## 21. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

## 22. Attendance at Hearings

The arbitrator shall have the authority to exclude witnesses, other than a party, from the hearing during the testimony of any other witness. The arbitrator also shall have the authority to decide whether any person who is not a witness may attend the hearing.

## 23. Confidentiality

The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard that confidentiality, unless the parties agree otherwise or the law provides to the contrary.

## 24. Postponements

The arbitrator: (1) may postpone any hearing upon the request of a party for good cause shown; (2) must postpone any hearing upon the mutual agreement of the parties; and (3) may postpone any hearing on his or her own initiative.

## 25. Oaths

Before proceeding with the first hearing, each arbitrator shall take an oath of office. The oath shall be provided to the parties prior to the first hearing. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

## 26. Majority Decision

All decisions and awards of the arbitrators must be by a majority, unless the unanimous decision of all arbitrators is expressly required by the arbitration agreement or by law.

## 27. Dispositive Motions

The arbitrator may allow the filing of a dispositive motion if the arbitrator determines that the moving party has shown substantial cause that the motion is likely to succeed and dispose of or narrow the issues in the case.

## 28. Order of Proceedings

A hearing may be opened by: (1) recording the date, time, and place of the hearing; (2) recording the presence of the arbitrator, the parties, and their representatives, if any; and (3) receiving into the record the Demand and the Answer, if any. The arbitrator may, at the beginning of the hearing, ask for statements clarifying the issues involved.

The parties shall bear the same burdens of proof and burdens of producing evidence as would apply if their claims and counterclaims had been brought in court.

Witnesses for each party shall submit to direct and cross examination.

With the exception of the rules regarding the allocation of the burdens of proof and going forward with the evidence, the arbitrator has the authority to set the rules for the conduct of the proceedings and shall exercise that authority to afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute. When deemed appropriate, the arbitrator may also allow for the presentation of evidence by alternative means including web conferencing, internet communication, telephonic conferences and means other than an in-person presentation of evidence. Such alternative means must still afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute and when involving witnesses, provide that such witness submit to direct and cross-examination.

The arbitrator, in exercising his or her discretion, shall conduct the proceedings with a view toward expediting the resolution of the dispute, may direct the order of proof, bifurcate proceedings, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

Documentary and other forms of physical evidence, when offered by either party, may be received in evidence by the arbitrator.

The names and addresses of all witnesses and a description of the exhibits in the order received shall be made a part of the record.

## 29. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be based solely on the default of a party. The arbitrator shall require the party who is in attendance to present such evidence as the arbitrator may require for the making of the award.

## 30. Evidence

The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator deems necessary to an understanding and determination of the dispute. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any party or arbitrator is absent, in default, or has waived the right to be present, however "presence" should not be construed to mandate that the parties and arbitrators must be physically present in the same location.

An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

The arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary. The arbitrator may in his or her discretion direct the order of proof, bifurcate proceedings, exclude cumulative or irrelevant testimony or other evidence, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any party is absent, in default, or has waived the right to be present.

If the parties agree or the arbitrator directs that documents or other evidence may be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator, unless the parties agree to a different method of distribution. All parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any.

## 31. Inspection

Upon the request of a party, the arbitrator may make an inspection in connection with the arbitration. The arbitrator shall set the date and time, and the AAA shall

notify the parties. In the event that one or all parties are not present during the inspection, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

## 32. Interim Measures

At the request of any party, the arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court, as stated in Rule 39(d), Award.

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

## 33. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Rule 30 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the date of closing the hearing. The time limit within which the arbitrator is required to make the award shall commence to run, in the absence of other agreements by the parties, upon closing of the hearing.

## 34. Reopening of Hearing

The hearing may be reopened by the arbitrator upon the arbitrator's initiative, or upon application of a party for good cause shown, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

## 35. Waiver of Oral Hearing

The parties may provide, by written agreement, for the waiver of oral hearings. If the parties are unable to agree as to the procedure, upon the appointment of the arbitrator, the arbitrator shall specify a fair and equitable procedure.

## 36. Waiver of Objection/Lack of Compliance with These Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with, and who fails to state objections thereto in writing or in a transcribed record, shall be deemed to have waived the right to object.

## 37. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.

## 38. Serving of Notice

**a.** Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

**b.** The AAA, the arbitrator, and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (e-mail), or other methods of communication.

**c.** Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

## 39. The Award

**a.** The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator. Three additional

days are provided if briefs are to be filed or other documents are to be transmitted pursuant to Rule 30.

**b.** An award issued under these rules shall be publicly available, on a cost basis. The names of the parties and witnesses will not be publicly available, unless a party expressly agrees to have its name made public in the award.

**c.** The award shall be in writing and shall be signed by a majority of the arbitrators and shall provide the written reasons for the award unless the parties agree otherwise. It shall be executed in the manner required by law.

**d.** The arbitrator may grant any remedy or relief that would have been available to the parties had the matter been heard in court including awards of attorney's fees and costs, in accordance with applicable law. The arbitrator shall, in the award, assess arbitration fees, expenses, and compensation as provided in Rules 43, 44, and 45 in favor of any party and, in the event any administrative fees or expenses are due the AAA, in favor of the AAA, subject to the provisions contained in the Costs of Arbitration section.

**e.** If the parties settle their dispute during the course of the arbitration and mutually request, the arbitrator may set forth the terms of the settlement in a consent award.

**f.** The parties shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail, addressed to a party or its representative at the last known address, personal service of the award, or the filing of the award in any manner that may be required by law.

**g.** The arbitrator's award shall be final and binding.

## 40. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator to correct any clerical, typographical, technical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto. If applicable law requires a different procedural time frame, that procedure shall be followed.

## 41. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at that party's expense, certified copies of any papers in the AAA's case file that may be required in judicial proceedings relating to the arbitration.

## 42. Applications to Court

**a.** No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

**b.** Neither the AAA nor any arbitrator in a proceeding under these rules is or shall be considered a necessary or proper party in judicial proceedings relating to the arbitration.

**c.** Parties to these procedures shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction.

**d.** Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

## 43. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees to compensate it for the cost of providing administrative services. The AAA administrative fee schedule in effect at the time the demand for arbitration or submission agreement is received shall be applicable.

AAA fees shall be paid in accordance with the Costs of Arbitration section. The AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees. (To ensure that you have the most current information, see our website at **www.adr.org).**

## 44. Neutral Arbitrator's Compensation

Arbitrators shall charge a rate consistent with the arbitrator's stated rate of compensation. If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator. Payment of the arbitrator's fees and expenses shall be made by the AAA from the fees and moneys collected by the AAA for this purpose.

Arbitrator compensation shall be borne in accordance with the Costs of Arbitration section.

## 45. Expenses

Unless otherwise agreed by the parties or as provided under applicable law, the expenses of witnesses for either side shall be borne by the party producing such witnesses.

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator shall be borne in accordance with the Costs of Arbitration section.

## 46. Deposits

The AAA may require deposits in advance of any hearings such sums of money as it deems necessary to cover the expenses of the arbitration, including the arbitrator's fee, if any, and shall render an accounting and return any unexpended balance at the conclusion of the case.

## 47. Suspension for Non-Payment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend or terminate the proceedings.

## 48. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be resolved by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other procedures shall be interpreted and applied by the AAA.

## Costs of Arbitration (including AAA Administrative Fees)

This Costs of Arbitration section contains two separate and distinct sub-sections. Initially, the AAA shall make an administrative determination as to whether the dispute arises from an employer plan or an individually-negotiated employment agreement or contract.

If a party disagrees with the AAA's determination, the parties may bring the issue to the attention of the arbitrator for a final determination. The arbitrator's determination will be made on documents only, unless the arbitrator deems a hearing is necessary.

## For Disputes Arising Out of Employer Plans*:

Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment. The employer shall pay the arbitrator's compensation unless the employee, post dispute, voluntarily elects to pay a portion of the arbitrator's compensation. Arbitrator compensation, expenses as defined in section (iv) below, and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

*  Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your house hold. Please contact Case Filing Services at 877-495-4185 if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003.)

A party making a demand for treatment of a claim, counterclaim, or additional claim as a collective action arbitration will be subject to the administrative fees as outlined in the standard and flexible fee schedules below. Arbitrator compensation is not included as a part of the administrative fees charged by the AAA. Arbitrator compensation in cases involving a collective action claim will be charged in accordance with the determination as to whether the dispute arises from an employer plan or an individually negotiated employment agreement or contract.

## (i) Filing Fees

### Cases Filed by Employee Against Employer

In cases before a single arbitrator, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1,500 is payable in full by the employer, unless the plan provides that the employer pay more.

In cases before three or more arbitrators, a non-refundable filing fee capped in the amount of $200 is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A non-refundable fee in the amount of $1,950 is payable in full by the employer, unless the plan provides that the employer pay more.

The employer's share is due as soon as the employee meets his or her filing requirements, even if the matter settles.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually negotiated employment agreements.

The above fee schedule will also apply where the employer files on behalf of the employee pursuant to the terms of the employer plan.

**Cases Filed by Employer Against Employee**

In cases before a single arbitrator, a non-refundable fee in the amount of $1,700 is payable in full by the employer.

In cases before three or more arbitrators, a non-refundable fee in the amount of $2,150 is payable in full by the employer.

There shall be no filing fee charged for a counterclaim. If a determination is made that the dispute arises out of an individually-negotiated employment agreement, the filing fee for a counterclaim will be charged in accordance with the fee schedules below for disputes arising out of individually-negotiated employment agreements.

(ii) Hearing Fees

For each day of hearing held before a single arbitrator, an administrative fee of $350 is payable by the employer.

For each day of hearing held before a multi-arbitrator panel, an administrative fee of $500 is payable by the employer.

There is no AAA hearing fee for the initial Arbitration Management Conference.

(iii) Postponement/Cancellation Fees

A fee of $150 is payable by a party causing a postponement of any hearing scheduled before a single arbitrator.

A fee of $250 is payable by a party causing a postponement of any hearing scheduled before a multi-arbitrator panel.

## (iv) Hearing Room Rental

The hearing fees described above do not cover the rental of hearing rooms. The AAA maintains hearing rooms in most offices for the convenience of the parties. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the employer.

## (v) Abeyance Fee

Parties on cases held in abeyance for one year will be assessed an annual abeyance fee of $300. A case may only be held in abeyance after the initial filing fees have been paid. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be administratively closed.

## (vi) Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne by the employer.

## For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:

The AAA's Fee Schedule, as modified below, will apply to disputes arising out of individually-negotiated employment agreements and contracts, even if such agreements and contracts reference or incorporate an employer plan. Arbitrator compensation is not included as part of the administrative fees charged by the AAA. Arbitrator compensation is based on the most recent biography sent to the parties prior to appointment.

## Administrative Fee Schedules

For all cases determined to be international by the AAA–ICDR, the International Fee Schedule shall apply. An international case is generally defined as having either the place of arbitration or performance of the agreement outside the United States, or having an arbitration agreement between parties from different countries. To view the International Fee Schedule, visit **info.adr.org/internationalfeeschedule.**

The AAA offers parties two options for the payment of administrative fees.

For both schedules, administrative fees are based on the amount of the claim or counterclaim and are to be paid by the party bringing the claim or counterclaim at the time the demand or claim is filed with the AAA. Arbitrator compensation is not included in either schedule. Unless the parties' agreement provides otherwise, arbitrator compensation and administrative fees are subject to allocation by an arbitrator in an award.

**Standard Fee Schedule:** A two-payment schedule that provides for somewhat higher initial filing fees, but lower overall administrative fees for cases that proceed to a hearing.

**Flexible Fee Schedule:** A three-payment schedule that provides for lower initial filing fee, and then spreads subsequent payments out over the course of the arbitration. Total administrative fees will be somewhat higher for cases that proceed to a hearing.

The Standard Fee Schedule begins on the next page.

## Standard Fee Schedule

| Amount of Claim | Initial Filing Fee | Final Fee |
|---|---|---|
| Up to $75,000 | $750 | $800 |
| > $75,000 to $150,000 | $1,750 | $1,250 |
| > $150,000 to $300,000 | $2,650 | $2,000 |
| > $300,000 to $500,000 | $4,000 | $3,500 |
| > $500,000 to $1,000,000 | $5,000 | $6,200 |
| > $1,000,000 to $10,000,000 | $7,000 | $7,700 |
| > $10,000,000 | $10,000 plus .01% of the claim amount above $10,000,000 up to $65,000 | $12,500 |
| Undetermined Monetary Claims | $7,000 | $7,700 |
| Nonmonetary Claims | $3,250 | $2,500 |
| Collective Action Claims | $3,250 | $2,500 |
| Deficient Claim Filing Fee | $500 | |
| Additional Party Fees | If there are more than two separately represented parties in the arbitration, an additional 10% of each fee contained in these fee schedules will be charged for each additional separately represented party.  However, Additional Party Fees will not exceed 50% of the base fees contained in these fee schedules unless there are more than 10 separately represented parties. *See below for additional details.* | |

- The **Initial Filing Fee** is payable in full by a filing party when a claim, counterclaim, or additional claim is filed.

- The **Final Fee** will be incurred for all cases that proceed to their first hearing and is payable in advance at the time the first hearing is scheduled.

- **Fee Modifications:** Fees are subject to increase if the claim or counterclaim is increased after the initial filing date. Fees are subject to decrease if the claim or counterclaim decreases prior to the first hearing.

- **Cases with Three or More Arbitrators** are subject to a minimum Initial Filing Fee of $4,000 and a Final Fee of $3,500.

**Refunds—Standard Fee Schedule:**

**Initial Filing Fees:** Subject to a $500 minimum non-refundable Initial Filing Fee for all cases, refunds of Initial Filing Fees for settled or withdrawn cases will be calculated from the date the AAA receives the demand for arbitration as follows:

- within 5 calendar days of filing—100%
- between 6 and 30 calendar days of filing—50%
- between 31 and 60 calendar days of filing—25%

However, *no refunds will be made once:*

- any arbitrator has been appointed (including one arbitrator on a three-arbitrator panel).
- an award has been rendered.

**Final Fees:** If a case is settled or withdrawn prior to the first hearing taking place, all Final Fees paid will be refunded. However, if the AAA is not notified of a cancellation at least 24 hours before a scheduled hearing date, the Final fee will remain due and will not be refunded.

The Flexible Fee Schedule begins on the next page.

## Flexible Fee Schedule

| Amount of Claim | Initial Filing Fee | Proceed Fee | Final Fee |
|---|---|---|---|
| Up to $75,000 | Only available for claims above $150,000 | | |
| >$75,000 to $150,000 | | | |
| >$150,000 to $300,000 | $1,650 | $1,700 | $2,000 |
| >$300,000 to $500,000 | $2,000 | $3,000 | $3,500 |
| >$500,000 to $1,000,000 | $2,500 | $4,300 | $6,200 |
| >$1,000,000 to $10,000,000 | $3,500 | $5,700 | $7,700 |
| >$10,000,000 | $5,000 | $9,000 plus .01% of the claim amount above $10,000,000 up to $65,000 | $12,500 |
| Undetermined Monetary Claims | $3,500 | $5,700 | $7,700 |
| Nonmonetary Claims | $2,000 | $2,250 | $2,500 |
| Collective Action Claims | $2,000 | $2,250 | $2,500 |
| Deficient Filing Fee | $500 | | |
| Additional Party Fees | If there are more than two separately represented parties in the arbitration, an additional 10% of each fee contained in these fee schedules will be charged for each additional separately represented party. However, Additional Party Fees will not exceed 50% of the base fees contained in these fee schedules unless there are more than 10 separately represented parties. *See below for additional details.* | | |

- The **Initial Filing Fee** is payable in full by a filing party when a claim, counterclaim, or additional claim is filed.

- The **Proceed Fee** must be paid within 90 days of the filing of the demand for arbitration or a counterclaim before the AAA will proceed with the further administration of the arbitration, including the arbitrator appointment process.

  - If a Proceed Fee is not submitted within 90 days of the filing of the Claimant's Demand for Arbitration, the AAA will administratively close the file and notify all parties.

  - If the Flexible Fee Schedule is being used for the filing of a counterclaim, the counterclaim will not be presented to the arbitrator until the Proceed Fee is paid.

- The **Final Fee** will be incurred for all cases that proceed to their first hearing and is payable in advance at the time the first hearing is scheduled.

- **Fee Modifications:** Fees are subject to increase if the claim or counterclaim is increased after the initial filing date. Fees are subject to decrease if the claim or counterclaim decreases prior to the first hearing.

- **Cases with Three or More Arbitrators** are subject to a minimum Initial Filing Fee of $2,000, a $3,000 Proceed Fee and a Final Fee of $3,500.

**Refunds—Flexible Fee Schedule:**

Under the Flexible Fee Schedule, Filing Fees and Proceed Fees are **_non-refundable_** once incurred.

**Final Fees:** If a case is settled or withdrawn prior to the first hearing taking place, all Final Fees paid will be refunded. However, if the AAA is not notified of a cancellation at least 24 hours before a scheduled hearing date, the Final fee will remain due and will not be refunded.

## Additional Fees Applicable to the Standard Fee and Flexible Fee Schedules

**Additional Party Fees:** Additional Party Fees will be charged as described above, and in addition:

- Additional Party Fees are payable by the party, whether a claimant or respondent, that names the additional parties to the arbitration.

- Such fees shall not exceed 50% of the base fees in the fee schedule, except that the AAA reserves the right to assess additional fees where there are more than 10 separately represented parties.

- An example of the Additional Party Fee is as follows: A single claimant represented by one attorney brings an arbitration against three separate respondents, however both respondents are represented by the same attorney. No Additional Party Fees are due. However, if the respondents are represented by different attorneys, or if one of the respondents is self-represented and the other is represented by an attorney, an additional 10% of the Initial Filing fee is charged to the claimant. If the case moves to the Proceed Fee stage or the Final Fee stage, an additional 10% of those fees will also be charged to the claimant.

**Incomplete or Deficient Filings:** Where the applicable arbitration agreement does not reference the AAA, the AAA will attempt to obtain the agreement of the all parties to have the arbitration administered by the AAA.

- Where the AAA is unable to obtain the parties' agreement to have the AAA administer the arbitration, the AAA will not proceed further and will administratively close the case. The AAA will also return the filing fees to the filing party, less the amount specified in the fee schedule above for deficient filings.

- Parties that file Demands for Arbitration that are incomplete or otherwise do not meet the filing requirements contained in the rules shall also be charged the amount specified above for deficient filings if they fail or are unable to respond to the AAA's request to correct the deficiency.

**Arbitrations in Abeyance:** Cases held in abeyance by mutual agreement for one year will be assessed an annual abeyance fee of $500, to be split equally among the parties. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the arbitration will be administratively closed. All filing requirements, including the payment of filing fees, must be met before a matter will be placed in abeyance.

**Fees for Additional Services:** The AAA reserves the right to assess additional administrative fees for services performed by the AAA that go beyond those provided for in the AAA's rules, but which are required as a result of the parties' agreement or stipulation.

**Hearing Room Rentals:** The fees described above do not cover the cost of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

## Expenses

All expenses of the arbitrator, including required travel and other expenses, and any AAA expenses, as well as the costs relating to proof and witnesses produced at the direction of the arbitrator, shall be borne equally by the parties.

## For Disputes Proceeding Under the Supplementary Rules for Class Action Arbitration ("Supplementary Rules"):

The AAA's Administered Fee Schedule, as listed in Section 11 of the Supplementary Rules for Class Action Arbitration, shall apply to disputes proceeding under the Supplementary Rules.

## Optional Rules for Emergency Measures of Protection

### O-1. Applicability

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

### O-2. Appointment of Emergency Arbitrator

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

### O-3. Schedule

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

### O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

## O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

## O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

## O-7. Special Master

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

## O-8. Costs

The costs associated with applications for emergency relief shall be apportioned in the same manner as set forth in the Costs of Arbitration section.

# Employment Mediation Procedures

## M-1. Agreement of Parties

Whenever, by stipulation or in their contract, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (AAA) or under these procedures, the parties and their representatives, unless agreed otherwise in writing, shall be deemed to have made these procedures, as amended and in effect as of the date of filing of a request for mediation, a part of their agreement and designate the AAA as the administrator of their mediation.

The parties by mutual agreement may vary any part of these procedures including, but not limited to, agreeing to conduct the mediation via telephone or other electronic or technical means.

## M-2. Initiation of Mediation

Any party or parties to a dispute may initiate mediation under the AAA's auspices by making a Request for Mediation to any of the AAA's regional offices or case management centers via telephone, email, regular mail or fax. Requests for Mediation may also be filed online via AAA WebFile® at **www.adr.org.**

The party initiating the mediation shall simultaneously notify the other party or parties of the request. The initiating party shall provide the following information to the AAA and the other party or parties as applicable:

i. A copy of the mediation provision of the parties' contract or the parties' stipulation to mediate.

ii. The names, regular mail addresses, email addresses (if available), and telephone numbers of all parties to the dispute and representatives, if any, in the mediation.

iii. A brief statement of the nature of the dispute and the relief requested.

iv. Any specific qualifications the mediator should possess.

Where there is no preexisting stipulation or contract by which the parties have provided for mediation of existing or future disputes under the auspices of the AAA, a party may request the AAA to invite another party to participate in "mediation by voluntary submission". Upon receipt of such a request, the AAA will contact the other party or parties involved in the dispute and attempt to obtain a submission to mediation.

## M-3. Fixing of Locale (the city, county, state, territory and, if applicable, country of the mediation)

**i.** When the parties' agreement to mediate is silent with respect to locale and the parties are unable to agree upon a locale, the AAA shall have the authority to consider the parties' arguments and determine the locale.

**ii.** When the parties' agreement to mediate requires a specific locale, absent the parties' agreement to change it, the locale shall be that specified in the agreement to mediate.

**iii.** If the reference to a locale in the agreement to mediate is ambiguous, the AAA shall have the authority to consider the parties' arguments and determine the locale.

## M-4. Representation

Any party may participate without representation (*pro se)*, or by any representative of that party's choosing, or by counsel, unless such choice is prohibited by applicable law. A party intending to have representation shall notify the other party and the AAA of the name, telephone number and address, and email address if available of the representative.

## M-5. Appointment of the Mediator

Parties may search the online profiles of the AAA's Panel of Mediators at **www.mediation.org** in an effort to agree on a mediator. If the parties have not agreed to the appointment of a mediator and have not provided any other method of appointment, the mediator shall be appointed in the following manner:

**i.** Upon receipt of a request for mediation, the AAA will send to each party a list of mediators from the AAA's Panel of Mediators. The parties are encouraged to agree to a mediator from the submitted list and to advise the AAA of their agreement.

**ii.** If the parties are unable to agree upon a mediator, each party shall strike unacceptable names from the list, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all mediators on the list shall be deemed acceptable to that party. From among the mediators who have been mutually approved by the parties, and in accordance with the designated order of mutual preference, the AAA shall invite a mediator to serve.

**iii.** If the parties fail to agree on any of the mediators listed, or if acceptable mediators are unable to serve, or if for any other reason the appointment cannot be made from the submitted list, the AAA shall have the authority to make the appointment from among other members of the Panel of Mediators without the submission of additional lists.

## M-6. Mediator's Impartiality and Duty to Disclose

AAA mediators are required to abide by the *Model Standards of Conduct for Mediators* in effect at the time a mediator is appointed to a case. Where there is a conflict between the *Model Standards* and any provision of these Mediation Procedures, these Mediation Procedures shall govern. The Standards require mediators to (i) decline a mediation if the mediator cannot conduct it in an impartial manner, and (ii) disclose, as soon as practicable, all actual and potential conflicts of interest that are reasonably known to the mediator and could reasonably be seen as raising a question about the mediator's impartiality.

Prior to accepting an appointment, AAA mediators are required to make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest for the mediator. AAA mediators are required to disclose any circumstance likely to create a presumption of bias or prevent a resolution of the parties' dispute within the time-frame desired by the parties. Upon receipt of such disclosures, the AAA shall immediately communicate the disclosures to the parties for their comments.

The parties may, upon receiving disclosure of actual or potential conflicts of interest of the mediator, waive such conflicts and proceed with the mediation. In the event that a party disagrees as to whether the mediator shall serve, or in the event that the mediator's conflict of interest might reasonably be viewed as undermining the integrity of the mediation, the mediator shall be replaced.

## M-7. Vacancies

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise, in accordance with section M-5.

## M-8. Duties and Responsibilities of the Mediator

i.   The mediator shall conduct the mediation based on the principle of party self-determination. Self-determination is the act of coming to a voluntary, uncoerced decision in which each party makes free and informed choices as to process and outcome.

ii.  The mediator is authorized to conduct separate or ex parte meetings and other communications with the parties and/or their representatives, before, during, and after any scheduled mediation conference. Such communications

      may be conducted via telephone, in writing, via email, online, in person or otherwise.

**iii.** The parties are encouraged to exchange all documents pertinent to the relief requested. The mediator may request the exchange of memoranda on issues, including the underlying interests and the history of the parties' negotiations. Information that a party wishes to keep confidential may be sent to the mediator, as necessary, in a separate communication with the mediator.

**iv.** The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. Subject to the discretion of the mediator, the mediator may make oral or written recommendations for settlement to a party privately or, if the parties agree, to all parties jointly.

**v.** In the event a complete settlement of all or some issues in dispute is not achieved within the scheduled mediation session(s), the mediator may continue to communicate with the parties, for a period of time, in an ongoing effort to facilitate a complete settlement.

**vi.** The mediator is not a legal representative of any party and has no fiduciary duty to any party.

**vii.** The mediator shall set the date, time, and place for each session of the mediation conference. The parties shall respond to requests for conference dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established conference schedule. The AAA shall provide notice of the conference to the parties in advance of the conference date, when timing permits.

## M-9. Responsibilities of the Parties

The parties shall ensure that appropriate representatives of each party, having authority to consummate a settlement, attend the mediation conference. Prior to and during the scheduled mediation conference session(s) the parties and their representatives shall, as appropriate to each party's circumstances, exercise their best efforts to prepare for and engage in a meaningful and productive mediation.

## M-10. Privacy

Mediation sessions and related mediation communications are private proceedings. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

## M-11. Confidentiality

Subject to applicable law or the parties' agreement, confidential information disclosed to a mediator by the parties or by other participants (witnesses) in the course of the mediation shall not be divulged by the mediator. The mediator shall maintain the confidentiality of all information obtained in the mediation, and all records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding the following, unless agreed to by the parties or required by applicable law:

   i.  Views expressed or suggestions made by a party or other participant with respect to a possible settlement of the dispute;

   ii. Admissions made by a party or other participant in the course of the mediation proceedings;

  iii. Proposals made or views expressed by the mediator; or

   iv. The fact that a party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

## M-12. No Stenographic Record

There shall be no stenographic record of the mediation process.

## M-13. Termination of Mediation

The mediation shall be terminated:

   i.  By the execution of a settlement agreement by the parties; or

   ii. By a written or verbal declaration of the mediator to the effect that further efforts at mediation would not contribute to a resolution of the parties' dispute; or

  iii. By a written or verbal declaration of all parties to the effect that the mediation proceedings are terminated; or

   iv. When there has been no communication between the mediator and any party or party's representative for 21 days following the conclusion of the mediation conference.

## M-14. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any error, act or omission in connection with any mediation conducted under these procedures. Parties to a mediation under these procedures may not call the mediator, the AAA or AAA employees as a witness in litigation or any other proceeding relating to the mediation. The mediator, the AAA and AAA employees are not competent to testify as witnesses in any such proceeding.

## M-15. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

## M-16. Deposits

Unless otherwise directed by the mediator, the AAA will require the parties to deposit in advance of the mediation conference such sums of money as it, in consultation with the mediator, deems necessary to cover the costs and expenses of the mediation and shall render an accounting to the parties and return any unexpended balance at the conclusion of the mediation.

## M-17. Expenses

All expenses of the mediation, including required traveling and other expenses or charges of the mediator, shall be borne equally by the parties unless they agree otherwise. The expenses of participants for either side shall be paid by the party requesting the attendance of such participants.

## M-18. Cost of the Mediation

A $250 non-refundable deposit, which will be applied toward the cost of mediation, is required to initiate the AAA's administration of the mediation and appointment of the mediator.

The cost of mediation is based on the hourly or daily mediation rate published on the mediator's AAA profile. In addition, the parties will be assessed an administrative fee for the AAA's services of $75 for each hour charged by the mediator. There is a four-hour or one-half day minimum charge for a mediation

conference. Expenses referenced in Section M-17 of the Mediation Procedures may also apply.

If a matter submitted for mediation is withdrawn or cancelled or results in a settlement after the request to initiate mediation is filed but prior to the mediation conference, the cost is $250 (to which the deposit will be applied), plus any mediator time and charges incurred. These costs shall be borne by the initiating party unless the parties agree otherwise.

If you have questions about mediation costs or services visit **www.adr.org** or contact your local AAA office.

© 2016 American Arbitration Association, Inc. All rights reserved. These Rules are the copyrighted property of the American Arbitration Association (AAA) and are intended to be used in conjunction with the AAA's administrative services. Any unauthorized use or modification of these Rules may violate copyright laws and other applicable laws. Please contact 800.778.7879 or websitemail@adr.org for additional information.

## Regional Vice Presidents and Assistant Vice Presidents

**States: Delaware, District of Columbia, Maryland, New Jersey, Pennsylvania, West Virginia**
Kenneth Egger
Vice President
Phone: 215.731.2281
Email: EggerK@adr.org

**States: Alaska, Arizona, California, Colorado, Hawaii, Idaho, Montana, Nevada, Oregon, Utah, Washington, Wyoming**
John English
Vice President
Phone: 619.239.3051
Email: EnglishJ@adr.org

**States: Illinois, Indiana, Iowa, Kansas, Kentucky, Michigan, Minnesota, Missouri, Nebraska, North Dakota, Ohio, South Dakota, Tennessee, Wisconsin**
Jan Holdinski
Vice President
Phone: 248.352.5509
Email: HoldinskiJ@adr.org

**States: Connecticut, Maine, Massachusetts, New Hampshire, New York, Vermont**
Ann Lesser, Esq.
Vice President
Phone: 212.484.4084
Email: LesserA@adr.org

**States: Alabama, Arkansas, Florida, Georgia, Mississippi, North Carolina, South Carolina, Virginia**
Charles Dorsey
Assistant Vice President
Phone: 866.686.6024
Email: DorseyC@adr.org

**States: Rhode Island**
Heather Santo
Assistant Vice President
Phone: 866.293.4053
Email: SantoH@adr.org

**States: Louisiana, New Mexico, Oklahoma, Texas**
Patrick Tatum
Vice President
Phone: 559.490.1905
Email: TatumP@adr.org

## Case Management Vice President and Assistant Vice Presidents

Charles Dorsey
Assistant Vice President
Phone: 866.686.6024
Email: DorseyC@adr.org
**Administers cases in FL, GA**

Heather Santo
Assistant Vice President
Phone: 866.293.4053
Email: SantoH@adr.org
**Administers cases in AL, CT, DE, DC, IN, KY, ME, MD, MA, MI, NH, NJ, NY, NC, OH, PA, RI, SC, TN, VT, VA, WV**

Patrick Tatum
Vice President
Phone: 559.490.1905
Email: TatumP@adr.org
**Administers cases in AK, AZ, AR, CA, CO, HI, ID, IL, IA, KS, LA, MN, MS, MO, MT, NE, NV, NM, ND, OK, OR, SD, TX, UT, WA, WI, WY**

AMERICAN ARBITRATION ASSOCIATION®

# EXHIBIT L

Petitioners' Names Appearing On Client Lists Of Other Law Firms

| First Name | Last Name | Abernathy or Boyd | Client List |
|---|---|---|---|
| Ali | Abbas | Boyd | Tidrick |
| Amber | Aguilar | Boyd | Tidrick |
| Maria | Alarcon | Boyd | Tidrick |
| Ramon | Alfaro | Boyd | Outten & Golden |
| Denny | Alfaro | Boyd | Outten & Golden |
| Elizabeth | Almendarez | Boyd | Tidrick |
| Diego | Altamirano | Boyd | Tidrick |
| Lilia | Alvarez | Boyd | Tidrick |
| Ingrid | Amaya | Boyd | Tidrick |
| Kyle | Anderson | Abernathy | Outten & Golden |
| Masoud | Anwary | Boyd | Tidrick |
| Kaylee | Araujo | Boyd | Tidrick |
| James | Arce | Boyd | Tidrick |
| Yoniki | Asa | Abernathy | LLR |
| LeAndre | Atkins | Boyd | Tidrick |
| Natalie | Aubele | Boyd | Tidrick |
| Paul | Azzolina | Boyd | Tidrick |
| Javier | Bahamonde | Boyd | Tidrick |
| Rashaun | Bailey | Abernathy | Outten & Golden |
| Marvin | Baker | Boyd | Tidrick |
| Cynthia | Bakker | Abernathy | Outten & Golden |
| Katelynn | Barnes | Boyd | Tidrick |
| Lauren | Battaglia | Boyd | Outten & Golden |
| Jason | Beadle | Boyd | Tidrick |
| Tanisha | Bell | Boyd | Outten & Golden |
| Dessa | Bernabe | Boyd | Outten & Golden |
| Vincent | Berry | Boyd | Outten & Golden |
| Seneca | Beverly | Boyd | Tidrick |
| Michael | Bickham | Boyd | Tidrick |
| Christanya | Blackman | Boyd | Tidrick |
| Shauwn | Bland | Boyd | Tidrick |
| Troy | Blanton | Boyd | Tidrick |
| Richard | Bogolub | Boyd | Outten & Golden |
| Rachel | Bolander | Abernathy | Outten & Golden |
| Eric | Boothe | Boyd | Tidrick |
| Alejandro | Boquiren | Boyd | Tidrick |
| Diana | Bostan | Abernathy | LLR |
| Catherine | Boyd | Boyd | Outten & Golden |
| Amanda | Boyett | Boyd | LLR |
| Dennis | Boyle | Abernathy | Outten & Golden |
| Destiny | Brewer | Boyd | Tidrick |
| Greg | Bridgewater | Boyd | Tidrick |
| Colleen | Brown | Boyd | Outten & Golden |
| Colleen | Brown | Boyd | Tidrick |
| Heather | Brown | Boyd | LLR |
| Heather | Brown | Boyd | Tidrick |

| Kimberly | Brown | Boyd | Tidrick |
|----------|-------|------|---------|
| Michael | Brown | Boyd | Tidrick |
| Sabrina | Brown | Boyd | Tidrick |
| Vu | Bui | Boyd | Tidrick |
| Gurgen | Buniatyan | Boyd | Tidrick |
| Marissa | Burgess | Boyd | Tidrick |
| Doshon | Busby | Abernathy | Outten & Golden |
| Azeenith | Cabanero | Boyd | Tidrick |
| Saul | Cabral | Boyd | Outten & Golden |
| Kiemara | Campbell | Boyd | Tidrick |
| Casey | Canales | Boyd | Outten & Golden |
| James | Cannon | Abernathy | Outten & Golden |
| Michael | Carrieri | Boyd | Tidrick |
| Ronnie | Carter | Boyd | Tidrick |
| Ronnie | Carter | Boyd | Tidrick |
| Shawnice | Carter | Boyd | Tidrick |
| Andrew | Cash | Boyd | Outten & Golden |
| Adriana | Cassell | Boyd | Tidrick |
| Steve | Cha | Abernathy | LLR |
| Kalia | Chambers | Boyd | Tidrick |
| Drake | Chaput | Boyd | Tidrick |
| Alvin | Chetty | Boyd | Outten & Golden |
| Alvin | Chetty | Boyd | Tidrick |
| Moeun | Chheang | Boyd | Tidrick |
| Chikezie | Chima | Boyd | LLR |
| Raymond | Cho | Boyd | Tidrick |
| Won | Cho | Abernathy | Outten & Golden |
| Saiman | Chu | Boyd | Tidrick |
| Aminmorn | Chuengmankong | Boyd | Tidrick |
| Matthew | Chum | Abernathy | LLR |
| Ricardo | Cisneros | Boyd | Tidrick |
| Michael | Clark | Boyd | Tidrick |
| Michael | Clark | Boyd | LLR |
| Virginia | Clark | Boyd | Outten & Golden |
| Virginia | Clark | Boyd | Tidrick |
| Gian | Claudio | Boyd | LLR |
| Jennifer | Clifton | Boyd | Tidrick |
| Marcie | Coe | Boyd | Tidrick |
| Danny | Coello | Boyd | Tidrick |
| Courtney | Cole | Abernathy | Outten & Golden |
| Celia | Colon | Boyd | Tidrick |
| Marvin | Conant | Boyd | Tidrick |
| Alex | Converse Sr | Boyd | Tidrick |
| Nicolas | Corral | Boyd | Outten & Golden |
| Keith | Corsi | Boyd | Tidrick |
| Feisal | Cortez | Boyd | Tidrick |
| Jimmy | Cortez | Abernathy | Outten & Golden |

| Bevedine | Cosey | Abernathy | LLR |
|---|---|---|---|
| Angela | Cotton | Boyd | Tidrick |
| Cabonia | Crawford | Boyd | Tidrick |
| Lekeitra | Crawford | Boyd | Tidrick |
| Brynn | Crowley | Boyd | Tidrick |
| Wesley | Crum | Boyd | Tidrick |
| Wesley | Crum | Boyd | Outten & Golden |
| Maria | Cunanan | Boyd | Tidrick |
| Stephanie | Curtis | Boyd | Tidrick |
| Latanya | Curtis | Boyd | Tidrick |
| Karen | DaDalt | Boyd | Tidrick |
| Joseph | Dangler | Boyd | Tidrick |
| Michalay | Daniels | Boyd | Tidrick |
| Darren | Davis | Boyd | Tidrick |
| Ryan | Davis | Boyd | Tidrick |
| Tadeh | Davtian | Boyd | Outten & Golden |
| Hugh | Dawson | Abernathy | Outten & Golden |
| Nicholas | DeBrito | Boyd | Tidrick |
| James Carter | del Rosario | Boyd | Tidrick |
| Christine | DeVore | Boyd | Tidrick |
| Alvera | Dias | Boyd | Tidrick |
| Cassidy | Dick | Boyd | Tidrick |
| Christopher | Diego | Boyd | Tidrick |
| Jabulani | Dill | Boyd | Tidrick |
| Devontay | Dimery | Boyd | Tidrick |
| Irvin | Dina | Boyd | Tidrick |
| Jason | Doan | Boyd | Tidrick |
| Shawn | Dormishian | Boyd | Tidrick |
| Kenneth | Douglas | Boyd | Tidrick |
| Kelly | Dunn | Boyd | Tidrick |
| Stephann | Durr | Boyd | Tidrick |
| Kimberly | Ellis | Boyd | Tidrick |
| Victoria | England | Boyd | Tidrick |
| David | Erickson | Boyd | LLR |
| Irma | Eubanks | Boyd | Outten & Golden |
| Irma | Eubanks | Boyd | Tidrick |
| James | Farag | Boyd | Outten & Golden |
| Mohsen Rahpeyma | Fard | Abernathy | LLR |
| Rhonda | Felix | Boyd | Tidrick |
| Rhonda | Felix | Boyd | Outten & Golden |
| Alexis | Flores | Boyd | Tidrick |
| Ben | Flores | Boyd | Tidrick |
| Ben | Flores | Boyd | Outten & Golden |
| Tuesday | Foman | Boyd | Tidrick |
| Joseph | Franco | Boyd | Outten & Golden |
| SheTara | Franklin | Boyd | Tidrick |

| Wade | Fussner | Boyd | Tidrick |
|------|---------|------|---------|
| Michael | Gaither | Boyd | Outten & Golden |
| Melody | Galizadeh | Boyd | Tidrick |
| Sean Michael | Gallagher | Boyd | Tidrick |
| Daniel | Garcia | Boyd | Tidrick |
| Makaela | Garcia | Boyd | Tidrick |
| Rocio | Garcia | Boyd | Outten & Golden |
| Ginny | Gaucher | Boyd | Tidrick |
| Asgedom | Gebre | Boyd | Tidrick |
| Caleb | Gebrewold | Boyd | Tidrick |
| Kristy | Gill | Boyd | Tidrick |
| Tayron | Giovani | Boyd | Tidrick |
| Jasmin | Gipolan | Boyd | Tidrick |
| Andrew | Goldenberg | Boyd | Tidrick |
| Federico | Gomez | Boyd | Tidrick |
| Gilberto | Gomez | Boyd | Outten & Golden |
| Cornelio | Gomez | Boyd | Tidrick |
| Delanna | Gonzalez | Boyd | Outten & Golden |
| Francisco | Gonzalez | Boyd | Tidrick |
| Francisco | Gonzalez | Boyd | Tidrick |
| Daniel | Gorman | Boyd | Tidrick |
| Jordan | Govorko | Boyd | Tidrick |
| Erik | Granados | Boyd | Tidrick |
| Lanesha | Grant | Boyd | Tidrick |
| Anthony | Gray | Boyd | Tidrick |
| Tina | Greco | Boyd | Tidrick |
| James | Green | Boyd | Tidrick |
| Adam | Green | Boyd | Tidrick |
| Andre | Greene | Boyd | Tidrick |
| Ellen | Gudino | Boyd | Tidrick |
| Katelynn | Hambley | Boyd | Tidrick |
| Fatima | Hamid | Abernathy | Outten & Golden |
| Desseri | Hansen | Boyd | Tidrick |
| Julie | Harms | Abernathy | LLR |
| Jordan | Harris | Boyd | Tidrick |
| Sandra | Harris | Boyd | Tidrick |
| Virginia | Hayes | Abernathy | LLR |
| Breeaunna | Henry | Boyd | Tidrick |
| Sallie | Henry | Boyd | Outten & Golden |
| Sallie | Henry | Boyd | Tidrick |
| Hancy F | Henry Jr | Boyd | Tidrick |
| Cody | Hermanson | Boyd | Tidrick |
| Paul | Herrera | Boyd | Tidrick |
| Alicia | Hill | Boyd | Tidrick |
| Travis | Hill | Abernathy | LLR |
| Justin | Hilton | Boyd | Tidrick |
| Shalinda | Hogains | Boyd | Tidrick |

| | | | |
|---|---|---|---|
| Michael | Holland | Boyd | Tidrick |
| Brandon | Hollis | Boyd | Tidrick |
| Kendra | Hopkins | Boyd | Tidrick |
| David | Hoptman | Boyd | Tidrick |
| James | Howell | Boyd | Tidrick |
| Frank | Hsieh | Abernathy | LLR |
| Andrew | Huff | Boyd | Tidrick |
| Brent | Humphreys | Boyd | Tidrick |
| Jasmine | Husak | Boyd | Tidrick |
| Hallie | Husak | Abernathy | Outten & Golden |
| Michael | Huynh | Boyd | Tidrick |
| Khongorzul | Iderkhangai | Boyd | Outten & Golden |
| Khongorzul | Iderkhangai | Boyd | Tidrick |
| Dominique | Jackson | Boyd | Outten & Golden |
| Dominique | Jackson | Boyd | Tidrick |
| Heather | Jackson | Boyd | Tidrick |
| Shanine | Jackson | Boyd | Tidrick |
| Shayna | Jai | Boyd | Tidrick |
| Brandie | James | Boyd | Tidrick |
| Brysha | James | Boyd | Tidrick |
| Amber | Jennings | Boyd | Tidrick |
| Francene | Jensen | Abernathy | Outten & Golden |
| Ruben | Jimenez | Abernathy | LLR |
| Mariana | Jimenez | Boyd | Tidrick |
| Gladys | Jimenez | Boyd | Tidrick |
| Hyniah | Johnson | Abernathy | Outten & Golden |
| Sondra | Johnson | Boyd | Tidrick |
| Laheaven | Jones | Boyd | Tidrick |
| Leroy | Kemp | Boyd | Tidrick |
| Haris | Khan | Boyd | Tidrick |
| Alamzeb | Khan | Boyd | Tidrick |
| Mohammed | Khan | Boyd | Tidrick |
| Daryush | Khodadadi-Mobarakeh | Boyd | LLR |
| Daryush | Khodadadi-Mobarakeh | Boyd | Tidrick |
| Haseeb | Khuwajazada | Boyd | Tidrick |
| Michael | Kim | Abernathy | Outten & Golden |
| Kisung | Kim | Boyd | Tidrick |
| Sarah | Klapheck | Boyd | Tidrick |
| Jules | Korman | Boyd | Outten & Golden |
| Leslie | Kukuk | Boyd | Tidrick |
| Maria | Kyle | Boyd | Tidrick |
| Michael | Lang | Boyd | Tidrick |
| Samira | Lavender | Boyd | Tidrick |
| Gyula | Lazar | Boyd | Tidrick |
| Ryan | Lee | Boyd | Tidrick |
| Aaron | Lee | Abernathy | Outten & Golden |
| Richard | Lee | Boyd | Tidrick |

| David | Lee | Boyd | Tidrick |
|---|---|---|---|
| Katy | Lee | Boyd | Tidrick |
| Andy | Lee | Boyd | Tidrick |
| Jennifer | Lemmon | Boyd | Tidrick |
| Jamena | Levi | Boyd | Tidrick |
| Jennifer | Lewis | Boyd | LLR |
| Juan | Lockett | Boyd | Tidrick |
| Michael | Logan | Boyd | Tidrick |
| Michael | Lok | Abernathy | Outten & Golden |
| Christine | Long | Boyd | Outten & Golden |
| Sierra | Lopez | Boyd | Tidrick |
| Ricardo | Luna | Boyd | Tidrick |
| Steven | Lundin | Boyd | LLR |
| David | Ly | Boyd | Tidrick |
| Barbara | Macfarland | Boyd | Tidrick |
| Edwin | Macias | Boyd | Tidrick |
| Sharon | macias | Boyd | Tidrick |
| Roshan | Mahabali | Boyd | Tidrick |
| David | Maier | Boyd | Tidrick |
| Elizabeth | Maldonado | Boyd | Tidrick |
| Suzanne | Mapes | Boyd | Tidrick |
| Hector | Mariano | Boyd | Tidrick |
| Juliette | Marin | Boyd | Outten & Golden |
| Juliette | Marin | Boyd | Tidrick |
| Preness | Marks | Boyd | LLR |
| Daniel | Martin | Abernathy | Outten & Golden |
| Anthony | Martinez | Boyd | Tidrick |
| Gabriel | Martinez | Boyd | Outten & Golden |
| Gabriel | Martinez | Boyd | Tidrick |
| Jessica | Martinez | Boyd | Tidrick |
| Tamie | Martinez | Boyd | Tidrick |
| Lucia | Mayorga | Abernathy | Outten & Golden |
| Andrea | Mccowan | Boyd | Tidrick |
| Andre | McCoy | Boyd | Tidrick |
| Desirae | McCoy | Boyd | Tidrick |
| Suzanne | McGreer | Boyd | Tidrick |
| Myles | McKee-Osibodu | Boyd | Tidrick |
| Erin | Mcleod | Boyd | LLR |
| Jalen | McNeal | Boyd | Tidrick |
| Amanda | Medina | Boyd | Tidrick |
| Joovana | Mendoza | Boyd | Tidrick |
| Luis | Mendoza | Boyd | Tidrick |
| Ihab | Merabet | Boyd | Tidrick |
| Yelile | Miller | Boyd | Tidrick |
| Damien | Milton | Boyd | Tidrick |
| Kimberly | Mizuta | Boyd | LLR |
| Larry | Moore | Boyd | Outten & Golden |

| Danielle | Moore | Boyd | Tidrick |
|----------|-------|------|---------|
| Clara | Morales | Boyd | Tidrick |
| Jennifer | Morales | Abernathy | Outten & Golden |
| Tera | Morgan | Abernathy | Outten & Golden |
| Kayode | Mustapha | Boyd | Tidrick |
| Gunchin | Myagmarsambuu | Boyd | LLR |
| Andrea | Myers | Boyd | Tidrick |
| Samantha | Myers | Abernathy | Tidrick |
| Robert | Myers | Boyd | Tidrick |
| Brian | Mynatt | Boyd | LLR |
| Nicholas | Natividad | Boyd | Tidrick |
| Anastasia | Navarro | Boyd | Tidrick |
| Sherika | Neal | Boyd | Tidrick |
| Georges | Nesim | Boyd | Tidrick |
| Quan | Nguyen | Boyd | Tidrick |
| Quan | Nguyen | Boyd | Tidrick |
| Quan | Nguyen | Boyd | Tidrick |
| Francesca | Nhem | Boyd | Outten & Golden |
| Francisco | Noguer | Boyd | Tidrick |
| John | Nolan | Boyd | Outten & Golden |
| John | Nolan | Boyd | Tidrick |
| Jeanette | Nolan | Boyd | Tidrick |
| John | Normoyle | Abernathy | LLR |
| Tekia | Oliver | Abernathy | Outten & Golden |
| Jorge | Osorio | Boyd | Tidrick |
| Jean | Owono | Abernathy | Tidrick |
| Yair | Pablo | Boyd | Tidrick |
| Yair | Pablo | Boyd | Outten & Golden |
| Leonel | Paredes | Boyd | Tidrick |
| Sam | Park | Boyd | LLR |
| Yesenia | Parra | Boyd | LLR |
| Amira | Pearson | Boyd | Tidrick |
| Suzann | Pedersen | Boyd | Tidrick |
| Rosa | Penate | Boyd | Tidrick |
| Jennifer | Pendrak | Boyd | Tidrick |
| Victoria | Perez | Boyd | Tidrick |
| Hang | Pham | Boyd | Tidrick |
| Pinky | Phang | Abernathy | LLR |
| Rocheall | Pierre | Boyd | Tidrick |
| Greg | Pinto | Boyd | Tidrick |
| Rita | Pipkins | Boyd | Tidrick |
| Simone | Pirtle | Boyd | Tidrick |
| Hailee | Pitsley | Boyd | Tidrick |
| Veronica | Platas | Boyd | Tidrick |
| Claudine | Polk | Abernathy | LLR |
| Jani | Polk | Boyd | Outten & Golden |
| Ramona | Ponce | Boyd | Tidrick |

| Christin | Price | Boyd | Tidrick |
|---|---|---|---|
| Soghra | Quraishy | Boyd | Tidrick |
| Darlene | Ramirez | Boyd | Outten & Golden |
| Lutricia | Randolph | Boyd | Tidrick |
| Sounthaly | Rattanapanya | Boyd | Tidrick |
| Sean | Ray | Boyd | Outten & Golden |
| Angelica | Redman | Boyd | Tidrick |
| Laguanna | Reed | Boyd | Tidrick |
| Amirreza | Resali | Boyd | Tidrick |
| Anson | Reynolds | Boyd | Tidrick |
| April | Rice | Boyd | Tidrick |
| Jamilo | Richardson | Boyd | Tidrick |
| Kimberly | Ricks-Sponberg | Boyd | LLR |
| Kimberly | Ricks-Sponberg | Boyd | Tidrick |
| Glorimar | Rivera | Boyd | Outten & Golden |
| Kimberlee | Rivera | Boyd | Tidrick |
| Joseph | Robitaille | Boyd | Outten & Golden |
| Waikeena | Rodrigues | Abernathy | Outten & Golden |
| Ivan | Rodriguez | Abernathy | Keller Lenkner |
| Jose | Rodriguez | Abernathy | Outten & Golden |
| Sylvia | Rogers | Boyd | Tidrick |
| Traci | Rogers | Boyd | Tidrick |
| Rene | Romero | Boyd | Tidrick |
| Jason | Rosen | Boyd | Tidrick |
| Terry | Ross | Boyd | Tidrick |
| Rio | Ruiz | Boyd | Tidrick |
| Alan | Ruiz | Boyd | Tidrick |
| Marissa | Sainz | Boyd | Outten & Golden |
| Selena | Salgado | Boyd | Tidrick |
| Brandee | Samples | Boyd | Tidrick |
| Savijot | Sandhar | Boyd | Tidrick |
| Michelle | Santos | Boyd | Outten & Golden |
| Michelle | Santos | Boyd | Tidrick |
| Oscar | Santos | Boyd | Tidrick |
| Derrick | Scales | Boyd | Tidrick |
| Starlena | Schroeder | Boyd | Tidrick |
| Aisha | Scott | Boyd | Tidrick |
| Ashley | Shaw | Boyd | Tidrick |
| Vijay | Sheth | Boyd | Tidrick |
| Daniel | Shrigley | Boyd | Tidrick |
| Claudia | Silva | Boyd | Tidrick |
| Sherrie | Simmons | Boyd | Outten & Golden |
| Jagprit | Singh | Boyd | Tidrick |
| Vinay | Slathia | Boyd | Tidrick |
| Jan | Smejkal | Boyd | Tidrick |
| Emilee | Smith | Boyd | Tidrick |
| Jalena | Smith | Boyd | Tidrick |

| Pamela | Smith | Boyd | Tidrick |
|--------|-------|------|---------|
| Althea | Smith | Boyd | Tidrick |
| Timothy | Smith | Abernathy | LLR |
| Brandon | Smith | Boyd | Tidrick |
| Derek | Snarr | Boyd | Tidrick |
| Kelly | Solomon | Boyd | Tidrick |
| Bryan | Spelker | Boyd | Tidrick |
| Meosha | Spencer | Boyd | Tidrick |
| Corene | Stayner | Abernathy | Outten & Golden |
| Janet | Stegman | Boyd | Outten & Golden |
| Janet | Stegman | Boyd | Tidrick |
| NicTaye | Stephens | Boyd | Tidrick |
| Patricia | Stewart | Boyd | Outten & Golden |
| patricia | Stewart | Boyd | Tidrick |
| Shonnel | Stewart | Boyd | Tidrick |
| Lisa | Stover | Boyd | Tidrick |
| Amie | Stratton | Boyd | Tidrick |
| Brittany | Strecker | Boyd | Tidrick |
| Julian | Suter | Boyd | Tidrick |
| Phonexay | Sychareun | Boyd | Tidrick |
| Patricia | Sydnor | Boyd | Tidrick |
| Ahmad | Tabbarah | Boyd | Tidrick |
| Massinissa | Taieb | Boyd | Tidrick |
| Amy | Tarpley | Boyd | Tidrick |
| Solimon | Tawfiq | Boyd | Tidrick |
| Ian | Taylor | Boyd | Tidrick |
| Larry | Taylor | Boyd | Tidrick |
| Manjinger | Thind | Boyd | Tidrick |
| Robert | Thoman | Boyd | Tidrick |
| Dajanae | Thomas | Boyd | Tidrick |
| Jodi | Thomas | Boyd | Outten & Golden |
| Andre | Thomas | Boyd | Tidrick |
| Patricia | Thomas | Boyd | Tidrick |
| Brandon | Thompson | Boyd | Tidrick |
| Richard | Thompson | Boyd | Tidrick |
| Courtney | Thompson | Boyd | Tidrick |
| Inez | Tolbert | Boyd | Outten & Golden |
| Miguel | Torres | Boyd | Tidrick |
| Isis | Torres | Boyd | Tidrick |
| Miguel | Torres | Boyd | Tidrick |
| Benjamin | tovar | Boyd | Tidrick |
| Blake | Tovey | Boyd | Outten & Golden |
| Lori | Troester | Boyd | Outten & Golden |
| Quan | Tsang | Boyd | Tidrick |
| Phyo | Tun | Abernathy | LLR |
| Arthur | Turner | Boyd | Tidrick |
| Aziza | Turner | Boyd | Tidrick |

| Juan | Valdez | Abernathy | Outten & Golden |
|---|---|---|---|
| Lynette | Valencia | Boyd | Tidrick |
| Abigail | Valerio | Boyd | Outten & Golden |
| Abigail | Valerio | Boyd | Tidrick |
| Wilfredo | Vasquez | Boyd | Tidrick |
| Angelica | Vasquez | Boyd | Tidrick |
| David | Velez | Boyd | Tidrick |
| Theresa | Vellone | Boyd | Tidrick |
| Patrice | Ventresca | Boyd | Tidrick |
| Laura | Villa | Boyd | Outten & Golden |
| Mark | Villanueva | Abernathy | LLR |
| Peter | Vu | Boyd | Tidrick |
| Joniesha | Walker | Boyd | Tidrick |
| DeAnna | Wallace | Boyd | Tidrick |
| Tonja | Warren | Abernathy | LLR |
| Jaime | Weaver | Boyd | Tidrick |
| Michelle | Weeks | Boyd | Tidrick |
| Christopher | Weil | Boyd | Tidrick |
| Andrew | West | Boyd | Tidrick |
| Richard | West | Boyd | Tidrick |
| Natalie | Weymouth | Abernathy | Outten & Golden |
| Julian | White | Boyd | Tidrick |
| Lisa | White | Abernathy | Outten & Golden |
| Nettie | White | Boyd | Tidrick |
| Terry | Whitfield | Boyd | Outten & Golden |
| Courtney | Whitfield | Boyd | Tidrick |
| William | Wilkins | Boyd | Tidrick |
| Deanndra | Williams | Boyd | Tidrick |
| Jamila | Williams | Boyd | Tidrick |
| Ronald | Williams | Boyd | Tidrick |
| Elijah | Williams | Abernathy | Outten & Golden |
| Kenov | Williams | Boyd | Tidrick |
| Derek | Williams jr | Boyd | Tidrick |
| Alexis | Wilson | Boyd | Tidrick |
| David | Wilson | Boyd | Outten & Golden |
| Whitney | Wilson | Boyd | Tidrick |
| Tamika | Winslow | Boyd | Tidrick |
| Corey | Wojahn | Boyd | Outten & Golden |
| Spencer | Woodcock | Boyd | Tidrick |
| Ashley | Wright | Boyd | Tidrick |
| Zonobia | Wright | Boyd | Tidrick |
| Sondra | Wyrick | Boyd | Tidrick |
| Chris | Yanke | Boyd | Tidrick |
| Chris | Yoder | Boyd | Tidrick |
| Michael | Zambelli | Boyd | Tidrick |
| San Juanita | Zamora-Meza | Boyd | Outten & Golden |
| San Juanita | Zamora-Meza | Boyd | Tidrick |

| Andrea | Zavala | Boyd | Tidrick |
|--------|--------|------|---------|
| Shaundra | Zee | Abernathy | LLR |

# EXHIBIT M

| Case # | Claimant | Respondent | Locale: | | Balance: |
|---|---|---|---|---|---|
| 01-19-0002-7773 | Surhab Ahmadzai | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-7774 | Catherine Alava | DoorDash; Inc. | South Gate | CA | $ 750.00 |
| 01-19-0002-7775 | Aaron Almeda | DoorDash; Inc. | Atascadero | CA | $ 750.00 |
| 01-19-0002-7785 | Fatima Alvaro | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-7787 | Booker Anderson | DoorDash; Inc. | Encino | CA | $ 750.00 |
| 01-19-0002-7789 | Laron Austin | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-7790 | Kim Balingit | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7791 | Lashonda Banks | DoorDash; Inc. | North Highlands | CA | $ 750.00 |
| 01-19-0002-7792 | Tamara Barber | DoorDash; Inc. | Oxnard | CA | $ 750.00 |
| 01-19-0002-7794 | Natalie Barcenas | DoorDash; Inc. | Modesto | CA | $ 750.00 |
| 01-19-0002-7795 | Tyler Bardin | DoorDash; Inc. | Ione | CA | $ 750.00 |
| 01-19-0002-7796 | Nathan Barnes | DoorDash; Inc. | Selma | CA | $ 750.00 |
| 01-19-0002-7797 | Jessica Bauman | DoorDash; Inc. | Bakersfield | CA | $ 750.00 |
| 01-19-0002-7813 | Elizabeth Beagley | DoorDash; Inc. | Rancho Cucamonga | CA | $ 750.00 |
| 01-19-0002-7814 | Isaiah Bean | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7817 | Walelign Belay | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-7818 | Nivaban Bell | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7819 | Marcus Bell | DoorDash; Inc. | Elk Grove | CA | $ 750.00 |
| 01-19-0002-7824 | Justin Bellow | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-7826 | Amanda Bernard | DoorDash; Inc. | Roseville | CA | $ 750.00 |
| 01-19-0002-7827 | Daesha Black | DoorDash; Inc. | Fresno | CA | $ 750.00 |
| 01-19-0002-7828 | Erika Bolton | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7829 | Akili Bolton | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-7833 | Belen Bonilla | DoorDash; Inc. | Salinas | CA | $ 750.00 |
| 01-19-0002-7842 | Rolando Boo | DoorDash; Inc. | Union City | CA | $ 750.00 |
| 01-19-0002-7843 | Donell Brown | DoorDash; Inc. | Rialto | CA | $ 750.00 |
| 01-19-0002-7845 | Krystal Bujanda | DoorDash; Inc. | Temple City | CA | $ 750.00 |
| 01-19-0002-7962 | Barbara Burley | DoorDash; Inc. | Vallejo | CA | $ 750.00 |
| 01-19-0002-7964 | Dayak Cabrera | DoorDash; Inc. | Walnut Creek | CA | $ 750.00 |
| 01-19-0002-7967 | Andrea Carr | DoorDash; Inc. | Westminster | CA | $ 750.00 |
| 01-19-0002-7968 | Aleehya Carr | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7969 | Jazmyn Carrasco | DoorDash; Inc. | Hayward | CA | $ 750.00 |
| 01-19-0002-7970 | Jesus Guillermo Carrillo | DoorDash; Inc. | Lake Forest | CA | $ 750.00 |

| | | | | | |
|---|---|---|---|---|---|
| 01-19-0002-7971 | Jennifer Casillas | DoorDash; Inc. | Anaheim | CA | $ 750.00 |
| 01-19-0002-7972 | Ernesto Castro | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-7974 | Maci Ceja | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-7975 | Adrian Cendejas | DoorDash; Inc. | American Canyon | CA | $ 750.00 |
| 01-19-0002-7976 | Priyanka Chand | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7977 | Yolanda Charles | DoorDash; Inc. | Vacaville | CA | $ 750.00 |
| 01-19-0002-7979 | Savanna Christensen | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-7980 | Juan Contreras | DoorDash; Inc. | Commerce | CA | $ 750.00 |
| 01-19-0002-7982 | Landry Cooper | DoorDash; Inc. | Oakland | CA | $ 750.00 |
| 01-19-0002-7983 | Edward Corinealdi | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-7984 | Tanya Corona | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-7985 | Cynthia Corona | DoorDash; Inc. | Santa Ana | CA | $ 750.00 |
| 01-19-0002-7986 | Andrea Cortez | DoorDash; Inc. | Ontario | CA | $ 750.00 |
| 01-19-0002-7999 | Jasmine Cotton | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-8001 | Addison Cowan | DoorDash; Inc. | Santa Rosa | CA | $ 750.00 |
| 01-19-0002-8002 | Amanda Crawfordb | DoorDash; Inc. | Newark | CA | $ 750.00 |
| 01-19-0002-8004 | Oscar Cruz Aquino | DoorDash; Inc. | San Leandro | CA | $ 750.00 |
| 01-19-0002-8005 | Bryce Davis | DoorDash; Inc. | El Segundo | CA | $ 750.00 |
| 01-19-0002-8006 | Brandon Devera | DoorDash; Inc. | Pittsburg | CA | $ 750.00 |
| 01-19-0002-8007 | Brandon Dobbins | DoorDash; Inc. | Lake Forest | CA | $ 750.00 |
| 01-19-0002-8010 | Aproll Dossman | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8012 | Matthew Dumlao | DoorDash; Inc. | Suisan | CA | $ 750.00 |
| 01-19-0002-8013 | Alexandra Eccleston | DoorDash; Inc. | Gilroy | CA | $ 750.00 |
| 01-19-0002-8016 | Alicia Egbokhan | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8024 | Megan Elliott | DoorDash; Inc. | Marysville | CA | $ 750.00 |
| 01-19-0002-8018 | Robert Ellis | DoorDash; Inc. | Yucaipa | CA | $ 750.00 |
| 01-19-0002-8020 | Daniel Estrada | DoorDash; Inc. | Oceanside | CA | $ 750.00 |
| 01-19-0002-8021 | Luis Estrada | DoorDash; Inc. | Fresno | CA | $ 750.00 |
| 01-19-0002-8022 | Margarita Farias | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8024 | Sam Farzinkhou | DoorDash; Inc. | Murrieta | CA | $ 750.00 |
| 01-19-0002-8025 | Lisa Faulkner | DoorDash; Inc. | Citrus Height | CA | $ 750.00 |
| 01-19-0002-8026 | Fernando Ferrer | DoorDash; Inc. | San Gabriel | CA | $ 750.00 |
| 01-19-0002-8027 | Jamesha Fitzpatrick | DoorDash; Inc. | Richmond | CA | $ 750.00 |
| 01-19-0002-8029 | Mikeia Ford | DoorDash; Inc. | Sacramento | CA | $ 750.00 |

| | | | | |
|---|---|---|---|---|
| 01-19-0002-8032 | Paolo Fortuna | DoorDash; Inc. | Glendale | CA | $ 750.00 |
| 01-19-0002-8033 | Diamante Fredricks | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8034 | Keycha Gallon | DoorDash; Inc. | Vallejo | CA | $ 750.00 |
| 01-19-0002-8035 | Juan Garcia | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8047 | Ernest Garcia | DoorDash; Inc. | Lodi | CA | $ 750.00 |
| 01-19-0002-8048 | Andres Gaviria | DoorDash; Inc. | Aliso Viejo | CA | $ 750.00 |
| 01-19-0002-8049 | Daniel Geering | DoorDash; Inc. | Mountain View | CA | $ 750.00 |
| 01-19-0002-8155 | Paul Giancola | DoorDash; Inc. | Covina | CA | $ 750.00 |
| 01-19-0002-8156 | Janaya Gilkey | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-8157 | Kasey Gleed | DoorDash; Inc. | Redding | CA | $ 750.00 |
| 01-19-0002-8158 | Natasha Glenn | DoorDash; Inc. | Merced | CA | $ 750.00 |
| 01-19-0002-8159 | Javier Gonzalez | DoorDash; Inc. | Bellflower | CA | $ 750.00 |
| 01-19-0002-8160 | Terrell Goodwin | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-8161 | Shamorrow Graham | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8162 | Stephanie Granados | DoorDash; Inc. | Torrance | CA | $ 750.00 |
| 01-19-0002-8163 | Mia Granadoz | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8164 | Brandon Grausso | DoorDash; Inc. | Torrance | CA | $ 750.00 |
| 01-19-0002-8165 | Joseph Graves | DoorDash; Inc. | Modesto | CA | $ 750.00 |
| 01-19-0002-8166 | Courtney Greenhagen | DoorDash; Inc. | Covina | CA | $ 750.00 |
| 01-19-0002-8167 | Inderjit Grewal | DoorDash; Inc. | San Leandro | CA | $ 750.00 |
| 01-19-0002-8168 | Mar Guarin | DoorDash; Inc. | Daly City | CA | $ 750.00 |
| 01-19-0002-8169 | Ivy Guemez | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-8170 | Joseph Guillory | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8171 | Jorge Gutierrez | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-8172 | Miguel Gutierrez | DoorDash; Inc. | Coachella | CA | $ 750.00 |
| 01-19-0002-8173 | Williearl Harris | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8174 | Desseree Harvey | DoorDash; Inc. | Berkeley | CA | $ 750.00 |
| 01-19-0002-8176 | Timothy Hazelwood | DoorDash; Inc. | Bakersfield | CA | $ 750.00 |
| 01-19-0002-8177 | Malissa Heath | DoorDash; Inc. | Mather | CA | $ 750.00 |
| 01-19-0002-8178 | Abigail Henderson | DoorDash; Inc. | Pacific Grove | CA | $ 750.00 |
| 01-19-0002-8179 | Andrew Hernandez | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8180 | Dolores Herrera | DoorDash; Inc. | Victorville | CA | $ 750.00 |
| 01-19-0002-8181 | Lucas Hoekstra | DoorDash; Inc. | Oakland | CA | $ 750.00 |
| 01-19-0002-8182 | Ashli Howard | DoorDash; Inc. | Oakland | CA | $ 750.00 |

| | | | | | |
|---|---|---|---|---|---|
| 01-19-0002-8184 | Maria Hurtado | DoorDash; Inc. | Vallejo | CA | $ 750.00 |
| 01-19-0002-8185 | Hien Huynh | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-8186 | Glenn Jackson | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8187 | Annjanette Jackson | DoorDash; Inc. | Fairfield | CA | $ 750.00 |
| 01-19-0002-8188 | Isaiah Jackson | DoorDash; Inc. | San Bernardino | CA | $ 750.00 |
| 01-19-0002-8189 | Natalia Jeanpierre | DoorDash; Inc. | Campbell | CA | $ 750.00 |
| 01-19-0002-8190 | Timmie Jennings | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-8192 | James Jones | DoorDash; Inc. | Elk Grove | CA | $ 750.00 |
| 01-19-0002-8194 | Laduana Jones | DoorDash; Inc. | North Highlands | CA | $ 750.00 |
| 01-19-0002-8195 | Harrison Jones | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-8197 | Jermario Jordan | DoorDash; Inc. | Carson | CA | $ 750.00 |
| 01-19-0002-8198 | Dessirae Keith | DoorDash; Inc. | Menifee | CA | $ 750.00 |
| 01-19-0002-8199 | Jasmine Keyes Galdamez | DoorDash; Inc. | Richmond | CA | $ 750.00 |
| 01-19-0002-8200 | Josh King | DoorDash; Inc. | Marysville | CA | $ 750.00 |
| 01-19-0002-8201 | Jeremy Kirschke | DoorDash; Inc. | Glendora | CA | $ 750.00 |
| 01-19-0002-8202 | Troy Knight | DoorDash; Inc. | San Francisco | CA | $ 750.00 |
| 01-19-0002-8203 | Rebecca Knowles | DoorDash; Inc. | Lodi | CA | $ 750.00 |
| 01-19-0002-8204 | Win Ko | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8205 | Gozde Kucuk | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8206 | Tonya Lawson | DoorDash; Inc. | Hayward | CA | $ 750.00 |
| 01-19-0002-8207 | Blake Lewis | DoorDash; Inc. | Fresno | CA | $ 750.00 |
| 01-19-0002-8212 | Havanah Lopez | DoorDash; Inc. | Ontario | CA | $ 750.00 |
| 01-19-0002-8213 | Robert Luna | DoorDash; Inc. | Baldwin Park | CA | $ 750.00 |
| 01-19-0002-8214 | Barbara Lyles | DoorDash; Inc. | Oakland | CA | $ 750.00 |
| 01-19-0002-8215 | Ericka Malone | DoorDash; Inc. | Concord | CA | $ 750.00 |
| 01-19-0002-8216 | Dorian Malone | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8217 | Xavier Manzke | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8218 | Veronica Martin | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8219 | Adrianne Martin-Harris | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8220 | Alejandro Martinez | DoorDash; Inc. | San Bernardino | CA | $ 750.00 |
| 01-19-0002-8221 | Alejandro Martinez Barron | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-8222 | Pamela Mathews | DoorDash; Inc. | Antioch | CA | $ 750.00 |
| 01-19-0002-8223 | Jason Mcguire | DoorDash; Inc. | Inglewood | CA | $ 750.00 |
| 01-19-0002-8224 | Eric Mcneal | DoorDash; Inc. | Monroe | CA | $ 750.00 |

| | | | | | |
|---|---|---|---|---|---|
| 01-19-0002-8225 | Evelyn Mcomie | DoorDash; Inc. | Antelope | CA | $ 750.00 |
| 01-19-0002-8226 | Raenard Mephee | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-8227 | Estephania Melgoza | DoorDash; Inc. | Salida | CA | $ 750.00 |
| 01-19-0002-8228 | Aldo Mendoza | DoorDash; Inc. | Hayward | CA | $ 750.00 |
| 01-19-0002-8229 | Nefertiti Mike | DoorDash; Inc. | Moreno Valley | CA | $ 750.00 |
| 01-19-0002-8230 | Vincente Miles | DoorDash; Inc. | East Palo Alto | CA | $ 750.00 |
| 01-19-0002-8231 | Jeremiah Miller | DoorDash; Inc. | Leandro | CA | $ 750.00 |
| 01-19-0002-8232 | Eddie Monteroso | DoorDash; Inc. | Lomita | CA | $ 750.00 |
| 01-19-0002-8234 | Terry Moore | DoorDash; Inc. | Hemet | CA | $ 750.00 |
| 01-19-0002-8235 | Nicholas Moreno | DoorDash; Inc. | San Jose | CA | $ 750.00 |
| 01-19-0002-8236 | Masai Moton | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8237 | Vitor Moutinho | DoorDash; Inc. | Torrance | CA | $ 750.00 |
| 01-19-0002-8238 | Dina Mullen | DoorDash; Inc. | Chico | CA | $ 750.00 |
| 01-19-0002-8239 | Seyarra Mundy Nguyen | DoorDash; Inc. | Mission Viejo | CA | $ 750.00 |
| 01-19-0002-8240 | Chelsey Newton | DoorDash; Inc. | Gilroy | CA | $ 750.00 |
| 01-19-0002-8241 | Hang Nguyen | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-8242 | Nguyen Nguyen | DoorDash; Inc. | Milpitas | CA | $ 750.00 |
| 01-19-0002-8244 | Aaronique Norwood | DoorDash; Inc. | Lake Elsinore | CA | $ 750.00 |
| 01-19-0002-8245 | Christopher Oliver | DoorDash; Inc. | Fresno | CA | $ 750.00 |
| 01-19-0002-8248 | Brayam Onofre | DoorDash; Inc. | Compton | CA | $ 750.00 |
| 01-19-0002-8249 | Kayla Orozco | DoorDash; Inc. | Crockett | CA | $ 750.00 |
| 01-19-0002-8250 | Erica Padilla | DoorDash; Inc. | Citrus Height | CA | $ 750.00 |
| 01-19-0002-8252 | Elias Palmer | DoorDash; Inc. | San Diego | CA | $ 750.00 |
| 01-19-0002-8253 | Jennifer Parangueo | DoorDash; Inc. | Oakland | CA | $ 750.00 |
| 01-19-0002-8254 | Jatonn Parham | DoorDash; Inc. | Victorville | CA | $ 750.00 |
| 01-19-0002-8255 | Simone Parker | DoorDash; Inc. | Stockton | CA | $ 750.00 |
| 01-19-0002-8256 | Rikia Parram | DoorDash; Inc. | Los Angeles | CA | $ 750.00 |
| 01-19-0002-8257 | Brea Patterson | DoorDash; Inc. | Lancaster | CA | $ 750.00 |
| 01-19-0002-8258 | Christian Payne | DoorDash; Inc. | Inglewood | CA | $ 750.00 |
| 01-19-0002-8259 | Matthew Peltier | DoorDash; Inc. | Sacramento | CA | $ 750.00 |
| 01-19-0002-8260 | Allyson Perez | DoorDash; Inc. | Ontario | CA | $ 750.00 |
| 01-19-0002-8261 | Martha Perez | DoorDash; Inc. | South San Francisco | CA | $ 750.00 |
| 01-19-0002-8262 | Jamonte Perry | DoorDash; Inc. | Fresno | CA | $ 750.00 |
| 01-19-0002-8263 | Kimari Pinkney | DoorDash; Inc. | Pittsburg | CA | $ 750.00 |

| 01-19-0002-8264 | Hannah Polk | DoorDash; Inc. | Napa | CA | $ | 750.00 |
| 01-19-0002-8265 | Shantiel Poole | DoorDash; Inc. | San Jose | CA | $ | 750.00 |
| 01-19-0002-8266 | Rodney Powers | DoorDash; Inc. | Dos Palos | CA | $ | 750.00 |
| 01-19-0002-8267 | Turrell Price | DoorDash; Inc. | Oakland | CA | $ | 750.00 |
| 01-19-0002-8268 | John Pryor | DoorDash; Inc. | Stockton | CA | $ | 750.00 |
| 01-19-0002-8269 | Rachel Quesenberry | DoorDash; Inc. | Chula Vista | CA | $ | 750.00 |
| 01-19-0002-8270 | Jordan Ramirez | DoorDash; Inc. | Long Beach | CA | $ | 750.00 |
| 01-19-0002-8271 | Katinkia Rausse | DoorDash; Inc. | Los Angeles | CA | $ | 750.00 |
| 01-19-0002-8272 | Larico Ray | DoorDash; Inc. | San Leandro | CA | $ | 750.00 |
| 01-19-0002-8273 | Gabriel Reyes | DoorDash; Inc. | Hawthorne | CA | $ | 750.00 |
| 01-19-0002-8274 | Matthew Reynolds | DoorDash; Inc. | San Jose | CA | $ | 750.00 |
| 01-19-0002-8275 | Laura Roach | DoorDash; Inc. | Sacramento | CA | $ | 750.00 |
| 01-19-0002-8276 | Scott Roberts | DoorDash; Inc. | Sacramento | CA | $ | 750.00 |
| 01-19-0002-8277 | Valerie Robinson | DoorDash; Inc. | Tracy | CA | $ | 750.00 |
| 01-19-0002-8278 | Ivan Rodriguez | DoorDash; Inc. | Mission Viejo | CA | $ | 750.00 |
| 01-19-0002-8279 | Luisana Rodriguez | DoorDash; Inc. | Sylmar | CA | $ | 750.00 |
| 01-19-0002-8280 | Joe Romero | DoorDash; Inc. | Hollister | CA | $ | 750.00 |
| 01-19-0002-8282 | Shannon Rubalcava | DoorDash; Inc. | Turlock | CA | $ | 750.00 |
| 01-19-0002-8283 | Anibal Rubio | DoorDash; Inc. | Whittier | CA | $ | 750.00 |
| 01-19-0002-8284 | Andrew Rump | DoorDash; Inc. | Sacramento | CA | $ | 750.00 |
| 01-19-0002-8285 | Roger Samuel | DoorDash; Inc. | San Jose | CA | $ | 750.00 |
| 01-19-0002-8286 | Dean Sanchez | DoorDash; Inc. | Mission Viejo | CA | $ | 750.00 |
| 01-19-0002-8287 | Bianca Santiesteban | DoorDash; Inc. | Ontario | CA | $ | 750.00 |
| 01-19-0002-8288 | Marquis Scott | DoorDash; Inc. | Los Angeles | CA | $ | 750.00 |
| 01-19-0002-8289 | Phoebe Esperanza Segales | DoorDash; Inc. | Cerritos | CA | $ | 750.00 |
| 01-19-0002-8290 | Joseph Sepulveda | DoorDash; Inc. | Hanford | CA | $ | 750.00 |
| 01-19-0002-8291 | Fachon Servio | DoorDash; Inc. | Orange | CA | $ | 750.00 |
| 01-19-0002-8292 | Joey Silva | DoorDash; Inc. | Martienz | CA | $ | 750.00 |
| 01-19-0002-8293 | Jaspreet Singh | DoorDash; Inc. | Citrus Height | CA | $ | 750.00 |
| 01-19-0002-8294 | Sergey Sinyutin | DoorDash; Inc. | San Jose | CA | $ | 750.00 |
| 01-19-0002-8295 | Brittany Smith | DoorDash; Inc. | Chino | CA | $ | 750.00 |
| 01-19-0002-8297 | Diana Solis | DoorDash; Inc. | Oro Grande | CA | $ | 750.00 |
| 01-19-0002-8298 | Kimaree Solomon | DoorDash; Inc. | Vallejo | CA | $ | 750.00 |
| 01-19-0002-8299 | Ashley Sorpraseuth | DoorDash; Inc. | San Diego | CA | $ | 750.00 |

| 01-19-0002-8300 | Jessica Stewart | DoorDash; Inc. | Richmond | CA | $ | 750.00 |
| 01-19-0002-8301 | Bria Stewart | DoorDash; Inc. | Ontario | CA | $ | 750.00 |
| 01-19-0002-8302 | Barbara Stoeser | DoorDash; Inc. | Concord | CA | $ | 750.00 |
| 01-19-0002-8303 | Kyle Stuart | DoorDash; Inc. | Sacramento | CA | $ | 750.00 |
| 01-19-0002-8304 | Christopher Sylvester | DoorDash; Inc. | Long Beach | CA | $ | 750.00 |
| 01-19-0002-8305 | Estia Takamotonga | DoorDash; Inc. | East Palo Alto | CA | $ | 750.00 |
| 01-19-0002-8306 | Christopher Talaga | DoorDash; Inc. | San Jose | CA | $ | 750.00 |
| 01-19-0002-8307 | Sojan Tandukar | DoorDash; Inc. | Aliso Viejo | CA | $ | 750.00 |
| 01-19-0002-8308 | Feahoaki Tapopo | DoorDash; Inc. | Hesperia | CA | $ | 750.00 |
| 01-19-0002-8309 | Adel Tawfik | DoorDash; Inc. | Bay Point | CA | $ | 750.00 |
| 01-19-0002-8310 | Dorte Thomas | DoorDash; Inc. | Concord | CA | $ | 750.00 |
| 01-19-0002-8317 | Nequetta Thompson | DoorDash; Inc. | Carson | CA | $ | 750.00 |
| 01-19-0002-8318 | Gabriel Torneros | DoorDash; Inc. | Elk Grove | CA | $ | 750.00 |
| 01-19-0002-8319 | Terrance Tucker | DoorDash; Inc. | Tracy | CA | $ | 750.00 |
| 01-19-0002-8320 | Kory Turner | DoorDash; Inc. | Sacramento | CA | $ | 750.00 |
| 01-19-0002-8321 | Jessica Uva | DoorDash; Inc. | Modesto | CA | $ | 750.00 |
| 01-19-0002-8322 | Elisa Vasquez | DoorDash; Inc. | Santa Ana | CA | $ | 750.00 |
| 01-19-0002-8323 | Cindy Vera Cruz | DoorDash; Inc. | Los Angeles | CA | $ | 750.00 |
| 01-19-0002-8325 | Jiros Vickson | DoorDash; Inc. | Moreno Valley | CA | $ | 750.00 |
| 01-19-0002-8327 | Sheidon Ward | DoorDash; Inc. | Long Beach | CA | $ | 750.00 |
| 01-19-0002-8329 | Armon Ware | DoorDash; Inc. | La Palma | CA | $ | 750.00 |
| 01-19-0002-8332 | Elijah Watson | DoorDash; Inc. | Los Angeles | CA | $ | 750.00 |
| 01-19-0002-8334 | Michael West | DoorDash; Inc. | Pasadena | CA | $ | 750.00 |
| 01-19-0002-8336 | Trena Wheeler | DoorDash; Inc. | Upland | CA | $ | 750.00 |
| 01-19-0002-8338 | Annette White | DoorDash; Inc. | Fresno | CA | $ | 750.00 |
| 01-19-0002-8341 | Malaysia Williams | DoorDash; Inc. | Los Angeles | CA | $ | 750.00 |
| 01-19-0002-8343 | Felicia Williams | DoorDash; Inc. | Riverside | CA | $ | 750.00 |
| 01-19-0002-8345 | Latasha Williams | DoorDash; Inc. | Berkeley | CA | $ | 750.00 |
| 01-19-0002-8346 | Monet Wilson | DoorDash; Inc. | San Francisco | CA | $ | 750.00 |
| 01-19-0002-8347 | Marissa Worthy | DoorDash; Inc. | San Diego | CA | $ | 750.00 |
| 01-19-0002-8348 | Richard Zamora | DoorDash; Inc. | Azusa | CA | $ | 750.00 |
| 01-19-0002-8349 | George Zamudio | DoorDash; Inc. | Salinas | CA | $ | 750.00 |
| 01-19-0002-8351 | Guillermo Zavala | DoorDash; Inc. | Modesto | CA | $ | 750.00 |
| 01-19-0002-1633 | Nicole Addison | DoorDash; Inc. | Antioch | CA | $ | 750.00 |

| 01-19-0004-0567 | Patrick Arata | DoorDash, Inc. | San Jose | CA | $ | 750.00 |
| --- | --- | --- | --- | --- | --- | --- |

| | $ | 178,500.00 |
| --- | --- | --- |
| | **Due January 21st** | |

# EXHIBIT N



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 108322033C3344FCB5A0A6AA8E2C2FEF | | Status: Completed |
| Subject: DoorDash Declaration Court Update - Aaron Lee - ██████ | | |
| Source Envelope: | | |
| Document Pages: 1 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Jeremy Troxel |
| AutoNav: Enabled | | 910 17th Street, NW |
| EnvelopeId Stamping: Enabled | | Washington, DC  20006 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | attorneys@deliverydriverhelp.com |
| | | IP Address: 174.222.129.144 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jeremy Troxel | Location: DocuSign |
| 12/5/2019 7:07:21 PM | attorneys@deliverydriverhelp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Aaron Lee<br>██████████<br>Security Level:<br>DocuSign.email<br>ID: 1<br>12/5/2019 7:07:23 PM | *(DocuSigned by signature)*<br>5FA42F60FCB14E8...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: ██████████<br>Signed using mobile | Sent: 12/5/2019 7:07:22 PM<br>Viewed: 12/5/2019 7:07:35 PM<br>Signed: 12/5/2019 7:07:46 PM |
| Electronic Record and Signature Disclosure:<br>Accepted: 8/13/2019 6:41:55 PM<br>ID: 0cee3c04-57ce-4cd7-af48-c212d1569359 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/5/2019 7:07:22 PM |
| Certified Delivered | Security Checked | 12/5/2019 7:07:35 PM |
| Signing Complete | Security Checked | 12/5/2019 7:07:46 PM |
| Completed | Security Checked | 12/5/2019 7:07:46 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Troxel Law (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

## Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

## Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

## Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

## All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Troxel Law:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Troxel Law of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at attorneys@troxellaw.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Troxel Law**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to attorneys@troxellaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Troxel Law**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jon@pioneertownmedia.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent..  The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Troxel Law as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Troxel Law during the course of your relationship with Troxel Law.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 2867224FF9DA48A18190FD9096BA2181 | | Status: Completed |
| Subject: Delivery Driver Compensation Claim - Aaron Wheeler - ▇▇▇▇▇▇▇ | | |
| Source Envelope: | | |
| Document Pages: 12 | Signatures: 2 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 1 | Jeremy Troxel |
| AutoNav: Enabled | | 910 17th Street, NW |
| EnvelopeId Stamping: Enabled | | Washington, DC  20006 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | attorneys@deliverydriverhelp.com |
| | | IP Address: 76.103.209.231 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jeremy Troxel | Location: DocuSign |
|     7/2/2019 9:18:42 AM |     attorneys@deliverydriverhelp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Aaron Wheeler<br>▇▇▇▇▇▇▇▇▇▇<br>Security Level:<br>    DocuSign.email<br>    ID: 1<br>    7/2/2019 9:18:45 AM | DocuSigned by:<br>[signature]<br>18326B1FCE64417...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: ▇▇▇▇▇▇<br>Signed using mobile | Sent: 7/2/2019 9:18:44 AM<br>Viewed: 7/2/2019 9:18:58 AM<br>Signed: 7/2/2019 9:25:08 AM |
| Electronic Record and Signature Disclosure:<br>    Accepted: 7/2/2019 9:18:58 AM<br>    ID: 38f9645d-7083-4728-9c8d-10684d314446 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/2/2019 9:18:44 AM |
| Certified Delivered | Security Checked | 7/2/2019 9:18:59 AM |
| Signing Complete | Security Checked | 7/2/2019 9:25:08 AM |
| Completed | Security Checked | 7/2/2019 9:25:08 AM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

Electronic Record and Signature Disclosure created on: 6/12/2019 10:55:01 AM
Parties agreed to: Aaron Wheeler

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Troxel Law (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Troxel Law:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Troxel Law of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at attorneys@troxellaw.com and in the body of such request you must state: your previous email address, your new email address.  We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Troxel Law**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to attorneys@troxellaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Troxel Law**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jon@pioneertownmedia.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Troxel Law as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Troxel Law during the course of your relationship with Troxel Law.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: CE1D5C73E16C41A0BD5EAD2836656072 | | Status: Completed |
| Subject: DoorDash Declaration Court Update - Adriana Cassell - ███████ | | |
| Source Envelope: | | |
| Document Pages: 2 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Jeremy Troxel |
| AutoNav: Enabled | | 910 17th Street, NW |
| EnvelopeId Stamping: Enabled | | Washington, DC 20006 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | attorneys@deliverydriverhelp.com |
| | | IP Address: 172.58.21.26 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jeremy Troxel | Location: DocuSign |
| 12/8/2019 4:27:49 PM | attorneys@deliverydriverhelp.com | |

| Signer Events | Signature | Timestamp |
|---|---|---|
| Adriana Cassell | ![signature] -82874C2EC5F64FB... | Sent: 12/8/2019 4:27:50 PM |
| ███████ | | Viewed: 12/8/2019 4:28:02 PM |
| Security Level: | | Signed: 12/8/2019 4:28:15 PM |
| DocuSign.email | | |
| ID: 1 | | |
| 12/8/2019 4:27:51 PM | Signature Adoption: Drawn on Device | |
| | Using IP Address: ███████ | |
| | Signed using mobile | |
| Electronic Record and Signature Disclosure: | | |
| Accepted: 7/8/2019 6:01:43 PM | | |
| ID: 21128920-1800-486e-b4f4-056fa48418c4 | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/8/2019 4:27:50 PM |
| Certified Delivered | Security Checked | 12/8/2019 4:28:02 PM |
| Signing Complete | Security Checked | 12/8/2019 4:28:15 PM |
| Completed | Security Checked | 12/8/2019 4:28:15 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

**Electronic Record and Signature Disclosure**

Electronic Record and Signature Disclosure created on: 6/12/2019 10:55:01 AM
Parties agreed to: Adriana Cassell

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Troxel Law (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Troxel Law:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Troxel Law of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at attorneys@troxellaw.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Troxel Law**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to attorneys@troxellaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Troxel Law**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jon@pioneertownmedia.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Troxel Law as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Troxel Law during the course of your relationship with Troxel Law.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 82DC824DAB8C4D7DB5E132364402838A | | Status: Completed |
| Subject: Delivery Driver Compensation Claim - Ahndy Emelia - ▇▇▇▇▇▇ | | |
| Source Envelope: | | |
| Document Pages: 12 | Signatures: 4 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 2 | Jeremy Troxel |
| AutoNav: Enabled | | 910 17th Street, NW |
| EnvelopeId Stamping: Enabled | | Washington, DC 20006 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | attorneys@deliverydriverhelp.com |
| | | IP Address: 99.203.106.102 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jeremy Troxel | Location: DocuSign |
|     7/6/2019 10:47:10 PM | attorneys@deliverydriverhelp.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Ahndy Emelia<br>▇▇▇▇▇▇▇▇<br>Security Level:<br>    DocuSign.email<br>    ID: 1<br>    7/6/2019 10:47:12 PM | [DocuSigned by signature image]<br>57468373AF2C4DC...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: ▇▇▇▇▇▇▇<br>Signed using mobile | Sent: 7/6/2019 10:47:11 PM<br>Viewed: 7/6/2019 10:47:22 PM<br>Signed: 7/6/2019 10:52:24 PM |
| Electronic Record and Signature Disclosure:<br>    Accepted: 7/6/2019 10:47:22 PM<br>    ID: 4bc24a39-7304-47f9-bed8-13d0a099261f | | |

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

| Witness Events | Signature | Timestamp |
|---|---|---|

| Notary Events | Signature | Timestamp |
|---|---|---|

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 7/6/2019 10:47:11 PM |
| Certified Delivered | Security Checked | 7/6/2019 10:47:22 PM |
| Signing Complete | Security Checked | 7/6/2019 10:52:24 PM |
| Completed | Security Checked | 7/6/2019 10:52:24 PM |

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Troxel Law (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Troxel Law:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Troxel Law of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at attorneys@troxellaw.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Troxel Law**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to attorneys@troxellaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Troxel Law**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jon@pioneertownmedia.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Troxel Law as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Troxel Law during the course of your relationship with Troxel Law.



## Certificate Of Completion

| | | |
|---|---|---|
| Envelope Id: 5CE539629DBC42C38DF2425CDE14B8BE | | Status: Completed |
| Subject: DoorDash Declaration Court Update - Aireez Asberry - ▬▬▬▬▬ | | |
| Source Envelope: | | |
| Document Pages: 2 | Signatures: 1 | Envelope Originator: |
| Certificate Pages: 4 | Initials: 0 | Jeremy Troxel |
| AutoNav: Enabled | | 910 17th Street, NW |
| EnvelopeId Stamping: Enabled | | Washington, DC 20006 |
| Time Zone: (UTC-08:00) Pacific Time (US & Canada) | | attorneys@deliverydriverhelp.com |
| | | IP Address: 69.181.52.165 |

## Record Tracking

| | | |
|---|---|---|
| Status: Original | Holder: Jeremy Troxel | Location: DocuSign |
| 12/6/2019 3:58:54 PM | attorneys@deliverydriverhelp.com | |

## Signer Events

| Signer Events | Signature | Timestamp |
|---|---|---|
| Aireez Asberry<br>▬▬▬▬▬<br>Security Level:<br>DocuSign.email<br>ID: 1<br>12/6/2019 3:58:56 PM | *(signature)*<br>7CBCC299D50944B...<br><br>Signature Adoption: Drawn on Device<br>Using IP Address: ▬▬▬▬▬<br>Signed using mobile | Sent: 12/6/2019 3:58:55 PM<br>Viewed: 12/6/2019 3:59:03 PM<br>Signed: 12/6/2019 3:59:12 PM |
| Electronic Record and Signature Disclosure:<br>Accepted: 7/6/2019 7:46:21 AM<br>ID: 9113f6a4-e43b-4027-a63f-226519dad9a2 | | |

## In Person Signer Events

| In Person Signer Events | Signature | Timestamp |
|---|---|---|

## Editor Delivery Events

| Editor Delivery Events | Status | Timestamp |
|---|---|---|

## Agent Delivery Events

| Agent Delivery Events | Status | Timestamp |
|---|---|---|

## Intermediary Delivery Events

| Intermediary Delivery Events | Status | Timestamp |
|---|---|---|

## Certified Delivery Events

| Certified Delivery Events | Status | Timestamp |
|---|---|---|

## Carbon Copy Events

| Carbon Copy Events | Status | Timestamp |
|---|---|---|

## Witness Events

| Witness Events | Signature | Timestamp |
|---|---|---|

## Notary Events

| Notary Events | Signature | Timestamp |
|---|---|---|

## Envelope Summary Events

| Envelope Summary Events | Status | Timestamps |
|---|---|---|
| Envelope Sent | Hashed/Encrypted | 12/6/2019 3:58:55 PM |
| Certified Delivered | Security Checked | 12/6/2019 3:59:03 PM |
| Signing Complete | Security Checked | 12/6/2019 3:59:12 PM |
| Completed | Security Checked | 12/6/2019 3:59:12 PM |

## Payment Events

| Payment Events | Status | Timestamps |
|---|---|---|

## Electronic Record and Signature Disclosure

## ELECTRONIC RECORD AND SIGNATURE DISCLOSURE

From time to time, Troxel Law (we, us or Company) may be required by law to provide to you certain written notices or disclosures. Described below are the terms and conditions for providing to you such notices and disclosures electronically through the DocuSign system. Please read the information below carefully and thoroughly, and if you can access this information electronically to your satisfaction and agree to this Electronic Record and Signature Disclosure (ERSD), please confirm your agreement by selecting the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

### Getting paper copies

At any time, you may request from us a paper copy of any record provided or made available electronically to you by us. You will have the ability to download and print documents we send to you through the DocuSign system during and immediately after the signing session and, if you elect to create a DocuSign account, you may access the documents for a limited period of time (usually 30 days) after such documents are first sent to you. After such time, if you wish for us to send you paper copies of any such documents from our office to you, you will be charged a $0.00 per-page fee. You may request delivery of such paper copies from us by following the procedure described below.

### Withdrawing your consent

If you decide to receive notices and disclosures from us electronically, you may at any time change your mind and tell us that thereafter you want to receive required notices and disclosures only in paper format. How you must inform us of your decision to receive future notices and disclosure in paper format and withdraw your consent to receive notices and disclosures electronically is described below.

### Consequences of changing your mind

If you elect to receive required notices and disclosures only in paper format, it will slow the speed at which we can complete certain steps in transactions with you and delivering services to you because we will need first to send the required notices or disclosures to you in paper format, and then wait until we receive back from you your acknowledgment of your receipt of such paper notices or disclosures. Further, you will no longer be able to use the DocuSign system to receive required notices and consents electronically from us or to sign electronically documents from us.

### All notices and disclosures will be sent to you electronically

Unless you tell us otherwise in accordance with the procedures described herein, we will provide electronically to you through the DocuSign system all required notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you during the course of our relationship with you. To reduce the chance of you inadvertently not receiving any notice or disclosure, we prefer to provide all of the required notices and disclosures to you by the same method and to the same address that you have given us. Thus, you can receive all the disclosures and notices electronically or in paper format through the paper mail delivery system. If you do not agree with this process, please let us know as described below. Please also see the paragraph immediately above that describes the consequences of your electing not to receive delivery of the notices and disclosures electronically from us.

**How to contact Troxel Law:**

You may contact us to let us know of your changes as to how we may contact you electronically, to request paper copies of certain information from us, and to withdraw your prior consent to receive notices and disclosures electronically as follows:

**To advise Troxel Law of your new email address**

To let us know of a change in your email address where we should send notices and disclosures electronically to you, you must send an email message to us at attorneys@troxellaw.com and in the body of such request you must state: your previous email address, your new email address. We do not require any other information from you to change your email address.

If you created a DocuSign account, you may update it with your new email address through your account preferences.

**To request paper copies from Troxel Law**

To request delivery from us of paper copies of the notices and disclosures previously provided by us to you electronically, you must send us an email to attorneys@troxellaw.com and in the body of such request you must state your email address, full name, mailing address, and telephone number. We will bill you for any fees at that time, if any.

**To withdraw your consent with Troxel Law**

To inform us that you no longer wish to receive future notices and disclosures in electronic format you may:

i. decline to sign a document from within your signing session, and on the subsequent page, select the check-box indicating you wish to withdraw your consent, or you may;

ii. send us an email to jon@pioneertownmedia.com and in the body of such request you must state your email, full name, mailing address, and telephone number. We do not need any other information from you to withdraw consent.. The consequences of your withdrawing consent for online documents will be that transactions may take a longer time to process..

**Required hardware and software**

The minimum system requirements for using the DocuSign system may change over time. The current system requirements are found here: https://support.docusign.com/guides/signer-guide-signing-system-requirements.

**Acknowledging your access and consent to receive and sign documents electronically**

To confirm to us that you can access this information electronically, which will be similar to other electronic notices and disclosures that we will provide to you, please confirm that you have read this ERSD, and (i) that you are able to print on paper or electronically save this ERSD for your future reference and access; or (ii) that you are able to email this ERSD to an email address where you will be able to print on paper or save it for your future reference and access. Further, if you consent to receiving notices and disclosures exclusively in electronic format as described herein, then select the check-box next to 'I agree to use electronic records and signatures' before clicking 'CONTINUE' within the DocuSign system.

By selecting the check-box next to 'I agree to use electronic records and signatures', you confirm that:

- You can access and read this Electronic Record and Signature Disclosure; and
- You can print on paper this Electronic Record and Signature Disclosure, or save or send this Electronic Record and Disclosure to a location where you can print it, for future reference and access; and
- Until or unless you notify Troxel Law as described above, you consent to receive exclusively through electronic means all notices, disclosures, authorizations, acknowledgements, and other documents that are required to be provided or made available to you by Troxel Law during the course of your relationship with Troxel Law.

# EXHIBIT O



**Planet Depos®**
We Make It *Happen*™

# Transcript of Allen Waxman

**Date:** December 27, 2019
**Case:** Abernathy -v- Doordash

**Planet Depos**
**Phone:** 888.433.3767
**Email::** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

1              UNITED STATES DISTRICT COURT

2            NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4    --------------------------------X

5    TERRELL ABERNATHY, et al,          :

6                                       :

7                    Petitioners, :

8         vs.                   :Case No:

9                                :3:19-cv-07545

10   DOORDASH INC.,                     :

11                  Respondent.  :

12   --------------------------------X

13       Videotaped Deposition of ALLEN WAXMAN

14                    NEW YORK

15            FRIDAY, DECEMBER 27, 2019

16                   9:30 A.M.

17   Job No.:  279552

18   Pages: 1 - 267

19   Reported by: Adrienne Mignano, RPR

20

21

22

23

24

25

Transcript of Allen Waxman
Conducted on December 27, 2019                    2

1      Videotaped Deposition of ALLEN WAXMAN, held at

2    the offices of:

3

4

5           MORGAN, LEWIS & BOCKIUS LLP

6           101 Park Avenue

7           New York, New York 10178

8

9

10

11           Pursuant to Notice, before Adrienne M.

12    Mignano, Notary Public in and for the State of New

13    York.

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Allen Waxman
Conducted on December 27, 2019                    3

```
 1           A P P E A R A N C E S

 2   ON BEHALF OF PETITIONER:

 3        KELLER LENKNER

 4        AARON M. ZIGLER, ESQUIRE

 5        TOM KAYES, ESQUIRE

 6        150 N. Riverside Plaza

 7        Chicago, Illinois 60606

 8        (312) 210-7278

 9

10   ON BEHALF OF RESPONDENT:

11        JESENKA MRDJENOVIC, ESQUIRE

12        GIBSON, DUNN & CRUTCHER, LLP`

13        1050 Connecticut Avenue, N.W.

14        Washington, D.C. 20036-5306

15        (202) 955-8500

16

17   ON BEHALF OF WITNESS:

18        KIMBERLEY LUNETTA, ESQUIRE

19        SAMANTHA PADILLA, ESQUIRE

20        MORGAN, LEWIS & BOCKIUS LLP`

21        101 Park Avenue

22        New York, New York 10178

23        (202) 955-8500

24   ALSO PRESENT:  Enrique Casas - Videographer

25                  Anna M. Hershenberg, Esq.
```

Transcript of Allen Waxman
Conducted on December 27, 2019                    4

```
 1        -------------- I N D E X ----------------

 2     WITNESS          EXAMINATION BY              PAGE

 3     ALLEN WAXMAN

 4               MR. ZIGLER                           7

 5               MS. LUNETTA                        256

 6               MR. ZIGLER                         257

 7

 8        ---------------- EXHIBITS ----------------

 9     PETITIONER'S                            FOR ID.

10     Exhibit 1  Form 990                          13

11     Exhibit 2  Document entitled Business Unusual 61

12                Rules

13     Exhibit 3  Annual Review for CPR 2018         82

14     Exhibit 4  E-mail, Dated May 14, 2019         85

15     Exhibit 5  Handwritten Notes of Ms. Erickson  91

16     Exhibit 6  E-mail from Helena Erickson       101

17     Exhibit 7  E-mail                             97

18     Exhibit 8  E-mail from Helena Erickson       125

19     Exhibit 9  Notes of Allen Waxman             126

20     Exhibit 10  E-mail from Allen Waxman         133

21     Exhibit 11  E-mail from Allen Waxman         152

22     Exhibit 12  E-mail from Allen Waxman         162

23     Exhibit 13  Invite                           168

24     Exhibit 14  Draft of Protocol                180

25     Exhibit 15  Draft of Protocol                185
```

Transcript of Allen Waxman
Conducted on December 27, 2019                    5

```
1      ---------------- EXHIBITS ----------------

2    PETITIONER'S                          FOR ID.

3    Exhibit 16  Draft of Protocol             195

4    Exhibit 17  Invite for phone call         202

5    Exhibit 18  Draft of Protocol             204

6    Exhibit 19  E-mail from Allen Waxman      214

7    Exhibit 20  E-mail from Allen Waxman      217

8    Exhibit 21  E-mail from Allen Waxman      222

9    Exhibit 22  Draft of Protocol             224

10   Exhibit 23  E-mail from Allen Waxman      227

11   Exhibit 24  E-mail from Allen Waxman      229

12   Exhibit 25  E-mail from Allen Waxman      234

13   Exhibit 26  E-mail from Gregg Farano      235

14   Exhibit 27  E-mail from Michael Holecek   236

15   Exhibit 28  E-mail from Allen Waxman      236

16   Exhibit 29  E-mail from Michael Holecek   240

17   Exhibit 30  Calendar of Allen Waxman      252

18   Exhibit 31  E-mail from Ms. Erickson      250

19   Exhibit 32  Diary of Ms. Erickson         253

20

21

22

23

24

25
```

| | | |
|---|---|---|
| 1 | THE VIDEOGRAPHER:  Here begins disk | |
| 2 | number one in the videotaped deposition of Allen | 09:33:54 |
| 3 | Waxman in the matter of Abernathy versus DoorDash, | 09:33:58 |
| 4 | in the United States District Court, Northern | 09:33:59 |
| 5 | District of California, San Francisco Division; | 09:34:03 |
| 6 | Case Number: 3:19-CV-07545(WHA). | 09:34:05 |
| 7 | Today's date is December 27, 2019.  The | 09:34:11 |
| 8 | time on the video monitor is 9:34 a.m. | 09:34:14 |
| 9 | The videographer today is Enrique Casas | 09:34:17 |
| 10 | representing Planet Depos.  This videotaped | 09:34:20 |
| 11 | deposition is taking place at 101 Park Avenue, New | 09:34:23 |
| 12 | York, New York 10178. | 09:34:26 |
| 13 | Would counsel please voice identify | 09:34:28 |
| 14 | themselves and state who they represent. | 09:34:30 |
| 15 | MR. ZIGLER:  Aaron Zigler for the | 09:34:32 |
| 16 | plaintiffs. | 09:34:34 |
| 17 | MR. KAYES:  Tom Kayes for the | 09:34:36 |
| 18 | plaintiffs. | 09:34:37 |
| 19 | MS. LUNETTA:  Kimberley Lunetta, | 09:34:39 |
| 20 | Morgan, Lewis & Bockius, on behalf of third-party | 09:34:39 |
| 21 | witness, CPR. | 09:34:41 |
| 22 | MS. PADILLA:  Samantha Padilla, Morgan | 09:34:46 |
| 23 | Lewis, on behalf of third-party witness, CPR. | 09:34:46 |
| 24 | MS. HERSHENBERG:  Anna Hershenberg, | 09:34:51 |
| 25 | corporate counsel with CPR, for third-party | 09:34:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    7

| | | |
|---|---|---|
| 1 | witness, CPR. | 09:34:53 |
| 2 | MS. DeSTEFANO:  Sara DeStefano on | 09:34:58 |
| 3 | behalf of third-party witness, CPR, with Morgan, | 09:34:58 |
| 4 | Lewis & Bockius. | 09:35:00 |
| 5 | MS. MRDJENOVIC:  Jesenka Mrdjenovic, | 09:35:02 |
| 6 | Gibson Dunn, on behalf of DoorDash. | 09:35:02 |
| 7 | THE VIDEOGRAPHER:  The court reporter | 09:35:08 |
| 8 | today is Adrienne Mignano, representing Planet | 09:35:08 |
| 9 | Depos. | 09:35:10 |
| 10 | Would the reporter please swear in the | 09:35:11 |
| 11 | witness. | 09:35:12 |
| 12 | Whereupon, | 09:35:13 |
| 13 | A L L E N   W A X M A N, | 09:35:13 |
| 14 | being first duly sworn or affirmed to testify to | 09:35:13 |
| 15 | the truth, the whole truth, and nothing but the | 09:35:13 |
| 16 | truth, was examined and testified as follows: | 09:35:13 |
| 17 | EXAMINATION BY COUNSEL FOR THE PLAINTIFF | 09:35:13 |
| 18 | BY MR. ZIGLER: | 09:35:21 |
| 19 | Q    Please state your name. | 09:35:23 |
| 20 | A    Allen Waxman. | 09:35:24 |
| 21 | Q    Are you employed, Mr. Waxman? | 09:35:25 |
| 22 | A    I am. | 09:35:27 |
| 23 | Q    And who is your current employer? | 09:35:28 |
| 24 | A    The International Institute for | 09:35:30 |
| 25 | Conflict Prevention & Resolution, otherwise known | 09:35:33 |

| | | |
|---|---|---|
| 1 | as CPR. | 09:35:33 |
| 2 | Q    Can we refer to your employer as CPR | 09:35:38 |
| 3 | today? | 09:35:40 |
| 4 | A    Please do. | 09:35:42 |
| 5 | Q    What is your current job title? | 09:35:42 |
| 6 | A    President and CEO. | 09:35:44 |
| 7 | Q    What does CPR do? | 09:35:46 |
| 8 | A    CPR's mission is conflict prevention | 09:35:48 |
| 9 | and resolution.  It is part think tank, in which | 09:35:51 |
| 10 | it brings together stakeholders to generate | 09:35:55 |
| 11 | innovations in the area of dispute prevention and | 09:35:59 |
| 12 | resolution.  And it is also a dispute resolution | 09:36:03 |
| 13 | provider, in which it has independent neutrals and | 09:36:06 |
| 14 | provides arbitration, mediation and other | 09:36:10 |
| 15 | services. | 09:36:12 |
| 16 | Q    How does CPR prevent disputes? | 09:36:16 |
| 17 | A    I mean, there is a variety of ways. | 09:36:23 |
| 18 | One of the ways we're working on is by | 09:36:26 |
| 19 | establishing provisions for standing or standby | 09:36:28 |
| 20 | neutrals in relationships that can help identify | 09:36:32 |
| 21 | issues between parties and prevent conflict before | 09:36:36 |
| 22 | it arises. | 09:36:40 |
| 23 | Q    So CPR has a part of it that is | 09:36:46 |
| 24 | reviewing contracts to resolve any ambiguities | 09:36:50 |
| 25 | before they are finalized? | 09:36:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                      9

| | | |
|---|---|---|
| 1 | A    No, no, we are a neutral -- we provide | 09:36:55 |
| 2 | best practices for parties to use if they so | 09:36:59 |
| 3 | choose. | 09:37:02 |
| 4 | Q    Right. | 09:37:03 |
| 5 | So CPR is not out making sure there | 09:37:04 |
| 6 | aren't any ambiguities in contracts or stress | 09:37:07 |
| 7 | testing products to make sure they don't fail? | 09:37:11 |
| 8 | A    We provide no legal services per se. | 09:37:13 |
| 9 | We provide best practices, guides, protocols, | 09:37:16 |
| 10 | rules to help guide either dispute prevention or | 09:37:21 |
| 11 | dispute resolution. | 09:37:26 |
| 12 | Q    And so is it fair to characterize it as | 09:37:28 |
| 13 | providing services to try to avoid litigation? | 09:37:32 |
| 14 | A    One of the things we do is we try to | 09:37:38 |
| 15 | provide alternatives to litigation.  Another is we | 09:37:41 |
| 16 | may facilitate resolution during litigation.  And | 09:37:44 |
| 17 | by the way I say that, is there may be best | 09:37:50 |
| 18 | practices for how to do that and there also may be | 09:37:54 |
| 19 | a desire by parties to engage one of our mediators | 09:37:56 |
| 20 | to resolve disputes. | 09:38:01 |
| 21 | Q    That have occurred during litigation? | 09:38:04 |
| 22 | A    That have occurred during litigation, | 09:38:05 |
| 23 | before litigation, on appeal; different points in | 09:38:07 |
| 24 | time. | 09:38:10 |
| 25 | Q    Okay. | 09:38:11 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    10

| | | |
|---|---|---|
| 1 | Resolve disputes regardless of when | 09:38:11 |
| 2 | they might occur? | 09:38:13 |
| 3 | A    Correct.  Legal disputes. | 09:38:14 |
| 4 | Q    Okay. | 09:38:17 |
| 5 | Is there a best practices for when that | 09:38:17 |
| 6 | resolution should occur? | 09:38:20 |
| 7 | MS. LUNETTA:  Objection to form.  You | 09:38:25 |
| 8 | can answer. | 09:38:26 |
| 9 | A    I think it is highly circumstantial, | 09:38:29 |
| 10 | depending upon the facts and circumstances of the | 09:38:31 |
| 11 | nature of the dispute. | 09:38:34 |
| 12 | Q    So CPR doesn't have a position on -- | 09:38:36 |
| 13 | excuse me. | 09:38:39 |
| 14 | You don't have a position on whether it | 09:38:39 |
| 15 | is better to resolve disputes prior to litigation, | 09:38:41 |
| 16 | during litigation, in the course of litigation; | 09:38:44 |
| 17 | you don't have a preference there? | 09:38:47 |
| 18 | A    I think our preference is for | 09:38:51 |
| 19 | resolution and preventing legal disputes, if | 09:38:54 |
| 20 | possible, and resolving them more efficiently and | 09:38:58 |
| 21 | effectively if they do arise. | 09:39:01 |
| 22 | Q    Okay. | 09:39:03 |
| 23 | Is there a timing feature to resolving | 09:39:03 |
| 24 | disputes more effectively? | 09:39:10 |
| 25 | MS. LUNETTA:  Objection to form. | 09:39:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    11

| | | |
|---|---|---|
| 1 | A    I'm not sure I understand the question. | 09:39:15 |
| 2 | Q    You said that you would like, if | 09:39:25 |
| 3 | possible, to resolve disputes more efficiently and | 09:39:28 |
| 4 | effectively if they arise. | 09:39:32 |
| 5 | A    Yes. | 09:39:34 |
| 6 | Q    And my question is:  Are disputes | 09:39:34 |
| 7 | resolved more efficiently and effectively if they | 09:39:38 |
| 8 | are resolved prior to litigation or during | 09:39:42 |
| 9 | litigation? | 09:39:45 |
| 10 | MS. LUNETTA:  Same objection. | 09:39:46 |
| 11 | A    If it is possible to resolve the | 09:39:49 |
| 12 | disputes before litigation, then we would seek to | 09:39:51 |
| 13 | facilitate the resolution of the dispute before | 09:39:55 |
| 14 | litigation.  If it is necessary to resolve the | 09:39:58 |
| 15 | dispute during litigation, then we hope to | 09:40:01 |
| 16 | facilitate the resolution of the dispute during | 09:40:04 |
| 17 | litigation. | 09:40:07 |
| 18 | Q    And who do you perform these services | 09:40:11 |
| 19 | on behalf of? | 09:40:14 |
| 20 | MS. LUNETTA:  Objection to the form. | 09:40:18 |
| 21 | You can answer. | 09:40:19 |
| 22 | A    So in generating best practices, it is | 09:40:20 |
| 23 | available to whoever wants to use them.  If, in | 09:40:23 |
| 24 | fact, mediators or arbitrators are engaged, then | 09:40:26 |
| 25 | it would be in connection with particular | 09:40:32 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          12

| | | |
|---|---|---|
| 1 | disputes, the parties in those disputes. | 09:40:35 |
| 2 | Q    Do you market your services to | 09:40:38 |
| 3 | particular segments? | 09:40:40 |
| 4 | MS. LUNETTA:  Objection to form. | 09:40:43 |
| 5 | A    Our services are generally available to | 09:40:51 |
| 6 | the marketplace. | 09:40:53 |
| 7 | Q    That wasn't my question. | 09:40:55 |
| 8 | Do you market your dispute resolution | 09:40:57 |
| 9 | services to particular segments of the market? | 09:41:00 |
| 10 | MS. LUNETTA:  Objection to form. | 09:41:03 |
| 11 | A    I'm struggling with the idea of | 09:41:06 |
| 12 | particular segments.  We have, for instance, | 09:41:08 |
| 13 | specialty panels that may specialize on IP | 09:41:11 |
| 14 | disputes, and so we're available to resolve IP | 09:41:16 |
| 15 | disputes that may arise.  Life science health care | 09:41:19 |
| 16 | disputes, we have a specialty panel.  Construction | 09:41:23 |
| 17 | disputes, we have a specialty panel.  So in terms | 09:41:25 |
| 18 | of the nature of disputes, we have experts in | 09:41:30 |
| 19 | those areas to help resolve them. | 09:41:35 |
| 20 | Q    Let me start with the big picture. | 09:41:39 |
| 21 | Do you generally direct your services | 09:41:42 |
| 22 | to businesses or individuals? | 09:41:45 |
| 23 | A    Some of our services relate to | 09:41:56 |
| 24 | businesses.  I think in the employment area, it's | 09:41:58 |
| 25 | businesses and individuals.  So it really just | 09:42:03 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    13

| | | |
|---|---|---|
| 1 | depends upon the nature of the disputes. | 09:42:07 |
| 2 |     Q    Would you say that that's been true of | 09:42:11 |
| 3 | CPR for a significant length of time or is that a | 09:42:13 |
| 4 | relatively new development? | 09:42:18 |
| 5 |         MS. LUNETTA:  Objection to form. | 09:42:20 |
| 6 |     A    I think CPR has been available in that | 09:42:23 |
| 7 | regard for a longer period of time.  I think more | 09:42:27 |
| 8 | recently in connection with employment mass | 09:42:29 |
| 9 | claims, we got involved in developing an | 09:42:34 |
| 10 | employment-related mass claims protocol, and that | 09:42:36 |
| 11 | is a more recent development. | 09:42:40 |
| 12 |     Q    But generally, being available to | 09:42:42 |
| 13 | businesses and individuals is something that CPR | 09:42:46 |
| 14 | has been doing for much longer than September; is | 09:42:50 |
| 15 | that true? | 09:42:54 |
| 16 |     A    Yes. | 09:42:56 |
| 17 |         (Waxman Exhibit 1 marked for | 09:42:56 |
| 18 | identification and attached to the transcript.) | 09:42:56 |
| 19 | BY MR. ZIGLER: | 09:43:43 |
| 20 |     Q    Mr. Waxman, I'm going to hand you | 09:43:43 |
| 21 | what's been marked as Exhibit 1.  If you can take | 09:43:46 |
| 22 | a minute to look at that and tell me when you're | 09:43:50 |
| 23 | ready. | 09:43:52 |
| 24 |         MS. LUNETTA:  I'm happy to hear where | 09:44:11 |
| 25 | this is going, but I'm going to object to this | 09:44:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    14

| 1 | document being used because this is not a 30(b)(6) | 09:44:18 |
| 2 | deposition. | 09:44:22 |
| 3 | MR. ZIGLER:  Okay.  And for the record, | 09:44:38 |
| 4 | the document that I put in front of Mr. Waxman is | 09:44:53 |
| 5 | 52 pages, double sided.  We tried to save on some | 09:44:56 |
| 6 | trees. | 09:45:02 |
| 7 | A    You're not asking me to read the whole | 09:45:03 |
| 8 | document now? | 09:45:05 |
| 9 | Q    No, I'm just going to ask you about the | 09:45:06 |
| 10 | first two pages, but I wanted you to familiarize | 09:45:08 |
| 11 | yourself with it.  You can take as long as you | 09:45:11 |
| 12 | like. | 09:45:14 |
| 13 | A    Okay. | 09:45:16 |
| 14 | Q    Okay. | 09:45:18 |
| 15 | I want to direct you to the first page, | 09:45:18 |
| 16 | part one, summary, line one says, "Briefly | 09:45:22 |
| 17 | describe the organization's mission or most | 09:45:26 |
| 18 | significant activities." | 09:45:29 |
| 19 | Could you read that aloud for me.  Do | 09:45:31 |
| 20 | you see where I am? | 09:45:34 |
| 21 | A    Yes. | 09:45:36 |
| 22 | "CPR is the leading independent | 09:45:37 |
| 23 | resource helping businesses and their lawyers | 09:45:38 |
| 24 | resolve disputes more effectively." | 09:45:41 |
| 25 | Q    Do you believe that that is a true and | 09:45:44 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    15

| | | |
|---|---|---|
| 1 | correct statement of CPR's mission or most | 09:45:46 |
| 2 | significant activity? | 09:45:49 |
| 3 | MS. LUNETTA:  Objection.  This return | 09:45:53 |
| 4 | is dated 2017.  You can answer. | 09:45:54 |
| 5 | A    I mean, that is a significant part of | 09:45:57 |
| 6 | our mission, but let me clarify something. | 09:45:59 |
| 7 | Businesses I view, broadly speaking, as not just | 09:46:01 |
| 8 | management, but employees as well. | 09:46:07 |
| 9 | Q    Okay. | 09:46:12 |
| 10 | So you believe that -- I'm sorry, I | 09:46:16 |
| 11 | don't know if I got your answer. | 09:46:21 |
| 12 | Do you believe that the statement in | 09:46:22 |
| 13 | part one, line one of this form, 998, is | 09:46:24 |
| 14 | accurate -- | 09:46:31 |
| 15 | MS. LUNETTA:  Same objection. | 09:46:35 |
| 16 | Q    -- or not? | 09:46:36 |
| 17 | A    I believe this is a significant part of | 09:46:36 |
| 18 | our mission.  Another significant part of our | 09:46:39 |
| 19 | mission is prevention as well, as I mentioned | 09:46:45 |
| 20 | before.  But as a top level summary, yes. | 09:46:46 |
| 21 | Q    Okay. | 09:46:50 |
| 22 | So let me ask the question in a | 09:46:51 |
| 23 | different way. | 09:46:53 |
| 24 | As CEO of CPR, are you going to have | 09:46:54 |
| 25 | this summary of the organization's mission or most | 09:47:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    16

| | | |
|---|---|---|
| 1 | significant activities modified in the next tax | 09:47:08 |
| 2 | filing year, or you're going to be satisfied with | 09:47:10 |
| 3 | what's stated here for the previous years? | 09:47:14 |
| 4 | A   I'm not going to speculate on what | 09:47:18 |
| 5 | we're going to do in future years.  This was filed | 09:47:20 |
| 6 | in 2017.  I wasn't -- or in connection with 2017. | 09:47:23 |
| 7 | I wasn't the CEO at the time.  I have no problem | 09:47:27 |
| 8 | with what's stated here.  But for clarification | 09:47:31 |
| 9 | purposes I do want to say, I don't know that it | 09:47:34 |
| 10 | completely captures all of the significant | 09:47:37 |
| 11 | activities we do.  But it does capture a most | 09:47:40 |
| 12 | significant activity that we do, which is what I | 09:47:44 |
| 13 | believe is being asked for here. | 09:47:47 |
| 14 | Q   Okay. | 09:47:49 |
| 15 | And just so we're all on the same page, | 09:47:49 |
| 16 | it's for the -- if you look at the top, under line | 09:47:51 |
| 17 | A, it says it is for the 2017 calendar year, for | 09:47:55 |
| 18 | the tax year beginning 7-1-2017 and ending | 09:47:58 |
| 19 | 6-30-2018. | 09:48:01 |
| 20 | A   Understood.  Thank you for the | 09:48:03 |
| 21 | clarification. | 09:48:05 |
| 22 | I wasn't here at the time this was | 09:48:06 |
| 23 | filed. | 09:48:08 |
| 24 | Q   Sure. | 09:48:08 |
| 25 | A   I wasn't at CPR at the time this was | 09:48:09 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              17

| 1 | filed. | 09:48:15 |
| 2 | Q    Sure. | 09:48:15 |
| 3 | A    I wasn't at CPR at the time this was | 09:48:15 |
| 4 | filed.  I just started at CPR in August of this | 09:48:15 |
| 5 | year. | 09:48:18 |
| 6 | Q    Okay.  All right. | 09:48:20 |
| 7 | So can you turn to the second page and | 09:48:21 |
| 8 | then could you read me again the line one of part | 09:48:25 |
| 9 | three which says, "Briefly describe the | 09:48:31 |
| 10 | organization's mission"? | 09:48:34 |
| 11 | A    "The International Institute for | 09:48:35 |
| 12 | Conflict Prevention & Resolution, CPR, is an | 09:48:36 |
| 13 | independent nonprofit organization that helps | 09:48:41 |
| 14 | global businesses and their counsel prevent and | 09:48:44 |
| 15 | resolve commercial disputes more effectively both | 09:48:47 |
| 16 | directly by enhancing their capabilities and | 09:48:51 |
| 17 | indirectly by improving alternative dispute | 09:48:53 |
| 18 | resolution capacity worldwide." | 09:48:55 |
| 19 | Q    Okay. | 09:48:58 |
| 20 | And again, my question would be:  Do | 09:48:58 |
| 21 | you believe that that is an accurate statement? | 09:49:00 |
| 22 | A    I believe that is a fair summary. | 09:49:02 |
| 23 | Q    You can set that aside for now. | 09:49:05 |
| 24 | A    Thank you. | 09:49:07 |
| 25 | Q    So in that statement, you said -- I'm | 09:49:40 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    18

| | | |
|---|---|---|
| 1 | sorry.  It reads, "Resolve commercial disputes | 09:49:42 |
| 2 | more effectively." | 09:49:44 |
| 3 | And I'm sorry, I didn't mean to refer | 09:49:46 |
| 4 | back to it after I told you you could set it | 09:49:48 |
| 5 | aside. | 09:49:50 |
| 6 | A    That's fine. | 09:49:50 |
| 7 | Q    I just want to pick at "commercial" | 09:49:53 |
| 8 | there, "resolve commercial disputes more | 09:49:55 |
| 9 | effectively." | 09:49:58 |
| 10 | Could you define commercial disputes in | 09:49:59 |
| 11 | that context? | 09:50:02 |
| 12 | MS. LUNETTA:  Objection to form. | 09:50:09 |
| 13 | A    I'll tell you, the writers of this, | 09:50:10 |
| 14 | whatever they meant, they meant commercial, I | 09:50:13 |
| 15 | would define very broadly speaking.  I know that | 09:50:16 |
| 16 | for some time we've been involved in intellectual | 09:50:21 |
| 17 | property matters, employment matters, contract | 09:50:25 |
| 18 | matters; a whole variety of matters.  So I'm going | 09:50:32 |
| 19 | to assume, which is always a dangerous thing to | 09:50:36 |
| 20 | do, that commercial is very broad here. | 09:50:39 |
| 21 | Q    But you didn't write that, so -- and | 09:50:43 |
| 22 | you have only been there since August, so you're | 09:50:45 |
| 23 | not sure? | 09:50:48 |
| 24 | A    I didn't write it, so I can't say what | 09:50:51 |
| 25 | those who wrote it meant at the time they wrote | 09:50:54 |

| | | |
|---|---|---|
| 1 | it.  But given my understanding of the | 09:50:57 |
| 2 | organization, commercial would be very broad. | 09:50:59 |
| 3 | Q    Similarly, there is a statement on | 09:51:04 |
| 4 | CPR's website that says, "CPR provides ADR | 09:51:06 |
| 5 | services through innovative and practical rules | 09:51:19 |
| 6 | and procedures." | 09:51:24 |
| 7 | Are you familiar with that statement? | 09:51:25 |
| 8 | A    I think so.  There are a lot of | 09:51:29 |
| 9 | statements on the website. | 09:51:31 |
| 10 | Q    Sure. | 09:51:32 |
| 11 | The one about CPR uses innovative | 09:51:32 |
| 12 | rules. | 09:51:36 |
| 13 | A    Sounds like something -- | 09:51:38 |
| 14 | Q    You guys would say? | 09:51:39 |
| 15 | A    Yeah. | 09:51:40 |
| 16 | Q    All right.  I'm sorry.  I'm talking | 09:51:41 |
| 17 | over you and she's got the hardest job here today, | 09:51:43 |
| 18 | so I'm sorry. | 09:51:46 |
| 19 | All right.  It's a pretty easy | 09:51:48 |
| 20 | question. | 09:51:52 |
| 21 | How are CPR's rules innovative? | 09:51:52 |
| 22 | A    So the rules would, perhaps in that | 09:52:02 |
| 23 | context, be referring to our arbitration rules for | 09:52:07 |
| 24 | administered and non-administered arbitration. | 09:52:12 |
| 25 | So, for example, we won an award for having a | 09:52:16 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    20

| | | |
|---|---|---|
| 1 | screening selection process that when arbitrators | 09:52:20 |
| 2 | are selected by parties, there is the intervention | 09:52:24 |
| 3 | of CPR.  The parties don't actually reach out to | 09:52:28 |
| 4 | identify their selected arbitrator.  They work | 09:52:33 |
| 5 | through CPR to do that in a screen process to | 09:52:37 |
| 6 | remove sometimes what is considered the | 09:52:41 |
| 7 | awkwardness of parties having party-appointed | 09:52:43 |
| 8 | arbitrators.  And that received the GAR Innovation | 09:52:48 |
| 9 | Award.  I think that's a good example of the | 09:52:52 |
| 10 | innovation in our rules.  I think there are other | 09:52:55 |
| 11 | innovations in our rules and there is just other | 09:52:58 |
| 12 | innovations we engage in.  That is part of our | 09:53:01 |
| 13 | ethos, is to innovate. | 09:53:07 |
| 14 | Q    Okay. | 09:53:08 |
| 15 | The screening selection that you | 09:53:08 |
| 16 | mentioned, that's not a procedure that's followed | 09:53:10 |
| 17 | by other ADR providers? | 09:53:13 |
| 18 | MS. LUNETTA:  Objection to form. | 09:53:17 |
| 19 | A    I can't sit here and tell you all of | 09:53:22 |
| 20 | the different rules that exist.  I know it was | 09:53:24 |
| 21 | considered innovative.  I know there are others | 09:53:29 |
| 22 | who do not do that.  I'm sorry, that's the extent | 09:53:33 |
| 23 | of my -- and I know it received the innovation | 09:53:38 |
| 24 | award, so -- | 09:53:40 |
| 25 | Q    You mentioned that there were a couple | 09:53:42 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    21

| | | |
|---|---|---|
| 1 | of other ways that CPR's rules were innovative. | 09:53:44 |
| 2 | Can you give me another example? | 09:53:48 |
| 3 | A    I think that the emphasis on early | 09:53:51 |
| 4 | disposition, where CPR has built into its rules | 09:53:53 |
| 5 | that it itself can raise the prospects of | 09:54:00 |
| 6 | mediating or resolving a dispute in arbitration by | 09:54:04 |
| 7 | prompting it without asking the parties themselves | 09:54:09 |
| 8 | to raise that on their own, is another innovation | 09:54:11 |
| 9 | that we put in place based on feedback from users | 09:54:15 |
| 10 | in disputes, that having a third party such as CPR | 09:54:19 |
| 11 | prompt the innovation -- I'm sorry, the | 09:54:24 |
| 12 | resolution, would be helpful, and I think that's | 09:54:27 |
| 13 | innovative as well. | 09:54:29 |
| 14 | Q    How does that work? | 09:54:31 |
| 15 | A    So CPR, at any point in time, can reach | 09:54:33 |
| 16 | out to the parties and say would you like to sit | 09:54:36 |
| 17 | down and talk settlement, without either party | 09:54:40 |
| 18 | having to raise that.  And I think there is often | 09:54:43 |
| 19 | a barrier to resolution when parties themselves | 09:54:45 |
| 20 | are concerned, they don't want to be the first | 09:54:48 |
| 21 | mover in a situation.  CPR as the administrator | 09:54:51 |
| 22 | can do so. | 09:54:54 |
| 23 | Q    Okay. | 09:55:00 |
| 24 | Is there another example of the ways | 09:55:00 |
| 25 | that CPR's rules are innovative? | 09:55:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           22

| | | |
|---|---|---|
| 1 | A    I think maintaining -- CPR maintaining | 09:55:07 |
| 2 | timelines by itself, asking for the parties, if | 09:55:09 |
| 3 | they are going to go beyond a certain time frame, | 09:55:16 |
| 4 | to have to get that reviewed by CPR, is another | 09:55:18 |
| 5 | way in which CPR innovated in the field.  Some of | 09:55:24 |
| 6 | these things have now been followed by other | 09:55:28 |
| 7 | institutions, but it is my understanding that CPR | 09:55:32 |
| 8 | was often the first adopter of these kinds of | 09:55:35 |
| 9 | innovations. | 09:55:38 |
| 10 | Q    Can you describe to me the difference | 09:55:39 |
| 11 | between the administered rules and the | 09:55:42 |
| 12 | non-administered rules? | 09:55:44 |
| 13 | A    Sure. | 09:55:46 |
| 14 | When CPR started out, really it started | 09:55:46 |
| 15 | out with non-administered rules.  So our rules | 09:55:49 |
| 16 | could be downloaded from the website and parties | 09:55:54 |
| 17 | can identify an arbitrator and begin arbitrating a | 09:55:57 |
| 18 | dispute with no intervention, no connection with | 09:56:02 |
| 19 | CPR.  And those are the non-administered rules. | 09:56:08 |
| 20 | There is no filing.  Just the parties begin and | 09:56:14 |
| 21 | just use the rules. | 09:56:18 |
| 22 | If they want CPR to be involved, either | 09:56:19 |
| 23 | as an appointing authority or for fund holding or | 09:56:22 |
| 24 | other services, they can come to CPR to do that. | 09:56:27 |
| 25 | The administered rules, which just really started | 09:56:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                     23

| | | |
|---|---|---|
| 1 | a few years ago, have CPR administering throughout | 09:56:34 |
| 2 | the dispute.  So there is a filing through CPR. | 09:56:37 |
| 3 | There is appointment by CPR and other services CPR | 09:56:40 |
| 4 | provides. | 09:56:43 |
| 5 |      MS. LUNETTA:  Clarity for the | 09:56:45 |
| 6 | transcript, I just want to make sure we're using | 09:56:48 |
| 7 | the right word, it's "administered" not | 09:56:48 |
| 8 | "administrative."  So "administered" or | 09:56:50 |
| 9 | "non-administered" rules.  Just so the transcript | 09:56:52 |
| 10 | is clear. | 09:56:55 |
| 11 |    Q    Are there different sets of rules for | 09:57:03 |
| 12 | different types of disputes at CPR? | 09:57:07 |
| 13 |    A    There can be. | 09:57:09 |
| 14 |    Q    How many different types of rules does | 09:57:12 |
| 15 | CPR currently maintain? | 09:57:15 |
| 16 |    A    I don't know the answer to that. | 09:57:19 |
| 17 |    Q    Do you know any set of rules that's | 09:57:20 |
| 18 | particular to -- | 09:57:28 |
| 19 |    A    When I say I don't know the -- sure. | 09:57:29 |
| 20 | We can look at what the answer to that is, but as | 09:57:31 |
| 21 | I sit here today, I don't know the answer to that. | 09:57:34 |
| 22 |    Q    Okay. | 09:57:36 |
| 23 |      So instead of naming them all, can you | 09:57:36 |
| 24 | name one particular set of rules for a | 09:57:39 |
| 25 | particularized type of -- | 09:57:42 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    24

| | | |
|---|---|---|
| 1 | A    Construction rules for construction | 09:57:44 |
| 2 | disputes. | 09:57:45 |
| 3 | MS. LUNETTA:  Make sure he finishes his | 09:57:48 |
| 4 | question before you start answering so that we | 09:57:50 |
| 5 | don't drive the court reporter crazy. | 09:57:53 |
| 6 | Q    I skipped my introductory comments in | 09:57:59 |
| 7 | deference to your years of practice, but we should | 09:58:03 |
| 8 | just make sure the record is clear. | 09:58:06 |
| 9 | Mr. Waxman, you're a lawyer; is that | 09:58:10 |
| 10 | right? | 09:58:12 |
| 11 | A    I am. | 09:58:12 |
| 12 | Q    And with many years of practice; is | 09:58:13 |
| 13 | that correct? | 09:58:15 |
| 14 | A    Yes. | 09:58:15 |
| 15 | Q    And you have taken depositions before; | 09:58:16 |
| 16 | is that right? | 09:58:17 |
| 17 | A    I have. | 09:58:18 |
| 18 | Q    More than one? | 09:58:20 |
| 19 | A    More than one. | 09:58:21 |
| 20 | Q    Okay. | 09:58:23 |
| 21 | The court reporter has got the toughest | 09:58:24 |
| 22 | job here today.  I can't imagine doing her job. | 09:58:27 |
| 23 | Probably impossible if two people talk at the same | 09:58:31 |
| 24 | time, so I'll work on that.  We'll all work on | 09:58:34 |
| 25 | that. | 09:58:37 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        25

| | | |
|---|---|---|
| 1 | A     And I'll do the same.  Thank you. | 09:58:37 |
| 2 | Q     Construction rules, you mentioned. | 09:58:40 |
| 3 |       Can you think of another specialized | 09:58:42 |
| 4 | set of rules that CPR maintains other than | 09:58:45 |
| 5 | construction rules? | 09:58:48 |
| 6 | A     We may have IP-related rules. | 09:59:00 |
| 7 |       There are employment-related | 09:59:12 |
| 8 | procedures.  There may be others.  I'm sorry, I | 09:59:14 |
| 9 | don't have that digested in my mind. | 09:59:27 |
| 10 | Q     No, that's all right. | 09:59:29 |
| 11 |       And what's the reason for having | 09:59:30 |
| 12 | different types of rules for different types of | 09:59:34 |
| 13 | disputes? | 09:59:36 |
| 14 |       MS. LUNETTA:  Objection to form. | 09:59:38 |
| 15 | A     I mean, it may very well be that there | 09:59:41 |
| 16 | are particular idiosyncrasies or aspects of types | 09:59:44 |
| 17 | of disputes, that developing specific rules for | 09:59:50 |
| 18 | how to resolve those issues is helpful to get them | 09:59:54 |
| 19 | resolved. | 09:59:58 |
| 20 | Q     Is it fair to say that at some point | 09:59:59 |
| 21 | CPR thought that construction disputes required | 10:00:02 |
| 22 | specialized rules? | 10:00:06 |
| 23 |       MS. LUNETTA:  Objection.  Form. | 10:00:08 |
| 24 | A     So understanding I wasn't there when | 10:00:11 |
| 25 | the construction rules were developed, my | 10:00:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    26

| | | |
|---|---|---|
| 1 | understanding of how the process works is if there | 10:00:18 |
| 2 | is a recognized need for particular rules that | 10:00:22 |
| 3 | will help facilitate dispute resolution, then | 10:00:30 |
| 4 | there may be development of particular rules to | 10:00:35 |
| 5 | help resolve those disputes. | 10:00:38 |
| 6 |         Q    Yeah.  I mean, I think that that's a | 10:00:41 |
| 7 | fair assumption.  I don't think that this was just | 10:00:43 |
| 8 | make-work, somebody decided some day to come up | 10:00:46 |
| 9 | with rules that nobody thought were necessary. | 10:00:48 |
| 10 |         Is that a fair assumption? | 10:00:51 |
| 11 |         MS. LUNETTA:  Objection to form. | 10:00:55 |
| 12 |     A    I agree.  I don't think any of this is | 10:00:56 |
| 13 | make-work. | 10:00:58 |
| 14 |         Q    Okay. | 10:00:59 |
| 15 |         And I think the reason -- or one of the | 10:01:07 |
| 16 | reasons for that is that construction disputes are | 10:01:10 |
| 17 | different than intellectual property disputes, | 10:01:13 |
| 18 | which are different than employment disputes. | 10:01:16 |
| 19 |         Is that a fair recognition? | 10:01:19 |
| 20 |         MS. LUNETTA:  Objection to form. | 10:01:22 |
| 21 |     A    There may be particularities to the | 10:01:23 |
| 22 | different types of disputes that require different | 10:01:25 |
| 23 | approaches. | 10:01:27 |
| 24 |         Q    Have you given any consideration to | 10:01:28 |
| 25 | eliminating the various different types of rules | 10:01:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    27

| | | |
|---|---|---|
| 1 | in coming up with an omnibus set of rules that | 10:01:34 |
| 2 | cover all disputes that might be brought to CPR? | 10:01:38 |
| 3 | A    Well, I do think our administered and | 10:01:42 |
| 4 | non-administered rules are omnibus rules that can | 10:01:44 |
| 5 | be broadly applicable in all situations. | 10:01:48 |
| 6 | Q    Have you given any thought to | 10:01:51 |
| 7 | eliminating the construction rules or the IP rules | 10:01:53 |
| 8 | or the employment rules in favor of the | 10:01:56 |
| 9 | administered or non-administered rules? | 10:01:57 |
| 10 | A    I think there has been discussion from | 10:02:03 |
| 11 | time to time whether we still want to have a | 10:02:06 |
| 12 | variety of different rules, but beyond that broad | 10:02:10 |
| 13 | consideration, that's what we currently have.  And | 10:02:14 |
| 14 | as I say, the administered and non-administered | 10:02:19 |
| 15 | rules are broadly applicable. | 10:02:23 |
| 16 | Q    And did you decide to continue having a | 10:02:25 |
| 17 | variety of different rules? | 10:02:28 |
| 18 | MS. LUNETTA:  Objection to form. | 10:02:33 |
| 19 | A    I don't know the issue has been finally | 10:02:35 |
| 20 | resolved, but currently, as it stands, we do have | 10:02:38 |
| 21 | a variety of different rules. | 10:02:40 |
| 22 | Q    And why have you decided to not | 10:02:44 |
| 23 | eliminate the variety of different rules? | 10:02:47 |
| 24 | MS. LUNETTA:  Objection to form.  It | 10:02:57 |
| 25 | misstates his testimony. | 10:02:58 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          28

| | | |
|---|---|---|
| 1 | A    We haven't, as I say, come to a final | 10:03:05 |
| 2 | decision.  I have been there four months.  We may | 10:03:09 |
| 3 | have ongoing discussions on that issue. | 10:03:14 |
| 4 | To the extent that they are considered | 10:03:19 |
| 5 | still helpful, and I believe they are considered | 10:03:21 |
| 6 | still helpful, it is useful to have those rules in | 10:03:23 |
| 7 | place. | 10:03:26 |
| 8 | Q    Okay. | 10:03:27 |
| 9 | Why do you believe it is useful to have | 10:03:27 |
| 10 | those rules in place? | 10:03:29 |
| 11 | A    To the extent it helps facilitate | 10:03:33 |
| 12 | resolution. | 10:03:35 |
| 13 | Q    How does having different rules | 10:03:36 |
| 14 | facilitate resolution? | 10:03:38 |
| 15 | A    They may address particular kinds of | 10:03:41 |
| 16 | disputes and provide features that help facilitate | 10:03:44 |
| 17 | resolution of those disputes. | 10:03:48 |
| 18 | Q    Does CPR have rules directed to | 10:04:07 |
| 19 | consumer disputes? | 10:04:11 |
| 20 | A    Define what you mean by consumer | 10:04:16 |
| 21 | disputes. | 10:04:18 |
| 22 | Q    Somebody buys a product from a company, | 10:04:20 |
| 23 | a toaster that explodes. | 10:04:21 |
| 24 | A    We do not have particular rules for | 10:04:25 |
| 25 | that kind of a situation, no. | 10:04:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          29

| | | |
|---|---|---|
| 1 | Q    Okay. | 10:04:31 |
| 2 | A    And we're talking arbitration rules. | 10:04:31 |
| 3 | Q    Right. | 10:04:33 |
| 4 | We can just assume for the day I'll be | 10:04:35 |
| 5 | talking to you about CPR's arbitration and ADR | 10:04:38 |
| 6 | services and that's it. | 10:04:42 |
| 7 | A    Well, Mr. Zigler, the reason I | 10:04:44 |
| 8 | mentioned this is because we do provide mediation | 10:04:46 |
| 9 | services, we do provide other dispute resolution | 10:04:50 |
| 10 | services.  And in the context of personal injury | 10:04:53 |
| 11 | claims, for example, there may be the opportunity | 10:04:57 |
| 12 | to mediate those disputes.  We don't have | 10:05:01 |
| 13 | arbitration rules particular to that kind of a | 10:05:04 |
| 14 | dispute that you referenced. | 10:05:07 |
| 15 | Q    Well, let's just -- in that branch, so | 10:05:09 |
| 16 | we can set it aside for the day. | 10:05:13 |
| 17 | Besides your arbitration services, what | 10:05:15 |
| 18 | other types of ADR services do you provide? | 10:05:19 |
| 19 | A    As I say, mediation, neutral | 10:05:23 |
| 20 | evaluation, mini trial, expert disposition boards, | 10:05:28 |
| 21 | standing neutrals, as I mentioned earlier, for | 10:05:31 |
| 22 | dispute prevention.  Those are the ones that come | 10:05:46 |
| 23 | to mind. | 10:05:50 |
| 24 | Q    I think everybody is familiar with what | 10:05:51 |
| 25 | mediation is. | 10:05:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          30

| | | |
|---|---|---|
| 1 | What is neutral evaluation? | 10:05:56 |
| 2 | A    Early neutral evaluation, bringing the | 10:06:00 |
| 3 | parties together early on with a third party to | 10:06:03 |
| 4 | help them evaluate their case and give them some | 10:06:07 |
| 5 | guidance as to the merits of that case. | 10:06:10 |
| 6 | Q    And how does that differ from | 10:06:13 |
| 7 | mediation? | 10:06:15 |
| 8 | A    So it is a more evaluative approach. | 10:06:16 |
| 9 | It is something between mediation and sort of a | 10:06:21 |
| 10 | non-binding arbitration where, actually, the | 10:06:24 |
| 11 | merits can be, early on in a matter, assessed and | 10:06:29 |
| 12 | evaluated and an evaluation can be provided to the | 10:06:33 |
| 13 | parties. | 10:06:37 |
| 14 | Q    Is the goal there to do that prior to | 10:06:38 |
| 15 | any litigation? | 10:06:41 |
| 16 | A    The goal is to do that early.  I don't | 10:06:43 |
| 17 | know that it necessarily has to happen before the | 10:06:46 |
| 18 | litigation begins because, that's my point, there | 10:06:48 |
| 19 | may be an opportunity to bring the parties | 10:06:50 |
| 20 | together.  It also may be that a party, a single | 10:06:53 |
| 21 | party, wants an evaluator to come in and help | 10:06:56 |
| 22 | evaluate their own merits of their matter.  And | 10:07:00 |
| 23 | the neutrals can help do that as well. | 10:07:03 |
| 24 | Q    And can you describe to me CPR's mini | 10:07:09 |
| 25 | trial services? | 10:07:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    31

| | | |
|---|---|---|
| 1 | A     So that's just as it sounds.  It is | 10:07:15 |
| 2 | a -- parties can choose to come together and put | 10:07:18 |
| 3 | on a mini trial, a non-binding trial where there | 10:07:21 |
| 4 | will be an evaluation by a neutral.  So a little | 10:07:24 |
| 5 | further down the spectrum from the early neutral | 10:07:28 |
| 6 | evaluation. | 10:07:29 |
| 7 | Q     And what sort of evaluation does a | 10:07:29 |
| 8 | neutral provide there, does he act as a juror or | 10:07:34 |
| 9 | as a consultant? | 10:07:37 |
| 10 | A     Almost as a judge, as an arbitrator. | 10:07:40 |
| 11 | Q     And could you describe to me CPR's | 10:07:44 |
| 12 | expert disposition boards? | 10:07:47 |
| 13 | A     This is when you can have a group of | 10:07:54 |
| 14 | one or three neutrals, who are available as a | 10:07:57 |
| 15 | dispute arises, to quickly give an opinion upon | 10:08:02 |
| 16 | the nature of that dispute, how the dispute should | 10:08:06 |
| 17 | be resolved, and help facilitate early resolution | 10:08:09 |
| 18 | of the dispute so the parties' relationship can | 10:08:13 |
| 19 | continue on. | 10:08:16 |
| 20 | Q     So this is sort of a standing group of | 10:08:17 |
| 21 | neutrals? | 10:08:20 |
| 22 | A     It can be, yes. | 10:08:21 |
| 23 | Q     And are they engaged by -- I don't know | 10:08:23 |
| 24 | how to say it, regular CPR customers? | 10:08:27 |
| 25 | MS. LUNETTA:  Objection to form. | 10:08:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                     32

| | | |
|---|---|---|
| 1 | A    I don't know what you mean by regular | 10:08:35 |
| 2 | CPR customers.  They would be engaged by the | 10:08:37 |
| 3 | parties to a matter.  Often they may be engaged at | 10:08:42 |
| 4 | the outset of a relationship, to be in place, lest | 10:08:46 |
| 5 | the dispute arises, to help resolve the matter | 10:08:52 |
| 6 | quickly. | 10:08:57 |
| 7 | Q    So the reason for my question is, to | 10:08:57 |
| 8 | have a standing board, you think that they have | 10:08:59 |
| 9 | things come up more than once, that would kind of | 10:09:02 |
| 10 | be the definition of a standing board, correct? | 10:09:06 |
| 11 | A    I think that's correct.  I think in | 10:09:08 |
| 12 | terms of its utility, if you expect there to be | 10:09:10 |
| 13 | disputes that may arise, this is something worth | 10:09:14 |
| 14 | considering. | 10:09:19 |
| 15 | Q    Okay. | 10:09:20 |
| 16 | So -- and you said that in some | 10:09:20 |
| 17 | instances, the parties will create a standing | 10:09:23 |
| 18 | board at the outset of a relationship to try to | 10:09:25 |
| 19 | resolve disputes as they might come up; is that | 10:09:28 |
| 20 | correct? | 10:09:30 |
| 21 | A    Yes. | 10:09:31 |
| 22 | Q    Okay. | 10:09:31 |
| 23 | Are there other circumstances in which | 10:09:32 |
| 24 | a standing board would be created? | 10:09:33 |
| 25 | A    That's the one that comes to mind. | 10:09:37 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Allen Waxman
Conducted on December 27, 2019                    33

| | | |
|---|---|---|
| 1 | Q    Okay. | 10:09:40 |
| 2 | Can you give an example of a standing | 10:09:40 |
| 3 | board that's been created, to your knowledge? | 10:09:43 |
| 4 | MS. LUNETTA:  Objection to form.  I'm | 10:09:47 |
| 5 | not sure if there are confidentiality concerns. | 10:09:48 |
| 6 | A    I was going to say, that would be | 10:09:51 |
| 7 | subject to confidentiality. | 10:09:53 |
| 8 | Q    Okay. | 10:09:57 |
| 9 | Well, I mean there is a Protective | 10:09:57 |
| 10 | Order in place.  Could you describe it to me, | 10:09:58 |
| 11 | generally, without giving me the parties' names? | 10:10:01 |
| 12 | A    No. | 10:10:03 |
| 13 | MS. LUNETTA:  It is also beyond the | 10:10:04 |
| 14 | scope of the deposition. | 10:10:06 |
| 15 | Q    Are you familiar with the process that | 10:10:19 |
| 16 | CPR has undertaken in the creation of its rules | 10:10:23 |
| 17 | prior to your starting with CPR? | 10:10:30 |
| 18 | MS. LUNETTA:  Objection to form. | 10:10:41 |
| 19 | A    Generally speaking, not precisely, I | 10:10:47 |
| 20 | mean before I was there, I wasn't there, generally | 10:10:49 |
| 21 | speaking. | 10:10:54 |
| 22 | Q    Right.  Okay. | 10:10:55 |
| 23 | So while you have been at CPR, CPR has | 10:10:55 |
| 24 | created one set of rules; is that correct? | 10:10:59 |
| 25 | A    Are you referring to the protocol? | 10:11:05 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          34

| | | |
|---|---|---|
| 1 | Q    Yes. | 10:11:07 |
| 2 | A    We've been talking about rules all | 10:11:08 |
| 3 | along, not protocols. | 10:11:10 |
| 4 | Q    Okay. | 10:11:12 |
| 5 | A    We created the employment-related mass | 10:11:13 |
| 6 | claims protocol. | 10:11:18 |
| 7 | Q    Besides the employment-related mass | 10:11:21 |
| 8 | claims protocol, have any rules or protocols been | 10:11:21 |
| 9 | created while you have been at CPR? | 10:11:28 |
| 10 | A    There has been work on a variety of | 10:11:37 |
| 11 | matters. | 10:11:42 |
| 12 | Q    A variety of protocols or a variety | 10:11:42 |
| 13 | of -- | 10:11:47 |
| 14 | A    Rules, protocols, guidance. | 10:11:48 |
| 15 | Q    Okay. | 10:11:52 |
| 16 | Can you tell me the rules that you have | 10:11:53 |
| 17 | worked on while you have been at CPR? | 10:11:56 |
| 18 | MS. LUNETTA:  Objection.  Beyond the | 10:12:01 |
| 19 | scope of the deposition.  Aside from the protocol? | 10:12:02 |
| 20 | Q    Can you answer my question? | 10:12:05 |
| 21 | MS. LUNETTA:  He can't.  I'm going to | 10:12:07 |
| 22 | direct him not to answer.  Aside from the mass | 10:12:09 |
| 23 | employment claims protocol, it would be beyond the | 10:12:12 |
| 24 | scope. | 10:12:15 |
| 25 | Q    Are you going to follow your lawyer's | 10:12:16 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    35

| | | |
|---|---|---|
| 1 | advice? | 10:12:18 |
| 2 |     A    Always. | 10:12:18 |
| 3 |     Q    Generally, good advice. | 10:12:19 |
| 4 |        Besides the employment-related mass | 10:12:22 |
| 5 | claims protocol, have there been other protocols | 10:12:23 |
| 6 | that you have worked on at CPR? | 10:12:28 |
| 7 |        MS. LUNETTA:  Are you asking him | 10:12:39 |
| 8 | personally or CPR generally? | 10:12:40 |
| 9 |     Q    Do you need me to clarify the question | 10:12:44 |
| 10 | for you? | 10:12:46 |
| 11 |     A    Sure. | 10:12:47 |
| 12 |     Q    Okay. | 10:12:48 |
| 13 |        Other than the mass related -- mass | 10:12:48 |
| 14 | employment-related protocol that you mentioned | 10:12:54 |
| 15 | earlier, have you personally worked on any other | 10:12:57 |
| 16 | protocols while you have been at CPR? | 10:13:01 |
| 17 |        MS. LUNETTA:  Just I think -- it would | 10:13:10 |
| 18 | be beyond the scope, other than protocol.  But if | 10:13:12 |
| 19 | you can answer "yes" or "no," I'm fine with that. | 10:13:15 |
| 20 |     A    Generally speaking, yes. | 10:13:18 |
| 21 |     Q    What other protocols have you worked on | 10:13:19 |
| 22 | while you have been at CPR other than the | 10:13:22 |
| 23 | employment mass protocol? | 10:13:25 |
| 24 |        MS. LUNETTA:  Objection.  Beyond the | 10:13:28 |
| 25 | scope.  I'm going to direct him not to answer. | 10:13:29 |

| | | |
|---|---|---|
| 1 | Q    Are you going to follow your lawyer's | 10:13:33 |
| 2 | advice? | 10:13:35 |
| 3 | A    Yes. | 10:13:35 |
| 4 | Q    Other than the employment mass claims | 10:13:51 |
| 5 | protocol that you mentioned before, have you | 10:13:56 |
| 6 | worked on any guidance while at CPR? | 10:14:00 |
| 7 | A    I believe it is the same answer. | 10:14:17 |
| 8 | Q    The same answer as "yes"? | 10:14:21 |
| 9 | A    Yes. | 10:14:24 |
| 10 | Q    Can you describe to me the guidance | 10:14:26 |
| 11 | that you have worked on other than the mass | 10:14:28 |
| 12 | claim -- employment mass claims protocol while you | 10:14:34 |
| 13 | have been at CPR? | 10:14:37 |
| 14 | MS. LUNETTA:  Objection.  Beyond the | 10:14:39 |
| 15 | scope of the deposition.  I'm going to direct him | 10:14:40 |
| 16 | not to answer. | 10:14:43 |
| 17 | Q    Are you going to follow your lawyer's | 10:14:44 |
| 18 | advice? | 10:14:46 |
| 19 | A    I am. | 10:14:46 |
| 20 | Q    Okay. | 10:14:48 |
| 21 | What is the procedure that has been | 10:14:59 |
| 22 | followed at CPR for the creation or modification | 10:15:03 |
| 23 | of rules while you have been there? | 10:15:10 |
| 24 | MS. LUNETTA:  Objection to form. | 10:15:21 |
| 25 | Q    Can you answer the question? | 10:15:25 |

| | | |
|---|---|---|
| 1 | A    There has been a discussion amongst a | 10:15:28 |
| 2 | variety of stakeholders relating to whatever the | 10:15:34 |
| 3 | particular issues are. | 10:15:40 |
| 4 | Q    Okay. | 10:15:47 |
| 5 | And what happens after there is a | 10:15:48 |
| 6 | discussion among stakeholders? | 10:15:50 |
| 7 | MS. LUNETTA:  Objection to form. | 10:15:54 |
| 8 | A    There is continuing work on the | 10:15:58 |
| 9 | project. | 10:16:02 |
| 10 | Q    And what do you mean by continuing work | 10:16:04 |
| 11 | on the project? | 10:16:06 |
| 12 | A    The development of whether -- be it | 10:16:07 |
| 13 | rules or procedures or guidances or whatever. | 10:16:09 |
| 14 | Q    Does that mean drafts are exchanged | 10:16:13 |
| 15 | among the stakeholders? | 10:16:16 |
| 16 | A    It may. | 10:16:18 |
| 17 | Q    What else can it mean besides the | 10:16:21 |
| 18 | circulation of drafts among the stakeholders? | 10:16:23 |
| 19 | A    Continued discussions, continued | 10:16:27 |
| 20 | inquiry. | 10:16:29 |
| 21 | Q    Is there any factual research that is | 10:16:34 |
| 22 | done? | 10:16:38 |
| 23 | MS. LUNETTA:  Objection to form. | 10:16:41 |
| 24 | A    There may be research that is done | 10:16:51 |
| 25 | depending upon the given circumstances or | 10:16:53 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    38

| | | |
|---|---|---|
| 1 | questions or issues that arise.  And research in | 10:16:56 |
| 2 | its broadest sense. | 10:17:03 |
| 3 |    Q    Is there legal research that's done in | 10:17:06 |
| 4 | preparation for the modification or creation of | 10:17:09 |
| 5 | rules? | 10:17:12 |
| 6 |         MS. LUNETTA:  Objection to form. | 10:17:13 |
| 7 |    A    So for these purposes, it is helpful -- | 10:17:19 |
| 8 | I don't know that I can distinguish between rules, | 10:17:22 |
| 9 | protocols, guide -- there is -- there may be legal | 10:17:25 |
| 10 | questions that arise in an effort to answer those | 10:17:32 |
| 11 | legal questions.  There may be factual questions | 10:17:35 |
| 12 | that arise in an effort to answer those factual | 10:17:38 |
| 13 | questions. | 10:17:41 |
| 14 |         THE WITNESS:  Do you mind if we take a | 10:17:42 |
| 15 | quick break at this point? | 10:17:44 |
| 16 |         MR. ZIGLER:  No, that's fine. | 10:17:45 |
| 17 |         THE WITNESS:  Thank you. | 10:17:46 |
| 18 |         THE VIDEOGRAPHER:  Standby.  We are | 10:17:47 |
| 19 | going off the record.  The time is 10:17 a.m. | 10:17:48 |
| 20 |       (A recess was taken.) | 10:17:52 |
| 21 |         THE VIDEOGRAPHER:  Standby.  We are | 10:26:42 |
| 22 | back on the record.  The time is 10:26 a.m. | 10:26:44 |
| 23 | BY MR. ZIGLER: | 10:26:47 |
| 24 |    Q    So before our break, we were talking | 10:26:52 |
| 25 | about various procedures to draft new rules, | 10:26:55 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    39

| | | |
|---|---|---|
| 1 | protocols and guidance.  And I think you were | 10:27:01 |
| 2 | struggling with the distinction between rules, | 10:27:11 |
| 3 | protocols and guidance before we took our break. | 10:27:14 |
| 4 | And I don't want to hold you to a distinction that | 10:27:18 |
| 5 | doesn't matter. | 10:27:21 |
| 6 |      A    No, no, I'm sorry.  I was just | 10:27:22 |
| 7 | saying -- you were asking me some general | 10:27:26 |
| 8 | questions about what I've done with respect to the | 10:27:28 |
| 9 | various matters, and I was just saying that the | 10:27:34 |
| 10 | struggle I was trying to convey is that, in my | 10:27:43 |
| 11 | mind, what I've done with rules or what I've done | 10:27:47 |
| 12 | with protocols or what I've done with guidances, I | 10:27:50 |
| 13 | don't know that's a firm distinction in my mind, | 10:27:55 |
| 14 | in my recollections. | 10:27:58 |
| 15 |      Q    I don't have a firm distinction in my | 10:27:59 |
| 16 | mind, the difference between those things either, | 10:28:02 |
| 17 | so I can understand how those might run together | 10:28:03 |
| 18 | from your perspective. | 10:28:07 |
| 19 |           Could you describe to me the difference | 10:28:10 |
| 20 | between rules, protocols and guidance, in your | 10:28:12 |
| 21 | mind? | 10:28:15 |
| 22 |      A    Sure. | 10:28:15 |
| 23 |           The rules are the rules that govern the | 10:28:15 |
| 24 | process of particular arbitration matters.  On top | 10:28:23 |
| 25 | of those may be protocols that help provide | 10:28:29 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          40

| | | |
|---|---|---|
| 1 | further guidance for aspects relating to the | 10:28:32 |
| 2 | arbitrations and procedures.  Similarly, maybe | 10:28:39 |
| 3 | procedures and guidances may provide further | 10:28:42 |
| 4 | guidance on how various matters will be handled. | 10:28:50 |
| 5 |     Q    Okay. | 10:28:55 |
| 6 |     Are there any written procedures at CPR | 10:29:00 |
| 7 | for how rules, protocols or guidance are to be | 10:29:06 |
| 8 | created or modified? | 10:29:09 |
| 9 |     A    Not per se, no. | 10:29:13 |
| 10 |     Q    Are there any informal rules for how | 10:29:16 |
| 11 | rules, protocols or guidance are to be created or | 10:29:22 |
| 12 | modified at CPR? | 10:29:25 |
| 13 |     MS. LUNETTA:  Objection to form. | 10:29:27 |
| 14 |     A    No. | 10:29:30 |
| 15 |     Q    Is the procedure, to your knowledge, to | 10:29:34 |
| 16 | create or modify rules, protocol or guidance | 10:29:39 |
| 17 | historically the same at CPR? | 10:29:44 |
| 18 |     MS. LUNETTA:  Objection to form. | 10:29:51 |
| 19 |     A    Historically the same? | 10:29:52 |
| 20 |     Well, what do you mean? | 10:29:56 |
| 21 |     Q    Sure. | 10:29:57 |
| 22 |     So has the procedure that CPR follows | 10:29:58 |
| 23 | to create or modify rules, protocols and guidance, | 10:30:02 |
| 24 | does it vary between whether or not it is a | 10:30:08 |
| 25 | creation or modification of a rule or a protocol | 10:30:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    41

| | | |
|---|---|---|
| 1 | or guidance? | 10:30:17 |
| 2 | MS. LUNETTA:  Objection to form. | 10:30:21 |
| 3 | A    Given my limited history with the | 10:30:23 |
| 4 | organization, I don't know that I have the best | 10:30:26 |
| 5 | historical perspective on that other than to say, | 10:30:31 |
| 6 | I do think the rules are reviewed on a regular | 10:30:34 |
| 7 | periodic basis.  The same may be true of protocols | 10:30:40 |
| 8 | and guidances.  And the overarching principle is | 10:30:45 |
| 9 | to respond to the need for resolution and do so | 10:30:52 |
| 10 | innovatively and do so effectively. | 10:30:56 |
| 11 | Q    When was the last time one of the | 10:31:02 |
| 12 | non-administered rules was changed? | 10:31:04 |
| 13 | A    I think our non-administered rules -- I | 10:31:17 |
| 14 | think the date is 2018. | 10:31:20 |
| 15 | Q    Okay. | 10:31:25 |
| 16 | So they haven't been changed since you | 10:31:25 |
| 17 | have been at CPR? | 10:31:28 |
| 18 | A    You're talking about the general | 10:31:30 |
| 19 | non-administered rules for arbitration? | 10:31:32 |
| 20 | Q    Yes. | 10:31:39 |
| 21 | A    Yeah. | 10:31:39 |
| 22 | Q    What about the administered rules for | 10:31:40 |
| 23 | arbitration, when was the last time they were | 10:31:42 |
| 24 | changed? | 10:31:45 |
| 25 | A    I think that was earlier this year. | 10:31:45 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    42

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 10:31:47 |
| 2 | | While you were at CPR or before? | 10:31:47 |
| 3 | A | Before I got there. | 10:31:50 |
| 4 | Q | Do you know why the administered rules | 10:31:51 |
| 5 | were changed? | | 10:31:56 |
| 6 | | MS. LUNETTA:  Objection.  Beyond the | 10:31:58 |
| 7 | scope. | | 10:31:59 |
| 8 | A | No. | 10:31:59 |
| 9 | Q | Do you know how long it took to | 10:32:02 |
| 10 | change -- to make that change to the administered | | 10:32:07 |
| 11 | rules? | | 10:32:08 |
| 12 | | MS. LUNETTA:  Objection.  Beyond the | 10:32:10 |
| 13 | scope. | | 10:32:11 |
| 14 | Q | Can you answer my question? | 10:32:16 |
| 15 | | MS. LUNETTA:  I'm going to direct him | 10:32:18 |
| 16 | not to answer. | | 10:32:19 |
| 17 | Q | Are you going to follow your lawyer's | 10:32:20 |
| 18 | advice? | | 10:32:22 |
| 19 | A | I am. | 10:32:25 |
| 20 | Q | Besides the employment mass claims | 10:32:43 |
| 21 | protocol, have there been any other protocols that | | 10:32:49 |
| 22 | have been changed since you have been at CPR? | | 10:32:54 |
| 23 | | MS. LUNETTA:  Objection.  Beyond the | 10:33:02 |
| 24 | scope.  I'm going to direct him not to answer. | | 10:33:03 |
| 25 | Q | Are you going to follow your lawyer's | 10:33:05 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    43

| | | |
|---|---|---|
| 1 | advice? | 10:33:08 |
| 2 | A    I am. | 10:33:08 |
| 3 | Q    Can you describe to me the process that | 10:33:32 |
| 4 | was filed -- I'm sorry -- was followed the last | 10:33:33 |
| 5 | time CPR's rules were changed? | 10:33:44 |
| 6 | MS. LUNETTA:  Objection.  Beyond the | 10:33:56 |
| 7 | scope.  Unless you're talking about the | 10:33:56 |
| 8 | arbitration protocol, I'm going to direct him not | 10:33:58 |
| 9 | to answer except with the arbitration protocol | 10:34:02 |
| 10 | that we're talking about. | 10:34:04 |
| 11 | Q    To clarify my question, I'm asking you | 10:34:06 |
| 12 | about administered or non-administered arbitration | 10:34:09 |
| 13 | rules, the general rules that we discussed, not | 10:34:12 |
| 14 | the mass claims protocol.  And I'm asking you to | 10:34:15 |
| 15 | describe to me the process that was followed the | 10:34:18 |
| 16 | last time they were modified. | 10:34:20 |
| 17 | MS. LUNETTA:  Same objection.  Beyond | 10:34:23 |
| 18 | the scope.  I'm going to direct him not to answer. | 10:34:24 |
| 19 | Q    Are you going to follow your lawyer's | 10:34:27 |
| 20 | advice? | 10:34:28 |
| 21 | A    I am. | 10:34:29 |
| 22 | Q    Okay. | 10:34:30 |
| 23 | The same question with respect to any | 10:34:31 |
| 24 | other protocols at CPR, could you describe -- | 10:34:35 |
| 25 | other than the employment mass claims protocol, | 10:34:40 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    44

| | | |
|---|---|---|
| 1 | can you describe to me the process that was | 10:34:44 |
| 2 | followed to create or modify another CPR protocol? | 10:34:47 |
| 3 | MS. LUNETTA:  Objection.  Beyond the | 10:34:55 |
| 4 | scope.  I'm going to direct him not to answer. | 10:34:56 |
| 5 | Q    Are you going to follow your lawyer's | 10:34:58 |
| 6 | advice? | 10:35:00 |
| 7 | A    I am. | 10:35:00 |
| 8 | Q    And the same question with respect to | 10:35:01 |
| 9 | any guidance that CPR has issued, other than the | 10:35:02 |
| 10 | employment mass claims protocol that we have | 10:35:08 |
| 11 | discussed, could you describe to me the process | 10:35:12 |
| 12 | that was followed to create or amend any guidance | 10:35:15 |
| 13 | that CPR has issued? | 10:35:19 |
| 14 | MS. LUNETTA:  Objection.  Beyond the | 10:35:26 |
| 15 | scope.  I'm going to direct him not to answer. | 10:35:27 |
| 16 | Q    Are you going to follow your lawyer's | 10:35:29 |
| 17 | advice? | 10:35:31 |
| 18 | A    I am. | 10:35:32 |
| 19 | Q    I believe, earlier, you testified that | 10:35:43 |
| 20 | you have been involved with discussions to modify | 10:35:45 |
| 21 | or create rules, protocols and guidance while you | 10:35:52 |
| 22 | have been at CPR, other than the employment mass | 10:35:56 |
| 23 | claims protocol. | 10:36:02 |
| 24 | Could you tell me how long those | 10:36:04 |
| 25 | discussions have been in progress? | 10:36:08 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        45

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  Objection.  It is vague | 10:36:11 |
| 2 | and ambiguous, but also it is beyond the scope of | 10:36:12 |
| 3 | the deposition.  I'm going to direct him not to | 10:36:15 |
| 4 | answer. | 10:36:18 |
| 5 | Q    Are you going to follow your lawyer's | 10:36:19 |
| 6 | advice? | 10:36:20 |
| 7 | A    I am. | 10:36:21 |
| 8 | Q    Again, addressing the rules, protocols | 10:36:26 |
| 9 | and guidance that you have been involved -- | 10:36:29 |
| 10 | MR. ZIGLER:  Strike that. | 10:36:35 |
| 11 | Q    With respect to the rules, protocols | 10:36:43 |
| 12 | and guidance that you have worked, creating and | 10:36:44 |
| 13 | modifying, other than the employment mass claims | 10:36:52 |
| 14 | protocol, can you tell me the stakeholders that | 10:36:55 |
| 15 | have been involved in those processes? | 10:36:59 |
| 16 | MS. LUNETTA:  Objection.  Beyond the | 10:37:03 |
| 17 | scope.  I'm going to direct him not to answer. | 10:37:04 |
| 18 | Q    Are you going to follow your lawyer's | 10:37:07 |
| 19 | advice? | 10:37:09 |
| 20 | A    I am. | 10:37:09 |
| 21 | Q    Can you describe to me the genesis | 10:37:22 |
| 22 | of -- and by that, I mean the person or persons | 10:37:26 |
| 23 | who advocated for the creation or change of the | 10:37:36 |
| 24 | rules, protocols and guidance, other than the | 10:37:45 |
| 25 | mass -- employment mass claims protocol that you | 10:37:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    46

| | | |
|---|---|---|
| 1 | have worked on during your time at CPR? | 10:37:54 |
| 2 | MS. LUNETTA:  Objection.  Beyond the | 10:37:57 |
| 3 | scope.  I'm going to direct him not to answer. | 10:37:58 |
| 4 | Q    Are you going to follow your lawyer's | 10:38:00 |
| 5 | advice? | 10:38:02 |
| 6 | A    Yes.  I'm not sure I understand the | 10:38:03 |
| 7 | question, but yes, I'm going to follow. | 10:38:04 |
| 8 | Q    Well, let me restate it to make sure | 10:38:06 |
| 9 | that it is clear on the record. | 10:38:08 |
| 10 | Earlier you discussed that you had | 10:38:10 |
| 11 | worked on either creation or modification of | 10:38:12 |
| 12 | rules, protocols and guidance while you have been | 10:38:15 |
| 13 | at CPR, other than the mass employment protocol; | 10:38:19 |
| 14 | is that right? | 10:38:21 |
| 15 | A    I'm sorry, ask that question again. | 10:38:24 |
| 16 | Q    Sure. | 10:38:26 |
| 17 | I said, so earlier you testified that | 10:38:27 |
| 18 | you had worked on either the creation or | 10:38:29 |
| 19 | modification of rules, protocols and guidance | 10:38:33 |
| 20 | while you have been at CPR, other than the | 10:38:36 |
| 21 | employment mass claims protocol; is that correct? | 10:38:40 |
| 22 | A    Correct. | 10:38:43 |
| 23 | Q    And my question is:  For those rules, | 10:38:44 |
| 24 | protocols and guidance for which you have worked | 10:38:47 |
| 25 | on either the creation or modification during your | 10:38:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    47

| | | |
|---|---|---|
| 1 | time at CPR, other than the mass claims employment | 10:38:54 |
| 2 | protocol, who were the person or persons who | 10:39:00 |
| 3 | advocated for the creation or change? | 10:39:09 |
| 4 | MS. LUNETTA:  Objection.  Beyond the | 10:39:14 |
| 5 | scope.  I'm going to direct the witness not to | 10:39:15 |
| 6 | answer. | 10:39:17 |
| 7 | Q    Are you going to follow your lawyer's | 10:39:18 |
| 8 | advice? | 10:39:20 |
| 9 | A    I am. | 10:39:20 |
| 10 | Q    Okay.  Let's go for a bit of a change | 10:39:22 |
| 11 | of pace. | 10:39:43 |
| 12 | Where did you work before joining CPR? | 10:39:53 |
| 13 | MS. LUNETTA:  Objection.  Beyond the | 10:39:56 |
| 14 | scope.  I'm going to direct him not to answer. | 10:39:57 |
| 15 | Q    Are you going to follow your lawyer's | 10:40:00 |
| 16 | advice? | 10:40:02 |
| 17 | A    I am. | 10:40:02 |
| 18 | Q    How long did you work with Roivant | 10:40:06 |
| 19 | Sciences? | 10:40:08 |
| 20 | MS. LUNETTA:  Objection.  Beyond the | 10:40:10 |
| 21 | scope.  I'm going to direct the witness not to | 10:40:11 |
| 22 | answer. | 10:40:14 |
| 23 | Q    How long were you with -- I don't know | 10:40:18 |
| 24 | how to pronounce that, E-I-S-A-I? | 10:40:24 |
| 25 | MS. LUNETTA:  Objection.  Beyond the | 10:40:29 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    48

| | | |
|---|---|---|
| 1 | scope.  I'm going to direct the witness not to | 10:40:30 |
| 2 | answer. | 10:40:32 |
| 3 |     Q    Are you going to follow your lawyer's | 10:40:32 |
| 4 | advice? | 10:40:34 |
| 5 |     A    I am. | 10:40:34 |
| 6 |     Q    How do you pronounce that?  Just | 10:40:35 |
| 7 | because that's going to eat at me on the way home. | 10:40:36 |
| 8 |         MS. LUNETTA:  You can answer that. | 10:40:40 |
| 9 |     A    Eisai. | 10:40:42 |
| 10 |     Q    Eisai.  I guess Health Sciences Group | 10:40:44 |
| 11 | is making up their own words. | 10:40:45 |
| 12 |         All right. | 10:40:49 |
| 13 |         How long did you work at Kaye Scholer? | 10:40:49 |
| 14 |         MS. LUNETTA:  Objection.  Beyond the | 10:40:52 |
| 15 | scope.  I'm going to direct him not to answer.  I | 10:40:53 |
| 16 | would say, probably, this is all available on | 10:40:55 |
| 17 | LinkedIn. | 10:40:58 |
| 18 |     Q    Are you going to follow your lawyer's | 10:41:00 |
| 19 | advice? | 10:41:01 |
| 20 |     A    I am. | 10:41:02 |
| 21 |     Q    How long were you with Pfizer? | 10:41:04 |
| 22 |         MS. LUNETTA:  Same objection.  Beyond | 10:41:06 |
| 23 | the scope.  I'm going to direct him not to answer. | 10:41:07 |
| 24 |     Q    Are you going to follow your lawyer's | 10:41:11 |
| 25 | advice? | 10:41:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    49

| | | |
|---|---|---|
| 1 | A    I am. | 10:41:13 |
| 2 | Q    How long were you with Williams & | 10:41:16 |
| 3 | Connolly? | 10:41:17 |
| 4 | MS. LUNETTA:  Same objection.  I'm | 10:41:19 |
| 5 | going to direct the witness not to answer.  It's | 10:41:20 |
| 6 | beyond the scope. | 10:41:23 |
| 7 | Q    Are you going to follow your lawyer's | 10:41:24 |
| 8 | advice? | 10:41:26 |
| 9 | A    I am. | 10:41:26 |
| 10 | Q    I thought we were getting into some | 10:41:30 |
| 11 | easy questions.  Boy, was I wrong. | 10:41:31 |
| 12 | I want to use the proper phrasing. | 10:41:49 |
| 13 | The neutrals that CPR has access to, | 10:41:52 |
| 14 | can I say the neutrals that you employ or the | 10:41:56 |
| 15 | neutrals that you contract with? | 10:42:00 |
| 16 | How would you -- what -- how would you | 10:42:03 |
| 17 | describe your relationship with neutrals? | 10:42:07 |
| 18 | A    They are neutrals, we neither employ | 10:42:17 |
| 19 | nor contract with them.  They sit on our panel of | 10:42:20 |
| 20 | neutrals. | 10:42:23 |
| 21 | Q    Do you maintain a list of neutrals that | 10:42:29 |
| 22 | are available to you? | 10:42:31 |
| 23 | A    Let me amend one thing. | 10:42:32 |
| 24 | There are fee arrangements that -- so I | 10:42:34 |
| 25 | just want -- they are not employed by us, but in | 10:42:41 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        50

| | | |
|---|---|---|
| 1 | matters that they handle where they have been | 10:42:46 |
| 2 | selected through a CPR matter, they pay us a | 10:42:50 |
| 3 | percentage of the matter. | 10:42:57 |
| 4 | Q    I wasn't really trying to get into | 10:43:04 |
| 5 | payment structure.  I was just trying to | 10:43:06 |
| 6 | understand -- | 10:43:08 |
| 7 | A    Yeah, I just wanted to -- you asked | 10:43:08 |
| 8 | about contract.  They are not independent | 10:43:11 |
| 9 | contractors, they are not consultants.  They are | 10:43:13 |
| 10 | neutrals who are -- sit on our panel and are | 10:43:16 |
| 11 | available for handling various matters. | 10:43:20 |
| 12 | Q    Okay. | 10:43:22 |
| 13 | So sit on your panel, I think is the | 10:43:22 |
| 14 | verb that I'll use. | 10:43:26 |
| 15 | A    Yes. | 10:43:28 |
| 16 | Q    All right. | 10:43:30 |
| 17 | So how many arbitrators currently sit | 10:43:30 |
| 18 | on your panel? | 10:43:33 |
| 19 | A    I know the total number is about 545 | 10:43:38 |
| 20 | neutrals.  I don't have in hand the precise number | 10:43:42 |
| 21 | of how many of those do arbitrations and nothing | 10:43:49 |
| 22 | else. | 10:43:53 |
| 23 | Q    Okay. | 10:43:56 |
| 24 | Is that to say that some of your | 10:44:02 |
| 25 | neutrals have other jobs other than being | 10:44:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              51

| 1 | neutrals? | 10:44:08 |
| 2 | A   Well, it is to certainly say that.  It | 10:44:11 |
| 3 | is also to say that some of the neutrals may just | 10:44:13 |
| 4 | do mediations, for example. | 10:44:16 |
| 5 | Q   Okay. | 10:44:18 |
| 6 | A   I don't know.  But I'm -- in response | 10:44:18 |
| 7 | to your question, I'm raising that as a | 10:44:20 |
| 8 | possibility. | 10:44:23 |
| 9 | Q   Okay. | 10:44:24 |
| 10 | Do you have documents that would show | 10:44:24 |
| 11 | you what those 545 neutrals are available for? | 10:44:28 |
| 12 | A   I believe so, yes. | 10:44:36 |
| 13 | Q   So there would be a document that would | 10:44:38 |
| 14 | tell you that a certain neutral only does | 10:44:40 |
| 15 | mediations as opposed to arbitrations; is that | 10:44:42 |
| 16 | fair? | 10:44:45 |
| 17 | A   I believe so, yes. | 10:44:46 |
| 18 | Q   Are there some of those 545 neutrals | 10:44:47 |
| 19 | that have specified that they are only available | 10:44:50 |
| 20 | for a particular type of matter? | 10:44:53 |
| 21 | A   I don't know. | 10:44:58 |
| 22 | Q   Are there some of those 545 neutrals | 10:44:59 |
| 23 | that have specified that they are only available | 10:45:03 |
| 24 | for a certain number of matters at a time? | 10:45:05 |
| 25 | A   I don't think so, but I'm not sure. | 10:45:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    52

| | | |
|---|---|---|
| 1 | Q    Is there a certain number of those 545 | 10:45:18 |
| 2 | neutrals that have stated that they have a limited | 10:45:20 |
| 3 | amount of time availability that they could give | 10:45:27 |
| 4 | to you? | 10:45:31 |
| 5 | A    Mr. Zigler, my impression is that our | 10:45:39 |
| 6 | neutrals want to be actively engaged.  I don't | 10:45:39 |
| 7 | believe so, but I'm not sure. | 10:45:45 |
| 8 | Q    But you would agree that some of your | 10:45:46 |
| 9 | neutrals have -- for -- let's use a colloquialism, | 10:45:48 |
| 10 | a day job? | 10:45:53 |
| 11 | MS. LUNETTA:  Objection to form. | 10:45:57 |
| 12 | Q    Is that fair? | 10:45:58 |
| 13 | Okay.  I'll rephrase it. | 10:46:00 |
| 14 | Some of your neutrals are business | 10:46:02 |
| 15 | professionals that are employed -- that have | 10:46:04 |
| 16 | full-time employment outside of being a neutral; | 10:46:12 |
| 17 | is that true? | 10:46:14 |
| 18 | MS. LUNETTA:  Objection to form. | 10:46:16 |
| 19 | A    What do you mean by "business | 10:46:21 |
| 20 | professionals"? | 10:46:23 |
| 21 | Q    They have a job in corporate America. | 10:46:25 |
| 22 | MS. LUNETTA:  Objection to form. | 10:46:30 |
| 23 | A    Again, I'm not clear, but some of our | 10:46:34 |
| 24 | neutrals who are predominantly lawyers, they also | 10:46:36 |
| 25 | have legal practices.  And those legal practices | 10:46:42 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    53

| | | |
|---|---|---|
| 1 | may mean they are focused on being neutrals or | 10:46:46 |
| 2 | they may have other kinds of practices. | 10:46:50 |
| 3 | Q    Okay. | 10:46:53 |
| 4 | It is true that some of your 545 | 10:46:59 |
| 5 | neutrals are lawyers who have jobs at law firms; | 10:47:03 |
| 6 | is that right? | 10:47:09 |
| 7 | A    I believe there are neutrals on our | 10:47:10 |
| 8 | panel who are lawyers with law firms. | 10:47:12 |
| 9 | Q    And do you believe that there are | 10:47:15 |
| 10 | neutrals on your panel that do things other than | 10:47:16 |
| 11 | serve as neutrals? | 10:47:20 |
| 12 | MS. LUNETTA:  Objection to form. | 10:47:25 |
| 13 | A    I think what I'm saying is they may be | 10:47:27 |
| 14 | lawyers in practice as advocates. | 10:47:30 |
| 15 | Q    And you worked at Kaye Scholer, you | 10:47:36 |
| 16 | worked at Williams & Connolly. | 10:47:41 |
| 17 | If they are a lawyer at that firm and | 10:47:45 |
| 18 | they are engaged as a neutral, the press of | 10:47:48 |
| 19 | business will sometimes limit their ability to | 10:47:51 |
| 20 | serve as a neutral; is that fair? | 10:47:54 |
| 21 | MS. LUNETTA:  Objection to form.  And | 10:47:58 |
| 22 | it's also beyond the scope.  And I'm going to | 10:47:58 |
| 23 | direct him not to answer. | 10:48:01 |
| 24 | Q    Are you going to follow your lawyer's | 10:48:02 |
| 25 | advice? | 10:48:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           54

| | | |
|---|---|---|
| 1 | A    I am. | 10:48:05 |
| 2 | Q    Does CPR have any rules about how many | 10:48:08 |
| 3 | arbitrations a neutral can handle at one time? | 10:48:11 |
| 4 | A    I'm not aware of any such rules. | 10:48:22 |
| 5 | Q    Does CPR have any procedures governing | 10:48:24 |
| 6 | the assignment of matters that takes into account | 10:48:28 |
| 7 | a neutral's current caseload? | 10:48:39 |
| 8 | A    I'm a bit confused by the question. | 10:48:48 |
| 9 | I'm not -- I'm not sure I understand the question. | 10:48:50 |
| 10 | Q    If you have 545 neutrals on your list | 10:48:55 |
| 11 | and one of your neutrals currently has, | 10:48:59 |
| 12 | hypothetically, ten mediations that they are | 10:49:04 |
| 13 | working on, would you offer them an eleventh, or | 10:49:07 |
| 14 | would you go to somebody on your roster who had | 10:49:10 |
| 15 | zero? | 10:49:15 |
| 16 | A    I'm not aware of any, per se, rule that | 10:49:23 |
| 17 | says at a certain point, we no longer would | 10:49:25 |
| 18 | approach somebody.  If, for instance, the parties | 10:49:29 |
| 19 | identified that somebody as somebody they wanted | 10:49:33 |
| 20 | to use in a mediation, I'm not aware of that. | 10:49:36 |
| 21 | Q    I'm trying to get the other side of | 10:49:40 |
| 22 | that. | 10:49:42 |
| 23 | Do you generally try to spread the work | 10:49:42 |
| 24 | out amongst your 545 neutrals or are there some | 10:49:44 |
| 25 | that get more work than others? | 10:49:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    55

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  Objection to form. | 10:49:53 |
| 2 | A    I think it is going to depend upon the | 10:49:54 |
| 3 | matter and the desire of the parties to the | 10:49:57 |
| 4 | matter. | 10:49:58 |
| 5 | Q    Let me ask that question. | 10:49:59 |
| 6 | Are there certain neutrals on your | 10:50:00 |
| 7 | roster that serve as a neutral more frequently | 10:50:02 |
| 8 | than others, to your knowledge? | 10:50:09 |
| 9 | MS. LUNETTA:  Objection to form. | 10:50:13 |
| 10 | A    I don't currently have, in mind, | 10:50:15 |
| 11 | statistics about how many neutrals have done how | 10:50:18 |
| 12 | many different matters. | 10:50:21 |
| 13 | So I best not speculate. | 10:50:24 |
| 14 | Q    Does CPR keep track of how often a | 10:50:29 |
| 15 | neutral is selected? | 10:50:33 |
| 16 | MS. LUNETTA:  Objection.  Beyond the | 10:50:36 |
| 17 | scope.  I'm going to direct him not to answer. | 10:50:37 |
| 18 | Q    Are you going to follow your lawyer's | 10:50:40 |
| 19 | advice? | 10:50:42 |
| 20 | A    I am. | 10:50:43 |
| 21 | Q    Of the 545 neutrals on your roster, how | 10:50:48 |
| 22 | many of those do you have exclusive access to at | 10:50:52 |
| 23 | their neutral services? | 10:50:55 |
| 24 | MS. LUNETTA:  Objection.  Beyond the | 10:50:59 |
| 25 | scope.  I'm going to direct him not to answer. | 10:51:00 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    56

| | | |
|---|---|---|
| 1 | Q    Are you going to follow your lawyer's | 10:51:04 |
| 2 | advice? | 10:51:06 |
| 3 | A    I am. | 10:51:06 |
| 4 | Q    Of the 545 neutrals on your roster, how | 10:51:07 |
| 5 | many of them only provide neutral services? | 10:51:11 |
| 6 | MS. LUNETTA:  Objection.  Beyond the | 10:51:14 |
| 7 | scope.  I'm going to direct him not to answer. | 10:51:15 |
| 8 | Q    Are you going to follow your lawyer's | 10:51:17 |
| 9 | advice? | 10:51:19 |
| 10 | A    I am. | 10:51:20 |
| 11 | Q    What is the average caseload of the 545 | 10:51:22 |
| 12 | neutrals that you have on your roster? | 10:51:27 |
| 13 | MS. LUNETTA:  Objection.  Beyond the | 10:51:30 |
| 14 | scope.  I'm going to direct him not to answer. | 10:51:31 |
| 15 | Q    Are you going to follow your lawyer's | 10:51:34 |
| 16 | advice? | 10:51:36 |
| 17 | A    I am. | 10:51:36 |
| 18 | Q    How many arbitrations did you | 10:51:38 |
| 19 | administer last year? | 10:51:40 |
| 20 | MS. LUNETTA:  Objection.  Beyond the | 10:51:42 |
| 21 | scope.  I'm going t direct him not to answer. | 10:51:42 |
| 22 | Q    Are you going to follow your lawyer's | 10:51:45 |
| 23 | advice? | 10:51:47 |
| 24 | A    I am. | 10:51:48 |
| 25 | Q    That was a bad question. | 10:51:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    57

| | | |
|---|---|---|
| 1 | How many arbitrations did CPR | 10:51:56 |
| 2 | administer last year? | 10:51:57 |
| 3 | MS. LUNETTA:  Same objection.  Beyond | 10:52:00 |
| 4 | the scope.  I'm going to direct him not to answer. | 10:52:01 |
| 5 | Q    Are you going to follow your lawyer's | 10:52:04 |
| 6 | advice? | 10:52:05 |
| 7 | A    I am. | 10:52:06 |
| 8 | Q    Are you aware of CPR's market share in | 10:52:09 |
| 9 | the neutral services market? | 10:52:12 |
| 10 | MS. LUNETTA:  Objection.  Beyond the | 10:52:17 |
| 11 | scope.  I'm going to direct the witness not to | 10:52:17 |
| 12 | answer. | 10:52:20 |
| 13 | Q    Are you going to follow your lawyer's | 10:52:22 |
| 14 | advice? | 10:52:24 |
| 15 | A    I am. | 10:52:28 |
| 16 | Q    Does CPR track its market share in the | 10:52:29 |
| 17 | neutral services market? | 10:52:33 |
| 18 | MS. LUNETTA:  Objection.  Beyond the | 10:52:35 |
| 19 | scope.  I'm going to direct him not to answer. | 10:52:35 |
| 20 | Q    Are you going to follow your lawyer's | 10:52:38 |
| 21 | advice? | 10:52:41 |
| 22 | A    I am. | 10:52:41 |
| 23 | Q    What steps does CPU take to increase | 10:52:42 |
| 24 | its market share in the neutral services market? | 10:52:47 |
| 25 | MS. LUNETTA:  Objection.  I think you | 10:52:52 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    58

| | | |
|---|---|---|
| 1 | misspoke and you meant CPR.  In any event, it's | 10:52:52 |
| 2 | beyond the scope.  I'm going to direct him not to | 10:52:53 |
| 3 | answer. | 10:52:55 |
| 4 | Q    Are you going to follow your lawyer's | 10:52:56 |
| 5 | advice? | 10:52:58 |
| 6 | A    I am. | 10:52:58 |
| 7 | Q    Even if I ask that question with | 10:52:59 |
| 8 | respect to CPR? | 10:53:00 |
| 9 | A    Are you an old software guy? | 10:53:03 |
| 10 | Q    I don't know what my problem is.  Maybe | 10:53:05 |
| 11 | it's that east coast time change. | 10:53:07 |
| 12 | A    I'm sorry, what's your question? | 10:53:09 |
| 13 | I will follow my lawyer's advice. | 10:53:12 |
| 14 | Q    All right. | 10:53:14 |
| 15 | Why does CPR track its market share? | 10:53:15 |
| 16 | That is the question I meant to ask. | 10:53:17 |
| 17 | MS. LUNETTA:  Same objection.  I'm | 10:53:21 |
| 18 | going to direct him not to answer. | 10:53:22 |
| 19 | Q    Are you going to follow your lawyer's | 10:53:24 |
| 20 | advice? | 10:53:25 |
| 21 | A    I am. | 10:53:26 |
| 22 | MR. ZIGLER:  It says "CPU" in my | 10:53:27 |
| 23 | outline here. | 10:53:29 |
| 24 | MS. LUNETTA:  So it's someone else's | 10:53:30 |
| 25 | fault. | 10:53:32 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    59

| | | |
|---|---|---|
| 1 | MR. ZIGLER:  I believe I typed the | 10:53:33 |
| 2 | outline. | 10:53:34 |
| 3 | MR. KAYES:  Nice try, Kim. | 10:53:37 |
| 4 | MS. LUNETTA:  Those admissions like | 10:53:39 |
| 5 | that go a long way for morale, I'll tell you. | 10:53:40 |
| 6 | BY MR. ZIGLER: | 10:53:43 |
| 7 | Q    Are there any geographical limitations | 10:53:45 |
| 8 | to CPR's neutral services? | 10:53:48 |
| 9 | MS. LUNETTA:  Objection to form. | 10:53:55 |
| 10 | A    No. | 10:53:59 |
| 11 | Q    How many businesses named CPR has the | 10:54:09 |
| 12 | exclusive arbitration provider for their | 10:54:13 |
| 13 | contractual disputes? | 10:54:15 |
| 14 | MS. LUNETTA:  Objection to form. | 10:54:18 |
| 15 | Beyond the scope.  I'm going to direct him not to | 10:54:19 |
| 16 | answer. | 10:54:21 |
| 17 | Q    Are you going to follow your lawyer's | 10:54:21 |
| 18 | advice? | 10:54:23 |
| 19 | A    I am. | 10:54:23 |
| 20 | Q    How many businesses named CPR has the | 10:54:24 |
| 21 | exclusive arbitration provider for their consumer | 10:54:27 |
| 22 | disputes? | 10:54:29 |
| 23 | MS. LUNETTA:  Same objection.  Beyond | 10:54:32 |
| 24 | the scope.  I'm going to direct him not to answer. | 10:54:33 |
| 25 | Q    Are you going to follow your lawyer's | 10:54:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          60

| | | |
|---|---|---|
| 1 | advice? | 10:54:36 |
| 2 | A    I am. | 10:54:36 |
| 3 | Q    How many businesses named CPR has the | 10:54:37 |
| 4 | exclusive arbitration provider for their | 10:54:37 |
| 5 | employment disputes? | 10:54:40 |
| 6 | MS. LUNETTA:  Same objection.  Beyond | 10:54:42 |
| 7 | the scope.  I'm going to direct the witness not to | 10:54:42 |
| 8 | answer. | 10:54:45 |
| 9 | Q    Are you going to follow your lawyer's | 10:54:48 |
| 10 | advice? | 10:54:50 |
| 11 | A    Yes. | 10:54:51 |
| 12 | Q    What is CPR's corporate structure? | 10:55:23 |
| 13 | MS. LUNETTA:  Objection to form.  I | 10:55:28 |
| 14 | think it is beyond the scope, but if he has an | 10:55:29 |
| 15 | answer, he can answer that. | 10:55:32 |
| 16 | A    I'm not sure I understand the question. | 10:55:37 |
| 17 | We're a 501(c)(3). | 10:55:40 |
| 18 | Is that what you're asking? | 10:55:42 |
| 19 | Q    Yeah. | 10:55:44 |
| 20 | A    We're a 501(c)(3). | 10:55:44 |
| 21 | Q    Who or what is CPR's largest | 10:55:48 |
| 22 | shareholder? | 10:55:52 |
| 23 | MS. LUNETTA:  I'm going to object to | 10:55:56 |
| 24 | that as beyond the scope and direct him not to | 10:55:58 |
| 25 | answer. | 10:56:01 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              61

| | | | |
|---|---|---|---|
| 1 | Q | Are you going to follow your lawyer's | 10:56:01 |
| 2 | advice? | | 10:56:04 |
| 3 | A | Yes. | 10:56:05 |
| 4 | Q | To whom do you report? | 10:56:05 |
| 5 | A | The board of CPR. | 10:56:09 |
| 6 | Q | How many members of the board are | 10:56:15 |
| 7 | there? | | 10:56:16 |
| 8 | A | I think approximately 30. | 10:56:22 |
| 9 | Q | Now, what's the function of the board? | 10:56:50 |
| 10 | MS. LUNETTA:  Objection to form. | | 10:56:54 |
| 11 | A | Oversight and governance for CPR. | 10:56:56 |
| 12 | Q | Are any of the board members paid? | 10:57:00 |
| 13 | A | No. | 10:57:03 |
| 14 | MS. LUNETTA:  Objection. | | 10:57:04 |
| 15 | Q | I'm going to hand you a document that's | 10:57:15 |
| 16 | been marked as Exhibit 2.  If you can take a | | 10:57:17 |
| 17 | moment to look at that. | | 10:57:19 |
| 18 | (Waxman Exhibit 2 marked for | | 10:57:20 |
| 19 | identification and attached to the transcript.) | | 10:57:20 |
| 20 | Q | For the record, the document is titled | 10:57:35 |
| 21 | Business Unusual Rules, Tools and Stranded Uses, | | 10:57:37 |
| 22 | Rough Disputes, 2019 Annual Review, International | | 10:57:38 |
| 23 | Institute for Conflict Prevention & Resolution. | | 10:57:45 |
| 24 | Have you seen Exhibit 2 before? | | 10:58:37 |
| 25 | A | I have. | 10:58:39 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    62

| | | | |
|---|---|---|---|
| 1 | Q | Okay. | 10:58:39 |
| 2 | | And could you tell me what Exhibit 2 | 10:58:40 |
| 3 | is. | | 10:58:41 |
| 4 | A | It is the 2019 annual review. | 10:58:41 |
| 5 | Q | Okay. | 10:58:45 |
| 6 | | And is this document prepared by CPR? | 10:58:45 |
| 7 | A | It is. | 10:58:48 |
| 8 | Q | And what's the purpose of this | 10:58:49 |
| 9 | document? | | 10:58:50 |
| 10 | A | To do a review of our activities. | 10:58:51 |
| 11 | Q | And who is the audience for this | 10:58:54 |
| 12 | document? | | 10:58:55 |
| 13 | A | It is publicly available. | 10:58:59 |
| 14 | Q | Did CPR have any particular audience in | 10:59:01 |
| 15 | mind in creating the 2019 annual review? | | 10:59:04 |
| 16 | | MS. LUNETTA:  Objection.  Beyond the | 10:59:08 |
| 17 | scope.  I'm going to direct him not to answer. | | 10:59:09 |
| 18 | Q | Are you going to follow your lawyer's | 10:59:12 |
| 19 | advice? | | 10:59:13 |
| 20 | A | I am. | 10:59:14 |
| 21 | Q | As far as you know, is the information | 10:59:28 |
| 22 | in Exhibit 2 true and accurate? | | 10:59:31 |
| 23 | A | Is it what? | 10:59:38 |
| 24 | Q | True and accurate, to the best of your | 10:59:39 |
| 25 | knowledge. | | 10:59:42 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    63

| | | |
|---|---|---|
| 1 | A    I'm only hesitating because I haven't | 10:59:50 |
| 2 | read the whole document here.  This is a long | 10:59:52 |
| 3 | document.  I'm sure the intention is for this to | 10:59:55 |
| 4 | be true and accurate. | 10:59:57 |
| 5 | Q    And you're not aware of any | 10:59:59 |
| 6 | inaccuracies in Exhibit 2? | 11:00:00 |
| 7 | A    No. | 11:00:02 |
| 8 | Q    I direct you to page 34.  So 34, there | 11:00:09 |
| 9 | is a pie chart there. | 11:00:29 |
| 10 | Do you see that? | 11:00:31 |
| 11 | A    I do. | 11:00:32 |
| 12 | Q    Okay. | 11:00:32 |
| 13 | Could you describe to me what that pie | 11:00:33 |
| 14 | chart represents? | 11:00:35 |
| 15 | MS. LUNETTA:  Objection.  Beyond the | 11:00:36 |
| 16 | scope.  I'm going to direct him not to answer. | 11:00:37 |
| 17 | Q    Are you going to follow your lawyer's | 11:00:40 |
| 18 | advice? | 11:00:42 |
| 19 | A    I am. | 11:00:42 |
| 20 | Q    Can you turn to page 35. | 11:00:52 |
| 21 | Your 35 looks different to me.  This is | 11:01:04 |
| 22 | what mine looks like. | 11:01:07 |
| 23 | A    Oh, I'm sorry. | 11:01:11 |
| 24 | Okay. | 11:01:24 |
| 25 | "Thank you, Donors"; is that the page? | 11:01:25 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          64

| | | |
|---|---|---|
| 1 | Q    Yes. | 11:01:27 |
| 2 |     Could you describe to me what page 35 | 11:01:27 |
| 3 | represents. | 11:01:30 |
| 4 |     MS. LUNETTA:  Objection.  Beyond the | 11:01:32 |
| 5 | scope.  I'm going to direct him not to answer. | 11:01:32 |
| 6 | Q    Are you going to follow your lawyer's | 11:01:34 |
| 7 | advice? | 11:01:36 |
| 8 | A    I am. | 11:01:36 |
| 9 | Q    Page 35 purports to list the donors to | 11:01:47 |
| 10 | CPR from 7-11-17 to 6-30-18 in various categories, | 11:01:51 |
| 11 | visionary, champion, supporter, contributor, | 11:02:00 |
| 12 | donor. | 11:02:04 |
| 13 |     To your knowledge, is the list on page | 11:02:07 |
| 14 | 35 complete? | 11:02:11 |
| 15 |     MS. LUNETTA:  Objection to form. | 11:02:13 |
| 16 | Beyond the scope.  I'm going to direct him not to | 11:02:16 |
| 17 | answer. | 11:02:18 |
| 18 | Q    Are you going to follow your lawyer's | 11:02:21 |
| 19 | advice? | 11:02:21 |
| 20 | A    I am. | 11:02:23 |
| 21 | Q    What percentage of CPR's yearly revenue | 11:02:47 |
| 22 | comes from contributions? | 11:02:52 |
| 23 |     MS. LUNETTA:  Objection.  Beyond the | 11:02:56 |
| 24 | scope.  I'm going to direct the witness not to | 11:02:57 |
| 25 | answer. | 11:02:59 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                65

| | | |
|---|---|---|
| 1 | Q    Are you going to follow your lawyer's | 11:03:00 |
| 2 | advice? | 11:03:00 |
| 3 | A    I am. | 11:03:01 |
| 4 | Q    What percentage of CPR's revenue comes | 11:03:05 |
| 5 | from contributions from Gibson, Dunn & Crutcher? | 11:03:12 |
| 6 |         MS. LUNETTA:  Objection.  Beyond the | 11:03:16 |
| 7 | scope.  I'm going to direct the witness not to | 11:03:17 |
| 8 | answer. | 11:03:19 |
| 9 | Q    Are you going to follow your lawyer's | 11:03:20 |
| 10 | advice? | 11:03:20 |
| 11 | A    I am. | 11:03:21 |
| 12 | Q    Has DoorDash contributed money to CPR? | 11:03:25 |
| 13 |         MS. LUNETTA:  Objection.  Beyond the | 11:03:30 |
| 14 | scope.  I'm going to direct the witness not to | 11:03:31 |
| 15 | answer. | 11:03:33 |
| 16 | Q    Are you going to follow your lawyer's | 11:03:34 |
| 17 | advice? | 11:03:34 |
| 18 | A    I am. | 11:03:35 |
| 19 | Q    Has Gibson, Dunn & Crutcher contributed | 11:03:36 |
| 20 | money to CPR? | 11:03:39 |
| 21 |         MS. LUNETTA:  Objection.  Beyond the | 11:03:41 |
| 22 | scope.  I'm going to direct the witness not to | 11:03:44 |
| 23 | answer.  I would note that they are publicly | 11:03:45 |
| 24 | available documents. | 11:03:48 |
| 25 | Q    Are you going to follow your lawyer's | 11:03:50 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    66

| | | |
|---|---|---|
| 1 | advice? | 11:03:50 |
| 2 | A    I am. | 11:03:51 |
| 3 | Q    Can you tell me the law firms who limit | 11:04:10 |
| 4 | their practice to only representing plaintiffs in | 11:04:13 |
| 5 | litigation who have donated money to CPR? | 11:04:16 |
| 6 | MS. LUNETTA:  Objection.  Beyond the | 11:04:22 |
| 7 | scope.  I'm going to direct the witness not to | 11:04:23 |
| 8 | answer. | 11:04:25 |
| 9 | Q    Are you going to follow your lawyer's | 11:04:26 |
| 10 | advice? | 11:04:26 |
| 11 | A    I am. | 11:04:27 |
| 12 | Q    Can you tell me your understanding of | 11:04:57 |
| 13 | this lawsuit? | 11:05:01 |
| 14 | MS. LUNETTA:  Let me just object and | 11:05:13 |
| 15 | caution him not to reveal anything that he learned | 11:05:14 |
| 16 | from his counsel, CPR's counsel. | 11:05:17 |
| 17 | Q    Can you answer the question, please? | 11:05:23 |
| 18 | A    I'm a little unclear on the nature of | 11:05:29 |
| 19 | this lawsuit that I'm testifying in, the Abernathy | 11:05:33 |
| 20 | case, and what the current status of that case is. | 11:05:37 |
| 21 | I understand it is a dispute between delivery | 11:05:40 |
| 22 | workers and DoorDash. | 11:05:46 |
| 23 | I'm not sure of the precise contours of | 11:05:52 |
| 24 | the nature of dispute, what the latest is that's | 11:05:55 |
| 25 | happening in court.  And I understood that we were | 11:06:00 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    67

| | | |
|---|---|---|
| 1 | here to talk about our communications with Gibson | 11:06:08 |
| 2 | Dunn and DoorDash relating to the development of | 11:06:10 |
| 3 | the protocol. | 11:06:17 |
| 4 | Q    Have you read any of the pleadings in | 11:06:18 |
| 5 | this case? | 11:06:20 |
| 6 | MS. LUNETTA:  Objection to form. | 11:06:23 |
| 7 | A    Yes. | 11:06:29 |
| 8 | Q    Which pleadings in this case have you | 11:06:31 |
| 9 | read? | 11:06:32 |
| 10 | A    I've read pleadings in this case that | 11:06:34 |
| 11 | we've generated relating to our third-party status | 11:06:39 |
| 12 | and associated pleadings in connection with that. | 11:06:44 |
| 13 | Q    So you've read the objection to the | 11:06:48 |
| 14 | subpoena and the document request that were filed | 11:06:51 |
| 15 | on CPR's behalf; is that right? | 11:06:54 |
| 16 | A    That, and there were letters written, | 11:06:57 |
| 17 | filed with the Court.  Whether those are | 11:06:59 |
| 18 | technically pleadings or not, I know there has | 11:07:03 |
| 19 | been correspondence. | 11:07:06 |
| 20 | Q    Have you read any other documents that | 11:07:08 |
| 21 | have been filed with the Court in this matter? | 11:07:10 |
| 22 | A    I don't believe so. | 11:07:15 |
| 23 | Q    Have you read any other documents -- | 11:07:16 |
| 24 | MR. ZIGLER:  Strike that. | 11:07:23 |
| 25 | A    I read -- | 11:07:30 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              68

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  There is no question. | 11:07:34 |
| 2 | Just wait for a question. | 11:07:34 |
| 3 | A    I just wanted to be complete in my | 11:07:36 |
| 4 | answer there, that there was a TRO filing.  I | 11:07:38 |
| 5 | believe I read the TRO filing. | 11:07:42 |
| 6 | Q    The petition for a temporary | 11:07:45 |
| 7 | restraining order? | 11:07:47 |
| 8 | A    Yeah. | 11:07:48 |
| 9 | And I believe I read the defense | 11:07:52 |
| 10 | response to that. | 11:07:54 |
| 11 | Q    Was that stylized as an answer, do you | 11:07:57 |
| 12 | recall? | 11:08:02 |
| 13 | A    I don't recall. | 11:08:04 |
| 14 | Q    Other than the materials that you just | 11:08:26 |
| 15 | mentioned, have you read any other documents that | 11:08:28 |
| 16 | relate or comment on the Abernathy versus DoorDash | 11:08:37 |
| 17 | dispute? | 11:08:44 |
| 18 | MS. LUNETTA:  Objection to form. | 11:08:45 |
| 19 | A    Legal documents? | 11:08:49 |
| 20 | Q    Documents of any nature. | 11:08:50 |
| 21 | MS. LUNETTA:  Objection to the form. | 11:08:52 |
| 22 | A    I believe I have read press relating to | 11:08:53 |
| 23 | it as well. | 11:08:56 |
| 24 | Q    Do you recall which particular outlet | 11:08:57 |
| 25 | those were from? | 11:09:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    69

| | | |
|---|---|---|
| 1 | A    Generally speaking, I believe Law360, | 11:09:11 |
| 2 | Bloomberg, Reuters.  Those are the ones that come | 11:09:16 |
| 3 | to mind. | 11:09:23 |
| 4 | Q    Do you know how long -- | 11:09:24 |
| 5 | A    Relating to this particular issue, that | 11:09:26 |
| 6 | is.  The TRO and the -- beyond that I'm not aware. | 11:09:28 |
| 7 | Q    Do you have an understanding when the | 11:09:37 |
| 8 | dispute between the plaintiffs and Abernathy and | 11:09:38 |
| 9 | DoorDash arose? | 11:09:44 |
| 10 | MS. LUNETTA:  Objection to form. | 11:09:48 |
| 11 | A    I really don't. | 11:09:48 |
| 12 | MS. LUNETTA:  When you get to a good | 11:10:00 |
| 13 | spot, can we just take a five-minute, quick, | 11:10:03 |
| 14 | restroom break? | 11:10:04 |
| 15 | MR. ZIGLER:  Yeah, that's fine. | 11:10:07 |
| 16 | MS. LUNETTA:  Okay. | 11:10:08 |
| 17 | THE VIDEOGRAPHER:  Right now? | 11:10:08 |
| 18 | Standby.  We're going off the record. | 11:10:09 |
| 19 | The time is 11:10 a.m. | 11:10:12 |
| 20 | (A recess was taken.) | 11:10:14 |
| 21 | THE VIDEOGRAPHER:  We are back on the | 11:25:45 |
| 22 | record.  The time is 11:25 a.m. | 11:25:46 |
| 23 | BY MR. ZIGLER: | 11:25:49 |
| 24 | Q    How long did you prepare -- how long | 11:25:51 |
| 25 | did you spend preparing for today's testimony? | 11:25:53 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          70

| | | | |
|---|---|---|---|
| 1 | A | A few hours over this past week. | 11:26:00 |
| 2 | Q | Over this past week? | 11:26:04 |
| 3 | | And what day or days was that? | 11:26:07 |
| 4 | A | I'd say it was scattered throughout the | 11:26:18 |
| 5 | week, but in particular, Tuesday and Thursday. | | 11:26:20 |
| 6 | Q | What did you do to prepare? | 11:26:27 |
| 7 | A | Met with counsel. | 11:26:31 |
| 8 | Q | And who was that? | 11:26:33 |
| 9 | A | Ms. Lunetta. | 11:26:39 |
| 10 | Q | Anyone else? | 11:26:41 |
| 11 | A | Her colleagues at Morgan Lewis.  And | 11:26:42 |
| 12 | Ms. Hershenberg. | | 11:26:46 |
| 13 | Q | Was anyone else there other than who | 11:26:56 |
| 14 | you just mentioned? | | 11:26:58 |
| 15 | A | Helena Erickson was on the phone for a | 11:27:09 |
| 16 | little bit of time. | | 11:27:14 |
| 17 | Q | Anyone else? | 11:27:19 |
| 18 | A | I don't believe so. | 11:27:22 |
| 19 | | MS. LUNETTA:  The lunch lady. | 11:27:30 |
| 20 | | MR. ZIGLER:  I'm sorry? | 11:27:32 |
| 21 | | MS. LUNETTA:  The lunch lady. | 11:27:32 |
| 22 | BY MR. ZIGLER: | | 11:27:32 |
| 23 | Q | Did you review any documents during | 11:27:38 |
| 24 | that time? | | 11:27:41 |
| 25 | A | Yes. | 11:27:45 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    71

| 1 | Q    What documents did you review? | 11:27:46 |
| 2 | A    I reviewed documents provided to me by | 11:27:52 |
| 3 | counsel. | 11:27:55 |
| 4 | Q    And which documents were those? | 11:27:55 |
| 5 | A    They were documents relating to | 11:28:01 |
| 6 | communications with Gibson Dunn and DoorDash about | 11:28:03 |
| 7 | the development of the protocol. | 11:28:07 |
| 8 | Q    Were they documents relating to | 11:28:09 |
| 9 | communications or were they the communications | 11:28:11 |
| 10 | themselves? | 11:28:14 |
| 11 | A    They were documents reflecting | 11:28:15 |
| 12 | communications with Gibson Dunn and DoorDash about | 11:28:18 |
| 13 | the development of the protocol. | 11:28:21 |
| 14 | Q    Were they documents that were produced | 11:28:24 |
| 15 | in discovery by your counsel in this case? | 11:28:26 |
| 16 | A    I believe so. | 11:28:29 |
| 17 | Q    Did you review any documents that were | 11:28:30 |
| 18 | not produced in discovery in this case? | 11:28:31 |
| 19 | A    I don't know. | 11:28:34 |
| 20 | Q    Did you review any documents that were | 11:28:37 |
| 21 | related to documents reflecting communications | 11:28:39 |
| 22 | with DoorDash and Gibson Dunn? | 11:28:44 |
| 23 | MS. LUNETTA:  Objection to form. | 11:28:51 |
| 24 | A    In preparation for my deposition, I | 11:28:52 |
| 25 | reviewed the documents that were -- I don't -- is | 11:28:56 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                72

| | | |
|---|---|---|
| 1 | relating, reflecting -- that reflected | 11:28:58 |
| 2 | communications with DoorDash and Gibson Dunn | 11:29:00 |
| 3 | relating to the development of the protocol. | 11:29:04 |
| 4 | Q    Okay. | 11:29:06 |
| 5 | And what I'm trying to get to is, | 11:29:06 |
| 6 | besides those documents that reflected the actual | 11:29:08 |
| 7 | communications, the e-mails back and forth, did | 11:29:11 |
| 8 | you review any other documents that might have | 11:29:14 |
| 9 | discussed those communications themselves? | 11:29:17 |
| 10 | A    I'm currently employed at CPR.   I | 11:29:26 |
| 11 | review all kinds of documents.  For purposes of | 11:29:28 |
| 12 | preparing for this deposition, they were as I | 11:29:31 |
| 13 | described them. | 11:29:34 |
| 14 | Q    Okay.  It was a bad question. | 11:29:36 |
| 15 | In preparing for your deposition -- | 11:29:38 |
| 16 | A    That's what I'm answering. | 11:29:40 |
| 17 | Q    Right. | 11:29:42 |
| 18 | In preparing for your deposition, did | 11:29:42 |
| 19 | you review documents that related to the | 11:29:44 |
| 20 | communications with Gibson Dunn and DoorDash | 11:29:49 |
| 21 | related to the creation of the mass claims | 11:29:55 |
| 22 | protocol? | 11:29:57 |
| 23 | A    Are you drawing a distinction between | 11:29:58 |
| 24 | relating to and reflecting? | 11:30:00 |
| 25 | Q    I am. | 11:30:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                 73

| | | |
|---|---|---|
| 1 | A    What is your distinction? | 11:30:03 |
| 2 | Q    Something more than the actual | 11:30:04 |
| 3 | communications. | 11:30:05 |
| 4 | A    I believe there are documents that | 11:30:09 |
| 5 | reflect the communications and documents where | 11:30:10 |
| 6 | somebody may have written something that said this | 11:30:16 |
| 7 | was a communication that I had. | 11:30:19 |
| 8 | MS. LUNETTA:  For clarification, I can | 11:30:24 |
| 9 | tell you he reviewed only the documents that we | 11:30:25 |
| 10 | produced to you. | 11:30:28 |
| 11 | Q    Outside of the two hours that you spent | 11:30:36 |
| 12 | with counsel, did you spend any time preparing for | 11:30:38 |
| 13 | today's testimony? | 11:30:42 |
| 14 | A    Yeah, I wouldn't limit it to two hours. | 11:30:45 |
| 15 | I don't know how many hours it was.  It was a few | 11:30:48 |
| 16 | hours. | 11:30:51 |
| 17 | Q    Okay. | 11:30:52 |
| 18 | A    And I did review documents that counsel | 11:30:52 |
| 19 | provided to me, without counsel. | 11:30:57 |
| 20 | Q    How many hours total do you believe you | 11:31:03 |
| 21 | have spent preparing for today's deposition? | 11:31:06 |
| 22 | A    I don't know.  As I said, a few hours. | 11:31:08 |
| 23 | Q    Do you know if it was more or less than | 11:31:11 |
| 24 | ten hours? | 11:31:16 |
| 25 | A    I'm going to say it was less than ten | 11:31:17 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    74

| | | |
|---|---|---|
| 1 | hours. | 11:31:20 |
| 2 | Q    Do you know if it was more or less than | 11:31:20 |
| 3 | five hours? | 11:31:22 |
| 4 | A    I'm going to say it was between five | 11:31:29 |
| 5 | and ten hours. | 11:31:31 |
| 6 | Q    Did you look for any documents in | 11:31:40 |
| 7 | connection with the subpoena sent to CPR? | 11:31:47 |
| 8 | A    Yes. | 11:31:52 |
| 9 | Q    And when did you do that? | 11:31:53 |
| 10 | A    Earlier this month.  I think the | 11:32:03 |
| 11 | subpoena was sent to us maybe the end of last | 11:32:07 |
| 12 | month, November.  And in connection with that, I | 11:32:13 |
| 13 | looked for documents. | 11:32:17 |
| 14 | Q    What documents did you look for? | 11:32:19 |
| 15 | A    Documents that the subpoena seemed to | 11:32:26 |
| 16 | be asking for. | 11:32:31 |
| 17 | Q    And did you find any documents that the | 11:32:33 |
| 18 | subpoena seemed to be asking for, in your opinion? | 11:32:35 |
| 19 | A    Yes. | 11:32:38 |
| 20 | Q    And what did you do with those | 11:32:39 |
| 21 | documents? | 11:32:40 |
| 22 | A    Gave them to counsel. | 11:32:41 |
| 23 | Q    Other than the documents that you | 11:32:44 |
| 24 | located and gave to your counsel, did you review | 11:32:46 |
| 25 | any other documents before they were turned | 11:32:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    75

| | | |
|---|---|---|
| 1 | over -- I'm sorry. | 11:32:52 |
| 2 | MR. ZIGLER:  Strike that. | 11:32:55 |
| 3 | Q    Other than the documents that you | 11:32:55 |
| 4 | provided to counsel that you thought were related | 11:32:57 |
| 5 | to the requests in the subpoena, did you review | 11:33:00 |
| 6 | any other documents that someone else thought | 11:33:04 |
| 7 | might be responsive? | 11:33:12 |
| 8 | MS. LUNETTA:  Objection to form. | 11:33:15 |
| 9 | A    I'm not sure I fully understand the | 11:33:27 |
| 10 | question.  Maybe. | 11:33:29 |
| 11 | Did I review any documents other than | 11:33:30 |
| 12 | the documents I turned over to counsel? | 11:33:32 |
| 13 | I may have.  That somebody else turned | 11:33:34 |
| 14 | over to counsel. | 11:33:38 |
| 15 | Q    Are you familiar with any documents | 11:33:39 |
| 16 | that you reviewed that you believed, or anyone | 11:33:42 |
| 17 | believed, might be responsive to the requests in | 11:33:48 |
| 18 | the subpoena that were not turned over? | 11:33:51 |
| 19 | MS. LUNETTA:  Objection to form. | 11:33:55 |
| 20 | A    I am not aware of any documents that we | 11:34:01 |
| 21 | believe were responsive to the request that were | 11:34:04 |
| 22 | not turned over to our counsel. | 11:34:08 |
| 23 | Q    Do you know if your counsel withheld | 11:34:12 |
| 24 | any documents from production? | 11:34:14 |
| 25 | MS. LUNETTA:  Objection.  Calls for | 11:34:18 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    76

| | | |
|---|---|---|
| 1 | privileged information.  And beyond the scope. | 11:34:20 |
| 2 | A    I'm not aware. | 11:34:28 |
| 3 | Q    You're represented by counsel here | 11:34:46 |
| 4 | today; is that right? | 11:34:47 |
| 5 | A    Yes. | 11:34:48 |
| 6 | Q    And who is your counsel here today? | 11:34:49 |
| 7 | A    Morgan Lewis & Bockius.  In particular, | 11:34:51 |
| 8 | Kim Lunetta. | 11:34:54 |
| 9 | Q    Do you know the other lawyers in the | 11:34:56 |
| 10 | room? | 11:34:58 |
| 11 | A    I do. | 11:34:59 |
| 12 | Q    Okay. | 11:34:59 |
| 13 | Could you describe them to me or name | 11:35:00 |
| 14 | them. | 11:35:05 |
| 15 | MS. LUNETTA:  I was going to say it | 11:35:08 |
| 16 | could get weird. | 11:35:08 |
| 17 | Q    I'm not looking for a physical | 11:35:08 |
| 18 | description.  I'm looking to understand your | 11:35:10 |
| 19 | relationship with them. | 11:35:13 |
| 20 | A    Sam and Sara are, I believe, associates | 11:35:17 |
| 21 | with Morgan Lewis & Bockius, and have been working | 11:35:21 |
| 22 | with Kim. | 11:35:25 |
| 23 | Q    Okay. | 11:35:25 |
| 24 | Besides the Morgan Lewis lawyers, do | 11:35:26 |
| 25 | you know any other lawyers in the room here today? | 11:35:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    77

| | | |
|---|---|---|
| 1 | A    Anna Hershenberg, who works with us at | 11:35:31 |
| 2 | CPR. | 11:35:34 |
| 3 | Q    And what is her role at CPR? | 11:35:35 |
| 4 | A    She has a number of different roles, | 11:35:39 |
| 5 | but for present purposes, her role is as our | 11:35:41 |
| 6 | corporate counsel. | 11:35:44 |
| 7 | Q    Okay. | 11:35:45 |
| 8 | Do you know any other lawyers in the | 11:35:45 |
| 9 | room today? | 11:35:48 |
| 10 | A    I met everybody else today. | 11:35:49 |
| 11 | Q    Okay. | 11:35:51 |
| 12 | When did you first retain Ms. Lunetta? | 11:36:10 |
| 13 | THE VIDEOGRAPHER:  I'm sorry, Counsel. | 11:36:20 |
| 14 | One second. | 11:36:24 |
| 15 | (Pause.) | 11:36:38 |
| 16 | BY MR. ZIGLER: | 11:36:38 |
| 17 | Q    Sorry. | 11:36:42 |
| 18 | So the question was:  When did you | 11:36:42 |
| 19 | first retain Ms. Lunetta? | 11:36:44 |
| 20 | MS. LUNETTA:  Objection to form. | 11:36:48 |
| 21 | Are you referring to just for this | 11:36:49 |
| 22 | matter? | 11:36:51 |
| 23 | MR. ZIGLER:  No. | 11:36:52 |
| 24 | MS. LUNETTA:  Okay. | 11:36:53 |
| 25 | For CPR? | 11:36:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                               78

| | | |
|---|---|---|
| 1 | BY MR. ZIGLER: | 11:36:55 |
| 2 | Q    When did you first retain Ms. Lunetta? | 11:36:59 |
| 3 | MS. LUNETTA:  Objection to form. | 11:37:03 |
| 4 | A    So in connection with this matter, it | 11:37:03 |
| 5 | would have been, I believe, sometime in the end of | 11:37:05 |
| 6 | November. | 11:37:09 |
| 7 | Q    Okay. | 11:37:10 |
| 8 | And you've hired her before that? | 11:37:11 |
| 9 | MS. LUNETTA:  Objection to form. | 11:37:14 |
| 10 | Beyond the scope.  I'm going to direct him not to | 11:37:14 |
| 11 | answer. | 11:37:17 |
| 12 | Q    Are you going to follow her advice? | 11:37:18 |
| 13 | A    I am. | 11:37:19 |
| 14 | Q    Was Ms. Lunetta referred to you by | 11:37:38 |
| 15 | someone? | 11:37:43 |
| 16 | A    When I first met Ms. Lunetta, I believe | 11:38:00 |
| 17 | she was referred to me by somebody. | 11:38:04 |
| 18 | Q    And who was that person? | 11:38:06 |
| 19 | MS. LUNETTA:  Objection to form. | 11:38:09 |
| 20 | Beyond the scope.  I'm going to direct him not to | 11:38:10 |
| 21 | answer. | 11:38:13 |
| 22 | Just for clarity, I have known | 11:38:13 |
| 23 | Mr. Waxman before he worked at CPR. | 11:38:16 |
| 24 | MR. ZIGLER:  Okay. | 11:38:20 |
| 25 | Maybe this is a good time for me to get | 11:38:22 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    79

| | | |
|---|---|---|
| 1 | a better understanding.  You have objected to a | 11:38:24 |
| 2 | number of lines of questioning as beyond the scope | 11:38:28 |
| 3 | of the deposition.  My understanding of the | 11:38:31 |
| 4 | judge's order was that he directed us or you to | 11:38:33 |
| 5 | produce somebody who knew about the protocol and | 11:38:36 |
| 6 | that we could ask him whatever we wanted, I | 11:38:38 |
| 7 | believe was the quote. | 11:38:42 |
| 8 | So I want to get an understanding of | 11:38:44 |
| 9 | your position on the scope of the deposition so I | 11:38:46 |
| 10 | can understand your objection and instruction not | 11:38:48 |
| 11 | to answer. | 11:38:51 |
| 12 | MS. LUNETTA:  Sure. | 11:38:52 |
| 13 | So my understanding of the Court's | 11:38:52 |
| 14 | order is he quashed the 30(b)(6) subpoena all | 11:38:54 |
| 15 | together and he ordered us to produce only | 11:38:57 |
| 16 | documents that were communications between CPR, | 11:39:00 |
| 17 | Gibson Dunn and DoorDash, and communications | 11:39:03 |
| 18 | internally that were about those communications | 11:39:07 |
| 19 | with respect to the development of the protocol. | 11:39:09 |
| 20 | And if the Court had wanted to open | 11:39:12 |
| 21 | this deposition to all of the other topics that | 11:39:15 |
| 22 | you have raised today, all the ones that were in | 11:39:18 |
| 23 | the 30(b)(6), I don't believe that the judge would | 11:39:20 |
| 24 | have quashed that subpoena in its entirety. | 11:39:23 |
| 25 | So Mr. Waxman has come here today to | 11:39:26 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    80

| | |
|---|---|
| 1  | testify about the documents, the communications | 11:39:29 |
| 2  | that he had between -- that CPR had between | 11:39:31 |
| 3  | DoorDash and Gibson Dunn regarding the development | 11:39:33 |
| 4  | of the protocol.  He is also happy to answer | 11:39:35 |
| 5  | questions about the development of the protocol, | 11:39:39 |
| 6  | the protocol itself, but anything outside of that | 11:39:41 |
| 7  | scope would be beyond the scope of the deposition. | 11:39:45 |
| 8  | MR. ZIGLER:  So we have got a different | 11:39:55 |
| 9  | view of that.  Obviously, we believe the | 11:39:59 |
| 10 | differences and distinctions between how the | 11:40:00 |
| 11 | protocol was developed would be fair game, which | 11:40:01 |
| 12 | is why I have asked questions about the | 11:40:05 |
| 13 | development of other protocols and rules, which | 11:40:07 |
| 14 | you have instructed him not to answer. | 11:40:09 |
| 15 | We believe that DoorDash and Gibson | 11:40:11 |
| 16 | Dunn's relationship with -- with CPR is also an | 11:40:13 |
| 17 | available line of questioning, which is why I've | 11:40:27 |
| 18 | asked about how much money they have given, | 11:40:30 |
| 19 | particularly relative to the total revenue of the | 11:40:33 |
| 20 | organization. | 11:40:40 |
| 21 | I have asked background questions of | 11:40:40 |
| 22 | the deponent including about his prior work | 11:40:44 |
| 23 | experience, which I think are just general | 11:40:50 |
| 24 | foundation questions, which you have objected to | 11:40:52 |
| 25 | as beyond the scope. | 11:40:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    81

| | | |
|---|---|---|
| 1 | Is there a particular privilege that | 11:40:56 |
| 2 | you're resting that objection on or is it just | 11:41:02 |
| 3 | simply your understanding of what's relevant for | 11:41:04 |
| 4 | the dispute in front of Judge Alsup? | 11:41:08 |
| 5 | MS. LUNETTA:  I'm just exercising my | 11:41:16 |
| 6 | right and fulfilling my obligation to limit this | 11:41:17 |
| 7 | to what I believe are the confines of the court | 11:41:21 |
| 8 | order. | 11:41:24 |
| 9 | MR. ZIGLER:  And which order is that, | 11:41:24 |
| 10 | in particular? | 11:41:26 |
| 11 | MS. LUNETTA:  Judge Alsup's order | 11:41:29 |
| 12 | during oral argument last Friday. | 11:41:32 |
| 13 | MR. ZIGLER:  Do you disagree that he | 11:41:36 |
| 14 | stated that we could ask whatever we wanted? | 11:41:38 |
| 15 | MS. LUNETTA:  I do.  We dispute that. | 11:41:41 |
| 16 | MR. ZIGLER:  Do you have a copy of the | 11:41:45 |
| 17 | transcript? | 11:41:46 |
| 18 | MS. LUNETTA:  Of course. | 11:41:49 |
| 19 | MR. KAYES:  We ordered it too and we | 11:41:53 |
| 20 | haven't gotten it yet. | 11:41:55 |
| 21 | MS. LUNETTA:  Would you like me to read | 11:42:18 |
| 22 | it? | 11:42:18 |
| 23 | MR. ZIGLER:  If you have a copy, I'd | 11:42:20 |
| 24 | love it. | 11:42:22 |
| 25 | Thank you. | 11:42:25 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    82

| | | |
|---|---|---|
| 1 | How are you doing hunger-wise? | 11:43:02 |
| 2 | Let's go off the record. | 11:43:12 |
| 3 | THE VIDEOGRAPHER:  We are going off the | 11:43:15 |
| 4 | record.  The time is 11:43. | 11:43:16 |
| 5 | (A luncheon recess was taken.) | 11:43:25 |
| 6 | THE VIDEOGRAPHER:  We are back on the | 12:34:01 |
| 7 | record.  The time is 12:33 p.m. | 12:34:02 |
| 8 | BY MR. ZIGLER: | 12:34:04 |
| 9 | Q    Mr. Waxman, I'm going to hand you a | 12:34:08 |
| 10 | document that's been marked as Exhibit 3.  If you | 12:34:11 |
| 11 | could take a moment to look at that. | 12:34:13 |
| 12 | (Waxman Exhibit 3 marked for | 12:34:15 |
| 13 | identification and attached to the transcript.) | 12:34:15 |
| 14 | Q    Have you seen Exhibit 3 before? | 12:34:51 |
| 15 | A    I believe I have, yes. | 12:35:33 |
| 16 | Q    Okay. | 12:35:35 |
| 17 | Can you tell me what Exhibit 3 is? | 12:35:36 |
| 18 | A    It is an annual review from 2018 for | 12:35:39 |
| 19 | CPR. | 12:35:45 |
| 20 | Q    Are you aware of any incorrect or | 12:35:51 |
| 21 | inaccurate information in Exhibit 3? | 12:35:55 |
| 22 | MS. LUNETTA:  Objection to form. | 12:35:59 |
| 23 | A    I didn't just read the entire exhibit. | 12:36:03 |
| 24 | I'm not aware of any incorrect information. | 12:36:06 |
| 25 | Q    Do you know who is responsible for the | 12:36:10 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              83

| | | |
|---|---|---|
| 1 | content of Exhibit 3? | 12:36:13 |
| 2 | MS. LUNETTA:  Objection to form. | 12:36:16 |
| 3 | A    I don't. | 12:36:18 |
| 4 | Q    If I wanted to know more about the | 12:36:19 |
| 5 | accuracy of the information in Exhibit 3, who | 12:36:25 |
| 6 | would I ask? | 12:36:28 |
| 7 | A    I don't know who was behind Exhibit 3. | 12:36:32 |
| 8 | Q    Is CPR in the process of preparing an | 12:36:36 |
| 9 | annual review for 2020? | 12:36:38 |
| 10 | A    Yes. | 12:36:41 |
| 11 | Q    And who is responsible for the | 12:36:41 |
| 12 | production of that annual review for 2020? | 12:36:43 |
| 13 | A    The person coordinating, pulling it | 12:36:49 |
| 14 | together, is the head of our marketing | 12:36:52 |
| 15 | communications. | 12:36:56 |
| 16 | Q    And what is their name? | 12:36:56 |
| 17 | A    Tania Zamorsky. | 12:36:58 |
| 18 | Q    And how long has Ms. Zamorsky been with | 12:37:01 |
| 19 | CPR? | 12:37:05 |
| 20 | A    I think she has been associated with | 12:37:10 |
| 21 | CPR about five years, but I'm not exactly sure. | 12:37:12 |
| 22 | Q    Has her role with CPR changed during | 12:37:16 |
| 23 | that time, are you aware? | 12:37:19 |
| 24 | A    Yes. | 12:37:20 |
| 25 | Q    Yes, it has? | 12:37:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          84

| | | | |
|---|---|---|---|
| 1 | A | Yes, it has. | 12:37:23 |
| 2 | Q | What was her previous position at CPR? | 12:37:24 |
| 3 | A | She is now an outside consultant.  She | 12:37:27 |
| 4 | | was a full-time employee previously. | 12:37:30 |
| 5 | Q | Do you know if Ms. Zamorsky was | 12:37:35 |
| 6 | | responsible for the coordination of the production | 12:37:38 |
| 7 | | of Exhibit 2? | 12:37:41 |
| 8 | | Exhibit 2 is the 2019 version. | 12:37:46 |
| 9 | A | I believe so.  I'm not sure. | 12:37:53 |
| 10 | Q | Okay. | 12:38:04 |
| 11 | | Who at CPR is responsible for the | 12:38:42 |
| 12 | | organization's tax filings every year? | 12:38:47 |
| 13 | | MS. LUNETTA:  Objection to form. | 12:38:53 |
| 14 | A | So that would be some combination of | 12:38:57 |
| 15 | | our chief financial officer, accounting controller | 12:39:01 |
| 16 | | and outside accountants. | 12:39:05 |
| 17 | Q | And who is your outside accountant? | 12:39:10 |
| 18 | A | I'm sorry, I forgot their name. | 12:39:14 |
| 19 | Q | Who is your CFO? | 12:39:16 |
| 20 | A | Beth Corman. | 12:39:19 |
| 21 | Q | And who is your accountant? | 12:39:20 |
| 22 | A | Agata -- Agata. | 12:39:24 |
| 23 | Q | Is there more than one Agata at CPR? | 12:39:29 |
| 24 | A | No. | 12:39:32 |
| 25 | Q | Then that's probably good enough. | 12:39:34 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              85

| | | |
|---|---|---|
| 1 | I'm going to hand you a document that's | 12:39:40 |
| 2 | marked as Exhibit 4.  It's Bates labeled | 12:39:42 |
| 3 | CPR_000001. | 12:39:45 |
| 4 | (Waxman Exhibit 4 marked for | 12:39:48 |
| 5 | identification and attached to the transcript.) | 12:39:48 |
| 6 | Q    Have you seen Exhibit 4 before? | 12:40:40 |
| 7 | A    Are you asking outside the context of | 12:40:47 |
| 8 | the preparations for this, or is that inclusive of | 12:40:50 |
| 9 | preparations for this deposition? | 12:40:53 |
| 10 | Q    It's inclusive of preparation for this | 12:40:55 |
| 11 | deposition. | 12:40:58 |
| 12 | A    Yes. | 12:40:58 |
| 13 | Q    When was the first time you saw Exhibit | 12:40:59 |
| 14 | 4? | 12:41:02 |
| 15 | A    In preparation for this deposition. | 12:41:02 |
| 16 | Q    Do you know the author of Exhibit 4? | 12:41:17 |
| 17 | A    I don't believe so. | 12:41:21 |
| 18 | Q    Do you know the recipient of Exhibit 4? | 12:41:23 |
| 19 | A    I do. | 12:41:26 |
| 20 | Q    And who is the recipient of Exhibit 4? | 12:41:27 |
| 21 | A    Olivier Andre and Helena Erickson and | 12:41:30 |
| 22 | Mike Holecek. | 12:41:36 |
| 23 | Q    And who is Olivier Andre? | 12:41:37 |
| 24 | A    He is a colleague at CPR. | 12:41:43 |
| 25 | Q    And what is her title at CPR? | 12:41:45 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    86

| | | | |
|---|---|---|---|
| 1 | A     Olivier is a man.  He is the senior | 12:41:50 |
| 2 | vice president at CPR.  He does a variety of | 12:41:53 |
| 3 | things and leads up our international initiatives. | 12:41:58 |
| 4 | Q     And who is Helena Erickson? | 12:42:04 |
| 5 | A     She is a senior vice president at CPR, | 12:42:07 |
| 6 | and she leads up the dispute resolution services. | 12:42:09 |
| 7 | Q     And who is Michael Holecek? | 12:42:22 |
| 8 | A     I understand him to be a lawyer at | 12:42:27 |
| 9 | Gibson Dunn. | 12:42:30 |
| 10 | Q     And how long have you known Mr. Andre? | 12:42:32 |
| 11 | A     I met him earlier this year in | 12:42:41 |
| 12 | connection with my coming to CPR. | 12:42:43 |
| 13 | Q     Do you recall what month that would | 12:42:46 |
| 14 | have been? | 12:42:48 |
| 15 | A     Sometime earlier in the year. | 12:42:53 |
| 16 | Q     Summer or fall? | 12:42:56 |
| 17 | A     I think it was spring or winter. | 12:43:01 |
| 18 | Q     Spring or winter of '18? | 12:43:04 |
| 19 | A     '19.  Earlier this year.  Earlier, | 12:43:06 |
| 20 | 2019. | 12:43:11 |
| 21 | Q     And when did you first meet Ms. | 12:43:14 |
| 22 | Erickson? | 12:43:16 |
| 23 | A     Same time. | 12:43:17 |
| 24 | Q     And when did you first meet | 12:43:20 |
| 25 | Mr. Holecek? | 12:43:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    87

| | | |
|---|---|---|
| 1 | A    I've only spoken to Mr. Holecek on the | 12:43:26 |
| 2 | phone and that was sometime in September. | 12:43:28 |
| 3 | Q    Do you know if Mr. Andre knows Ms. | 12:43:38 |
| 4 | Orlowski? | 12:43:50 |
| 5 | A    I'm not familiar of the nature of their | 12:43:55 |
| 6 | interaction.  I mean the precise nature.  I see | 12:43:58 |
| 7 | what the e-mail says. | 12:44:03 |
| 8 | Q    Do you have any information regarding | 12:44:04 |
| 9 | how well Mr. Olivier knows Ms. Orlowski outside of | 12:44:08 |
| 10 | the contents of this e-mail? | 12:44:16 |
| 11 | MS. LUNETTA:  Objection to form. | 12:44:18 |
| 12 | A    I do not. | 12:44:19 |
| 13 | Q    Do you know why Ms. Orlowski reached | 12:44:24 |
| 14 | out to Mr. Olivier -- or Mr. Andre, excuse me? | 12:44:27 |
| 15 | A    Other than what the e-mail says? | 12:44:37 |
| 16 | Q    Other than what the e-mail says. | 12:44:38 |
| 17 | A    I do not. | 12:44:40 |
| 18 | Q    Do you know if anyone from Gibson Dunn | 12:44:47 |
| 19 | reached out to CPR about the application or change | 12:44:52 |
| 20 | in any arbitration rules or protocols prior to | 12:45:02 |
| 21 | this e-mail? | 12:45:07 |
| 22 | A    I'm sorry, can you repeat the question? | 12:45:12 |
| 23 | Q    Sure. | 12:45:15 |
| 24 | Do you know if anybody from Gibson Dunn | 12:45:15 |
| 25 | reached out to CPR about the application or change | 12:45:17 |

Transcript of Allen Waxman
Conducted on December 27, 2019                            88

| | | |
|---|---|---|
| 1 | of any of CPR's rules or protocols prior to May | 12:45:25 |
| 2 | 14, 2019? | 12:45:31 |
| 3 | A    I don't know that that was what they | 12:45:36 |
| 4 | were reaching out for here, and I'm not aware of | 12:45:37 |
| 5 | any efforts prior thereto. | 12:45:40 |
| 6 | Q    Has anyone from Gibson Dunn ever | 12:45:47 |
| 7 | reached out to CPR about the application or change | 12:45:49 |
| 8 | of any of CPR's rules for protocols, to your | 12:45:54 |
| 9 | knowledge? | 12:45:58 |
| 10 | A    I'm sorry, ever? | 12:46:07 |
| 11 | Q    Ever. | 12:46:09 |
| 12 | A    So in -- I know there was an outreach | 12:46:10 |
| 13 | in connection with this time frame that I have | 12:46:16 |
| 14 | learned of in connection with preparation for this | 12:46:19 |
| 15 | deposition, to discuss what could be done with | 12:46:22 |
| 16 | respect to fees for arbitration.  That was | 12:46:25 |
| 17 | sometime in the May time frame.  And I know that | 12:46:29 |
| 18 | was, again, raised in the September time frame | 12:46:32 |
| 19 | with respect to fees.  I'm differing with you with | 12:46:37 |
| 20 | respect to changes in the rules. | 12:46:41 |
| 21 | Q    All right. | 12:46:47 |
| 22 | You said that you have learned of -- | 12:47:24 |
| 23 | that there was outreach from Gibson Dunn to | 12:47:26 |
| 24 | discuss what could be done with respect to fees | 12:47:34 |
| 25 | for arbitration. | 12:47:36 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    89

| | | |
|---|---|---|
| 1 | What was your understanding of Gibson | 12:47:41 |
| 2 | Dunn's concern with respect to fees for | 12:47:45 |
| 3 | arbitration? | 12:47:48 |
| 4 | A    So let me speak to the September time | 12:47:52 |
| 5 | frame, if I could.  That's the time -- I didn't | 12:47:54 |
| 6 | join CPR until August.  As I understand it, in | 12:47:57 |
| 7 | September, they reached out and indicated that | 12:48:00 |
| 8 | they were involved in a matter with AAA in which | 12:48:03 |
| 9 | they were being charged, up-front, a large sum, | 12:48:08 |
| 10 | I'm not remembering what it was, for the filing | 12:48:11 |
| 11 | and administration of arbitrations, and really not | 12:48:16 |
| 12 | connected with the work being done on the matter. | 12:48:21 |
| 13 | And it was a large sum of money in which -- I | 12:48:24 |
| 14 | recall something along the lines, it was being | 12:48:29 |
| 15 | treated like one matter, but it was being charged | 12:48:32 |
| 16 | like it was multiple matters. | 12:48:34 |
| 17 | And they were interested in CPR's | 12:48:37 |
| 18 | non-administered rules and -- which doesn't have | 12:48:40 |
| 19 | filings in connection with them, and whether or | 12:48:45 |
| 20 | not there were some other options for the charging | 12:48:48 |
| 21 | of fees that CPR would entertain. | 12:48:53 |
| 22 | Q    But you weren't a party to those | 12:48:58 |
| 23 | conversations in May? | 12:49:00 |
| 24 | A    What I was just referring to was | 12:49:03 |
| 25 | September.  In May, I was not a party -- I didn't | 12:49:04 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Allen Waxman
Conducted on December 27, 2019                    90

| | | |
|---|---|---|
| 1 | join CPR until August. | 12:49:09 |
| 2 | Q    Who was a party to the conversations in | 12:49:11 |
| 3 | May, if you know? | 12:49:13 |
| 4 | A    And the only thing I know is through | 12:49:18 |
| 5 | the documents that, I believe, you have.  As I | 12:49:19 |
| 6 | understand it, there was this initial outreach to | 12:49:22 |
| 7 | Mr. Andre, referring the matter to Ms. Erickson, | 12:49:26 |
| 8 | and then Ms. Erickson had a conversation, I | 12:49:28 |
| 9 | believe, with Michael Holecek. | 12:49:33 |
| 10 | Q    Do you know if anybody else was | 12:49:38 |
| 11 | involved in that outreach? | 12:49:40 |
| 12 | MS. LUNETTA:  Objection to form. | 12:49:44 |
| 13 | A    Again, I just want to be clear, | 12:49:48 |
| 14 | outreach, whom to whom? | 12:49:49 |
| 15 | Gibson Dunn, through this e-mail, was | 12:49:51 |
| 16 | interested in talking with CPR.  And Ms. Erickson, | 12:49:57 |
| 17 | I'm not sure who initiated that call or how that | 12:50:00 |
| 18 | took place, but there was a communication, I think | 12:50:06 |
| 19 | it was a telephone call, but it may have been an | 12:50:12 |
| 20 | e-mail communication between Ms. Erickson and | 12:50:15 |
| 21 | Mr. Holecek. | 12:50:19 |
| 22 | Q    And do you know if anybody else besides | 12:50:21 |
| 23 | Ms. Erickson was involved in that circumstance? | 12:50:24 |
| 24 | A    She is the only one I understand had a | 12:50:32 |
| 25 | communication with Mr. Holecek. | 12:50:34 |

Transcript of Allen Waxman
Conducted on December 27, 2019                      91

| | | |
|---|---|---|
| 1 | Q    I'm going to hand you a document that's | 12:50:41 |
| 2 | been marked as Exhibit 5. | 12:50:43 |
| 3 | (Waxman Exhibit 5 marked for | 12:50:46 |
| 4 | identification and attached to the transcript.) | 12:50:46 |
| 5 | Q    It's Bates number CPR_494 and Bates | 12:50:55 |
| 6 | number 502.  Take a moment to look at that. | 12:50:58 |
| 7 | Have you seen Exhibit 5 before? | 12:51:30 |
| 8 | A    I have. | 12:51:32 |
| 9 | Q    When was the first time you saw Exhibit | 12:51:35 |
| 10 | 5? | 12:51:37 |
| 11 | A    In connection with the collection here | 12:51:39 |
| 12 | for this deposition. | 12:51:40 |
| 13 | Q    So in the last month? | 12:51:43 |
| 14 | A    Yes. | 12:51:45 |
| 15 | Q    Do you recognize the handwriting in | 12:51:45 |
| 16 | Exhibit 5? | 12:51:47 |
| 17 | A    I mean, I know Exhibit 5 are notes of | 12:51:53 |
| 18 | Ms. Erickson.  I don't know that I independently | 12:51:57 |
| 19 | know her handwriting. | 12:52:02 |
| 20 | Q    Then how do you know that Exhibit 5 is | 12:52:04 |
| 21 | the notes of Ms. Erickson? | 12:52:06 |
| 22 | A    That was communicated to me. | 12:52:11 |
| 23 | Q    Okay. | 12:52:15 |
| 24 | Do you believe that communication? | 12:52:15 |
| 25 | MS. LUNETTA:  Objection to form. | 12:52:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    92

| | | | |
|---|---|---|---|
| 1 | A | Do I believe what communication? | 12:52:22 |
| 2 | Q | That those are Ms. Erickson's notes. | 12:52:25 |
| 3 | A | Yes. | 12:52:29 |
| 4 | | If you had asked me, are these Ms. | 12:52:29 |
| 5 | | Erickson's notes, I would say yes, I believe these | 12:52:31 |
| 6 | | are Ms. Erickson's notes.  But you had asked a | 12:52:35 |
| 7 | | series of questions, I was just trying to be | 12:52:38 |
| 8 | | responsive to your questions. | 12:52:40 |
| 9 | Q | Sure.  Appreciate that. | 12:52:41 |
| 10 | | Okay. | 12:52:43 |
| 11 | | Let's go to page 494.  At the top of | 12:52:44 |
| 12 | | the page, we've got 9/20 call with Michael Holecek | 12:52:57 |
| 13 | | of Gibson Dunn. | 12:53:07 |
| 14 | | Do you see that? | 12:53:09 |
| 15 | A | I do. | 12:53:10 |
| 16 | Q | And did I read that correctly? | 12:53:11 |
| 17 | A | Yes. | 12:53:13 |
| 18 | Q | Did you participate on a call with | 12:53:15 |
| 19 | | Michael Holecek on 9/20 of this year? | 12:53:19 |
| 20 | A | I don't believe so. | 12:53:25 |
| 21 | Q | You were at CPR at that time? | 12:53:26 |
| 22 | A | I was. | 12:53:28 |
| 23 | Q | Do you believe that a phone call | 12:53:29 |
| 24 | | occurred with Michael Holecek of Gibson Dunn on | 12:53:31 |
| 25 | | 9/20? | 12:53:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    93

| | | |
|---|---|---|
| 1 | A    I believe so. | 12:53:36 |
| 2 | Q    Do you believe that the notes contained | 12:53:37 |
| 3 | on page 494 are an accurate representation of the | 12:53:39 |
| 4 | call that occurred between Michael Holecek and Ms. | 12:53:45 |
| 5 | Erickson on 9/20 of 2019? | 12:53:52 |
| 6 |         MS. LUNETTA:  Objection to form. | 12:53:56 |
| 7 | A    I believe they are Ms. Erickson's notes | 12:53:57 |
| 8 | of the call. | 12:53:59 |
| 9 | Q    Do you believe that they were | 12:54:00 |
| 10 | contemporaneously recorded? | 12:54:01 |
| 11 | A    I don't really know how Ms. Erickson | 12:54:09 |
| 12 | takes her notes. | 12:54:11 |
| 13 | Q    Do you know who was on the call on | 12:54:15 |
| 14 | 9/20/2019 with Mr. Holecek and Ms. Erickson? | 12:54:18 |
| 15 | A    Mr. Holecek and Ms. Erickson. | 12:54:29 |
| 16 | Q    Do you know how long the call took | 12:54:33 |
| 17 | place? | 12:54:36 |
| 18 | A    I do not. | 12:54:36 |
| 19 | Q    Do you know what was said on the call | 12:54:40 |
| 20 | other than what's reflected in the notes on the | 12:54:42 |
| 21 | page? | 12:54:44 |
| 22 | A    I'm trying to remember here.  I think | 12:54:50 |
| 23 | Ms. Erickson forwarded an e-mail to me of her call | 12:54:52 |
| 24 | with Mr. Holecek, I believe.  And I think the two | 12:54:57 |
| 25 | are the same, but if you want to show me both | 12:55:03 |

Transcript of Allen Waxman
Conducted on December 27, 2019                            94

| | | |
|---|---|---|
| 1 | documents, I can look and see if it is the same | 12:55:06 |
| 2 | information.  I have no reason to think this is | 12:55:09 |
| 3 | not a recitation of her notes of the call. | 12:55:12 |
| 4 | Q    Did you have a conversation with Ms. | 12:55:15 |
| 5 | Erickson about the phone call with Mr. Holecek on | 12:55:17 |
| 6 | 9/20/2019? | 12:55:22 |
| 7 | A    I don't believe on 9/20, no. | 12:55:26 |
| 8 | Q    In case I wasn't clear, I'm not asking | 12:55:31 |
| 9 | you if you talked to Ms. Erickson on 9/20.  I'm | 12:55:34 |
| 10 | asking you if you had a conversation with Ms. | 12:55:38 |
| 11 | Erickson about her conversation that occurred on | 12:55:41 |
| 12 | 9/20/2019. | 12:55:45 |
| 13 | A    I know I had a variety of conversations | 12:55:47 |
| 14 | with Ms. Erickson.  And I know after she sent me | 12:55:49 |
| 15 | an e-mail, we had a conversation.  I wouldn't be | 12:55:53 |
| 16 | surprised if we talked about the communication she | 12:56:00 |
| 17 | had with Mr. Holecek on 9/20.  But I don't have a | 12:56:03 |
| 18 | specific memory of her reciting to me what | 12:56:09 |
| 19 | happened on the call on 9/20. | 12:56:11 |
| 20 | Q    Okay. | 12:56:16 |
| 21 | Do you recall what you and Ms. Erickson | 12:56:17 |
| 22 | talked about following the 9/20 call? | 12:56:21 |
| 23 | A    So as I indicated, I recall we had a | 12:56:25 |
| 24 | conversation about Gibson Dunn, Mr. Holecek, | 12:56:28 |
| 25 | reaching out to discuss this experience they were | 12:56:34 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              95

| | | |
|---|---|---|
| 1 | having with AAA relating to a matter that they | 12:56:39 |
| 2 | were handling involving DoorDash.  And I recall | 12:56:43 |
| 3 | there was frustrations that they had in terms of | 12:56:51 |
| 4 | the fee structure, of the way the fees were being | 12:56:55 |
| 5 | charged in that matter, and that there was a | 12:57:01 |
| 6 | desire to see if we were willing to work on the | 12:57:04 |
| 7 | matter, and if we could come up with other | 12:57:10 |
| 8 | options. | 12:57:14 |
| 9 | And I do recall that, as the notes | 12:57:16 |
| 10 | indicate here, there was talk about this was | 12:57:21 |
| 11 | about, prospectively -- not claims that already | 12:57:24 |
| 12 | had been filed in arbitration, but prospectively | 12:57:31 |
| 13 | matters that would be handled, that it was a large | 12:57:34 |
| 14 | number of claims, that the conversation sort of -- | 12:57:41 |
| 15 | I know that at some point it was communicated to | 12:58:00 |
| 16 | be, whether it was by Ms. Erickson or in a | 12:58:04 |
| 17 | conversation with Mr. Holecek, that the fees being | 12:58:07 |
| 18 | charged up-front was a large sum of money and that | 12:58:10 |
| 19 | there was a demand for settlement rather than | 12:58:14 |
| 20 | paying that large sum of money, that the process | 12:58:17 |
| 21 | wasn't working, cases weren't getting arbitrated. | 12:58:21 |
| 22 | So I recall a general sense of frustrations going | 12:58:29 |
| 23 | on, and it was a mass claims matter. | 12:58:33 |
| 24 | Q    Can you describe to me your | 12:58:51 |
| 25 | understanding of the prospective nature of the | 12:58:52 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           96

| | | |
|---|---|---|
| 1 | claim? | 12:58:56 |
| 2 | MS. LUNETTA:  Objection to form. | 12:59:03 |
| 3 | Q    The reason I'm asking is I'm a little | 12:59:04 |
| 4 | confused because you said that there was concern | 12:59:05 |
| 5 | that AAA wasn't doing work on the matter and that | 12:59:08 |
| 6 | there was a demand for settlement, but you also | 12:59:13 |
| 7 | said it would be prospective.  So I'm trying to | 12:59:16 |
| 8 | understand. | 12:59:19 |
| 9 | Did you understand the reach-out to be | 12:59:20 |
| 10 | on behalf of the claims that had already been | 12:59:22 |
| 11 | filed in AAA or on behalf of additional claims | 12:59:25 |
| 12 | that had yet to be filed? | 12:59:28 |
| 13 | A    My understanding was on additional | 12:59:30 |
| 14 | claims that had yet to be filed, that there was | 12:59:33 |
| 15 | concern that additional claims would be filed. | 12:59:35 |
| 16 | I also should say -- and I apologize, | 12:59:37 |
| 17 | whether this was through communication with Ms. | 12:59:39 |
| 18 | Erickson or newspaper articles or -- there was, to | 12:59:44 |
| 19 | my understanding, a series of claims involving | 12:59:50 |
| 20 | tipping and how tips were handled for the delivery | 12:59:54 |
| 21 | service workers.  It was my understanding that was | 01:00:01 |
| 22 | not the issue.  Prospectively, the issue was more | 01:00:07 |
| 23 | a misclassification issue, whether workers were | 01:00:14 |
| 24 | independent contractors or employees.  And it was | 01:00:18 |
| 25 | my understanding that to the extent CPR were to be | 01:00:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                      97

| | | |
|---|---|---|
| 1 | involved, it would deal with claims yet to be | 01:00:29 |
| 2 | filed.  It would be claims going forward. | 01:00:32 |
| 3 | Q    Okay. | 01:00:35 |
| 4 | So your understanding was that the | 01:00:35 |
| 5 | issue that was being -- that Mr. Holecek was | 01:00:38 |
| 6 | reaching out about was not the tipping claims; is | 01:00:43 |
| 7 | that right? | 01:00:45 |
| 8 | A    That's right. | 01:00:47 |
| 9 | Q    That the claims that Mr. Holecek was | 01:00:47 |
| 10 | reaching out about was about driver | 01:00:49 |
| 11 | misclassification claims; is that correct? | 01:00:52 |
| 12 | A    Yes, I believe so. | 01:00:54 |
| 13 | Q    And it was your understanding that | 01:00:55 |
| 14 | Mr. Holecek was reaching out about driver | 01:00:57 |
| 15 | misclassification claims that had not yet been | 01:01:00 |
| 16 | filed with AAA? | 01:01:03 |
| 17 | A    Or anybody. | 01:01:05 |
| 18 | Q    Okay. | 01:01:06 |
| 19 | And I'm going to hand you a document | 01:01:09 |
| 20 | that's been marked as Exhibit 7.  I'm sorry, I | 01:01:11 |
| 21 | would have handed this to you before, but I | 01:01:14 |
| 22 | couldn't get ahold of that. | 01:01:17 |
| 23 | (Waxman Exhibit 7 marked for | 01:01:17 |
| 24 | identification and attached to the transcript.) | 01:01:17 |
| 25 | MS. LUNETTA:  Do we have a 6? | 01:01:32 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           98

| | | |
|---|---|---|
| 1 | MR. ZIGLER:  Did I skip 6? | 01:01:32 |
| 2 | MS. LUNETTA:  Yes. | 01:01:32 |
| 3 | MR. ZIGLER:  Sorry. | 01:01:32 |
| 4 | MS. LUNETTA:  It's fine.  I just wanted | 01:01:32 |
| 5 | to make sure I didn't miss one. | 01:01:35 |
| 6 | THE WITNESS:  I see.  So -- I'm sorry. | 01:01:39 |
| 7 | Was there a question? | 01:01:39 |
| 8 | MS. LUNETTA:  Wait. | 01:01:39 |
| 9 | BY MR. ZIGLER: | 01:01:39 |
| 10 | Q    Sure. | 01:01:39 |
| 11 | Can you take a look at Exhibit 7 and | 01:01:39 |
| 12 | let me know if you have seen it before? | 01:01:41 |
| 13 | MS. LUNETTA:  What's the Bates number? | 01:01:44 |
| 14 | MR. ZIGLER:  It's Bates Number 50. | 01:01:46 |
| 15 | THE WITNESS:  Okay. | 01:02:06 |
| 16 | I've had a chance to look at Exhibit 7. | 01:02:08 |
| 17 | BY MR. ZIGLER: | 01:02:10 |
| 18 | Q    Okay. | 01:02:10 |
| 19 | So is this the e-mail that you | 01:02:11 |
| 20 | thought -- or that you mentioned earlier in your | 01:02:12 |
| 21 | testimony? | 01:02:15 |
| 22 | A    This is an e-mail that I was thinking | 01:02:32 |
| 23 | about and I think it is consistent with what I'm | 01:02:34 |
| 24 | recalling, but I thought there was an e-mail even | 01:02:36 |
| 25 | that predates this that was after the initial | 01:02:38 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          99

| | | |
|---|---|---|
| 1 | call.  I may be getting confused on dates here. | 01:02:45 |
| 2 |          Is there an e-mail entitled "Head's | 01:02:51 |
| 3 | Up"? | 01:02:54 |
| 4 |      Q    I believe there is. | 01:02:55 |
| 5 |      A    Maybe that was subsequent.  This is -- | 01:03:13 |
| 6 | so it looks like we have the notes of a 9/20 call | 01:03:15 |
| 7 | and then an e-mail to me from Ms. Erickson. | 01:03:19 |
| 8 |      Q    Okay. | 01:03:23 |
| 9 |          All right.  Well, this is the e-mail | 01:03:23 |
| 10 | that I have from Ms. Erickson to you on 9/20. | 01:03:26 |
| 11 |      A    Okay. | 01:03:30 |
| 12 |      Q    And we'll talk about the head's up -- | 01:03:30 |
| 13 | we'll find that. | 01:03:33 |
| 14 |      A    Is it subsequent? | 01:03:34 |
| 15 |      Q    I think it is before.  I think your | 01:03:36 |
| 16 | recollection is correct. | 01:03:37 |
| 17 |      A    Okay. | 01:03:39 |
| 18 |      Q    But I'll find it and we'll show it to | 01:03:39 |
| 19 | you in a moment. | 01:03:41 |
| 20 |      A    Okay. | 01:03:42 |
| 21 |      Q    But let's talk about Exhibit 7 for a | 01:03:43 |
| 22 | moment. | 01:03:45 |
| 23 |      A    Okay. | 01:03:46 |
| 24 |      Q    Otherwise everybody who reads the | 01:03:49 |
| 25 | transcript later is going to be upset with us. | 01:03:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    100

| | | |
|---|---|---|
| 1 | A    We won't want that to happen. | 01:03:54 |
| 2 | Q    Right.  Okay. | 01:03:57 |
| 3 | So does Exhibit 7 refresh your | 01:04:00 |
| 4 | recollection of a communication from Ms. Erickson | 01:04:01 |
| 5 | to you about a conversation with Mr. Holecek on | 01:04:08 |
| 6 | 9/20/19? | 01:04:14 |
| 7 | A    Well, it reflects a conversation she | 01:04:18 |
| 8 | had with Mr. Holecek on 9/20/19. | 01:04:21 |
| 9 | Q    And this was an e-mail from Ms. | 01:04:25 |
| 10 | Erickson to you? | 01:04:27 |
| 11 | A    Yep. | 01:04:30 |
| 12 | Q    What understanding do you have of the | 01:04:35 |
| 13 | reason that Ms. Erickson sent this e-mail to you? | 01:04:37 |
| 14 | MS. LUNETTA:  Take time to read it. | 01:04:47 |
| 15 | A    I'm not going to get into Ms. | 01:04:56 |
| 16 | Erickson's intent.  I'll tell you that it looks | 01:04:58 |
| 17 | like an e-mail, sharing with me the conversation | 01:05:00 |
| 18 | she had with Michael, who I believe is Michael | 01:05:03 |
| 19 | Holecek. | 01:05:08 |
| 20 | Q    Do you believe that you had spoken with | 01:05:09 |
| 21 | Ms. Erickson prior to the receipt of this e-mail | 01:05:12 |
| 22 | about Mr. Holecek and what he wanted? | 01:05:18 |
| 23 | A    What he wanted, what Mr. Holecek | 01:05:27 |
| 24 | wanted? | 01:05:30 |
| 25 | Q    Yes. | 01:05:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    101

| | | |
|---|---|---|
| 1 | A    I think so.  I mean, it would help me | 01:05:31 |
| 2 | if I saw the first -- just to put the timeline | 01:05:33 |
| 3 | together. | 01:05:36 |
| 4 | Q    Sure.  I'm not trying to play hide the | 01:05:37 |
| 5 | ball. | 01:05:40 |
| 6 | A    No, no, I know.  Yeah. | 01:05:40 |
| 7 | Q    All right. | 01:05:41 |
| 8 | So let's go there.  We found it. | 01:05:43 |
| 9 | A    Okay.  Thank you. | 01:05:46 |
| 10 | Q    Mark it as Exhibit 6.  And this is | 01:05:46 |
| 11 | Bates Number 12. | 01:05:49 |
| 12 | (Waxman Exhibit 6 marked for | 01:05:50 |
| 13 | identification and attached to the transcript.) | 01:05:50 |
| 14 | Q    So now they are in the right order. | 01:05:57 |
| 15 | MS. LUNETTA:  All is right with the | 01:06:01 |
| 16 | world. | 01:06:03 |
| 17 | A    Okay. | 01:06:15 |
| 18 | Q    All right. | 01:06:17 |
| 19 | A    Thank you. | 01:06:17 |
| 20 | Q    Do you recognize Exhibit 6? | 01:06:17 |
| 21 | A    Yes. | 01:06:19 |
| 22 | Q    And is Exhibit 6 the e-mail that you | 01:06:20 |
| 23 | were referencing earlier? | 01:06:22 |
| 24 | A    I believe it is, yes. | 01:06:24 |
| 25 | Q    And this is an e-mail from Ms. Erickson | 01:06:26 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    102

| | | |
|---|---|---|
| 1 | to you? | 01:06:28 |
| 2 | A    Yeah. | 01:06:29 |
| 3 | Q    With the subject line "Head's Up"? | 01:06:30 |
| 4 | A    Yeah. | 01:06:33 |
| 5 | Q    Do you recall receiving this e-mail? | 01:06:33 |
| 6 | A    I don't independently recall receiving | 01:06:37 |
| 7 | the e-mail.  I see I got the e-mail, and I believe | 01:06:39 |
| 8 | this was the communication I got on September 18th | 01:06:42 |
| 9 | from Ms. Erickson. | 01:06:45 |
| 10 | Q    Did you and Ms. Erickson subsequently | 01:06:54 |
| 11 | have a verbal communication about the e-mail that | 01:06:58 |
| 12 | she sent you on 9/18? | 01:07:02 |
| 13 | A    I believe we had a verbal communication | 01:07:05 |
| 14 | subsequent to this e-mail about her communication | 01:07:08 |
| 15 | with Gibson Dunn, Michael Holecek. | 01:07:11 |
| 16 | Q    Yeah. | 01:07:15 |
| 17 | What did you guys talk about? | 01:07:16 |
| 18 | A    Gibson Dunn's interest in us finding | 01:07:17 |
| 19 | other options along the lines we had mentioned. | 01:07:23 |
| 20 | And I wanted to get more information about the | 01:07:26 |
| 21 | nature of what was involved, which is, I believe, | 01:07:30 |
| 22 | what led to the 9/20 conversation between Ms. | 01:07:33 |
| 23 | Erickson and Mr. Holecek. | 01:07:37 |
| 24 | Q    Did you believe it was unusual to get | 01:07:40 |
| 25 | an inquiry like this from Gibson Dunn? | 01:07:44 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    103

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  Objection.  Form. | 01:07:49 |
| 2 |    A   I don't know exactly what that means, | 01:07:50 |
| 3 | but we get inquiries of all types, and welcome | 01:07:51 |
| 4 | such inquiries and welcome the opportunity to be | 01:07:55 |
| 5 | able to innovate. | 01:07:58 |
| 6 |    Q   So CPR is -- welcomes the opportunity | 01:08:06 |
| 7 | to address problems that aren't presented by | 01:08:13 |
| 8 | individual stakeholders in the dispute resolution | 01:08:16 |
| 9 | process. | 01:08:25 |
| 10 |    Is that fair? | 01:08:26 |
| 11 | MS. LUNETTA:  Objection to form. | 01:08:27 |
| 12 |    A   I would state it differently.  I would | 01:08:28 |
| 13 | state, we're interested in finding solutions to | 01:08:30 |
| 14 | legal conflict.  And as we noted before, trying to | 01:08:32 |
| 15 | prevent it if we can and resolve it more | 01:08:36 |
| 16 | effectively and efficiently.  And what was | 01:08:40 |
| 17 | becoming apparent in these initial conversations | 01:08:43 |
| 18 | is there was a legal conflict going on and nothing | 01:08:45 |
| 19 | was really happening.  And also, we were familiar | 01:08:48 |
| 20 | with the challenges of mass claims, and welcomed | 01:08:52 |
| 21 | the opportunity to innovate in the area, not for a | 01:08:57 |
| 22 | particular person or party, but more generally | 01:09:01 |
| 23 | speaking.  And that's what we did. | 01:09:06 |
| 24 |    Q   Okay. | 01:09:14 |
| 25 |    And Ms. Erickson's e-mail notes that | 01:09:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          104

| 1 | this wasn't the first time that CPR would be | 01:09:18 |
|---|---|---|
| 2 | innovating at the request of a particular | 01:09:25 |
| 3 | stakeholder; is that fair? | 01:09:28 |
| 4 | MS. LUNETTA:  Objection to form. | 01:09:31 |
| 5 | A    Well, I don't know if her e-mail is | 01:09:34 |
| 6 | indicating that to me. | 01:09:39 |
| 7 | You're referring -- by the way, you're | 01:09:41 |
| 8 | on Exhibit 6? | 01:09:42 |
| 9 | Q    Yes. | 01:09:44 |
| 10 | A    You're referring to her reference to | 01:09:44 |
| 11 | other models? | 01:09:45 |
| 12 | Q    Yes. | 01:09:48 |
| 13 | A    Yeah. | 01:09:49 |
| 14 | So I would say most of our innovations | 01:09:49 |
| 15 | come because stakeholders identify needs for | 01:09:52 |
| 16 | innovation. | 01:09:56 |
| 17 | Q    So what I was referring there was Ms. | 01:09:59 |
| 18 | Erickson's -- where she writes, "I explain that we | 01:10:01 |
| 19 | have, in the past, negotiated deals for a 'volume' | 01:10:06 |
| 20 | of cases."  Volume in quotes.  "These have | 01:10:08 |
| 21 | included models like the AKC, which is on our | 01:10:12 |
| 22 | website, as well as hourly rate models." | 01:10:15 |
| 23 | Are you familiar with other models, | 01:10:22 |
| 24 | other than the AKC, that -- where CPR has, in the | 01:10:25 |
| 25 | past, negotiated deals for volume of cases? | 01:10:34 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    105

| | | |
|---|---|---|
| 1 | A    Not specifically.  And if I could just | 01:10:40 |
| 2 | say, the AKC, which is something we announced on | 01:10:43 |
| 3 | our website, the American Kennel Club, I didn't | 01:10:49 |
| 4 | think of it as a negotiation on volume, although | 01:10:53 |
| 5 | maybe there was a negotiation on volume.  It was | 01:10:57 |
| 6 | really a model to try to resolve disputes | 01:11:00 |
| 7 | involving the AKC and other franchisees or other | 01:11:03 |
| 8 | outfits. | 01:11:07 |
| 9 | Q    Were you with CPR when that model was | 01:11:10 |
| 10 | created? | 01:11:13 |
| 11 | A    I was not. | 01:11:13 |
| 12 | Q    Where does your knowledge from the | 01:11:14 |
| 13 | purpose or development of the AKC model come from? | 01:11:16 |
| 14 | A    There is a press release on our website | 01:11:20 |
| 15 | about the AKC. | 01:11:23 |
| 16 | Q    So besides reading the press release | 01:11:25 |
| 17 | about the AKC model, do you have any other | 01:11:28 |
| 18 | knowledge about the purpose or development of the | 01:11:31 |
| 19 | AKC model at CPR? | 01:11:33 |
| 20 | A    I imagine I do in my learnings.  In | 01:11:35 |
| 21 | coming up to speed on the organization, I have | 01:11:38 |
| 22 | been learning about different things we have been | 01:11:40 |
| 23 | doing.  And amongst those conversations, what we | 01:11:44 |
| 24 | did with the AKC I believe was discussed amongst a | 01:11:46 |
| 25 | whole lot of things. | 01:11:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    106

| | | |
|---|---|---|
| 1 | Q    Do you recall who you discussed the AKC | 01:11:51 |
| 2 | model with at CPR? | 01:11:53 |
| 3 | MS. LUNETTA:  I'm going to object to | 01:11:56 |
| 4 | this as beyond the scope.  And direct him not to | 01:11:58 |
| 5 | answer. | 01:12:01 |
| 6 | Q    Are you going to follow your lawyer's | 01:12:01 |
| 7 | advice? | 01:12:01 |
| 8 | A    I am. | 01:12:02 |
| 9 | Q    If I wanted to know about the AKC model | 01:12:03 |
| 10 | and its development at CPR, who would be the best | 01:12:06 |
| 11 | person to talk to? | 01:12:10 |
| 12 | A    I'm going to say that probably Ms. | 01:12:25 |
| 13 | Erickson, but I'm not exactly sure. | 01:12:27 |
| 14 | Q    So Ms. Erickson says in this e-mail, | 01:12:30 |
| 15 | besides the AKC, "as well as hourly rate models." | 01:12:32 |
| 16 | Do you see that? | 01:12:39 |
| 17 | A    Yes. | 01:12:40 |
| 18 | Q    Do you know what she was referring to | 01:12:41 |
| 19 | in that sentence? | 01:12:42 |
| 20 | A    We do do a la carte services as hourly | 01:12:47 |
| 21 | rate services.  I don't know exactly what she is | 01:12:52 |
| 22 | referring to. | 01:12:55 |
| 23 | Q    Okay. | 01:12:56 |
| 24 | The hourly rate a la carte services are | 01:12:56 |
| 25 | listed on your website, aren't they? | 01:13:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    107

| | | |
|---|---|---|
| 1 | A    I believe so, yes. | 01:13:04 |
| 2 | Q    Do you believe that those are a result | 01:13:06 |
| 3 | of negotiated deals for volume of cases? | 01:13:10 |
| 4 | A    Those would not be, no. | 01:13:16 |
| 5 | Q    Do you believe, in her e-mail, when she | 01:13:20 |
| 6 | was referring to hourly rate models, she was | 01:13:24 |
| 7 | referring to hourly rate models that had been in | 01:13:26 |
| 8 | the past negotiated deals for volume of cases? | 01:13:29 |
| 9 | MS. LUNETTA:  Objection to form. | 01:13:33 |
| 10 | A    I don't know. | 01:13:34 |
| 11 | Q    So earlier in discussing Mr. Holecek's | 01:14:02 |
| 12 | reaching out, you testified that it was apparent | 01:14:08 |
| 13 | in these conversations that there was a legal | 01:14:15 |
| 14 | conflict going on and nothing was really | 01:14:18 |
| 15 | happening. | 01:14:20 |
| 16 | Do you recall that testimony? | 01:14:21 |
| 17 | A    Yes. | 01:14:23 |
| 18 | Q    From where did you get your knowledge | 01:14:29 |
| 19 | that there was nothing really happening in | 01:14:34 |
| 20 | these -- in this legal conflict? | 01:14:38 |
| 21 | A    That could have been some combination | 01:14:44 |
| 22 | of Ms. Erickson relating that to me, Mr. Holecek | 01:14:46 |
| 23 | relating that to me and/or newspaper articles. | 01:14:52 |
| 24 | But I recall, generally, arbitrations weren't | 01:14:54 |
| 25 | proceeding. | 01:14:57 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    108

| | | |
|---|---|---|
| 1 | Q    Did you do any factual investigation of | 01:15:04 |
| 2 | any other source other than Mr. Holecek, Ms. | 01:15:09 |
| 3 | Erickson and the publicly available press? | 01:15:13 |
| 4 | MS. LUNETTA:  Objection to form. | 01:15:19 |
| 5 | A    Not that I recall. | 01:15:20 |
| 6 | Q    Did you talk with anybody at AAA about | 01:15:27 |
| 7 | DoorDash arbitrations? | 01:15:30 |
| 8 | A    I did not, no. | 01:15:31 |
| 9 | Q    Did you talk with anyone at any firm | 01:15:33 |
| 10 | representing drivers in DoorDash misclassification | 01:15:37 |
| 11 | claims? | 01:15:44 |
| 12 | A    I don't know. | 01:15:57 |
| 13 | Q    Is there someone that you talk to that | 01:15:57 |
| 14 | might have been representing drivers in DoorDash | 01:15:59 |
| 15 | misclassification claims? | 01:16:00 |
| 16 | MS. LUNETTA:  Objection to form. | 01:16:07 |
| 17 | A    Yeah. | 01:16:08 |
| 18 | Q    And who is that? | 01:16:08 |
| 19 | A    I -- | 01:16:12 |
| 20 | MS. LUNETTA:  I think if it is not | 01:16:21 |
| 21 | Keller Lenkner or DoorDash or Gibson Dunn, it is | 01:16:23 |
| 22 | outside the scope of the deposition. | 01:16:26 |
| 23 | MR. ZIGLER:  Are you instructing him | 01:16:31 |
| 24 | not to answer? | 01:16:32 |
| 25 | MS. LUNETTA:  Let me just ask, do you | 01:16:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    109

| | | |
|---|---|---|
| 1 | recall? | 01:16:35 |
| 2 | THE WITNESS:  I just don't know.  We | 01:16:36 |
| 3 | spoke to a variety of folks and it may be that | 01:16:37 |
| 4 | somebody we spoke to was involved, but I don't | 01:16:41 |
| 5 | know. | 01:16:45 |
| 6 | MS. LUNETTA:  Okay. | 01:16:46 |
| 7 | Can I suggest that on the next break, | 01:16:46 |
| 8 | if he remembers any names, I can look them up and | 01:16:47 |
| 9 | see if they work at Keller Lenkner or Gibson Dunn, | 01:16:51 |
| 10 | and if they do, he can come back and respond. | 01:16:54 |
| 11 | MR. KAYES:  Kim, I don't think that's | 01:17:00 |
| 12 | the scope here, looking at the page.  He may | 01:17:02 |
| 13 | inquire to the existence of other witnesses that | 01:17:03 |
| 14 | might be useful.  But he can also inquire to | 01:17:06 |
| 15 | everything he wants with respect to what happened | 01:17:08 |
| 16 | here on these mass rules. | 01:17:09 |
| 17 | MS. LUNETTA:  I'm happy to make a | 01:17:11 |
| 18 | motion with the Court now for a Protective Order, | 01:17:13 |
| 19 | if that's an issue. | 01:17:17 |
| 20 | MR. KAYES:  So is it your position that | 01:17:19 |
| 21 | we cannot ask about anyone that Mr. Waxman | 01:17:20 |
| 22 | communicated with about the development of the | 01:17:23 |
| 23 | appointment-related mass claims protocol other | 01:17:24 |
| 24 | than ourselves and Gibson? | 01:17:28 |
| 25 | MS. LUNETTA:  Yes, and DoorDash. | 01:17:32 |

| | | |
|---|---|---|
| 1 | MR. KAYES:  And DoorDash. | 01:17:32 |
| 2 | MS. LUNETTA:  Otherwise, the judge | 01:17:34 |
| 3 | would have not quashed the entire 30(b)(6) as well | 01:17:35 |
| 4 | as the document request that went to all of the | 01:17:41 |
| 5 | litigants. | 01:17:44 |
| 6 | BY MR. ZIGLER: | 01:17:44 |
| 7 | Q    So I'm going to ask the question again | 01:17:46 |
| 8 | so that we get our record clear. | 01:17:48 |
| 9 | And the question that I asked you was | 01:17:52 |
| 10 | if you spoke to anyone representing DoorDash | 01:17:55 |
| 11 | drivers in misclassification claims and you said | 01:18:02 |
| 12 | "I don't know"; is that right? | 01:18:10 |
| 13 | A    I did. | 01:18:12 |
| 14 | Q    Okay. | 01:18:13 |
| 15 | And then I asked you if there was | 01:18:14 |
| 16 | anyone that you spoke to that may have been | 01:18:17 |
| 17 | representing drivers in misclassification claims | 01:18:22 |
| 18 | and you were instructed not to answer that | 01:18:29 |
| 19 | question. | 01:18:33 |
| 20 | MS. LUNETTA:  Wait, wait.  I think the | 01:18:34 |
| 21 | problem that I had was, when you asked the | 01:18:35 |
| 22 | question the second time, you didn't -- you did | 01:18:38 |
| 23 | not limit it to DoorDash drivers.  If he only | 01:18:41 |
| 24 | represented DoorDash drivers, I'm fine with that. | 01:18:45 |
| 25 | I don't know if there was another firm that | 01:18:48 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    111

| | | |
|---|---|---|
| 1 | represented them. | 01:18:50 |
| 2 | To the extent that they represented any | 01:18:52 |
| 3 | drivers in any misclassification claim, I would | 01:18:54 |
| 4 | want to limit it unless we know that it is limited | 01:18:57 |
| 5 | to DoorDash drivers. | 01:19:00 |
| 6 | MR. ZIGLER:  Okay. | 01:19:02 |
| 7 | Well, I'll ask the question again and | 01:19:03 |
| 8 | you can give him the instruction that you think is | 01:19:04 |
| 9 | appropriate. | 01:19:06 |
| 10 | BY MR. ZIGLER: | 01:19:10 |
| 11 | Q    In connection with developing the mass | 01:19:10 |
| 12 | claim employment protocol at CPR, did you talk to | 01:19:18 |
| 13 | any lawyer representing DoorDash drivers in | 01:19:23 |
| 14 | misclassification claims? | 01:19:29 |
| 15 | A    Different question.  Not that I know | 01:19:36 |
| 16 | of. | 01:19:37 |
| 17 | Q    Okay. | 01:19:39 |
| 18 | In connection with the creation of the | 01:19:40 |
| 19 | employment mass claims protocol at CPR, did you | 01:19:44 |
| 20 | talk to any lawyer who you believe may have been | 01:19:48 |
| 21 | representing DoorDash drivers in misclassification | 01:19:52 |
| 22 | claims? | 01:19:59 |
| 23 | A    I don't know. | 01:20:12 |
| 24 | THE WITNESS:  And I'm going to ask to | 01:20:12 |
| 25 | take a break. | 01:20:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              112

| | | |
|---|---|---|
| 1 | MR. ZIGLER:  Okay. | 01:20:15 |
| 2 | THE VIDEOGRAPHER:  We are going off the | 01:20:17 |
| 3 | record.  The time is 1:20 p.m. | 01:20:17 |
| 4 | (A recess was taken.) | 01:20:21 |
| 5 | THE VIDEOGRAPHER:  We are back on the | 01:32:54 |
| 6 | record.  The time is 1:32 p.m. | 01:32:55 |
| 7 | BY MR. ZIGLER: | 01:32:58 |
| 8 | Q    Mr. Waxman, I understand that you have | 01:33:00 |
| 9 | some additional information from my last question; | 01:33:05 |
| 10 | is that right? | 01:33:08 |
| 11 | A    Well, just that, as I understand it, | 01:33:09 |
| 12 | your firm, Keller Lenkner, and Quinn Emanuel are | 01:33:11 |
| 13 | representing the delivery workers in the Abernathy | 01:33:17 |
| 14 | matter, and I recall no conversations with anybody | 01:33:23 |
| 15 | from either of the firms. | 01:33:26 |
| 16 | Q    And I appreciate that. | 01:33:28 |
| 17 | Do you recall talking to any other | 01:33:31 |
| 18 | lawyer at any firm that represents DoorDash | 01:33:37 |
| 19 | drivers in misclassification cases about the | 01:33:44 |
| 20 | employment mass claims protocol? | 01:33:54 |
| 21 | MS. LUNETTA:  I'm not 100 percent sure | 01:34:00 |
| 22 | whether that falls into the scope or not.  Let me | 01:34:02 |
| 23 | just look at it. | 01:34:06 |
| 24 | Are there other misclassification cases | 01:34:15 |
| 25 | right now that are involving DoorDashers? | 01:34:17 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    113

| 1 | MR. KAYES:  We and Quinn Emanuel | 01:34:21 |
| 2 | represent approximately 20-plus-thousand Dashers. | 01:34:22 |
| 3 | There are several other firms that have a | 01:34:26 |
| 4 | thousand, few hundred. | 01:34:29 |
| 5 | MS. LUNETTA:  Do you know what those | 01:34:31 |
| 6 | firms are? | 01:34:32 |
| 7 | MR. KAYES:  I know a handful of them. | 01:34:37 |
| 8 | MS. LUNETTA:  Could you provide that | 01:34:40 |
| 9 | information? | 01:34:40 |
| 10 | Because I think Mr. Waxman doesn't | 01:34:41 |
| 11 | necessarily know whether -- who works for whom and | 01:34:41 |
| 12 | maybe who they even were calling about.  Like, if | 01:34:41 |
| 13 | somebody called -- I don't want him to give a | 01:34:43 |
| 14 | misleading answer.  If he spoke to somebody about | 01:34:44 |
| 15 | DoorDashers, right, or drivers in a case, I don't | 01:34:47 |
| 16 | want him to give a misleading answer because he | 01:34:51 |
| 17 | doesn't know who works for which firm or what | 01:34:53 |
| 18 | firms are involved. | 01:34:56 |
| 19 | Would you be okay if he told us what | 01:34:57 |
| 20 | those firms are? | 01:35:00 |
| 21 | MR. ZIGLER:  Well, I mean, the first | 01:35:01 |
| 22 | question is:  Is he aware if he spoke to anybody | 01:35:02 |
| 23 | that he knew of that was representing Dashers.  If | 01:35:05 |
| 24 | the answer is no, then the answer is no. | 01:35:08 |
| 25 | MS. LUNETTA:  He is not aware whether | 01:35:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    114

| | | |
|---|---|---|
| 1 | they represented Dashers or not.  He talked to | 01:35:14 |
| 2 | various people, but he is not aware if they | 01:35:17 |
| 3 | represent Dashers.  That's what I'm saying.  Like, | 01:35:20 |
| 4 | if you say, you know, Joe Shmoe represents Dashers | 01:35:20 |
| 5 | in another case and Mr. Waxman is, like, oh, wait, | 01:35:24 |
| 6 | I did talk to him, but I didn't know it was | 01:35:27 |
| 7 | about -- that they represented DoorDashers, | 01:35:29 |
| 8 | then -- | 01:35:30 |
| 9 | MR. ZIGLER:  I get that, and I don't | 01:35:31 |
| 10 | think that that is a misleading answer.  If his | 01:35:32 |
| 11 | answer is I talked people, as far as I know, none | 01:35:35 |
| 12 | of them were representing DoorDashers in | 01:35:40 |
| 13 | misclassification cases, that's a fine answer, if | 01:35:41 |
| 14 | that's his answer.  But I mean, this isn't -- | 01:35:43 |
| 15 | MS. LUNETTA:  I just don't want him to | 01:35:48 |
| 16 | give a misleading answer unintentionally, right, | 01:35:49 |
| 17 | and certainly not intentionally. | 01:35:53 |
| 18 | MR. ZIGLER:  I understand. | 01:35:55 |
| 19 | THE WITNESS:  I'm not giving any | 01:35:56 |
| 20 | intentional answers. | 01:35:57 |
| 21 | Can I have one moment, please? | 01:36:00 |
| 22 | MS. LUNETTA:  Can we just confer? | 01:36:02 |
| 23 | MR. ZIGLER:  Sure. | 01:36:11 |
| 24 | You want the room? | 01:36:12 |
| 25 | THE VIDEOGRAPHER:  Off the record. | 01:36:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    115

| | | |
|---|---|---|
| 1 | (A recess was taken.) | 01:36:12 |
| 2 | THE VIDEOGRAPHER:  Back on the record. | 01:36:29 |
| 3 | BY MR. ZIGLER: | 01:36:29 |
| 4 | Q    Okay. | 01:36:44 |
| 5 | In connection with developing CPR's | 01:36:45 |
| 6 | mass claims employment protocol, did you talk to | 01:36:52 |
| 7 | any lawyer that you know that was representing | 01:36:58 |
| 8 | DoorDash drivers in misclassification cases? | 01:37:05 |
| 9 | A    I cannot sit here today and testify | 01:37:11 |
| 10 | that I had a conversation with any lawyer | 01:37:13 |
| 11 | representing Dashers.  And I'm taking that beyond | 01:37:15 |
| 12 | whatever -- the development of mass claims | 01:37:24 |
| 13 | protocol, because I think that's going to get into | 01:37:26 |
| 14 | a separate issue.  I cannot sit here today and say | 01:37:28 |
| 15 | I have had such a discussion. | 01:37:31 |
| 16 | Q    Okay. | 01:37:37 |
| 17 | Earlier you testified that "we were | 01:37:37 |
| 18 | familiar with the challenges of mass claims." | 01:37:41 |
| 19 | Do you recall that? | 01:37:44 |
| 20 | A    Yes. | 01:37:45 |
| 21 | Q    Okay. | 01:37:49 |
| 22 | How are you familiar with the | 01:37:49 |
| 23 | challenges of mass claims? | 01:37:50 |
| 24 | A    How was I myself familiar? | 01:37:53 |
| 25 | Q    Well, I'm referring to your testimony. | 01:37:55 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    116

| | | |
|---|---|---|
| 1 | You used the royal "we" in giving it, so whatever | 01:37:57 |
| 2 | you meant. | 01:38:00 |
| 3 | A    So, generally speaking, our | 01:38:02 |
| 4 | organization was familiar, had written about it | 01:38:07 |
| 5 | previously, and I know it was a subject that was | 01:38:10 |
| 6 | discussed within our employment disputes | 01:38:13 |
| 7 | committee, generally speaking.  And that was the | 01:38:18 |
| 8 | familiarity. | 01:38:23 |
| 9 | Q    And when were those -- did those | 01:38:24 |
| 10 | discussions take place? | 01:38:26 |
| 11 | A    I am thinking of a discussion in | 01:38:30 |
| 12 | September of 2019. | 01:38:32 |
| 13 | Q    Okay. | 01:38:36 |
| 14 | Was that before or after the call with | 01:38:36 |
| 15 | Mr. Holecek? | 01:38:40 |
| 16 | A    Before. | 01:38:41 |
| 17 | Q    What are the challenges of mass claims | 01:38:48 |
| 18 | in the employment context? | 01:38:50 |
| 19 | A    Well, there is any number of challenges | 01:38:55 |
| 20 | that I'm referring to.  But certainly, trying to | 01:38:58 |
| 21 | find ways to be able to adjudicate multiple | 01:39:00 |
| 22 | individual matters is challenging for the system, | 01:39:06 |
| 23 | for any arbitral provider, for arbitrators, for | 01:39:13 |
| 24 | employees, for employers.  It presents a | 01:39:17 |
| 25 | substantial challenge. | 01:39:22 |

| | | |
|---|---|---|
| 1 | Q    Certainly. | 01:39:28 |
| 2 | And that's one of the reasons why the | 01:39:29 |
| 3 | class action procedure was invented, wasn't it? | 01:39:31 |
| 4 | MS. LUNETTA:  Objection to form. | 01:39:35 |
| 5 | Beyond the scope. | 01:39:36 |
| 6 | A    Mr. Zigler, yes, I believe class | 01:39:38 |
| 7 | actions, let me just explain here, were developed | 01:39:41 |
| 8 | for dealing with many similar matters in a variety | 01:39:47 |
| 9 | of contexts, not just employment, but in any | 01:39:55 |
| 10 | variety of contexts.  As you know, the | 01:39:57 |
| 11 | jurisprudence in this area has allowed for there | 01:40:00 |
| 12 | to be waivers of class actions.  I and CPR take no | 01:40:04 |
| 13 | position one way or the other, other than -- on | 01:40:11 |
| 14 | that issue, from a policy standpoint, other than | 01:40:14 |
| 15 | to say that's where the court has come down, and | 01:40:16 |
| 16 | now in response.  And I note, in an understandable | 01:40:20 |
| 17 | response, multiple mass claims, individual claims | 01:40:24 |
| 18 | are being brought. | 01:40:28 |
| 19 | In recognition of the challenge that | 01:40:30 |
| 20 | brings and where there is not a class action | 01:40:33 |
| 21 | procedure, that is what led us and me to develop a | 01:40:35 |
| 22 | protocol which would try to solve for, how do we | 01:40:41 |
| 23 | get those matters resolved most efficiently and | 01:40:45 |
| 24 | expeditiously? | 01:40:49 |
| 25 | That is the protocol that we conceived | 01:40:51 |

| | | |
|---|---|---|
| 1 | of, we wrote and we control and we put in place. | 01:40:53 |
| 2 | And we believe it offers a procedure for trying to | 01:40:57 |
| 3 | bring resolution to multiple claims promptly.  And | 01:41:02 |
| 4 | not in favor of one side or the other, but in | 01:41:06 |
| 5 | favor of resolution. | 01:41:10 |
| 6 | Q    And when was this protocol conceived | 01:41:15 |
| 7 | of? | 01:41:18 |
| 8 | A    In September of this year. | 01:41:20 |
| 9 | Q    Do you remember on what day in | 01:41:23 |
| 10 | September? | 01:41:25 |
| 11 | A    I don't. | 01:41:26 |
| 12 | Q    Do you remember if it was before or | 01:41:26 |
| 13 | after the call from Mr. Holecek? | 01:41:28 |
| 14 | A    It would have been after the call from | 01:41:32 |
| 15 | Mr. Holecek, when I took the opportunity to -- | 01:41:34 |
| 16 | Mr. Holecek was raising issues around fees.  I was | 01:41:40 |
| 17 | interested in developing something with broader | 01:41:44 |
| 18 | applicability and that would really try to address | 01:41:48 |
| 19 | the challenges of mass claims. | 01:41:53 |
| 20 | And if I might, I have spent a good | 01:41:56 |
| 21 | deal of my career dealing in the mass claims area | 01:41:59 |
| 22 | in a different context, but taking from my | 01:42:03 |
| 23 | experience in that context, conceived of this mass | 01:42:06 |
| 24 | claims protocol that would try to find incentives | 01:42:10 |
| 25 | and methodology for resolution earlier and more | 01:42:16 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    119

| | | |
|---|---|---|
| 1 | efficiently. | 01:42:19 |
| 2 | Q    That's not to say that you didn't want | 01:42:24 |
| 3 | the protocol to address Mr. Holecek's concerns as | 01:42:27 |
| 4 | well; is that right? | 01:42:31 |
| 5 | A    I was, frankly, less concerned about | 01:42:33 |
| 6 | Mr. Holecek's particular concerns about fees than | 01:42:36 |
| 7 | I was about finding an approach that would bring | 01:42:40 |
| 8 | resolution for both sides. | 01:42:45 |
| 9 | Q    But you reached out to and allowed | 01:42:48 |
| 10 | edits by the lawyers representing DoorDash in this | 01:42:53 |
| 11 | particular instance, but just testified that you | 01:42:57 |
| 12 | did not solicit or talk to anyone representing | 01:42:59 |
| 13 | DoorDashers in the same dispute; isn't that right? | 01:43:04 |
| 14 | MS. LUNETTA:  Object to the form.  It | 01:43:08 |
| 15 | misstates his testimony. | 01:43:09 |
| 16 | A    I think it does misstate my testimony. | 01:43:10 |
| 17 | Gibson Dunn had reached out to us and | 01:43:13 |
| 18 | raised an issue that they had in particular | 01:43:16 |
| 19 | relating to fees.  We responded by developing a | 01:43:19 |
| 20 | protocol and welcomed their input on the protocol | 01:43:23 |
| 21 | from a practical application standpoint.  And | 01:43:28 |
| 22 | also, because we knew and we were interested in | 01:43:31 |
| 23 | getting this applied, and there was an opportunity | 01:43:34 |
| 24 | to get it applied by DoorDash and Gibson Dunn. | 01:43:39 |
| 25 | To say they made edits, I think is a | 01:43:43 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    120

| | | |
|---|---|---|
| 1 | little too micro in terms of your offering that | 01:43:47 |
| 2 | terminology for what they did.  They did provide | 01:43:53 |
| 3 | us feedback, as did others.  At the end of the | 01:43:56 |
| 4 | day, that protocol was ours.  We own that | 01:43:59 |
| 5 | protocol.  And as you have seen through the | 01:44:03 |
| 6 | documents, there were things they, perhaps, liked | 01:44:05 |
| 7 | in the protocol and there were things they, | 01:44:10 |
| 8 | perhaps, didn't like in the protocol.  At the end | 01:44:13 |
| 9 | of the day, that was our protocol.  So we built in | 01:44:15 |
| 10 | a back-end opt-out procedure, something that they | 01:44:19 |
| 11 | did not -- they very much did not want.  We built | 01:44:24 |
| 12 | that in and provided an opportunity for, if | 01:44:29 |
| 13 | resolution didn't work, that claimants could go to | 01:44:33 |
| 14 | court and back out, opt out of arbitrations all | 01:44:38 |
| 15 | together.  That was not for DoorDash or Gibson | 01:44:43 |
| 16 | Dunn.  This was not for DoorDash or Gibson Dunn, | 01:44:45 |
| 17 | although they have applied it.  This was for the | 01:44:50 |
| 18 | general marketplace. | 01:44:54 |
| 19 |     Q    So it was not a negotiated deal for a | 01:44:55 |
| 20 | volume of cases? | 01:44:58 |
| 21 |     A    It was not. | 01:44:59 |
| 22 |     Let me also add, just in response to | 01:45:02 |
| 23 | your point about class actions, I think there is a | 01:45:17 |
| 24 | substantial open question beyond the circumstance | 01:45:19 |
| 25 | of a back-end opt-out, whether class actions would | 01:45:26 |

| | | |
|---|---|---|
| 1 | be available to the claimants. | 01:45:29 |
| 2 |     Q   I don't know if this is relevant to our | 01:45:37 |
| 3 | discussions, but are you suggesting -- | 01:45:39 |
| 4 |     A   I think it is highly relevant, Mr. | 01:45:40 |
| 5 | Zigler. | 01:45:41 |
| 6 |     Q   Okay. | 01:45:42 |
| 7 |     A   I think in terms of the neutrality of | 01:45:42 |
| 8 | this, I think in terms of our role, I think in | 01:45:44 |
| 9 | terms of our trying to accommodate various | 01:45:47 |
| 10 | perspectives, the fact that a class action could | 01:45:50 |
| 11 | be brought in response to a back-end opt-out, I do | 01:45:52 |
| 12 | think is highly relevant to this. | 01:46:02 |
| 13 |     Q   Okay. | 01:46:11 |
| 14 |     Could you tell us why? | 01:46:12 |
| 15 |     A   I think it provides another opportunity | 01:46:17 |
| 16 | for resolution in the instance where, if this | 01:46:20 |
| 17 | protocol does not bring about resolution, then the | 01:46:22 |
| 18 | open question of whether or not there could be a | 01:46:26 |
| 19 | class action, I think would highly incentivize | 01:46:29 |
| 20 | resolution in the first place of the parties | 01:46:34 |
| 21 | involved.  And, secondly, provide an alternative | 01:46:36 |
| 22 | for claimants to get resolution through a class | 01:46:38 |
| 23 | action mechanism if the arbitration mechanism | 01:46:41 |
| 24 | doesn't work.  Or they have the option to go | 01:46:44 |
| 25 | forward with arbitrations. | 01:46:47 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          122

| | | |
|---|---|---|
| 1 | Q    So is that to say that you believe that | 01:46:48 |
| 2 | the plaintiff's lawyer would have leverage in | 01:46:50 |
| 3 | negotiation in order to bring a 23(b)(3) class, | 01:46:53 |
| 4 | should the mediation fail; is that what you're | 01:46:58 |
| 5 | saying? | 01:47:02 |
| 6 | MS. LUNETTA:  Objection to form. | 01:47:04 |
| 7 | A    I am saying that I think there would be | 01:47:05 |
| 8 | strong incentives for all of the parties to try to | 01:47:11 |
| 9 | resolve the matter in the mediation. | 01:47:13 |
| 10 | Q    Do you think that the defendant's | 01:47:16 |
| 11 | lawyer has leverage due to the potential of a | 01:47:18 |
| 12 | class action, if the mediation were to fail under | 01:47:20 |
| 13 | your rules? | 01:47:23 |
| 14 | A    I didn't think of that as something the | 01:47:30 |
| 15 | defendant would want. | 01:47:33 |
| 16 | Q    You mentioned earlier that there was | 01:47:37 |
| 17 | discussion of mass claims in the employment | 01:47:39 |
| 18 | disputes committee in September, at some point. | 01:47:45 |
| 19 | Do you recall that? | 01:47:48 |
| 20 | A    Yes. | 01:47:48 |
| 21 | Q    Do you keep minutes of those meetings? | 01:47:50 |
| 22 | A    I don't -- I don't recall. | 01:47:55 |
| 23 | Q    Who was a member of your employment | 01:47:57 |
| 24 | disputes committee? | 01:47:59 |
| 25 | MS. LUNETTA:  Objection to form.  And | 01:48:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    123

| | | |
|---|---|---|
| 1 | objection, beyond the scope.  I'm going to | 01:48:03 |
| 2 | instruct him not to answer unless it is one of the | 01:48:05 |
| 3 | relevant parties here. | 01:48:10 |
| 4 | Q    Are you going to answer the question? | 01:48:16 |
| 5 | A    I'm going to follow my lawyer's | 01:48:17 |
| 6 | instruction. | 01:48:20 |
| 7 | Q    Okay. | 01:48:20 |
| 8 | Is DoorDash, Gibson Dunn or any | 01:48:21 |
| 9 | plaintiff's firm representing DoorDashers in this | 01:48:25 |
| 10 | classification claims a member of your employment | 01:48:29 |
| 11 | disputes committee? | 01:48:33 |
| 12 | A    I don't believe so. | 01:48:34 |
| 13 | Q    Is there any record of what was said in | 01:48:40 |
| 14 | the employment disputes committee? | 01:48:41 |
| 15 | A    I don't know. | 01:48:46 |
| 16 | Q    Who at CPR is a member of the -- or | 01:48:47 |
| 17 | would attend an employment disputes committee | 01:48:52 |
| 18 | meeting? | 01:48:56 |
| 19 | A    The meeting I'm thinking of, I | 01:48:59 |
| 20 | attended, Ms. Hershenberg attended, Richard Murphy | 01:49:01 |
| 21 | attended.  I think that's it. | 01:49:10 |
| 22 | Q    Do you know if Ms. Hershenberg or | 01:49:15 |
| 23 | Mr. Murphy took notes of that meeting? | 01:49:20 |
| 24 | A    I don't know. | 01:49:25 |
| 25 | Q    Was Mr. Holecek's reach-out to CPR | 01:49:27 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    124

| | | |
|---|---|---|
| 1 | discussed at that meeting? | 01:49:32 |
| 2 | A    I think I testified to this before. | 01:49:37 |
| 3 | Well, I don't believe -- nothing was discussed | 01:49:41 |
| 4 | there.  And also, that meeting was before any | 01:49:46 |
| 5 | conversations I had with Mr. Holecek. | 01:49:48 |
| 6 | Q    Did there come a time where you had a | 01:50:17 |
| 7 | phone call with Mr. Holecek? | 01:50:19 |
| 8 | A    Yes. | 01:50:24 |
| 9 | Q    How many phone calls have you had with | 01:50:25 |
| 10 | Mr. Holecek? | 01:50:27 |
| 11 | A    I don't recall. | 01:50:28 |
| 12 | Q    More than one? | 01:50:30 |
| 13 | A    Yes. | 01:50:31 |
| 14 | Q    More than five? | 01:50:33 |
| 15 | A    Maybe around five.  I just don't | 01:50:40 |
| 16 | specifically recall the number. | 01:50:44 |
| 17 | Q    More than ten? | 01:50:46 |
| 18 | A    No, I don't believe so. | 01:50:46 |
| 19 | Q    Do you remember talking to Mr. Holecek | 01:50:55 |
| 20 | on September 23rd? | 01:50:58 |
| 21 | A    If the document indicates I spoke to | 01:51:05 |
| 22 | him on September 23rd, that's when we spoke. | 01:51:09 |
| 23 | Q    I'm going to hand you a document that's | 01:51:12 |
| 24 | been marked Exhibit 8.  It's Bates Number 476. | 01:51:14 |
| 25 | | |

Transcript of Allen Waxman
Conducted on December 27, 2019                      125

| | | |
|---|---|---|
| 1 | (Waxman Exhibit 8 marked for | 01:51:18 |
| 2 | identification and attached to the transcript.) | 01:51:18 |
| 3 | Q    Bates Number 476 reflects a meeting | 01:51:27 |
| 4 | invite for a call with Mr. Holecek and you and Ms. | 01:51:30 |
| 5 | Erickson, does it not? | 01:51:41 |
| 6 | A    I'm sorry, you're asking if Exhibit 8 | 01:51:49 |
| 7 | reflects a phone call between Ms. Erickson, myself | 01:51:52 |
| 8 | and Mr. Holecek, September 23rd? | 01:51:55 |
| 9 | Q    Yes, an invitation for a phone call at | 01:51:58 |
| 10 | that time. | 01:52:01 |
| 11 | A    Yes, it does. | 01:52:02 |
| 12 | Q    Do you recall if that conversation took | 01:52:02 |
| 13 | place? | 01:52:04 |
| 14 | A    I believe it did. | 01:52:04 |
| 15 | Q    I'm going to hand you a document that's | 01:52:06 |
| 16 | been marked as -- | 01:52:08 |
| 17 | A    I mean, I see it shows the time as | 01:52:12 |
| 18 | tentative.  Whether it took place at this time or | 01:52:14 |
| 19 | another time, I believe a call did take place. | 01:52:17 |
| 20 | Q    Do you recall how long that call | 01:52:19 |
| 21 | lasted? | 01:52:21 |
| 22 | A    I don't. | 01:52:21 |
| 23 | Q    Do you recall who was on that call? | 01:52:22 |
| 24 | A    I believe my first call with him was | 01:52:26 |
| 25 | with Ms. Erickson as well. | 01:52:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    126

| | | |
|---|---|---|
| 1 | Q    Just the three of you? | 01:52:30 |
| 2 | A    I believe so. | 01:52:31 |
| 3 | Q    Do you recall what you discussed? | 01:52:33 |
| 4 | A    More along the lines of what we have | 01:52:36 |
| 5 | been discussing here. | 01:52:38 |
| 6 | Q    I'm going to hand you an exhibit that's | 01:52:39 |
| 7 | marked Exhibit 9.  It's Bates Number 503. | 01:52:41 |
| 8 | (Waxman Exhibit 9 marked for | 01:52:45 |
| 9 | identification and attached to the transcript.) | 01:52:45 |
| 10 | Q    Can you tell me what Bates Number 503 | 01:52:53 |
| 11 | represents? | 01:52:56 |
| 12 | A    These are my notes. | 01:52:56 |
| 13 | Q    These are your notes? | 01:52:57 |
| 14 | A    Yep. | 01:52:59 |
| 15 | Q    Is it your habit to take notes of your | 01:53:01 |
| 16 | day? | 01:53:04 |
| 17 | MS. LUNETTA:  Objection to form. | 01:53:06 |
| 18 | A    I don't know that I have a particular | 01:53:07 |
| 19 | habit.  I know I took notes on this call. | 01:53:09 |
| 20 | Q    Do you keep time of your day? | 01:53:12 |
| 21 | A    I don't. | 01:53:14 |
| 22 | Q    One of the benefits of leaving private | 01:53:15 |
| 23 | practice. | 01:53:18 |
| 24 | MS. LUNETTA:  I was going to say, | 01:53:18 |
| 25 | imagine that freedom. | 01:53:20 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              127

| | | |
|---|---|---|
| 1 | Q    You said you took notes on this call, | 01:53:26 |
| 2 | but you don't normally take notes; is that fair? | 01:53:28 |
| 3 | A    Sometimes I take notes, sometimes I | 01:53:31 |
| 4 | don't take notes. | 01:53:32 |
| 5 | Q    Okay. | 01:53:33 |
| 6 | Is there a reason that you would take | 01:53:33 |
| 7 | notes for one call and not take notes for another? | 01:53:35 |
| 8 | A    No particular reason.  I thought it | 01:53:41 |
| 9 | would be useful to take notes here, so I did. | 01:53:46 |
| 10 | Q    Okay. | 01:53:49 |
| 11 | Can you explain to me the contents of | 01:53:50 |
| 12 | Exhibit 9, please? | 01:53:53 |
| 13 | A    Sure. | 01:53:58 |
| 14 | To the best of my recollection, the | 01:53:59 |
| 15 | notes reflect that there was a discussion of this | 01:54:01 |
| 16 | Dynamax decision, which changed the independent | 01:54:03 |
| 17 | contractor law, which was relevant to these | 01:54:07 |
| 18 | misclassification issues.  I think I referred to | 01:54:11 |
| 19 | it before.  And this seems to indicate that Gibson | 01:54:14 |
| 20 | Dunn was litigation counsel for all of those | 01:54:18 |
| 21 | matters.  They were the national coordinating | 01:54:21 |
| 22 | counsel, but the firm of Littler, I believe it is | 01:54:23 |
| 23 | Mendelson, was actually handling the arbitration. | 01:54:27 |
| 24 | The AAA was the arbitral provider in their | 01:54:31 |
| 25 | contracts as well as in consumer agreements, that | 01:54:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    128

| | | |
|---|---|---|
| 1 | the lawyers for the plaintiffs were making mass | 01:54:39 |
| 2 | arbitration demands.  They had marshaled a lot of | 01:54:43 |
| 3 | cases. | 01:54:47 |
| 4 | And then, apparently, there is a $1,900 | 01:54:47 |
| 5 | filing fee for each of the cases, AAA, and said -- | 01:54:52 |
| 6 | and this indicates to me that they had | 01:54:57 |
| 7 | communicated, that is the lawyers for the | 01:54:59 |
| 8 | claimants, that to pay the claimants rather than | 01:55:02 |
| 9 | paying the filing fees.  That there was a desire | 01:55:06 |
| 10 | for a new solution.  Over 20,000 potential | 01:55:12 |
| 11 | claimants, 2,000 have been filed.  The thought was | 01:55:17 |
| 12 | there would only end up being a few cases, | 01:55:20 |
| 13 | actually, that would be handled a month.  AAA | 01:55:23 |
| 14 | gives filing fee waivers.  Our non-administered | 01:55:30 |
| 15 | rules have no filing fees, so there would be no | 01:55:35 |
| 16 | waiver.  And then a question, maybe to myself or | 01:55:38 |
| 17 | maybe they raised, could plaintiff be charged for | 01:55:44 |
| 18 | the selection process, and the answer to that | 01:55:46 |
| 19 | under our due process protocol is no. | 01:55:49 |
| 20 | There was a reference to due process | 01:55:55 |
| 21 | protections for the defendant in mass arbitration. | 01:56:00 |
| 22 | I'm not sure what that meant.  In other words, | 01:56:05 |
| 23 | that was something mentioned, but I'm not sure | 01:56:09 |
| 24 | what it meant.  Insist on individual by | 01:56:12 |
| 25 | individual, but run into court.  I'm not sure what | 01:56:18 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    129

| | | |
|---|---|---|
| 1 | that meant either.  There was, I think, relayed to | 01:56:20 |
| 2 | us that there had been a bunch of arbitrations | 01:56:25 |
| 3 | filed, but 250 had been paid for.  That AAA has | 01:56:29 |
| 4 | about 300 arbitrators from California, | 01:56:36 |
| 5 | experienced, and another thousand outside of | 01:56:38 |
| 6 | California. | 01:56:42 |
| 7 |     Q    And how many neutrals does CPR have in | 01:56:44 |
| 8 | California? | 01:56:49 |
| 9 |     A    I don't know offhand. | 01:56:51 |
| 10 |     Q    Is it more or less than 300? | 01:56:53 |
| 11 |     A    I'm assuming it is less. | 01:56:57 |
| 12 |     Q    All right. | 01:57:06 |
| 13 |         I want to, sorry, direct you back to | 01:57:12 |
| 14 | Exhibit 5 for a moment. | 01:57:15 |
| 15 |         MS. LUNETTA:  That's 494, right, the | 01:57:31 |
| 16 | notes? | 01:57:33 |
| 17 |         MR. ZIGLER:  The notes, the handwritten | 01:57:33 |
| 18 | notes.  Yeah, I think it is that black sheet | 01:57:34 |
| 19 | there. | 01:57:37 |
| 20 | BY MR. ZIGLER: | 01:57:38 |
| 21 |     Q    So there are a number of redactions on | 01:57:38 |
| 22 | Exhibit 5. | 01:57:40 |
| 23 |         Do you know the reason for the | 01:57:40 |
| 24 | redactions? | 01:57:42 |
| 25 |         Take it up with your counsel? | 01:57:48 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    130

| | | | |
|---|---|---|---|
| 1 | A | Please. | 01:57:49 |
| 2 | Q | Okay. | 01:57:49 |
| 3 | | MS. LUNETTA:  I can tell you they are | 01:57:50 |
| 4 | beyond the scope.  Totally unrelated to this | | 01:57:51 |
| 5 | matter. | | 01:57:53 |
| 6 | Q | Okay. | 01:57:54 |
| 7 | | Can we go to Exhibit 6. | 01:58:00 |
| 8 | A | I'm sorry, is that it for 5? | 01:58:04 |
| 9 | Q | That's it for 5. | 01:58:04 |
| 10 | | Can you go to 6 for me? | 01:58:06 |
| 11 | | I'm sorry, 7.  My apologies. | 01:58:09 |
| 12 | | So here we've got another significant | 01:58:17 |
| 13 | redaction. | | 01:58:20 |
| 14 | | Do you know the reason for the | 01:58:21 |
| 15 | redaction? | | 01:58:22 |
| 16 | | Take it up with your counsel? | 01:58:23 |
| 17 | | MS. LUNETTA:  Same reason.  Totally | 01:58:25 |
| 18 | unrelated. | | 01:58:27 |
| 19 | | MR. ZIGLER:  Okay. | 01:58:33 |
| 20 | | Counsel, let me ask you this question | 01:58:33 |
| 21 | generally:  There are redactions throughout the | | 01:58:35 |
| 22 | production.  Is the basis for all of the | | 01:58:39 |
| 23 | redactions outside the scope? | | 01:58:42 |
| 24 | | MS. LUNETTA:  I believe so, because | 01:58:48 |
| 25 | there were a few documents -- I think we e-mailed | | 01:58:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          131

| | | |
|---|---|---|
| 1 | about them.  There was an e-mail that was withheld | 01:58:52 |
| 2 | as privileged because it was just forwarding to | 01:58:55 |
| 3 | counsel documents, but each one of those documents | 01:58:58 |
| 4 | was produced in its original form, so I didn't log | 01:59:00 |
| 5 | it yet.  I was going to redact it and give you the | 01:59:05 |
| 6 | whole thing, but it was kind of like another 200 | 01:59:08 |
| 7 | pages that was irrelevant because it was all | 01:59:10 |
| 8 | duplicate. | 01:59:13 |
| 9 | Other than that, I believe that I | 01:59:13 |
| 10 | can -- I'll let you know if I'm wrong, I'll check, | 01:59:15 |
| 11 | but I think the only reason we redacted anything | 01:59:17 |
| 12 | else was because it was unrelated. | 01:59:20 |
| 13 | BY MR. ZIGLER: | 01:59:22 |
| 14 | Q    Do you know on the second page or page | 01:59:37 |
| 15 | two of these notes, you have got AAA -- | 01:59:41 |
| 16 | A    Where are we now? | 01:59:47 |
| 17 | Q    We're on your notes for the DoorDash | 01:59:49 |
| 18 | call. | 01:59:52 |
| 19 | A    Exhibit 9? | 01:59:53 |
| 20 | Q    Which is Exhibit 9. | 01:59:53 |
| 21 | Page two, you have got a star next to | 01:59:56 |
| 22 | the AAA filing fee -- or the AAA waiver fee, | 01:59:57 |
| 23 | excuse me. | 02:00:01 |
| 24 | A    Where? | 02:00:04 |
| 25 | Q    Do you remember why you put a star | 02:00:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    132

| | | |
|---|---|---|
| 1 | there? | 02:00:06 |
| 2 | A    I don't. | 02:00:06 |
| 3 | Q    Do you recall having a conversation | 02:00:15 |
| 4 | about your September 23rd phone conference with | 02:00:18 |
| 5 | Mr. Holecek with anyone else? | 02:00:22 |
| 6 | A    You mean after it was over? | 02:00:28 |
| 7 | Q    Yes. | 02:00:30 |
| 8 | A    I'm sure I discussed it with Ms. | 02:00:31 |
| 9 | Erickson. | 02:00:34 |
| 10 | Q    Okay. | 02:00:34 |
| 11 | Besides Ms. Erickson, did you have any | 02:00:35 |
| 12 | conversations about your September 23rd phone | 02:00:37 |
| 13 | conference with Mr. Holecek? | 02:00:40 |
| 14 | A    Not specifically, no. | 02:00:43 |
| 15 | Q    What did you and Ms. Erickson discuss | 02:00:44 |
| 16 | following your September 23rd phone conference | 02:00:48 |
| 17 | with Mr. Holecek? | 02:00:51 |
| 18 | A    I don't remember specifically.  The | 02:00:58 |
| 19 | reason I'm saying I'm sure, things progressed | 02:00:59 |
| 20 | forward.  And you may have other documents -- I'm | 02:01:02 |
| 21 | not remembering the whole timeline of documents. | 02:01:09 |
| 22 | So maybe if I saw the next document, I could see. | 02:01:11 |
| 23 | But, you know, somewhere in this time frame, I | 02:01:14 |
| 24 | began drafting a protocol. | 02:01:17 |
| 25 | Q    Okay. | 02:01:20 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           133

| | | |
|---|---|---|
| 1 | You said things progressed.  Do you | 02:01:20 |
| 2 | remember what your next step was? | 02:01:22 |
| 3 | A    Other than what I just said? | 02:01:26 |
| 4 | I mean, there was a variety of | 02:01:32 |
| 5 | conversations that took place.  There was drafting | 02:01:34 |
| 6 | of a protocol.  There were conversations that -- | 02:01:36 |
| 7 | Q    Do you remember who you consulted with | 02:01:41 |
| 8 | next? | 02:01:43 |
| 9 | A    Relating to either DoorDash or Gibson | 02:01:49 |
| 10 | Dunn, I believe our next conversation was with | 02:01:51 |
| 11 | Mr. Holecek.  Again, it may have included | 02:01:59 |
| 12 | Mr. Farano from DoorDash, but I'm not sure if that | 02:02:02 |
| 13 | was the next communication or the communication | 02:02:08 |
| 14 | after that. | 02:02:11 |
| 15 | Q    That's fine.  We'll get there, but I | 02:02:11 |
| 16 | think there was an intermediate one. | 02:02:12 |
| 17 | Exhibit 10.  This is Bates 84. | 02:02:15 |
| 18 | (Waxman Exhibit 10 marked for | 02:02:20 |
| 19 | identification and attached to the transcript.) | 02:02:20 |
| 20 | THE WITNESS:  Okay, yes. | 02:02:22 |
| 21 | Q    Did you travel to Europe this summer? | 02:02:33 |
| 22 | A    In September. | 02:02:36 |
| 23 | Q    Exhibit 10 is an e-mail from you to | 02:02:45 |
| 24 | Thomas Sabatino and John Kiernan; is that right? | 02:02:47 |
| 25 | A    Kiernan. | 02:02:53 |

Transcript of Allen Waxman
Conducted on December 27, 2019                     134

| | | | |
|---|---|---|---|
| 1 | Q | Kiernan. | 02:02:55 |
| 2 | A | Yes. | 02:02:56 |
| 3 | Q | And are they both board members at CPR? | 02:02:56 |
| 4 | A | They are. | 02:02:59 |
| 5 | Q | And Mr. Sabatino has a position with | 02:03:00 |
| 6 | the AKC; is that right? | | 02:03:04 |
| 7 | A | No. | 02:03:06 |
| 8 | Q | No? | 02:03:08 |
| 9 | | Okay. | 02:03:09 |
| 10 | A | Jay Waks, W-A-K-S, on our board, has a | 02:03:19 |
| 11 | position with the AKC.  Mr. Sabatino is the | | 02:03:26 |
| 12 | chairman of our board. | | 02:03:28 |
| 13 | Q | And do you recall if Mr. Sabatino is | 02:03:29 |
| 14 | employed? | | 02:03:37 |
| 15 | A | If he is employed? | 02:03:38 |
| 16 | Q | Yes. | 02:03:40 |
| 17 | A | Currently? | 02:03:40 |
| 18 | Q | Yes. | 02:03:41 |
| 19 | A | I'm not sure of his current status. | 02:03:42 |
| 20 | Q | Okay. | 02:03:44 |
| 21 | | Do you recall who he most recently | 02:03:44 |
| 22 | worked for? | | 02:03:47 |
| 23 | A | I believe Aetna.  I know he is serving | 02:03:48 |
| 24 | on various boards.  I know he has a variety of | | 02:03:55 |
| 25 | different things he is engaged in. | | 02:03:58 |

Transcript of Allen Waxman
Conducted on December 27, 2019                         135

| | | |
|---|---|---|
| 1 | Q    The Humane Society? | 02:04:00 |
| 2 | A    I know he is co-chair of the Humane | 02:04:08 |
| 3 | Society, but I know he also does other things as | 02:04:10 |
| 4 | well. | 02:04:12 |
| 5 | Q    And I was confused.  Humane Society, | 02:04:13 |
| 6 | AKC, dogs. | 02:04:16 |
| 7 | A    Oh, okay, I see. | 02:04:17 |
| 8 | Q    All right. | 02:04:18 |
| 9 | Exhibit 10, you say, "While I was away, | 02:04:25 |
| 10 | a friend of mine from Gibson Dunn." | 02:04:27 |
| 11 | Do you see that? | 02:04:31 |
| 12 | A    I do. | 02:04:31 |
| 13 | Q    Who is your friend at Gibson Dunn? | 02:04:32 |
| 14 | A    I was referring here to Kevin Rosen. | 02:04:34 |
| 15 | Q    Who is Kevin Rosen? | 02:04:37 |
| 16 | A    He is a friend of mine. | 02:04:40 |
| 17 | Q    Where do you know Kevin Rosen from? | 02:04:41 |
| 18 | A    He was my college roommate. | 02:04:44 |
| 19 | Q    College roommate.  That goes back a | 02:04:46 |
| 20 | while. | 02:04:47 |
| 21 | A    It does.  And I won't take from that | 02:04:48 |
| 22 | that you think I have been out of college for a | 02:04:50 |
| 23 | while. | 02:04:52 |
| 24 | Q    I was just looking at your resumé. | 02:04:53 |
| 25 | You've accomplished a lot. | 02:04:55 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    136

| | | |
|---|---|---|
| 1 | A    I see.  Okay. | 02:04:57 |
| 2 | I have to say, I was -- so that's who | 02:04:58 |
| 3 | I'm referring to here.  It turned out that this | 02:05:05 |
| 4 | was incorrect.  I was not familiar with the | 02:05:07 |
| 5 | conversation in May, nor had anybody made me | 02:05:11 |
| 6 | familiar with the conversation in May.  And I had | 02:05:17 |
| 7 | thought that Mr. Rosen had referred the matter to | 02:05:20 |
| 8 | us, but I was incorrect about that. | 02:05:26 |
| 9 | Q    Did you talk to Mr. Rosen in September? | 02:05:33 |
| 10 | A    I did not. | 02:05:35 |
| 11 | Q    Have you talked to Mr. Rosen since | 02:05:36 |
| 12 | September? | 02:05:39 |
| 13 | A    Maybe, but not about this matter. | 02:05:45 |
| 14 | Q    Who corrected your misremembering or | 02:05:48 |
| 15 | misbelief that Mr. Rosen had referred the matter | 02:05:54 |
| 16 | to you? | 02:05:57 |
| 17 | A    Well, frankly, it was only in | 02:05:59 |
| 18 | connection with going through the documents that I | 02:06:01 |
| 19 | came to see there was a communication in May. | 02:06:04 |
| 20 | That had never been raised before.  I thought the | 02:06:09 |
| 21 | first communication was the September one we | 02:06:13 |
| 22 | looked at. | 02:06:15 |
| 23 | Q    Why was it that you thought that the | 02:06:16 |
| 24 | September communication was a result of Mr. Rosen? | 02:06:18 |
| 25 | A    I think one of the e-mails said | 02:06:22 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    137

| | | |
|---|---|---|
| 1 | something along the lines of Mr. Holecek works | 02:06:24 |
| 2 | with Mr. Rosen and I just made an assumption.  It | 02:06:28 |
| 3 | was misplaced. | 02:06:35 |
| 4 | Q    Okay. | 02:06:36 |
| 5 | A    Not that it mattered. | 02:06:36 |
| 6 | Q    That's the key fact. | 02:06:39 |
| 7 | A    That is the key fact, not that it | 02:06:40 |
| 8 | mattered. | 02:06:43 |
| 9 | Q    What does it mean to be a member firm? | 02:06:47 |
| 10 | A    Members pay dues on an annual basis, | 02:06:51 |
| 11 | and there are various benefits of being able to | 02:06:55 |
| 12 | participate in committees, get journals, get | 02:06:59 |
| 13 | discounts on trainings, attend events.  This was a | 02:07:03 |
| 14 | mistake as well.  Apparently, Gibson Dunn, at this | 02:07:09 |
| 15 | time, was not a member firm. | 02:07:14 |
| 16 | Q    Have they since become a member firm? | 02:07:17 |
| 17 | A    No. | 02:07:19 |
| 18 | Q    So they are not a member firm? | 02:07:20 |
| 19 | A    They are not a member firm. | 02:07:22 |
| 20 | Q    Had they previously been a member firm? | 02:07:25 |
| 21 | A    Not that it matters. | 02:07:27 |
| 22 | Q    Not that it matters.  But had they | 02:07:29 |
| 23 | previously been a member firm? | 02:07:30 |
| 24 | A    I believe they had been. | 02:07:32 |
| 25 | Q    Do you know when they ceased being a | 02:07:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    138

| | | |
|---|---|---|
| 1 | member firm? | 02:07:35 |
| 2 | A    I don't. | 02:07:36 |
| 3 | Q    Do members get preferential treatment | 02:07:57 |
| 4 | of any kind from CPR? | 02:08:00 |
| 5 | A    There is no preferential treatment when | 02:08:03 |
| 6 | it comes to providing of our dispute resolution | 02:08:05 |
| 7 | services.  There are certain benefits, as I | 02:08:09 |
| 8 | mentioned, of membership, of being able to | 02:08:11 |
| 9 | participate in committees and get journals and | 02:08:15 |
| 10 | things of that sort on the think tank side. | 02:08:19 |
| 11 | Q    Does a member get a fee discount when | 02:08:23 |
| 12 | participating in ADR services? | 02:08:24 |
| 13 | A    That fee discount is extended to both | 02:08:28 |
| 14 | members and non-members alike, whoever is in front | 02:08:30 |
| 15 | of the tribunal. | 02:08:35 |
| 16 | Q    Everybody gets a fee discount at CPR? | 02:08:37 |
| 17 | A    No.  If there is a member appearing in | 02:08:39 |
| 18 | front of a tribunal and the tribunal is willing to | 02:08:42 |
| 19 | extend a discount, then that would go to all of | 02:08:46 |
| 20 | the parties that appear in the matter. | 02:08:50 |
| 21 | Q    You write to Mr. Sabatino and | 02:08:59 |
| 22 | Mr. Kiernan in here about DoorDash and Gibson | 02:09:03 |
| 23 | Dunn. | 02:09:06 |
| 24 | Is all of the information that's | 02:09:10 |
| 25 | contained in this e-mail from you to -- Exhibit | 02:09:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    139

| | | |
|---|---|---|
| 1 | 10, is it based on your conversations with | 02:09:16 |
| 2 | Mr. Holecek and Ms. Erickson? | 02:09:19 |
| 3 | A    I believe so.  There may have been some | 02:09:28 |
| 4 | independent work that I had done.  Like, I had | 02:09:30 |
| 5 | studied the Dynamax case.  There may have been | 02:09:34 |
| 6 | other information that I was provided and there | 02:09:38 |
| 7 | may have been conversations with others that I | 02:09:41 |
| 8 | had, but certainly the bulk of it here is my work | 02:09:44 |
| 9 | with Ms. Erickson, my conversation with | 02:09:49 |
| 10 | Mr. Holecek. | 02:09:52 |
| 11 | Q    Besides researching the Dynamax case, | 02:09:53 |
| 12 | did you do any other factual or legal | 02:09:56 |
| 13 | investigation? | 02:09:57 |
| 14 | A    Like I said, there may have been other | 02:09:59 |
| 15 | things I looked at.  The DoorDash contract, there | 02:10:02 |
| 16 | may have been other things that I reviewed. | 02:10:05 |
| 17 | Q    But you don't recall anything sitting | 02:10:08 |
| 18 | here today? | 02:10:09 |
| 19 | A    No.  I mean, I just thought of the | 02:10:10 |
| 20 | DoorDash contract, the Dynamax case.  I don't have | 02:10:15 |
| 21 | specific recollection of what I had looked at by | 02:10:20 |
| 22 | September 28th. | 02:10:23 |
| 23 | Q    Okay. | 02:10:25 |
| 24 | You write in this e-mail, "DoorDash and | 02:10:25 |
| 25 | Gibson Dunn are frustrated." | 02:10:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    140

| | | |
|---|---|---|
| 1 | Do you see that? | 02:10:30 |
| 2 | A    Yep. | 02:10:31 |
| 3 | Q    And what is the basis of that | 02:10:31 |
| 4 | statement? | 02:10:33 |
| 5 | A    It would have been a communication | 02:10:38 |
| 6 | either from Ms. Erickson vis-a-vis Mr. Holecek or | 02:10:40 |
| 7 | from Mr. Holecek. | 02:10:45 |
| 8 | Q    And were they frustrated with AAA's | 02:10:46 |
| 9 | inaction; is that your understanding? | 02:10:52 |
| 10 | MS. LUNETTA:  Objection to form. | 02:10:55 |
| 11 | A    My understanding is they were | 02:10:55 |
| 12 | frustrated both with inaction and this fee | 02:10:58 |
| 13 | structure, which related to the inaction. | 02:11:01 |
| 14 | Q    Any other frustrations that you're | 02:11:05 |
| 15 | aware of by Gibson Dunn and DoorDash with -- | 02:11:08 |
| 16 | A    That's what I recall. | 02:11:18 |
| 17 | Q    You write that DoorDash and Gibson Dunn | 02:11:20 |
| 18 | want to avoid a filing fee all together. | 02:11:23 |
| 19 | What's the basis of that statement? | 02:11:25 |
| 20 | A    It would have been through | 02:11:29 |
| 21 | communications vis-a-vis them.  And that's why | 02:11:31 |
| 22 | they wanted to explore the application of the | 02:11:34 |
| 23 | non-administered rules in these circumstances, so | 02:11:36 |
| 24 | as to avoid a filing fee all together. | 02:11:39 |
| 25 | Q    And -- | 02:11:44 |

Transcript of Allen Waxman
Conducted on December 27, 2019                         141

| | | |
|---|---|---|
| 1 | A    You -- | 02:11:44 |
| 2 | Q    I'm sorry, I didn't mean to interrupt. | 02:11:44 |
| 3 | A    Go ahead. | 02:11:47 |
| 4 | Q    And you write -- and you have been | 02:11:47 |
| 5 | discussing certain challenges with them and that | 02:11:50 |
| 6 | Gibson understands. | 02:11:53 |
| 7 | Can you tell me what you mean by that? | 02:11:55 |
| 8 | A    Yeah, the challenges of mass claims | 02:11:57 |
| 9 | that we talked about before.  And as I | 02:11:59 |
| 10 | communicated earlier, although I don't remember | 02:12:05 |
| 11 | precisely how these communications worked, at some | 02:12:08 |
| 12 | point I had communicated I wanted to do more than | 02:12:14 |
| 13 | just address a fee restructure, that I wanted to | 02:12:17 |
| 14 | brainstorm on different ways that we might | 02:12:23 |
| 15 | approach resolution here, and they seemed open. | 02:12:25 |
| 16 | Q    Did you ultimately brainstorm with | 02:12:31 |
| 17 | Gibson? | 02:12:33 |
| 18 | A    I'd say we had some discussions with | 02:12:37 |
| 19 | them about the protocol that we were developing | 02:12:40 |
| 20 | and got inputs from them and brainstormed with | 02:12:42 |
| 21 | others as well. | 02:12:45 |
| 22 | Q    Who else did you brainstorm with? | 02:12:46 |
| 23 | MS. LUNETTA:  Objection.  Beyond the | 02:12:49 |
| 24 | scope.  And I will instruct him not to answer. | 02:12:50 |
| 25 | Except that I will say in our objections to | 02:12:52 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    142

| | | |
|---|---|---|
| 1 | document requests, we did give you a pre-cursor | 02:12:55 |
| 2 | intro.  If you want to show him that and have him | 02:12:59 |
| 3 | confirm accuracy of anything, that's fine.  We've | 02:13:03 |
| 4 | already provided that. | 02:13:06 |
| 5 | Q    Will you answer my question? | 02:13:09 |
| 6 | MS. LUNETTA:  I instructed him not to | 02:13:13 |
| 7 | answer. | 02:13:14 |
| 8 | Q    Are you going to follow your lawyer's | 02:13:17 |
| 9 | advice? | 02:13:17 |
| 10 | A    I am. | 02:13:18 |
| 11 | Q    What makes you say that they understand | 02:13:23 |
| 12 | the overall challenge of handling mass filing of | 02:13:25 |
| 13 | individual arbitration claims? | 02:13:29 |
| 14 | A    I mean, that was my sense, is that the | 02:13:32 |
| 15 | fact that there were multiple claims, they weren't | 02:13:34 |
| 16 | preceding the fee structure they were frustrated | 02:13:37 |
| 17 | with.  It was all part and parcel of the | 02:13:41 |
| 18 | challenges that many claims being filed | 02:13:43 |
| 19 | simultaneously can present.  And so my sense of it | 02:13:46 |
| 20 | was that they understood that challenge and that's | 02:13:49 |
| 21 | why I wrote my understanding. | 02:13:55 |
| 22 | Q    In the next paragraph, you say that you | 02:13:59 |
| 23 | want to explore this because, among other things, | 02:14:01 |
| 24 | it can be an important source of funding going | 02:14:03 |
| 25 | forward. | 02:14:06 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    143

| | | |
|---|---|---|
| 1 | Do you see that? | 02:14:06 |
| 2 | A   I do. | 02:14:07 |
| 3 | Q   How much funding does CPR receive as a | 02:14:10 |
| 4 | result of its ADR services? | 02:14:13 |
| 5 | MS. LUNETTA:  Objection.  Beyond the | 02:14:17 |
| 6 | scope.  I'm going to instruct him not to answer. | 02:14:17 |
| 7 | Q   Are you going to follow your lawyer's | 02:14:20 |
| 8 | advice? | 02:14:20 |
| 9 | A   I am. | 02:14:22 |
| 10 | I do want to note that we provided -- | 02:14:23 |
| 11 | this is the problem that demands CPR innovation, | 02:14:25 |
| 12 | with further emission, it could be an important | 02:14:29 |
| 13 | source of funding going forward. | 02:14:32 |
| 14 | Q   Right.  That's what the document says. | 02:14:34 |
| 15 | How much funding going forward did you | 02:14:36 |
| 16 | anticipate that this could be? | 02:14:38 |
| 17 | MS. LUNETTA:  Objection.  Beyond the | 02:14:40 |
| 18 | scope.  I'm going to instruct him not to answer. | 02:14:41 |
| 19 | Q   Are you going to follow your lawyer's | 02:14:43 |
| 20 | advice? | 02:14:43 |
| 21 | A   I am. | 02:14:46 |
| 22 | Q   Do you believe that the amount of | 02:14:47 |
| 23 | funding going forward was not important to whether | 02:14:49 |
| 24 | or not you pursued this activity? | 02:14:52 |
| 25 | MS. LUNETTA:  Same objection.  Beyond | 02:14:56 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    144

| | | |
|---|---|---|
| 1 | the scope.  I'm going to instruct him not to | 02:14:57 |
| 2 | answer. | 02:14:59 |
| 3 | Q    Are you going to follow your lawyer's | 02:14:59 |
| 4 | advice? | 02:14:59 |
| 5 | A    I am. | 02:15:02 |
| 6 | Q    Why did you think Mr. Sabatino or | 02:15:17 |
| 7 | Mr. Kiernan would be interested in the fact that | 02:15:19 |
| 8 | it could be an important source of funding going | 02:15:23 |
| 9 | forward? | 02:15:27 |
| 10 | MS. LUNETTA:  Objection.  That's beyond | 02:15:28 |
| 11 | the scope also.  I'm going to instruct him not to | 02:15:29 |
| 12 | answer. | 02:15:31 |
| 13 | Q    Are you going to follow your lawyer's | 02:15:32 |
| 14 | advice? | 02:15:32 |
| 15 | A    I am. | 02:15:33 |
| 16 | Q    Did Mr. Sabatino or Mr. Kiernan respond | 02:15:40 |
| 17 | to this e-mail? | 02:15:44 |
| 18 | A    I recall we had a conversation with | 02:15:45 |
| 19 | them a few days later.  So I think that was a | 02:15:47 |
| 20 | response, and we provided them a draft of the | 02:15:53 |
| 21 | protocol. | 02:15:56 |
| 22 | Q    Okay. | 02:15:56 |
| 23 | A    Or an earlier draft of the protocol. | 02:15:56 |
| 24 | Q    Do you know if they responded in | 02:16:00 |
| 25 | writing or there was just this conversation? | 02:16:02 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    145

| | | |
|---|---|---|
| 1 | A    We had to set up scheduling.  There may | 02:16:05 |
| 2 | have been communication.  I don't recall. | 02:16:09 |
| 3 | Q    Okay. | 02:16:13 |
| 4 | Who participated in the meeting with | 02:16:14 |
| 5 | Mr. Sabatino and Mr. Kiernan besides yourself? | 02:16:16 |
| 6 | A    And Ms. Erickson. | 02:16:20 |
| 7 | Q    Ms. Erickson? | 02:16:22 |
| 8 | A    Yes. | 02:16:23 |
| 9 | Q    Was anybody else present at that | 02:16:24 |
| 10 | meeting? | 02:16:25 |
| 11 | A    I don't believe so. | 02:16:26 |
| 12 | Q    Did anybody take any notes? | 02:16:27 |
| 13 | A    I don't recall. | 02:16:31 |
| 14 | Q    Was there ever any documents | 02:16:32 |
| 15 | memorializing the content of that meeting? | 02:16:34 |
| 16 | A    I don't recall. | 02:16:43 |
| 17 | I recall the outcome of the meeting was | 02:16:54 |
| 18 | to press forward. | 02:16:57 |
| 19 | Q    In your e-mail you say, you "canvassed | 02:16:57 |
| 20 | our panel." | 02:16:59 |
| 21 | Can you tell me what that means? | 02:17:01 |
| 22 | A    We put out a communication to the | 02:17:03 |
| 23 | panel. | 02:17:10 |
| 24 | Q    Is that like a mass e-mail? | 02:17:12 |
| 25 | A    I wasn't the one who did it. | 02:17:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    146

| | | | |
|---|---|---|---|
| 1 | Q | Who did it? | 02:17:16 |
| 2 | A | Ms. Erickson. | 02:17:17 |
| 3 | Q | What sort of response did you get to | 02:17:19 |
| 4 | that e-mail? | | 02:17:21 |
| 5 | | MS. LUNETTA:  Objection.  It's beyond | 02:17:24 |
| 6 | the scope.  Other than what's here.  Beyond the | | 02:17:24 |
| 7 | scope of the deposition. | | 02:17:28 |
| 8 | A | It's what's here. | 02:17:29 |
| 9 | Q | So the e-mail says, "Over 40 thus far | 02:17:30 |
| 10 | have expressed interest." | | 02:17:36 |
| 11 | | Isn't that what it says? | 02:17:38 |
| 12 | A | That's what it says. | 02:17:40 |
| 13 | Q | Okay. | 02:17:41 |
| 14 | | And how many neutrals do you have? | 02:17:41 |
| 15 | A | 545. | 02:17:44 |
| 16 | Q | Okay. | 02:17:48 |
| 17 | | Does that mean that 500 didn't respond | 02:17:48 |
| 18 | or expressed disinterest in the proposal? | | 02:17:53 |
| 19 | A | No, because the numbers | 02:17:56 |
| 20 | substantially -- I have access to that now, so I | | 02:17:58 |
| 21 | know -- but as of this date, this is -- | | 02:18:01 |
| 22 | Q | Do you know how many neutrals had | 02:18:04 |
| 23 | expressed disinterest or concern over | | 02:18:06 |
| 24 | participating at the time of this e-mail to | | 02:18:09 |
| 25 | Mr. Kiernan and Mr. Sabatino? | | 02:18:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        147

| | | |
|---|---|---|
| 1 | A    I don't know that anybody expressed | 02:18:17 |
| 2 | concern.  This was a number.  It was a rolling | 02:18:19 |
| 3 | situation. | 02:18:23 |
| 4 | Q    All right. | 02:18:24 |
| 5 | I'm just asking, you say in the e-mail | 02:18:24 |
| 6 | that 40 have expressed interest so far. | 02:18:26 |
| 7 | So contrary to that is, how many were | 02:18:29 |
| 8 | uninterested? | 02:18:32 |
| 9 | A    I don't know.  I don't know that | 02:18:33 |
| 10 | anybody expressed disinterest or concern at all. | 02:18:35 |
| 11 | This was the number so far. | 02:18:38 |
| 12 | Q    Okay. | 02:18:39 |
| 13 | Over the course of time, to the | 02:18:39 |
| 14 | present, have any of your neutrals expressed | 02:18:42 |
| 15 | concern or disinterest in participating in the | 02:18:45 |
| 16 | mass employment protocol? | 02:18:48 |
| 17 | A    Not that I'm aware of.  I don't know. | 02:18:50 |
| 18 | Q    Would you be the person that they would | 02:18:52 |
| 19 | talk to if they were not interested in | 02:18:56 |
| 20 | participating or had concerns with the protocol? | 02:18:59 |
| 21 | A    No.  This is -- they are being | 02:19:07 |
| 22 | canvassed for their interest in the arbitrated | 02:19:14 |
| 23 | cases. | 02:19:21 |
| 24 | Q    And who does that canvassing on behalf | 02:19:22 |
| 25 | of CPR? | 02:19:25 |

| | | |
|---|---|---|
| 1 | A    I think it was Ms. Erickson. | 02:19:28 |
| 2 | Q    How many of your neutrals have | 02:19:35 |
| 3 | expressed an interest in participating in the | 02:19:38 |
| 4 | protocol as of today? | 02:19:40 |
| 5 | MS. LUNETTA:  Objection to form. | 02:19:42 |
| 6 | A    Yeah.  Can I just clarify something? | 02:19:43 |
| 7 | Q    Sure. | 02:19:51 |
| 8 | A    You keep saying in participating in the | 02:19:51 |
| 9 | protocol.  It's participating in arbitrations. | 02:19:54 |
| 10 | Q    Participating in arbitrations under the | 02:19:57 |
| 11 | protocol? | 02:20:00 |
| 12 | A    Well, employment arbitrations.  Doing | 02:20:00 |
| 13 | employment arbitrations.  The employment | 02:20:01 |
| 14 | arbitrations are arbitrations.  They are | 02:20:04 |
| 15 | employment arbitrations.  We've been doing | 02:20:07 |
| 16 | employment arbitrations for a long time.  We have | 02:20:10 |
| 17 | rules. | 02:20:12 |
| 18 | And I'm sorry, so can you repeat the | 02:20:12 |
| 19 | question? | 02:20:16 |
| 20 | Q    Sure. | 02:20:17 |
| 21 | As of today, how many of your neutrals | 02:20:17 |
| 22 | have expressed an interest in serving as a neutral | 02:20:21 |
| 23 | under the employment mass claims protocol? | 02:20:28 |
| 24 | MS. LUNETTA:  Objection to form. | 02:20:38 |
| 25 | A    So I believe, as of now, 120-plus have | 02:20:39 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    149

| | | |
|---|---|---|
| 1 | expressed interest in doing employment | 02:20:43 |
| 2 | arbitrations under a mass claims situation. | 02:20:45 |
| 3 |     Q    Okay. | 02:20:48 |
| 4 |          So the 120 that you speak of are aware | 02:20:48 |
| 5 | of the existence and the content of the mass | 02:20:52 |
| 6 | employment protocol; is that right? | 02:21:01 |
| 7 |     A    I haven't spoken to the 120.  The mass | 02:21:04 |
| 8 | claims protocol we have published, it's out there. | 02:21:07 |
| 9 | We disseminated it. | 02:21:11 |
| 10 |     Q    So you have 120-plus neutrals that will | 02:21:15 |
| 11 | do employment claims, that's your understanding? | 02:21:18 |
| 12 |     A    Currently. | 02:21:21 |
| 13 |          MS. LUNETTA:  Objection to form. | 02:21:23 |
| 14 |     A    And we expect the list will continue to | 02:21:27 |
| 15 | grow. | 02:21:30 |
| 16 |     Q    In this e-mail you write, "Gibson does | 02:21:36 |
| 17 | not think plaintiffs will actually pursue that | 02:21:38 |
| 18 | many claims." | 02:21:42 |
| 19 |          Do you see that? | 02:21:43 |
| 20 |          What's the basis for that statement? | 02:21:44 |
| 21 |     A    I think I had it in my note. | 02:21:46 |
| 22 |     Q    It's just what Gibson told you? | 02:21:48 |
| 23 |     A    Yeah. | 02:21:50 |
| 24 |     Q    Did you do any independent research on | 02:21:55 |
| 25 | whether or not claims were going forward in AAA | 02:21:57 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    150

| | |
|---|---|
| 1 | and how many? | 02:22:01 |
| 2 |     A    Somewhere along the line here I've | 02:22:05 |
| 3 | learned that not many claims are going forward. | 02:22:07 |
| 4 | That even in the 250, that -- where payments were | 02:22:12 |
| 5 | made, many of those haven't proceeded.  So | 02:22:17 |
| 6 | somewhere along the line, I've learned that -- I | 02:22:21 |
| 7 | don't remember specifically when I learned that, | 02:22:23 |
| 8 | and I'm talking about the 250 -- I think I | 02:22:24 |
| 9 | referenced in a note, 250 have been paid for, and | 02:22:30 |
| 10 | that still many of those haven't proceeded.  So I | 02:22:33 |
| 11 | don't know when I became familiar with that | 02:22:39 |
| 12 | information. | 02:22:42 |
| 13 |     Q    Do you know who told you that? | 02:22:43 |
| 14 |     A    I could have read it.  I'm sorry, I | 02:22:44 |
| 15 | don't recall. | 02:22:47 |
| 16 |         It was in a time frame -- I saw this | 02:22:50 |
| 17 | somewhere.  There was a time frame of 250 were | 02:22:53 |
| 18 | paid, months have passed.  I'm sure you know this | 02:22:56 |
| 19 | better than I, but -- | 02:23:02 |
| 20 |     Q    You mentioned a moment ago that you | 02:23:15 |
| 21 | believe that you'll have more neutrals interested | 02:23:19 |
| 22 | in doing employment claims than you currently have | 02:23:25 |
| 23 | now. | 02:23:29 |
| 24 |         I believe you said "and growing"; is | 02:23:29 |
| 25 | that right? | 02:23:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    151

| | | |
|---|---|---|
| 1 | A      That is really our intention. | 02:23:32 |
| 2 | Q      And why do you want to add to the list | 02:23:34 |
| 3 | of neutrals that are willing to do employment | 02:23:36 |
| 4 | claims for CPR? | 02:23:40 |
| 5 | A      We're going to need a lot of | 02:23:43 |
| 6 | arbitrators. | 02:23:45 |
| 7 | Q      I'm sorry, I didn't hear you. | 02:23:47 |
| 8 | A      We're going to need a lot of | 02:23:48 |
| 9 | arbitrators. | 02:23:50 |
| 10 | Q      How many arbitrators do you think | 02:23:51 |
| 11 | you're going to need? | 02:23:53 |
| 12 | A      I don't know. | 02:23:54 |
| 13 | Q      More than you have got now? | 02:23:55 |
| 14 | A      Potentially.  I mean, I think we'll | 02:23:57 |
| 15 | have to see circumstances as they arise, but I | 02:24:01 |
| 16 | would like to be prepared with more arbitrators. | 02:24:04 |
| 17 | Q      Do you have a goal of the number of | 02:24:08 |
| 18 | neutrals that you would like to have? | 02:24:10 |
| 19 | A      I don't have a specific goal.  When I | 02:24:13 |
| 20 | set a goal, I think I would like to grow it. | 02:24:18 |
| 21 | Q      Are you concerned with having more | 02:24:27 |
| 22 | neutrals than you can keep busy? | 02:24:29 |
| 23 | A      I'm concerned with having enough | 02:24:35 |
| 24 | neutrals that we can move matters forward | 02:24:37 |
| 25 | expeditiously.  That is what we want to do.  And | 02:24:41 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    152

| | | |
|---|---|---|
| 1 | the faster we can move forward the matters | 02:24:43 |
| 2 | expeditiously, the faster we will bring resolution | 02:24:46 |
| 3 | and the faster we will bring funding into our | 02:24:50 |
| 4 | organization. | 02:24:54 |
| 5 | Q    I'm going to hand you a document that's | 02:25:13 |
| 6 | been marked Exhibit 11.  It's Bates -- | 02:25:15 |
| 7 | A    So are we done with these? | 02:25:18 |
| 8 | Q    You can set them aside.  I'm trying to | 02:25:19 |
| 9 | move forward chronologically. | 02:25:22 |
| 10 | A    Let me put this back. | 02:25:24 |
| 11 | Q    It's marked Exhibit 11.  It's Bates | 02:25:26 |
| 12 | number 87.  Sorry, I didn't give it all to you. | 02:25:29 |
| 13 | (Waxman Exhibit 11 marked for | 02:25:50 |
| 14 | identification and attached to the transcript.) | 02:25:50 |
| 15 | Q    So this is an e-mail from you to | 02:25:52 |
| 16 | Mr. Sabatino and Mr. Kiernan, copying Ms. | 02:25:55 |
| 17 | Erickson. | 02:26:01 |
| 18 | MS. LUNETTA:  87 to 90? | 02:26:06 |
| 19 | MR. ZIGLER:  It's 87 to 90. | 02:26:08 |
| 20 | MS. LUNETTA:  Thanks.  Sorry. | 02:26:14 |
| 21 | MR. ZIGLER:  That's all right. | 02:26:14 |
| 22 | BY MR. ZIGLER: | 02:26:14 |
| 23 | Q    Is that correct? | 02:26:18 |
| 24 | A    I'm sorry, can you ask that again? | 02:26:19 |
| 25 | Q    Is this Bates number 87 to 90? | 02:26:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                     153

| | | | |
|---|---|---|---|
| 1 | A | It is. | 02:26:23 |
| 2 | Q | Okay. | 02:26:24 |
| 3 | | And this is an e-mail from you to | 02:26:24 |
| 4 | Mr. Sabatino and Mr. Kiernan, copying Ms. | | 02:26:26 |
| 5 | Erickson? | | 02:26:30 |
| 6 | A | On October 2nd. | 02:26:32 |
| 7 | Q | And the subject is "Re: DRS". | 02:26:33 |
| 8 | | Do you see that? | 02:26:36 |
| 9 | A | Yes. | 02:26:37 |
| 10 | Q | What does DRS stand for? | 02:26:37 |
| 11 | A | Dispute resolution services. | 02:26:40 |
| 12 | Q | Okay. | 02:26:46 |
| 13 | | Is there a draft of the mass employment | 02:26:48 |
| 14 | protocol to this e-mail? | | 02:26:52 |
| 15 | A | There is.  At this time, this went | 02:26:55 |
| 16 | through various nomenclatures.  It was called the | | 02:26:59 |
| 17 | multi-claims protocol draft, 10-2-19. | | 02:27:03 |
| 18 | Q | Okay. | 02:27:06 |
| 19 | | And is that the first draft of the | 02:27:06 |
| 20 | protocol? | | 02:27:08 |
| 21 | A | I don't recall.  We have a lot of | 02:27:12 |
| 22 | drafts of the protocol. | | 02:27:14 |
| 23 | Q | Okay. | 02:27:15 |
| 24 | | Do you know of the existence of a draft | 02:27:15 |
| 25 | prior to this one? | | 02:27:18 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              154

| | | |
|---|---|---|
| 1 | A    I was doing most of the drafting, so I | 02:27:21 |
| 2 | probably would have known of the existence, but I | 02:27:24 |
| 3 | don't -- I'm not sitting here today with a | 02:27:28 |
| 4 | specific memory there was something prior to this. | 02:27:31 |
| 5 | Q    Okay.  Let's talk about the drafting of | 02:27:33 |
| 6 | that. | 02:27:35 |
| 7 | Did you start from a blank sheet? | 02:27:35 |
| 8 | A    Pretty much. | 02:27:38 |
| 9 | Q    Okay. | 02:27:39 |
| 10 | What did you have besides the blank | 02:27:39 |
| 11 | sheet? | 02:27:42 |
| 12 | A    I had some guidance on the fact that in | 02:27:51 |
| 13 | the mass claim situations, various things had been | 02:28:00 |
| 14 | tried.  I recall test cases was amongst those, and | 02:28:06 |
| 15 | that got me thinking about my own experience with | 02:28:11 |
| 16 | bellwether test cases in the mass tort context. | 02:28:14 |
| 17 | And from there, I drafted. | 02:28:20 |
| 18 | Q    Did you pull up any old pleadings or | 02:28:23 |
| 19 | memos that you had done before? | 02:28:26 |
| 20 | A    I don't believe so. | 02:28:31 |
| 21 | Q    Did you use your notes with your | 02:28:36 |
| 22 | call -- from your call with Gibson Dunn? | 02:28:38 |
| 23 | A    I don't think so. | 02:28:44 |
| 24 | Q    Did you sit down to draft that with | 02:28:48 |
| 25 | your conversations with Gibson Dunn in mind? | 02:28:50 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    155

| | |
|---|---|
| 1 | A    Well, in the general sense, that there | 02:28:56 |
| 2 | was an opportunity for doing something different | 02:28:58 |
| 3 | here, but there was sort of no guidance from them. | 02:29:02 |
| 4 | This was something that I developed with Ms. | 02:29:06 |
| 5 | Erickson.  And so that's pretty much how the | 02:29:12 |
| 6 | drafting worked. | 02:29:18 |
| 7 | Q    You write in your e-mail that you and | 02:29:26 |
| 8 | Helena had been working back and forth on a draft | 02:29:28 |
| 9 | protocol. | 02:29:32 |
| 10 | Do you see that? | 02:29:33 |
| 11 | A    Yes. | 02:29:34 |
| 12 | Q    Okay. | 02:29:36 |
| 13 | What role had Helena had on the draft | 02:29:36 |
| 14 | protocol at this point? | 02:29:39 |
| 15 | A    That suggests to me there probably was | 02:29:41 |
| 16 | prior drafts.  Thank you.  It was very active. | 02:29:43 |
| 17 | You know, she had been -- Helena had been with CPR | 02:29:46 |
| 18 | 15 years, had been doing arbitrations much of her | 02:29:53 |
| 19 | career, so subject matter expert.  And it was just | 02:29:56 |
| 20 | lots of communications going back and forth | 02:30:01 |
| 21 | between us. | 02:30:04 |
| 22 | Q    Okay. | 02:30:07 |
| 23 | Do you believe that those were by | 02:30:08 |
| 24 | e-mail? | 02:30:09 |
| 25 | A    Could have been some, some by telephone | 02:30:14 |

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Allen Waxman
Conducted on December 27, 2019                    156

| | | |
|---|---|---|
| 1 | call. | 02:30:17 |
| 2 | Q    Do you know how else you could have | 02:30:18 |
| 3 | exchanged drafts with Ms. Erickson? | 02:30:20 |
| 4 | A    Oh, the exchanging of drafts would have | 02:30:25 |
| 5 | been by e-mail communications.  Might have been by | 02:30:26 |
| 6 | e-mail or telephone call. | 02:30:29 |
| 7 | Q    Besides Ms. Erickson, did you send the | 02:30:38 |
| 8 | draft protocol to anyone else before sending it to | 02:30:43 |
| 9 | Mr. Sabatino and Mr. Kiernan? | 02:30:47 |
| 10 | MS. LUNETTA:  Objection to the scope. | 02:30:51 |
| 11 | Goes beyond the deposition unless it was Gibson | 02:30:52 |
| 12 | Dunn, DoorDash or someone referring to | 02:30:55 |
| 13 | communications with DoorDash or Gibson Dunn. | 02:30:58 |
| 14 | A    I don't believe we sent anything to | 02:31:02 |
| 15 | Gibson Dunn.  In fact, I'm pretty sure this | 02:31:04 |
| 16 | communication occurred before we sent anything to | 02:31:07 |
| 17 | Gibson Dunn.  That was one of the purposes of the | 02:31:10 |
| 18 | communication. | 02:31:13 |
| 19 | Q    All right. | 02:31:14 |
| 20 | Did you send it to anyone else other | 02:31:15 |
| 21 | than Mrs. Erickson -- sorry, Ms. Erickson before | 02:31:18 |
| 22 | sending it to Mr. Sabatino and Mr. Kiernan? | 02:31:22 |
| 23 | MS. LUNETTA:  Again, same objection. | 02:31:28 |
| 24 | You can answer as to Gibson Dunn, DoorDash or | 02:31:30 |
| 25 | between you, referring to them, but anything | 02:31:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    157

| | | |
|---|---|---|
| 1 | beyond that is beyond the scope, and I'll instruct | 02:31:37 |
| 2 | you not to answer. | 02:31:39 |
| 3 | Q    Are you going to follow her advice? | 02:31:41 |
| 4 | A    Yeah.  In light of that -- the | 02:31:42 |
| 5 | communication with Gibson Dunn postdated this. | 02:31:43 |
| 6 | Q    Did you have a call with Mr. Sabatino | 02:32:08 |
| 7 | and Mr. Kiernan the next day? | 02:32:11 |
| 8 | A    Is there a document? | 02:32:19 |
| 9 | I don't remember the date of it. | 02:32:20 |
| 10 | Q    I'll flip the page. | 02:32:22 |
| 11 | A    It says, "I'm looking forward to our | 02:32:23 |
| 12 | call tomorrow." | 02:32:26 |
| 13 | I assume we had a call the next day. | 02:32:27 |
| 14 | Q    Do you know who was on the call? | 02:32:29 |
| 15 | A    I believe Mr. Sabatino, Mr. Kiernan, | 02:32:33 |
| 16 | Ms. Erickson and myself. | 02:32:35 |
| 17 | Q    Okay. | 02:32:37 |
| 18 | Do you recall what was discussed? | 02:32:37 |
| 19 | A    The protocol. | 02:32:39 |
| 20 | Q    Did anybody take notes of the contents | 02:32:41 |
| 21 | of the call? | 02:32:43 |
| 22 | A    I don't recall. | 02:32:44 |
| 23 | Q    Was anybody else on the call other than | 02:32:48 |
| 24 | Mr. Sabatino, Mr. Kiernan, Ms. Erickson and | 02:32:50 |
| 25 | yourself? | 02:32:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    158

| | | |
|---|---|---|
| 1 | A    No. | 02:32:54 |
| 2 | Q    Do you recall how long the call lasted? | 02:32:58 |
| 3 | A    I don't. | 02:33:01 |
| 4 | MR. ZIGLER:  All right. | 02:33:02 |
| 5 | We're going to take a break for a | 02:33:02 |
| 6 | minute. | 02:33:03 |
| 7 | MS. LUNETTA:  Okay. | 02:33:04 |
| 8 | THE VIDEOGRAPHER:  We're going off the | 02:33:06 |
| 9 | record.  The time is 2:33 p.m. | 02:33:07 |
| 10 | (A recess was taken.) | 02:33:09 |
| 11 | THE VIDEOGRAPHER:  We are going back on | 02:43:27 |
| 12 | the record.  The time is 2:43 p.m. | 02:43:29 |
| 13 | MR. ZIGLER:  All right.  Just before we | 02:43:35 |
| 14 | move on, I asked Mr. Waxman about others that he | 02:43:36 |
| 15 | would have shown the -- that he did show the | 02:43:42 |
| 16 | protocol to before Mr. Kiernan and Mr. Sabatino. | 02:43:45 |
| 17 | You objected as outside the scope.  I hear your | 02:43:51 |
| 18 | objection.  But we believe that this would | 02:43:54 |
| 19 | identify additional witnesses to the creation of | 02:43:57 |
| 20 | the protocol, which we believe is in the scope of | 02:44:00 |
| 21 | Judge Alsup's order, and I would like you to take | 02:44:04 |
| 22 | a look at the transcript and reconsider that.  We | 02:44:08 |
| 23 | can come back to it if necessary, just in order | 02:44:11 |
| 24 | not to waste time. | 02:44:13 |
| 25 | MS. LUNETTA:  I think my objection | 02:44:16 |

| | | |
|---|---|---|
| 1 | stands because I don't think that he is interested | 02:44:17 |
| 2 | at all in what other people's involvement was. | 02:44:20 |
| 3 | What he is interested in, and I think there is no | 02:44:24 |
| 4 | basis under Ninth Circuit law, but what the judge | 02:44:26 |
| 5 | allowed is for you to explore Gibson Dunn and | 02:44:29 |
| 6 | DoorDash's involvement in developing the protocol. | 02:44:33 |
| 7 | I think involvement by anybody else is not | 02:44:35 |
| 8 | relevant and not within the scope.  I'm happy to | 02:44:37 |
| 9 | call the Court and move for a Protective Order if | 02:44:39 |
| 10 | you want to do that.  But as it stands, the way I | 02:44:43 |
| 11 | read the order, it was limited in that way. | 02:44:44 |
| 12 | MR. ZIGLER:  Okay.  Well, I will move | 02:44:47 |
| 13 | on and reserve my rights to revisit that later. | 02:44:49 |
| 14 | MS. LUNETTA:  Okay. | 02:44:55 |
| 15 | BY MR. ZIGLER: | 02:44:55 |
| 16 | Q    Mr. Waxman, if you would pull out | 02:44:57 |
| 17 | Exhibit 5, which is Ms. Erickson's handwritten | 02:44:59 |
| 18 | notes.  The notes cover multiple days. | 02:45:04 |
| 19 | A    I understand. | 02:45:15 |
| 20 | MS. LUNETTA:  Got it. | 02:45:15 |
| 21 | A    What page are you on? | 02:45:15 |
| 22 | Q    I'm on 496.  The notation in the | 02:45:17 |
| 23 | left-hand margin says 10/3. | 02:45:19 |
| 24 | A    Okay. | 02:45:25 |
| 25 | Q    Do you see that? | 02:45:27 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    160

| | | | |
|---|---|---|---|
| 1 | A    Yes.  And this causes me to respond | 02:45:29 |
| 2 | back to a question you asked me before, were there | 02:45:31 |
| 3 | notes taken.  This looks like a note taken from | 02:45:34 |
| 4 | the 10/3 call. | 02:45:36 |
| 5 | Q    Voluminous notes taken from the 10/3 | 02:45:39 |
| 6 | call.  I see it saying, "worth pitching" and | 02:45:43 |
| 7 | "check with Jay Waks." | 02:45:46 |
| 8 | A    Waks. | 02:45:50 |
| 9 | Q    Waks? | 02:45:51 |
| 10 | A    W-A-K-S. | 02:45:51 |
| 11 | Q    Who is Jay Waks? | 02:45:53 |
| 12 | A    Another board member. | 02:45:55 |
| 13 | Q    Why did someone think that Mr. Waks | 02:45:58 |
| 14 | needed to be consulted? | 02:46:04 |
| 15 | A    That wasn't my idea, so I'm not totally | 02:46:13 |
| 16 | sure, but Mr. Waks has substantial experience in | 02:46:18 |
| 17 | employment law, so that may be why. | 02:46:21 |
| 18 | Q    Did you follow up with Mr. Waks? | 02:46:25 |
| 19 | A    We did follow up with Mr. Waks. | 02:46:32 |
| 20 | Q    Did you follow up with Mr. Waks? | 02:46:35 |
| 21 | A    I did follow up with Mr. Waks. | 02:46:38 |
| 22 | Q    Okay. | 02:46:41 |
| 23 |      When did you follow up with Mr. Waks? | 02:46:41 |
| 24 | A    Sometime in this time frame. | 02:46:48 |
| 25 | Q    And what did you ask Mr. Waks? | 02:46:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    161

| # | | Time |
|---|---|---|
| 1 | MS. LUNETTA:  Objection.  Beyond the | 02:46:52 |
| 2 | scope, unless it relates to Gibson Dunn or | 02:46:53 |
| 3 | DoorDash and the development of the protocol and | 02:46:57 |
| 4 | their involvement in it.  If it's within that | 02:47:00 |
| 5 | scope, you can answer; otherwise, I'm going to | 02:47:03 |
| 6 | direct you not to answer. | 02:47:06 |
| 7 | A    It had nothing to do with our | 02:47:07 |
| 8 | communications with Gibson Dunn, DoorDash and | 02:47:09 |
| 9 | their communications on the development of the | 02:47:13 |
| 10 | protocol. | 02:47:15 |
| 11 | Q    Did it have anything to do with the | 02:47:16 |
| 12 | development of the protocol? | 02:47:18 |
| 13 | A    It was about the protocol. | 02:47:21 |
| 14 | Q    Okay. | 02:47:25 |
| 15 | So you talked to Mr. Waks about the | 02:47:25 |
| 16 | protocol sometime subsequent to your 10/3 call | 02:47:27 |
| 17 | with Helena, Mr. Kiernan and Mr. Sabatino? | 02:47:31 |
| 18 | A    Correct. | 02:47:38 |
| 19 | Q    And you're going to follow your | 02:47:41 |
| 20 | lawyer's instruction not to tell me what you and | 02:47:43 |
| 21 | Mr. Waks spoke about; is that right? | 02:47:46 |
| 22 | MS. LUNETTA:  Are you following my | 02:47:51 |
| 23 | instruction? | 02:47:53 |
| 24 | THE WITNESS:  I'm following your | 02:47:53 |
| 25 | instruction. | 02:47:55 |

Transcript of Allen Waxman
Conducted on December 27, 2019                   162

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  Yeah.  Okay. | 02:47:55 |
| 2 | BY MR. ZIGLER: | 02:47:55 |
| 3 | Q    Did you take any particular actions | 02:48:01 |
| 4 | with respect to the protocol following this 10/3 | 02:48:03 |
| 5 | call with Mr. Kiernan and Mr. Sabatino? | 02:48:07 |
| 6 | MS. LUNETTA:  Objection to the form. | 02:48:12 |
| 7 | A    We kept developing the protocol. | 02:48:14 |
| 8 | Q    You can set that aside for now. | 02:48:30 |
| 9 | A    Which am I setting aside? | 02:48:39 |
| 10 | Q    Everything for the moment. | 02:48:41 |
| 11 | I'm going to hand you a document that's | 02:48:44 |
| 12 | been marked Exhibit 12. | 02:48:46 |
| 13 | (Waxman Exhibit 12 marked for | 02:48:47 |
| 14 | identification and attached to the transcript.) | 02:48:47 |
| 15 | Q    It is Bates 107.  Take a look at that | 02:48:47 |
| 16 | for a second. | 02:48:51 |
| 17 | A    Okay. | 02:49:21 |
| 18 | Q    You see this is an e-mail from you to | 02:49:24 |
| 19 | Mike Holecek; is that right? | 02:49:27 |
| 20 | A    Correct. | 02:49:29 |
| 21 | Q    I see that you're listed as a BCC on | 02:49:30 |
| 22 | this e-mail; is that right? | 02:49:34 |
| 23 | A    Correct. | 02:49:36 |
| 24 | Q    Is it your practice to BCC yourself | 02:49:37 |
| 25 | e-mails? | 02:49:40 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                   163

| | | | |
|---|---|---|---|
| 1 | A | Very often. | 02:49:41 |
| 2 | Q | And why would you BCC an e-mail to | 02:49:42 |
| 3 | yourself? | | 02:49:44 |
| 4 | A | To keep a record of it. | 02:49:45 |
| 5 | Q | Would you do that in documents that you | 02:49:48 |
| 6 | think are important? | | 02:49:50 |
| 7 | | MS. LUNETTA:  Objection to form. | 02:49:55 |
| 8 | A | I do that often. | 02:49:55 |
| 9 | Q | What makes you decide to BCC an e-mail | 02:49:58 |
| 10 | to yourself as opposed to when you don't BCC an | | 02:50:00 |
| 11 | e-mail to yourself? | | 02:50:04 |
| 12 | A | If I want a reminder of something.  If | 02:50:06 |
| 13 | I want to be able to follow up on something.  If I | | 02:50:09 |
| 14 | want to be able to go back to something, I BCC | | 02:50:12 |
| 15 | myself. | | 02:50:15 |
| 16 | Q | What's the date of this e-mail? | 02:50:18 |
| 17 | A | October 6th, 7:55 p.m. and 31 seconds. | 02:50:23 |
| 18 | Q | All right. | 02:50:29 |
| 19 | | So can you tell me what it is that you | 02:50:30 |
| 20 | did with respect to the protocol between your | | 02:50:32 |
| 21 | conversation with Mr. Sabatino and Mr. Kiernan on | | 02:50:35 |
| 22 | October 3rd and sending this e-mail to Mr. Holecek | | 02:50:40 |
| 23 | on October 6th? | | 02:50:44 |
| 24 | A | Can I see the attachment? | 02:50:46 |
| 25 | Q | Sorry, I didn't mean to withhold | 02:50:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    164

| | | |
|---|---|---|
| 1 | anything from you. | 02:50:53 |
| 2 | So I'm handing you Bates 108 through | 02:50:54 |
| 3 | 109. | 02:50:58 |
| 4 | A    You know, you have the two documents | 02:51:17 |
| 5 | here, the one we sent to Mr. Sabatino and | 02:51:20 |
| 6 | Mr. Kiernan and the one I'm forwarding to | 02:51:23 |
| 7 | Mr. Holecek here.  And we could go look through it | 02:51:26 |
| 8 | and see changes that were made between the two. | 02:51:30 |
| 9 | Q    Were the changes that were made between | 02:51:34 |
| 10 | the two the results of conversations you had with | 02:51:36 |
| 11 | Mr. Sabatino and Mr. Kiernan? | 02:51:38 |
| 12 | A    Could have been, could have been with | 02:51:40 |
| 13 | others.  Could have been work that I do with Ms. | 02:51:42 |
| 14 | Erickson, could have been work I did on my own. | 02:51:45 |
| 15 | Q    What others? | 02:51:48 |
| 16 | MS. LUNETTA:  Objection.  Again, if it | 02:51:50 |
| 17 | is not related to conversations with DoorDash or | 02:51:52 |
| 18 | Gibson Dunn or conversations internally about | 02:51:57 |
| 19 | those conversations, it's outside the scope.  And | 02:52:01 |
| 20 | I'm going to direct him not to answer. | 02:52:03 |
| 21 | A    By the way, I'm listing possibilities | 02:52:05 |
| 22 | for you.  I think the best source to look at to | 02:52:08 |
| 23 | see is, you have here the protocols, you have here | 02:52:11 |
| 24 | the drafts.  So you have the draft that was sent | 02:52:14 |
| 25 | on October 2nd and a draft that was sent on | 02:52:18 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                      165

| | | |
|---|---|---|
| 1 | October 6th. | 02:52:20 |
| 2 | Q    Right. | 02:52:21 |
| 3 | A    And we were actively working on this. | 02:52:21 |
| 4 | Q    Right. | 02:52:24 |
| 5 | And I'm trying to understand whose | 02:52:24 |
| 6 | input was accepted into the development of the | 02:52:26 |
| 7 | draft.  And I'm asking the author of the drafts | 02:52:29 |
| 8 | today at the deposition, who had input that was | 02:52:33 |
| 9 | accepted, and that's what I'm trying to | 02:52:36 |
| 10 | understand. | 02:52:38 |
| 11 | A    Well, I think relevant to -- if I'm | 02:52:39 |
| 12 | understanding my counsel's position, what happened | 02:52:42 |
| 13 | in the court hearing, I can tell you definitively | 02:52:44 |
| 14 | that there was no input from Gibson Dunn or | 02:52:47 |
| 15 | DoorDash between the protocol sent on October 2nd | 02:52:50 |
| 16 | and the protocol sent on October 6th. | 02:52:54 |
| 17 | Q    And you can also tell me with certainty | 02:52:58 |
| 18 | there was no input from anyone representing | 02:52:59 |
| 19 | DoorDash drivers and misclassification claims as | 02:53:03 |
| 20 | well? | 02:53:07 |
| 21 | A    I'm sorry, I'm not following your | 02:53:13 |
| 22 | question. | 02:53:14 |
| 23 | Q    You testified earlier that, to the best | 02:53:15 |
| 24 | of your knowledge, you did not speak to any | 02:53:17 |
| 25 | counsel representing DoorDash drivers in | 02:53:19 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    166

| | | |
|---|---|---|
| 1 | misclassification claims. | 02:53:21 |
| 2 | Do you remember that? | 02:53:22 |
| 3 | A    Correct. | 02:53:24 |
| 4 | Q    Okay. | 02:53:25 |
| 5 | So since you have not talked to any | 02:53:26 |
| 6 | counsel representing DoorDash drivers in | 02:53:28 |
| 7 | misclassification cases, you also know that no | 02:53:29 |
| 8 | input from counsel representing DoorDash drivers | 02:53:33 |
| 9 | in misclassification claims was implemented in | 02:53:36 |
| 10 | that draft either, right? | 02:53:41 |
| 11 | A    We had, to my knowledge, no | 02:53:44 |
| 12 | conversation with counsel representing DoorDash | 02:53:46 |
| 13 | drivers. | 02:53:49 |
| 14 | Q    Right. | 02:53:49 |
| 15 | So no suggestions or edits that they | 02:53:50 |
| 16 | might have offered are reflected in that document, | 02:53:52 |
| 17 | correct? | 02:53:55 |
| 18 | A    I was referring to the issue, as I | 02:53:56 |
| 19 | understand it, at hand, which is the | 02:53:57 |
| 20 | communications with Gibson Dunn and DoorDash | 02:53:59 |
| 21 | relating to the development of the protocol. | 02:54:03 |
| 22 | Q    Did you send this draft of the protocol | 02:54:22 |
| 23 | to anybody else besides Mr. Holecek? | 02:54:24 |
| 24 | MS. LUNETTA:  Ever? | 02:54:28 |
| 25 | MR. ZIGLER:  Yeah. | 02:54:32 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    167

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  This particular draft? | 02:54:33 |
| 2 | MR. ZIGLER:  Yeah. | 02:54:35 |
| 3 | THE WITNESS:  I don't recall. | 02:54:37 |
| 4 | BY MR. ZIGLER: | 02:54:37 |
| 5 | Q    You see at the top of this e-mail, you | 02:54:41 |
| 6 | say that you hope that Mr. Holecek's trial went | 02:54:43 |
| 7 | okay. | 02:54:46 |
| 8 | Do you see that? | 02:54:47 |
| 9 | A    I do. | 02:54:47 |
| 10 | Q    Is that a potential trial that he had, | 02:54:48 |
| 11 | a topic of your conversation, over the course of | 02:54:49 |
| 12 | this time? | 02:54:52 |
| 13 | A    I seem to have heard he was in trial, | 02:54:57 |
| 14 | which affected our scheduling of a call. | 02:54:59 |
| 15 | Q    Okay. | 02:55:02 |
| 16 | You say here, "We think we may be | 02:55:02 |
| 17 | helpful." | 02:55:05 |
| 18 | Can you tell me what you meant by that? | 02:55:05 |
| 19 | MS. LUNETTA:  "We think we can be | 02:55:07 |
| 20 | helpful." | 02:55:10 |
| 21 | A    We thought that we had something that | 02:55:12 |
| 22 | could provide value in handling mass claims. | 02:55:15 |
| 23 | Q    Valuable to whom? | 02:55:22 |
| 24 | A    All parties involved. | 02:55:23 |
| 25 | I note, "We believe we have identified | 02:55:41 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    168

| | | |
|---|---|---|
| 1 | an innovative solution that makes arbitration work | 02:55:44 |
| 2 | for all involved in a fair and efficient matter. | 02:55:48 |
| 3 | Attached is our first draft of the protocol.  We | 02:55:52 |
| 4 | think it enables the parties, in good faith, to | 02:55:55 |
| 5 | try and resolve their disputes in an efficient | 02:55:58 |
| 6 | fashion by using test arbitration cases and | 02:56:01 |
| 7 | mediation.  If this fails, the parties can then | 02:56:03 |
| 8 | opt out or proceed with the remaining | 02:56:03 |
| 9 | arbitrations.  We, at CPR, believe this provides a | 02:56:08 |
| 10 | fair alternative and preferrable alternative to | 02:56:11 |
| 11 | litigation." | 02:56:14 |
| 12 |     Q    Do you know what are the next steps you | 02:56:16 |
| 13 | took with respect to the protocol following | 02:56:18 |
| 14 | sending this draft to Mr. Holecek? | 02:56:22 |
| 15 |     A    I don't precisely -- I don't recall our | 02:56:28 |
| 16 | precise next steps. | 02:56:31 |
| 17 |     Q    I'm going to hand you a document that's | 02:56:33 |
| 18 | been marked Exhibit 13.  It's Bates 122. | 02:56:35 |
| 19 |     A    So we're moving on from these? | 02:56:48 |
| 20 |     Q    Yes. | 02:56:51 |
| 21 |         (Waxman Exhibit 13 marked for | 02:56:51 |
| 22 | identification and attached to the transcript.) | 02:56:51 |
| 23 |     Q    122 looks to me to be an invite from | 02:56:54 |
| 24 | Mr. Holecek to you, Ms. Erickson and Gregg Farano. | 02:56:56 |
| 25 |     A    Farano. | 02:57:05 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    169

| | | | |
|---|---|---|---|
| 1 | Q | Is that how you pronounce his name? | 02:57:06 |
| 2 | A | I think so. | 02:57:08 |
| 3 | Q | And Joshua Lipshutz. | 02:57:09 |
| 4 | | Is that an accurate representation of | 02:57:17 |
| 5 | | Exhibit 13? | 02:57:20 |
| 6 | A | It looks to be a scheduling note. | 02:57:22 |
| 7 | Q | Did you have a phone call on November | 02:57:28 |
| 8 | | 7th with Mr. Farano, Ms. Erickson and | 02:57:31 |
| 9 | | Mr. Lipshutz? | 02:57:37 |
| 10 | A | I think you meant October 7th. | 02:57:40 |
| 11 | | I know there was a conversation with | 02:57:46 |
| 12 | | Mr. Holecek and Mr. Farano or Farano.  I recall -- | 02:57:50 |
| 13 | | I don't recall ever speaking with Mr. Lipshutz. | 02:57:56 |
| 14 | Q | Who is Mr. Farano? | 02:58:00 |
| 15 | A | My understanding was he was an in-house | 02:58:02 |
| 16 | | counsel at DoorDash. | 02:58:05 |
| 17 | Q | Had you ever spoken to him before 10/7? | 02:58:06 |
| 18 | A | No, I don't believe so. | 02:58:10 |
| 19 | Q | Okay. | 02:58:13 |
| 20 | | Have you spoken to him since that time? | 02:58:13 |
| 21 | A | I may have spoken to him on 10/7. | 02:58:19 |
| 22 | Q | Besides the 10/7 phone call, have you | 02:58:23 |
| 23 | | ever spoken to Mr. Farano? | 02:58:25 |
| 24 | A | There may have been a subsequent phone | 02:58:28 |
| 25 | | call with him.  I don't recall. | 02:58:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          170

| | | |
|---|---|---|
| 1 | Q    Do you know how many conversations you | 02:58:33 |
| 2 | have had with Mr. Farano? | 02:58:35 |
| 3 | A    I seem to think it was more than one, | 02:58:38 |
| 4 | but I think the records will reflect what our | 02:58:41 |
| 5 | conversations were. | 02:58:46 |
| 6 | Q    Was anybody else on the 10/7 call | 02:58:48 |
| 7 | besides Mr. Farano, Ms. Erickson, Mr. Lipshutz and | 02:58:50 |
| 8 | yourself? | 02:58:56 |
| 9 | A    I don't believe so. | 02:58:57 |
| 10 | Q    Was Mr. Holecek on the call? | 02:58:57 |
| 11 | A    I'm sorry, did you not say Mr. Holecek? | 02:59:00 |
| 12 | Q    I didn't. | 02:59:02 |
| 13 | A    I'm sorry.  Mr. Holecek, Mr. Farano, | 02:59:04 |
| 14 | not Mr. Lipshutz, Ms. Erickson and myself. | 02:59:06 |
| 15 | Q    Do you know what Mr. Lipshutz's role | 02:59:12 |
| 16 | was to be included in the invite, but not to be on | 02:59:15 |
| 17 | the call? | 02:59:18 |
| 18 | A    I mean, as a lawyer at Gibson Dunn, I | 02:59:19 |
| 19 | assumed he was working on these matters as well. | 02:59:26 |
| 20 | Q    Have you ever met Mr. Lipshutz? | 02:59:29 |
| 21 | A    I don't believe so. | 02:59:33 |
| 22 | Q    Do you know him by reputation? | 02:59:33 |
| 23 | A    No. | 02:59:35 |
| 24 | Q    Do you know how long this October 7th | 02:59:36 |
| 25 | call was? | 02:59:38 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    171

| | | |
|---|---|---|
| 1 | A    Not independently, no. | 02:59:42 |
| 2 | Q    Do you have any recollection of what | 02:59:44 |
| 3 | was discussed on the call? | 02:59:45 |
| 4 | A    Is it part of Ms. Erickson's notes? | 02:59:52 |
| 5 | Q    I was just about to turn there to see. | 02:59:56 |
| 6 | Independent of her notes to you, do you | 03:00:02 |
| 7 | have any recollection of what was discussed on the | 03:00:04 |
| 8 | call? | 03:00:07 |
| 9 | A    If you'd like, I can give you some | 03:00:09 |
| 10 | recollections, but I can't place them call by | 03:00:12 |
| 11 | call. | 03:00:15 |
| 12 | Q    Okay. | 03:00:15 |
| 13 | We can turn to Ms. Erickson's notes and | 03:00:16 |
| 14 | go through those.  That's fine. | 03:00:18 |
| 15 | So it looks like on page 496 there is a | 03:00:23 |
| 16 | note for 10/7 and then DoorDash. | 03:00:27 |
| 17 | A    Yes. | 03:00:30 |
| 18 | Q    Do you see that? | 03:00:30 |
| 19 | A    So it looks here like he is the head of | 03:00:30 |
| 20 | litigation at DoorDash. | 03:00:33 |
| 21 | Q    Do you mean Mr. Farano? | 03:00:38 |
| 22 | A    Yes.  Yeah, I think you asked me what | 03:00:41 |
| 23 | his role was.  I know he was in-house counsel. | 03:00:44 |
| 24 | But on seeing this, he may have identified himself | 03:00:48 |
| 25 | as that at litigation. | 03:00:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          172

| | | |
|---|---|---|
| 1 | Q    Does Ms. Erickson's notes refresh your | 03:00:53 |
| 2 | recollection of what was discussed on the 10/7 | 03:00:55 |
| 3 | phone call? | 03:00:58 |
| 4 | A    Well, at least here, if not on other | 03:01:01 |
| 5 | occasions, there was discussion over the concern | 03:01:03 |
| 6 | of the opt-out and the ability in California to | 03:01:06 |
| 7 | proceed, at least in California, with a class | 03:01:09 |
| 8 | action since there could not be a collective | 03:01:14 |
| 9 | action waiver separate from arbitration. | 03:01:17 |
| 10 | Q    So it is your understanding that | 03:01:21 |
| 11 | DoorDash was concerned about the provision in the | 03:01:22 |
| 12 | protocol that allowed for an opt-out and the | 03:01:26 |
| 13 | parties to proceed in court because that might | 03:01:30 |
| 14 | expose them to class action litigation? | 03:01:32 |
| 15 | A    Yes.  And I recall that being discussed | 03:01:36 |
| 16 | on more than one occasion, but I see the note | 03:01:41 |
| 17 | here. | 03:01:44 |
| 18 | Q    And being exposed to class action | 03:01:44 |
| 19 | litigation is not what DoorDash wanted; is that | 03:01:46 |
| 20 | correct? | 03:01:49 |
| 21 | MS. LUNETTA:  Objection to form. | 03:01:50 |
| 22 | A    They were expressing concern about this | 03:01:56 |
| 23 | provision.  What they wanted or not wanted, you | 03:01:59 |
| 24 | would have to ask DoorDash, but I would assume | 03:02:01 |
| 25 | that was not something -- that was not a risk they | 03:02:05 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    173

| 1 | wanted to confront. | 03:02:08 |
| 2 |     Q   And you were on the call? | 03:02:09 |
| 3 |     A   I'm just not recalling all of the words | 03:02:11 |
| 4 | that were used.  I recall this was a particular | 03:02:13 |
| 5 | concern and it was a concern that came up more | 03:02:16 |
| 6 | than one time. | 03:02:18 |
| 7 |     Q   Okay. | 03:02:19 |
| 8 |     And it was your sense that they weren't | 03:02:19 |
| 9 | in favor of defending a class action in California | 03:02:22 |
| 10 | against DoorDash drivers. | 03:02:26 |
| 11 |     Is that fair? | 03:02:27 |
| 12 |     A   They were concerned about this | 03:02:30 |
| 13 | provision in the protocol.  Again, one thing we | 03:02:31 |
| 14 | made clear, we were developing this protocol for | 03:02:36 |
| 15 | more than this particular matter.  This was | 03:02:39 |
| 16 | broader.  They were concerned by this provision as | 03:02:43 |
| 17 | it might apply to them and the risk it might | 03:02:46 |
| 18 | create for them as to defending -- didn't go into | 03:02:49 |
| 19 | more than that as I recall. | 03:02:54 |
| 20 |     Q   Let me try and make it a little easier. | 03:02:55 |
| 21 |     They didn't want the opt-out provision | 03:02:58 |
| 22 | in the protocol; is that right? | 03:03:00 |
| 23 |     A   Correct. | 03:03:02 |
| 24 |     Q   And did you give them a reason for why | 03:03:05 |
| 25 | it was in the protocol? | 03:03:10 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    174

| | | |
|---|---|---|
| 1 | A     I recall our thinking was that there | 03:03:23 |
| 2 | were trade-offs to be had in the protocol.  One of | 03:03:25 |
| 3 | the trade-offs was we were going to try to drive | 03:03:30 |
| 4 | to resolution as efficiently and effectively as | 03:03:33 |
| 5 | possible.  There would be a front stay of cases | 03:03:36 |
| 6 | with all rights preserved, but if that didn't work | 03:03:40 |
| 7 | out, that is the resolution didn't work out, then | 03:03:43 |
| 8 | in return for that relative -- that delay in | 03:03:46 |
| 9 | staying cases, then on the back end of that, if | 03:03:50 |
| 10 | that didn't work out, there should be an option | 03:03:53 |
| 11 | for claimants to go to court. | 03:03:56 |
| 12 | Q     And do you recall if Mr. Farano or | 03:03:59 |
| 13 | Mr. Holecek told you that that trade-off was | 03:04:08 |
| 14 | worthwhile to them? | 03:04:13 |
| 15 | A     I don't recall.  I'm recalling for you | 03:04:21 |
| 16 | what our thinking was.  Whether we articulated | 03:04:25 |
| 17 | that to them, we may very well have, number one. | 03:04:28 |
| 18 | Number two, I'm not recalling if they said, okay, | 03:04:31 |
| 19 | that's a fine trade-off.  I do recall they were | 03:04:34 |
| 20 | concerned by that provision and didn't want that | 03:04:37 |
| 21 | provision. | 03:04:40 |
| 22 | Q     Were they concerned at all about the | 03:04:40 |
| 23 | stay of matters pending mediation? | 03:04:43 |
| 24 | A     I don't recall a concern over the stay | 03:04:58 |
| 25 | of matters pending mediation.  I do recall, as I | 03:04:59 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          175

| | | |
|---|---|---|
| 1 | say, there was discussion of fees, there was | 03:05:05 |
| 2 | discussion of how things would be filed under the | 03:05:08 |
| 3 | protocol, the non-administered rules.  And this is | 03:05:11 |
| 4 | an important thing, I think, to keep in mind and | 03:05:15 |
| 5 | not be lost here, our non-administered rules, | 03:05:18 |
| 6 | which long predated the protocol, provided for the | 03:05:23 |
| 7 | handling of arbitrations with no filing fees.  So | 03:05:27 |
| 8 | we were building on top of that construct. | 03:05:29 |
| 9 | There was discussion of how filings | 03:05:33 |
| 10 | would be handled, templates would be handled. | 03:05:35 |
| 11 | There was discussion of arbitrator selection.  And | 03:05:38 |
| 12 | by the way, I'm just recalling for you, I can't | 03:05:40 |
| 13 | say this all occurred on October 7th, arbitrator | 03:05:43 |
| 14 | selection, and our proposal was the claimant | 03:05:47 |
| 15 | should get to select the arbitrators.  After a | 03:05:49 |
| 16 | master list was presented, they could make general | 03:05:53 |
| 17 | objections based on bias.  But after that, it | 03:05:57 |
| 18 | would all be nominations by the claimants, which | 03:06:00 |
| 19 | would make for a more efficient process as we move | 03:06:04 |
| 20 | forward. | 03:06:08 |
| 21 | I recall there was a discussion of how | 03:06:09 |
| 22 | the mediation process would work.  In connection | 03:06:11 |
| 23 | with that, we shortened the time frame.  I think | 03:06:17 |
| 24 | if you look at one of the protocols here, the | 03:06:21 |
| 25 | protocol, for instance, that we provided, it | 03:06:26 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          176

| | | |
|---|---|---|
| 1 | had -- this may be a later point in time.  I | 03:06:31 |
| 2 | recall we were first suggesting the mediations | 03:06:49 |
| 3 | would take -- not mediations, the arbitrations | 03:06:52 |
| 4 | would take six months and then we shortened it to | 03:06:55 |
| 5 | four months.  Just shortened the time frame of the | 03:06:58 |
| 6 | test cases and then shortened that down. | 03:07:04 |
| 7 | Q    I think, actually, it started at 60 | 03:07:06 |
| 8 | days, then went to six months and then went to | 03:07:09 |
| 9 | four months, if you look at it. | 03:07:12 |
| 10 | A    No, I don't think it started at 60 | 03:07:14 |
| 11 | days. | 03:07:18 |
| 12 | Q    Okay. | 03:07:18 |
| 13 | A    Can you show me what you're talking | 03:07:20 |
| 14 | about there? | 03:07:23 |
| 15 | Q    I'd rather not waste the time.  The | 03:07:23 |
| 16 | documents say what the documents say. | 03:07:25 |
| 17 | A    No, no, no, I think this -- because I | 03:07:28 |
| 18 | think, ultimately, what is on the face of the | 03:07:30 |
| 19 | protocol is what's going to really count here.  I | 03:07:32 |
| 20 | don't recall. | 03:07:35 |
| 21 | Where is there a 60-day provision for | 03:07:35 |
| 22 | doing an arbitration? | 03:07:38 |
| 23 | MS. LUNETTA:  What's the Bates number | 03:07:41 |
| 24 | you're looking at? | 03:07:43 |
| 25 | THE WITNESS:  I'm looking at CPR_108, | 03:07:45 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    177

| | | |
|---|---|---|
| 1 | which apparently was the first version. | 03:07:46 |
| 2 | BY MR. ZIGLER: | 03:07:48 |
| 3 | Q    During the call on 10/7, did DoorDash | 03:07:57 |
| 4 | or Gibson Dunn suggest any changes to the protocol | 03:08:02 |
| 5 | other than expressing their concern about the | 03:08:06 |
| 6 | opt-out provision? | 03:08:09 |
| 7 | A    There was a discussion as well of -- | 03:08:16 |
| 8 | what happens if the parties agree they want to | 03:08:19 |
| 9 | handle the matter outside the protocol. | 03:08:21 |
| 10 | Q    Okay. | 03:08:25 |
| 11 | A    And as is generally the case with the | 03:08:26 |
| 12 | way we handle most matters, if the parties agree | 03:08:28 |
| 13 | to something, we're okay abiding by the agreement. | 03:08:32 |
| 14 | Q    Was there any discussion of DoorDash's | 03:08:36 |
| 15 | willingness to resolve the misclassification | 03:08:38 |
| 16 | claims? | 03:08:42 |
| 17 | A    We weren't discussing the merits of | 03:08:42 |
| 18 | particular cases.  So no, there wasn't discussion | 03:08:45 |
| 19 | of misclassification claims or any other claims | 03:08:48 |
| 20 | for that matter. | 03:08:53 |
| 21 | Q    Well, you did discuss the status of | 03:08:54 |
| 22 | those claims with AAA or what frustrations they | 03:08:57 |
| 23 | had with AAA with the misclassification claims, | 03:09:00 |
| 24 | right? | 03:09:04 |
| 25 | MS. LUNETTA:  Objection to form. | 03:09:06 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    178

| | | |
|---|---|---|
| 1 | A    We discussed there was frustration with | 03:09:07 |
| 2 | the way those matters were being handled and they | 03:09:10 |
| 3 | were looking at a different arbitral provider and | 03:09:14 |
| 4 | what options we could present.  We didn't get into | 03:09:14 |
| 5 | merits of cases or whether cases should be settled | 03:09:17 |
| 6 | other than, once the protocol is in place, if the | 03:09:20 |
| 7 | protocol ends up being triggered, and it applies | 03:09:24 |
| 8 | to the DoorDash case, then the mediator would get | 03:09:29 |
| 9 | into that matter. | 03:09:32 |
| 10 | Q    Did you set expectations or next steps | 03:09:34 |
| 11 | on this 10/7 call? | 03:09:38 |
| 12 | A    I don't recall. | 03:10:02 |
| 13 | Is the next communication -- what do | 03:10:02 |
| 14 | you show as the next communication? | 03:10:04 |
| 15 | Q    Well, the next one that I was going to | 03:10:06 |
| 16 | go with was an invite for a call with Mr. Holecek | 03:10:08 |
| 17 | on 10/11. | 03:10:12 |
| 18 | A    Okay. | 03:10:13 |
| 19 | I'm sorry, I don't recall, like, | 03:10:14 |
| 20 | specific next steps. | 03:10:15 |
| 21 | Q    Okay. | 03:10:17 |
| 22 | A    There may very well have been, but we | 03:10:19 |
| 23 | were continuing to work on the protocol. | 03:10:22 |
| 24 | Q    All right. | 03:10:24 |
| 25 | A    Where is that -- | 03:10:25 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    179

| | | |
|---|---|---|
| 1 | Q    Mr. Waxman, I have another question for | 03:10:28 |
| 2 | you. | 03:10:30 |
| 3 | A    Just hang on one second.  I'm sorry. | 03:10:30 |
| 4 | Okay. | 03:10:33 |
| 5 | Q    Do you recall which of DoorDash's and | 03:10:39 |
| 6 | Gibson Dunn's suggestions from the 10/7 call were | 03:10:42 |
| 7 | incorporated into the protocol? | 03:10:46 |
| 8 | A    Well, I know that we ended up putting | 03:10:49 |
| 9 | into the protocol a provision that said if the | 03:10:55 |
| 10 | parties agree to treat something outside the | 03:10:58 |
| 11 | protocol, it will be treated outside the protocol. | 03:11:01 |
| 12 | I don't know, frankly, whether the genesis of that | 03:11:05 |
| 13 | was their suggestion or Ms. Erickson's suggestion. | 03:11:07 |
| 14 | It was discussed, and it was something that we | 03:11:10 |
| 15 | agreed.  That's, generally, the way we handle | 03:11:14 |
| 16 | matters.  If parties agree to something, we'll | 03:11:19 |
| 17 | abide by it. | 03:11:22 |
| 18 | Q    Any other changes that were suggested | 03:11:24 |
| 19 | by DoorDash or Gibson Dunn that were incorporated? | 03:11:26 |
| 20 | A    So maybe let's look at the next draft | 03:11:30 |
| 21 | and I can try to look at the two. | 03:11:33 |
| 22 | Q    Sure. | 03:11:35 |
| 23 | So the documents show that there was an | 03:11:36 |
| 24 | invitation for a call on 10/11, so three days | 03:11:43 |
| 25 | later, at three o'clock. | 03:11:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          180

| 1 | A   Did that call actually happen? | 03:11:55 |
| 2 | Q   I don't know. | 03:12:03 |
| 3 | Do you know? | 03:12:04 |
| 4 | A   I don't see any notes here from the | 03:12:05 |
| 5 | call.  And I -- I mean, there may have been | 03:12:07 |
| 6 | scheduling of calls and then calls being canceled, | 03:12:11 |
| 7 | too, given schedules and so forth. | 03:12:15 |
| 8 | Q   All right. | 03:12:17 |
| 9 | I'm going to hand you document 189 to | 03:12:18 |
| 10 | 192, and this is going to be Exhibit 14. | 03:12:25 |
| 11 | (Waxman Exhibit 14 marked for | 03:12:27 |
| 12 | identification and attached to the transcript.) | 03:12:27 |
| 13 | Q   And that has another draft of the | 03:12:37 |
| 14 | protocol with it. | 03:12:39 |
| 15 | A   Okay. | 03:12:56 |
| 16 | So a few things here, from looking at | 03:13:03 |
| 17 | Exhibit 14, CPR_189, this refreshes me.  And it | 03:13:07 |
| 18 | may have happened on the call on ten -- what were | 03:13:11 |
| 19 | you saying, 10/7? | 03:13:12 |
| 20 | Q   10/7. | 03:13:15 |
| 21 | A   But there was discussion of -- we have | 03:13:17 |
| 22 | an appellate procedure under our arbitration rules | 03:13:20 |
| 23 | where you can actually have a panel to appeal | 03:13:24 |
| 24 | matters.  And one of the things we were thinking | 03:13:30 |
| 25 | about was, should we impose that appellate | 03:13:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          181

| | | |
|---|---|---|
| 1 | procedure for these ten test cases.  Then we | 03:13:36 |
| 2 | ourselves also -- and I believe we talked about | 03:13:39 |
| 3 | that with them, Gibson Dunn and Holecek, as | 03:13:42 |
| 4 | something we were thinking about.  And then we | 03:13:47 |
| 5 | thought that's just going to further delay that | 03:13:50 |
| 6 | front end, we don't need to do that. | 03:13:52 |
| 7 |     Q    Was the appellate procedure CPR's idea | 03:13:55 |
| 8 | or was it something voted by Gibson Dunn or | 03:13:58 |
| 9 | DoorDash? | 03:14:02 |
| 10 |     A    Totally our idea. | 03:14:03 |
| 11 |     And then the other thing that came up | 03:14:04 |
| 12 | was in the mediation context.  What if you mediate | 03:14:06 |
| 13 | the cases and you come up with a set of objective | 03:14:09 |
| 14 | criteria to be able to resolve all of the cases, | 03:14:12 |
| 15 | but what if a threshold -- what if there is a | 03:14:15 |
| 16 | thought of, like, well, we should set a threshold, | 03:14:19 |
| 17 | as in we need to have 80 percent of the cases | 03:14:21 |
| 18 | resolved in order for us to resolve any cases. | 03:14:25 |
| 19 | And how do we build that into the process. | 03:14:28 |
| 20 |     I think this was a question that they | 03:14:30 |
| 21 | raised.  And, ultimately, we said that's something | 03:14:32 |
| 22 | you will have to work out in the mediation.  We're | 03:14:37 |
| 23 | not building that into the protocol.  You have 90 | 03:14:40 |
| 24 | days, work through, come up with the methodology | 03:14:44 |
| 25 | to resolve it.  And then you'll go out and try to | 03:14:47 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    182

| | | |
|---|---|---|
| 1 | settle those cases.  And if you are successful in | 03:14:50 |
| 2 | settling them, you're successful in settling them. | 03:14:54 |
| 3 | If you're not, you're not.  We're not going to | 03:14:55 |
| 4 | hold up the process to see if you get 80 percent, | 03:14:58 |
| 5 | that could take longer.  We're going to start with | 03:15:02 |
| 6 | arbitrations. | 03:15:05 |
| 7 |     Q    Okay. | 03:15:06 |
| 8 |     A    So that's what Exhibit 14 refreshes me | 03:15:11 |
| 9 | on, two issues that were discussed. | 03:15:16 |
| 10 |        Now, if we look at the attachment to | 03:15:19 |
| 11 | Exhibit 14 and compare the protocol sent on | 03:15:21 |
| 12 | October 14th with the protocol sent on October | 03:15:25 |
| 13 | 6th, you'll see a variety of changes here.  I dare | 03:15:25 |
| 14 | say most, if not all, of these changes came from | 03:15:30 |
| 15 | us, not Gibson Dunn, or any suggestions by them. | 03:15:47 |
| 16 |     Q    So these were suggestions that are | 03:15:54 |
| 17 | changes that were generated by you and Ms. | 03:15:56 |
| 18 | Erickson working together to find a protocol? | 03:15:59 |
| 19 |     A    By us working through the process of | 03:16:03 |
| 20 | developing the protocol. | 03:16:05 |
| 21 |     Q    Did you -- | 03:16:07 |
| 22 |     A    I'm still looking for your reference to | 03:16:07 |
| 23 | this 60-day. | 03:16:10 |
| 24 |     Q    Don't bother to address that. | 03:16:14 |
| 25 |     A    Well, I want to address that because | 03:16:16 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    183

| | | |
|---|---|---|
| 1 | you have a suggestion here, we went from 60 days | 03:16:17 |
| 2 | to 180 days to 120 days. | 03:16:19 |
| 3 | MS. LUNETTA:  Are you looking at 190? | 03:16:22 |
| 4 | Is that the number you're looking at? | 03:16:23 |
| 5 | MR. ZIGLER:  We're looking at 189 to | 03:16:24 |
| 6 | 191. | 03:16:27 |
| 7 | THE WITNESS:  Yeah. | 03:16:27 |
| 8 | MS. LUNETTA:  That one has six months. | 03:16:27 |
| 9 | BY MR. ZIGLER: | 03:16:27 |
| 10 | Q    My questions aren't evidence, Mr. | 03:16:31 |
| 11 | Waxman, the documents and your testimony -- | 03:16:34 |
| 12 | A    I know.  But look, I think we're all | 03:16:36 |
| 13 | trying to get to the right answers here.  I'm sure | 03:16:38 |
| 14 | you and us. | 03:16:42 |
| 15 | Q    So did you -- | 03:16:43 |
| 16 | A    Paragraph two? | 03:16:43 |
| 17 | Q    -- work through the changes that are -- | 03:16:44 |
| 18 | A    Oh, here it is.  Paragraph two is: | 03:16:47 |
| 19 | "Provided in the NA rules and unless these matters | 03:16:52 |
| 20 | are resolved in advance" -- | 03:16:55 |
| 21 | MS. LUNETTA:  Slow down. | 03:16:58 |
| 22 | A    -- "arbitrators will render final | 03:16:58 |
| 23 | reasoned awards, an award that sets out the | 03:17:02 |
| 24 | reasoning on which it is based, in these matters, | 03:17:05 |
| 25 | within six months of the initial pre-hearing | 03:17:07 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                      184

| | | |
|---|---|---|
| 1 | conference." | 03:17:09 |
| 2 | So not 60 days, six months.  And then | 03:17:11 |
| 3 | we lowered that to four months. | 03:17:14 |
| 4 | Q    And the differences between the version | 03:17:18 |
| 5 | that was given to Gibson Dunn on 10/7 and the | 03:17:19 |
| 6 | version that was given to Gibson Dunn on 10/14, | 03:17:23 |
| 7 | you testified that those were changes that you and | 03:17:27 |
| 8 | Mr. Erickson came up with. | 03:17:34 |
| 9 | Is that fair? | 03:17:38 |
| 10 | A    Let me just read through this version. | 03:17:39 |
| 11 | Q    Sure. | 03:17:42 |
| 12 | A    So I have reviewed provisional | 03:18:58 |
| 13 | multi-claims protocol draft, CPR_190 through 192. | 03:19:00 |
| 14 | And seeing the changes from CPR_108 to 109, again, | 03:19:05 |
| 15 | to the best of my recollection, the changes | 03:19:10 |
| 16 | between the two are not a result of inputs -- any | 03:19:12 |
| 17 | inputs from Gibson Dunn. | 03:19:17 |
| 18 | Q    So these were all changes that came | 03:19:26 |
| 19 | about as a result of your work with Ms. Erickson? | 03:19:28 |
| 20 | A    So Footnote 3 here, "CPR reserves the | 03:19:37 |
| 21 | right to treat a claim like those commenced in the | 03:19:41 |
| 22 | initial mass arbitrations, as distinct from this | 03:19:43 |
| 23 | protocol." | 03:19:46 |
| 24 | This became, if there is an agreement | 03:19:47 |
| 25 | between the parties, which I know is something | 03:19:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    185

| | | |
|---|---|---|
| 1 | they raised, but it is not in this version. | 03:19:51 |
| 2 | Q    But there are several more back and | 03:19:57 |
| 3 | forth, so you just might have the timing wrong. | 03:20:00 |
| 4 | A    And then we had the due process | 03:20:06 |
| 5 | requirements. | 03:20:08 |
| 6 | So I'm sorry, what was your question? | 03:20:09 |
| 7 | Q    My question was:  The changes between | 03:20:11 |
| 8 | this version of the protocol that's reflected in | 03:20:14 |
| 9 | Exhibit 14 and the 10/7 version that was sent to | 03:20:17 |
| 10 | Gibson Dunn, those changes were the result of you | 03:20:23 |
| 11 | working with Ms. Erickson; is that correct? | 03:20:26 |
| 12 | A    In our development of the protocol. | 03:20:28 |
| 13 | Q    Okay. | 03:20:41 |
| 14 | I'm going to hand you another document. | 03:20:52 |
| 15 | We'll mark this one Exhibit 15. | 03:20:57 |
| 16 | (Waxman Exhibit 15 marked for | 03:21:00 |
| 17 | identification and attached to the transcript.) | 03:21:00 |
| 18 | Q    This is Bates 198 to 203.  It is a | 03:21:01 |
| 19 | cover e-mail and another version of the protocol. | 03:21:08 |
| 20 | You can take a look at that. | 03:21:13 |
| 21 | So, for the record, I'll tell you that | 03:21:23 |
| 22 | this is an e-mail from Mr. Holecek to you and Ms. | 03:21:25 |
| 23 | Erickson, subject, "Re: DoorDash".  "Allen and | 03:21:28 |
| 24 | Helena, thanks again for sending this revised | 03:21:31 |
| 25 | protocol.  We continue to think that we're on the | 03:21:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    186

| | | |
|---|---|---|
| 1 | same page and that the protocol could work for | 03:21:38 |
| 2 | DoorDash.  In the attached draft, I have | 03:21:40 |
| 3 | interlineated a few comments, questions and | 03:21:41 |
| 4 | recommendations.  If it's easy for you to e-mail | 03:21:44 |
| 5 | responses, that's fine.  Alternatively, if it's | 03:21:47 |
| 6 | easier for you to discuss these issues over the | 03:21:50 |
| 7 | phone, that works as well.  We'll find a time for | 03:21:52 |
| 8 | a call later this week.  Thanks again." | 03:21:54 |
| 9 | Are you familiar with this e-mail? | 03:21:59 |
| 10 | A    I am. | 03:22:01 |
| 11 | Q    Have you seen it before? | 03:22:01 |
| 12 | A    I did. | 03:22:03 |
| 13 | Q    What did you do after receiving this | 03:22:07 |
| 14 | e-mail? | 03:22:08 |
| 15 | A    I recall having communications with Ms. | 03:22:12 |
| 16 | Erickson on it.  So this looks like they took the | 03:22:15 |
| 17 | provisional multi-claims protocol we sent them the | 03:22:19 |
| 18 | day before and they raised certain questions and | 03:22:23 |
| 19 | comments in the course of the protocol. | 03:22:26 |
| 20 | Q    And you discussed their questions and | 03:22:33 |
| 21 | comments -- well, let me back up. | 03:22:41 |
| 22 | Can I call this a red line, what they | 03:22:42 |
| 23 | sent back to you? | 03:22:46 |
| 24 | Would we understand each other if I | 03:22:49 |
| 25 | called the attachment to Exhibit 15 a red line? | 03:22:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    187

| | | |
|---|---|---|
| 1 | A    I think we probably just ought to call | 03:22:57 |
| 2 | it their response here. | 03:23:01 |
| 3 | Q    Okay. | 03:23:02 |
| 4 | A    I don't see what they are doing as | 03:23:02 |
| 5 | making suggestions of edits for us, which I think | 03:23:04 |
| 6 | a red line would suggest.  I see it is their way | 03:23:07 |
| 7 | of communicating questions to us. | 03:23:10 |
| 8 | Q    Okay. | 03:23:12 |
| 9 | So then they sent you certain questions | 03:23:12 |
| 10 | and comments in the course of the protocol, is | 03:23:16 |
| 11 | what you said. | 03:23:18 |
| 12 | Did you discuss those certain questions | 03:23:19 |
| 13 | and comments with Ms. Erickson? | 03:23:22 |
| 14 | A    I remember us having communications on | 03:23:26 |
| 15 | these, and I can walk through each of them if | 03:23:29 |
| 16 | you'd like. | 03:23:31 |
| 17 | Q    Did you discuss DoorDash and Gibson | 03:23:32 |
| 18 | Dunn's questions and comments with respect to the | 03:23:33 |
| 19 | protocol with anyone other than Ms. Erickson? | 03:23:36 |
| 20 | A    We may have. | 03:23:50 |
| 21 | Q    Who may you have discussed it with? | 03:23:51 |
| 22 | A    Other stakeholders. | 03:23:58 |
| 23 | Q    What other stakeholders? | 03:23:59 |
| 24 | MS. LUNETTA:  I'm going to object to | 03:24:08 |
| 25 | the extent that they are outside of CPR.  Because | 03:24:09 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    188

| | | |
|---|---|---|
| 1 | what we agreed to produce and what I think the | 03:24:12 |
| 2 | order is limited to is communications with Gibson | 03:24:15 |
| 3 | Dunn and DoorDash and communications internally | 03:24:18 |
| 4 | about those communications. | 03:24:23 |
| 5 |     A    And let me also help out here.  We | 03:24:24 |
| 6 | didn't, per se, take these comments and send them | 03:24:27 |
| 7 | to other people and say, well, what do you think | 03:24:30 |
| 8 | about these.  When I say we may have discussed, we | 03:24:33 |
| 9 | discussed the protocol with others.  In the course | 03:24:36 |
| 10 | of discussing the protocol with others, issues may | 03:24:39 |
| 11 | have been raised here.  So, for example, I know we | 03:24:43 |
| 12 | discussed the opt-out, and you'll see they have a | 03:24:46 |
| 13 | lot of comments on the opt-out.  I know we | 03:24:48 |
| 14 | discussed the opt-out with others, not, per se, | 03:24:51 |
| 15 | Gibson Dunn's comments on the opt-out, but the | 03:24:54 |
| 16 | opt-out provision. | 03:24:57 |
| 17 |     Q    Okay. | 03:24:59 |
| 18 |     A    That's what I mean. | 03:24:59 |
| 19 |     Q    Okay. | 03:25:01 |
| 20 |          So just so the record is clear, let me | 03:25:01 |
| 21 | ask that exact question. | 03:25:03 |
| 22 |          Did you discuss the comments that were | 03:25:05 |
| 23 | made by Gibson Dunn and DoorDash with anyone other | 03:25:09 |
| 24 | than Ms. Erickson? | 03:25:13 |
| 25 |     A    I don't know that I -- I don't recall | 03:25:22 |

Transcript of Allen Waxman
Conducted on December 27, 2019                     189

| | | |
|---|---|---|
| 1 | whether I discussed them as in here are Gibson | 03:25:23 |
| 2 | Dunn comments or here are issues that we're | 03:25:26 |
| 3 | raising that we want to dig into more. | 03:25:30 |
| 4 | Q    Okay. | 03:25:32 |
| 5 | And did you discuss those with people | 03:25:33 |
| 6 | inside CPR, other than Ms. Erickson? | 03:25:35 |
| 7 | A    Maybe, but it would probably be Ms. | 03:25:45 |
| 8 | Erickson. | 03:25:48 |
| 9 | Q    When you say maybe, who are you | 03:25:49 |
| 10 | thinking about? | 03:25:51 |
| 11 | A    I think it is probably Ms. Erickson. | 03:25:52 |
| 12 | Q    Is there somebody else it could have | 03:25:55 |
| 13 | been? | 03:25:57 |
| 14 | A    Well, there is a variety of people at | 03:25:57 |
| 15 | CPR.  I don't know if I mentioned to somebody an | 03:26:00 |
| 16 | issue about the opt-out, for example.  But not | 03:26:06 |
| 17 | necessarily saying, well, here is Gibson Dunn's | 03:26:10 |
| 18 | issue with the opt-out, just the opt-out. | 03:26:12 |
| 19 | Q    Right.  No, I'm not drawing a | 03:26:15 |
| 20 | distinction. | 03:26:18 |
| 21 | A    I understand that.  That's why I'm | 03:26:18 |
| 22 | trying to be fair here.  If you're asking me who | 03:26:20 |
| 23 | else did I discuss the opt-out provision with, I | 03:26:22 |
| 24 | discussed it with a variety of people. | 03:26:26 |
| 25 | Q    Who else internally at CPR did you end | 03:26:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    190

| | | |
|---|---|---|
| 1 | up discussing the drafts of the mass claims | 03:26:30 |
| 2 | protocol with besides the people we have discussed | 03:26:33 |
| 3 | so far, which is Ms. Erickson, Mr. Kiernan, | 03:26:37 |
| 4 | Mr. Sabatino?  Besides those people which we have | 03:26:45 |
| 5 | already discussed, who else inside CPR did you | 03:26:52 |
| 6 | discuss the provisions or drafts of the | 03:26:56 |
| 7 | multi-claim employment protocol with? | 03:27:01 |
| 8 |     A   In terms of the development of the | 03:27:12 |
| 9 | protocol? | 03:27:14 |
| 10 |     Q   Yes. | 03:27:16 |
| 11 |     A   I mean just so I'm clear on this, if I | 03:27:18 |
| 12 | said to the team, we're developing a mass claims | 03:27:22 |
| 13 | protocol, are you putting that in the box or | 03:27:25 |
| 14 | outside of the box? | 03:27:28 |
| 15 |     Q   Let me ask the question differently and | 03:27:29 |
| 16 | maybe it will help you. | 03:27:32 |
| 17 |        Besides the people we've discussed so | 03:27:34 |
| 18 | far, Mr. Kiernan, Mr. Sabatino, Ms. Erickson, who | 03:27:37 |
| 19 | else had input into the development at CPR of the | 03:27:42 |
| 20 | multi-claims protocol? | 03:27:46 |
| 21 |        MS. LUNETTA:  Okay.  I think that's | 03:27:50 |
| 22 | also beyond the scope.  Because that has nothing | 03:27:51 |
| 23 | to do with Gibson Dunn or DoorDash's input or | 03:27:55 |
| 24 | communication with Gibson Dunn or DoorDash, the | 03:27:55 |
| 25 | way that you just asked it. | 03:27:55 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        191

```
1          Q    Will you answer the question?              03:27:57
2               MS. LUNETTA:  I'm going to direct him      03:27:59
3     not to answer.  If what you're asking is who else    03:28:01
4     had input into the development at CPR of             03:28:04
5     multi-claims protocol, I'm going to direct him not   03:28:05
6     to answer that unless it is related to               03:28:09
7     communications about discussions with DoorDash and   03:28:11
8     Gibson Dunn.                                         03:28:15
9          Q    Are you going to follow her advice?        03:28:17
10         A    I am.                                       03:28:17
11         Q    Who else at CPR did you discuss            03:28:33
12    DoorDash and Gibson Dunn's comments, suggestions,    03:28:36
13    concerns about the multi-claims protocol with?       03:28:45
14         A    Sorry, can you read back that question?    03:28:54
15         Q    I'll rephrase it.                          03:28:57
16              Besides Mr. Kiernan, Mr. Sabatino and      03:29:01
17    Ms. Erickson, did you discuss DoorDash's or Gibson   03:29:12
18    Dunn's questions, concerns, comments about the       03:29:19
19    multi-claims protocol with anyone at CPR?            03:29:25
20         A    So, first off, I just want to be clear.    03:29:32
21    I'm not saying we discussed concerns that Gibson     03:29:35
22    Dunn raised with Mr. Sabatino or Mr. Kiernan.        03:29:38
23    Secondly, just being mindful of my counsel's         03:29:43
24    instruction, but just to make -- I can't recall      03:29:47
25    every single conversation I had.  But to the best    03:29:53
```

Transcript of Allen Waxman
Conducted on December 27, 2019                           192

| | | |
|---|---|---|
| 1 | of my recollection, the only real substantive | 03:29:56 |
| 2 | conversations there internally at CPR were me and | 03:30:00 |
| 3 | Ms. Erickson. | 03:30:05 |
| 4 | Q    Okay. | 03:30:07 |
| 5 | Who else did you discuss DoorDash's or | 03:30:07 |
| 6 | Gibson Dunn's questions, concerns or comments | 03:30:14 |
| 7 | about the multi-claims protocol with outside of | 03:30:17 |
| 8 | CPR? | 03:30:24 |
| 9 | A    As being their concerns? | 03:30:27 |
| 10 | Q    Their concerns, whether or not you | 03:30:30 |
| 11 | referred to them as their concerns or not. | 03:30:31 |
| 12 | MS. LUNETTA:  And that's outside the | 03:30:34 |
| 13 | scope.  I'm going to direct him not to answer | 03:30:35 |
| 14 | that.  It's only limited to internally | 03:30:37 |
| 15 | communication about discussions with Gibson Dunn | 03:30:40 |
| 16 | and DoorDash. | 03:30:44 |
| 17 | Q    Are you going to follow her advice? | 03:30:46 |
| 18 | A    I am going to follow her advice.  And I | 03:30:47 |
| 19 | think I have mentioned to you that also we had a | 03:30:49 |
| 20 | variety of discussions on a variety of matters. | 03:30:52 |
| 21 | Q    Who is "we" in that answer? | 03:30:58 |
| 22 | A    Me and Helena. | 03:31:02 |
| 23 | Q    So one thing that you mentioned was a | 03:31:12 |
| 24 | concern of DoorDash and Gibson Dunn was this | 03:31:14 |
| 25 | opt-out provision; is that right? | 03:31:17 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          193

| | | |
|---|---|---|
| 1 | A    Yes, they were concerned.  Let's walk | 03:31:20 |
| 2 | through their comments. | 03:31:23 |
| 3 | Q    I don't want to walk through them all | 03:31:24 |
| 4 | because we're running out of time. | 03:31:26 |
| 5 | A    You brought me down here to talk about | 03:31:28 |
| 6 | communications from Gibson Dunn and DoorDash. | 03:31:30 |
| 7 | Here we have a document of | 03:31:34 |
| 8 | communications with them and we're running out of | 03:31:35 |
| 9 | time to go through these communications? | 03:31:38 |
| 10 | Q    Well, the ones in the paper are in | 03:31:40 |
| 11 | writing.  I'm trying to get the ones that we don't | 03:31:43 |
| 12 | have records of. | 03:31:46 |
| 13 | A    Yeah, but let's talk about these | 03:31:47 |
| 14 | communications.  These are their communications. | 03:31:50 |
| 15 | Q    I appreciate that, Mr. Waxman. | 03:31:52 |
| 16 | A    We've spent a lot of time today talking | 03:31:52 |
| 17 | about a lot of things other than DoorDash and | 03:31:56 |
| 18 | Gibson Dunn's communications. | 03:31:59 |
| 19 | And now here we have Gibson Dunn's and | 03:32:02 |
| 20 | DoorDash's communications and we don't have time | 03:32:02 |
| 21 | to go through Gibson Dunn and DoorDash's | 03:32:03 |
| 22 | communications? | 03:32:03 |
| 23 | Q    I'd like to ask my question, if that's | 03:32:04 |
| 24 | all right, Mr. Waxman. | 03:32:06 |
| 25 | THE WITNESS:  Can we take a break? | 03:32:06 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    194

| | | |
|---|---|---|
| 1 | MR. ZIGLER:  Sure. | 03:32:08 |
| 2 | THE VIDEOGRAPHER:  We are going off the | 03:32:10 |
| 3 | record.  The time is 3:32 p.m. | 03:32:11 |
| 4 | (A recess was taken.) | 03:32:14 |
| 5 | THE VIDEOGRAPHER:  We are back on the | 03:42:50 |
| 6 | record.  The time is 3:43 p.m. | 03:42:51 |
| 7 | BY MR. ZIGLER: | 03:42:54 |
| 8 | Q    Mr. Waxman, did you discuss the opt-out | 03:42:55 |
| 9 | provision concerns of DoorDash and Gibson Dunn | 03:42:58 |
| 10 | with anyone outside of CPR? | 03:43:06 |
| 11 | MS. LUNETTA:  Okay.  I was going to | 03:43:10 |
| 12 | restate my objection, that that goes beyond and he | 03:43:17 |
| 13 | has already answered it. | 03:43:23 |
| 14 | Q    Are you going to follow your lawyer's | 03:43:26 |
| 15 | advice? | 03:43:28 |
| 16 | MS. LUNETTA:  Just give me one second. | 03:43:32 |
| 17 | I think we have been through this | 03:43:40 |
| 18 | before, but my concern is, are you asking him -- | 03:43:42 |
| 19 | he said -- he testified that he discussed the | 03:43:45 |
| 20 | opt-out issue with a lot of people, right? | 03:43:47 |
| 21 | And so this deposition is limited to | 03:43:50 |
| 22 | who he discussed -- whether he had discussed, | 03:43:52 |
| 23 | internally, Gibson Dunn and DoorDash's | 03:43:55 |
| 24 | communications about developing the protocol.  So | 03:43:59 |
| 25 | if you're asking if he discussed Gibson Dunn's or | 03:44:01 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    195

| | | |
|---|---|---|
| 1 | DoorDash's communications about the opt-out | 03:44:03 |
| 2 | provision outside of CPR, I think it is beyond the | 03:44:05 |
| 3 | scope and I'll direct him not to answer. | 03:44:08 |
| 4 |     Q   Are you going to follow your -- | 03:44:12 |
| 5 |     A   I am. | 03:44:13 |
| 6 |     Q   All right. | 03:44:17 |
| 7 |     I'm going to hand you another document. | 03:44:17 |
| 8 | This is Bates 222 to 226. | 03:44:19 |
| 9 |     (Waxman Exhibit 16 marked for | 03:44:25 |
| 10 | identification and attached to the transcript.) | 03:44:25 |
| 11 |     Q   This has been marked as Exhibit 16. | 03:44:30 |
| 12 | And this is another cover e-mail with another | 03:44:36 |
| 13 | version of the protocol dated 10-24-2019, from you | 03:44:39 |
| 14 | to Mr. Holecek, Mr. Lipshutz, Mr. Farano and BCC | 03:44:46 |
| 15 | to yourself, "Re: DoorDash CPR call".  "Michael, | 03:44:52 |
| 16 | Josh and Gregg, please see the latest version of | 03:44:56 |
| 17 | the protocol for our discussion below.  We believe | 03:44:58 |
| 18 | we've addressed all of Michael's comments from the | 03:45:01 |
| 19 | prior draft.  To the extent feasible for us, we | 03:45:05 |
| 20 | can talk about fees, albeit we are still | 03:45:08 |
| 21 | finalizing our analysis on this.  We look forward | 03:45:11 |
| 22 | to our discussion tomorrow." | 03:45:15 |
| 23 |     Are you familiar with this e-mail? | 03:45:17 |
| 24 |     A   I am. | 03:45:18 |
| 25 |     Q   Okay. | 03:45:22 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          196

| | | |
|---|---|---|
| 1 | Can you tell me what you were referring | 03:45:22 |
| 2 | to when you say, "We are still finalizing our | 03:45:24 |
| 3 | analysis on this"? | 03:45:27 |
| 4 | A    On the fee structure.  On the amount of | 03:45:29 |
| 5 | fees. | 03:45:33 |
| 6 | So this is helpful to have this | 03:45:41 |
| 7 | document next to the other document and see, | 03:45:43 |
| 8 | again, between October 15th and October 24th, the | 03:45:49 |
| 9 | protocol continued to evolve with additional | 03:45:56 |
| 10 | discussions and work by us.  And we certainly were | 03:45:59 |
| 11 | aware of comments and questions raised by Gibson | 03:46:04 |
| 12 | Dunn in their prior, but that did not guide our | 03:46:09 |
| 13 | continued development of the protocol.  So, for | 03:46:13 |
| 14 | example, they suggest there should be a six-month | 03:46:16 |
| 15 | window for nearly identical claims.  We rejected | 03:46:19 |
| 16 | that in favor of putting in place an | 03:46:23 |
| 17 | administrative arbitrator, which is, I think, as | 03:46:26 |
| 18 | you know now, Judge Scheindlin, and having a | 03:46:31 |
| 19 | process of resolving those issues. | 03:46:34 |
| 20 | There was a question of if the NA rules | 03:46:38 |
| 21 | are being applied, does that mean the claims will | 03:46:42 |
| 22 | be filed or not be filed, and so forth.  That did | 03:46:44 |
| 23 | not get addressed at all at this point in time, | 03:46:48 |
| 24 | but ultimately, in the final protocol, it is the | 03:46:50 |
| 25 | NA rules or the administered arbitration rules | 03:46:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          197

| | | |
|---|---|---|
| 1 | which can be used, which then get trumped by the | 03:46:58 |
| 2 | trigger and a template that gets filed, and that | 03:47:02 |
| 3 | was done for efficiency sake in bringing the | 03:47:06 |
| 4 | claims into CPR. | 03:47:09 |
| 5 | There is question here on filing fees | 03:47:11 |
| 6 | and there are no particular filing fees under the | 03:47:13 |
| 7 | NA rules on which this is being built.  There was | 03:47:17 |
| 8 | a question here on -- down on Footnote 3, | 03:47:20 |
| 9 | "Consider adding that CPR should treat a claim | 03:47:26 |
| 10 | separately if both claimant and respondent agree | 03:47:29 |
| 11 | to treat that claim separately." | 03:47:32 |
| 12 | And we did include that concept in | 03:47:37 |
| 13 | here, and I think that discussion began even prior | 03:47:39 |
| 14 | to this reference here. | 03:47:43 |
| 15 | Then came the discussion of opt-outs | 03:47:46 |
| 16 | relating to paragraph nine in the earlier version | 03:47:50 |
| 17 | we sent them on October 14th.  And you'll note | 03:47:54 |
| 18 | here, they raised a question about individual | 03:47:59 |
| 19 | opt-outs.  We had a discussion between Ms. | 03:48:02 |
| 20 | Erickson and I and decided that, legally, we | 03:48:05 |
| 21 | probably did need to require individualized | 03:48:08 |
| 22 | opt-outs, that is an indication of who, in fact, | 03:48:11 |
| 23 | is opting out.  But then Gibson Dunn also raised | 03:48:14 |
| 24 | that the opt-outs should not be able to lead to | 03:48:19 |
| 25 | class actions, should not be able to expand their | 03:48:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    198

| | | |
|---|---|---|
| 1 | claims.  We rejected those suggestions and just | 03:48:25 |
| 2 | left it as an opt-out.  There was other questions | 03:48:28 |
| 3 | about fees and the timing of filing fees and so | 03:48:33 |
| 4 | forth.  And we were still working on, as we note | 03:48:37 |
| 5 | here in the e-mail, finalizing our analysis on the | 03:48:43 |
| 6 | amount of the fees. | 03:48:46 |
| 7 |     Q    When did you decide that legally you | 03:48:55 |
| 8 | needed individual opt-outs? | 03:48:57 |
| 9 |     A    Really, I give Ms. Erickson credit on | 03:49:01 |
| 10 | this.  There is a concern that if someone | 03:49:04 |
| 11 | represented 200 people that opted out and we | 03:49:06 |
| 12 | treated those all as opt-outs and took away their | 03:49:10 |
| 13 | arbitration claims, but, in fact, they had not | 03:49:13 |
| 14 | opted out, that is, a mistake had been made, there | 03:49:16 |
| 15 | was no attestation by the individual they wanted | 03:49:19 |
| 16 | to opt out, then we would have dismissed | 03:49:22 |
| 17 | somebody's arbitration claim when they didn't | 03:49:25 |
| 18 | really want it dismissed.  And by getting some | 03:49:27 |
| 19 | sort of an attestation from the individual, yes, I | 03:49:30 |
| 20 | want to opt out, we know that, in fact, they want | 03:49:32 |
| 21 | to opt out. | 03:49:35 |
| 22 |     Q    And your internal analysis was that | 03:49:36 |
| 23 | that was required for due process protection of | 03:49:44 |
| 24 | the claimant; is that fair? | 03:49:47 |
| 25 |     A    Yeah.  We didn't want to remove | 03:49:52 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          199

| | | |
|---|---|---|
| 1 | somebody from arbitration if they didn't want to | 03:49:54 |
| 2 | be removed from arbitration. | 03:49:56 |
| 3 | Q    Is there an analogous provision in | 03:49:58 |
| 4 | federal or state court that made you feel that | 03:50:08 |
| 5 | that was required? | 03:50:11 |
| 6 | MS. LUNETTA:  Objection to form. | 03:50:14 |
| 7 | A    I'm not sure what you mean. | 03:50:14 |
| 8 | Q    I'm sorry? | 03:50:16 |
| 9 | A    I'm not sure what that means, an | 03:50:17 |
| 10 | analogous provision. | 03:50:19 |
| 11 | Q    Well, for example, are there | 03:50:22 |
| 12 | protections for claimants from having their claims | 03:50:23 |
| 13 | dismissed by lawyers who otherwise were exceeding | 03:50:30 |
| 14 | their authorization? | 03:50:35 |
| 15 | MS. LUNETTA:  Objection to form. | 03:50:37 |
| 16 | A    I know that's happened, yes. | 03:50:38 |
| 17 | Q    So what protections are there in courts | 03:50:40 |
| 18 | to prevent such behavior? | 03:50:44 |
| 19 | MS. LUNETTA:  Objection.  This is | 03:50:47 |
| 20 | outside the scope and it calls for a legal | 03:50:48 |
| 21 | conclusion.  And I direct him not to answer. | 03:50:50 |
| 22 | Q    Are you going to follow your lawyer's | 03:50:54 |
| 23 | advice? | 03:50:54 |
| 24 | A    I am. | 03:50:56 |
| 25 | Q    Who researched the legal requirement, | 03:51:11 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          200

| | | |
|---|---|---|
| 1 | as you put it, to have individual opt-outs, was | 03:51:13 |
| 2 | that you or Ms. Erickson? | 03:51:17 |
| 3 | MS. LUNETTA:  Objection to form.  And | 03:51:22 |
| 4 | it misstates his testimony. | 03:51:23 |
| 5 | A    I did it too.  But as I said, this was | 03:51:24 |
| 6 | Ms. Erickson's idea. | 03:51:27 |
| 7 | Q    Do you recall if that's something that | 03:51:43 |
| 8 | Gibson Dunn suggested? | 03:51:45 |
| 9 | A    Well, I think in their note here -- | 03:51:47 |
| 10 | MS. LUNETTA:  What's the Bates number? | 03:51:58 |
| 11 | THE WITNESS:  CPR_000201. | 03:52:02 |
| 12 | A    "The protocol should require | 03:52:04 |
| 13 | individualized infirmative opt-outs by each | 03:52:06 |
| 14 | claimant who wants to opt out." | 03:52:07 |
| 15 | And I think that our discussion was | 03:52:16 |
| 16 | that we didn't want to make it overly burdensome | 03:52:20 |
| 17 | on the plaintiffs.  And at the same time, we | 03:52:22 |
| 18 | didn't want to end up opting out people who didn't | 03:52:26 |
| 19 | really want to opt out. | 03:52:29 |
| 20 | Q    Turning to paragraph 13. | 03:52:44 |
| 21 | A    Where are you? | 03:52:48 |
| 22 | MS. LUNETTA:  225. | 03:52:54 |
| 23 | Q    I am on 225, Bates 225. | 03:52:55 |
| 24 | This reads now that as many | 03:53:02 |
| 25 | arbitrations will proceed simultaneously as | 03:53:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    201

1    practicable.  And previously had language that        03:53:08
2    referenced going to other providers if CPR is         03:53:13
3    fully engaged.                                        03:53:15
4           Do you see that?                               03:53:21
5           MS. LUNETTA:  Do you happen to know,           03:53:33
6    Aaron, what paragraph it is in the prior?             03:53:34
7           MR. ZIGLER:  It was paragraph 13, is it        03:53:40
8    not?                                                  03:53:41
9      A    I think you may be conflating two              03:53:46
10   different parts here, but I do recall there was a     03:53:48
11   provision about going to other arbitral providers.    03:53:52
12          MS. LUNETTA:  Oh, it's 23 in the prior         03:54:05
13   one.                                                  03:54:16
14          MR. ZIGLER:  Thank you, Counsel.               03:54:17
15     A    So in paragraph ten, on CPR_201, it            03:54:18
16   says the same thing, "As many proceedings             03:54:21
17   simultaneously as practical, consistent with the      03:54:23
18   paragraphs of the protocol set forth below."          03:54:25
19          Then the provision on -- separate              03:54:28
20   provision, paragraph 23, "To the extent that the      03:54:47
21   parties agree to proceed with more arbitrations       03:54:50
22   and CPR's capacity permits, at a given time, they     03:54:53
23   may submit those to a different arbitral provider     03:54:57
24   so long as CPR is fully engaged to its                03:55:00
25   availability or agrees otherwise."                    03:55:02

Transcript of Allen Waxman
Conducted on December 27, 2019                              202

| | | |
|---|---|---|
| 1 | And that did not stay in the final | 03:55:07 |
| 2 | protocol.  That was our decision to pull it out. | 03:55:09 |
| 3 | Actually, Gibson Dunn wanted us to keep that in. | 03:55:11 |
| 4 | We chose to pull it out because it wasn't clear | 03:55:15 |
| 5 | exactly how we would make that work with other | 03:55:18 |
| 6 | arbitral providers.  And in our view, if, by the | 03:55:21 |
| 7 | time we got to that point in the proceedings, that | 03:55:23 |
| 8 | is mediation, we see how many arbitrations are | 03:55:26 |
| 9 | left, we see what the availability of the list is, | 03:55:30 |
| 10 | we can always, with agreement of the parties, work | 03:55:32 |
| 11 | on another mechanism and rely upon other | 03:55:35 |
| 12 | arbitrators, be they AAA or others, at that point | 03:55:38 |
| 13 | in time. | 03:55:42 |
| 14 | So we thought it only confused the | 03:55:43 |
| 15 | matter to keep it in here, but, in fact, Gibson | 03:55:46 |
| 16 | Dunn wanted us to keep that provision in.  Or at | 03:55:49 |
| 17 | least asked us to consider keeping that provision | 03:55:57 |
| 18 | in. | 03:56:00 |
| 19 | (Waxman Exhibit 17 marked for | 04:33:22 |
| 20 | identification and attached to the transcript.) | 04:33:22 |
| 21 | Q   I'm going to hand you a document that's | 03:56:15 |
| 22 | been marked Exhibit 17.  It's Bates 234.  I don't | 03:56:17 |
| 23 | believe there are any attachments to that | 03:56:22 |
| 24 | document.  It is simply an invitation from Ms. | 03:56:25 |
| 25 | Erickson to Mr. Holecek for a call on 10/25 at | 03:56:28 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    203

| | | |
|---|---|---|
| 1 | 3:30. | 03:56:37 |
| 2 | A    Yes. | 03:56:38 |
| 3 | Q    Do you recall if that call took place? | 03:56:41 |
| 4 | A    I believe it did.  I'm looking at Ms. | 03:57:03 |
| 5 | Erickson's notes and there is a note from 10/25. | 03:57:06 |
| 6 | Q    Okay. | 03:57:10 |
| 7 | So, for the record, you're looking at | 03:57:11 |
| 8 | Exhibit 5 now? | 03:57:12 |
| 9 | A    Yeah, CPR_000498, there is a 10/25/19 | 03:57:13 |
| 10 | entry. | 03:57:16 |
| 11 | Q    And it indicates that there was a call | 03:57:17 |
| 12 | between Gregg and Michael Holecek and Ms. | 03:57:19 |
| 13 | Erickson; is that correct? | 03:57:22 |
| 14 | A    And I think I was on that call as well, | 03:57:23 |
| 15 | but maybe I wasn't. | 03:57:25 |
| 16 | Q    I'm sorry, I couldn't hear you. | 03:57:27 |
| 17 | A    I said I'm wondering if I was on that | 03:57:29 |
| 18 | call as well.  Maybe I wasn't.  I see the | 03:57:30 |
| 19 | invitation did not include me, so I may not have | 03:57:33 |
| 20 | been on that call.  I don't independently | 03:57:37 |
| 21 | remember. | 03:57:38 |
| 22 | Q    Okay. | 03:57:41 |
| 23 | Do you have any independent memory of | 03:57:41 |
| 24 | what was discussed in that call? | 03:57:43 |
| 25 | A    I don't have an independent memory.  I | 03:57:46 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    204

| | | |
|---|---|---|
| 1 | see here the reference to the NA rules, how things | 03:57:48 |
| 2 | would be commenced, filed, the template, and the | 03:57:51 |
| 3 | administrative arbitrator. | 03:57:55 |
| 4 | Q    Does referring to those notes refresh | 03:57:58 |
| 5 | your recollection of whether or not you were on | 03:58:01 |
| 6 | the call? | 03:58:03 |
| 7 | A    I do recall at some point in time we | 03:58:09 |
| 8 | did discuss the issue of where would things be | 03:58:11 |
| 9 | filed when they came in, especially before the | 03:58:16 |
| 10 | protocol was triggered.  We did discuss the notion | 03:58:19 |
| 11 | of a template, the non-administered rules.  I | 03:58:22 |
| 12 | think we may have discussed the administrative | 03:58:28 |
| 13 | arbitrator while I was present, but I'm not | 03:58:29 |
| 14 | exactly sure. | 03:58:33 |
| 15 | Q    Okay. | 03:58:43 |
| 16 | I'm going to hand you a document that I | 03:58:43 |
| 17 | have marked as Exhibit 18.  It is CPR 236 to 240. | 03:58:45 |
| 18 | (Waxman Exhibit 18 marked for | 03:58:50 |
| 19 | identification and attached to the transcript.) | 03:58:50 |
| 20 | Q    It is a cover e-mail and another draft | 03:58:56 |
| 21 | of the mass claims protocol.  This one is from you | 03:58:58 |
| 22 | to Mr. Sabatino and Mr. Kiernan, cc'ing Ms. | 03:59:02 |
| 23 | Erickson, BCC'ing yourself.  Subject is mass | 03:59:05 |
| 24 | claims protocol; is that right? | 03:59:11 |
| 25 | A    Yes. | 03:59:15 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    205

| | | |
|---|---|---|
| 1 | Q    Okay. | 03:59:33 |
| 2 | Could you tell me what, if anything, | 03:59:33 |
| 3 | with respect to the protocol, happened between the | 03:59:36 |
| 4 | October 25th call with Mr. Holecek and sending | 03:59:38 |
| 5 | this e-mail? | 03:59:42 |
| 6 | MS. LUNETTA:  223 is the prior one. | 03:59:56 |
| 7 | A    So I'm comparing the provisional mass | 04:00:07 |
| 8 | claims protocol draft at CPR_223 through 226 to | 04:00:12 |
| 9 | CPR_237 to 240, which is entitled The | 04:00:18 |
| 10 | Employment-Related Mass Claims Protocol.  And I | 04:00:25 |
| 11 | notice up front, there is a reference to lowering | 04:00:30 |
| 12 | the number from 50 to 30 for the triggering of the | 04:00:33 |
| 13 | protocol. | 04:00:39 |
| 14 | Q    Do you know whose idea that was? | 04:00:40 |
| 15 | A    That was ours. | 04:00:42 |
| 16 | There seems to be, if you give me a | 04:00:49 |
| 17 | chance here -- so now we make reference to if | 04:00:51 |
| 18 | claims are filed under either the administered or | 04:00:57 |
| 19 | non-administered rules, this can govern.  And then | 04:01:00 |
| 20 | the idea is when this -- by this meaning the | 04:01:05 |
| 21 | protocol governs, templates get filed, that really | 04:01:08 |
| 22 | takes precedence at that point in time. | 04:01:13 |
| 23 | Q    Okay. | 04:01:15 |
| 24 | The cover letter says that the | 04:01:15 |
| 25 | protocol -- | 04:01:17 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    206

| | | |
|---|---|---|
| 1 | A    Which cover letter now? | 04:01:18 |
| 2 | Q    236, the cover e-mail to this. | 04:01:20 |
| 3 | A    Got it. | 04:01:23 |
| 4 | Q    Says, "We have proceeded in our | 04:01:24 |
| 5 | discussions with Gibson Dunn and its client, | 04:01:27 |
| 6 | DoorDash, in developing the attached protocol, | 04:01:30 |
| 7 | which has also benefited from inputs from a number | 04:01:32 |
| 8 | of lawyers that are members, including Ken | 04:01:36 |
| 9 | Feinberg." | 04:01:38 |
| 10 | Do you see that? | 04:01:39 |
| 11 | A    I do. | 04:01:39 |
| 12 | Q    Besides Mr. Feinberg, what other | 04:01:40 |
| 13 | lawyers and your members had offered inputs into | 04:01:44 |
| 14 | the mass claims employment-related protocol? | 04:01:51 |
| 15 | MS. LUNETTA:  To the extent you were | 04:01:55 |
| 16 | discussing Gibson Dunn or DoorDash's comments with | 04:01:56 |
| 17 | internal people, you can answer.  If it is outside | 04:02:00 |
| 18 | of CPR or it doesn't involve your conversations | 04:02:03 |
| 19 | with Gibson Dunn, DoorDash, I'm going to direct | 04:02:06 |
| 20 | you not to answer. | 04:02:10 |
| 21 | Q    Can you answer the question? | 04:02:11 |
| 22 | A    I don't recall any conversations with | 04:02:31 |
| 23 | others about Gibson Dunn's or DoorDash's comments | 04:02:33 |
| 24 | per se.  Certainly not internally.  And then I | 04:02:44 |
| 25 | would follow my lawyers's instruction. | 04:02:48 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          207

| | | |
|---|---|---|
| 1 | Q    Okay. | 04:02:53 |
| 2 |          The next sentence says, "DoorDash may | 04:02:53 |
| 3 | want to go live with its protocol this week as it | 04:02:55 |
| 4 | updates its contracts with its contractors." | 04:02:59 |
| 5 |          Do you see that? | 04:03:01 |
| 6 | A    Yes. | 04:03:02 |
| 7 | Q    Did you learn that from DoorDash or | 04:03:02 |
| 8 | Gibson Dunn? | 04:03:05 |
| 9 | A    We must have. | 04:03:08 |
| 10 | Q    Do you know when you learned that? | 04:03:09 |
| 11 |          The reason I ask is because we didn't | 04:03:18 |
| 12 | know if you were on the previous call that was | 04:03:20 |
| 13 | with Ms. Erickson. | 04:03:22 |
| 14 | A    Oh, you mean might I have learned it | 04:03:23 |
| 15 | from Ms. Erickson?  Yeah, I don't recall.  I | 04:03:27 |
| 16 | recall learning at some point in time that they | 04:03:29 |
| 17 | wanted to make some amendments.  It wasn't clear | 04:03:32 |
| 18 | to us why, what was going on, but they were | 04:03:34 |
| 19 | looking to amend their contracts.  And we thought | 04:03:36 |
| 20 | that if they were going to be relying upon the | 04:03:41 |
| 21 | protocol, the protocol needed to be upped, posted | 04:03:44 |
| 22 | and available for the other side to review. | 04:03:49 |
| 23 | Q    Did DoorDash or Gibson Dunn give you | 04:03:54 |
| 24 | any reasons for the timing of that change? | 04:03:58 |
| 25 | A    No. | 04:04:01 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    208

| | | |
|---|---|---|
| 1 | Q    And from your understanding, any change | 04:04:04 |
| 2 | in an arbitral forum with DoorDash drivers was to | 04:04:08 |
| 3 | be prospective only; is that right? | 04:04:12 |
| 4 | A    Yeah. | 04:04:15 |
| 5 | Q    When, if ever, did you find out that | 04:04:19 |
| 6 | DoorDash attempted to change the arbitral forum | 04:04:21 |
| 7 | with drivers who had already filed claims with | 04:04:31 |
| 8 | AAA? | 04:04:34 |
| 9 | MS. LUNETTA:  Objection to the form.  I | 04:04:36 |
| 10 | just want to caution you that if you only learned | 04:04:37 |
| 11 | it from counsel, it's privileged and you can't | 04:04:39 |
| 12 | answer it. | 04:04:42 |
| 13 | A    So let me just say the procedural | 04:04:44 |
| 14 | posture of what's going on in this matter is -- I | 04:04:47 |
| 15 | can't pretend to understand the whole procedural | 04:04:51 |
| 16 | context. | 04:04:54 |
| 17 | I do recall reading in the newspaper or | 04:04:55 |
| 18 | some -- it wasn't in the newspaper, it was some | 04:05:01 |
| 19 | press, that it was being applied to people who had | 04:05:04 |
| 20 | filed with AAA. | 04:05:09 |
| 21 | Q    Did you learn -- so did you learn that | 04:05:13 |
| 22 | after the protocol was live? | 04:05:15 |
| 23 | A    Yes. | 04:05:20 |
| 24 | Q    Would you have done anything | 04:05:23 |
| 25 | differently had you known that DoorDash intended | 04:05:25 |

| | | |
|---|---|---|
| 1 | to apply the protocol to Dashers who had already | 04:05:27 |
| 2 | filed arbitration claims? | 04:05:32 |
| 3 | A    I'm just going to say I was surprised. | 04:05:47 |
| 4 | Q    You testified earlier that your | 04:05:49 |
| 5 | understanding was it was to be prospective only; | 04:05:50 |
| 6 | is that right? | 04:05:54 |
| 7 | A    That was my testimony. | 04:05:55 |
| 8 | Q    And it's reflected in the e-mails that | 04:05:56 |
| 9 | you were told that the change was to be | 04:05:58 |
| 10 | prospective only; is that right? | 04:06:03 |
| 11 | A    Yes.  There's, like I said, a lot of | 04:06:06 |
| 12 | procedural aspects to this about claims being | 04:06:07 |
| 13 | filed, claims being dismissed, why they were | 04:06:11 |
| 14 | dismissed.  I can't tell you that I have -- I'm up | 04:06:12 |
| 15 | on the facts as I'm sure you-all are.  It just was | 04:06:17 |
| 16 | not my anticipation that claims would be brought | 04:06:21 |
| 17 | at CPR that had previously been brought at AAA, | 04:06:27 |
| 18 | but I don't understand the dismissals and how that | 04:06:31 |
| 19 | all works. | 04:06:35 |
| 20 | Q    Upon learning that DoorDash was | 04:06:38 |
| 21 | attempting to effectuate the mass employment | 04:06:42 |
| 22 | protocol on drivers who had already filed at AAA, | 04:06:52 |
| 23 | did you inquire of Gibson Dunn or DoorDash why | 04:06:58 |
| 24 | your understanding was incorrect, that it was to | 04:07:04 |
| 25 | be prospective only? | 04:07:07 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    210

| | | |
|---|---|---|
| 1 | A    This is after the launch of the | 04:07:09 |
| 2 | protocol? | 04:07:11 |
| 3 | Q    Yeah. | 04:07:14 |
| 4 | MS. LUNETTA:  You personally.  He is | 04:07:15 |
| 5 | asking you personally. | 04:07:16 |
| 6 | THE WITNESS:  This is after the launch | 04:07:18 |
| 7 | of the protocol? | 04:07:20 |
| 8 | MS. LUNETTA:  Yes. | 04:07:22 |
| 9 | THE WITNESS:  Am I allowed to ask -- | 04:07:22 |
| 10 | MS. LUNETTA:  Let me just say, the | 04:07:22 |
| 11 | reason for his hesitation is he knows I -- with | 04:07:23 |
| 12 | Mr. Posman, I spoke to Gibson Dunn for clarity | 04:07:26 |
| 13 | when we were at the hearing in San Francisco last | 04:07:29 |
| 14 | Friday.  So he is obviously -- | 04:07:32 |
| 15 | THE WITNESS:  Can we just take a quick | 04:07:34 |
| 16 | break? | 04:07:35 |
| 17 | MR. ZIGLER:  Sure. | 04:07:36 |
| 18 | THE WITNESS:  I'm sorry. | 04:07:36 |
| 19 | MS. LUNETTA:  I just don't want him to | 04:07:36 |
| 20 | testify to something that's privileged. | 04:07:38 |
| 21 | THE VIDEOGRAPHER:  We're going off the | 04:07:42 |
| 22 | record.  The time is 4:07 p.m. | 04:07:44 |
| 23 | (A recess was taken.) | 04:07:46 |
| 24 | THE VIDEOGRAPHER:  We are back on the | 04:11:36 |
| 25 | record.  The time is 4:11 p.m. | 04:11:37 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        211

| | | |
|---|---|---|
| 1 | BY MR. ZIGLER: | 04:11:39 |
| 2 | Q    So do you have further answer for us | 04:11:41 |
| 3 | for which you would like me to ask the question | 04:11:43 |
| 4 | again? | 04:11:45 |
| 5 | MS. LUNETTA:  Now that I reviewed the | 04:11:46 |
| 6 | question and have gotten some clarity, I think I'm | 04:11:48 |
| 7 | going to object on the scope of this because | 04:11:51 |
| 8 | you're asking for something that happened after | 04:11:53 |
| 9 | the protocol was launched.  My understanding is | 04:11:56 |
| 10 | this deposition was about the development of the | 04:11:59 |
| 11 | protocol and communications with Gibson Dunn or | 04:12:01 |
| 12 | DoorDash involving the development.  So anything | 04:12:03 |
| 13 | after the launch is outside the scope and I'm | 04:12:08 |
| 14 | going to direct him not to answer. | 04:12:11 |
| 15 | Q    Are you going to follow your lawyer's | 04:12:13 |
| 16 | advice? | 04:12:13 |
| 17 | A    I am. | 04:12:14 |
| 18 | Q    Was the purpose of this -- let me just | 04:12:24 |
| 19 | ask, what was the purpose of document 236? | 04:12:29 |
| 20 | A    To keep Tom and John updated on what | 04:12:44 |
| 21 | was happening with respect to the protocol. | 04:12:48 |
| 22 | Q    Were you looking for their sign off on | 04:12:50 |
| 23 | the fee structure? | 04:12:53 |
| 24 | A    Well, I certainly wanted to know if | 04:12:54 |
| 25 | they had any comments, questions, ideas. | 04:12:56 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    212

| | | |
|---|---|---|
| 1 | Q    Did they have any feedback about the | 04:12:59 |
| 2 | fee structure? | 04:13:02 |
| 3 | A    Do you have a document? | 04:13:06 |
| 4 | I don't recall them having a particular | 04:13:09 |
| 5 | comment on the fee structure. | 04:13:10 |
| 6 | Q    As far as I can tell, you corresponded | 04:13:12 |
| 7 | with them, but they did not correspond with you. | 04:13:15 |
| 8 | A    I don't recall a communication back on | 04:13:23 |
| 9 | the fee structure. | 04:13:25 |
| 10 | Q    Okay. | 04:13:26 |
| 11 | I can tell you that, ultimately, the | 04:13:26 |
| 12 | fee structure that you communicated to DoorDash | 04:13:28 |
| 13 | and to Gibson Dunn raised the initiation fee to | 04:13:30 |
| 14 | $70,000. | 04:13:37 |
| 15 | A    Correct. | 04:13:38 |
| 16 | Q    And included an appointment fee of | 04:13:39 |
| 17 | $3,000. | 04:13:41 |
| 18 | A    Well, that was in this one.  And then I | 04:13:42 |
| 19 | think it also upped either the mediation fee or | 04:13:44 |
| 20 | the presentation fee. | 04:13:47 |
| 21 | Q    Presentation fee of $15,000. | 04:13:49 |
| 22 | A    Where was the mediation administrative | 04:13:52 |
| 23 | fee? | 04:13:55 |
| 24 | Q    Initiation fee was 70. | 04:13:57 |
| 25 | A    No, no.  I'm sorry. | 04:13:59 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    213

| | | |
|---|---|---|
| 1 | You're looking at the ultimate | 04:14:01 |
| 2 | document? | 04:14:03 |
| 3 | Q    Yeah, we can go to that in a minute, if | 04:14:04 |
| 4 | you'd like. | 04:14:06 |
| 5 | A    I think it says mediation | 04:14:07 |
| 6 | administrative fee.  Something like that. | 04:14:09 |
| 7 | Q    Oh, here we are, $20,000. | 04:14:12 |
| 8 | A    Yeah.  So it was up from 15 to 20.  So | 04:14:15 |
| 9 | the two changes were the initiation fee of 60 to | 04:14:19 |
| 10 | 70 and the mediation administrative fee of 15 to | 04:14:22 |
| 11 | 20. | 04:14:25 |
| 12 | Q    And were those changes recommended by | 04:14:26 |
| 13 | Mr. Sabatino and Mr. Kiernan? | 04:14:28 |
| 14 | A    I don't believe so, no.  Internally, we | 04:14:30 |
| 15 | made those decisions. | 04:14:34 |
| 16 | Q    Was that you and Ms. Erickson? | 04:14:35 |
| 17 | A    I believe so. | 04:14:39 |
| 18 | Q    You don't sound so sure. | 04:14:43 |
| 19 | A    Well, I'm wondering if our CFO got | 04:14:45 |
| 20 | involved in that at all. | 04:14:48 |
| 21 | Q    Okay. | 04:14:50 |
| 22 | I'm going to hand you what I have | 04:15:20 |
| 23 | marked as Exhibit 19.  This is another cover | 04:15:22 |
| 24 | letter, this time to Mr. Holecek, Mr. Farano, | 04:15:24 |
| 25 | Mr. Lipshutz and Ms. Erickson, BCC'ing yourself. | 04:15:27 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    214

| | | |
|---|---|---|
| 1 | Exhibit 19, Bates 241 to 246. | 04:15:34 |
| 2 | (Waxman Exhibit 19 marked for | 04:15:39 |
| 3 | identification and attached to the transcript.) | 04:15:39 |
| 4 | Q    Is this an e-mail that you sent to | 04:15:47 |
| 5 | Mr. Holecek, Mr. Lipshutz and Mr. Farano? | 04:15:49 |
| 6 | A    Yes. | 04:15:56 |
| 7 | Q    This e-mail says that you proposed to | 04:16:07 |
| 8 | specify the fees separately in a note. | 04:16:09 |
| 9 | Do you see that? | 04:16:12 |
| 10 | A    Yep. | 04:16:13 |
| 11 | Q    Does that mean that the fees would be | 04:16:14 |
| 12 | private between you and DoorDash and not public? | 04:16:17 |
| 13 | A    Initially, that's what we were doing. | 04:16:21 |
| 14 | We were just going to negotiate that with | 04:16:23 |
| 15 | DoorDash. | 04:16:26 |
| 16 | Q    Why? | 04:16:28 |
| 17 | A    I think I had some -- I wasn't sure | 04:16:35 |
| 18 | about the fees we were establishing, whether or | 04:16:42 |
| 19 | not those would be the right fees, and I wasn't | 04:16:45 |
| 20 | sure I wanted to establish a public precedent for | 04:16:48 |
| 21 | that, especially the initiation fee.  And, you | 04:16:49 |
| 22 | know, this was the first application of the | 04:16:55 |
| 23 | protocol and wanted to gain some more experience | 04:16:58 |
| 24 | with it. | 04:17:02 |
| 25 | Q    Okay. | 04:17:03 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    215

| | | |
|---|---|---|
| 1 | A    As you probably know, we've now | 04:17:15 |
| 2 | published the fee structure but for the | 04:17:17 |
| 3 | initiation. | 04:17:20 |
| 4 | Q    So, currently, the initiation fee is | 04:17:20 |
| 5 | private; is that right? | 04:17:24 |
| 6 | A    When I say we've published it, so if | 04:17:27 |
| 7 | somebody else uses the protocol, the other fees | 04:17:30 |
| 8 | are set forth on our website.  The initiation fee, | 04:17:33 |
| 9 | we're saying come talk to us about.  And in part, | 04:17:36 |
| 10 | we need to know what the nature of the matter is, | 04:17:38 |
| 11 | how big is the matter.  So -- | 04:17:42 |
| 12 | Q    Has anybody come to you to have that | 04:17:49 |
| 13 | discussion? | 04:17:51 |
| 14 | MS. LUNETTA:  Objection.  Outside the | 04:17:52 |
| 15 | scope.  I'm going to direct him not to answer. | 04:17:53 |
| 16 | Q    Are you going to follow your lawyer's | 04:17:55 |
| 17 | advice? | 04:17:55 |
| 18 | A    I am. | 04:17:57 |
| 19 | Q    Has Gibson Dunn come to you with | 04:18:07 |
| 20 | respect to the protocol for any of its other | 04:18:11 |
| 21 | clients? | 04:18:15 |
| 22 | MS. LUNETTA:  Objection.  Temporal | 04:18:15 |
| 23 | scope is limited to up to the launch of the | 04:18:17 |
| 24 | protocol, so I'm going to direct him not to | 04:18:20 |
| 25 | answer.  I think any discussions that may or may | 04:18:24 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          216

1   not have happened after the launch of the protocol          04:18:25

2   would be outside the scope.                                 04:18:29

3       Q    Are you going to follow your lawyer's             04:18:31

4   advice?                                                     04:18:36

5       A    I am.                                              04:18:36

6       Q    When you were talking to Gibson Dunn              04:18:37

7   and DoorDash prior to the launch of the protocol,           04:18:39

8   did Gibson Dunn ever raise the prospect that the            04:18:41

9   protocol would be used by any of its other                  04:18:49

10  clients?                                                    04:18:52

11      A    I think in the context of our talking             04:18:54

12  about the protocol being more broadly applicable            04:18:56

13  than from DoorDash, Gibson Dunn noted that they             04:19:00

14  were involved in other similar matters, but we              04:19:04

15  really never got to a discussion of the                     04:19:10

16  application to another similar matter.                      04:19:13

17      Q    So Gibson Dunn never raised the specter           04:19:19

18  of let's get this done for DoorDash and then we'll          04:19:23

19  have another client that will be looking to do the          04:19:26

20  same thing?                                                 04:19:28

21      A    Well, you say the specter.  I prefer to           04:19:29

22  refer to that as an opportunity.  Because, as I             04:19:33

23  understood it, they had other clients that might            04:19:37

24  be interested.  But prior to the launch of the              04:19:39

25  protocol, we never had any such discussions.                04:19:43

Transcript of Allen Waxman
Conducted on December 27, 2019                    217

| 1 | Q   But you saw the potential for an | 04:19:47 |
| 2 | opportunity with additional Gibson Dunn clients | 04:19:49 |
| 3 | prior to the launch of the protocol? | 04:19:54 |
| 4 | A   I was saying I was certainly hoping for | 04:19:56 |
| 5 | additional opportunities with Gibson Dunn and | 04:19:58 |
| 6 | hopefully others as well. | 04:20:01 |
| 7 | Q   Okay. | 04:20:03 |
| 8 | I'm going to hand you a document I have | 04:20:03 |
| 9 | marked as Exhibit 20.  It's Bates 255 to 256. | 04:20:05 |
| 10 | (Waxman Exhibit 20 marked for | 04:20:10 |
| 11 | identification and attached to the transcript.) | 04:20:10 |
| 12 | Q   This is an e-mail from you to | 04:20:19 |
| 13 | Mr. Sabatino and Mr. Kiernan, again "re: mass | 04:20:20 |
| 14 | claims protocol, dated 10-29." | 04:20:27 |
| 15 | A   Uh-huh. | 04:20:31 |
| 16 | Q   So it says you spoke to GDC last | 04:20:40 |
| 17 | evening. | 04:20:44 |
| 18 | Is that Gibson, Dunn & Crutcher. | 04:20:44 |
| 19 | A   I'm sorry, where are you looking? | 04:20:48 |
| 20 | Q   I'm sorry.  You say, "We spoke to | 04:20:50 |
| 21 | DoorDash last evening."  Excuse me. | 04:20:56 |
| 22 | 255, at the top. | 04:21:01 |
| 23 | A   Yeah.  So it looks like on October 28th | 04:21:03 |
| 24 | we had a conversation with not just DoorDash, but | 04:21:06 |
| 25 | Gibson Dunn as well.  We say here on Exhibit 19, | 04:21:12 |

Transcript of Allen Waxman
Conducted on December 27, 2019                      218

| | | |
|---|---|---|
| 1 | "Michael, Gregg and Josh, Helena may not be able | 04:21:17 |
| 2 | to join us for today's call, but let's proceed in | 04:21:23 |
| 3 | any event." | 04:21:26 |
| 4 | Q    Do you know who was on that call? | 04:21:27 |
| 5 | A    Again, I don't recall ever speaking | 04:21:29 |
| 6 | with Josh, so I'm assuming he was not on the call. | 04:21:30 |
| 7 | I don't have an independent | 04:21:35 |
| 8 | recollection, but most likely it was Michael and | 04:21:37 |
| 9 | Gregg. | 04:21:39 |
| 10 | Q    Okay. | 04:21:42 |
| 11 | Were there any changes to the draft | 04:21:42 |
| 12 | protocol as a result of your conversation with | 04:21:44 |
| 13 | DoorDash on the 28th? | 04:21:44 |
| 14 | A    Do you have the attachment here to | 04:21:51 |
| 15 | Exhibit 20? | 04:21:55 |
| 16 | Q    I haven't held anything back. | 04:22:05 |
| 17 | MS. LUNETTA:  I don't believe there is | 04:22:08 |
| 18 | one. | 04:22:10 |
| 19 | A    I see.  I see the attached protocol is | 04:22:12 |
| 20 | down to the lower e-mail of October 27th. | 04:22:15 |
| 21 | MS. LUNETTA:  That was Exhibit 19, | 04:22:24 |
| 22 | right? | 04:22:25 |
| 23 | MR. ZIGLER:  I'm sorry? | 04:22:26 |
| 24 | MS. LUNETTA:  That was Exhibit 19, the | 04:22:26 |
| 25 | one below? | 04:22:26 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    219

| | | |
|---|---|---|
| 1 | THE WITNESS:  No. | 04:22:27 |
| 2 | MR. ZIGLER:  No, it is the previous | 04:22:29 |
| 3 | e-mail. | 04:22:30 |
| 4 | MS. LUNETTA:  Okay. | 04:22:32 |
| 5 | Exhibit 18.  Okay. | 04:22:33 |
| 6 | A    I don't recall DoorDash -- us making | 04:22:36 |
| 7 | any other changes to the protocol.  But if I could | 04:22:39 |
| 8 | see subsequent protocols, I can tell you what | 04:22:42 |
| 9 | changes are made and whether anything arose out of | 04:22:45 |
| 10 | comments from Gibson Dunn. | 04:22:49 |
| 11 | Q    Okay. | 04:22:52 |
| 12 | You say, "They may want to launch as | 04:22:55 |
| 13 | early as today." | 04:22:58 |
| 14 | Do you know what the hurry was? | 04:23:00 |
| 15 | A    Again, I think this goes back to the | 04:23:02 |
| 16 | earlier e-mail.  I know that they were wanting to | 04:23:04 |
| 17 | amend their contracts and I wasn't sure why the | 04:23:07 |
| 18 | timing was what it was, nor did we inquire. | 04:23:10 |
| 19 | MS. LUNETTA:  I just want to make sure | 04:23:24 |
| 20 | I have my notes right. | 04:23:25 |
| 21 | Did we mark 247 through 251 -- sorry, | 04:23:27 |
| 22 | through 252 as an exhibit? | 04:23:31 |
| 23 | THE WITNESS:  No, I don't think so.  I | 04:23:38 |
| 24 | have Exhibit 19 as CPR_241 through 246. | 04:23:42 |
| 25 | MS. LUNETTA:  Okay. | 04:23:47 |

| | | |
|---|---|---|
| 1 | Just for clarity, there is another | 04:23:48 |
| 2 | draft that went on Exhibit 20 -- | 04:23:50 |
| 3 | MR. KAYES:  Is that a duplicate of the | 04:23:55 |
| 4 | one prior? | 04:23:56 |
| 5 | We may have gotten one from | 04:23:57 |
| 6 | Mr. Waxman's e-mail and one from Helena's e-mail. | 04:23:59 |
| 7 | MS. LUNETTA:  Okay. | 04:24:05 |
| 8 | MR. ZIGLER:  So 241 and 247 are the | 04:24:05 |
| 9 | same document? | 04:24:07 |
| 10 | MS. LUNETTA:  I apologize.  You're | 04:24:07 |
| 11 | right.  I just want to make sure we weren't | 04:24:08 |
| 12 | missing something.  Thank you. | 04:24:12 |
| 13 | BY MR. ZIGLER: | 04:24:12 |
| 14 | Q    The e-mail says that "we are ready to | 04:24:27 |
| 15 | execute." | 04:24:30 |
| 16 | Was there a document that required | 04:24:32 |
| 17 | signature or consent to DoorDash or Gibson Dunn? | 04:24:34 |
| 18 | A    When I say we are ready to execute, | 04:24:49 |
| 19 | this was us.  CPR are ready to post the protocol | 04:24:51 |
| 20 | and move forward.  We're telling this, advising | 04:24:59 |
| 21 | our board there. | 04:25:05 |
| 22 | Q    Okay. | 04:25:06 |
| 23 | So you weren't waiting for anything | 04:25:16 |
| 24 | from Gibson Dunn or DoorDash? | 04:25:18 |
| 25 | A    Well, I know we were waiting for the | 04:25:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                 221

| | | |
|---|---|---|
| 1 | agreement to the fee structure. | 04:25:24 |
| 2 | Q    Why was getting an agreement by Gibson | 04:25:25 |
| 3 | Dunn and DoorDash to the fee structure a | 04:25:28 |
| 4 | prerequisite to you posting the -- | 04:25:32 |
| 5 | A    It really wasn't a prerequisite, but I | 04:25:36 |
| 6 | had a sense of -- I wanted to know if they were | 04:25:40 |
| 7 | going to agree to that fee structure before we put | 04:25:48 |
| 8 | out.  I guess I had some questions in my mind how | 04:25:51 |
| 9 | this was all playing out and I wanted to | 04:25:55 |
| 10 | understand from them that they were committed to | 04:26:00 |
| 11 | paying the fees. | 04:26:04 |
| 12 | Q    Right. | 04:26:05 |
| 13 | They wanted the mass claims protocol | 04:26:07 |
| 14 | and you wanted their agreement on fees. | 04:26:10 |
| 15 | Is that fair? | 04:26:12 |
| 16 | MS. LUNETTA:  Objection to form. | 04:26:14 |
| 17 | A    I don't know that they wanted the mass | 04:26:15 |
| 18 | claims protocol.  There was a lot about the mass | 04:26:16 |
| 19 | claims protocol, as I think I have gone through in | 04:26:20 |
| 20 | some depth, that they didn't want. | 04:26:22 |
| 21 | Q    Okay. | 04:26:27 |
| 22 | A    But to answer, if the mass claims | 04:26:34 |
| 23 | protocol was going to apply, I wanted to make sure | 04:26:35 |
| 24 | we had a commitment to the fees. | 04:26:38 |
| 25 | | |

Transcript of Allen Waxman
Conducted on December 27, 2019                    222

| | | |
|---|---|---|
| 1 | (Waxman Exhibit 21 marked for | 04:26:40 |
| 2 | identification and attached to the transcript.) | 04:26:40 |
| 3 | Q   I'm going to hand you an exhibit I have | 04:26:54 |
| 4 | marked as 21.  It's Bates 259 to 264.  Take a look | 04:26:56 |
| 5 | at that. | 04:27:02 |
| 6 | This is an e-mail from you to Michael | 04:27:11 |
| 7 | Holecek, Gregg Farano and Joshua Lipshutz dated | 04:27:14 |
| 8 | 10/29.  It says, "Please find the attached | 04:27:24 |
| 9 | protocol with one addition we made in Footnote 3. | 04:27:30 |
| 10 | What's the status out there?  We are still working | 04:27:32 |
| 11 | through some issues here." | 04:27:36 |
| 12 | Do you see that? | 04:27:38 |
| 13 | A   Yep. | 04:27:39 |
| 14 | Q   What issues were you working through at | 04:27:39 |
| 15 | CPR? | 04:27:42 |
| 16 | A   In this time frame, I think we wanted | 04:27:47 |
| 17 | it to make sure we got it posted correctly.  We | 04:27:50 |
| 18 | wanted to make sure the links worked.  We wanted | 04:27:53 |
| 19 | to make sure the template would work, that the | 04:27:56 |
| 20 | launch process was all organized and ready to go. | 04:28:02 |
| 21 | So that may have been what I was | 04:28:08 |
| 22 | referring to.  I'm not exactly sure.  I was trying | 04:28:10 |
| 23 | to find out.  Again, I thought it was very | 04:28:13 |
| 24 | important before you send out your contracts, I | 04:28:16 |
| 25 | want to make sure the protocol is up so whoever | 04:28:19 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    223

| | | |
|---|---|---|
| 1 | you're asking to sign those contracts can actually | 04:28:23 |
| 2 | see the protocol, read the protocol, consult on | 04:28:25 |
| 3 | the protocol, do whatever.  So I wanted to make | 04:28:29 |
| 4 | sure that was happening. | 04:28:32 |
| 5 | And we had sent them the prior version | 04:28:33 |
| 6 | of the protocol as in, so, okay, you're going to | 04:28:36 |
| 7 | be referencing this in your contract, and then we | 04:28:39 |
| 8 | made another change.  I want to make sure you know | 04:28:43 |
| 9 | what you're about to reference in your contract, | 04:28:45 |
| 10 | so here is another change.  And this change, as | 04:28:47 |
| 11 | you can see, is redlined here in Footnote 3, | 04:28:50 |
| 12 | noting that the procedures of this protocol shall | 04:28:52 |
| 13 | apply whether or not you file under the | 04:28:58 |
| 14 | administered rules or the non-administered rules, | 04:29:00 |
| 15 | and that the submission of the Excel spreadsheet | 04:29:03 |
| 16 | amounts to filing for purposes of the administered | 04:29:07 |
| 17 | rules. | 04:29:10 |
| 18 | So the technical aspect of how that was | 04:29:10 |
| 19 | all happening, I wanted to make sure they | 04:29:12 |
| 20 | understood that as they were about to incorporate | 04:29:14 |
| 21 | this into their contract. | 04:29:17 |
| 22 | Q    And who came up with that change, the | 04:29:19 |
| 23 | Footnote 3? | 04:29:21 |
| 24 | A    Me and Helena. | 04:29:23 |
| 25 | Q    Okay. | 04:29:25 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    224

| | | |
|---|---|---|
| 1 | What is the status out there, you | 04:29:25 |
| 2 | ask -- | 04:29:26 |
| 3 | A    Are you amending? | 04:29:29 |
| 4 | Again, I wanted to make sure we had our | 04:29:31 |
| 5 | protocol.  If you're amending to refer to us, I | 04:29:34 |
| 6 | want to make the protocol precedes that. | 04:29:37 |
| 7 | Q    Okay. | 04:29:40 |
| 8 | I'm going to hand you a document that's | 04:30:00 |
| 9 | marked CPR_271. | 04:30:02 |
| 10 | (Waxman Exhibit 22 marked for | 04:30:05 |
| 11 | identification and attached to the transcript.) | 04:30:05 |
| 12 | Q    It is another cover e-mail with another | 04:30:06 |
| 13 | protocol attached.  It's Bates 271 to 276.  This | 04:30:09 |
| 14 | is an e-mail from you to Ms. Erickson, cc'ing Ms. | 04:30:24 |
| 15 | Zamorsky and Mr. Growcock and Ms. Grace. | 04:30:29 |
| 16 | A    Yes. | 04:30:37 |
| 17 | Q    This is forward DD/CPR call? | 04:30:42 |
| 18 | A    Yep. | 04:30:46 |
| 19 | Q    "Helena, DoorDash signed off on one | 04:30:47 |
| 20 | change to the protocol." | 04:30:50 |
| 21 | A    This is, I think, referring back to | 04:30:55 |
| 22 | that addition of Footnote 3, I think in the prior | 04:30:58 |
| 23 | document we were just looking at. | 04:31:04 |
| 24 | Q    Okay. | 04:31:07 |
| 25 | A    And that DoorDash had indicated they | 04:31:07 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    225

| | | |
|---|---|---|
| 1 | would be able to deal with those filing -- the | 04:31:11 |
| 2 | nature of the filing procedures we were putting in | 04:31:18 |
| 3 | place. | 04:31:21 |
| 4 | Q    Okay. | 04:31:22 |
| 5 | Was there a call we missed?  I didn't | 04:31:22 |
| 6 | see an invite or a notation for a call, and this | 04:31:27 |
| 7 | is referencing a call.  I'm just wondering if we | 04:31:31 |
| 8 | missed something. | 04:31:35 |
| 9 | A    You mean because DoorDash signed off -- | 04:31:35 |
| 10 | references a call? | 04:31:37 |
| 11 | Q    Yeah.  Do you know? | 04:31:40 |
| 12 | A    That may very well be.  There was, | 04:31:48 |
| 13 | like, a call where -- but there may not have been. | 04:31:50 |
| 14 | Somehow I got the notion that, okay, they were | 04:31:54 |
| 15 | registering with us.  Yes, we see you have made | 04:31:58 |
| 16 | the change, yes, we could abide by the change. | 04:32:01 |
| 17 | And then I may have gotten other information on | 04:32:04 |
| 18 | the status of things, but I'm not recalling | 04:32:06 |
| 19 | offhand. | 04:32:10 |
| 20 | Q    Do you recall who you talked to at | 04:32:11 |
| 21 | Gibson Dunn or DoorDash? | 04:32:14 |
| 22 | A    The only person I ever spoke to at | 04:32:16 |
| 23 | Gibson Dunn was Mike Holecek.  And the only person | 04:32:18 |
| 24 | I ever spoke to at DoorDash was Gregg Farano.  I | 04:32:22 |
| 25 | don't think that would have been with Gregg | 04:32:26 |

Transcript of Allen Waxman
Conducted on December 27, 2019                         226

| 1 | Farano.  I think I had a couple of calls with | 04:32:26 |
| 2 | Gregg Farano and that was it.  It would probably | 04:32:28 |
| 3 | have been with Holecek. | 04:32:31 |
| 4 | Q    Okay. | 04:32:38 |
| 5 | A    And then here, on Exhibit 22, it is | 04:32:38 |
| 6 | referring, I think, to some of the other matters | 04:32:40 |
| 7 | that I referenced before we were working on it. | 04:32:41 |
| 8 | Q    Okay. | 04:32:44 |
| 9 | What role did Ms. Zamorsky play in all | 04:32:45 |
| 10 | of this? | 04:32:49 |
| 11 | A    So, again, I think I referenced her | 04:32:50 |
| 12 | earlier.  She is in communications and marketing. | 04:32:52 |
| 13 | Q    Okay. | 04:32:55 |
| 14 | So what did she have to do with respect | 04:32:55 |
| 15 | to the protocol? | 04:32:57 |
| 16 | A    She helps us post things up on the | 04:32:58 |
| 17 | website. | 04:33:02 |
| 18 | Q    Okay. | 04:33:03 |
| 19 | A    And we issued a press release a couple | 04:33:03 |
| 20 | of days after we launched it. | 04:33:06 |
| 21 | Q    What about Ms. Grace? | 04:33:08 |
| 22 | A    She works in the dispute resolution | 04:33:10 |
| 23 | services and works with our panel. | 04:33:12 |
| 24 | Q    Okay. | 04:33:14 |
| 25 | So why was she copied on this e-mail? | 04:33:14 |

Transcript of Allen Waxman
Conducted on December 27, 2019                           227

| | |
|---|---|
| 1 |     A   For working with the master panel list | 04:33:16 |
| 2 | and bios, which is what's indicated here on | 04:33:23 |
| 3 | Exhibit 22. | 04:33:26 |
| 4 |     Q   And Mr. Growcock? | 04:33:30 |
| 5 |     A   He is IT. | 04:33:33 |
| 6 |     Q   So is he backing up Ms. Zamorsky? | 04:33:34 |
| 7 |     A   There is the website and then there is | 04:33:39 |
| 8 | this template that's available, and we want to | 04:33:41 |
| 9 | make sure we can upload it seamlessly.  He was | 04:33:43 |
| 10 | working on IT matters. | 04:33:47 |
| 11 |     Q   Okay. | 04:33:49 |
| 12 |     I'm going to give you another document. | 04:33:55 |
| 13 | This one is marked Exhibit 23, and it is Bates 277 | 04:34:00 |
| 14 | to 282. | 04:34:08 |
| 15 |     (Waxman Exhibit 23 marked for | 04:34:09 |
| 16 | identification and attached to the transcript.) | 04:34:09 |
| 17 |     Q   Again, an e-mail from you to | 04:34:18 |
| 18 | Mr. Holecek, cc'ing yourself again.  "Michael, one | 04:34:20 |
| 19 | other change, see paragraph 27.  We think | 04:34:24 |
| 20 | necessary given state laws.  Let me know if you | 04:34:28 |
| 21 | have any questions.  We are going to send off the | 04:34:30 |
| 22 | agreement.  Any updates on status?" | 04:34:31 |
| 23 |     Who came up with the change for | 04:34:36 |
| 24 | paragraph 27? | 04:34:38 |
| 25 |     A   I did. | 04:34:39 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    228

| | | |
|---|---|---|
| 1 | Q    Sorry, you did? | 04:34:40 |
| 2 | A    I did. | 04:34:41 |
| 3 | Q    Okay. | 04:34:46 |
| 4 |       Who were you going to send off the | 04:34:47 |
| 5 | agreement to? | 04:34:49 |
| 6 | A    And again, just to be clear, I wanted | 04:34:50 |
| 7 | to make sure, if they are about to amend their | 04:34:53 |
| 8 | contracts, they had the latest version of the | 04:34:58 |
| 9 | protocol and that they were going to be | 04:35:00 |
| 10 | referencing that and we were going to have that up | 04:35:02 |
| 11 | there.  So that's what this was about.  And the | 04:35:06 |
| 12 | status that I'm seeking is, where are you on this | 04:35:09 |
| 13 | amendment process?  "Sending off the agreement," | 04:35:12 |
| 14 | is the fee agreement with Mr. Farano. | 04:35:15 |
| 15 | Q    So you were telling Mr. Farano that you | 04:35:20 |
| 16 | were getting ready to send him -- | 04:35:23 |
| 17 | A    No, this is Mr. Holecek. | 04:35:25 |
| 18 | Q    Mr. Holecek? | 04:35:27 |
| 19 | A    They were going to send off the | 04:35:28 |
| 20 | agreement to Mr. Farano. | 04:35:30 |
| 21 | Q    That you were going to send the | 04:35:32 |
| 22 | agreement to Mr. Farano? | 04:35:33 |
| 23 | A    Right, on the fees. | 04:35:35 |
| 24 | Q    I'm going to hand you another document | 04:35:50 |
| 25 | I've marked as Exhibit 24. | 04:35:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    229

| | | |
|---|---|---|
| 1 | (Waxman Exhibit 24 marked for | 04:35:56 |
| 2 | identification and attached to the transcript.) | 04:35:56 |
| 3 | Q    This is Bates 289.  It is a one-page | 04:35:57 |
| 4 | e-mail from you to Mr. Farano. | 04:35:59 |
| 5 | Could you describe this e-mail for me. | 04:36:37 |
| 6 | A    "Subject: Employment-related mass | 04:36:39 |
| 7 | claims matter agreement.  We ask that you confirm, | 04:36:44 |
| 8 | on behalf of DoorDash, by return e-mail, the | 04:36:48 |
| 9 | agreement of DoorDash to the following terms, | 04:36:52 |
| 10 | references to paragraphs in the protocol relating | 04:36:54 |
| 11 | to application of CPR's employment-related mass | 04:36:58 |
| 12 | claims protocol." | 04:37:00 |
| 13 | And then it sets forth the various fee | 04:37:03 |
| 14 | structures and what the fees cover.  And then | 04:37:05 |
| 15 | finally concludes, "Finally, DoorDash agrees that | 04:37:07 |
| 16 | its inclusion of this protocol in its contracts | 04:37:11 |
| 17 | and application to counterparties shall comply | 04:37:14 |
| 18 | with all applicable laws, ordinances, regulations | 04:37:16 |
| 19 | and orders of any relevant jurisdiction." | 04:37:19 |
| 20 | Q    So this was the agreement that you | 04:37:25 |
| 21 | mentioned in the previous e-mail -- | 04:37:26 |
| 22 | A    Yes. | 04:37:28 |
| 23 | Q    -- that you were sending to Mr. Farano. | 04:37:29 |
| 24 | And this was the agreement that you | 04:37:32 |
| 25 | wanted him to consent to prior to launching the | 04:37:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    230

| | | |
|---|---|---|
| 1 | mass claims protocol? | 04:37:36 |
| 2 | MS. LUNETTA:  Objection to form. | 04:37:38 |
| 3 | A    Correct. | 04:37:39 |
| 4 | Q    Now, I'm not a rules jockey when it | 04:37:41 |
| 5 | comes to the protocol or your arbitration rules, | 04:37:47 |
| 6 | but is it fair to say that should an arbitration | 04:37:52 |
| 7 | run through the mass claims protocol, that | 04:38:00 |
| 8 | DoorDash would owe CPR $108,000 under this | 04:38:02 |
| 9 | agreement? | 04:38:08 |
| 10 | A    I'm sorry, you'll have to -- | 04:38:11 |
| 11 | Q    I have just gone through and added up | 04:38:14 |
| 12 | the various menu items here and came up with | 04:38:16 |
| 13 | $108,000. | 04:38:20 |
| 14 | Is this what would happen if one mass | 04:38:23 |
| 15 | claims protocol was initiated against DoorDash | 04:38:28 |
| 16 | with CPR, the fees that DoorDash would -- | 04:38:33 |
| 17 | MS. LUNETTA:  Objection. | 04:38:38 |
| 18 | A    I don't see how it would be one if it | 04:38:39 |
| 19 | states 30 or more to trigger the protocol.  So | 04:38:41 |
| 20 | that would be 30 arbitrations, $3,000 per | 04:38:44 |
| 21 | arbitration appointment. | 04:38:47 |
| 22 | Q    Okay.  Oh, all right. | 04:38:50 |
| 23 | A    30 times 3,000 is 90,000. | 04:38:51 |
| 24 | Q    Okay. | 04:38:54 |
| 25 | A    And if there is 100, that's 300,000. | 04:38:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    231

| | | |
|---|---|---|
| 1 | If there is -- | 04:38:57 |
| 2 | Q    Okay. | 04:39:01 |
| 3 | So let's go through just the bare | 04:39:01 |
| 4 | minimum. | 04:39:03 |
| 5 | So it takes 30 to invoke the mass | 04:39:06 |
| 6 | claims protocol; is that right? | 04:39:08 |
| 7 | A    30 nearly identical claims, yeah. | 04:39:11 |
| 8 | Q    Right.  Okay. | 04:39:14 |
| 9 | So if 30 nearly identical claims were | 04:39:15 |
| 10 | filed against DoorDash with CPR, 30 nearly | 04:39:18 |
| 11 | identical employment claims, it would invoke the | 04:39:23 |
| 12 | mass employment protocol; is that right? | 04:39:26 |
| 13 | A    Yeah.  Let me step back for a second. | 04:39:34 |
| 14 | So let us say, because, again, this | 04:39:36 |
| 15 | wasn't just DoorDash, this is -- let's say | 04:39:39 |
| 16 | somebody filed 15 nearly identical claims. | 04:39:43 |
| 17 | Q    Uh-huh. | 04:39:46 |
| 18 | A    Those claims would be treated as either | 04:39:46 |
| 19 | administered or non-administered and the current | 04:39:48 |
| 20 | fee structure on our website would apply. | 04:39:51 |
| 21 | Q    Right. | 04:39:53 |
| 22 | A    At such point as it got to be more than | 04:39:54 |
| 23 | 30, then the protocol would get triggered. | 04:39:58 |
| 24 | Q    Okay. | 04:40:00 |
| 25 | A    If the protocol gets triggered, there | 04:40:00 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    232

| | | |
|---|---|---|
| 1 | is an initiation fee.  In this case, that's | 04:40:03 |
| 2 | $70,000.  Then there are the test cases, which | 04:40:06 |
| 3 | would be 10 to 20.  Those would be 30,000 or maybe | 04:40:09 |
| 4 | $60,000 to appoint arbitrators, plus presentation | 04:40:14 |
| 5 | fee of $15,000.  Then there would be a mediation | 04:40:20 |
| 6 | administrative fee of $20,000.  Then, depending | 04:40:26 |
| 7 | upon what happens on the back end, if there are | 04:40:30 |
| 8 | more arbitrations, it becomes $3,000 per | 04:40:34 |
| 9 | appointment of an arbitrator for the remaining | 04:40:37 |
| 10 | arbitrations. | 04:40:40 |
| 11 | Q    This would be -- | 04:40:41 |
| 12 | A    And then every six months, there is | 04:40:42 |
| 13 | another presentation of the master list, which is | 04:40:45 |
| 14 | another $15,000. | 04:40:47 |
| 15 | Q    This would be a substantial amount of | 04:40:49 |
| 16 | ADR fees in comparison to CPR's usual annual | 04:40:53 |
| 17 | revenue in ADR fees; is that correct? | 04:41:02 |
| 18 | MS. LUNETTA:  Objection to form.  And | 04:41:06 |
| 19 | it's beyond the scope.  So I'm going to direct him | 04:41:07 |
| 20 | not to answer. | 04:41:09 |
| 21 | Q    Are you going to follow your lawyer's | 04:41:12 |
| 22 | advice? | 04:41:12 |
| 23 | A    I'm following my lawyer's instructions. | 04:41:14 |
| 24 | This is probably worth noting.  The | 04:41:29 |
| 25 | more arbitrations occur, the faster the | 04:41:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                              233

| | | |
|---|---|---|
| 1 | arbitrations occur, the more the fees accumulate. | 04:41:34 |
| 2 | How are you doing on status of time? | 04:41:50 |
| 3 | Q    I think we're almost done. | 04:41:55 |
| 4 | THE WITNESS:  Can we take one last -- | 04:41:57 |
| 5 | MR. ZIGLER:  We can take a break | 04:41:58 |
| 6 | whenever you want. | 04:41:58 |
| 7 | THE WITNESS:  Yeah, do you mind? | 04:41:58 |
| 8 | THE VIDEOGRAPHER:  We're going off the | 04:41:59 |
| 9 | record.  The time is 4:41. | 04:42:00 |
| 10 | (A recess was taken.) | 04:42:02 |
| 11 | THE VIDEOGRAPHER:  We are back on the | 04:56:24 |
| 12 | record.  The time is 4:56 p.m. | 04:56:25 |
| 13 | BY MR. ZIGLER: | 04:56:27 |
| 14 | Q    Okay. | 04:56:28 |
| 15 | So we're referring back to Exhibit 24, | 04:56:28 |
| 16 | Bates 289. | 04:56:30 |
| 17 | Was this the first time that you | 04:56:34 |
| 18 | conveyed the fee structure to DoorDash or Gibson | 04:56:35 |
| 19 | Dunn? | 04:56:38 |
| 20 | A    Well, I think you've seen, probably in | 04:56:41 |
| 21 | the earlier protocols, there was some reference to | 04:56:43 |
| 22 | fees when we were talking about different fee | 04:56:46 |
| 23 | structures. | 04:56:48 |
| 24 | Q    Yeah, but I don't know that they had | 04:56:49 |
| 25 | any amounts in them. | 04:56:51 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                234

| | | |
|---|---|---|
| 1 | A    No, I think the earlier ones did have a | 04:56:52 |
| 2 | reference to some amounts, the very early ones. | 04:56:54 |
| 3 | Q    But other than the draft -- other than | 04:56:57 |
| 4 | if it was included in the draft protocol, this | 04:57:00 |
| 5 | would have been the first time that you conveyed | 04:57:02 |
| 6 | the fee amounts? | 04:57:05 |
| 7 | A    Yeah. | 04:57:06 |
| 8 | MS. LUNETTA:  Objection to form. | 04:57:07 |
| 9 | Q    Were these fees negotiated with Gibson | 04:57:15 |
| 10 | Dunn or DoorDash prior to this e-mail of 10/30? | 04:57:17 |
| 11 | A    No. | 04:57:22 |
| 12 | Q    You can set that one aside. | 04:57:59 |
| 13 | I'm going to hand you a document that's | 04:58:02 |
| 14 | been marked as Exhibit 25.  It is CPR_294 through | 04:58:05 |
| 15 | 296. | 04:58:10 |
| 16 | (Waxman Exhibit 25 marked for | 04:58:11 |
| 17 | identification and attached to the transcript.) | 04:58:11 |
| 18 | Q    E-mail from you to Michael Holecek. | 04:58:12 |
| 19 | Is this you conveying to Michael that | 04:58:23 |
| 20 | the ball is in his court? | 04:58:26 |
| 21 | MS. LUNETTA:  Objection to form. | 04:58:29 |
| 22 | A    Well, not so much the ball is in his | 04:58:32 |
| 23 | court.  I'm just waiting on Gregg to sign off on | 04:58:35 |
| 24 | the payment terms. | 04:58:38 |
| 25 | Q    I'm going to hand you a document marked | 04:59:04 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    235

| | | |
|---|---|---|
| 1 | as Exhibit 26.  This is CPR_303 to 304. | 04:59:06 |
| 2 | (Waxman Exhibit 26 marked for | 04:59:11 |
| 3 | identification and attached to the transcript.) | 04:59:11 |
| 4 | Q    Can you describe Exhibit 26 to me? | 04:59:21 |
| 5 | A    This is an e-mail from Gregg Farano to | 04:59:26 |
| 6 | me and others, dated October 31st. | 04:59:31 |
| 7 | Q    Okay. | 04:59:37 |
| 8 | And this is Mr. Farano agreeing to the | 04:59:37 |
| 9 | fee structure that you proposed to him on behalf | 04:59:46 |
| 10 | of DoorDash? | 04:59:49 |
| 11 | MS. LUNETTA:  Objection to the form. | 04:59:52 |
| 12 | A    He is agreeing on behalf of DoorDash to | 04:59:53 |
| 13 | pay these fees. | 04:59:55 |
| 14 | Q    What did you do after you received this | 05:00:05 |
| 15 | e-mail? | 05:00:09 |
| 16 | A    I don't recall specifically. | 05:00:16 |
| 17 | Q    Did you forward it on to anybody? | 05:00:18 |
| 18 | A    I might have. | 05:00:24 |
| 19 | Q    Do you know who you forwarded it on to? | 05:00:24 |
| 20 | A    I don't recall. | 05:00:27 |
| 21 | Q    Were you at home when you received it? | 05:00:32 |
| 22 | A    7:18 p.m.?  I don't know. | 05:00:38 |
| 23 | Q    You don't remember where you were when | 05:00:42 |
| 24 | you got it? | 05:00:44 |
| 25 | A    I don't recall. | 05:00:49 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    236

| | | |
|---|---|---|
| 1 | Q    I'm going to hand you a document marked | 05:01:46 |
| 2 | Exhibit 27.  It's CPR_307.  It is just a one-page | 05:01:48 |
| 3 | document. | 05:01:53 |
| 4 | (Waxman Exhibit 27 marked for | 05:01:54 |
| 5 | identification and attached to the transcript.) | 05:01:54 |
| 6 | Q    Take a look at that for me. | 05:01:55 |
| 7 | A    Okay. | 05:02:12 |
| 8 | Q    When did Mr. Holecek think you were | 05:02:22 |
| 9 | planning to publish on November 1st? | 05:02:25 |
| 10 | A    Wasn't there an earlier e-mail that I | 05:02:34 |
| 11 | said something like we would have it done by the | 05:02:36 |
| 12 | end of the week?  That may be why. | 05:02:39 |
| 13 | Q    Based on something you told him? | 05:02:47 |
| 14 | A    Yeah, I would assume so. | 05:02:49 |
| 15 | Q    Okay. | 05:02:57 |
| 16 | I'm going to hand you a document marked | 05:02:57 |
| 17 | Exhibit 28.  It's CPR_308. | 05:02:59 |
| 18 | (Waxman Exhibit 28 marked for | 05:03:03 |
| 19 | identification and attached to the transcript.) | 05:03:03 |
| 20 | Q    It is just a one-page document.  It is | 05:03:04 |
| 21 | your response. | 05:03:06 |
| 22 | A    Yeah.  So again, the protocol was for | 05:03:16 |
| 23 | more than just DoorDash matter and we wanted to | 05:03:23 |
| 24 | prepare some explanatory documents.  So if you | 05:03:27 |
| 25 | have seen the protocol, there is a cover page in | 05:03:30 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                    237

1    which we try to simplify the terms of the protocol         05:03:34

2    so as to facilitate understanding of the protocol.         05:03:39

3    And we wanted to get all of that ready, so we              05:03:42

4    wanted to hold off until the following week.               05:03:46

5         Q    From your perspective, the more                  05:03:49

6    businesses that adopted the protocol, the better           05:03:52

7    off you were?                                              05:03:55

8              MS. LUNETTA:  Objection to the form.             05:03:56

9         A    You said the better off we were.  I              05:03:58

10   thought -- I think it is a good protocol.  It              05:04:00

11   facilitates resolution.  I think it can help in            05:04:03

12   that regard.  I think it furthers our mission.  I          05:04:06

13   think it furthers our desire for resolution and            05:04:09

14   our work in this area, and we think we have                05:04:13

15   something to offer in this area.  And I think,             05:04:15

16   financially, it can be beneficial to us from a             05:04:17

17   funding perspective as well.                               05:04:21

18        Q    And the second issue deals with fee              05:04:25

19   waivers, which I believe was raised by Gibson Dunn         05:04:27

20   previously, according to Ms. Erickson's notes; is          05:04:32

21   that right?                                                05:04:37

22        A    I think that was my note.  You had               05:04:38

23   asked me about that earlier today.  I'm not sure           05:04:42

24   that I recalled this was something we discussed            05:04:45

25   back at the outset, but it may very well have been         05:04:48

Transcript of Allen Waxman
Conducted on December 27, 2019                    238

| | | |
|---|---|---|
| 1 | the same topic, but I'm not sure I recall that | 05:04:52 |
| 2 | when I received this. | 05:04:55 |
| 3 | Q    Okay. | 05:04:58 |
| 4 | And you say, "We have not typically | 05:04:58 |
| 5 | provided our waivers given our bandwidth, but | 05:05:00 |
| 6 | let's discuss what you have in mind." | 05:05:04 |
| 7 | Do you see that? | 05:05:07 |
| 8 | A    Yeah. | 05:05:07 |
| 9 | Q    Did you discuss with Mr. Holecek what | 05:05:08 |
| 10 | he had in mind? | 05:05:10 |
| 11 | A    Yeah.  It wasn't clear to me what he | 05:05:12 |
| 12 | was talking about with respect to fee waivers. | 05:05:14 |
| 13 | What it turned out, that I've learned, he was | 05:05:17 |
| 14 | talking about waivers of employees or claimants | 05:05:20 |
| 15 | who could not afford the state filing fee and | 05:05:26 |
| 16 | providing waivers for that. | 05:05:31 |
| 17 | Q    So did you two have a discussion about | 05:05:33 |
| 18 | that? | 05:05:35 |
| 19 | A    I don't recall whether we had a | 05:05:38 |
| 20 | discussion or e-mail correspondence or -- I don't. | 05:05:39 |
| 21 | I mean, I recall we carried that forward and we | 05:05:45 |
| 22 | have fee waivers available for claimants. | 05:05:49 |
| 23 | Q    Okay. | 05:05:53 |
| 24 | What did you think that he was talking | 05:05:54 |
| 25 | about before he clarified? | 05:05:56 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          239

| | | |
|---|---|---|
| 1 | A    Waiving fees.  And I wasn't sure in | 05:06:03 |
| 2 | what context that was and so forth, and that's | 05:06:08 |
| 3 | generally not something we've done.  So -- | 05:06:11 |
| 4 | Q    For respondents, was that your | 05:06:15 |
| 5 | understanding? | 05:06:17 |
| 6 | A    No, just fees in general, waivers of | 05:06:18 |
| 7 | fees.  And I wasn't sure in what context he was -- | 05:06:23 |
| 8 | well, he says here, "Fee waivers.  If the | 05:06:30 |
| 9 | claimants cannot afford fees and their income | 05:06:32 |
| 10 | falls below a certain threshold.  AAA offers fee | 05:06:35 |
| 11 | waivers, but I did not see it on your website. | 05:06:37 |
| 12 | We're just curious about what the policy is with | 05:06:39 |
| 13 | respect to fee waivers." | 05:06:44 |
| 14 | So I guess at this point in time, I | 05:06:45 |
| 15 | understood he was talking about with respect to | 05:06:46 |
| 16 | claimants.  We had not done that previously, and I | 05:06:48 |
| 17 | wanted to understand a little bit more, what he | 05:06:51 |
| 18 | was talking about.  So -- | 05:06:54 |
| 19 | Q    So in -- as of November 2nd, you did | 05:06:57 |
| 20 | not offer fee waivers to indigent claimants; is | 05:07:03 |
| 21 | that the case? | 05:07:07 |
| 22 | MS. LUNETTA:  Objection to form. | 05:07:09 |
| 23 | A    I say we have not typically provided. | 05:07:16 |
| 24 | I would have to -- I would have to dig into it a | 05:07:19 |
| 25 | little more, if we ever had provided fee waivers | 05:07:24 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    240

| | | |
|---|---|---|
| 1 | for indigent claimants.  I know that subsequent to | 05:07:27 |
| 2 | this, we updated our approach so that there is a | 05:07:31 |
| 3 | form that can be filled out to establish | 05:07:35 |
| 4 | indigency. | 05:07:38 |
| 5 | Q   I'm going to hand you what's been | 05:07:57 |
| 6 | marked Exhibit 29. | 05:07:59 |
| 7 | (Waxman Exhibit 29 marked for | 05:08:01 |
| 8 | identification and attached to the transcript.) | 05:08:01 |
| 9 | Q   This is a two-page document, beginning | 05:08:03 |
| 10 | Bates 310. | 05:08:06 |
| 11 | Have you seen this document before? | 05:08:23 |
| 12 | A   I'm sure I have. | 05:08:25 |
| 13 | Q   Did you breathe a sigh of relief upon | 05:08:26 |
| 14 | sending this e-mail? | 05:08:29 |
| 15 | MS. LUNETTA:  Objection to form.  Even | 05:08:33 |
| 16 | though I know the spirit in which it was offered. | 05:08:34 |
| 17 | A   I was proud of our accomplishment. | 05:08:41 |
| 18 | Q   Okay. | 05:08:45 |
| 19 | So this e-mail is you conveying to | 05:08:47 |
| 20 | Gibson Dunn that the protocol is live; is that | 05:08:51 |
| 21 | right? | 05:08:55 |
| 22 | A   The call goes up and you can link to | 05:08:55 |
| 23 | it. | 05:08:57 |
| 24 | Q   Okay. | 05:09:00 |
| 25 | Why did you ask when the contracts with | 05:09:00 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    241

| | | |
|---|---|---|
| 1 | links would go out? | 05:09:03 |
| 2 |     A   I just wanted to know, like, what | 05:09:06 |
| 3 | should we be expecting. | 05:09:09 |
| 4 |     Q   Did you send an e-mail concerning -- | 05:09:11 |
| 5 | stating that the protocol was live to anyone else | 05:09:14 |
| 6 | other than Gibson Dunn? | 05:09:20 |
| 7 |     A   I'm fairly confident I did. | 05:09:25 |
| 8 |     Q   Who else did you send an e-mail to | 05:09:28 |
| 9 | stating that the protocol was live? | 05:09:30 |
| 10 |     MS. LUNETTA:  I'm going to object that | 05:09:38 |
| 11 | it is beyond the scope of the deposition.  And I'm | 05:09:39 |
| 12 | going to instruct him not to answer. | 05:09:41 |
| 13 |     Q   Are you going to follow your attorney's | 05:09:43 |
| 14 | advice? | 05:09:43 |
| 15 |     A   Yes. | 05:09:44 |
| 16 |     Q   Since the launch of the protocol, have | 05:09:56 |
| 17 | you or anyone else at CPR exchanged e-mails with | 05:09:58 |
| 18 | Gibson Dunn or DoorDash? | 05:10:04 |
| 19 |     MS. LUNETTA:  Objection.  Beyond the | 05:10:07 |
| 20 | scope of the deposition.  I'm going to instruct | 05:10:07 |
| 21 | him not to answer. | 05:10:10 |
| 22 |     Q   Are you going to follow your lawyer's | 05:10:11 |
| 23 | advice? | 05:10:12 |
| 24 |     A   I'm going to follow counsel's | 05:10:12 |
| 25 | instruction. | 05:10:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    242

| | | |
|---|---|---|
| 1 | Q    Since the launch of the protocol, have | 05:10:14 |
| 2 | you or anyone else at CPR discussed the protocol | 05:10:15 |
| 3 | with Gibson or DoorDash? | 05:10:15 |
| 4 | MS. LUNETTA:  Same objection.  I'm | 05:10:17 |
| 5 | going to direct him not to answer. | 05:10:17 |
| 6 | Q    Are you going to follow your lawyer's | 05:10:21 |
| 7 | advice? | 05:10:21 |
| 8 | A    Yes. | 05:10:23 |
| 9 | Q    I think I asked this question before, | 05:10:33 |
| 10 | but I just want to make sure. | 05:10:34 |
| 11 | Did CPR or you conduct any factual | 05:10:35 |
| 12 | investigation in connection with its development | 05:10:38 |
| 13 | of the mass claims protocol in September or | 05:10:39 |
| 14 | October of 2019? | 05:10:43 |
| 15 | MS. LUNETTA:  Objection to form. | 05:10:45 |
| 16 | A    What do you mean by a factual | 05:10:46 |
| 17 | investigation on that? | 05:10:48 |
| 18 | Q    The status, factual status of claims | 05:10:49 |
| 19 | with respect to DoorDash drivers -- | 05:10:55 |
| 20 | MS. LUNETTA:  Objection to form. | 05:10:58 |
| 21 | Q    -- for example. | 05:10:59 |
| 22 | A    The protocol we were developing was not | 05:11:00 |
| 23 | for DoorDash.  The protocol we were developing was | 05:11:03 |
| 24 | more generally applicable. | 05:11:08 |
| 25 | Q    Okay. | 05:11:10 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    243

| | | |
|---|---|---|
| 1 | Did you do any factual investigation to | 05:11:17 |
| 2 | determine the state of DoorDash arbitrations at | 05:11:20 |
| 3 | AAA? | 05:11:24 |
| 4 | A    Other than what I have testified to | 05:11:27 |
| 5 | today, and I believe I have testified to all of | 05:11:29 |
| 6 | the various specific information I had, I can't | 05:11:32 |
| 7 | recall anything else that I did to look into the | 05:11:36 |
| 8 | status of the delivery service drivers claims with | 05:11:39 |
| 9 | AAA. | 05:11:44 |
| 10 | Q    Okay. | 05:11:45 |
| 11 | Did you do any factual investigation as | 05:11:45 |
| 12 | to other ADR providers' existence or development | 05:11:47 |
| 13 | of mass claims protocols? | 05:11:53 |
| 14 | MS. LUNETTA:  Objection.  Beyond the | 05:11:56 |
| 15 | scope of the deposition.  I'm going to advise him | 05:11:57 |
| 16 | not to answer. | 05:11:59 |
| 17 | Q    Are you going to follow your lawyer's | 05:12:01 |
| 18 | advice? | 05:12:01 |
| 19 | A    I am. | 05:12:02 |
| 20 | Q    Since their adoption, have any changes | 05:12:28 |
| 21 | to the mass claims protocol been discussed? | 05:12:31 |
| 22 | MS. LUNETTA:  Objection to form. | 05:12:37 |
| 23 | Do you mean the launch or the adoption | 05:12:38 |
| 24 | by DoorDash? | 05:12:42 |
| 25 | MR. ZIGLER:  I can use the launch, | 05:12:45 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    244

| | | |
|---|---|---|
| 1 | that's fine. | 05:12:46 |
| 2 | BY MR. ZIGLER: | 05:12:47 |
| 3 | Q    Since the launch of the mass claims | 05:12:47 |
| 4 | protocol at CPR, have you discussed any suggested | 05:12:49 |
| 5 | changes to the protocol? | 05:12:55 |
| 6 | A    Discussed with whom? | 05:12:59 |
| 7 | Q    With anybody. | 05:13:01 |
| 8 | MS. LUNETTA:   Objection.   And I just | 05:13:05 |
| 9 | want to caution him not to discuss anything that's | 05:13:06 |
| 10 | been discussed with counsel, if there is any. | 05:13:08 |
| 11 | Q    Externing those communications that you | 05:13:13 |
| 12 | would consider covered by attorney-client | 05:13:17 |
| 13 | privilege, since the launch of the mass claims | 05:13:19 |
| 14 | protocol, have you discussed any changes with the | 05:13:22 |
| 15 | protocol with anyone? | 05:13:25 |
| 16 | A    With anyone? | 05:13:28 |
| 17 | Look, the mass claims protocol was | 05:13:30 |
| 18 | launched on November 4th.   Within two and a half | 05:13:35 |
| 19 | weeks, there was litigation that raised issues | 05:13:41 |
| 20 | about the mass claims protocol.   There has been a | 05:13:46 |
| 21 | lot of discussions of the mass claims protocol. | 05:13:50 |
| 22 | And I'm going to follow my counsel's | 05:13:56 |
| 23 | advice to differentiate in my mind between | 05:14:00 |
| 24 | conversations before, after.   It has been a rather | 05:14:07 |
| 25 | short period of time and there has been a lot of | 05:14:13 |

Transcript of Allen Waxman
Conducted on December 27, 2019                      245

| | | |
|---|---|---|
| 1 | discussion of the mass claims protocol, and I | 05:14:16 |
| 2 | can't differentiate in my mind if all of those | 05:14:18 |
| 3 | discussions have happened in the context of this | 05:14:21 |
| 4 | matter or something else. | 05:14:23 |
| 5 | Q    Okay. | 05:14:26 |
| 6 | Has CPR considered exempting any | 05:14:36 |
| 7 | person, claimant or group of claimants from the | 05:14:43 |
| 8 | mass claims protocol? | 05:14:46 |
| 9 | MS. LUNETTA:  Objection to form. | 05:14:49 |
| 10 | A    I'd be happy, outside the context of a | 05:14:57 |
| 11 | deposition, to have a discussion with you, with | 05:15:00 |
| 12 | counsel for Gibson Dunn and with anybody else who | 05:15:02 |
| 13 | wants to have a discussion about the application | 05:15:05 |
| 14 | of the mass claims protocol. | 05:15:07 |
| 15 | Other than that, I don't think a | 05:15:11 |
| 16 | deposition is the appropriate forum for us to have | 05:15:13 |
| 17 | discussions of applicability of the exemptions and | 05:15:16 |
| 18 | so forth.  I understand you and your colleagues | 05:15:21 |
| 19 | have raised that.  I think that's best done | 05:15:24 |
| 20 | outside the context of the deposition. | 05:15:26 |
| 21 | Q    I understand that. | 05:15:30 |
| 22 | Just so that I can make my record, I | 05:15:34 |
| 23 | understand that you're unwilling to testify about | 05:15:39 |
| 24 | the application of the current existing | 05:15:45 |
| 25 | protocol -- | 05:15:48 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          246

| | | |
|---|---|---|
| 1 | A    No, that's not what I'm saying.  You | 05:15:49 |
| 2 | know you-all raised this as a prospect with our | 05:15:52 |
| 3 | counsel.  You know you raised it.  And so you're | 05:15:55 |
| 4 | asking me now have there been discussions of it. | 05:15:58 |
| 5 | You raised it.  You're asking me now to talk about | 05:16:01 |
| 6 | conversations I have had with my counsel.  I'm | 05:16:04 |
| 7 | more than happy to have conversations with anybody | 05:16:06 |
| 8 | and everybody, as you would like, but I don't | 05:16:08 |
| 9 | think the deposition is the place to have those | 05:16:11 |
| 10 | conversations. | 05:16:13 |
| 11 | Q    Sure. | 05:16:14 |
| 12 | No, I want to -- in case I wasn't | 05:16:14 |
| 13 | clear, I want to exclude any conversation that you | 05:16:16 |
| 14 | have had with counsel. | 05:16:19 |
| 15 | A    You raised an issue with counsel.  Now | 05:16:20 |
| 16 | you're asking me -- | 05:16:22 |
| 17 | MS. LUNETTA:  Let me just object.  To | 05:16:24 |
| 18 | the extent there have been conversations that | 05:16:26 |
| 19 | would fall under Rule 408 as potential settlement | 05:16:28 |
| 20 | discussions or CPR's efforts during | 05:16:32 |
| 21 | counsel-to-counsel discussions about trying to | 05:16:36 |
| 22 | help facilitate a resolution of the issues that | 05:16:37 |
| 23 | we're currently involved in, I don't think it is | 05:16:40 |
| 24 | appropriate for Mr. Waxman to testify about that | 05:16:44 |
| 25 | on the record. | 05:16:48 |

Transcript of Allen Waxman
Conducted on December 27, 2019                                 247

| | | |
|---|---|---|
| 1 | But as I said before, it's enigma to | 05:16:48 |
| 2 | CPR to be in the middle of the litigation in any | 05:16:48 |
| 3 | way.  It's against their mission.  And we've | 05:16:48 |
| 4 | offered several times to counsel on both sides | 05:16:53 |
| 5 | that if there is a way that we can help resolve | 05:16:57 |
| 6 | any concerns that claimants may have or that | 05:17:00 |
| 7 | respondents may have, we're happy to do that. | 05:17:02 |
| 8 | Outside the context of litigation, CPR stands | 05:17:04 |
| 9 | ready to help resolve any issues that you might | 05:17:08 |
| 10 | have.  And I've already communicated that to you, | 05:17:11 |
| 11 | so this is not a surprise. | 05:17:14 |
| 12 | MR. ZIGLER:  And that's not what I'm | 05:17:14 |
| 13 | trying to get into. | 05:17:16 |
| 14 | MS. LUNETTA:  Okay. | 05:17:17 |
| 15 | BY MR. ZIGLER: | 05:17:17 |
| 16 | Q    Just so that I am clear, outside of | 05:17:17 |
| 17 | communication with your counsel, outside | 05:17:19 |
| 18 | communications with any of my colleagues, have | 05:17:23 |
| 19 | there been discussions with other parties, not to | 05:17:26 |
| 20 | this litigation, about excluding any claimant or | 05:17:30 |
| 21 | group of claimants from application of the mass | 05:17:34 |
| 22 | claims protocol? | 05:17:37 |
| 23 | MS. LUNETTA:  So given that question, | 05:17:38 |
| 24 | I'm going to object to that as beyond the scope of | 05:17:39 |
| 25 | the deposition for totally unrelated reasons. | 05:17:43 |

Transcript of Allen Waxman
Conducted on December 27, 2019                        248

| 1 | Q    Okay. | 05:17:46 |
|---|---|---|
| 2 | When did CPR first contact Judge | 05:17:47 |
| 3 | Scheindlin about serving as an administrator in | 05:17:49 |
| 4 | the protocol? | 05:17:53 |
| 5 | MS. LUNETTA:  It is outside the scope, | 05:18:00 |
| 6 | but I already shared some of these broad details | 05:18:02 |
| 7 | with your colleague, that it was after the | 05:18:06 |
| 8 | litigation, after this litigation began.  So I | 05:18:10 |
| 9 | think it is outside the scope, but I think you | 05:18:13 |
| 10 | know the answer.  I don't think he can testify to | 05:18:16 |
| 11 | it because it is outside the scope of the | 05:18:18 |
| 12 | deposition. | 05:18:20 |
| 13 | MR. ZIGLER:  Okay. | 05:18:21 |
| 14 | So you're going to instruct him not to | 05:18:21 |
| 15 | answer? | 05:18:23 |
| 16 | MS. LUNETTA:  Yes.  Although I'm happy | 05:18:24 |
| 17 | to talk to you about it after. | 05:18:25 |
| 18 | BY MR. ZIGLER: | 05:18:27 |
| 19 | Q    Are you going to follow your lawyer's | 05:18:28 |
| 20 | advice? | 05:18:28 |
| 21 | A    I am. | 05:18:30 |
| 22 | Q    Okay. | 05:18:31 |
| 23 | MS. LUNETTA:  Yeah, I hope.  At the end | 05:18:33 |
| 24 | of the day, you get nervous as a lawyer, are they | 05:18:34 |
| 25 | going to just get tired of following your advice? | 05:18:35 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    249

| | | |
|---|---|---|
| 1 | It could happen at any time. | 05:18:38 |
| 2 | MR. ZIGLER:  Let me just cut through | 05:18:47 |
| 3 | this. | 05:18:49 |
| 4 | You intend to instruct the witness not | 05:18:52 |
| 5 | to answer any questions about Judge Scheindlin's | 05:18:54 |
| 6 | involvement; is that correct? | 05:18:57 |
| 7 | MS. LUNETTA:  Yes.  Although we're | 05:19:00 |
| 8 | happy to have an off-the-record conversation to | 05:19:02 |
| 9 | help facilitate this matter going forward. | 05:19:04 |
| 10 | MR. ZIGLER:  That's with somebody else. | 05:19:07 |
| 11 | I'm just here to take the deposition. | 05:19:09 |
| 12 | MS. LUNETTA:  Got it. | 05:19:11 |
| 13 | BY MR. ZIGLER: | 05:19:11 |
| 14 | Q    And you intend to follow your lawyer's | 05:19:11 |
| 15 | advice? | 05:19:13 |
| 16 | A    I do. | 05:19:14 |
| 17 | Q    Okay. | 05:19:14 |
| 18 | Do you know of any other business that | 05:19:19 |
| 19 | has adopted the CPR's mass claims protocol other | 05:19:25 |
| 20 | than DoorDash? | 05:19:35 |
| 21 | MS. LUNETTA:  Objection.  Beyond the | 05:19:41 |
| 22 | scope.  I'm going to advise my client not to | 05:19:42 |
| 23 | answer. | 05:19:44 |
| 24 | A    I follow. | 05:19:45 |
| 25 | MR. ZIGLER:  Okay. | 05:19:45 |

| | | |
|---|---|---|
| 1 | And just to make the record, do you | 05:19:45 |
| 2 | plan on instructing him not to answer with respect | 05:19:47 |
| 3 | to any questions concerning anything that happened | 05:19:50 |
| 4 | post adoption of the claims protocol? | 05:19:54 |
| 5 | MS. LUNETTA:  Just to be clear, do you | 05:19:59 |
| 6 | mean after CPR launched the protocol on November | 05:20:00 |
| 7 | 4th? | 05:20:04 |
| 8 | MR. ZIGLER:  Yes, I do. | 05:20:05 |
| 9 | MS. LUNETTA:  Yes, I do. | 05:20:06 |
| 10 | BY MR. ZIGLER: | 05:20:06 |
| 11 | Q    And you intend to follow your lawyer's | 05:20:07 |
| 12 | advice? | 05:20:09 |
| 13 | A    I do. | 05:20:10 |
| 14 | Q    Okay. | 05:20:11 |
| 15 | All right.  Home stretch. | 05:20:16 |
| 16 | MS. LUNETTA:  That's what they all say. | 05:20:18 |
| 17 | (Waxman Exhibit 31 marked for | 05:20:19 |
| 18 | identification and attached to the transcript.) | 05:20:19 |
| 19 | Q    I'm going to hand you a document that's | 05:20:20 |
| 20 | been marked 31.  It is CPR_514. | 05:20:23 |
| 21 | Have you seen that document before? | 05:20:30 |
| 22 | A    Yes, I believe I've seen this document | 05:20:51 |
| 23 | before. | 05:20:53 |
| 24 | Q    Okay. | 05:20:53 |
| 25 | And can you describe it for me? | 05:20:53 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    251

| | | |
|---|---|---|
| 1 | A    It's an e-mail from Ms. Erickson to me | 05:20:55 |
| 2 | on September 27th. | 05:20:59 |
| 3 | Q    Do you know who GB is? | 05:21:00 |
| 4 | A    I'm not sure, but I'm thinking that's | 05:21:07 |
| 5 | GD, Gibson Dunn. | 05:21:10 |
| 6 | Q    Well, the next sentence says, "He is | 05:21:12 |
| 7 | good." | 05:21:15 |
| 8 | A    So I would think that's Mike Holecek. | 05:21:17 |
| 9 | Q    Okay. | 05:21:20 |
| 10 | MS. LUNETTA:  Is this one of the | 05:21:21 |
| 11 | documents we produced to you today? | 05:21:22 |
| 12 | MR. ZIGLER:  Yeah. | 05:21:24 |
| 13 | MS. LUNETTA:  We realize there was a | 05:21:24 |
| 14 | typo, so we didn't pick it up. | 05:21:26 |
| 15 | MR. ZIGLER:  Okay. | 05:21:28 |
| 16 | MS. LUNETTA:  So that's why we produced | 05:21:28 |
| 17 | it.  It was GD, was the intention. | 05:21:28 |
| 18 | MR. ZIGLER:  Okay. | 05:21:34 |
| 19 | So the reference to his client later in | 05:21:34 |
| 20 | that paragraph is to DoorDash, is your | 05:21:36 |
| 21 | understanding? | 05:21:40 |
| 22 | MS. LUNETTA:  That's what we believe it | 05:21:42 |
| 23 | to be, yes. | 05:21:44 |
| 24 | A    So here she is referencing some ideas | 05:21:56 |
| 25 | we have around test cases and their concerns, | 05:21:59 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    252

| | | |
|---|---|---|
| 1 | which later get reflected as well, about -- | 05:22:01 |
| 2 | albeit, I'm not sure why test cases raise | 05:22:07 |
| 3 | collective action light bulbs, but that is a | 05:22:11 |
| 4 | concern they had throughout. | 05:22:14 |
| 5 |     Q   Okay. | 05:22:16 |
| 6 |     Can you explain collection action light | 05:22:17 |
| 7 | bulbs to me? | 05:22:20 |
| 8 |     A   I assume the same concern that got | 05:22:21 |
| 9 | manifested later on with respect to the protocol | 05:22:24 |
| 10 | is, could this protocol lead to a back-end class | 05:22:26 |
| 11 | action collective action. | 05:22:30 |
| 12 |     (Waxman Exhibit 30 marked for | 05:22:32 |
| 13 | identification and attached to the transcript.) | 05:22:32 |
| 14 |     Q   I'm going to hand you another document | 05:22:34 |
| 15 | marked Exhibit 30.  It is 527 to 530. | 05:22:36 |
| 16 |     Can you tell me what this is? | 05:22:52 |
| 17 |     A   This may be my calendar.  I don't know. | 05:23:02 |
| 18 |     This is someone's calendar. | 05:23:12 |
| 19 |     Q   Someone's calendar.  Okay. | 05:23:13 |
| 20 |     A   Maybe it is Ms. Erickson's calendar or | 05:23:16 |
| 21 | maybe it is my calendar. | 05:23:19 |
| 22 |     MS. LUNETTA:  It is Ms. Erickson's. | 05:23:20 |
| 23 |     Q   Okay. | 05:23:23 |
| 24 |     Ms. Erickson's calendar. | 05:23:23 |
| 25 | | |

Transcript of Allen Waxman
Conducted on December 27, 2019                    253

| | | |
|---|---|---|
| 1 | (Waxman Exhibit 32 marked for | 05:23:25 |
| 2 | identification and attached to the transcript.) | 05:23:25 |
| 3 | Q    All right. | 05:23:26 |
| 4 | I'm going to hand you another document | 05:23:26 |
| 5 | marked Exhibit 32.  This is Bates 515 to 526. | 05:23:28 |
| 6 | Can you tell me what that is? | 05:23:55 |
| 7 | A    This is not mine.  I believe this is | 05:24:02 |
| 8 | Ms. Erickson's.  And I believe it is a diary of | 05:24:04 |
| 9 | sorts. | 05:24:09 |
| 10 | Q    Okay. | 05:24:13 |
| 11 | A    Time diary. | 05:24:19 |
| 12 | MR. ZIGLER:  All right. | 05:24:25 |
| 13 | Let's take a five-minute break. | 05:24:25 |
| 14 | THE VIDEOGRAPHER:  We're going off the | 05:24:30 |
| 15 | record.  The time is 5:24 p.m. | 05:24:31 |
| 16 | (A recess was taken.) | 05:33:18 |
| 17 | THE VIDEOGRAPHER:  We are back on the | 05:39:10 |
| 18 | record.  The time is 5:39 p.m. | 05:39:11 |
| 19 | BY MR. ZIGLER: | 05:39:13 |
| 20 | Q    Earlier, you testified that CPR was | 05:39:19 |
| 21 | aware of the issues related to mass arbitrations. | 05:39:23 |
| 22 | Do you recall that testimony? | 05:39:27 |
| 23 | A    I do. | 05:39:29 |
| 24 | Q    Were you aware of Keller Lenkner's | 05:39:31 |
| 25 | participation in mass arbitrations during the | 05:39:39 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    254

| | | |
|---|---|---|
| 1 | creation of the mass claims protocol? | 05:39:47 |
| 2 | A    I don't believe that is registering | 05:39:53 |
| 3 | with me.  I may have read in an article who the | 05:39:57 |
| 4 | players were involved in various mass claims | 05:40:00 |
| 5 | protocol, but I don't remember the name of your | 05:40:05 |
| 6 | law firm coming up. | 05:40:08 |
| 7 | Q    Are you familiar, as you sit here | 05:40:10 |
| 8 | today, with Keller Lenkner's role in mass | 05:40:11 |
| 9 | arbitrations? | 05:40:16 |
| 10 | A    I am now. | 05:40:18 |
| 11 | Q    Did you ever consider reaching out to | 05:40:26 |
| 12 | Keller Lenkner to solicit their reviews in | 05:40:30 |
| 13 | connection with the creation of the mass claims | 05:40:34 |
| 14 | protocol? | 05:40:39 |
| 15 | A    I don't know that I considered it one | 05:40:42 |
| 16 | way or the other. | 05:40:44 |
| 17 | Q    Why not? | 05:40:51 |
| 18 | A    Again, I don't know that I considered | 05:40:54 |
| 19 | it one way or the other. | 05:40:55 |
| 20 | Q    Did you not think that that was | 05:40:58 |
| 21 | important? | 05:41:01 |
| 22 | MS. LUNETTA:  Objection to form. | 05:41:02 |
| 23 | A    I don't know, Mr. Zigler, that it was | 05:41:04 |
| 24 | either important or wasn't important.  I wasn't | 05:41:06 |
| 25 | against getting input from others, nor did I feel | 05:41:10 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          255

| | | |
|---|---|---|
| 1 | the need to reach out for input from others.  We | 05:41:13 |
| 2 | felt like we had received good input on the | 05:41:16 |
| 3 | protocol.  We felt like we had something | 05:41:19 |
| 4 | innovative.  We felt like we had something neutral | 05:41:22 |
| 5 | and balanced, and we were excited to launch it. | 05:41:25 |
| 6 |      Q    And then I just have one clarification | 05:41:28 |
| 7 | question. | 05:41:31 |
| 8 |           Earlier, I asked you if you had | 05:41:31 |
| 9 | discussed the mass claims protocol with any | 05:41:34 |
| 10 | counsel representing DoorDash drivers in this | 05:41:40 |
| 11 | classification of claims and you told me no. | 05:41:47 |
| 12 |           And what I should have asked you was: | 05:41:49 |
| 13 | Did you attempt to contact any counsel who | 05:41:51 |
| 14 | represented DoorDash drivers in misclassification | 05:41:55 |
| 15 | claims? | 05:42:02 |
| 16 |           So let me ask that question.  Sorry. | 05:42:02 |
| 17 |           Did you, during the creation and | 05:42:05 |
| 18 | drafting of the mass claims protocol, attempt to | 05:42:10 |
| 19 | reach out to lawyers that you knew were | 05:42:14 |
| 20 | representing DoorDash drivers in misclassification | 05:42:20 |
| 21 | claims? | 05:42:26 |
| 22 |           MS. LUNETTA:  Objection.  That's beyond | 05:42:27 |
| 23 | the scope of the deposition.  I'm going to | 05:42:28 |
| 24 | instruct him not to answer. | 05:42:30 |
| 25 |      Q    Are you going to follow your lawyer's | 05:42:31 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    256

| | | |
|---|---|---|
| 1 | advice? | 05:42:31 |
| 2 |     A    I am. | 05:42:32 |
| 3 |     MR. ZIGLER:  I'm all done. | 05:42:36 |
| 4 | EXAMINATION BY | 05:42:39 |
| 5 | MS. LUNETTA: | 01:39:11 |
| 6 |     Q    I just have one clarifying question. | 05:42:41 |
| 7 |     Mr. Waxman, if Gibson Dunn or DoorDash | 05:42:44 |
| 8 | reached out to CPR today with a new arbitration | 05:42:49 |
| 9 | agreement, maybe with consumers or some other | 05:42:55 |
| 10 | population, what would they have to do before they | 05:42:58 |
| 11 | could reference the CPR protocol in that new | 05:43:02 |
| 12 | arbitration agreement? | 05:43:06 |
| 13 |     A    Well, again, I don't know we would do | 05:43:10 |
| 14 | something with consumers.  So it would be, if | 05:43:13 |
| 15 | there was an attempt to use the employment mass | 05:43:15 |
| 16 | claims protocol, the first thing is that the | 05:43:20 |
| 17 | underlying agreement needs to reference our | 05:43:23 |
| 18 | administered or non-administered rules.  Secondly, | 05:43:26 |
| 19 | the due process protocols need to be included in | 05:43:29 |
| 20 | the agreement.  Third, there needs to be a | 05:43:34 |
| 21 | specific reference to the mass claims protocol in | 05:43:41 |
| 22 | the agreement.  Fourth, the employer needs to make | 05:43:47 |
| 23 | that accessible to the claimants.  And fifth, we | 05:43:52 |
| 24 | need to have a discussion on a fee structure. | 05:43:57 |
| 25 |     On our website, it is clear that you | 05:44:03 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    257

| | | |
|---|---|---|
| 1 | need to talk to CPR, before utilizing the | 05:44:07 |
| 2 | protocol, to arrive at the fee structure, and we | 05:44:13 |
| 3 | want that resolved and taken care of before any | 05:44:17 |
| 4 | party launches with our mass claims protocol.  So | 05:44:22 |
| 5 | that is all worked out. | 05:44:27 |
| 6 | Q    Would you require all of those steps if | 05:44:29 |
| 7 | anyone else came to you now to use the mass claims | 05:44:36 |
| 8 | protocol? | 05:44:41 |
| 9 | A    Same steps for everybody. | 05:44:42 |
| 10 | Q    And did you follow all of those same | 05:44:43 |
| 11 | steps when DoorDash wanted to reference the CPR | 05:44:46 |
| 12 | protocol in its current arbitration agreement with | 05:44:49 |
| 13 | drivers? | 05:44:53 |
| 14 | A    Yes. | 05:44:53 |
| 15 | MS. LUNETTA:  That's all I have. | 05:44:54 |
| 16 | CONTINUED EXAMINATION | 05:44:55 |
| 17 | BY MR. ZIGLER: | 05:44:55 |
| 18 | Q    So what would you do if -- I'll pick a | 05:44:56 |
| 19 | company, ABC, today decided to roll out an | 05:44:59 |
| 20 | arbitration agreement with its employees that | 05:45:05 |
| 21 | referenced or required CPR as the sole arbitration | 05:45:08 |
| 22 | provider, and tomorrow a dispute arose between one | 05:45:14 |
| 23 | of its employees and that employee initiated the | 05:45:20 |
| 24 | requirements necessary to begin an arbitration | 05:45:28 |
| 25 | with CPR, but yet you never talked to, never done | 05:45:33 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    258

| | | |
|---|---|---|
| 1 | any of those other steps with company, ABC? | 05:45:41 |
| 2 | A    This is for the mass claims, or do you | 05:45:47 |
| 3 | just mean an individual arbitration? | 05:45:49 |
| 4 | Q    I just mean an individual arbitration, | 05:45:52 |
| 5 | right now. | 05:45:54 |
| 6 | A    In that instance, the parties would | 05:45:55 |
| 7 | come to us. | 05:45:56 |
| 8 | Is it under administered or | 05:45:58 |
| 9 | non-administered rules? | 05:46:01 |
| 10 | Q    It would be under the administered | 05:46:03 |
| 11 | rules. | 05:46:04 |
| 12 | A    Under the administered rules, the | 05:46:04 |
| 13 | parties need to come to us. | 05:46:05 |
| 14 | Q    So the claimant shows up, he pays his | 05:46:06 |
| 15 | fee, files his initiating documents. | 05:46:06 |
| 16 | A    In an employment case? | 05:46:09 |
| 17 | Q    In an employment case. | 05:46:11 |
| 18 | A    Is this employment or non-employment? | 05:46:12 |
| 19 | Q    Employment case. | 05:46:15 |
| 20 | He comes to you, files his initial | 05:46:15 |
| 21 | documents, pays his fee, and gets served upon the | 05:46:18 |
| 22 | company, but the company hasn't done any of the | 05:46:22 |
| 23 | stuff that you just mentioned.  They haven't come | 05:46:27 |
| 24 | to you to negotiate fees, they haven't referenced | 05:46:29 |
| 25 | the due process protocols. | 05:46:32 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    259

| | | |
|---|---|---|
| 1 | A    Well, if the due process protocols | 05:46:34 |
| 2 | aren't in place in the contract, then, as is | 05:46:37 |
| 3 | clear, we will not administer the case. | 05:46:40 |
| 4 | Q    You will just reject it? | 05:46:42 |
| 5 | A    We will just reject it. | 05:46:44 |
| 6 | Q    And if -- what if everything else is | 05:46:44 |
| 7 | met, but the company hasn't come to you to | 05:46:48 |
| 8 | negotiate fees? | 05:46:51 |
| 9 | A    Well, our administered fees are posted. | 05:46:52 |
| 10 | And we will ask if there is then going to be a | 05:46:57 |
| 11 | selection of an arbitrator, you have to pay the | 05:47:02 |
| 12 | fee before we commence the -- before we select the | 05:47:05 |
| 13 | arbitrator. | 05:47:08 |
| 14 | Q    Right. | 05:47:09 |
| 15 | A    Because that's what you're coming to us | 05:47:09 |
| 16 | for. | 05:47:13 |
| 17 | Q    And what would happen if company ABC | 05:47:13 |
| 18 | refused to pay the fee that was charged by CPR? | 05:47:16 |
| 19 | A    Probably the arbitrator wouldn't get | 05:47:25 |
| 20 | selected. | 05:47:28 |
| 21 | Q    And what would you tell the claimant? | 05:47:29 |
| 22 | A    So under our due process protocols, | 05:47:33 |
| 23 | this is on the respondent to pay. | 05:47:36 |
| 24 | Q    And if the respondent -- | 05:47:39 |
| 25 | A    And the claimant only pays up to what's | 05:47:39 |

Transcript of Allen Waxman
Conducted on December 27, 2019                          260

| | | |
|---|---|---|
| 1 | the equivalent of a filing fee, of a state court | 05:47:43 |
| 2 | filing fee. | 05:47:46 |
| 3 | Q    So the claimant pays $450.  The | 05:47:47 |
| 4 | respondent -- | 05:47:49 |
| 5 | A    Or less. | 05:47:51 |
| 6 | Q    Or less.  The respondent refuses to pay | 05:47:52 |
| 7 | his share of the arbitration fees. | 05:47:55 |
| 8 | What happens next? | 05:47:58 |
| 9 | MS. LUNETTA:  What CPR does next, is | 05:48:04 |
| 10 | what you're asking? | 05:48:07 |
| 11 | Q    Yes, what does CPR do next? | 05:48:09 |
| 12 | A    The intention is to require an | 05:48:15 |
| 13 | agreement that all rights are preserved pending | 05:48:19 |
| 14 | either the claimant going to court to move to | 05:48:24 |
| 15 | compel or move to dismiss or seek whatever relief. | 05:48:27 |
| 16 | We want to hold things in abeyance, with all | 05:48:33 |
| 17 | rights preserved, until the claimant decides what | 05:48:38 |
| 18 | the claimant wants to do.  We would not be able to | 05:48:41 |
| 19 | proceed with the arbitration. | 05:48:43 |
| 20 | Q    I thought the due process protocols | 05:49:00 |
| 21 | were incorporated into your rules. | 05:49:02 |
| 22 | Is that not right? | 05:49:04 |
| 23 | A    No, they live on our website.  And it | 05:49:04 |
| 24 | is very clear, if you have an employment matter, | 05:49:06 |
| 25 | we have indicated we will not administer the | 05:49:08 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    261

| | | |
|---|---|---|
| 1 | matter if the due process protocols are not in | 05:49:12 |
| 2 | place.  And that's also part of the protocol. | 05:49:15 |
| 3 | Q    Okay. | 05:49:18 |
| 4 | So if I have an arbitration agreement | 05:49:19 |
| 5 | with an employee that says you've got a dispute | 05:49:21 |
| 6 | with me, we've got to go to binding arbitration in | 05:49:24 |
| 7 | front of CPR? | 05:49:29 |
| 8 | A    Right.  So in the agreement, it says | 05:49:31 |
| 9 | CPR. | 05:49:32 |
| 10 | Q    Period, the end.  It doesn't say | 05:49:33 |
| 11 | anything more than that. | 05:49:35 |
| 12 | Is that something that you will | 05:49:36 |
| 13 | administer or not? | 05:49:36 |
| 14 | A    And there is no other due process | 05:49:38 |
| 15 | protocols provided? | 05:49:40 |
| 16 | Q    That's all that the clause says. | 05:49:41 |
| 17 | A    We won't administer if the due process | 05:49:43 |
| 18 | protections are not in place. | 05:49:46 |
| 19 | Q    Okay. | 05:49:48 |
| 20 | So when the claimant shows up and he | 05:49:48 |
| 21 | says, I have a contract that says I am going to | 05:49:50 |
| 22 | come here, here is my $450, what do you tell him? | 05:49:52 |
| 23 | A    Well, in that instance, we would see | 05:49:56 |
| 24 | the contract. | 05:50:00 |
| 25 | Are the protections in place? | 05:50:01 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    262

| | | |
|---|---|---|
| 1 | We then, if the protections aren't in | 05:50:04 |
| 2 | place, may ask the employer, are you going to | 05:50:06 |
| 3 | provide these protections?  And if not, we won't | 05:50:10 |
| 4 | administer it. | 05:50:13 |
| 5 | Q    Okay. | 05:50:14 |
| 6 | So what if 50 claimants show up with an | 05:50:27 |
| 7 | employment claim against ABC and, again, ABC's | 05:50:31 |
| 8 | arbitration provision says if we have a dispute, | 05:50:37 |
| 9 | you have to go to binding arbitration in front of | 05:50:40 |
| 10 | CPR, and we'll follow the due process protections. | 05:50:44 |
| 11 | Period.  No reference to the mass claims protocol. | 05:50:53 |
| 12 | What do you tell the 50 claimants in | 05:50:59 |
| 13 | that instance? | 05:51:01 |
| 14 | A    Those are going to be 50 separate | 05:51:04 |
| 15 | claims.  Yeah, it shouldn't be by accident that | 05:51:06 |
| 16 | the mass claims protocol gets applied. | 05:51:10 |
| 17 | Q    Okay. | 05:51:31 |
| 18 | So then I'll ask a follow-up question | 05:51:31 |
| 19 | to Kim's, which is -- | 05:51:36 |
| 20 | A    I thought that's what you were doing. | 05:51:38 |
| 21 | Q    You said would you require these steps | 05:51:42 |
| 22 | if anyone came to you now to use the mass claims | 05:51:45 |
| 23 | protocol, and you said, yes, everybody. | 05:51:49 |
| 24 | Has anyone come to you to want to use | 05:51:52 |
| 25 | the mass claims protocol? | 05:51:54 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    263

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  Yeah, I objected | 05:51:56 |
| 2 | previously, and I renew that objection.  It's | 05:51:58 |
| 3 | outside the scope.  And I direct him not to | 05:52:00 |
| 4 | answer. | 05:52:02 |
| 5 | MR. ZIGLER:  I think you opened the | 05:52:03 |
| 6 | door to that question with your redirect. | 05:52:05 |
| 7 | MS. LUNETTA:  I don't think so, but I'm | 05:52:08 |
| 8 | still instructing him not to answer. | 05:52:10 |
| 9 | BY MR. ZIGLER: | 05:52:11 |
| 10 | Q    Are you going to follow your lawyer's | 05:52:13 |
| 11 | advice? | 05:52:13 |
| 12 | A    I am. | 05:52:14 |
| 13 | MR. ZIGLER:  All right. | 05:52:14 |
| 14 | That's all I've got. | 05:52:14 |
| 15 | MS. LUNETTA:  I want to say real quick, | 05:52:15 |
| 16 | notwithstanding the time, if there is anything | 05:52:17 |
| 17 | else that you want to ask him, he is here to do | 05:52:19 |
| 18 | this, right.  So if there is anything else you | 05:52:22 |
| 19 | want to ask about Gibson Dunn or DoorDash or their | 05:52:24 |
| 20 | involvement with the development of the protocol | 05:52:27 |
| 21 | or if you want to go through the protocol with | 05:52:27 |
| 22 | him, we're here.  Notwithstanding the time, if | 05:52:30 |
| 23 | you're here, we're here.  He's willing to do that. | 05:52:32 |
| 24 | MR. ZIGLER:  Do you mean off the | 05:52:34 |
| 25 | record? | 05:52:36 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    264

| | | |
|---|---|---|
| 1 | MS. LUNETTA:  No, no, no, on the | 05:52:36 |
| 2 | record. | 05:52:37 |
| 3 | MR. ZIGLER:  Okay. | 05:52:42 |
| 4 | Why don't we take a break. | 05:52:42 |
| 5 | THE VIDEOGRAPHER:  We're going off the | 05:52:45 |
| 6 | record.  The time is 5:52 p.m. | 05:52:46 |
| 7 | (Recess taken.) | 05:52:48 |
| 8 | THE VIDEOGRAPHER:  We're back on the | 05:54:42 |
| 9 | record.  The time is 5:54 p.m. | 05:54:43 |
| 10 | BY MR. ZIGLER: | 05:54:46 |
| 11 | Q    Were there other questions that you | 05:54:47 |
| 12 | were prepared to respond to today that I didn't | 05:54:51 |
| 13 | ask you? | 05:54:55 |
| 14 | A    You didn't ask me a single question | 05:54:58 |
| 15 | about the final protocol. | 05:55:00 |
| 16 | Q    About application of the protocol? | 05:55:02 |
| 17 | A    About the protocol. | 05:55:04 |
| 18 | Q    About the protocol itself? | 05:55:06 |
| 19 | A    The final protocol, you didn't ask a | 05:55:06 |
| 20 | single question.  And I have been here since 9:30 | 05:55:09 |
| 21 | in the morning and it's almost 6 o'clock at night, | 05:55:12 |
| 22 | and we've never seen the final protocol. | 05:55:14 |
| 23 | Q    Okay. | 05:55:17 |
| 24 | Is that all? | 05:55:18 |
| 25 | A    Is that all what? | 05:55:21 |

Transcript of Allen Waxman
Conducted on December 27, 2019                    265

| | | |
|---|---|---|
| 1 | Q    Is that all? | 05:55:23 |
| 2 |      Is that the -- I'm just following up. | 05:55:24 |
| 3 | A    I mean, I'm assuming my lawyer would | 05:55:28 |
| 4 | object on what I was prepared on.  I'm just | 05:55:31 |
| 5 | surprised, frankly, that, apparently, the issue | 05:55:34 |
| 6 | here is the conscionability or unconscionability | 05:55:38 |
| 7 | of the protocol, and there wasn't a discussion of | 05:55:44 |
| 8 | the protocol at all.  And I was presented and | 05:55:45 |
| 9 | prepared and spent a day and -- but that's neither | 05:55:46 |
| 10 | here nor there for me. | 05:55:52 |
| 11 | Q    All right. | 05:55:55 |
| 12 | A    If you ask me, was there something else | 05:55:56 |
| 13 | I was -- I would have thought we would have talked | 05:55:58 |
| 14 | about the protocol. | 05:56:00 |
| 15 |      MR. ZIGLER:  All right.  Well, thank | 05:56:01 |
| 16 | you for your time. | 05:56:01 |
| 17 |      THE WITNESS:  Thank you. | 05:56:02 |
| 18 |      MS. LUNETTA:  Thank you. | 05:56:02 |
| 19 |      THE VIDEOGRAPHER:  This marks the end | 05:56:03 |
| 20 | of the deposition. | 05:56:04 |
| 21 |      We are off the record at 5:56 p.m. | 05:56:05 |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

Transcript of Allen Waxman
Conducted on December 27, 2019                          266

1                ACKNOWLEDGMENT OF DEPONENT

2

3           I, ALLEN WAXMAN, do hereby acknowledge

4     that I have read and examined the foregoing

5     testimony, and the same is a true, correct and

6     complete transcription of the testimony given by

7     me and any corrections appear on the attached

8     Errata sheet signed by me.

9

10    _____      _____

11           (Date)                     (Signature)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Transcript of Allen Waxman
Conducted on December 27, 2019                          267

1           CERTIFICATE OF REPORTER - NOTARY PUBLIC

2                I, ADRIENNE MIGNANO, the officer before

3      whom the foregoing deposition was taken, do hereby

4      certify that the foregoing transcript is a true

5      and correct record of the testimony given; that

6      said testimony was taken by me and thereafter

7      reduced to typewriting under my direction; that

8      reading and signing was requested; and that I am

9      neither counsel for, related to, nor employed by

10     any of the parties to this case and have no

11     interest, financial or otherwise, in its outcome.

12                IN WITNESS WHEREOF, I have hereunto set

13     my hand and affixed my notarial seal this 2nd day

14     of January, 2020.

15     My Commission Expires: June 26, 2022.

16

17

18

19

20     _____

21

22

23

24

25

Transcript of Allen Waxman
Conducted on December 27, 2019

**A**

**aaa**
89:8, 95:1,
96:5, 96:11,
97:16, 108:6,
127:24, 128:5,
128:13, 129:3,
131:15, 131:22,
149:25, 177:22,
177:23, 202:12,
208:8, 208:20,
209:17, 209:22,
239:10, 243:3,
243:9
**aaa's**
140:8
**aaron**
3:4, 6:15,
201:6
**abc**
257:19, 258:1,
259:17, 262:7
**abc's**
262:7
**abernathy**
1:5, 6:3,
66:19, 68:16,
69:8, 112:13
**abeyance**
260:16
**abide**
179:17, 225:16
**abiding**
177:13
**ability**
53:19, 172:6
**able**
103:5, 116:21,
137:11, 138:8,
163:13, 163:14,
181:14, 197:24,
197:25, 218:1,
225:1, 260:18
**accepted**
165:6, 165:9
**access**
49:13, 55:22,

146:20
**accessible**
256:23
**accident**
262:15
**accommodate**
121:9
**accomplished**
135:25
**accomplishment**
240:17
**according**
237:20
**account**
54:6
**accountant**
84:17, 84:21
**accountants**
84:16
**accounting**
84:15
**accumulate**
233:1
**accuracy**
83:5, 142:3
**accurate**
15:14, 17:21,
62:22, 62:24,
63:4, 93:3,
169:4
**acknowledge**
266:3
**acknowledgment**
266:1
**act**
31:8
**action**
117:3, 117:20,
121:10, 121:19,
121:23, 122:12,
172:8, 172:9,
172:14, 172:18,
173:9, 252:3,
252:6, 252:11
**actions**
117:7, 117:12,
120:23, 120:25,
162:3, 197:25

**active**
155:16
**actively**
52:6, 165:3
**activities**
14:18, 16:1,
16:11, 62:10
**activity**
15:2, 16:12,
143:24
**actual**
72:6, 73:2
**actually**
20:3, 30:10,
127:23, 128:13,
149:17, 176:7,
180:1, 180:23,
202:3, 223:1
**add**
120:22, 151:2
**added**
230:11
**adding**
197:9
**addition**
222:9, 224:22
**additional**
96:11, 96:13,
96:15, 112:9,
158:19, 196:9,
217:2, 217:5
**address**
28:15, 103:7,
118:18, 119:3,
141:13, 182:24,
182:25
**addressed**
195:18, 196:23
**addressing**
45:8
**adjudicate**
116:21
**administer**
56:19, 57:2,
259:3, 260:25,
261:13, 261:17,
262:4
**administered**
19:24, 22:11,

22:25, 23:7,
23:8, 27:3,
27:9, 27:14,
41:22, 42:4,
42:10, 43:12,
196:25, 205:18,
223:14, 223:16,
231:19, 256:18,
258:8, 258:10,
258:12, 259:9
**administering**
23:1
**administration**
89:11
**administrative**
23:8, 196:17,
204:3, 204:12,
212:22, 213:6,
213:10, 232:6
**administrator**
21:21, 248:3
**admissions**
59:4
**adopted**
237:6, 249:19
**adopter**
22:8
**adoption**
243:20, 243:23,
250:4
**adr**
19:4, 20:17,
29:5, 29:18,
138:12, 143:4,
232:16, 232:17,
243:12
**adrienne**
1:19, 2:11,
7:8, 267:2
**advance**
183:20
**advice**
35:1, 35:3,
36:2, 36:18,
42:18, 43:1,
43:20, 44:6,
44:17, 45:6,
45:19, 46:5,

47:8, 47:16,
48:4, 48:19,
48:25, 49:8,
53:25, 55:19,
56:2, 56:9,
56:16, 56:23,
57:6, 57:14,
57:21, 58:5,
58:13, 58:20,
59:18, 60:1,
60:10, 61:2,
62:19, 63:18,
64:7, 64:19,
65:2, 65:10,
65:17, 66:1,
66:10, 78:12,
106:7, 142:9,
143:8, 143:20,
144:4, 144:14,
157:3, 191:9,
192:17, 192:18,
194:15, 199:23,
211:16, 215:17,
216:4, 232:22,
242:7, 243:18,
244:23, 248:20,
248:25, 249:15,
250:12, 256:1,
263:11
**advise**
243:15, 249:22
**advising**
220:20
**advocated**
45:23, 47:3
**advocates**
53:14
**aetna**
134:23
**affected**
167:14
**affirmed**
7:14
**affixed**
267:13
**afford**
238:15, 239:9

**after**
18:4, 37:5,
94:14, 98:25,
116:14, 118:13,
118:14, 132:6,
133:14, 175:15,
175:17, 186:13,
208:22, 210:1,
210:6, 211:8,
211:13, 216:1,
226:20, 235:14,
244:24, 248:7,
248:8, 248:17,
250:6
**again**
17:8, 17:20,
45:8, 46:15,
52:23, 88:18,
90:13, 110:7,
111:7, 133:11,
152:24, 156:23,
164:16, 173:13,
184:14, 185:24,
186:8, 196:8,
211:4, 217:13,
218:5, 219:15,
222:23, 224:4,
226:11, 227:17,
227:18, 228:6,
231:14, 236:22,
254:18, 256:13,
262:7
**against**
173:10, 230:15,
231:10, 247:3,
254:25, 262:7
**agata**
84:22, 84:23
**ago**
23:1, 150:20
**agree**
26:12, 52:8,
177:8, 177:12,
179:10, 179:16,
197:10, 201:21,
221:7
**agreed**
179:15, 188:1

**agreeing**
235:8, 235:12
**agreement**
177:13, 184:24,
202:10, 221:1,
221:2, 221:14,
227:22, 228:5,
228:13, 228:14,
228:20, 228:22,
229:7, 229:9,
229:20, 229:24,
230:9, 256:9,
256:12, 256:17,
256:20, 256:22,
257:12, 257:20,
260:13, 261:4,
261:8
**agreements**
127:25
**agrees**
201:25, 229:15
**ahead**
141:3
**ahold**
97:22
**akc**
104:21, 104:24,
105:2, 105:7,
105:13, 105:15,
105:17, 105:19,
105:24, 106:1,
106:9, 106:15,
134:6, 134:11,
135:6
**al**
1:5
**albeit**
195:20, 252:2
**alike**
138:14
**all**
16:10, 16:15,
17:6, 19:16,
19:19, 20:19,
23:23, 24:24,
25:10, 27:2,
27:5, 34:2,
48:12, 48:16,

50:16, 58:14,
72:11, 79:14,
79:21, 79:22,
88:21, 99:9,
101:7, 101:15,
101:18, 103:3,
110:4, 120:14,
122:8, 127:20,
129:12, 130:22,
131:7, 135:8,
138:19, 138:24,
140:18, 140:24,
142:17, 147:4,
147:10, 152:12,
152:21, 156:19,
158:4, 158:13,
159:2, 163:18,
167:24, 168:2,
173:3, 174:6,
174:22, 175:13,
175:18, 178:24,
180:8, 181:14,
182:14, 183:12,
184:18, 193:3,
193:24, 195:6,
195:18, 196:23,
198:12, 209:19,
213:20, 221:9,
222:20, 223:19,
226:9, 229:18,
230:22, 237:3,
243:5, 245:2,
250:15, 250:16,
253:3, 253:12,
256:3, 257:5,
257:6, 257:10,
257:15, 260:13,
260:16, 261:16,
263:13, 263:14,
264:24, 264:25,
265:1, 265:8,
265:11, 265:15
**allen**
1:13, 2:1, 4:3,
4:19, 4:20,
4:21, 4:22, 5:6,
5:7, 5:8, 5:10,
5:11, 5:12,

Transcript of Allen Waxman
Conducted on December 27, 2019

270

5:15, 5:17, 6:2,
7:20, 185:23,
266:3
**allowed**
117:11, 119:9,
159:5, 172:12,
210:9
**almost**
31:10, 233:3,
264:21
**along**
34:3, 89:14,
102:19, 126:4,
137:1, 150:2,
150:6
**aloud**
14:19
**already**
95:11, 96:10,
142:4, 190:5,
194:13, 208:7,
209:1, 209:22,
247:10, 248:6
**also**
3:24, 8:12,
9:18, 30:20,
33:13, 45:2,
51:3, 52:24,
53:22, 80:4,
80:16, 96:6,
96:16, 103:19,
109:14, 119:22,
120:22, 124:4,
135:3, 144:11,
165:17, 166:7,
181:2, 188:5,
190:22, 192:19,
197:23, 206:7,
212:19, 261:2
**alsup**
81:4
**alsup's**
81:11, 158:21
**alternative**
17:17, 121:21,
168:10
**alternatively**
186:5

**alternatives**
9:15
**although**
105:4, 120:17,
141:10, 248:16,
249:7
**always**
18:19, 35:2,
202:10
**ambiguities**
8:24, 9:6
**ambiguous**
45:2
**amend**
44:12, 49:23,
207:19, 219:17,
228:7
**amending**
224:3, 224:5
**amendment**
228:13
**amendments**
207:17
**america**
52:21
**american**
105:3
**among**
37:6, 37:15,
37:18, 142:23
**amongst**
37:1, 54:24,
105:23, 105:24,
154:14
**amount**
52:3, 143:22,
196:4, 198:6,
232:15
**amounts**
223:16, 233:25,
234:2, 234:6
**analogous**
199:3, 199:10
**analysis**
195:21, 196:3,
198:5, 198:22
**andre**
85:21, 85:23,

86:10, 87:3,
87:14, 90:7
**anna**
3:25, 6:24,
77:1
**announced**
105:2
**annual**
4:13, 61:22,
62:4, 62:15,
82:18, 83:9,
83:12, 137:10,
232:16
**another**
9:15, 15:18,
21:2, 21:8,
21:24, 22:4,
25:3, 44:2,
110:25, 114:5,
121:15, 125:19,
127:7, 129:5,
130:12, 131:6,
160:12, 179:1,
180:13, 185:14,
185:19, 195:7,
195:12, 202:11,
204:20, 213:23,
216:16, 216:19,
220:1, 223:8,
223:10, 224:12,
227:12, 228:24,
232:13, 232:14,
252:14, 253:4
**answered**
194:13
**answering**
24:4, 72:16
**answers**
114:20, 183:13
**anticipate**
143:16
**anticipation**
209:16
**anybody**
87:24, 90:10,
90:22, 97:17,
108:6, 112:14,
113:22, 136:5,

145:9, 145:12,
147:1, 147:10,
157:20, 157:23,
159:7, 166:23,
170:6, 215:12,
235:17, 244:7,
245:12, 246:7
**anyone**
70:10, 70:13,
70:17, 75:16,
87:18, 88:6,
108:9, 109:21,
110:10, 110:16,
119:12, 132:5,
156:8, 156:20,
165:18, 187:19,
188:23, 191:19,
194:10, 241:5,
241:17, 242:2,
244:15, 244:16,
257:7, 262:22,
262:24
**anything**
66:15, 80:6,
131:11, 139:17,
142:3, 156:14,
156:16, 156:25,
161:11, 164:1,
205:2, 208:24,
211:12, 218:16,
219:9, 220:23,
243:7, 244:9,
250:3, 261:11,
263:16, 263:18
**apologies**
130:11
**apologize**
96:16, 220:10
**apparent**
103:17, 107:12
**apparently**
128:4, 137:14,
177:1, 265:5
**appeal**
9:23, 180:23
**appear**
138:20, 266:7
**appearing**
138:17

Transcript of Allen Waxman
Conducted on December 27, 2019

271

**appellate**
180:22, 180:25,
181:7
**applicability**
118:18, 245:17
**applicable**
27:5, 27:15,
216:12, 229:18,
242:24
**application**
87:19, 87:25,
88:7, 119:21,
140:22, 214:22,
216:16, 229:11,
229:17, 245:13,
245:24, 247:21,
264:16
**applied**
119:23, 119:24,
120:17, 196:21,
208:19, 262:16
**applies**
178:7
**apply**
173:17, 209:1,
221:23, 223:13,
231:20
**appoint**
232:4
**appointing**
22:23
**appointment**
23:3, 212:16,
230:21, 232:9
**appointment-rela-
ted**
109:23
**appreciate**
92:9, 112:16,
193:15
**approach**
30:8, 54:18,
119:7, 141:15,
240:2
**approaches**
26:23
**appropriate**
111:9, 245:16,

246:24
**approximately**
61:8, 113:2
**arbitral**
116:23, 127:24,
178:3, 201:11,
201:23, 202:6,
208:2, 208:6
**arbitrated**
95:21, 147:22
**arbitrating**
22:17
**arbitration**
8:14, 19:23,
19:24, 21:6,
29:2, 29:5,
29:13, 29:17,
30:10, 39:24,
41:19, 41:23,
43:8, 43:9,
43:12, 59:12,
59:21, 60:4,
87:20, 88:16,
88:25, 89:3,
95:12, 121:23,
127:23, 128:2,
128:21, 142:13,
168:1, 168:6,
172:9, 176:22,
180:22, 196:25,
198:13, 198:17,
199:1, 199:2,
209:2, 230:5,
230:6, 230:21,
256:8, 256:12,
257:12, 257:20,
257:21, 257:24,
258:3, 258:4,
260:7, 260:19,
261:4, 261:6,
262:8, 262:9
**arbitrations**
40:2, 50:21,
51:15, 54:3,
56:18, 57:1,
89:11, 107:24,
108:7, 120:14,
121:25, 129:2,

148:9, 148:10,
148:12, 148:13,
148:14, 148:15,
148:16, 149:2,
155:18, 168:9,
175:7, 176:3,
182:6, 184:22,
200:25, 201:21,
202:8, 230:20,
232:8, 232:10,
232:25, 233:1,
243:2, 253:21,
253:25, 254:9
**arbitrator**
20:4, 22:17,
31:10, 175:11,
175:13, 196:17,
204:3, 204:13,
232:9, 259:11,
259:13, 259:19
**arbitrators**
11:24, 20:1,
20:8, 50:17,
116:23, 129:4,
151:6, 151:9,
151:10, 151:16,
175:15, 183:22,
202:12, 232:4
**area**
8:11, 12:24,
103:21, 117:11,
118:21, 237:14,
237:15
**areas**
12:19
**aren't**
9:6, 103:7,
106:25, 183:10,
259:2, 262:1
**argument**
81:12
**arise**
10:21, 11:4,
12:15, 32:13,
38:1, 38:10,
38:12, 151:15
**arises**
8:22, 31:15,

32:5
**arose**
69:9, 219:9,
257:22
**around**
118:16, 124:15,
251:25
**arrangements**
49:24
**arrive**
257:2
**article**
254:3
**articles**
96:18, 107:23
**articulated**
174:16
**aside**
17:23, 18:5,
29:16, 34:19,
34:22, 152:8,
162:8, 162:9,
234:12
**asked**
16:13, 50:7,
80:12, 80:18,
80:21, 92:4,
92:6, 110:9,
110:15, 110:21,
158:14, 160:2,
171:22, 190:25,
202:17, 237:23,
242:9, 255:8,
255:12
**asking**
14:7, 21:7,
22:2, 35:7,
39:7, 43:11,
43:14, 60:18,
74:16, 74:18,
85:7, 94:8,
94:10, 96:3,
125:6, 147:5,
165:7, 189:22,
191:3, 194:18,
194:25, 210:5,
211:8, 223:1,
246:4, 246:5,

Transcript of Allen Waxman
Conducted on December 27, 2019                                    272

| | | | |
|---|---|---|---|
| 246:16, 260:10 | 186:25, 218:14 | **average** | 224:21, 231:13, |
| **aspect** | **attachments** | 56:11 | 232:7, 233:11, |
| 223:18 | 202:23 | **avoid** | 233:15, 237:25, |
| **aspects** | **attempt** | 9:13, 140:18, | 253:17, 264:8 |
| 25:16, 40:1, | 255:13, 255:18, | 140:24 | **back-end** |
| 209:12 | 256:15 | **award** | 120:10, 120:25, |
| **assessed** | **attempted** | 19:25, 20:9, | 121:11, 252:10 |
| 30:11 | 208:6 | 20:24, 183:23 | **background** |
| **assignment** | **attempting** | **awards** | 80:21 |
| 54:6 | 209:21 | 183:23 | **backing** |
| **associated** | **attend** | **aware** | 227:6 |
| 67:12, 83:20 | 123:17, 137:13 | 54:4, 54:16, | **bad** |
| **associates** | **attended** | 54:20, 57:8, | 56:25, 72:14 |
| 76:20 | 123:20, 123:21 | 63:5, 69:6, | **balanced** |
| **assume** | **attestation** | 75:20, 76:2, | 255:5 |
| 18:19, 29:4, | 198:15, 198:19 | 82:20, 82:24, | **ball** |
| 157:13, 172:24, | **attorney's** | 83:23, 88:4, | 101:5, 234:20, |
| 236:14, 252:8 | 241:13 | 113:22, 113:25, | 234:22 |
| **assumed** | **attorney-client** | 114:2, 140:15, | **bandwidth** |
| 170:19 | 244:12 | 147:17, 149:4, | 238:5 |
| **assuming** | **audience** | 196:11, 253:21, | **bare** |
| 129:11, 218:6, | 62:11, 62:14 | 253:24 | 231:3 |
| 265:3 | **august** | **away** | **barrier** |
| **assumption** | 17:4, 18:22, | 135:9, 198:12 | 21:19 |
| 26:7, 26:10, | 89:6, 90:1 | **awkwardness** | **based** |
| 137:2 | **author** | 20:7 | 21:9, 139:1, |
| **attached** | 85:16, 165:7 | | 175:17, 183:24, |
| 13:18, 61:19, | **authority** | **B** | 236:13 |
| 82:13, 85:5, | 22:23 | | **basis** |
| 91:4, 97:24, | **authorization** | **b) (3** | 41:7, 130:22, |
| 101:13, 125:2, | 199:14 | 122:3 | 137:10, 140:3, |
| 126:9, 133:19, | **availability** | **b) (6** | 140:19, 149:20, |
| 152:14, 162:14, | 52:3, 201:25, | 14:1, 79:14, | 159:4 |
| 168:3, 168:22, | 202:9 | 79:23, 110:3 | **bates** |
| 180:12, 185:17, | **available** | **back** | 85:2, 91:5, |
| 186:2, 195:10, | 11:23, 12:5, | 18:4, 38:22, | 98:13, 98:14, |
| 202:20, 204:19, | 12:14, 13:6, | 69:21, 72:7, | 101:11, 124:24, |
| 206:6, 214:3, | 13:12, 31:14, | 82:6, 109:10, | 125:3, 126:7, |
| 217:11, 218:19, | 48:16, 49:22, | 112:5, 115:2, | 126:10, 133:17, |
| 222:2, 222:8, | 50:11, 51:11, | 120:14, 129:13, | 152:6, 152:11, |
| 224:11, 224:13, | 51:19, 51:23, | 135:19, 152:10, | 152:25, 162:15, |
| 227:16, 229:2, | 62:13, 65:24, | 155:8, 155:20, | 164:2, 168:18, |
| 234:17, 235:3, | 80:17, 108:3, | 158:11, 158:23, | 176:23, 185:18, |
| 236:5, 236:19, | 121:1, 207:22, | 160:2, 163:14, | 195:8, 200:10, |
| 240:8, 250:18, | 227:8, 238:22 | 174:9, 185:2, | 200:23, 202:22, |
| 252:13, 253:2, | **avenue** | 186:21, 186:23, | 214:1, 217:9, |
| 266:7 | 2:6, 3:13, | 191:14, 194:5, | 222:4, 224:13, |
| **attachment** | 3:21, 6:11 | 210:24, 212:8, | 227:13, 229:3, |
| 163:24, 182:10, | | 218:16, 219:15, | |

Transcript of Allen Waxman
Conducted on December 27, 2019

273

233:16, 240:10,
253:5
**bcc**
162:21, 162:24,
163:2, 163:9,
163:10, 163:14,
195:14
**bcc'ing**
204:23, 213:25
**became**
150:11, 184:24
**because**
14:1, 29:8,
30:18, 48:7,
63:1, 96:4,
104:15, 113:10,
113:16, 115:13,
119:22, 130:24,
131:2, 131:7,
131:12, 142:23,
146:19, 159:1,
172:13, 176:17,
182:25, 187:25,
190:22, 193:4,
202:4, 207:11,
211:7, 216:22,
225:9, 231:14,
248:11, 259:15
**become**
137:16
**becomes**
232:8
**becoming**
103:17
**before**
2:11, 8:21,
8:25, 9:23,
11:12, 11:13,
15:20, 24:4,
24:15, 30:17,
33:20, 36:5,
38:24, 39:3,
42:2, 42:3,
47:12, 61:24,
74:25, 78:8,
78:23, 82:14,
85:6, 91:7,
97:21, 98:12,

99:15, 103:14,
116:14, 116:16,
118:12, 124:2,
124:4, 127:19,
136:20, 141:9,
154:19, 156:8,
156:16, 156:21,
158:13, 158:16,
160:2, 169:17,
186:11, 186:18,
194:18, 204:9,
221:7, 222:24,
226:7, 238:25,
240:11, 242:9,
244:24, 247:1,
250:21, 250:23,
256:10, 257:1,
257:3, 259:12,
267:2
**began**
132:24, 197:13,
248:8
**begin**
22:17, 22:20,
257:24
**beginning**
16:18, 240:9
**begins**
6:1, 30:18
**behalf**
3:2, 3:10,
3:17, 6:20,
6:23, 7:3, 7:6,
11:19, 67:15,
96:10, 96:11,
147:24, 229:8,
235:9, 235:12
**behavior**
199:18
**behind**
83:7
**being**
7:14, 13:12,
14:1, 16:13,
50:25, 52:16,
53:1, 89:9,
89:12, 89:14,
89:15, 95:4,

95:17, 97:5,
117:18, 128:12,
137:11, 137:25,
138:8, 142:18,
147:21, 172:15,
172:18, 178:2,
178:7, 180:6,
191:23, 192:9,
196:21, 192:7,
208:19, 209:12,
209:13, 216:12
**believed**
75:16, 75:17
**bellwether**
154:16
**below**
195:17, 201:18,
218:25, 239:10
**beneficial**
237:16
**benefited**
206:7
**benefits**
126:22, 137:11,
138:7
**besides**
29:17, 34:7,
35:4, 37:17,
42:20, 72:6,
76:24, 90:22,
105:16, 106:15,
132:11, 139:11,
145:5, 154:10,
156:7, 166:23,
169:22, 170:7,
190:2, 190:4,
190:17, 191:16,
206:12
**best**
9:2, 9:9, 9:17,
10:5, 11:22,
41:4, 55:13,
62:24, 106:10,
127:14, 164:22,
165:23, 184:15,
191:25, 245:19
**beth**
84:20

**better**
10:15, 79:1,
150:19, 237:6,
237:9
**between**
8:21, 22:11,
30:9, 38:8,
39:2, 39:16,
39:20, 40:24,
66:21, 69:8,
72:23, 74:4,
79:16, 80:2,
80:10, 90:20,
93:4, 102:22,
125:7, 155:21,
156:25, 163:20,
164:8, 164:9,
165:15, 184:4,
184:16, 184:25,
185:7, 196:8,
197:19, 203:12,
205:3, 214:12,
244:23, 257:22
**beyond**
22:3, 27:12,
33:13, 34:18,
34:23, 35:18,
35:24, 36:14,
42:6, 42:12,
42:23, 43:6,
43:17, 44:3,
44:14, 45:2,
45:16, 46:2,
47:4, 47:13,
47:20, 47:25,
48:14, 48:22,
49:6, 53:22,
55:16, 55:24,
56:6, 56:13,
56:20, 57:3,
57:10, 57:18,
58:2, 59:15,
59:23, 60:6,
60:14, 60:24,
62:16, 63:15,
64:4, 64:16,
64:23, 65:6,
65:13, 65:21,

Transcript of Allen Waxman
Conducted on December 27, 2019

274

66:6, 69:6,
76:1, 78:10,
78:20, 79:2,
80:7, 80:25,
106:4, 115:11,
117:5, 120:24,
123:1, 130:4,
141:23, 143:5,
143:17, 143:25,
144:10, 146:5,
146:6, 156:11,
157:1, 161:1,
190:22, 194:12,
195:2, 232:19,
241:11, 241:19,
243:14, 247:24,
249:21, 255:22
**bias**
175:17
**big**
12:20, 215:11
**binding**
261:6, 262:9
**bios**
227:2
**bit**
47:10, 54:8,
70:16, 239:17
**black**
129:18
**blank**
154:7, 154:10
**bloomberg**
69:2
**board**
32:8, 32:10,
32:18, 32:24,
33:3, 61:5,
61:6, 61:9,
61:12, 134:3,
134:10, 134:12,
160:12, 220:21
**boards**
29:20, 31:12,
134:24
**bockius**
2:5, 3:20,
6:20, 7:4, 76:7,

76:21
**both**
17:15, 93:25,
119:8, 134:3,
138:13, 140:12,
197:10, 247:4
**bother**
182:24
**box**
190:13, 190:14
**boy**
49:11
**brainstorm**
141:14, 141:16,
141:22
**brainstormed**
141:20
**branch**
29:15
**break**
38:15, 38:24,
39:3, 69:14,
109:7, 111:25,
158:5, 193:25,
210:16, 233:5,
253:13, 264:4
**breathe**
240:13
**briefly**
14:16, 17:9
**bring**
30:19, 118:3,
119:7, 121:17,
122:3, 152:2,
152:3
**bringing**
30:2, 197:3
**brings**
8:10, 117:20
**broad**
18:20, 19:2,
27:12, 248:6
**broader**
118:17, 173:16
**broadest**
38:2
**broadly**
15:7, 18:15,

27:5, 27:15,
216:12
**brought**
27:2, 117:18,
121:11, 193:5,
209:16, 209:17
**build**
181:19
**building**
175:8, 181:23
**built**
21:4, 120:9,
120:11, 197:7
**bulbs**
252:3, 252:7
**bulk**
139:8
**bunch**
129:2
**burdensome**
200:16
**business**
4:11, 52:14,
52:19, 53:19,
61:21, 249:18
**businesses**
12:22, 12:24,
12:25, 13:13,
14:23, 15:7,
17:14, 59:11,
59:20, 60:3,
237:6
**busy**
151:22
**buys**
28:22

| C |

**c) (3**
60:17, 60:20
**calendar**
5:17, 16:17,
252:17, 252:18,
252:19, 252:20,
252:21, 252:24
**california**
1:2, 6:5,
129:4, 129:6,

129:8, 172:6,
172:7, 173:9
**call**
5:4, 90:17,
90:19, 92:12,
92:18, 92:23,
93:4, 93:8,
93:13, 93:16,
93:19, 93:23,
94:3, 94:5,
94:19, 94:22,
99:1, 99:6,
116:14, 118:13,
118:14, 124:7,
125:4, 125:7,
125:9, 125:19,
125:20, 125:23,
125:24, 126:19,
127:1, 127:7,
131:18, 154:22,
156:1, 156:6,
157:6, 157:12,
157:13, 157:14,
157:21, 157:23,
158:2, 159:9,
160:4, 160:6,
161:16, 162:5,
167:14, 169:7,
169:22, 169:25,
170:6, 170:10,
170:17, 170:25,
171:3, 171:8,
171:10, 171:11,
172:3, 173:2,
177:3, 178:11,
178:16, 179:6,
179:24, 180:1,
180:5, 180:18,
186:8, 186:22,
187:1, 195:15,
202:25, 203:3,
203:11, 203:14,
203:18, 203:20,
203:24, 204:6,
205:4, 207:12,
218:2, 218:4,
218:6, 224:17,
225:5, 225:6,

Transcript of Allen Waxman
Conducted on December 27, 2019

225:7, 225:10,
225:13, 240:22
**called**
113:13, 153:16,
186:25
**calling**
113:12
**calls**
75:25, 124:9,
180:6, 199:20,
226:1
**came**
136:19, 173:5,
181:11, 182:14,
184:8, 184:18,
197:15, 204:9,
223:22, 227:23,
230:12, 257:7,
262:22
**can't**
18:24, 20:19,
24:22, 34:21,
171:10, 175:12,
191:24, 208:11,
208:15, 209:14,
243:6, 245:2
**canceled**
180:6
**cannot**
109:21, 115:9,
115:14, 239:9
**canvassed**
145:19, 147:22
**canvassing**
147:24
**capabilities**
17:16
**capacity**
17:18, 201:22
**capture**
16:11
**captures**
16:10
**care**
12:15, 257:3
**career**
118:21, 155:19
**carried**
238:21

**carte**
106:20, 106:24
**casas**
3:24, 6:9
**case**
1:8, 6:6, 30:4,
30:5, 66:20,
67:5, 67:8,
67:10, 71:15,
71:18, 94:8,
113:15, 114:5,
139:5, 139:11,
139:20, 177:11,
178:8, 232:1,
239:21, 246:12,
258:16, 258:17,
258:19, 259:3,
267:10
**caseload**
54:7, 56:11
**cases**
95:21, 104:20,
104:25, 107:3,
107:8, 112:19,
112:24, 114:13,
115:8, 120:20,
128:3, 128:5,
128:12, 147:23,
154:14, 154:16,
166:7, 168:6,
174:5, 174:9,
176:6, 177:18,
178:5, 181:1,
181:13, 181:14,
181:17, 181:18,
182:1, 232:2,
251:25, 252:2
**categories**
64:10
**causes**
160:1
**caution**
66:15, 208:10,
244:9
**cc'ing**
204:22, 224:14,
227:18
**ceased**
137:25

**ceo**
8:6, 15:24,
16:7
**certain**
22:3, 51:14,
51:24, 52:1,
54:17, 55:6,
138:7, 141:5,
186:18, 187:9,
187:12, 239:10
**certainly**
51:2, 114:17,
116:20, 117:1,
139:8, 196:10,
206:24, 211:24,
217:4
**certainty**
165:17
**certificate**
267:1
**certify**
267:4
**cfo**
84:19, 213:19
**chairman**
134:12
**challenge**
116:25, 117:19,
142:12, 142:20
**challenges**
103:20, 115:18,
115:23, 116:17,
116:19, 118:19,
141:5, 141:8,
142:18
**challenging**
116:22
**champion**
64:11
**chance**
98:16, 205:17
**change**
42:10, 45:23,
47:3, 47:10,
58:11, 87:19,
87:25, 88:7,
207:24, 208:1,
208:6, 209:9,

223:8, 223:10,
223:22, 224:20,
225:16, 227:19,
227:23
**changed**
41:12, 41:16,
41:24, 42:5,
42:22, 43:5,
83:22, 127:16
**changes**
88:20, 164:8,
164:9, 177:4,
179:18, 182:13,
182:14, 182:17,
183:17, 184:7,
184:14, 184:15,
184:18, 185:7,
185:10, 213:9,
213:12, 218:11,
219:7, 219:9,
243:20, 244:5,
244:14
**characterize**
9:12
**charged**
89:9, 89:15,
95:5, 95:18,
128:17, 259:18
**charging**
89:20
**chart**
63:9, 63:14
**check**
131:10, 160:7
**chicago**
3:7
**chief**
84:15
**choose**
9:3, 31:2
**chose**
202:4
**chronologically**
152:9
**circuit**
159:4
**circulation**
37:18

circumstance
90:23, 120:24
circumstances
10:10, 32:23,
37:25, 140:23,
151:15
circumstantial
10:9
claim
36:12, 96:1,
111:3, 111:12,
154:13, 184:21,
197:9, 197:11,
198:17, 262:7
claimant
175:14, 197:10,
198:24, 200:14,
245:7, 247:20,
258:14, 259:21,
259:25, 260:3,
260:14, 260:17,
260:18, 261:20
claimants
120:13, 121:1,
121:22, 128:8,
128:11, 174:11,
175:18, 199:12,
238:14, 238:22,
239:9, 239:16,
239:20, 240:1,
245:7, 247:6,
247:21, 256:23,
262:6, 262:12
clarification
16:8, 16:21,
73:8, 255:6
clarified
238:25
clarify
15:6, 35:9,
43:11, 148:6
clarifying
256:6
clarity
23:5, 78:22,
210:12, 211:6,
220:1
class
117:3, 117:6,

117:12, 117:20,
120:23, 120:25,
121:10, 121:19,
121:22, 122:3,
122:12, 172:7,
172:14, 172:18,
173:9, 197:25,
252:10
classification
123:10, 255:11
clause
261:16
clear
23:10, 24:8,
46:9, 52:23,
90:13, 94:8,
110:8, 173:14,
188:20, 190:11,
191:20, 202:4,
207:17, 228:6,
238:11, 246:13,
247:16, 250:5,
256:25, 259:3,
260:24
client
206:5, 216:19,
249:22, 251:19
clients
215:21, 216:10,
216:23, 217:2
club
105:3
co-chair
135:2
coast
58:11
colleague
85:24, 248:7
colleagues
70:11, 245:18,
247:18
collection
91:11, 252:6
collective
172:8, 252:3,
252:11
college
135:18, 135:19,

135:22
colloquialism
52:9
combination
84:14, 107:21
come
22:24, 26:8,
28:1, 29:22,
30:21, 31:2,
32:9, 32:19,
69:2, 79:25,
95:7, 104:15,
105:13, 109:10,
117:15, 124:6,
158:23, 181:13,
181:24, 215:9,
215:12, 215:19,
258:7, 258:13,
258:23, 259:7,
261:22, 262:24
comes
32:25, 64:22,
65:4, 138:6,
230:5, 258:20
coming
27:1, 86:12,
105:21, 254:6,
259:15
commence
259:12
commenced
184:21, 204:2
comment
68:16, 212:5
comments
24:6, 186:3,
186:19, 186:21,
187:10, 187:13,
187:18, 188:6,
188:13, 188:15,
188:22, 189:2,
191:12, 191:18,
192:6, 193:2,
195:18, 196:11,
206:16, 206:23,
211:25, 219:10
commercial
17:15, 18:1,

18:7, 18:8,
18:10, 18:14,
18:20, 19:2
commission
267:15
commitment
221:24
committed
221:10
committee
116:7, 122:18,
122:24, 123:11,
123:14, 123:17
committees
137:12, 138:9
communicated
91:22, 95:15,
109:22, 128:7,
141:10, 141:12,
212:12, 247:10
communicating
187:7
communication
73:7, 90:18,
90:20, 90:25,
91:24, 92:1,
94:16, 96:17,
100:4, 102:8,
102:11, 102:13,
102:14, 133:13,
136:19, 136:21,
136:24, 140:5,
145:2, 145:22,
156:16, 156:18,
157:5, 178:13,
178:14, 190:24,
192:15, 212:8,
247:17
communications
67:1, 71:6,
71:9, 71:12,
71:21, 72:2,
72:7, 72:9,
72:20, 73:3,
73:5, 79:16,
79:17, 79:18,
80:1, 83:15,
140:21, 141:11,

155:20, 156:5,
156:13, 161:8,
161:9, 166:20,
186:15, 187:14,
188:2, 188:3,
188:4, 191:7,
193:6, 193:8,
193:9, 193:14,
193:18, 193:20,
193:22, 194:24,
195:1, 211:11,
226:12, 244:11,
247:18
**company**
28:22, 257:19,
258:1, 258:22,
259:7, 259:17
**compare**
182:11
**comparing**
205:7
**comparison**
232:16
**compel**
260:15
**complete**
64:14, 68:3,
266:6
**completely**
16:10
**comply**
229:17
**conceived**
117:25, 118:6,
118:23
**concept**
197:12
**concern**
89:2, 96:4,
96:15, 146:23,
147:2, 147:10,
147:15, 172:5,
172:22, 173:5,
174:24, 177:5,
192:24, 194:18,
198:10, 252:4,
252:8
**concerned**
21:20, 119:5,

151:21, 151:23,
172:11, 173:12,
173:16, 174:20,
174:22, 193:1
**concerning**
241:4, 250:3
**concerns**
33:5, 119:3,
119:6, 147:20,
191:13, 191:18,
191:21, 192:6,
192:9, 192:10,
192:11, 194:9,
247:6, 251:25
**concludes**
229:15
**conclusion**
199:21
**conduct**
242:11
**confer**
114:22
**conference**
132:4, 132:13,
132:16, 184:1
**confident**
241:7
**confidentiality**
33:5, 33:7
**confines**
81:7
**confirm**
142:3, 229:7
**conflating**
201:9
**conflict**
7:25, 8:8,
8:21, 17:12,
61:23, 103:14,
103:18, 107:14,
107:20
**confront**
173:1
**confused**
54:8, 96:4,
99:1, 135:5,
202:14
**connected**
89:12

**connecticut**
3:13
**connection**
11:25, 13:8,
16:6, 22:18,
67:12, 74:7,
74:12, 78:4,
86:12, 88:13,
88:14, 89:19,
91:11, 111:11,
111:18, 115:5,
136:18, 175:22,
242:12, 254:13
**connolly**
49:3, 53:16
**conscionability**
265:6
**consent**
220:17, 229:25
**consider**
197:9, 202:17,
244:12, 254:11
**consideration**
26:24, 27:13
**considered**
20:6, 20:21,
28:4, 28:5,
245:6, 254:15,
254:18
**considering**
32:14
**consistent**
98:23, 201:17
**construct**
175:8
**construction**
12:16, 24:1,
25:2, 25:5,
25:21, 25:25,
26:16, 27:7
**consult**
223:2
**consultant**
31:9, 84:3
**consultants**
50:9
**consulted**
133:7, 160:14

**consumer**
28:19, 28:20,
59:21, 127:25
**consumers**
256:9, 256:14
**contact**
248:2, 255:13
**contained**
93:2, 138:25
**contemporaneously**
93:10
**content**
83:1, 145:15,
149:5
**contents**
87:10, 127:11,
157:20
**context**
18:11, 19:23,
29:10, 85:7,
116:18, 118:22,
118:23, 154:16,
181:12, 208:16,
216:11, 239:2,
239:7, 245:3,
245:10, 245:20,
247:8
**contexts**
117:9, 117:10
**continue**
27:16, 31:19,
149:14, 185:25
**continued**
37:19, 196:9,
196:13, 257:16
**continuing**
37:8, 37:10,
178:23
**contours**
66:23
**contract**
18:17, 49:15,
49:19, 50:8,
139:15, 139:20,
223:7, 223:9,
223:21, 259:2,
261:21, 261:24
**contractor**
127:17

Transcript of Allen Waxman
Conducted on December 27, 2019

278

contractors
50:9, 96:24,
207:4
contracts
8:24, 9:6,
127:25, 207:4,
207:19, 219:17,
222:24, 223:1,
228:8, 229:16,
240:25
contractual
59:13
contrary
147:7
contributed
65:12, 65:19
contributions
64:22, 65:5
contributor
64:11
control
118:1
controller
84:15
conversation
90:8, 94:4,
94:10, 94:11,
94:15, 94:24,
95:14, 95:17,
100:5, 100:7,
100:17, 102:22,
115:10, 125:12,
132:3, 133:10,
136:5, 136:6,
139:9, 144:18,
144:25, 163:21,
166:12, 167:11,
169:11, 191:25,
217:24, 218:12,
246:13, 249:8
conversations
89:23, 90:2,
94:13, 103:17,
105:23, 107:13,
112:14, 124:5,
132:12, 133:5,
133:6, 139:1,
139:7, 154:25,

164:10, 164:17,
164:18, 164:19,
170:1, 170:5,
192:2, 206:18,
206:22, 244:24,
246:6, 246:7,
246:10, 246:18
convey
39:10
conveyed
233:18, 234:5
conveying
234:19, 240:19
coordinating
83:13, 127:21
coordination
84:6
copied
226:25
copy
81:16, 81:23
copying
152:16, 153:4
corman
84:20
corporate
6:25, 52:21,
60:12, 77:6
correct
10:3, 15:1,
24:13, 32:10,
32:11, 32:20,
33:24, 46:21,
46:22, 97:11,
99:16, 152:23,
161:18, 162:20,
162:23, 166:3,
166:17, 172:20,
173:23, 185:11,
203:13, 212:15,
230:3, 232:17,
249:6, 266:5,
267:5
corrected
136:14
corrections
266:7
correctly
92:16, 222:17

correspond
212:7
corresponded
212:6
correspondence
67:19, 238:20
could
14:19, 17:8,
18:4, 18:10,
22:16, 31:11,
33:10, 39:19,
43:24, 44:11,
44:24, 52:3,
62:2, 63:13,
64:2, 76:13,
76:16, 79:6,
81:14, 82:11,
88:15, 88:24,
89:5, 95:7,
105:1, 107:21,
113:8, 120:13,
121:10, 121:14,
121:18, 128:17,
132:22, 143:12,
143:16, 144:8,
150:14, 155:25,
156:2, 164:7,
164:12, 164:13,
164:14, 167:22,
172:8, 175:16,
178:4, 182:5,
186:1, 189:12,
205:2, 219:7,
225:16, 229:5,
238:15, 249:1,
252:10, 256:11
couldn't
97:22, 203:16
counsel
6:13, 6:25,
7:17, 17:14,
66:16, 70:7,
71:3, 71:15,
73:12, 73:18,
73:19, 74:22,
74:24, 75:4,
75:12, 75:14,
75:22, 75:23,

76:3, 76:6,
77:6, 77:13,
127:20, 127:22,
129:25, 130:16,
130:20, 131:3,
165:25, 166:6,
166:8, 166:12,
169:16, 171:23,
201:14, 208:11,
244:10, 245:12,
246:3, 246:6,
246:14, 246:15,
247:4, 247:17,
255:10, 255:13,
267:9
counsel's
165:12, 191:23,
241:24, 244:22
counsel-to-couns-
el
246:21
count
176:19
counterparties
229:17
couple
20:25, 226:1,
226:19
course
10:16, 81:18,
147:13, 167:11,
186:19, 187:10,
188:9
court
1:1, 6:4, 7:7,
24:5, 24:21,
66:25, 67:17,
67:21, 79:20,
81:7, 109:18,
117:15, 120:14,
128:25, 159:9,
165:13, 172:13,
174:11, 199:4,
234:20, 234:23,
260:1, 260:14
court's
79:13
courts
199:17

Transcript of Allen Waxman
Conducted on December 27, 2019

279

cover
27:2, 159:18,
185:19, 195:12,
204:20, 205:24,
206:1, 206:2,
213:23, 224:12,
229:14, 236:25
covered
244:12
cpr's
8:8, 15:1,
19:4, 19:21,
21:1, 21:25,
29:5, 30:24,
31:11, 43:5,
57:8, 59:8,
60:12, 60:21,
64:21, 65:4,
66:16, 67:15,
88:1, 88:8,
89:17, 115:5,
181:7, 201:22,
229:11, 232:16,
246:20, 249:19
cpu
57:23, 58:22
crazy
24:5
create
32:17, 40:16,
40:23, 44:2,
44:12, 44:21,
173:18
created
32:24, 33:3,
33:24, 34:5,
34:9, 40:8,
40:11, 105:10
creating
45:12, 62:15
creation
33:16, 36:22,
38:4, 40:25,
45:23, 46:11,
46:18, 46:25,
47:3, 72:21,
111:18, 158:19,
254:1, 254:13,

255:17
credit
198:9
criteria
181:14
crutcher
3:12, 65:5,
65:19, 217:18
curious
239:12
current
7:23, 8:5,
54:7, 66:20,
134:19, 231:19,
245:24, 257:12
currently
23:15, 27:13,
27:20, 50:17,
54:11, 55:10,
72:10, 134:17,
149:12, 150:22,
215:4, 246:23
customers
31:24, 32:2
cut
249:2

| D |
| --- |

dangerous
18:19
dare
182:13
dashers
113:2, 113:23,
114:1, 114:3,
114:4, 115:11,
209:1
date
6:7, 41:14,
146:21, 157:9,
163:16, 266:11
dated
4:14, 15:4,
195:13, 217:14,
222:7, 235:6
dates
99:1
day
26:8, 29:4,

29:16, 52:10,
70:3, 118:9,
120:4, 120:9,
126:16, 126:20,
157:7, 157:13,
176:21, 182:23,
186:18, 248:24,
265:9, 267:13
days
70:3, 144:19,
159:18, 176:8,
176:11, 179:24,
181:24, 183:1,
183:2, 184:2,
226:20
dd
224:17
deal
97:1, 118:21,
120:19, 225:1
dealing
117:8, 118:21
deals
104:19, 104:25,
107:3, 107:8,
237:18
december
1:15, 6:7
decide
27:16, 163:9,
198:7
decided
26:8, 27:22,
197:20, 257:19
decides
260:17
decision
28:2, 127:16,
202:2
decisions
213:15
defendant
122:15, 128:21
defendant's
122:10
defending
173:9, 173:18
defense
68:9

deference
24:7
define
18:10, 18:15,
28:20
definition
32:10
definitively
165:13
delay
174:8, 181:5
delivery
66:21, 96:20,
112:13, 243:8
demand
95:19, 96:6
demands
128:2, 143:11
depend
55:2
depending
10:10, 37:25,
232:6
depends
13:1
deponent
80:22, 266:1
depos
6:10, 7:9
deposition
1:13, 2:1, 6:2,
6:11, 14:2,
33:14, 34:19,
36:15, 45:3,
71:24, 72:12,
72:15, 72:18,
73:21, 79:3,
79:9, 79:21,
80:7, 85:9,
85:11, 85:15,
88:15, 91:12,
108:22, 146:7,
156:11, 165:8,
194:21, 211:10,
241:11, 241:20,
243:15, 245:11,
245:16, 245:20,
246:9, 247:25,

Transcript of Allen Waxman
Conducted on December 27, 2019

280

248:12, 249:11,
255:23, 265:20,
267:3
**depositions**
24:15
**depth**
221:20
**describe**
14:17, 17:9,
22:10, 30:24,
31:11, 33:10,
36:10, 39:19,
43:3, 43:15,
43:24, 44:1,
44:11, 45:21,
49:17, 63:13,
64:2, 76:13,
95:24, 229:5,
235:4, 250:25
**described**
72:13
**description**
76:18
**desire**
9:19, 55:3,
95:6, 128:9,
237:13
**destefano**
7:2
**details**
248:6
**determine**
243:2
**develop**
117:21
**developed**
25:25, 80:11,
117:7, 155:4
**developing**
13:9, 25:17,
111:11, 115:5,
118:17, 119:19,
141:19, 159:6,
162:7, 173:14,
182:20, 190:12,
194:24, 206:6,
242:22, 242:23
**development**
13:4, 13:11,

26:4, 37:12,
67:2, 71:7,
71:13, 72:3,
79:19, 80:3,
80:5, 80:13,
105:13, 105:18,
106:10, 109:22,
115:12, 161:3,
161:9, 161:12,
165:6, 166:21,
185:12, 190:8,
190:19, 191:4,
196:13, 211:10,
211:12, 242:12,
243:12, 263:20
**diary**
5:19, 253:8,
253:11
**differ**
30:6
**difference**
22:10, 39:16,
39:19
**differences**
80:10, 184:4
**different**
9:23, 15:23,
20:20, 23:11,
23:12, 23:14,
25:12, 26:17,
26:18, 26:22,
26:25, 27:12,
27:17, 27:21,
27:23, 28:13,
55:12, 63:21,
77:4, 80:8,
105:22, 111:15,
118:22, 134:25,
141:14, 155:2,
178:3, 201:10,
201:23, 233:22
**differentiate**
244:23, 245:2
**differently**
103:12, 190:15,
208:25
**differing**
88:19

**dig**
189:3, 239:24
**digested**
25:9
**direct**
12:21, 14:15,
34:22, 35:25,
36:15, 42:15,
42:24, 43:8,
43:18, 44:4,
44:15, 45:3,
45:17, 46:3,
47:5, 47:14,
47:21, 48:1,
48:15, 48:23,
49:5, 53:23,
55:17, 55:25,
56:7, 56:14,
56:21, 57:4,
57:11, 57:19,
58:2, 58:18,
59:15, 59:24,
60:7, 60:24,
62:17, 63:8,
63:16, 64:5,
64:16, 64:24,
65:7, 65:14,
65:22, 66:7,
78:10, 78:20,
106:4, 129:13,
161:6, 164:20,
191:2, 191:5,
192:13, 195:3,
199:21, 206:19,
211:14, 215:15,
215:24, 232:19,
242:5, 263:3
**directed**
28:18, 79:4
**direction**
267:7
**directly**
17:16
**disagree**
81:13
**discount**
138:11, 138:13,
138:16, 138:19

**discounts**
137:13
**discovery**
71:15, 71:18
**discuss**
88:15, 88:24,
94:25, 132:15,
177:21, 186:6,
187:12, 187:17,
188:22, 189:5,
189:23, 190:6,
191:11, 191:17,
192:5, 194:8,
204:8, 204:10,
238:6, 238:9,
244:9
**discussed**
43:13, 44:11,
46:10, 72:9,
105:24, 106:1,
116:6, 124:1,
124:3, 126:3,
132:8, 157:18,
171:3, 171:7,
172:2, 172:15,
178:1, 179:14,
182:9, 186:20,
187:21, 188:8,
188:9, 188:12,
188:14, 189:1,
189:24, 190:2,
190:5, 190:17,
191:21, 194:19,
194:22, 194:25,
203:24, 204:12,
237:24, 242:2,
243:21, 244:4,
244:6, 244:10,
244:14, 255:9
**discussing**
107:11, 126:5,
141:5, 177:17,
188:10, 190:1,
206:16
**discussion**
27:10, 37:1,
37:6, 115:15,
116:11, 122:17,

Transcript of Allen Waxman
Conducted on December 27, 2019

281

127:15, 172:5,
175:1, 175:2,
175:9, 175:11,
175:21, 177:7,
177:14, 177:18,
180:21, 195:17,
195:22, 197:13,
197:15, 197:19,
200:15, 215:13,
216:15, 238:17,
238:20, 245:1,
245:11, 245:13,
256:24, 265:7
**discussions**
28:3, 37:19,
44:20, 44:25,
116:10, 121:3,
141:18, 191:7,
192:15, 192:20,
196:10, 206:5,
215:25, 216:25,
244:21, 245:3,
245:17, 246:4,
246:20, 246:21,
247:19
**disinterest**
146:18, 146:23,
147:10, 147:15
**disk**
6:1
**dismiss**
260:15
**dismissals**
209:18
**dismissed**
198:16, 198:18,
199:13, 209:13,
209:14
**disposition**
21:4, 29:20,
31:12
**dispute**
8:11, 8:12,
9:10, 9:11,
10:11, 11:13,
11:15, 11:16,
12:8, 17:17,
21:6, 22:18,

23:2, 26:3,
29:9, 29:14,
29:22, 31:15,
31:16, 31:18,
32:5, 66:21,
66:24, 68:17,
69:8, 81:4,
81:15, 86:6,
103:8, 119:13,
138:6, 153:11,
226:22, 257:22,
261:5, 262:8
**disputes**
8:16, 9:20,
10:1, 10:3,
10:15, 10:19,
10:24, 11:3,
11:6, 11:12,
12:1, 12:14,
12:15, 12:16,
12:17, 12:18,
13:1, 14:24,
17:15, 18:1,
18:8, 18:10,
21:10, 23:12,
24:2, 25:13,
25:17, 25:21,
26:5, 26:16,
26:17, 26:18,
26:22, 27:2,
28:16, 28:17,
28:19, 28:21,
29:12, 32:13,
32:19, 59:13,
59:22, 60:5,
61:22, 105:6,
116:6, 122:18,
122:24, 123:11,
123:14, 123:17,
168:5
**disseminated**
149:9
**distinct**
184:22
**distinction**
39:2, 39:4,
39:13, 39:15,
72:23, 73:1,

189:20
**distinctions**
80:10
**distinguish**
38:8
**district**
1:1, 1:2, 6:4,
6:5
**division**
1:3, 6:5
**document**
4:11, 14:1,
14:4, 14:8,
51:13, 61:15,
61:20, 62:6,
62:9, 62:12,
63:2, 63:3,
67:14, 82:10,
85:1, 91:1,
97:19, 110:4,
124:21, 124:23,
125:15, 132:22,
142:1, 143:14,
152:5, 157:8,
162:11, 166:16,
168:17, 180:9,
185:14, 193:7,
195:7, 196:7,
202:21, 202:24,
204:16, 211:19,
212:3, 213:2,
217:8, 220:9,
220:16, 224:8,
224:23, 227:12,
228:24, 234:13,
234:25, 236:1,
236:3, 236:16,
236:20, 240:9,
240:11, 250:19,
250:21, 250:22,
252:14, 253:4
**documents**
51:10, 65:24,
67:20, 67:23,
68:15, 68:19,
68:20, 70:23,
71:1, 71:2,
71:4, 71:5,

71:8, 71:11,
71:14, 71:17,
71:20, 71:21,
71:25, 72:6,
72:8, 72:11,
72:19, 73:4,
73:5, 73:9,
73:18, 74:6,
74:13, 74:14,
74:15, 74:17,
74:21, 74:23,
74:25, 75:3,
75:6, 75:11,
75:12, 75:15,
75:20, 75:24,
79:16, 80:1,
90:5, 94:1,
120:6, 130:25,
131:3, 132:20,
132:21, 136:18,
145:14, 163:5,
164:4, 176:16,
179:23, 183:11,
236:24, 251:11,
258:15, 258:21
**dogs**
135:6
**doing**
13:14, 24:22,
82:1, 96:5,
105:23, 148:12,
148:15, 149:1,
150:22, 154:1,
155:2, 155:18,
176:22, 187:4,
214:13, 233:2,
262:20
**donated**
66:5
**done**
37:22, 37:24,
38:3, 39:8,
39:11, 39:12,
55:11, 88:15,
88:24, 89:12,
139:4, 152:7,
154:19, 197:3,
208:24, 216:18,

Transcript of Allen Waxman
Conducted on December 27, 2019

233:3, 236:11,
239:3, 239:16,
245:19, 256:3,
257:25, 258:22
**donor**
64:12
**donors**
64:9
**donors"**
63:25
**door**
263:6
**doordash's**
159:6, 177:14,
179:5, 190:23,
191:17, 192:5,
193:20, 193:21,
194:23, 195:1,
206:16, 206:23
**doordashers**
112:25, 113:15,
114:7, 114:12,
119:13, 123:9
**double**
14:5
**down**
21:17, 31:5,
117:15, 154:24,
176:6, 183:21,
193:5, 197:8,
218:20
**downloaded**
22:16
**draft**
4:24, 4:25,
5:3, 5:5, 5:9,
38:25, 144:20,
144:23, 153:13,
153:17, 153:19,
153:24, 154:24,
155:8, 155:13,
156:8, 164:24,
164:25, 165:7,
166:10, 166:22,
167:1, 168:3,
168:14, 179:20,
180:13, 184:13,
186:2, 195:19,

204:20, 205:8,
218:11, 220:2,
234:3, 234:4
**drafted**
154:17
**drafting**
132:24, 133:5,
154:1, 154:5,
155:6, 255:18
**drafts**
37:14, 37:18,
153:22, 155:16,
156:3, 156:4,
164:24, 165:7,
190:1, 190:6
**drawing**
72:23, 189:19
**drive**
24:5, 174:3
**driver**
97:10, 97:14
**drivers**
108:10, 108:14,
110:11, 110:17,
110:23, 110:24,
111:3, 111:5,
111:13, 111:21,
112:19, 113:15,
115:8, 165:19,
165:25, 166:6,
166:8, 166:13,
173:10, 208:2,
208:7, 209:22,
242:19, 243:8,
255:10, 255:14,
255:20, 257:13
**drs**
153:7, 153:10
**due**
122:11, 128:19,
128:20, 185:4,
198:23, 256:19,
258:25, 259:1,
259:22, 260:20,
261:1, 261:14,
261:17, 262:10
**dues**
137:10

**duly**
7:14
**dunn's**
80:16, 89:2,
102:18, 179:6,
187:18, 188:15,
189:17, 191:12,
191:18, 192:6,
193:18, 193:19,
194:25, 206:23
**duplicate**
131:8, 220:3
**during**
9:16, 9:21,
9:22, 10:16,
11:8, 11:15,
11:16, 46:1,
46:25, 70:23,
81:12, 83:22,
177:3, 246:20,
253:25, 255:17
**dynamax**
127:16, 139:5,
139:11, 139:20

**E**

**e-i-s-a-i**
47:24
**e-mailed**
130:25
**e-mails**
72:7, 136:25,
162:25, 209:8,
241:17
**each**
128:5, 131:3,
186:24, 187:15,
200:13
**earlier**
29:21, 35:15,
41:25, 44:19,
46:10, 46:17,
74:10, 86:11,
86:15, 86:19,
98:20, 101:23,
107:11, 115:17,
118:25, 122:16,
141:10, 144:23,

165:23, 197:16,
209:4, 219:16,
226:12, 233:21,
234:1, 236:10,
237:23, 253:20,
255:8
**early**
21:3, 30:2,
30:3, 30:11,
30:16, 31:5,
31:17, 219:13,
234:2
**easier**
173:20, 186:6
**east**
58:11
**easy**
19:19, 49:11,
186:4
**eat**
48:7
**edits**
119:10, 119:25,
166:15, 187:5
**effectively**
10:21, 10:24,
11:4, 11:7,
14:24, 17:15,
18:2, 18:9,
41:10, 103:16,
174:4
**effectuate**
209:21
**efficiency**
197:3
**efficient**
168:2, 168:5,
175:19
**efficiently**
10:20, 11:3,
11:7, 103:16,
117:23, 119:1,
174:4
**effort**
38:10, 38:12
**efforts**
88:5, 246:20
**eisai**
48:9, 48:10

Transcript of Allen Waxman
Conducted on December 27, 2019

283

| either | employed | 34:5, 34:7, | erickson |
|---|---|---|---|
| 9:10, 21:17, | 7:21, 49:25, | 35:4, 35:14, | 4:15, 4:16, |
| 22:22, 39:16, | 52:15, 72:10, | 205:10, 206:14, | 4:18, 5:18, |
| 46:11, 46:18, | 134:14, 134:15, | 229:6, 229:11 | 5:19, 70:15, |
| 46:25, 112:15, | 267:9 | **enables** | 85:21, 86:4, |
| 129:1, 133:9, | **employee** | 168:4 | 86:22, 90:7, |
| 140:6, 166:10, | 84:4, 257:23, | **end** | 90:8, 90:16, |
| 205:18, 212:19, | 261:5 | 74:11, 78:5, | 90:20, 90:23, |
| 231:18, 254:24, | **employees** | 120:3, 120:8, | 91:18, 91:21, |
| 260:14 | 15:8, 96:24, | 128:12, 174:9, | 93:5, 93:11, |
| **eleventh** | 116:24, 238:14, | 181:6, 189:25, | 93:14, 93:15, |
| 54:13 | 257:20, 257:23 | 200:18, 232:7, | 93:23, 94:5, |
| **eliminate** | **employer** | 236:12, 248:23, | 94:9, 94:11, |
| 27:23 | 7:23, 8:2, | 261:10, 265:19 | 94:14, 94:21, |
| **eliminating** | 256:22, 262:2 | **ended** | 95:16, 96:18, |
| 26:25, 27:7 | **employers** | 179:8 | 99:7, 99:10, |
| **else** | 116:24 | **ending** | 100:4, 100:10, |
| 37:17, 50:22, | **employment** | 16:18 | 100:13, 100:21, |
| 70:10, 70:13, | 12:24, 13:8, | **ends** | 101:25, 102:9, |
| 70:17, 75:6, | 18:17, 26:18, | 178:7 | 102:10, 102:23, |
| 75:13, 77:10, | 27:8, 34:23, | **engage** | 106:13, 106:14, |
| 90:10, 90:22, | 35:23, 36:4, | 9:19, 20:12 | 107:22, 108:3, |
| 131:12, 132:5, | 36:12, 42:20, | **engaged** | 125:5, 125:7, |
| 141:22, 145:9, | 43:25, 44:10, | 11:24, 31:23, | 125:25, 132:9, |
| 156:2, 156:8, | 44:22, 45:13, | 32:2, 32:3, | 132:11, 132:15, |
| 156:20, 157:23, | 45:25, 46:13, | 52:6, 53:18, | 139:2, 139:9, |
| 159:7, 166:23, | 46:21, 47:1, | 134:25, 201:3, | 140:6, 145:6, |
| 170:6, 189:12, | 52:16, 60:5, | 201:24 | 145:7, 146:2, |
| 189:23, 189:25, | 111:12, 111:19, | **enhancing** | 148:1, 152:17, |
| 190:5, 190:19, | 112:20, 115:6, | 17:16 | 153:5, 155:5, |
| 191:3, 191:11, | 116:6, 116:18, | **enigma** | 156:3, 156:7, |
| 192:5, 215:7, | 117:9, 122:17, | 247:1 | 156:21, 157:16, |
| 241:5, 241:8, | 122:23, 123:10, | **enough** | 157:24, 164:14, |
| 241:17, 242:2, | 123:14, 123:17, | 84:25, 151:23 | 168:24, 169:8, |
| 243:7, 245:4, | 147:16, 148:12, | **enrique** | 170:7, 170:14, |
| 245:12, 249:10, | 148:13, 148:15, | 3:24, 6:9 | 182:18, 184:8, |
| 257:7, 259:6, | 148:16, 148:23, | **entertain** | 184:19, 185:11, |
| 263:17, 263:18, | 149:1, 149:6, | 89:21 | 185:23, 186:16, |
| 265:12 | 149:11, 150:22, | **entire** | 187:13, 187:19, |
| **else's** | 151:3, 153:13, | 82:23, 110:3 | 188:24, 189:6, |
| 58:24 | 160:17, 190:7, | **entirety** | 189:8, 189:11, |
| **emanuel** | 209:21, 231:11, | 79:24 | 190:3, 190:18, |
| 112:12, 113:1 | 231:12, 256:15, | **entitled** | 191:17, 192:3, |
| **emission** | 258:16, 258:17, | 4:11, 99:2, | 197:20, 198:9, |
| 143:12 | 258:18, 258:19, | 205:9 | 200:2, 202:25, |
| **emphasis** | 260:24, 262:7 | **entry** | 203:13, 204:23, |
| 21:3 | **employment-relat-** | 203:10 | 207:13, 207:15, |
| **employ** | **ed** | **equivalent** | 213:16, 213:25, |
| 49:14, 49:18 | 13:10, 25:7, | 260:1 | |

Transcript of Allen Waxman
Conducted on December 27, 2019

284

| | | | |
|---|---|---|---|
| 224:14, 251:1 | event | excel | 152:2 |
| **erickson's** | 58:1, 218:3 | 223:15 | **experience** |
| 92:2, 92:5, | **events** | **except** | 80:23, 94:25, |
| 92:6, 93:7, | 137:13 | 43:9, 141:25 | 118:23, 154:15, |
| 100:16, 103:25, | **ever** | **exchanged** | 160:16, 214:23 |
| 104:18, 159:17, | 88:6, 88:10, | 37:14, 156:3, | **experienced** |
| 171:4, 171:13, | 88:11, 145:14, | 241:17 | 129:5 |
| 172:1, 179:13, | 166:24, 169:13, | **exchanging** | **expert** |
| 200:6, 203:5, | 169:17, 169:23, | 156:4 | 29:20, 31:12, |
| 237:20, 252:20, | 170:20, 208:5, | **excited** | 155:19 |
| 252:22, 252:24, | 216:8, 218:5, | 255:5 | **experts** |
| 253:8 | 225:22, 225:24, | **exclude** | 12:18 |
| **errata** | 239:25, 254:11 | 246:13 | **expires** |
| 266:8 | **every** | **excluding** | 267:15 |
| **especially** | 84:12, 191:25, | 247:20 | **explain** |
| 204:9, 214:21 | 232:12 | **exclusive** | 104:18, 117:7, |
| **esq** | **everybody** | 55:22, 59:12, | 127:11, 252:6 |
| 3:25 | 29:24, 77:10, | 59:21, 60:4 | **explanatory** |
| **esquire** | 99:24, 138:16, | **excuse** | 236:24 |
| 3:4, 3:5, 3:11, | 246:8, 257:9, | 10:13, 87:14, | **explodes** |
| 3:18, 3:19 | 262:23 | 131:23, 217:21 | 28:23 |
| **establish** | **everything** | **execute** | **explore** |
| 214:20, 240:3 | 109:15, 162:10, | 220:15, 220:18 | 140:22, 142:23, |
| **establishing** | 259:6 | **exempting** | 159:5 |
| 8:19, 214:18 | **evidence** | 245:6 | **expose** |
| **et** | 183:10 | **exemptions** | 172:14 |
| 1:5 | **evolve** | 245:17 | **exposed** |
| **ethos** | 196:9 | **exercising** | 172:18 |
| 20:13 | **exact** | 81:5 | **expressed** |
| **europe** | 188:21 | **exhibits** | 146:10, 146:18, |
| 133:21 | **exactly** | 4:8, 5:1 | 146:23, 147:1, |
| **evaluate** | 83:21, 103:2, | **exist** | 147:6, 147:10, |
| 30:4, 30:22 | 106:13, 106:21, | 20:20 | 147:14, 148:3, |
| **evaluated** | 202:5, 204:14, | **existence** | 148:22, 149:1 |
| 30:12 | 222:22 | 109:13, 149:5, | **expressing** |
| **evaluation** | **examination** | 153:24, 154:2, | 172:22, 177:5 |
| 29:20, 30:1, | 4:2, 7:17, | 243:12 | **extend** |
| 30:2, 30:12, | 256:4, 257:16 | **existing** | 138:19 |
| 31:4, 31:6, 31:7 | **examined** | 245:24 | **extended** |
| **evaluative** | 7:16, 266:4 | **expand** | 138:13 |
| 30:8 | **example** | 197:25 | **extent** |
| **evaluator** | 19:25, 20:9, | **expect** | 20:22, 28:4, |
| 30:21 | 21:2, 21:24, | 32:12, 149:14 | 28:11, 96:25, |
| **even** | 29:11, 33:2, | **expectations** | 111:2, 187:25, |
| 58:7, 98:24, | 51:4, 188:11, | 178:10 | 195:19, 201:20, |
| 113:12, 150:4, | 189:16, 196:14, | **expecting** | 206:15, 246:18 |
| 197:13, 240:15 | 199:11, 242:21 | 241:3 | **externing** |
| **evening** | **exceeding** | **expeditiously** | 244:11 |
| 217:17, 217:21 | 199:13 | 117:24, 151:25, | |

Transcript of Allen Waxman
Conducted on December 27, 2019

| F | | | |
|---|---|---|---|

**face**
176:18
**facilitate**
9:16, 11:13,
11:16, 26:3,
28:11, 28:14,
28:16, 31:17,
237:2, 246:22,
249:9
**facilitates**
237:11
**fact**
11:24, 121:10,
137:6, 137:7,
142:15, 144:7,
154:12, 156:15,
197:22, 198:13,
198:20, 202:15
**facts**
10:10, 209:15
**factual**
37:21, 38:11,
38:12, 108:1,
139:12, 242:11,
242:16, 242:18,
243:1, 243:11
**fail**
9:7, 122:4,
122:12
**fails**
168:7
**fair**
9:12, 17:22,
25:20, 26:7,
26:10, 26:19,
51:16, 52:12,
53:20, 80:11,
103:10, 104:3,
127:2, 168:2,
168:10, 173:11,
184:9, 189:22,
198:24, 221:15,
230:6
**fairly**
241:7
**faith**
168:4

**fall**
86:16, 246:19
**falls**
112:22, 239:10
**familiar**
19:7, 29:24,
33:15, 75:15,
87:5, 103:19,
104:23, 115:18,
115:22, 115:24,
116:4, 136:4,
136:6, 150:11,
186:9, 195:23,
254:7
**familiarity**
116:8
**familiarize**
14:10
**far**
62:21, 114:11,
146:9, 147:6,
147:11, 190:3,
190:18, 212:6
**farano**
5:13, 133:12,
168:24, 168:25,
169:8, 169:12,
169:14, 169:23,
170:2, 170:7,
170:13, 171:21,
174:12, 195:14,
213:24, 214:5,
222:7, 225:24,
226:1, 226:2,
228:14, 228:15,
228:20, 228:22,
229:4, 229:23,
235:5, 235:8
**fashion**
168:6
**faster**
152:1, 152:2,
152:3, 232:25
**fault**
58:25
**favor**
27:8, 118:4,
118:5, 173:9,

196:16
**feasible**
195:19
**feature**
10:23
**features**
28:16
**federal**
199:4
**fee**
49:24, 95:4,
128:5, 128:14,
131:22, 138:11,
138:13, 138:16,
140:12, 140:18,
140:24, 141:13,
142:16, 196:4,
211:23, 212:2,
212:5, 212:9,
212:12, 212:13,
212:16, 212:19,
212:20, 212:21,
212:23, 212:24,
213:6, 213:9,
213:10, 214:21,
215:2, 215:4,
215:8, 221:1,
221:3, 221:7,
228:14, 229:13,
231:20, 232:1,
232:5, 232:6,
233:18, 233:22,
234:6, 235:9,
237:18, 238:12,
238:15, 238:22,
239:8, 239:10,
239:13, 239:20,
239:25, 256:24,
257:2, 258:15,
258:21, 259:12,
259:18, 260:1,
260:2
**feedback**
21:9, 120:3,
212:1
**feel**
199:4, 254:25
**fees**
88:16, 88:19,

88:24, 89:2,
89:21, 95:4,
95:17, 118:16,
119:6, 119:19,
128:9, 128:15,
175:1, 175:7,
195:20, 196:5,
197:5, 197:6,
198:3, 198:6,
214:8, 214:11,
214:18, 214:19,
215:7, 221:11,
221:14, 221:24,
228:23, 229:14,
230:16, 232:16,
232:17, 233:1,
233:22, 234:9,
235:13, 239:1,
239:6, 239:7,
239:9, 258:24,
259:8, 259:9,
260:7
**feinberg**
206:9, 206:12
**felt**
255:2, 255:3,
255:4
**few**
23:1, 70:1,
73:15, 73:22,
113:4, 128:12,
130:25, 144:19,
180:16, 186:3
**field**
22:5
**fifth**
256:23
**file**
223:13
**filed**
16:5, 16:23,
17:1, 17:4,
43:4, 67:14,
67:17, 67:21,
95:12, 96:11,
96:12, 96:14,
96:15, 97:2,
97:16, 128:11,

Transcript of Allen Waxman
Conducted on December 27, 2019

286

129:3, 142:18,
175:2, 196:22,
197:2, 204:2,
204:9, 205:18,
205:21, 208:7,
208:20, 209:2,
209:13, 209:22,
231:10, 231:16
**files**
258:15, 258:20
**filing**
16:2, 22:20,
23:2, 68:4,
68:5, 89:10,
128:5, 128:9,
128:14, 128:15,
131:22, 140:18,
140:24, 142:12,
175:7, 197:5,
197:6, 198:3,
223:16, 225:1,
225:2, 238:15,
260:1, 260:2
**filings**
84:12, 89:19,
175:9
**filled**
240:3
**final**
28:1, 183:22,
196:24, 202:1,
264:15, 264:19,
264:22
**finalized**
8:25
**finalizing**
195:21, 196:2,
198:5
**finally**
27:19, 229:15
**financial**
84:15, 267:11
**financially**
237:16
**find**
74:17, 99:13,
99:18, 116:21,
118:24, 182:18,

186:7, 208:5,
222:8, 222:23
**finding**
102:18, 103:13,
119:7
**fine**
18:6, 35:19,
38:16, 69:15,
98:4, 110:24,
114:13, 133:15,
142:3, 171:14,
174:19, 186:5,
244:1
**finishes**
24:3
**firm**
39:13, 39:15,
53:17, 108:9,
110:25, 112:12,
112:18, 113:17,
123:9, 127:22,
137:9, 137:15,
137:16, 137:18,
137:19, 137:20,
137:23, 138:1,
254:6
**firms**
53:5, 53:8,
66:3, 112:15,
113:3, 113:6,
113:18, 113:20
**first**
7:14, 14:10,
14:15, 21:20,
22:8, 77:12,
77:19, 78:2,
78:16, 85:13,
86:21, 86:24,
91:9, 101:2,
104:1, 113:21,
121:20, 125:24,
136:21, 153:19,
168:3, 176:2,
177:1, 191:20,
214:22, 233:17,
234:5, 248:2,
256:16
**five**
74:3, 74:4,

83:21, 124:14,
124:15
**five-minute**
69:13, 253:13
**flip**
157:10
**focused**
53:1
**folks**
109:3
**follow**
34:25, 36:1,
36:17, 42:17,
42:25, 43:19,
44:5, 44:16,
45:5, 45:18,
46:4, 46:7,
47:7, 47:15,
48:3, 48:18,
48:24, 49:7,
53:24, 55:18,
56:1, 56:8,
56:15, 56:22,
57:5, 57:13,
57:20, 58:4,
58:13, 58:19,
59:17, 59:25,
60:9, 61:1,
62:18, 63:17,
64:6, 64:18,
65:1, 65:9,
65:16, 65:25,
66:9, 78:12,
106:6, 123:5,
142:8, 143:7,
143:19, 144:3,
144:13, 157:3,
160:18, 160:19,
160:20, 160:21,
160:23, 161:19,
163:13, 191:9,
192:17, 192:18,
194:14, 195:4,
199:22, 206:25,
211:15, 215:16,
216:3, 232:21,
241:13, 241:22,
241:24, 242:6,

243:17, 244:22,
248:19, 249:14,
249:24, 250:11,
255:25, 257:10,
262:10, 263:10
**follow-up**
262:18
**followed**
20:16, 22:6,
36:22, 43:4,
43:15, 44:2,
44:12
**following**
94:22, 132:16,
161:22, 161:24,
162:4, 165:21,
168:13, 229:9,
232:23, 237:4,
248:25, 265:2
**follows**
7:16, 40:22
**footnote**
184:20, 197:8,
222:9, 223:11,
223:23, 224:22
**foregoing**
266:4, 267:3,
267:4
**forgot**
84:18
**form**
4:10, 10:7,
10:25, 11:20,
12:4, 12:10,
13:5, 15:13,
18:12, 20:18,
25:14, 25:23,
26:11, 26:20,
27:18, 27:24,
31:25, 33:4,
33:18, 36:24,
37:7, 37:23,
38:6, 40:13,
40:18, 41:2,
52:11, 52:18,
52:22, 53:12,
53:21, 55:1,
55:9, 59:9,

Transcript of Allen Waxman
Conducted on December 27, 2019

287

59:14, 60:13,
61:10, 64:15,
67:6, 68:18,
68:21, 69:10,
71:23, 75:8,
75:19, 77:20,
78:3, 78:9,
78:19, 82:22,
83:2, 84:13,
87:11, 90:12,
91:25, 93:6,
96:2, 103:1,
103:11, 104:4,
107:9, 108:4,
108:16, 117:4,
119:14, 122:6,
122:25, 126:17,
131:4, 140:10,
148:5, 148:24,
149:13, 162:6,
163:7, 172:21,
177:25, 199:6,
199:15, 200:3,
208:9, 221:16,
230:2, 232:18,
234:8, 234:21,
235:11, 237:8,
239:22, 240:3,
240:15, 242:15,
242:20, 243:22,
245:9, 254:22
**forth**
72:7, 155:8,
155:20, 180:7,
185:3, 196:22,
198:4, 201:18,
215:8, 229:13,
239:2, 245:18
**forum**
208:2, 208:6,
245:16
**forward**
97:2, 121:25,
132:20, 142:25,
143:13, 143:15,
143:23, 144:9,
145:18, 149:25,
150:3, 151:24,

152:1, 152:9,
157:11, 175:20,
195:21, 220:20,
224:17, 235:17,
238:21, 249:9
**forwarded**
93:23, 235:19
**forwarding**
131:2, 164:6
**found**
101:8
**foundation**
80:24
**four**
28:2, 176:5,
176:9, 184:3
**fourth**
256:22
**frame**
22:3, 88:13,
88:17, 88:18,
89:5, 132:23,
150:16, 150:17,
160:24, 175:23,
176:5, 222:16
**franchisees**
105:7
**francisco**
1:3, 6:5,
210:13
**frankly**
119:5, 136:17,
179:12, 265:5
**freedom**
126:25
**frequently**
55:7
**friday**
1:15, 81:12,
210:14
**friend**
135:10, 135:13,
135:16
**front**
14:4, 81:4,
138:14, 138:18,
174:5, 181:6,
205:11, 261:7,

262:9
**frustrated**
139:25, 140:8,
140:12, 142:16
**frustration**
178:1
**frustrations**
95:3, 95:22,
140:14, 177:22
**fulfilling**
81:6
**full-time**
52:16, 84:4
**fully**
75:9, 201:3,
201:24
**function**
61:9
**fund**
22:23
**funding**
142:24, 143:3,
143:13, 143:15,
143:23, 144:8,
152:3, 237:17
**further**
31:5, 40:1,
40:3, 143:12,
181:5, 211:2
**furthers**
237:12, 237:13
**future**
16:5

--- G ---

**gain**
214:23
**game**
80:11
**gar**
20:8
**gave**
74:22, 74:24
**gb**
251:3
**gd**
251:5, 251:17
**gdc**
217:16

**general**
39:7, 41:18,
43:13, 80:23,
95:22, 120:18,
155:1, 175:16,
239:6
**generally**
12:5, 12:21,
13:12, 33:11,
33:19, 33:20,
35:3, 35:8,
35:20, 54:23,
69:1, 103:22,
107:24, 116:3,
116:7, 130:21,
177:11, 179:15,
239:3, 242:24
**generate**
8:10
**generated**
67:11, 182:17
**generating**
11:22
**genesis**
45:21, 179:12
**geographical**
59:7
**getting**
49:10, 95:21,
99:1, 119:23,
198:18, 221:2,
228:16, 254:25
**give**
21:2, 30:4,
31:15, 33:2,
52:3, 111:8,
113:13, 113:16,
114:16, 131:5,
142:1, 152:12,
171:9, 173:24,
194:16, 198:9,
205:16, 207:23,
227:12
**given**
19:1, 26:24,
27:6, 37:25,
41:3, 80:18,
180:7, 184:5,

Transcript of Allen Waxman
Conducted on December 27, 2019

288

184:6, 201:22,
227:20, 238:5,
247:23, 266:6,
267:5
**gives**
128:14
**giving**
33:11, 114:19,
116:1
**global**
17:14
**go**
22:3, 47:10,
54:14, 59:5,
82:2, 92:11,
101:8, 120:13,
121:24, 130:7,
130:10, 138:19,
141:3, 163:14,
164:7, 171:14,
173:18, 174:11,
178:16, 181:25,
193:9, 193:21,
207:3, 213:3,
222:20, 231:3,
241:1, 261:6,
262:9, 263:21
**goal**
30:14, 30:16,
151:17, 151:19,
151:20
**goes**
135:19, 156:11,
194:12, 219:15,
240:22
**gone**
221:19, 230:11
**good**
20:9, 35:3,
69:12, 78:25,
84:25, 118:20,
168:4, 237:10,
251:7, 255:2
**gotten**
81:20, 211:6,
220:5, 225:17
**govern**
39:23, 205:19

**governance**
61:11
**governing**
54:5
**governs**
205:21
**grace**
224:15, 226:21
**gregg**
5:13, 168:24,
195:16, 203:12,
218:1, 218:9,
222:7, 225:24,
225:25, 226:2,
234:23, 235:5
**group**
31:13, 31:20,
48:10, 245:7,
247:21
**grow**
149:15, 151:20
**growcock**
224:15, 227:4
**growing"**
150:24
**guess**
48:10, 221:8,
239:14
**guidance**
30:5, 34:14,
36:6, 36:10,
39:1, 39:3,
39:20, 40:1,
40:4, 40:7,
40:11, 40:16,
40:23, 41:1,
44:9, 44:12,
44:21, 45:9,
45:12, 45:24,
46:12, 46:19,
46:24, 154:12,
155:3
**guidances**
37:13, 39:12,
40:3, 41:8
**guide**
9:10, 38:9,
196:12

**guides**
9:9
**guy**
58:9
**guys**
19:14, 102:17

### H

**habit**
126:15, 126:19
**half**
244:18
**hand**
13:20, 50:20,
61:15, 82:9,
85:1, 91:1,
97:19, 124:23,
125:15, 126:6,
152:5, 162:11,
166:19, 168:17,
180:9, 185:14,
195:7, 202:21,
204:16, 213:22,
217:8, 222:3,
224:8, 228:24,
234:13, 234:25,
236:1, 236:16,
240:5, 250:19,
252:14, 253:4,
267:13
**handed**
97:21
**handful**
113:7
**handing**
164:2
**handle**
50:1, 54:3,
177:9, 177:12,
179:15
**handled**
40:4, 95:13,
96:20, 128:13,
175:10, 178:2
**handling**
50:11, 95:2,
127:23, 142:12,
167:22, 175:7

**handwriting**
91:15, 91:19
**handwritten**
4:15, 129:17,
159:17
**hang**
179:3
**happen**
30:17, 100:1,
180:1, 201:5,
230:14, 249:1,
259:17
**happened**
94:19, 109:15,
165:12, 180:18,
199:16, 205:3,
211:8, 216:1,
245:3, 250:3
**happening**
66:25, 103:19,
107:15, 107:19,
211:21, 223:4,
223:19
**happens**
37:5, 177:8,
232:7, 260:8
**happy**
13:24, 80:4,
109:17, 159:8,
245:10, 246:7,
247:7, 248:16,
249:8
**hardest**
19:17
**head**
83:14, 171:19
**head's**
99:2, 99:12,
102:3
**health**
12:15, 48:10
**hear**
13:24, 151:7,
158:17, 203:16
**heard**
167:13
**hearing**
165:13, 210:13

Transcript of Allen Waxman
Conducted on December 27, 2019

289

**held**
2:1, 218:16
**helena**
4:16, 4:18,
70:15, 85:21,
86:4, 155:8,
155:13, 155:17,
161:17, 185:24,
192:22, 218:1,
223:24, 224:19
**helena's**
220:6
**help**
8:20, 9:10,
12:19, 26:3,
26:5, 28:16,
30:4, 30:21,
30:23, 31:17,
32:5, 39:25,
101:1, 188:5,
190:16, 237:11,
246:22, 247:5,
247:9, 249:9
**helpful**
21:12, 25:18,
28:5, 28:6,
38:7, 167:17,
167:20, 196:6
**helping**
14:23
**helps**
17:13, 28:11,
226:16
**here**
6:1, 16:3,
16:8, 16:13,
16:22, 18:20,
19:17, 20:19,
23:21, 24:22,
58:23, 63:2,
67:1, 76:3,
76:6, 76:25,
79:25, 88:4,
91:11, 93:22,
95:10, 99:1,
109:12, 109:16,
115:9, 115:14,
117:7, 123:3,

126:5, 127:9,
130:12, 135:14,
136:3, 138:22,
139:8, 139:18,
141:15, 146:6,
146:8, 150:2,
154:3, 155:3,
164:5, 164:7,
164:23, 167:16,
171:19, 172:4,
172:17, 175:5,
175:24, 176:19,
180:4, 180:16,
182:13, 183:1,
183:13, 183:18,
184:20, 187:2,
188:5, 188:11,
189:1, 189:2,
189:17, 189:22,
193:5, 193:7,
193:19, 197:5,
197:8, 197:13,
197:14, 197:18,
198:5, 200:9,
201:10, 202:15,
204:1, 205:17,
213:7, 217:25,
218:14, 222:11,
223:10, 223:11,
226:5, 227:2,
230:12, 239:8,
249:11, 251:24,
254:7, 261:22,
263:17, 263:22,
263:23, 264:20,
265:6, 265:10
**hereby**
266:3, 267:3
**hereunto**
267:12
**hershenberg**
3:25, 6:24,
70:12, 77:1,
123:20, 123:22
**hesitating**
63:1
**hesitation**
210:11

**hide**
101:4
**highly**
10:9, 121:4,
121:12, 121:19
**himself**
171:24
**hired**
78:8
**historical**
41:5
**historically**
40:17, 40:19
**history**
41:3
**hold**
39:4, 182:4,
237:4, 260:16
**holding**
22:23
**holecek**
5:14, 5:16,
85:22, 86:7,
86:25, 87:1,
90:9, 90:21,
90:25, 92:12,
92:19, 92:24,
93:4, 93:14,
93:15, 93:24,
94:5, 94:17,
94:24, 95:17,
97:5, 97:9,
97:14, 100:5,
100:8, 100:19,
100:22, 100:23,
102:15, 102:23,
107:22, 108:2,
116:15, 118:13,
118:15, 118:16,
124:5, 124:7,
124:10, 124:19,
125:4, 125:8,
132:5, 132:13,
132:17, 133:11,
137:1, 139:2,
139:10, 140:6,
140:7, 162:19,
163:22, 164:7,

166:23, 168:14,
168:24, 169:12,
170:10, 170:11,
170:13, 174:13,
178:16, 181:3,
185:22, 195:14,
202:25, 203:12,
205:4, 213:24,
214:5, 222:7,
225:23, 226:3,
227:18, 228:17,
228:18, 234:18,
236:8, 238:9,
251:8
**holecek's**
107:11, 119:3,
119:6, 123:25,
167:6
**home**
48:7, 235:21,
250:15
**hope**
11:15, 167:6,
248:23
**hopefully**
217:6
**hoping**
217:4
**hourly**
104:22, 106:15,
106:20, 106:24,
107:6, 107:7
**hours**
70:1, 73:11,
73:14, 73:15,
73:16, 73:20,
73:22, 73:24,
74:1, 74:3, 74:5
**humane**
135:1, 135:2,
135:5
**hundred**
113:4
**hunger-wise**
82:1
**hurry**
219:14
**hypothetically**
54:12

Transcript of Allen Waxman
Conducted on December 27, 2019

290

| I |
|---|

**id**
4:9, 5:2
**idea**
12:11, 160:15,
181:7, 181:10,
200:6, 205:14,
205:20
**ideas**
211:25, 251:24
**identical**
196:15, 231:7,
231:9, 231:11,
231:16
**identification**
13:18, 61:19,
82:13, 85:5,
91:4, 97:24,
101:13, 125:2,
126:9, 133:19,
152:14, 162:14,
168:22, 180:12,
185:17, 195:10,
202:20, 204:19,
214:3, 217:11,
222:2, 224:11,
227:16, 229:2,
234:17, 235:3,
236:5, 236:19,
240:8, 250:18,
252:13, 253:2
**identified**
54:19, 167:25,
171:24
**identify**
6:13, 8:20,
20:4, 22:17,
104:15, 158:19
**idiosyncrasies**
25:16
**illinois**
3:7
**imagine**
24:22, 105:20,
126:25
**implemented**
166:9

**important**
142:24, 143:12,
143:23, 144:8,
163:6, 175:4,
222:24, 254:21,
254:24
**impose**
180:25
**impossible**
24:23
**impression**
52:5
**improving**
17:17
**in-house**
169:15, 171:23
**inaccuracies**
63:6
**inaccurate**
82:21
**inaction**
140:9, 140:12,
140:13
**inc**
1:10
**incentives**
118:24, 122:8
**incentivize**
121:19
**include**
197:12, 203:19
**included**
104:21, 133:11,
170:16, 212:16,
234:4, 256:19
**including**
80:22, 206:8
**inclusion**
229:16
**inclusive**
85:8, 85:10
**income**
239:9
**incorporate**
223:20
**incorporated**
179:7, 179:19,
260:21

**incorrect**
82:20, 82:24,
136:4, 136:8,
209:24
**increase**
57:23
**independent**
8:13, 14:22,
17:13, 50:8,
96:24, 127:16,
139:4, 149:24,
171:6, 203:23,
203:25, 218:7
**independently**
91:18, 102:6,
171:1, 203:20
**indicate**
95:10, 127:19
**indicated**
89:7, 94:23,
224:25, 227:2,
260:25
**indicates**
124:21, 128:6,
203:11
**indicating**
104:6
**indication**
197:22
**indigency**
240:4
**indigent**
239:20, 240:1
**indirectly**
17:17
**individual**
103:8, 116:22,
117:17, 128:24,
128:25, 142:13,
197:18, 198:8,
198:15, 198:19,
200:1, 258:3,
258:4
**individualized**
197:21, 200:13
**individuals**
12:22, 12:25,
13:13

**infirmative**
200:13
**informal**
40:10
**information**
62:21, 76:1,
82:21, 82:24,
83:5, 87:8,
94:2, 102:20,
112:9, 113:9,
138:24, 139:6,
150:12, 225:17,
243:6
**initial**
90:6, 98:25,
103:17, 183:25,
184:22, 258:20
**initially**
214:13
**initiated**
90:17, 230:15,
257:23
**initiating**
258:15
**initiation**
212:13, 212:24,
213:9, 214:21,
215:3, 215:4,
215:8, 232:1
**initiatives**
86:3
**injury**
29:10
**innovate**
20:13, 103:5,
103:21
**innovated**
22:5
**innovating**
104:2
**innovation**
20:8, 20:10,
20:23, 21:8,
21:11, 104:16,
143:11
**innovations**
8:11, 20:11,
20:12, 22:9,

Transcript of Allen Waxman
Conducted on December 27, 2019

291

104:14
**innovative**
19:5, 19:11,
19:21, 20:21,
21:1, 21:13,
21:25, 168:1,
255:4
**innovatively**
41:10
**input**
119:20, 165:6,
165:8, 165:14,
165:18, 166:8,
190:19, 190:23,
191:4, 254:25,
255:1, 255:2
**inputs**
141:20, 184:16,
184:17, 206:7,
206:13
**inquire**
109:13, 109:14,
209:23, 219:18
**inquiries**
103:3, 103:4
**inquiry**
37:20, 102:25
**inside**
189:6, 190:5
**insist**
128:24
**instance**
12:12, 54:18,
119:11, 121:16,
175:25, 258:6,
261:23, 262:13
**instances**
32:17
**instead**
23:23
**institute**
7:24, 17:11,
61:23
**institutions**
22:7
**instruct**
123:2, 141:24,
143:6, 143:18,

144:1, 144:11,
157:1, 241:12,
241:20, 248:14,
249:4, 255:24
**instructed**
80:14, 110:18,
142:6
**instructing**
108:23, 250:2,
263:8
**instruction**
79:10, 111:8,
123:6, 161:20,
161:23, 161:25,
191:24, 206:25,
241:25
**instructions**
232:23
**intellectual**
18:16, 26:17
**intend**
249:4, 249:14,
250:11
**intended**
208:25
**intent**
100:16
**intention**
63:3, 151:1,
251:17, 260:12
**intentional**
114:20
**intentionally**
114:17
**interaction**
87:6
**interest**
102:18, 146:10,
147:6, 147:22,
148:3, 148:22,
149:1, 267:11
**interested**
89:17, 90:16,
103:13, 118:17,
119:22, 144:7,
147:19, 150:21,
159:1, 159:3,
216:24

**interlineated**
186:3
**intermediate**
133:16
**internal**
198:22, 206:17
**internally**
79:18, 164:18,
188:3, 189:25,
192:2, 192:14,
194:23, 206:24,
213:14
**international**
7:24, 17:11,
61:22, 86:3
**interrupt**
141:2
**intervention**
20:2, 22:18
**intro**
142:2
**introductory**
24:6
**invented**
117:3
**investigation**
108:1, 139:13,
242:12, 242:17,
243:1, 243:11
**invitation**
125:9, 179:24,
202:24, 203:19
**invite**
4:23, 5:4,
125:4, 168:23,
170:16, 178:16,
225:6
**invoke**
231:5, 231:11
**involve**
206:18
**involved**
13:9, 18:16,
22:22, 44:20,
45:9, 45:15,
89:8, 90:11,
90:23, 97:1,
102:21, 109:4,

113:18, 121:21,
167:24, 168:2,
213:20, 216:14,
246:23, 254:4
**involvement**
159:2, 159:6,
159:7, 161:4,
249:6, 263:20
**involving**
95:2, 96:19,
105:7, 112:25,
211:12
**ip**
12:13, 12:14,
27:7
**ip-related**
25:6
**irrelevant**
131:7
**issue**
27:19, 28:3,
69:5, 96:22,
96:23, 97:5,
109:19, 115:14,
117:14, 119:18,
166:18, 189:16,
189:18, 194:20,
204:8, 237:18,
246:15, 265:5
**issued**
44:9, 44:13,
226:19
**issues**
8:21, 25:18,
37:3, 38:1,
118:16, 127:18,
182:9, 186:6,
188:10, 189:2,
196:19, 222:11,
222:14, 244:19,
246:22, 247:9,
253:21
**items**
230:12
**itself**
21:5, 22:2,
80:6, 264:18

---
**J**
---
**january**
267:14

Transcript of Allen Waxman
Conducted on December 27, 2019

292

**jay**
134:10, 160:7,
160:11
**jesenka**
3:11, 7:5
**job**
1:17, 8:5,
19:17, 24:22,
52:10, 52:21
**jobs**
50:25, 53:5
**jockey**
230:4
**joe**
114:4
**john**
133:24, 211:20
**join**
89:6, 90:1,
218:2
**joining**
47:12
**josh**
195:16, 218:1,
218:6
**joshua**
169:3, 222:7
**journals**
137:12, 138:9
**judge**
31:10, 79:23,
81:4, 81:11,
110:2, 158:21,
159:4, 196:18,
248:2, 249:5
**judge's**
79:4
**june**
267:15
**jurisdiction**
229:19
**jurisprudence**
117:11
**juror**
31:8

---
K
---

**kaye**
48:13, 53:15

**kayes**
3:5, 6:17,
59:3, 81:19,
109:11, 109:20,
110:1, 113:1,
113:7, 220:3
**keep**
55:14, 122:21,
126:20, 148:8,
151:22, 163:4,
175:4, 202:3,
202:15, 202:16,
211:20
**keeping**
202:17
**keller**
3:3, 108:21,
109:9, 112:12,
253:24, 254:8,
254:12
**ken**
206:8
**kennel**
105:3
**kept**
162:7
**kevin**
135:14, 135:15,
135:17
**key**
137:6, 137:7
**kiernan**
133:24, 133:25,
134:1, 138:22,
144:7, 144:16,
145:5, 146:25,
152:16, 153:4,
156:9, 156:22,
157:7, 157:15,
157:24, 158:16,
161:17, 162:5,
163:21, 164:6,
164:11, 190:3,
190:18, 191:16,
191:22, 204:22,
213:13, 217:13
**kim**
59:3, 76:8,

76:22, 109:11
**kim's**
262:19
**kimberley**
3:18, 6:19
**kind**
28:25, 29:13,
32:9, 131:6,
138:4
**kinds**
22:8, 28:15,
53:2, 72:11
**knew**
79:5, 113:23,
119:22, 255:19
**know"**
110:12
**knowledge**
33:3, 40:15,
55:8, 62:25,
64:13, 88:9,
105:12, 105:18,
107:18, 165:24,
166:11
**known**
7:25, 78:22,
86:10, 154:2,
208:25
**knows**
87:3, 87:9,
210:11

---
L
---

**la**
106:20, 106:24
**labeled**
85:2
**lady**
70:19, 70:21
**language**
201:1
**large**
89:9, 89:13,
95:13, 95:18,
95:20
**largest**
60:21
**last**
41:11, 41:23,

43:4, 43:16,
56:19, 57:2,
74:11, 81:12,
91:13, 112:9,
210:13, 217:16,
217:21, 233:4
**lasted**
125:21, 158:2
**later**
99:25, 144:19,
159:13, 176:1,
179:25, 186:8,
251:19, 252:1,
252:9
**latest**
66:24, 195:16,
228:8
**launch**
210:1, 210:6,
211:13, 215:23,
216:1, 216:7,
216:24, 217:3,
219:12, 222:20,
241:16, 242:1,
243:23, 243:25,
244:3, 244:13,
255:5
**launched**
211:9, 226:20,
244:18, 250:6
**launches**
257:4
**launching**
229:25
**law**
53:5, 53:8,
66:3, 69:1,
127:17, 159:4,
160:17, 254:6
**laws**
227:20, 229:18
**lawsuit**
66:13, 66:19
**lawyer**
24:9, 53:17,
86:8, 111:13,
111:20, 112:18,
115:7, 115:10,

Transcript of Allen Waxman
Conducted on December 27, 2019

293

122:2, 122:11,
170:18, 248:24,
265:3
**lawyer's**
34:25, 36:1,
36:17, 42:17,
42:25, 43:19,
44:5, 44:16,
45:5, 45:18,
46:4, 47:7,
47:15, 48:3,
48:18, 48:24,
49:7, 53:24,
55:18, 56:1,
56:8, 56:15,
56:22, 57:5,
57:13, 57:20,
58:4, 58:13,
58:19, 59:17,
59:25, 60:9,
61:1, 62:18,
63:17, 64:6,
64:18, 65:1,
65:9, 65:16,
65:25, 66:9,
106:6, 123:5,
142:8, 143:7,
143:19, 144:3,
144:13, 161:20,
194:14, 199:22,
211:15, 215:16,
216:3, 232:21,
232:23, 241:22,
242:6, 243:17,
248:19, 249:14,
250:11, 255:25,
263:10
**lawyers**
14:23, 52:24,
53:5, 53:8,
53:14, 76:9,
76:24, 76:25,
77:8, 119:10,
128:1, 128:7,
199:13, 206:8,
206:13, 255:19
**lawyers's**
206:25

**lead**
197:24, 252:10
**leading**
14:22
**leads**
86:3, 86:6
**learn**
207:7, 208:21
**learned**
66:15, 88:14,
88:22, 150:3,
150:6, 150:7,
207:10, 207:14,
208:10, 238:13
**learning**
105:22, 207:16,
209:20
**learnings**
105:20
**least**
172:4, 172:7,
202:17
**leaving**
126:22
**led**
102:22, 117:21
**left**
198:2, 202:9
**left-hand**
159:23
**legal**
9:8, 10:3,
10:19, 38:3,
38:9, 38:11,
52:25, 68:19,
103:14, 103:18,
107:13, 107:20,
139:12, 199:20,
199:25
**legally**
197:20, 198:7
**length**
13:3
**lenkner**
3:3, 108:21,
109:9, 112:12,
254:12
**lenkner's**
253:24, 254:8

**less**
73:23, 73:25,
74:2, 119:5,
129:10, 129:11,
260:5, 260:6
**lest**
32:4
**let's**
29:15, 47:10,
52:9, 82:2,
92:11, 99:21,
101:8, 154:5,
179:20, 193:1,
193:13, 216:18,
218:2, 231:3,
231:15, 238:6,
253:13
**letter**
205:24, 206:1,
213:24
**letters**
67:16
**level**
15:20
**leverage**
122:2, 122:11
**lewis**
2:5, 3:20,
6:20, 6:23, 7:4,
70:11, 76:7,
76:21, 76:24
**life**
12:15
**light**
157:4, 252:3,
252:6
**liked**
120:6
**likely**
218:8
**limit**
53:19, 66:3,
73:14, 81:6,
110:23, 111:4
**limitations**
59:7
**limited**
41:3, 52:2,

**111:4**, 159:11,
188:2, 192:14,
194:21, 215:23
**line**
14:16, 15:13,
16:16, 17:8,
80:17, 102:3,
150:2, 150:6,
186:22, 186:25,
187:6
**lines**
79:2, 89:14,
102:19, 126:4,
137:1
**link**
240:22
**linkedin**
48:17
**links**
222:18, 241:1
**lipshutz**
169:3, 169:9,
169:13, 170:7,
170:14, 170:20,
195:14, 213:25,
214:5, 222:7
**lipshutz's**
170:15
**list**
49:21, 54:10,
64:9, 64:13,
149:14, 151:2,
175:16, 202:9,
227:1, 232:13
**listed**
106:25, 162:21
**listing**
164:21
**litigants**
110:5
**litigation**
9:13, 9:15,
9:16, 9:21,
9:22, 9:23,
10:15, 10:16,
11:8, 11:9,
11:12, 11:14,
11:15, 11:17,

Transcript of Allen Waxman
Conducted on December 27, 2019

294

30:15, 30:18,
66:5, 127:20,
168:11, 171:20,
171:25, 172:14,
172:19, 244:19,
247:2, 247:8,
247:20, 248:8
**little**
31:4, 66:18,
70:16, 96:3,
120:1, 173:20,
239:17, 239:25
**littler**
127:22
**live**
207:3, 208:22,
240:20, 241:5,
241:9, 260:23
**llp**
2:5
**llp`**
3:12, 3:20
**located**
74:24
**log**
131:4
**long**
14:11, 42:9,
44:24, 47:18,
47:23, 48:13,
48:21, 49:2,
59:5, 63:2,
69:4, 69:24,
83:18, 86:10,
93:16, 125:20,
148:16, 158:2,
170:24, 175:6,
201:24
**longer**
13:7, 13:14,
54:17, 182:5
**look**
13:22, 16:16,
23:20, 61:17,
74:6, 74:14,
82:11, 91:6,
94:1, 98:11,
98:16, 109:8,

112:23, 158:22,
162:15, 164:7,
164:22, 175:24,
176:9, 179:20,
179:21, 182:10,
183:12, 185:20,
195:21, 222:4,
236:6, 243:7,
244:17
**looked**
74:13, 136:22,
139:15, 139:21
**looking**
76:17, 76:18,
109:12, 135:24,
157:11, 176:24,
176:25, 178:3,
180:16, 182:22,
183:3, 183:4,
183:5, 203:4,
203:7, 207:19,
211:22, 213:1,
216:19, 217:19,
224:23
**looks**
63:21, 63:22,
99:6, 100:16,
160:3, 168:23,
169:6, 171:15,
171:19, 186:16,
217:23
**lost**
175:5
**lot**
19:8, 105:25,
128:2, 135:25,
151:5, 151:8,
153:21, 188:13,
193:16, 193:17,
194:20, 209:11,
221:18, 244:21,
244:25
**lots**
155:20
**love**
81:24
**lower**
218:20

**lowered**
184:3
**lowering**
205:11
**lunch**
70:19, 70:21
**luncheon**
82:5

**M**

**made**
119:25, 136:5,
137:2, 150:5,
164:8, 164:9,
173:14, 188:23,
198:14, 199:4,
213:15, 219:9,
222:9, 223:8,
225:15
**maintain**
23:15, 49:21
**maintaining**
22:1
**maintains**
25:4
**make**
9:7, 23:6,
24:3, 24:8,
42:10, 46:8,
98:5, 109:17,
173:20, 175:16,
175:19, 191:24,
200:16, 202:5,
205:17, 207:17,
219:19, 220:11,
221:23, 222:17,
222:18, 222:19,
222:25, 223:3,
223:8, 223:19,
224:4, 224:6,
227:9, 228:7,
242:10, 245:22,
250:1, 256:22
**make-work**
26:8, 26:13
**makes**
142:11, 163:9,
168:1

**making**
9:5, 48:11,
128:1, 187:5,
219:6
**man**
86:1
**management**
15:8
**manifested**
252:9
**many**
23:14, 24:12,
50:17, 50:21,
54:2, 55:11,
55:12, 55:22,
56:5, 56:18,
57:1, 59:11,
59:20, 60:3,
61:6, 73:15,
73:20, 117:8,
124:9, 129:7,
142:18, 146:14,
146:22, 147:7,
148:2, 148:21,
149:18, 150:1,
150:3, 150:5,
150:10, 151:10,
170:1, 200:24,
201:16, 202:8
**margin**
159:23
**mark**
101:16, 185:15,
219:21
**marked**
13:17, 13:21,
61:16, 61:18,
82:10, 82:12,
85:2, 85:4,
91:2, 91:3,
97:20, 97:23,
101:12, 124:24,
125:1, 125:16,
126:7, 126:8,
133:18, 152:6,
152:11, 152:13,
162:12, 162:13,
168:18, 168:21,

Transcript of Allen Waxman
Conducted on December 27, 2019

295

180:11, 185:16,
195:9, 195:11,
202:19, 202:22,
204:17, 204:18,
213:23, 214:2,
217:9, 217:10,
222:1, 222:4,
224:9, 224:10,
227:13, 227:15,
228:25, 229:1,
234:14, 234:16,
234:25, 235:2,
236:1, 236:4,
236:16, 236:18,
240:6, 240:7,
250:17, 250:20,
252:12, 252:15,
253:1, 253:5
**market**
12:2, 12:8,
12:9, 57:8,
57:9, 57:16,
57:17, 57:24,
58:15
**marketing**
83:14, 226:12
**marketplace**
12:6, 120:18
**marks**
265:19
**marshaled**
128:2
**master**
175:16, 227:1,
232:13
**materials**
68:14
**matter**
6:3, 30:11,
30:22, 32:3,
32:5, 39:5,
50:2, 50:3,
51:20, 55:3,
55:4, 67:21,
77:22, 78:4,
89:8, 89:12,
89:15, 90:7,
95:1, 95:5,

95:7, 95:23,
96:5, 112:14,
122:9, 130:5,
136:7, 136:13,
136:15, 138:20,
155:19, 168:2,
173:15, 177:9,
177:20, 178:9,
202:15, 208:14,
215:10, 215:11,
216:16, 229:7,
236:23, 245:4,
249:9, 260:24,
261:1
**mattered**
137:5, 137:8
**matters**
18:17, 18:18,
34:11, 39:9,
39:24, 40:4,
50:1, 50:11,
51:24, 54:6,
55:12, 89:16,
95:13, 116:22,
117:8, 117:23,
127:21, 137:21,
137:22, 151:24,
152:1, 170:19,
174:23, 174:25,
177:12, 178:2,
179:16, 180:24,
183:19, 183:24,
192:20, 216:14,
226:6, 227:10
**maybe**
40:2, 58:10,
74:11, 75:10,
78:25, 99:5,
105:5, 113:12,
124:15, 128:16,
128:17, 132:22,
136:13, 179:20,
189:7, 189:9,
190:16, 203:15,
203:18, 232:3,
252:20, 252:21,
256:9
**mean**
8:17, 15:5,

18:3, 25:15,
26:6, 28:20,
32:1, 33:9,
33:20, 37:10,
37:14, 37:17,
40:20, 45:22,
52:19, 53:1,
87:6, 91:17,
101:1, 113:21,
114:14, 125:17,
132:6, 133:4,
137:9, 139:19,
141:2, 141:7,
142:14, 146:17,
151:14, 163:25,
170:18, 171:21,
180:5, 188:18,
190:11, 196:21,
199:7, 207:14,
214:11, 225:9,
238:21, 242:16,
243:23, 250:6,
258:3, 258:4,
263:24, 265:3
**meaning**
205:20
**means**
103:2, 145:21,
199:9
**meant**
18:14, 18:25,
58:1, 58:16,
116:2, 128:22,
128:24, 129:1,
167:18, 169:10
**mechanism**
121:23, 202:11
**mediate**
29:12, 181:12
**mediating**
21:6
**mediation**
8:14, 29:8,
29:19, 29:25,
30:7, 30:9,
54:20, 122:4,
122:9, 122:12,
168:7, 174:23,

174:25, 175:22,
181:12, 181:22,
202:8, 212:19,
212:22, 213:5,
213:10, 232:5
**mediations**
51:4, 51:15,
54:12, 176:2,
176:3
**mediator**
178:8
**mediators**
9:19, 11:24
**meet**
86:21, 86:24
**meeting**
123:18, 123:19,
123:23, 124:1,
124:4, 125:3,
145:4, 145:10,
145:15, 145:17
**meetings**
122:21
**member**
122:23, 123:10,
123:16, 137:9,
137:15, 137:16,
137:18, 137:19,
137:20, 137:23,
138:1, 138:11,
138:17, 160:12
**members**
61:6, 61:12,
134:3, 137:10,
138:3, 138:14,
206:8, 206:13
**membership**
138:8
**memorializing**
145:15
**memory**
94:18, 154:4,
203:23, 203:25
**memos**
154:19
**mendelson**
127:23
**mentioned**
15:19, 20:16,

Transcript of Allen Waxman
Conducted on December 27, 2019

296

20:25, 25:2,
29:8, 29:21,
35:14, 36:5,
68:15, 70:14,
98:20, 102:19,
122:16, 128:23,
138:8, 150:20,
189:15, 192:19,
192:23, 229:21,
258:23
**menu**
230:12
**merits**
30:5, 30:11,
30:22, 177:17,
178:5
**met**
70:7, 77:10,
78:16, 86:11,
170:20, 259:7
**methodology**
118:25, 181:24
**michael**
5:14, 5:16,
86:7, 90:9,
92:12, 92:19,
92:24, 93:4,
100:18, 102:15,
195:15, 203:12,
218:1, 218:8,
222:6, 227:18,
234:18, 234:19
**michael's**
195:18
**micro**
120:1
**middle**
247:2
**might**
10:2, 27:2,
32:19, 39:17,
72:8, 75:7,
75:17, 108:14,
109:14, 118:20,
141:14, 156:5,
166:16, 172:13,
173:17, 185:3,
207:14, 216:23,

235:18, 247:9
**mignano**
1:19, 2:12,
7:8, 267:2
**mike**
85:22, 162:19,
225:23, 251:8
**mind**
25:9, 29:23,
32:25, 38:14,
39:11, 39:13,
39:16, 39:21,
55:10, 62:15,
69:3, 154:25,
175:4, 221:8,
233:7, 238:6,
238:10, 244:23,
245:2
**mindful**
191:23
**mine**
63:22, 135:10,
135:16, 253:7
**mini**
29:20, 30:24,
31:3
**minimum**
231:4
**minute**
13:22, 158:6,
213:3
**minutes**
122:21
**misbelief**
136:15
**misclassification**
96:23, 97:11,
97:15, 108:10,
108:15, 110:11,
110:17, 111:3,
111:14, 111:21,
112:19, 112:24,
114:13, 115:8,
127:18, 165:19,
166:1, 166:7,
166:9, 177:15,
177:19, 177:23,
255:14, 255:20

**misleading**
113:14, 113:16,
114:10, 114:16
**misplaced**
137:3
**misremembering**
136:14
**miss**
98:5
**missed**
225:5, 225:8
**missing**
220:12
**mission**
8:8, 14:17,
15:1, 15:6,
15:18, 15:19,
15:25, 17:10,
237:12, 247:3
**misspoke**
58:1
**misstate**
119:16
**misstates**
27:25, 119:15,
200:4
**mistake**
137:14, 198:14
**model**
105:6, 105:9,
105:13, 105:17,
105:19, 106:2,
106:9
**models**
104:11, 104:21,
104:22, 104:23,
106:15, 107:6,
107:7
**modification**
36:22, 38:4,
40:25, 46:11,
46:19, 46:25
**modified**
16:1, 40:8,
40:12, 43:16
**modify**
40:16, 40:23,
44:2, 44:20

**modifying**
45:13
**moment**
61:17, 82:11,
91:6, 99:19,
99:22, 114:21,
129:14, 150:20,
162:10
**money**
65:12, 65:20,
66:5, 80:18,
89:13, 95:18,
95:20
**monitor**
6:8
**month**
74:10, 74:12,
86:13, 91:13,
128:13
**months**
28:2, 150:18,
176:4, 176:5,
176:8, 176:9,
183:8, 183:25,
184:2, 184:3,
232:12
**morale**
59:5
**more**
10:20, 10:24,
11:3, 11:7,
13:7, 13:11,
14:24, 17:15,
18:2, 18:8,
24:18, 24:19,
30:8, 32:9,
54:25, 55:7,
73:2, 73:23,
74:2, 83:4,
84:23, 96:22,
102:20, 103:15,
103:22, 118:25,
124:12, 124:14,
124:17, 126:4,
129:10, 141:12,
150:21, 151:13,
151:16, 151:21,
170:3, 172:16,

173:5, 173:15,
173:19, 175:19,
185:2, 189:3,
201:21, 214:23,
216:12, 230:19,
231:22, 232:8,
232:25, 233:1,
236:23, 237:5,
239:17, 239:25,
242:24, 246:7,
261:11
**morgan**
2:5, 3:20,
6:20, 6:22, 7:3,
70:11, 76:7,
76:21, 76:24
**morning**
264:21
**most**
14:17, 15:1,
15:25, 16:11,
104:14, 117:23,
134:21, 154:1,
177:12, 182:14,
218:8
**motion**
109:18
**move**
151:24, 152:1,
152:9, 158:14,
159:9, 159:12,
175:19, 220:20,
260:14, 260:15
**mover**
21:21
**moving**
168:19
**mrdjenovic**
3:11, 7:5
**much**
13:14, 80:18,
120:11, 143:3,
143:15, 154:8,
155:5, 155:18,
234:22
**multi-claim**
190:7
**multi-claims**
153:17, 184:13,

186:17, 190:20,
191:5, 191:13,
191:19, 192:7
**multiple**
89:16, 116:21,
117:17, 118:3,
142:15, 159:18
**murphy**
123:20, 123:23
**must**
207:9
**myself**
115:24, 125:7,
128:16, 157:16,
163:15, 170:14

**N**

**na**
183:19, 196:20,
196:25, 197:7,
204:1
**name**
7:19, 23:24,
76:13, 83:16,
84:18, 169:1,
254:5
**named**
59:11, 59:20,
60:3
**names**
33:11, 109:8
**naming**
23:23
**national**
127:21
**nature**
10:11, 12:18,
13:1, 31:16,
66:18, 66:24,
68:20, 87:5,
87:6, 95:25,
102:21, 215:10,
225:2
**nearly**
196:15, 231:7,
231:9, 231:10,
231:16
**necessarily**
30:17, 113:11,

189:17
**necessary**
11:14, 26:9,
158:23, 227:20,
257:24
**need**
26:2, 35:9,
41:9, 151:5,
151:8, 151:11,
181:6, 181:17,
197:21, 215:10,
255:1, 256:19,
256:24, 257:1,
258:13
**needed**
160:14, 198:8,
207:21
**needs**
104:15, 256:17,
256:20, 256:22
**negotiate**
214:14, 258:24,
259:8
**negotiated**
104:19, 104:25,
107:3, 107:8,
120:19, 234:9
**negotiation**
105:4, 105:5,
122:3
**neither**
49:18, 265:9,
267:9
**nervous**
248:24
**neutral**
9:1, 29:19,
30:1, 30:2,
31:4, 31:5,
31:8, 51:14,
52:16, 53:18,
53:20, 54:3,
55:7, 55:15,
55:23, 56:5,
57:9, 57:17,
57:24, 59:8,
148:22, 255:4
**neutral's**
54:7

**neutrality**
121:7
**neutrals**
8:13, 8:20,
29:21, 30:23,
31:14, 31:21,
49:13, 49:14,
49:15, 49:17,
49:18, 49:20,
49:21, 50:10,
50:20, 50:25,
51:1, 51:3,
51:11, 51:18,
51:22, 52:2,
52:6, 52:9,
52:14, 52:24,
53:1, 53:5,
53:7, 53:10,
53:11, 54:10,
54:11, 54:24,
55:6, 55:11,
55:21, 56:4,
56:12, 129:7,
146:14, 146:22,
147:14, 148:2,
148:21, 149:10,
150:21, 151:3,
151:18, 151:22,
151:24
**never**
136:20, 216:15,
216:17, 216:25,
257:25, 264:22
**new**
1:14, 2:7,
2:12, 3:22,
6:11, 6:12,
13:4, 38:25,
128:10, 256:8,
256:11
**newspaper**
96:18, 107:23,
208:17, 208:18
**next**
16:1, 109:7,
131:21, 132:22,
133:2, 133:8,
133:10, 133:13,

Transcript of Allen Waxman
Conducted on December 27, 2019

298

142:22, 157:7,
157:13, 168:12,
168:16, 178:10,
178:13, 178:14,
178:15, 178:20,
179:20, 196:7,
207:2, 251:6,
260:8, 260:9,
260:11
**nice**
59:3
**night**
264:21
**nine**
197:16
**ninth**
159:4
**nobody**
26:9
**nomenclatures**
153:16
**nominations**
175:18
**non-administered**
19:24, 22:12,
22:15, 22:19,
23:9, 27:4,
27:9, 27:14,
41:12, 41:13,
41:19, 43:12,
89:18, 128:14,
140:23, 175:3,
175:5, 204:11,
205:19, 223:14,
231:19, 256:18,
258:9
**non-binding**
30:10, 31:3
**non-employment**
258:18
**non-members**
138:14
**none**
114:11
**nonprofit**
17:13
**normally**
127:2

**northern**
1:2, 6:4
**notarial**
267:13
**notary**
2:12, 267:1
**notation**
159:22, 225:6
**note**
65:23, 117:16,
143:10, 149:21,
150:9, 160:3,
167:25, 169:6,
171:16, 172:16,
197:17, 198:4,
200:9, 203:5,
214:8, 237:22
**noted**
103:14, 216:13
**notes**
4:15, 4:19,
91:17, 91:21,
92:2, 92:5,
92:6, 93:2,
93:7, 93:12,
93:20, 94:3,
95:9, 99:6,
103:25, 123:23,
126:12, 126:13,
126:15, 126:19,
127:1, 127:2,
127:3, 127:4,
127:7, 127:9,
127:15, 129:16,
129:17, 129:18,
131:15, 131:17,
145:12, 154:21,
157:20, 159:18,
160:3, 160:5,
171:4, 171:6,
171:13, 172:1,
180:4, 203:5,
204:4, 219:20,
237:20
**nothing**
7:15, 50:21,
103:18, 107:14,
107:19, 124:3,

161:7, 190:22
**notice**
2:11, 205:11
**noting**
223:12, 232:24
**notion**
204:10, 225:14
**notwithstanding**
263:16, 263:22
**november**
74:12, 78:6,
169:7, 236:9,
239:19, 244:18,
250:6
**number**
6:2, 6:6,
50:19, 50:20,
51:24, 52:1,
77:4, 79:2,
91:5, 91:6,
95:14, 98:13,
98:14, 101:11,
116:19, 124:16,
124:24, 125:3,
126:7, 126:10,
129:21, 147:2,
147:11, 151:17,
152:12, 152:25,
174:17, 174:18,
176:23, 183:4,
200:10, 205:12,
206:7
**numbers**
146:19

## O

**o'clock**
179:25, 264:21
**object**
13:25, 60:23,
66:14, 106:3,
119:14, 187:24,
211:7, 241:10,
246:17, 247:24,
265:4
**objected**
79:1, 80:24,
158:17, 263:1

**objections**
141:25, 175:17
**objective**
181:13
**obligation**
81:6
**obviously**
80:9, 210:14
**occasion**
172:16
**occasions**
172:5
**occur**
10:2, 10:6,
232:25, 233:1
**occurred**
9:21, 9:22,
92:24, 93:4,
94:11, 156:16,
175:13
**october**
153:6, 163:17,
163:22, 163:23,
164:25, 165:1,
165:15, 165:16,
169:10, 170:24,
175:13, 182:12,
196:8, 197:17,
205:4, 217:23,
218:20, 235:6,
242:14
**off-the-record**
249:8
**offer**
54:13, 237:15,
239:20
**offered**
166:16, 206:13,
240:16, 247:4
**offering**
120:1
**offers**
118:2, 239:10
**offhand**
129:9, 225:19
**officer**
84:15, 267:2
**offices**
2:2

Transcript of Allen Waxman
Conducted on December 27, 2019

299

| | | | |
|---|---|---|---|
| **often** | 194:16, 201:13, | 103:4, 103:6, | **ordered** |
| 21:18, 22:8, | 204:21, 205:6, | 103:21, 118:15, | 79:15, 81:19 |
| 32:3, 55:14, | 212:18, 218:18, | 119:23, 120:12, | **orders** |
| 163:1, 163:8 | 218:25, 220:4, | 121:15, 155:2, | 229:19 |
| **oh** | 220:5, 220:6, | 216:22, 217:2 | **ordinances** |
| 63:23, 114:5, | 222:9, 224:19, | **opposed** | 229:18 |
| 135:7, 156:4, | 227:13, 227:18, | 51:15, 163:10 | **organization** |
| 183:18, 201:12, | 230:14, 230:18, | **opt** | 17:13, 19:2, |
| 207:14, 213:7, | 233:4, 234:12, | 120:14, 168:8, | 41:4, 80:20, |
| 230:22 | 251:10, 254:15, | 198:16, 198:20, | 105:21, 116:4, |
| **old** | 254:19, 255:6, | 198:21, 200:14, | 152:4 |
| 58:9, 154:18 | 256:6, 257:22 | 200:19 | **organization's** |
| **olivier** | **one-page** | **opt-out** | 14:17, 15:25, |
| 85:21, 85:23, | 229:3, 236:2, | 120:10, 120:25, | 17:10, 84:12 |
| 86:1, 87:9, | 236:20 | 121:11, 172:6, | **organized** |
| 87:14 | **ones** | 172:12, 173:21, | 222:20 |
| **omnibus** | 29:22, 69:2, | 177:6, 188:12, | **original** |
| 27:1, 27:4 | 79:22, 193:10, | 188:13, 188:14, | 131:4 |
| **once** | 193:11, 234:1, | 188:15, 188:16, | **orlowski** |
| 32:9, 178:6 | 234:2 | 189:16, 189:18, | 87:4, 87:9, |
| **one** | **ongoing** | 189:23, 192:25, | 87:13 |
| 6:2, 8:18, | 28:3 | 194:8, 194:20, | **others** |
| 9:14, 9:19, | **only** | 195:1, 198:2 | 20:21, 25:8, |
| 14:16, 15:13, | 18:22, 51:14, | **opt-outs** | 54:25, 55:8, |
| 17:8, 19:11, | 51:19, 51:23, | 197:15, 197:19, | 120:3, 139:7, |
| 23:24, 24:18, | 56:5, 63:1, | 197:22, 197:24, | 141:21, 158:14, |
| 24:19, 26:15, | 66:4, 73:9, | 198:8, 198:12, | 164:13, 164:15, |
| 31:14, 32:25, | 79:15, 87:1, | 200:1, 200:13 | 188:9, 188:10, |
| 33:24, 41:11, | 90:4, 90:24, | **opted** | 188:14, 202:12, |
| 49:23, 54:3, | 110:23, 128:12, | 198:11, 198:14 | 206:23, 217:6, |
| 54:11, 77:14, | 131:11, 136:17, | **opting** | 235:6, 254:25, |
| 84:23, 89:15, | 192:1, 192:14, | 197:23, 200:18 | 255:1 |
| 90:24, 98:5, | 202:14, 208:3, | **option** | **otherwise** |
| 114:21, 117:2, | 208:10, 209:5, | 121:24, 174:10 | 7:25, 99:24, |
| 117:13, 118:4, | 209:10, 209:25, | **options** | 110:2, 161:5, |
| 123:2, 124:12, | 225:22, 225:23, | 89:20, 95:8, | 199:13, 201:25, |
| 126:22, 127:7, | 259:25 | 102:19, 178:4 | 267:11 |
| 131:3, 133:16, | **open** | **oral** | **ought** |
| 136:21, 136:25, | 79:20, 120:24, | 81:12 | 187:1 |
| 145:25, 153:25, | 121:18, 141:15 | **order** | **ourselves** |
| 156:17, 164:5, | **opened** | 33:10, 68:7, | 109:24, 181:2 |
| 164:6, 170:3, | 263:5 | 79:4, 79:14, | **out** |
| 172:16, 173:6, | **opinion** | 81:8, 81:9, | 9:5, 20:3, |
| 173:13, 174:2, | 31:15, 74:18 | 81:11, 101:14, | 21:16, 22:14, |
| 174:17, 175:24, | **opportunities** | 109:18, 122:3, | 22:15, 54:24, |
| 178:15, 179:3, | 217:5 | 158:21, 158:23, | 87:14, 87:19, |
| 180:24, 183:8, | **opportunity** | 159:9, 159:11, | 87:25, 88:4, |
| 185:15, 192:23, | 29:11, 30:19, | 181:18, 188:2 | 88:7, 89:7, |

Transcript of Allen Waxman
Conducted on December 27, 2019

300

94:25, 97:6,
97:10, 97:14,
107:12, 119:9,
119:17, 120:14,
135:22, 136:3,
145:22, 149:8,
159:16, 168:8,
174:7, 174:10,
181:22, 181:25,
183:23, 188:5,
193:4, 193:8,
197:23, 198:11,
198:14, 198:16,
198:20, 198:21,
200:14, 200:18,
200:19, 202:2,
202:4, 208:5,
219:9, 221:8,
221:9, 222:10,
222:23, 222:24,
224:1, 238:13,
240:3, 241:1,
254:11, 255:1,
255:19, 256:8,
257:5, 257:19
**outcome**
145:17, 267:11
**outfits**
105:8
**outlet**
68:24
**outline**
58:23, 59:2
**outreach**
88:12, 88:23,
90:6, 90:11,
90:14
**outset**
32:4, 32:18,
237:25
**outside**
52:16, 73:11,
80:6, 84:3,
84:16, 84:17,
85:7, 87:9,
108:22, 129:5,
130:23, 158:17,
164:19, 177:9,

179:10, 179:11,
187:25, 190:14,
192:7, 192:12,
194:10, 195:2,
199:20, 206:17,
211:13, 215:14,
216:2, 245:10,
245:20, 247:8,
247:16, 247:17,
248:5, 248:9,
248:11, 263:3
**over**
19:17, 70:1,
70:2, 75:1,
75:12, 75:14,
75:18, 75:22,
128:10, 132:6,
146:9, 146:23,
147:13, 167:11,
172:5, 174:24,
186:6
**overall**
142:12
**overarching**
41:8
**overly**
200:16
**oversight**
61:11
**owe**
230:8
**own**
21:8, 30:22,
48:11, 120:4,
154:15, 164:14

---
**P**

**pace**
47:11
**padilla**
3:19, 6:22
**page**
4:2, 14:15,
16:15, 17:7,
63:8, 63:20,
63:25, 64:2,
64:9, 64:13,
92:11, 92:12,

93:3, 93:21,
109:12, 131:14,
131:21, 157:10,
159:21, 171:15,
186:1, 236:25
**pages**
1:18, 14:5,
14:10, 131:7
**paid**
61:12, 129:3,
150:9, 150:18
**panel**
12:16, 12:17,
49:19, 50:10,
50:13, 50:18,
53:8, 53:10,
145:20, 145:23,
180:23, 226:23,
227:1
**panels**
12:13
**paper**
193:10
**paragraph**
142:22, 183:16,
183:18, 197:16,
200:20, 201:6,
201:7, 201:15,
201:20, 227:19,
227:24, 251:20
**paragraphs**
201:18, 229:10
**parcel**
142:17
**park**
2:6, 3:21, 6:11
**part**
8:9, 8:23,
14:16, 15:5,
15:13, 15:17,
15:18, 17:8,
20:12, 142:17,
171:4, 215:9,
261:2
**participate**
92:18, 137:12,
138:9
**participated**
145:4

**participating**
138:12, 146:24,
147:15, 147:20,
148:3, 148:8,
148:9, 148:10
**participation**
253:25
**particular**
11:25, 12:3,
12:9, 12:12,
23:18, 23:24,
25:16, 26:2,
26:4, 28:15,
28:24, 29:13,
37:3, 39:24,
51:20, 62:14,
68:24, 69:5,
70:5, 76:7,
81:1, 81:10,
103:22, 104:2,
119:6, 119:11,
119:18, 126:18,
127:8, 162:3,
167:1, 173:4,
173:15, 177:18,
197:6, 212:4
**particularities**
26:21
**particularized**
23:25
**particularly**
80:19
**parties**
8:21, 9:2,
9:19, 12:1,
20:2, 20:3,
20:7, 21:7,
21:16, 21:19,
22:2, 22:16,
22:20, 30:3,
30:13, 30:19,
31:2, 31:18,
32:3, 32:17,
33:11, 54:18,
55:3, 121:20,
122:8, 123:3,
138:20, 167:24,
168:4, 168:7,

Transcript of Allen Waxman
Conducted on December 27, 2019

172:13, 177:8,
177:12, 179:10,
179:16, 184:25,
201:21, 202:10,
247:19, 258:6,
258:13, 267:10
**parts**
201:10
**party**
21:10, 21:17,
30:3, 30:20,
30:21, 89:22,
89:25, 90:2,
103:22, 257:4
**party-appointed**
20:7
**passed**
150:18
**past**
70:1, 70:2,
104:19, 104:25,
107:8
**pause**
77:15
**pay**
50:2, 128:8,
137:10, 235:13,
259:11, 259:18,
259:23, 260:6
**paying**
95:20, 128:9,
221:11
**payment**
50:5, 234:24
**payments**
150:4
**pays**
258:14, 258:21,
259:25, 260:3
**pending**
174:23, 174:25,
260:13
**people**
24:23, 114:2,
114:11, 188:7,
189:5, 189:14,
189:24, 190:2,
190:4, 190:17,

194:20, 198:11,
200:18, 206:17,
208:19
**people's**
159:2
**percent**
112:21, 181:17,
182:4
**percentage**
50:3, 64:21,
65:4
**perform**
11:18
**perhaps**
19:22, 120:6,
120:8
**period**
13:7, 244:25,
261:10, 262:11
**periodic**
41:7
**permits**
201:22
**person**
45:22, 47:2,
78:18, 83:13,
103:22, 106:11,
147:18, 225:22,
225:23, 245:7
**personal**
29:10
**personally**
35:8, 35:15,
210:4, 210:5
**persons**
45:22, 47:2
**perspective**
39:18, 41:5,
237:5, 237:17
**perspectives**
121:10
**petition**
68:6
**petitioner**
3:2
**petitioner's**
4:9, 5:2
**petitioners**
1:7

**pfizer**
48:21
**phone**
5:4, 70:15,
87:2, 92:23,
94:5, 124:7,
124:9, 125:7,
125:9, 132:4,
132:12, 132:16,
169:7, 169:22,
169:24, 172:3,
186:7
**phrasing**
49:12
**physical**
76:17
**pick**
18:7, 251:14,
257:18
**picture**
12:20
**pie**
63:9, 63:13
**pitching**
160:6
**place**
6:11, 21:9,
28:7, 28:10,
32:4, 33:10,
90:18, 93:17,
116:10, 118:1,
121:20, 125:13,
125:18, 125:19,
133:5, 171:10,
178:6, 196:16,
203:3, 225:3,
246:9, 259:2,
261:2, 261:18,
261:25, 262:2
**plaintiff**
7:17, 128:17
**plaintiff's**
122:2, 123:9
**plaintiffs**
6:16, 6:18,
66:4, 69:8,
128:1, 149:17,
200:17

**plan**
250:2
**planet**
6:10, 7:8
**planning**
236:9
**play**
101:4, 226:9
**players**
254:4
**playing**
221:9
**plaza**
3:6
**pleadings**
67:4, 67:8,
67:10, 67:12,
67:18, 154:18
**please**
6:13, 7:10,
7:19, 8:4,
66:17, 114:21,
127:12, 130:1,
195:16, 222:8
**plus**
148:25, 149:10,
232:4
**plus-thousand**
113:2
**point**
21:15, 25:20,
30:18, 38:15,
54:17, 95:15,
120:23, 122:18,
141:12, 155:14,
176:1, 196:23,
202:7, 202:12,
204:7, 205:22,
207:16, 231:22,
239:14
**points**
9:23
**policy**
117:14, 239:12
**population**
256:10
**position**
10:12, 10:14,

Transcript of Allen Waxman
Conducted on December 27, 2019

302

79:9, 84:2,
109:20, 117:13,
134:5, 134:11,
165:12
**posman**
210:12
**possibilities**
164:21
**possibility**
51:8
**possible**
10:20, 11:3,
11:11, 174:5
**post**
220:19, 226:16,
250:4
**postdated**
157:5
**posted**
207:21, 222:17,
259:9
**posting**
221:4
**posture**
208:14
**potential**
122:11, 128:10,
167:10, 217:1,
246:19
**potentially**
151:14
**practicable**
201:1
**practical**
19:5, 119:21,
201:17
**practice**
24:7, 24:12,
53:14, 66:4,
126:23, 162:24
**practices**
9:2, 9:9, 9:18,
10:5, 11:22,
52:25, 53:2
**pre-cursor**
142:1
**pre-hearing**
183:25

**precedence**
205:22
**precedent**
214:20
**precedes**
224:6
**preceding**
142:16
**precise**
50:20, 66:23,
87:6, 168:16
**precisely**
33:19, 141:11,
168:15
**predated**
175:6
**predates**
98:25
**predominantly**
52:24
**prefer**
216:21
**preference**
10:17, 10:18
**preferential**
138:3, 138:5
**preferrable**
168:10
**preparation**
38:4, 71:24,
85:10, 85:15,
88:14
**preparations**
85:8, 85:9
**prepare**
69:24, 70:6,
236:24
**prepared**
62:6, 151:16,
264:12, 265:4,
265:9
**preparing**
69:25, 72:12,
72:15, 72:18,
73:12, 73:21,
83:8
**prerequisite**
221:4, 221:5

**present**
3:24, 77:5,
142:19, 145:9,
147:14, 178:4,
204:13
**presentation**
212:20, 212:21,
232:4, 232:13
**presented**
103:7, 175:16,
265:8
**presents**
116:24
**preserved**
174:6, 260:13,
260:17
**president**
8:6, 86:2, 86:5
**press**
53:18, 68:22,
105:14, 105:16,
108:3, 145:18,
208:19, 226:19
**pretend**
208:15
**pretty**
19:19, 154:8,
155:5, 156:15
**prevent**
8:16, 8:21,
17:14, 103:15,
199:18
**preventing**
10:19
**prevention**
7:25, 8:8,
8:11, 9:10,
15:19, 17:12,
29:22, 61:23
**previous**
16:3, 84:2,
207:12, 219:2,
229:21
**previously**
84:4, 116:5,
137:22, 137:23,
201:1, 209:17,
237:20, 239:16,

263:2
**principle**
41:8
**prior**
10:15, 11:8,
30:14, 33:17,
80:22, 87:20,
88:1, 88:5,
100:21, 153:25,
154:4, 155:16,
195:19, 196:12,
197:13, 201:6,
201:12, 205:6,
216:7, 216:24,
217:3, 220:4,
223:5, 224:22,
229:25, 234:10
**private**
126:22, 214:12,
215:5
**privilege**
81:1, 244:13
**privileged**
76:1, 131:2,
208:11, 210:20
**probably**
24:23, 48:16,
84:25, 106:12,
154:2, 155:15,
187:1, 189:7,
189:11, 197:21,
215:1, 226:2,
232:24, 233:20,
259:19
**problem**
16:7, 58:10,
110:21, 143:11
**problems**
103:7
**procedural**
208:13, 208:15,
209:12
**procedure**
20:16, 36:21,
40:15, 40:22,
117:3, 117:21,
118:2, 120:10,
180:22, 181:1,

Transcript of Allen Waxman
Conducted on December 27, 2019

303

181:7
**procedures**
19:6, 25:8,
37:13, 38:25,
40:2, 40:3,
40:6, 54:5,
223:12, 225:2
**proceed**
168:8, 172:7,
172:13, 200:25,
201:21, 218:2,
260:19
**proceeded**
150:5, 150:10,
206:4
**proceeding**
107:25
**proceedings**
201:16, 202:7
**process**
20:1, 20:5,
26:1, 33:15,
39:24, 43:3,
43:15, 44:1,
44:11, 83:8,
95:20, 103:9,
128:18, 128:19,
128:20, 175:19,
175:22, 181:19,
182:4, 182:19,
185:4, 196:19,
198:23, 222:20,
228:13, 256:19,
258:25, 259:1,
259:22, 260:20,
261:1, 261:14,
261:17, 262:10
**processes**
45:15
**produce**
79:5, 79:15,
188:1
**produced**
71:14, 71:18,
73:10, 131:4,
251:11, 251:16
**product**
28:22

**production**
75:24, 83:12,
84:6, 130:22
**products**
9:7
**professionals**
52:15, 52:20
**progress**
44:25
**progressed**
132:19, 133:1
**project**
37:9, 37:11
**prompt**
21:11
**prompting**
21:7
**promptly**
118:3
**pronounce**
47:24, 48:6,
169:1
**proper**
49:12
**property**
18:17, 26:17
**proposal**
146:18, 175:14
**proposed**
214:7, 235:9
**prospect**
216:8, 246:2
**prospective**
95:25, 96:7,
208:3, 209:5,
209:10, 209:25
**prospectively**
95:11, 95:12,
96:22
**prospects**
21:5
**protection**
198:23
**protections**
128:21, 199:12,
199:17, 261:18,
261:25, 262:1,
262:3, 262:10

**protective**
33:9, 109:18,
159:9
**protocols**
9:9, 34:3,
34:8, 34:12,
34:14, 35:5,
35:16, 35:21,
38:9, 39:1,
39:3, 39:12,
39:20, 39:25,
40:7, 40:11,
40:23, 41:7,
42:21, 43:24,
44:21, 45:8,
45:11, 45:24,
46:12, 46:19,
46:24, 80:13,
87:20, 88:1,
88:8, 164:23,
175:24, 219:8,
233:21, 243:13,
256:19, 258:25,
259:1, 259:22,
260:20, 261:1,
261:15
**proud**
240:17
**provide**
9:1, 9:8, 9:9,
9:15, 28:16,
29:8, 29:9,
29:18, 31:8,
39:25, 40:3,
56:5, 113:8,
120:2, 121:21,
167:22, 262:3
**provided**
30:12, 71:2,
73:19, 75:4,
120:12, 139:6,
142:4, 143:10,
144:20, 175:6,
175:25, 183:19,
238:5, 239:23,
239:25, 261:15
**provider**
8:13, 59:12,

59:21, 60:4,
116:23, 127:24,
178:3, 201:23,
257:22
**providers**
20:17, 201:2,
201:11, 202:6,
243:12
**provides**
8:14, 19:4,
23:4, 121:15,
168:9
**providing**
9:13, 138:6,
238:16
**provision**
172:11, 172:23,
173:13, 173:16,
173:21, 174:20,
174:21, 176:21,
177:6, 179:9,
188:16, 189:23,
192:25, 194:9,
195:2, 199:3,
199:10, 201:11,
201:19, 201:20,
202:16, 202:17,
262:8
**provisional**
184:12, 186:17,
205:7
**provisions**
8:19, 190:6
**public**
2:12, 214:12,
214:20, 267:1
**publicly**
62:13, 65:23,
108:3
**publish**
236:9
**published**
149:8, 215:2,
215:6
**pull**
154:18, 159:16,
202:2, 202:4
**pulling**
83:13

Transcript of Allen Waxman
Conducted on December 27, 2019

304

| | | | |
|---|---|---|---|
| **purports**<br>64:9<br>**purpose**<br>62:8, 105:13,<br>105:18, 211:18,<br>211:19<br>**purposes**<br>16:9, 38:7,<br>72:11, 77:5,<br>156:17, 223:16<br>**pursuant**<br>2:11<br>**pursue**<br>149:17<br>**pursued**<br>143:24<br>**put**<br>14:4, 21:9,<br>31:2, 101:2,<br>118:1, 131:25,<br>145:22, 152:10,<br>200:1, 221:7<br>**putting**<br>179:8, 190:13,<br>196:16, 225:2<br><br>**Q**<br><br>**quashed**<br>79:14, 79:24,<br>110:3<br>**question**<br>11:1, 11:6,<br>12:7, 15:22,<br>17:20, 19:20,<br>24:4, 32:7,<br>34:20, 35:9,<br>36:25, 42:14,<br>43:11, 43:23,<br>44:8, 46:7,<br>46:15, 46:23,<br>51:7, 54:8,<br>54:9, 55:5,<br>56:25, 58:7,<br>58:12, 58:16,<br>60:16, 66:17,<br>68:1, 68:2,<br>72:14, 75:10,<br>77:18, 87:22, | 98:7, 110:7,<br>110:9, 110:19,<br>110:22, 111:7,<br>111:15, 112:9,<br>113:22, 120:24,<br>121:18, 123:4,<br>128:16, 130:20,<br>142:5, 148:19,<br>160:2, 165:22,<br>179:1, 181:20,<br>185:6, 185:7,<br>188:21, 190:15,<br>191:1, 191:14,<br>193:23, 196:20,<br>197:5, 197:8,<br>197:18, 206:21,<br>211:3, 211:6,<br>242:9, 247:23,<br>255:7, 255:16,<br>256:6, 262:18,<br>263:6, 264:14,<br>264:20<br>**questioning**<br>79:2, 80:17<br>**questions**<br>38:1, 38:10,<br>38:11, 38:13,<br>39:8, 49:11,<br>80:5, 80:12,<br>80:21, 80:24,<br>92:7, 92:8,<br>183:10, 186:3,<br>186:18, 186:20,<br>187:7, 187:9,<br>187:12, 187:18,<br>191:18, 192:6,<br>196:11, 198:2,<br>211:25, 221:8,<br>227:21, 249:5,<br>250:3, 264:11<br>**quick**<br>38:15, 69:13,<br>210:15, 263:15<br>**quickly**<br>31:15, 32:6<br>**quinn**<br>112:12, 113:1<br>**quote**<br>79:7 | **quotes**<br>104:20<br><br>**R**<br><br>**raise**<br>21:5, 21:8,<br>21:18, 216:8,<br>252:2<br>**raised**<br>79:22, 88:18,<br>119:18, 128:17,<br>136:20, 181:21,<br>185:1, 186:18,<br>188:11, 191:22,<br>196:11, 197:18,<br>197:23, 212:13,<br>216:17, 237:19,<br>244:19, 245:19,<br>246:2, 246:3,<br>246:5, 246:15<br>**raising**<br>51:7, 118:16,<br>189:3<br>**rate**<br>104:22, 106:15,<br>106:21, 106:24,<br>107:6, 107:7<br>**rather**<br>95:19, 128:8,<br>176:15, 244:24<br>**rd**<br>124:20, 124:22,<br>125:8, 132:4,<br>132:12, 132:16<br>**reach**<br>20:3, 21:15,<br>255:1, 255:19<br>**reach-out**<br>96:9, 123:25<br>**reached**<br>87:13, 87:19,<br>87:25, 88:7,<br>89:7, 119:9,<br>119:17, 256:8<br>**reaching**<br>88:4, 94:25,<br>97:6, 97:10,<br>97:14, 107:12, | 254:11<br>**read**<br>14:7, 14:19,<br>17:8, 63:2,<br>67:4, 67:9,<br>67:10, 67:13,<br>67:20, 67:23,<br>67:25, 68:5,<br>68:9, 68:15,<br>68:22, 81:21,<br>82:23, 92:16,<br>100:14, 150:14,<br>159:11, 184:10,<br>191:14, 223:2,<br>254:3, 266:4<br>**reading**<br>105:16, 208:17,<br>267:8<br>**reads**<br>18:1, 99:24,<br>200:24<br>**ready**<br>13:23, 220:14,<br>220:18, 220:19,<br>222:20, 228:16,<br>237:3, 247:9<br>**real**<br>192:1, 263:15<br>**realize**<br>251:13<br>**really**<br>12:25, 22:14,<br>22:25, 50:4,<br>69:11, 89:11,<br>93:11, 103:19,<br>105:6, 107:14,<br>107:19, 118:18,<br>151:1, 176:19,<br>198:9, 198:18,<br>200:19, 205:21,<br>216:15, 221:5<br>**reason**<br>25:11, 26:15,<br>29:7, 32:7,<br>94:2, 96:3,<br>100:13, 127:6,<br>127:8, 129:23,<br>130:14, 130:17, |

Transcript of Allen Waxman
Conducted on December 27, 2019

305

131:11, 132:19,
173:24, 207:11,
210:11
**reasoned**
183:23
**reasoning**
183:24
**reasons**
26:16, 117:2,
207:24, 247:25
**recall**
68:12, 68:13,
68:24, 86:13,
89:14, 94:21,
94:23, 95:2,
95:9, 95:22,
102:5, 102:6,
106:1, 107:16,
107:24, 108:5,
109:1, 112:14,
112:17, 115:19,
122:19, 122:22,
124:11, 124:16,
125:12, 125:20,
125:23, 126:3,
132:3, 134:13,
134:21, 139:17,
140:16, 144:18,
145:2, 145:13,
145:16, 145:17,
150:15, 153:21,
154:14, 157:18,
157:22, 158:2,
167:3, 168:15,
169:12, 169:13,
169:25, 172:15,
173:4, 173:19,
174:1, 174:12,
174:15, 174:19,
174:24, 174:25,
175:21, 176:2,
176:20, 178:12,
178:19, 179:5,
186:15, 188:25,
191:24, 200:7,
201:10, 203:3,
204:7, 206:22,
207:15, 207:16,

208:17, 212:4,
212:8, 218:5,
219:6, 225:20,
235:16, 235:20,
235:25, 238:1,
238:19, 238:21,
243:7, 253:22
**recalled**
237:24
**recalling**
98:24, 173:3,
174:15, 174:18,
175:12, 225:18
**receipt**
100:21
**receive**
143:3
**received**
20:8, 20:23,
235:14, 235:21,
238:2, 255:2
**receiving**
102:5, 102:6,
186:13
**recent**
13:11
**recently**
13:8, 134:21
**recess**
38:20, 69:20,
82:5, 112:4,
115:1, 158:10,
194:4, 210:23,
233:10, 253:16,
264:7
**recipient**
85:18, 85:20
**recitation**
94:3
**reciting**
94:18
**recognition**
26:19, 117:19
**recognize**
91:15, 101:20
**recognized**
26:2
**recollection**
99:16, 100:4,

127:14, 139:21,
171:2, 171:7,
172:2, 184:15,
192:1, 204:5,
218:8
**recollections**
39:14, 171:10
**recommendations**
186:4
**recommended**
213:12
**reconsider**
158:22
**record**
14:3, 24:8,
38:19, 38:22,
46:9, 61:20,
69:18, 69:22,
82:2, 82:4,
82:7, 110:8,
112:3, 112:6,
114:25, 115:2,
123:13, 158:9,
158:12, 163:4,
185:21, 188:20,
194:3, 194:6,
203:7, 210:22,
210:25, 233:9,
233:12, 245:22,
246:25, 250:1,
253:15, 253:18,
263:25, 264:2,
264:6, 264:9,
265:21, 267:5
**recorded**
93:10
**records**
170:4, 193:12
**red**
186:22, 186:25,
187:6
**redact**
131:5
**redacted**
131:11
**redaction**
130:13, 130:15
**redactions**
129:21, 129:24,

130:21, 130:23
**redirect**
263:6
**redlined**
223:11
**reduced**
267:7
**refer**
8:2, 18:3,
216:22, 224:5
**reference**
104:10, 128:20,
182:22, 197:14,
204:1, 205:11,
205:17, 223:9,
233:21, 234:2,
251:19, 256:11,
256:17, 256:21,
257:11, 262:11
**referenced**
29:14, 150:9,
201:2, 226:7,
226:11, 257:21,
258:24
**references**
225:10, 229:10
**referencing**
101:23, 223:7,
225:7, 228:10,
251:24
**referred**
78:14, 78:17,
127:18, 136:7,
136:15, 192:11
**referring**
19:23, 33:25,
77:21, 89:24,
90:7, 104:7,
104:10, 104:17,
106:18, 106:22,
107:6, 107:7,
115:25, 116:20,
135:14, 136:3,
156:12, 156:25,
166:18, 196:1,
204:4, 222:22,
224:21, 226:6,
233:15

Transcript of Allen Waxman
Conducted on December 27, 2019

reflect
73:5, 127:15,
170:4
reflected
72:1, 72:6,
93:20, 166:16,
185:8, 209:8,
252:1
reflecting
71:11, 71:21,
72:1, 72:24
reflects
100:7, 125:3,
125:7
refresh
100:3, 172:1,
204:4
refreshes
180:17, 182:8
refused
259:18
refuses
260:6
regard
13:7, 237:12
regarding
80:3, 87:8
regardless
10:1
registering
225:15, 254:2
regular
31:24, 32:1,
41:6
regulations
229:18
reject
259:4, 259:5
rejected
196:15, 198:1
relate
12:23, 68:16
related
35:13, 71:21,
72:19, 72:21,
75:4, 140:13,
164:17, 191:6,
253:21, 267:9

relates
161:2
relating
37:2, 40:1,
67:2, 67:11,
68:22, 69:5,
71:5, 71:8,
72:1, 72:3,
72:24, 95:1,
107:22, 107:23,
119:19, 133:9,
166:21, 197:16,
229:10
relationship
31:18, 32:4,
32:18, 49:17,
76:19, 80:16
relationships
8:20
relative
80:19, 174:8
relatively
13:4
relayed
129:1
release
105:14, 105:16,
226:19
relevant
81:3, 121:2,
121:4, 121:12,
123:3, 127:17,
159:8, 165:11,
229:19
relief
240:13, 260:15
rely
202:11
relying
207:20
remaining
168:8, 232:9
remember
93:22, 118:9,
118:12, 124:19,
131:25, 132:18,
133:2, 133:7,
141:10, 150:7,

157:9, 166:2,
187:14, 203:21,
235:23, 254:5
remembering
89:10, 132:21
remembers
109:8
reminder
163:12
remove
20:6, 198:25
removed
199:2
render
183:22
renew
263:2
repeat
87:22, 148:18
rephrase
52:13, 191:15
report
61:4
reported
1:19
reporter
7:7, 7:10,
24:5, 24:21,
267:1
represent
6:14, 113:2,
114:3
representation
93:3, 169:4
represented
76:3, 110:24,
111:1, 111:2,
114:1, 114:7,
198:11, 255:14
representing
6:10, 7:8,
66:4, 108:10,
108:14, 110:10,
110:17, 111:13,
111:21, 112:13,
113:23, 114:12,
115:7, 115:11,
119:10, 119:12,

123:9, 165:18,
165:25, 166:6,
166:8, 166:12,
255:10, 255:20
represents
63:14, 64:3,
112:18, 114:4,
126:11
reputation
170:22
request
67:14, 75:21,
104:2, 110:4
requested
267:8
requests
75:5, 75:17,
142:1
require
26:22, 197:21,
200:12, 257:6,
260:12, 262:21
required
25:21, 198:23,
199:5, 220:16,
257:21
requirement
199:25
requirements
185:5, 257:24
research
37:21, 37:24,
38:1, 38:3,
149:24
researched
199:25
researching
139:11
reserve
159:13
reserves
184:20
resolution
7:25, 8:9,
8:12, 9:11,
9:16, 10:6,
10:19, 11:13,
11:16, 12:8,

Transcript of Allen Waxman
Conducted on December 27, 2019

17:12, 17:18,
21:12, 21:19,
26:3, 28:12,
28:14, 28:17,
29:9, 31:17,
41:9, 61:23,
86:6, 103:8,
118:3, 118:5,
118:25, 119:8,
120:13, 121:16,
121:17, 121:20,
121:22, 138:6,
141:15, 152:2,
153:11, 174:4,
174:7, 226:22,
237:11, 237:13,
246:22
**resolve**
8:24, 9:20,
10:1, 10:15,
11:3, 11:11,
11:14, 12:14,
12:19, 14:24,
17:15, 18:1,
18:8, 25:18,
26:5, 32:5,
32:19, 103:15,
105:6, 122:9,
168:5, 177:15,
181:14, 181:18,
181:25, 247:5,
247:9
**resolved**
11:7, 11:8,
25:19, 27:20,
31:17, 117:23,
181:18, 183:20,
257:3
**resolving**
10:20, 10:23,
21:6, 196:19
**resource**
14:23
**respect**
39:8, 43:23,
44:8, 45:11,
58:8, 79:19,
88:16, 88:19,

88:20, 88:24,
89:2, 109:15,
162:4, 163:20,
168:13, 187:18,
205:3, 211:21,
215:20, 226:14,
238:12, 239:13,
239:15, 242:19,
250:2, 252:9
**respond**
41:9, 109:10,
144:16, 146:17,
160:1, 264:12
**responded**
119:19, 144:24
**respondent**
1:11, 3:10,
197:10, 259:23,
259:24, 260:4,
260:6
**respondents**
239:4, 247:7
**response**
51:6, 68:10,
117:16, 117:17,
120:22, 121:11,
144:20, 146:3,
187:2, 236:21
**responses**
186:5
**responsible**
82:25, 83:11,
84:6, 84:11
**responsive**
75:7, 75:17,
75:21, 92:8
**restate**
46:8, 194:12
**resting**
81:2
**restraining**
68:7
**restroom**
69:14
**restructure**
141:13
**result**
107:2, 136:24,

143:4, 184:16,
184:19, 185:10,
218:12
**results**
164:10
**resumé**
135:24
**retain**
77:12, 77:19,
78:2
**return**
15:3, 174:8,
229:8
**reuters**
69:2
**reveal**
66:15
**revenue**
64:21, 65:4,
80:19, 232:17
**review**
4:13, 61:22,
62:4, 62:10,
62:15, 70:23,
71:1, 71:17,
71:20, 72:8,
72:11, 72:19,
73:18, 74:24,
75:5, 75:11,
82:18, 83:9,
83:12, 207:22
**reviewed**
22:4, 41:6,
71:2, 71:25,
73:9, 75:16,
139:16, 184:12,
211:5
**reviewing**
8:24
**reviews**
254:12
**revised**
185:24
**revisit**
159:13
**richard**
123:20
**right**
9:4, 17:6,

19:16, 19:19,
23:7, 24:10,
24:16, 25:10,
29:3, 33:22,
46:14, 48:12,
50:16, 53:6,
58:14, 67:15,
69:17, 72:17,
76:4, 81:6,
88:21, 97:7,
97:8, 99:9,
100:2, 101:7,
101:14, 101:15,
101:18, 110:12,
112:10, 112:25,
113:15, 114:16,
119:4, 119:13,
129:12, 129:15,
133:24, 134:6,
135:8, 143:14,
147:4, 149:6,
150:25, 152:21,
156:19, 158:4,
158:13, 161:21,
162:19, 162:22,
163:18, 165:2,
165:4, 166:10,
166:14, 173:22,
177:24, 178:24,
180:8, 183:13,
184:21, 189:19,
192:25, 193:24,
194:20, 195:6,
204:24, 208:3,
209:6, 209:10,
214:19, 215:5,
218:22, 219:20,
220:11, 221:12,
228:23, 230:22,
231:6, 231:8,
231:12, 231:21,
237:21, 240:21,
250:15, 253:3,
253:12, 258:5,
259:14, 260:22,
261:8, 263:13,
263:18, 265:11,
265:15

Transcript of Allen Waxman
Conducted on December 27, 2019

**rights**
159:13, 174:6,
260:13, 260:17
**risk**
172:25, 173:17
**riverside**
3:6
**roivant**
47:18
**role**
77:3, 77:5,
83:22, 121:8,
155:13, 170:15,
171:23, 226:9,
254:8
**roles**
77:4
**roll**
257:19
**rolling**
147:2
**room**
76:10, 76:25,
77:9, 114:24
**roommate**
135:18, 135:19
**rosen**
135:14, 135:15,
135:17, 136:7,
136:9, 136:11,
136:15, 136:24,
137:2
**roster**
54:14, 55:7,
55:21, 56:4,
56:12
**rough**
61:22
**royal**
116:1
**rpr**
1:19
**rule**
40:25, 54:16,
246:19
**run**
39:17, 128:25,
230:7

**running**
193:4, 193:8

**S**

**sabatino**
133:24, 134:5,
134:11, 134:13,
138:21, 144:6,
144:16, 145:5,
146:25, 152:16,
153:4, 156:9,
156:22, 157:6,
157:15, 157:24,
158:16, 161:17,
162:5, 163:21,
164:5, 164:11,
190:4, 190:18,
191:16, 191:22,
204:22, 213:13,
217:13
**said**
11:2, 17:25,
32:16, 46:17,
73:6, 73:22,
88:22, 93:19,
96:4, 96:7,
110:11, 123:13,
127:1, 128:5,
133:1, 133:3,
136:25, 139:14,
150:24, 174:18,
179:9, 181:21,
187:11, 190:12,
194:19, 200:5,
203:17, 209:11,
236:11, 237:9,
247:1, 262:21,
262:23, 267:6
**sake**
197:3
**sam**
76:20
**samantha**
3:19, 6:22
**same**
11:10, 15:15,
16:15, 24:23,
25:1, 36:7,

36:8, 40:17,
40:19, 41:7,
43:17, 43:23,
44:8, 48:22,
49:4, 57:3,
58:17, 59:23,
60:6, 86:23,
93:25, 94:1,
119:13, 130:17,
143:25, 156:23,
186:1, 200:17,
201:16, 216:20,
220:9, 238:1,
242:4, 252:8,
257:9, 257:10,
266:5
**san**
1:3, 6:5,
210:13
**sara**
7:2, 76:20
**satisfied**
16:2
**save**
14:5
**saw**
85:13, 91:9,
101:2, 132:22,
150:16, 217:1
**say**
9:17, 13:2,
16:9, 18:24,
19:14, 21:16,
23:19, 25:20,
27:14, 28:1,
29:19, 31:24,
33:6, 41:5,
48:16, 49:14,
50:24, 51:2,
51:3, 70:4,
73:25, 74:4,
76:15, 92:5,
96:16, 104:14,
105:2, 106:12,
114:4, 115:14,
117:15, 119:2,
119:25, 122:1,
126:24, 135:9,

136:2, 141:18,
141:25, 142:11,
142:22, 145:19,
147:5, 167:6,
167:16, 170:11,
175:1, 175:13,
176:16, 182:14,
188:7, 188:8,
189:9, 196:2,
208:13, 209:3,
210:10, 215:6,
216:21, 217:20,
217:25, 219:12,
220:18, 230:6,
231:14, 231:15,
238:4, 239:23,
250:16, 261:10,
263:15
**saying**
39:7, 39:9,
53:13, 114:3,
122:5, 122:7,
132:19, 148:8,
160:6, 180:19,
189:17, 191:21,
215:9, 217:4,
246:1
**says**
14:16, 16:17,
17:9, 19:4,
54:17, 58:22,
87:7, 87:15,
87:16, 106:14,
143:14, 146:9,
146:11, 146:12,
157:11, 159:23,
201:16, 205:24,
206:4, 207:2,
213:5, 214:7,
217:16, 220:14,
222:8, 239:8,
251:6, 261:5,
261:8, 261:16,
261:21, 262:8
**scattered**
70:4
**schedules**
180:7

Transcript of Allen Waxman
Conducted on December 27, 2019

309

**scheduling**
145:1, 167:14,
169:6, 180:6
**scheindlin**
196:18, 248:3
**scheindlin's**
249:5
**scholer**
48:13, 53:15
**science**
12:15
**sciences**
47:19, 48:10
**scope**
33:14, 34:19,
34:24, 35:18,
35:25, 36:15,
42:7, 42:13,
42:24, 43:7,
43:18, 44:4,
44:15, 45:2,
45:17, 46:3,
47:5, 47:14,
47:21, 48:1,
48:15, 48:23,
49:6, 53:22,
55:17, 55:25,
56:7, 56:14,
56:21, 57:4,
57:11, 57:19,
58:2, 59:15,
59:24, 60:7,
60:14, 60:24,
62:17, 63:16,
64:5, 64:16,
64:24, 65:7,
65:14, 65:22,
66:7, 76:1,
78:10, 78:20,
79:2, 79:9,
80:7, 80:25,
106:4, 108:22,
109:12, 112:22,
117:5, 123:1,
130:4, 130:23,
141:24, 143:6,
143:18, 144:1,
144:11, 146:6,

146:7, 156:10,
157:1, 158:17,
158:20, 159:8,
161:2, 161:5,
164:19, 190:22,
192:13, 195:3,
199:20, 211:7,
211:13, 215:15,
215:23, 216:2,
232:19, 241:11,
241:20, 243:15,
247:24, 248:5,
248:9, 248:11,
249:22, 255:23,
263:3
**screen**
20:5
**screening**
20:1, 20:15
**se**
9:8, 40:9,
54:16, 188:6,
188:14, 206:24
**seal**
267:13
**seamlessly**
227:9
**second**
17:7, 77:14,
110:22, 131:14,
162:16, 179:3,
194:16, 231:13,
237:18
**secondly**
121:21, 191:23,
256:18
**seconds**
163:17
**see**
14:20, 63:10,
87:6, 92:14,
94:1, 95:6,
98:6, 102:7,
106:16, 109:9,
125:17, 132:22,
135:7, 135:11,
136:1, 136:19,
140:1, 143:1,

149:19, 151:15,
153:8, 155:10,
159:25, 160:6,
162:18, 162:21,
163:24, 164:8,
164:23, 167:5,
167:8, 171:5,
171:18, 172:16,
180:4, 182:4,
182:13, 187:4,
187:6, 188:12,
195:16, 196:7,
201:4, 202:8,
202:9, 203:18,
204:1, 206:10,
207:5, 214:9,
218:19, 219:8,
222:12, 223:2,
223:11, 225:6,
225:15, 227:19,
230:18, 238:7,
239:11, 261:23
**seeing**
171:24, 184:14
**seek**
11:12, 260:15
**seeking**
228:12
**seem**
167:13, 170:3
**seemed**
74:15, 74:18,
141:15
**seems**
127:19, 205:16
**seen**
61:24, 82:14,
85:6, 91:7,
98:12, 120:5,
186:11, 233:20,
236:25, 240:11,
250:21, 250:22,
264:22
**segments**
12:3, 12:9,
12:12
**select**
175:15, 259:12

**selected**
20:2, 20:4,
50:2, 55:15,
259:20
**selection**
20:1, 20:15,
128:18, 175:11,
175:14, 259:11
**send**
156:7, 156:20,
166:22, 188:6,
222:24, 227:21,
228:4, 228:16,
228:19, 228:21,
241:4, 241:8
**sending**
156:8, 156:22,
163:22, 168:14,
185:24, 205:4,
228:13, 229:23,
240:14
**senior**
86:1, 86:5
**sense**
38:2, 95:22,
142:14, 142:19,
155:1, 173:8,
221:6
**sent**
74:7, 74:11,
94:14, 100:13,
102:12, 156:14,
156:16, 164:5,
164:24, 164:25,
165:15, 165:16,
182:11, 182:12,
185:9, 186:17,
186:23, 187:9,
197:17, 214:4,
223:5
**sentence**
106:19, 207:2,
251:6
**separate**
115:14, 172:9,
201:19, 262:14
**separately**
197:10, 197:11,

Transcript of Allen Waxman
Conducted on December 27, 2019

310

214:8
**september**
13:14, 87:2,
88:18, 89:4,
89:7, 89:25,
102:8, 116:12,
118:8, 118:10,
122:18, 124:20,
124:22, 125:8,
132:4, 132:12,
132:16, 133:22,
136:9, 136:12,
136:21, 136:24,
139:22, 242:13,
251:2
**series**
92:7, 96:19
**serve**
53:11, 53:20,
55:7
**served**
258:21
**service**
96:21, 243:8
**services**
8:15, 9:8,
9:13, 11:18,
12:2, 12:5,
12:9, 12:21,
12:23, 19:5,
22:24, 23:3,
29:6, 29:9,
29:10, 29:17,
29:18, 30:25,
55:23, 56:5,
57:9, 57:17,
57:24, 59:8,
86:6, 106:20,
106:21, 106:24,
138:7, 138:12,
143:4, 153:11,
226:23
**serving**
134:23, 148:22,
248:3
**set**
17:23, 18:4,
23:17, 23:24,

25:4, 27:1,
29:16, 33:24,
145:1, 151:20,
152:8, 162:8,
178:10, 181:13,
181:16, 201:18,
215:8, 234:12,
267:12
**sets**
23:11, 183:23,
229:13
**setting**
162:9
**settle**
182:1
**settled**
178:5
**settlement**
21:17, 95:19,
96:6, 246:19
**settling**
182:2
**several**
113:3, 185:2,
247:4
**shall**
223:12, 229:17
**share**
57:8, 57:16,
57:24, 58:15,
260:7
**shared**
248:6
**shareholder**
60:22
**sharing**
100:17
**sheet**
129:18, 154:7,
154:11, 266:8
**shmoe**
114:4
**short**
244:25
**shortened**
175:23, 176:4,
176:5, 176:6
**should**
10:6, 24:7,

31:16, 96:16,
122:4, 174:10,
175:15, 178:5,
180:25, 181:16,
196:14, 197:9,
197:24, 197:25,
200:12, 230:6,
241:3, 255:12
**shouldn't**
262:15
**show**
51:10, 93:25,
99:18, 142:2,
158:15, 176:13,
178:14, 179:23,
262:6
**shown**
158:15
**shows**
125:17, 258:14,
261:20
**side**
54:21, 118:4,
138:10, 207:22
**sided**
14:5
**sides**
119:8, 247:4
**sigh**
240:13
**sign**
211:22, 223:1,
234:23
**signature**
220:17, 266:11
**signature-p1kal**
267:19
**signed**
224:19, 225:9,
266:8
**significant**
13:3, 14:18,
15:2, 15:5,
15:17, 15:18,
16:1, 16:10,
16:12, 130:12
**signing**
267:8

**similar**
117:8, 216:14,
216:16
**similarly**
19:3, 40:2
**simplify**
237:1
**simply**
81:3, 202:24
**simultaneously**
142:19, 200:25,
201:17
**since**
18:22, 41:16,
42:22, 136:11,
137:16, 166:5,
169:20, 172:8,
241:16, 242:1,
243:20, 244:3,
244:13, 264:20
**single**
30:20, 191:25,
264:14, 264:20
**sit**
20:19, 21:16,
23:21, 49:19,
50:10, 50:13,
50:17, 115:9,
115:14, 154:24,
254:7
**sitting**
139:17, 154:3
**situation**
21:21, 28:25,
147:3, 149:2
**situations**
27:5, 154:13
**six**
176:4, 176:8,
183:8, 183:25,
184:2, 232:12
**six-month**
196:14
**skip**
98:1
**skipped**
24:6
**slow**
183:21

Transcript of Allen Waxman
Conducted on December 27, 2019

311

society
135:1, 135:3,
135:5
software
58:9
sole
257:21
solicit
119:12, 254:12
solution
128:10, 168:1
solutions
103:13
solve
117:22
some
12:23, 14:5,
18:16, 22:5,
25:20, 26:8,
30:4, 32:16,
39:7, 49:10,
50:24, 51:3,
51:18, 51:22,
52:8, 52:14,
52:23, 53:4,
54:24, 84:14,
89:20, 95:15,
107:21, 112:9,
122:18, 139:3,
141:11, 141:18,
154:12, 155:25,
171:9, 198:18,
204:7, 207:16,
207:17, 208:18,
211:6, 214:17,
214:23, 221:8,
221:20, 222:11,
226:6, 233:21,
234:2, 236:24,
248:6, 251:24,
256:9
somebody
26:8, 28:22,
54:14, 54:18,
54:19, 73:6,
75:13, 78:17,
79:5, 109:4,
113:13, 113:14,

189:12, 189:15,
199:1, 215:7,
231:16, 249:10
somebody's
198:17
somehow
225:14
someone
58:24, 75:6,
78:15, 108:13,
156:12, 160:13,
198:10
someone's
252:18, 252:19
something
13:13, 15:6,
19:13, 30:9,
32:13, 73:2,
73:6, 89:14,
105:2, 118:17,
120:10, 122:14,
128:23, 137:1,
148:6, 154:4,
155:2, 155:4,
163:12, 163:13,
163:14, 167:21,
172:25, 177:13,
179:10, 179:14,
179:16, 181:4,
181:8, 181:21,
184:25, 200:7,
210:20, 211:8,
213:6, 220:12,
225:8, 236:11,
236:13, 237:15,
237:24, 239:3,
245:4, 255:3,
255:4, 256:14,
261:12, 265:12
sometime
78:5, 86:15,
87:2, 88:17,
160:24, 161:16
sometimes
20:6, 53:19,
127:3
somewhere
132:23, 150:2,

150:6, 150:17
sorry
15:10, 18:1,
18:3, 19:16,
19:18, 20:22,
21:11, 25:8,
39:6, 43:4,
46:15, 58:12,
63:23, 70:20,
75:1, 77:13,
77:17, 84:18,
87:22, 88:10,
97:20, 98:3,
98:6, 125:6,
129:13, 130:8,
130:11, 141:2,
148:18, 150:14,
151:7, 152:12,
152:20, 152:24,
156:21, 163:25,
165:21, 170:11,
170:13, 178:19,
179:3, 185:6,
191:14, 199:8,
203:16, 210:18,
212:25, 217:19,
217:20, 218:23,
219:21, 228:1,
230:10, 255:16
sort
30:9, 31:7,
31:20, 95:14,
138:10, 146:3,
155:3, 198:19
sorts
253:9
sound
213:18
sounds
19:13, 31:1
source
108:2, 142:24,
143:13, 144:8,
164:22
speak
89:4, 149:4,
165:24
speaking
15:7, 18:15,

33:19, 33:21,
35:20, 69:1,
103:23, 116:3,
116:7, 169:13,
218:5
specialize
12:13
specialized
25:3, 25:22
specialty
12:13, 12:16,
12:17
specific
25:17, 94:18,
139:21, 151:19,
154:4, 178:20,
243:6, 256:21
specifically
105:1, 124:16,
132:14, 132:18,
150:7, 235:16
specified
51:19, 51:23
specify
214:8
specter
216:17, 216:21
spectrum
31:5
speculate
16:4, 55:13
speed
105:21
spend
69:25, 73:12
spent
73:11, 73:21,
118:20, 193:16,
265:9
spirit
240:16
spoke
109:3, 109:4,
110:10, 110:16,
113:14, 113:22,
124:21, 124:22,
161:21, 210:12,
217:16, 217:20,

Transcript of Allen Waxman
Conducted on December 27, 2019                                    312

225:22, 225:24
**spoken**
87:1, 100:20,
149:7, 169:17,
169:20, 169:21,
169:23
**spot**
69:13
**spread**
54:23
**spreadsheet**
223:15
**spring**
86:17, 86:18
**st**
235:6
**stakeholder**
104:3
**stakeholders**
8:10, 37:2,
37:6, 37:15,
37:18, 45:14,
103:8, 104:15,
187:22, 187:23
**stand**
153:10
**standby**
8:19, 38:18,
38:21, 69:18
**standing**
8:19, 29:21,
31:20, 32:8,
32:10, 32:17,
32:24, 33:2
**standpoint**
117:14, 119:21
**stands**
27:20, 159:1,
159:10, 247:8
**star**
131:21, 131:25
**start**
12:20, 24:4,
154:7, 182:5
**started**
17:4, 22:14,
22:25, 176:7,
176:10

**starting**
33:17
**state**
2:12, 6:14,
7:19, 103:12,
103:13, 199:4,
227:20, 238:15,
243:2, 260:1
**stated**
16:3, 16:8,
52:2, 81:14
**statement**
15:1, 15:12,
17:21, 17:25,
19:3, 19:7,
140:4, 140:19,
149:20
**statements**
19:9
**states**
1:1, 6:4,
230:19
**stating**
241:5, 241:9
**statistics**
55:11
**status**
66:20, 67:11,
134:19, 177:21,
222:10, 224:1,
225:18, 227:22,
228:12, 233:2,
242:18, 243:8
**stay**
174:5, 174:23,
174:24, 202:1
**staying**
174:9
**step**
133:2, 231:13
**steps**
57:23, 168:12,
168:16, 178:10,
178:20, 257:6,
257:9, 257:11,
258:1, 262:21
**still**
27:11, 28:5,

28:6, 150:10,
182:22, 195:20,
196:2, 198:4,
222:10, 263:8
**stranded**
61:21
**stress**
9:6
**stretch**
250:15
**strike**
45:10, 67:24,
75:2
**strong**
122:8
**structure**
50:5, 60:12,
95:4, 140:13,
142:16, 196:4,
211:23, 212:2,
212:5, 212:9,
212:12, 215:2,
221:1, 221:3,
221:7, 231:20,
233:18, 235:9,
256:24, 257:2
**structures**
229:14, 233:23
**struggle**
39:10
**struggling**
12:11, 39:2
**studied**
139:5
**stuff**
258:23
**stylized**
68:11
**subject**
33:7, 102:3,
116:5, 153:7,
155:19, 185:23,
204:23, 229:6
**submission**
223:15
**submit**
201:23
**subpoena**
67:14, 74:7,

74:11, 74:15,
74:18, 75:5,
75:18, 79:14,
79:24
**subsequent**
99:5, 99:14,
102:14, 161:16,
169:24, 219:8,
240:1
**subsequently**
102:10
**substantial**
116:25, 120:24,
160:16, 232:15
**substantially**
146:20
**substantive**
192:1
**successful**
182:1, 182:2
**suggest**
109:7, 177:4,
187:6, 196:14
**suggested**
179:18, 200:8,
244:4
**suggesting**
121:3, 176:2
**suggestion**
179:13, 183:1
**suggestions**
166:15, 179:6,
182:15, 182:16,
187:5, 191:12,
198:1
**suggests**
155:15
**sum**
89:9, 89:13,
95:18, 95:20
**summary**
14:16, 15:20,
15:25, 17:22
**summer**
86:16, 133:21
**supporter**
64:11
**sure**
9:5, 9:7, 11:1,

Transcript of Allen Waxman
Conducted on December 27, 2019                                313

| | | | |
|---|---|---|---|
| 16:24, 17:2,<br>18:23, 19:10,<br>22:13, 23:6,<br>23:19, 24:3,<br>24:8, 33:5,<br>35:11, 39:22,<br>40:21, 46:6,<br>46:8, 46:16,<br>51:25, 52:7,<br>54:9, 60:16,<br>63:3, 66:23,<br>75:9, 79:12,<br>83:21, 84:9,<br>87:23, 90:17,<br>92:9, 98:5,<br>98:10, 101:4,<br>106:13, 112:21,<br>114:23, 127:13,<br>128:22, 128:23,<br>128:25, 132:8,<br>132:19, 133:12,<br>134:19, 148:7,<br>148:20, 150:18,<br>156:15, 160:16,<br>179:22, 183:13,<br>184:11, 194:1,<br>199:7, 199:9,<br>204:14, 209:15,<br>210:17, 213:18,<br>214:17, 214:20,<br>219:17, 219:19,<br>220:11, 221:23,<br>222:17, 222:18,<br>222:19, 222:22,<br>222:25, 223:4,<br>223:8, 223:19,<br>224:4, 227:9,<br>228:7, 237:23,<br>238:1, 239:1,<br>239:7, 240:12,<br>242:10, 246:11,<br>251:4, 252:2<br>**surprise**<br>247:11<br>**surprised**<br>94:16, 209:3,<br>265:5<br>**swear**<br>7:10 | **sworn**<br>7:14<br>**system**<br>116:22<br><br>**T**<br><br>**take**<br>13:21, 14:11,<br>38:14, 57:23,<br>61:16, 69:13,<br>82:11, 91:6,<br>98:11, 100:14,<br>111:25, 116:10,<br>117:12, 125:19,<br>126:15, 127:2,<br>127:3, 127:4,<br>127:6, 127:7,<br>127:9, 129:25,<br>130:16, 135:21,<br>145:12, 157:20,<br>158:5, 158:21,<br>162:3, 162:15,<br>176:3, 176:4,<br>182:5, 185:20,<br>188:6, 193:25,<br>210:15, 222:4,<br>233:4, 233:5,<br>236:6, 249:11,<br>253:13, 264:4<br>**taken**<br>24:15, 38:20,<br>69:20, 82:5,<br>112:4, 115:1,<br>158:10, 160:3,<br>160:5, 194:4,<br>210:23, 233:10,<br>253:16, 257:3,<br>264:7, 267:3,<br>267:6<br>**takes**<br>54:6, 93:12,<br>205:22, 231:5<br>**taking**<br>6:11, 115:11,<br>118:22<br>**talk**<br>21:17, 24:23,<br>67:1, 95:10, | 99:12, 99:21,<br>102:17, 106:11,<br>108:6, 108:9,<br>108:13, 111:12,<br>111:20, 114:6,<br>115:6, 119:12,<br>136:9, 147:19,<br>154:5, 193:5,<br>193:13, 195:20,<br>215:9, 246:5,<br>248:17, 257:1<br>**talked**<br>94:9, 94:16,<br>94:22, 114:1,<br>114:11, 136:11,<br>141:9, 161:15,<br>166:5, 181:2,<br>225:20, 257:25,<br>265:13<br>**talking**<br>19:16, 29:2,<br>29:5, 34:2,<br>38:24, 41:18,<br>43:7, 43:10,<br>90:16, 112:17,<br>124:19, 150:8,<br>176:13, 193:16,<br>216:6, 216:11,<br>233:22, 238:12,<br>238:14, 238:24,<br>239:15, 239:18<br>**tania**<br>83:17<br>**tank**<br>8:9, 138:10<br>**tax**<br>16:1, 16:18,<br>84:12<br>**team**<br>190:12<br>**technical**<br>223:18<br>**technically**<br>67:18<br>**telephone**<br>90:19, 155:25,<br>156:6<br>**tell**<br>13:22, 18:13, | 20:19, 34:16,<br>44:24, 45:14,<br>51:14, 59:5,<br>62:2, 66:3,<br>66:12, 73:9,<br>82:17, 100:16,<br>121:14, 126:10,<br>130:3, 141:7,<br>145:21, 161:20,<br>163:19, 165:13,<br>165:17, 167:18,<br>185:21, 196:1,<br>205:2, 209:14,<br>212:6, 212:11,<br>219:8, 252:16,<br>253:6, 259:21,<br>261:22, 262:12<br>**telling**<br>220:20, 228:15<br>**template**<br>197:2, 204:2,<br>204:11, 222:19,<br>227:8<br>**templates**<br>175:10, 205:21<br>**temporal**<br>215:22<br>**temporary**<br>68:6<br>**ten**<br>54:12, 73:24,<br>73:25, 74:5,<br>124:17, 180:18,<br>181:1, 201:15<br>**tentative**<br>125:18<br>**terminology**<br>120:2<br>**terms**<br>12:17, 32:12,<br>95:3, 120:1,<br>121:7, 121:8,<br>121:9, 190:8,<br>229:9, 234:24,<br>237:1<br>**terrell**<br>1:5<br>**test**<br>154:14, 154:16, |

Transcript of Allen Waxman
Conducted on December 27, 2019

314

168:6, 176:6,
181:1, 232:2,
251:25, 252:2
**testified**
7:16, 44:19,
46:17, 107:12,
115:17, 119:11,
124:2, 165:23,
184:7, 194:19,
209:4, 243:4,
243:5, 253:20
**testify**
7:14, 80:1,
115:9, 210:20,
245:23, 246:24,
248:10
**testifying**
66:19
**testimony**
27:25, 69:25,
73:13, 98:21,
107:16, 115:25,
119:15, 119:16,
183:11, 200:4,
209:7, 253:22,
266:5, 266:6,
267:5, 267:6
**testing**
9:7
**th**
102:8, 139:22,
182:12, 196:8,
197:17, 205:4,
217:23, 218:13,
218:20, 251:2
**thank**
16:20, 17:24,
25:1, 38:17,
63:25, 81:25,
101:9, 101:19,
155:16, 201:14,
220:12, 265:15,
265:17, 265:18
**thanks**
152:20, 185:24,
186:8
**themselves**
6:14, 21:7,

21:19, 71:10,
72:9
**thereafter**
267:6
**thereto**
88:5
**thing**
18:19, 49:23,
90:4, 131:6,
173:13, 175:4,
181:11, 192:23,
201:16, 216:20,
256:16
**things**
9:14, 22:6,
32:9, 39:16,
53:10, 86:3,
105:22, 105:25,
120:6, 120:7,
132:19, 133:1,
134:25, 135:3,
138:10, 139:15,
139:16, 142:23,
154:13, 175:2,
180:16, 180:24,
193:17, 204:1,
204:8, 225:18,
226:16, 260:16
**thinking**
98:22, 116:11,
123:19, 154:15,
174:1, 174:16,
180:24, 181:4,
189:10, 251:4
**third**
21:10, 30:3,
256:20
**third-party**
6:20, 6:23,
6:25, 7:3, 67:11
**thomas**
133:24
**thought**
25:21, 26:9,
27:6, 49:10,
75:4, 75:6,
98:20, 98:24,
127:8, 128:11,

136:7, 136:20,
136:23, 139:19,
167:21, 181:5,
181:16, 202:14,
207:19, 222:23,
237:10, 260:20,
262:20, 265:13
**thousand**
113:4, 129:5
**three**
17:9, 31:14,
126:1, 179:24,
179:25
**threshold**
181:15, 181:16,
239:10
**through**
19:5, 20:5,
23:2, 50:2,
90:4, 90:15,
96:17, 120:5,
121:22, 136:18,
140:20, 153:16,
164:2, 164:7,
171:14, 181:24,
182:19, 183:17,
184:10, 184:13,
187:15, 193:2,
193:3, 193:9,
193:21, 194:17,
205:8, 219:21,
219:22, 219:24,
221:19, 222:11,
222:14, 230:7,
230:11, 231:3,
234:14, 249:2,
263:21
**throughout**
23:1, 70:4,
130:21, 252:4
**thursday**
70:5
**timeline**
101:2, 132:21
**timelines**
22:2
**times**
230:23, 247:4

**timing**
10:23, 185:3,
198:3, 207:24,
219:18
**tipping**
96:20, 97:6
**tips**
96:20
**tired**
248:25
**title**
8:5, 85:25
**titled**
61:20
**toaster**
28:23
**today**
6:9, 7:8, 8:3,
19:17, 23:21,
24:22, 76:4,
76:6, 76:25,
77:9, 77:10,
79:22, 79:25,
115:9, 115:14,
139:18, 148:4,
148:21, 154:3,
165:8, 193:16,
219:13, 237:23,
243:5, 251:11,
254:8, 256:8,
257:19, 264:12
**today's**
6:7, 69:25,
73:13, 73:21,
218:2
**together**
8:10, 30:3,
30:20, 31:2,
39:17, 79:15,
83:14, 101:3,
120:15, 140:18,
140:24, 182:18
**told**
18:4, 113:19,
149:22, 150:13,
174:13, 209:9,
236:13, 255:11
**tom**
3:5, 6:17,

Transcript of Allen Waxman
Conducted on December 27, 2019

211:20
**tomorrow**
157:12, 195:22,
257:22
**took**
39:3, 42:9,
90:18, 93:16,
118:15, 123:23,
125:12, 125:18,
126:19, 127:1,
133:5, 168:13,
186:16, 198:12,
203:3
**tools**
61:21
**top**
15:20, 16:16,
39:24, 92:11,
167:5, 175:8,
217:22
**topic**
167:11, 238:1
**topics**
79:21
**tort**
154:16
**total**
50:19, 73:20,
80:19
**totally**
130:4, 130:17,
160:15, 181:10,
247:25
**toughest**
24:21
**track**
55:14, 57:16,
58:15
**trade-off**
174:13, 174:19
**trade-offs**
174:2, 174:3
**trainings**
137:13
**transcript**
13:18, 23:6,
23:9, 61:19,
81:17, 82:13,

85:5, 91:4,
97:24, 99:25,
101:13, 125:2,
126:9, 133:19,
152:14, 158:22,
162:14, 168:22,
180:12, 185:17,
195:10, 202:20,
204:19, 214:3,
217:11, 222:2,
224:11, 227:16,
229:2, 234:17,
235:3, 236:5,
236:19, 240:8,
250:18, 252:13,
253:2, 267:4
**transcription**
266:6
**travel**
133:21
**treat**
179:10, 184:21,
197:9, 197:11
**treated**
89:15, 179:11,
198:12, 231:18
**treatment**
138:3, 138:5
**trees**
14:6
**trial**
29:20, 30:25,
31:3, 167:6,
167:10, 167:13
**tribunal**
138:15, 138:18
**tried**
14:5, 154:14
**trigger**
197:2, 230:19
**triggered**
178:7, 204:10,
231:23, 231:25
**triggering**
205:12
**tro**
68:4, 68:5,
69:6

**true**
13:2, 13:15,
14:25, 41:7,
52:17, 53:4,
62:22, 62:24,
63:4, 266:5,
267:4
**trumped**
197:1
**truth**
7:15, 7:16
**try**
9:13, 9:14,
32:18, 54:23,
59:3, 105:6,
117:22, 118:18,
118:24, 122:8,
168:5, 173:20,
174:3, 179:21,
181:25, 237:1
**trying**
39:10, 50:4,
50:5, 54:21,
72:5, 92:7,
93:22, 96:7,
101:4, 103:14,
116:20, 118:2,
121:9, 152:8,
165:5, 165:9,
183:13, 189:22,
193:11, 222:22,
246:21, 247:13
**tuesday**
70:5
**turn**
17:7, 63:20,
171:5, 171:13
**turned**
74:25, 75:12,
75:13, 75:18,
75:22, 136:3,
238:13
**turning**
200:20
**two**
14:10, 24:23,
73:11, 73:14,
93:24, 131:15,

131:21, 164:4,
164:8, 164:10,
174:18, 179:21,
182:9, 183:16,
183:18, 184:16,
201:9, 213:9,
238:17, 244:18
**two-page**
240:9
**type**
23:25, 51:20
**typed**
59:1
**types**
23:12, 23:14,
25:12, 25:16,
26:22, 26:25,
29:18, 103:3
**typewriting**
267:7
**typically**
238:4, 239:23
**typo**
251:14

**U**

**uh-huh**
217:15, 231:17
**ultimate**
213:1
**ultimately**
141:16, 176:18,
181:21, 196:24,
212:11
**unclear**
66:18
**unconscionability**
265:6
**under**
16:16, 122:12,
128:19, 148:10,
148:23, 149:2,
159:4, 175:2,
180:22, 197:6,
205:18, 223:13,
230:8, 246:19,
258:8, 258:10,
258:12, 259:22,

Transcript of Allen Waxman
Conducted on December 27, 2019

267:7
**underlying**
256:17
**understand**
11:1, 39:17,
46:6, 50:6,
54:9, 60:16,
66:21, 75:9,
76:18, 79:10,
86:8, 89:6,
90:6, 90:24,
96:8, 96:9,
112:8, 112:11,
114:18, 142:11,
159:19, 165:5,
165:10, 166:19,
186:24, 189:21,
208:15, 209:18,
221:10, 239:17,
245:18, 245:21,
245:23
**understandable**
117:16
**understanding**
19:1, 22:7,
25:24, 26:1,
66:12, 69:7,
79:1, 79:3,
79:8, 79:13,
81:3, 89:1,
95:25, 96:13,
96:19, 96:21,
96:25, 97:4,
97:13, 100:12,
140:9, 140:11,
142:21, 149:11,
165:12, 169:15,
172:10, 208:1,
209:5, 209:24,
211:9, 237:2,
239:5, 251:21
**understands**
141:6
**understood**
16:20, 66:25,
142:20, 216:23,
223:20, 239:15
**undertaken**
33:16

**unintentionally**
114:16
**uninterested**
147:8
**united**
1:1, 6:4
**unless**
43:7, 111:4,
123:2, 156:11,
161:2, 183:19,
191:6
**unrelated**
130:4, 130:18,
131:12, 247:25
**until**
89:6, 90:1,
237:4, 260:17
**unusual**
4:11, 61:21,
102:24
**unwilling**
245:23
**up-front**
89:9, 95:18
**updated**
211:20, 240:2
**updates**
207:4, 227:22
**upload**
227:9
**upped**
207:21, 212:19
**upset**
99:25
**use**
9:2, 11:23,
22:21, 49:12,
50:14, 52:9,
54:20, 154:21,
243:25, 256:15,
257:7, 262:22,
262:24
**useful**
28:6, 28:9,
109:14, 127:9
**users**
21:9
**uses**
19:11, 61:21,

215:7
**using**
23:6, 168:6
**usual**
232:16
**utility**
32:12
**utilizing**
257:1

---

**V**

**vague**
45:1
**valuable**
167:23
**value**
167:22
**variety**
8:17, 18:18,
27:12, 27:17,
27:21, 27:23,
34:10, 34:12,
37:2, 86:2,
94:13, 109:3,
117:8, 117:10,
133:4, 134:24,
182:13, 189:14,
189:24, 192:20
**various**
26:25, 38:25,
39:9, 40:4,
50:11, 64:10,
114:2, 121:9,
134:24, 137:11,
153:16, 154:13,
229:13, 230:12,
243:6, 254:4
**vary**
40:24
**verb**
50:14
**verbal**
102:11, 102:13
**version**
84:8, 177:1,
184:4, 184:6,
184:10, 185:1,
185:8, 185:9,

185:19, 195:13,
195:16, 197:16,
223:5, 228:8
**versus**
6:3, 68:16
**vice**
86:2, 86:5
**video**
6:8
**videographer**
3:24, 6:1, 6:9,
7:7, 38:18,
38:21, 69:17,
69:21, 77:13,
82:3, 82:6,
112:2, 112:5,
114:25, 115:2,
158:8, 158:11,
194:2, 194:5,
210:21, 210:24,
233:8, 233:11,
253:14, 253:17,
264:5, 264:8,
265:19
**videotaped**
1:13, 2:1, 6:2,
6:10
**view**
15:7, 80:9,
202:6
**vis-a-vis**
140:6, 140:21
**visionary**
64:11
**voice**
6:13
**volume**
104:19, 104:20,
104:25, 105:4,
105:5, 107:3,
107:8, 120:20
**voluminous**
160:5
**voted**
181:8
**vs**
1:8

---

**W**

**w-a-k-s**
134:10, 160:10

Transcript of Allen Waxman
Conducted on December 27, 2019

**wait**
68:2, 98:8,
110:20, 114:5
**waiting**
220:23, 220:25,
234:23
**waiver**
128:16, 131:22,
172:9
**waivers**
117:12, 128:14,
237:19, 238:5,
238:12, 238:14,
238:16, 238:22,
239:6, 239:8,
239:11, 239:13,
239:20, 239:25
**waiving**
239:1
**waks**
134:10, 160:7,
160:8, 160:9,
160:11, 160:13,
160:16, 160:18,
160:19, 160:20,
160:21, 160:23,
160:25, 161:15,
161:21
**walk**
187:15, 193:1,
193:3
**want**
14:15, 16:9,
18:7, 21:20,
22:22, 23:6,
27:11, 39:4,
49:12, 49:25,
52:6, 79:8,
90:13, 93:25,
100:1, 111:4,
113:13, 113:16,
114:15, 114:24,
119:2, 120:11,
122:15, 129:13,
140:18, 142:2,
142:23, 143:10,
151:2, 151:25,
159:10, 163:12,

163:13, 163:14,
173:21, 174:20,
177:8, 182:25,
189:3, 191:20,
193:3, 198:18,
198:20, 198:25,
199:1, 200:16,
200:18, 200:19,
207:3, 208:10,
210:19, 219:12,
219:19, 220:11,
221:20, 222:25,
223:8, 224:6,
227:8, 233:6,
242:10, 244:9,
246:12, 246:13,
257:3, 260:16,
262:24, 263:15,
263:17, 263:19,
263:21
**wanted**
14:10, 50:7,
54:19, 68:3,
79:6, 79:20,
81:14, 83:4,
98:4, 100:22,
100:23, 100:24,
102:20, 106:9,
140:22, 141:12,
141:13, 172:19,
172:23, 173:1,
198:15, 202:3,
202:16, 207:17,
211:24, 214:20,
214:23, 221:6,
221:9, 221:13,
221:14, 221:17,
221:23, 222:16,
222:18, 223:3,
223:19, 224:4,
228:6, 229:25,
236:23, 237:3,
237:4, 239:17,
241:2, 257:11
**wanting**
219:16
**wants**
11:23, 30:21,

109:15, 200:14,
245:13, 260:18
**washington**
3:14
**waste**
158:24, 176:15
**waxman**
1:13, 2:1, 4:3,
4:19, 4:20,
4:21, 4:22, 5:6,
5:7, 5:8, 5:10,
5:11, 5:12,
5:15, 5:17, 6:3,
7:20, 7:21,
13:17, 13:20,
14:4, 24:9,
61:18, 78:23,
79:25, 82:9,
82:12, 85:4,
91:3, 97:23,
101:12, 109:21,
112:8, 113:10,
114:5, 125:1,
126:8, 133:18,
152:13, 158:14,
159:16, 162:13,
168:21, 179:1,
180:11, 183:11,
185:16, 193:15,
193:24, 194:8,
195:9, 202:19,
204:18, 214:2,
217:10, 222:1,
224:10, 227:15,
229:1, 234:16,
235:2, 236:4,
236:18, 240:7,
246:24, 250:17,
252:12, 253:1,
256:7, 266:3
**waxman's**
220:6
**way**
9:17, 15:23,
22:5, 48:7,
59:5, 95:4,
104:7, 117:13,
159:10, 159:11,

164:21, 175:12,
177:12, 178:2,
179:15, 187:6,
190:25, 247:3,
247:5, 254:16,
254:19
**ways**
8:17, 8:18,
21:1, 21:24,
116:21, 141:14
**we'll**
24:24, 99:12,
99:13, 99:18,
133:15, 151:14,
179:16, 185:15,
186:7, 216:18,
262:10
**we're**
8:18, 12:14,
16:5, 16:15,
23:6, 29:2,
43:10, 60:17,
60:20, 69:18,
103:13, 131:17,
151:5, 151:8,
158:5, 158:8,
168:19, 177:13,
181:22, 182:3,
182:5, 183:5,
183:12, 185:25,
189:2, 190:12,
193:4, 193:8,
210:21, 215:9,
220:20, 233:3,
233:8, 233:15,
239:12, 246:23,
247:7, 249:7,
253:14, 263:22,
263:23, 264:5,
264:8
**we've**
18:16, 34:2,
67:11, 92:12,
130:12, 142:3,
148:15, 190:17,
193:16, 195:18,
215:1, 215:6,
239:3, 247:3,

Transcript of Allen Waxman
Conducted on December 27, 2019

318

**website**
19:4, 19:9,
22:16, 104:22,
105:3, 105:14,
106:25, 215:8,
226:17, 227:7,
231:20, 239:11,
256:25, 260:23
**week**
70:1, 70:2,
70:5, 186:8,
207:3, 236:12,
237:4
**weeks**
244:19
**weird**
76:16
**welcome**
103:3, 103:4
**welcomed**
103:20, 119:20
**welcomes**
103:6
**went**
110:4, 153:15,
167:6, 176:8,
183:1, 220:2
**weren't**
89:22, 95:21,
107:24, 142:15,
173:8, 177:17,
220:11, 220:23
**whatever**
18:14, 37:2,
37:13, 79:6,
81:14, 115:12,
116:1, 223:3,
260:15
**whenever**
233:6
**whereof**
267:12
**whereupon**
7:12
**whether**
10:14, 27:11,
37:12, 40:24,

67:17, 89:19,
95:16, 96:17,
96:23, 112:22,
113:11, 113:25,
120:25, 121:18,
125:18, 143:23,
149:25, 174:16,
178:5, 179:12,
189:1, 192:10,
194:22, 204:5,
214:18, 219:9,
223:13, 238:19
**whoever**
11:23, 138:14,
222:25
**whole**
7:15, 14:7,
18:18, 63:2,
105:25, 131:6,
132:21, 208:15
**williams**
49:2, 53:16
**willing**
95:6, 138:18,
151:3, 263:23
**willingness**
177:15
**window**
196:15
**winter**
86:17, 86:18
**withheld**
75:23, 131:1
**withhold**
163:25
**within**
116:6, 159:8,
161:4, 183:25,
244:18
**without**
21:7, 21:17,
33:11, 73:19
**witness**
3:17, 4:2,
6:21, 6:23, 7:1,
7:3, 7:11,
38:14, 38:17,
47:5, 47:21,

48:1, 49:5,
57:11, 60:7,
64:24, 65:7,
65:14, 65:22,
66:7, 98:6,
98:15, 109:2,
111:24, 114:19,
133:20, 161:24,
167:3, 176:25,
183:7, 193:25,
200:11, 210:6,
210:9, 210:15,
210:18, 219:1,
219:23, 233:4,
233:7, 249:4,
265:17, 267:12
**witnesses**
109:13, 158:19
**won**
19:25
**wondering**
203:17, 213:19,
225:7
**word**
23:7
**words**
48:11, 128:22,
173:3
**work**
20:4, 21:14,
24:24, 34:10,
37:8, 37:10,
47:12, 47:18,
48:13, 54:23,
54:25, 80:22,
89:12, 95:6,
96:5, 109:9,
120:13, 121:24,
139:4, 139:8,
164:13, 164:14,
168:1, 174:6,
174:7, 174:10,
175:22, 178:23,
181:22, 181:24,
183:17, 184:19,
186:1, 196:10,
202:5, 202:10,
222:19, 237:14

**worked**
34:17, 35:6,
35:15, 35:21,
36:6, 36:11,
45:12, 46:1,
46:11, 46:18,
46:24, 53:15,
53:16, 78:23,
134:22, 141:11,
155:6, 222:18,
257:5
**workers**
66:22, 96:21,
96:23, 112:13
**working**
8:18, 54:13,
76:21, 95:21,
155:8, 165:3,
170:19, 182:18,
182:19, 185:11,
198:4, 222:10,
222:14, 226:7,
227:1, 227:10
**works**
26:1, 77:1,
113:11, 113:17,
137:1, 186:7,
209:19, 226:22,
226:23
**world**
101:16
**worldwide**
17:18
**worth**
32:13, 160:6,
232:24
**worthwhile**
174:14
**wouldn't**
73:14, 94:15,
259:19
**write**
18:21, 18:24,
138:21, 139:24,
140:17, 141:4,
149:16, 155:7
**writers**
18:13

Transcript of Allen Waxman
Conducted on December 27, 2019

319

writes
104:18
writing
144:25, 193:11
written
40:6, 67:16,
73:6, 116:4
wrong
49:11, 131:10,
185:3
wrote
18:25, 118:1,
142:21

**Y**

yeah
19:15, 26:6,
41:21, 50:7,
60:19, 68:8,
69:15, 73:14,
101:6, 102:2,
102:4, 102:16,
104:13, 108:17,
129:18, 141:8,
148:6, 149:23,
157:4, 162:1,
166:25, 167:2,
171:22, 183:7,
193:13, 198:25,
203:9, 207:15,
208:4, 210:3,
213:3, 213:8,
217:23, 225:11,
231:7, 231:13,
233:7, 233:24,
234:7, 236:14,
236:22, 238:8,
238:11, 248:23,
251:12, 262:15,
263:1
year
16:2, 16:17,
16:18, 17:5,
41:25, 56:19,
57:2, 84:12,
86:11, 86:15,
86:19, 92:19,
118:8

yearly
64:21
years
16:3, 16:5,
23:1, 24:7,
24:12, 83:21,
155:18
yep
100:11, 126:14,
140:2, 214:10,
222:13, 224:18
york
1:14, 2:7,
2:13, 3:22, 6:12
you-all
209:15, 246:2
yourself
14:11, 145:5,
157:25, 162:24,
163:3, 163:10,
163:11, 170:8,
195:15, 204:23,
213:25, 227:18

**Z**

zamorsky
83:17, 83:18,
84:5, 224:15,
226:9, 227:6
zero
54:15

**$**

$1,900
128:4
$108,000
230:8, 230:13
$15,000
212:21, 232:5,
232:14
$20,000
213:7, 232:6
$3,000
212:17, 230:20,
232:8
$450
260:3, 261:22
$60,000
232:4

$70,000
212:14, 232:2

**0**

000001
85:3
000201
200:11
000498
203:9
07
210:22
07545
1:9, 6:6

**1**

1
112:3, 112:6
10
4:20, 38:19,
38:22, 69:19,
133:17, 133:18,
133:23, 135:9,
139:1, 153:17,
159:23, 160:4,
160:5, 161:16,
162:4, 169:17,
169:21, 169:22,
170:6, 171:16,
172:2, 177:3,
178:11, 178:17,
179:6, 179:24,
180:19, 180:20,
184:5, 184:6,
185:9, 195:13,
202:25, 203:5,
203:9, 217:14,
222:8, 232:3,
234:10
100
112:21, 230:25
101
2:6, 3:21,
4:16, 6:11
10178
2:7, 3:22, 6:12
1050
3:13

107
162:15
108
164:2, 176:25,
184:14
109
164:3, 184:14
11
4:21, 64:10,
69:19, 69:22,
82:4, 152:6,
152:11, 152:13,
178:17, 179:24,
210:25
12
4:22, 82:7,
101:11, 162:12,
162:13
120
148:25, 149:4,
149:7, 149:10,
183:2
122
168:18, 168:23
125
4:18
126
4:19
13
4:10, 4:23,
168:18, 168:21,
169:5, 200:20,
201:7
133
4:20
14
4:14, 4:24,
88:2, 180:10,
180:11, 180:17,
182:8, 182:11,
182:12, 184:6,
185:9, 197:17
15
4:25, 155:18,
185:15, 185:16,
186:25, 196:8,
213:8, 213:10,
231:16

Transcript of Allen Waxman
Conducted on December 27, 2019

320

**150**
3:6
**152**
4:21
**16**
5:3, 195:9,
195:11
**162**
4:22
**168**
4:23
**17**
5:4, 38:19,
64:10, 202:19,
202:22
**18**
5:5, 64:10,
86:18, 102:8,
102:12, 204:17,
204:18, 219:5,
235:22
**180**
4:24, 183:2
**185**
4:25
**189**
180:9, 180:17,
183:5
**19**
1:9, 5:6, 6:6,
86:19, 93:5,
93:14, 94:6,
94:12, 100:6,
100:8, 153:17,
203:9, 213:23,
214:1, 214:2,
217:25, 218:21,
218:24, 219:24
**190**
183:3, 184:13
**191**
183:6
**192**
180:10, 184:13
**195**
5:3
**198**
185:18

**1st**
236:9

**2**

**2**
153:17, 158:9,
158:12
**2,000**
128:11
**20**
5:7, 92:12,
92:19, 92:25,
93:5, 93:14,
94:6, 94:7,
94:9, 94:12,
94:17, 94:19,
94:22, 99:6,
99:10, 100:6,
100:8, 102:22,
112:3, 113:2,
213:8, 213:11,
217:9, 217:10,
218:15, 220:2,
232:3
**20,000**
128:10
**200**
131:6, 198:11
**20036**
3:14
**201**
201:15
**2017**
15:4, 16:6,
16:17, 16:18
**2018**
4:13, 16:19,
41:14, 82:18
**2019**
1:15, 4:14,
6:7, 61:22,
62:4, 62:15,
84:8, 86:20,
88:2, 93:5,
93:14, 94:6,
94:12, 116:12,
195:13, 242:14
**202**
3:15, 3:23, 5:4

**2020**
83:9, 83:12,
267:14
**2022**
267:15
**203**
185:18
**204**
5:5
**21**
5:8, 222:1,
222:4
**210**
3:8
**214**
5:6
**217**
5:7
**22**
5:9, 224:10,
226:5, 227:3
**222**
5:8, 195:8
**223**
205:6, 205:8
**224**
5:9
**225**
200:22, 200:23
**226**
195:8, 205:8
**227**
5:10
**229**
5:11
**23**
5:10, 122:3,
124:20, 124:22,
125:8, 132:4,
132:12, 132:16,
201:12, 201:20,
227:13, 227:15
**234**
5:12, 202:22
**235**
5:13
**236**
5:14, 5:15,

**204:17, 206:2,
211:19**
**237**
205:9
**24**
5:11, 195:13,
196:8, 228:25,
229:1, 233:15,
253:15
**240**
5:16, 204:17,
205:9
**241**
214:1, 219:24,
220:8
**246**
214:1, 219:24
**247**
219:21, 220:8
**25**
5:12, 69:22,
202:25, 203:5,
203:9, 205:4,
234:14, 234:16
**250**
5:18, 129:3,
150:4, 150:8,
150:9, 150:17
**251**
219:21
**252**
5:17, 219:22
**253**
5:19
**255**
217:9, 217:22
**256**
4:5, 217:9
**257**
4:6
**259**
222:4
**26**
5:13, 38:22,
235:1, 235:2,
235:4, 267:15
**264**
222:4

Transcript of Allen Waxman
Conducted on December 27, 2019

321

**267**
1:18
**27**
1:15, 5:14,
6:7, 218:20,
227:19, 227:24,
236:2, 236:4,
251:2
**271**
224:9, 224:13
**276**
224:13
**277**
227:13
**279552**
1:17
**28**
5:15, 139:22,
217:23, 218:13,
236:17, 236:18
**282**
227:14
**289**
229:3, 233:16
**29**
5:16, 217:14,
222:8, 240:6,
240:7
**294**
234:14
**296**
234:15
**2nd**
153:6, 164:25,
165:15, 239:19,
267:13

---
**3**
---
**3**
194:3, 194:6,
203:1
**3,000**
230:23
**30**
1:16, 5:17,
14:1, 16:19,
61:8, 64:10,
79:14, 79:23,

110:3, 203:1,
205:12, 230:19,
230:20, 230:23,
231:5, 231:7,
231:9, 231:10,
231:23, 234:10,
252:12, 252:15,
264:20
**30,000**
232:3
**300**
129:4, 129:10
**300,000**
230:25
**303**
235:1
**304**
235:1
**307**
236:2
**308**
236:17
**31**
5:18, 163:17,
235:6, 250:17,
250:20
**310**
240:10
**312**
3:8
**32**
5:19, 112:6,
194:3, 253:1,
253:5
**33**
82:7, 158:9
**34**
6:8, 63:8
**35**
63:20, 63:21,
64:2, 64:9,
64:14
**360**
69:1
**39**
253:18
**3:-cv**
1:9

**3:-cv-(wha**
6:6
**3rd**
163:22

---
**4**
---
**4**
210:22, 210:25,
233:9, 233:12
**40**
146:9, 147:6
**408**
246:19
**41**
233:9
**43**
82:4, 158:12,
194:6
**476**
124:24, 125:3
**494**
91:5, 92:11,
93:3, 129:15
**496**
159:22, 171:15
**4th**
244:18, 250:7

---
**5**
---
**5**
253:15, 253:18,
264:6, 264:9,
265:21
**50**
98:14, 205:12,
262:6, 262:12,
262:14
**500**
146:17
**501**
60:17, 60:20
**502**
91:6
**503**
126:7, 126:10
**514**
250:20
**515**
253:5

**52**
14:5, 264:6
**526**
253:5
**527**
252:15
**530**
252:15
**5306**
3:14
**54**
264:9
**545**
50:19, 51:11,
51:18, 51:22,
52:1, 53:4,
54:10, 54:24,
55:21, 56:4,
56:11, 146:15
**55**
163:17
**56**
233:12, 265:21

---
**6**
---
**6-**
16:19, 64:10
**60**
176:7, 176:10,
176:21, 182:23,
183:1, 184:2,
213:9
**60606**
3:7
**61**
4:11
**6th**
163:17, 163:23,
165:1, 165:16,
182:13

---
**7**
---
**7**
163:17, 235:22
**7-**
64:10
**7-1**
16:18

**70**
212:24, 213:10
**7278**
3:8
**7th**
169:8, 169:10,
170:24, 175:13

---
**8**

**80**
181:17, 182:4
**82**
4:13
**84**
133:17
**85**
4:14
**8500**
3:15, 3:23
**87**
152:12, 152:18,
152:19, 152:25

---
**9**

**9**
1:16, 6:8,
264:20
**90**
152:18, 152:19,
152:25, 181:23
**90,000**
230:23
**91**
4:15
**955**
3:15, 3:23
**97**
4:17
**990**
4:10
**998**
15:13

# EXHIBIT P

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| IN RE: CENTURYLINK SALES PRACTICES AND SECURITIES LITIGATION | MDL No. 17-2795 (MJD/KMM) |

This Document Relates to

| | |
|---|---|
| 0:17-cv-02832 | 0:17-cv-04943 |
| 0:17-cv-04613 | 0:17-cv-04944 |
| 0:17-cv-04614 | 0:17-cv-04945 |
| 0:17-cv-04615 | 0:17-cv-04947 |
| 0:17-cv-04616 | 0:17-cv-05046 |
| 0:17-cv-04617 | 0:18-cv-01562 |
| 0:17-cv-04618 | 0:18-cv-01572 |
| 0:17-cv-04619 | 0:18-cv-01573 |
| 0:17-cv-04622 | 0:18-cv-01565 |

**DECLARATION OF PROFESSOR NANCY J. MOORE**

1.       I am Professor of Law and Nancy Barton Scholar at Boston University School of Law ("BU").  I have been a tenured full professor at BU since January 1999. From 1976 through December 1998, I was employed at Rutgers School of Law-Camden ("Rutgers") as an assistant professor, tenured associate professor, associate dean for academic affairs, and tenured full professor.  I am a Member and former Chair of the Multistate Professional Responsibility Test Drafting Committee.  In addition, I was Chief Reporter to the American Bar Association's Commission on Evaluation of Professional Rules of Conduct ("Ethics 2000 Commission").  I also served as an adviser to the American Law Institute's *Restatement of the Law (Third) Governing Lawyers*, and I served twice as Chair of the Professional Responsibility Section of the Association of American Law Schools.  I have authored numerous articles on legal ethics, including

articles on conflicts of interest in various aggregated forms of litigation, such as class actions and mass torts.

2.     I have testified as an expert on legal ethics via deposition, declaration, and in various state and federal tribunals, including testimony in courts in Connecticut, Florida, Maine, Maryland, Massachusetts, New Jersey, New York, and Pennsylvania.  I am currently licensed to practice law in the Commonwealth of Massachusetts (active) and the Commonwealth of Pennsylvania (inactive).  I have spoken on topics in legal ethics numerous times in the last thirty years at continuing legal education seminars and professional conferences, including national bar conferences.  I have regularly taught courses in legal ethics since 1978.  In addition to regularly teaching the basic course in Professional Responsibility (formerly at Rutgers and now at BU), I teach a seminar on Professional Responsibility for Business Lawyers. A current copy of my Curriculum Vitae is attached as Exhibit 1.

3.     I have been retained by Wheeler Trigg O'Donnell LLP ("WTO") to render expert opinions in connection with its representation of CenturyLink, Inc. and its subsidiaries (collectively, "CenturyLink") that are relevant to ethical issues arising in *In re: CenturyLink Sales Practices and Securities Litigation* ("the Class Action Lawsuit"), and in threatened mass arbitrations by Keller Lenkner against CenturyLink, including 1,000 claims simultaneously submitted shortly before the date of this Declaration. More specifically, I have been asked to render opinions concerning ethical issues arising from Keller Lenkner's joint representation of tens of thousands of purported CenturyLink customers with respect to their potential claims against CenturyLink. Based on Keller

Lenkner's generic allegations in its arbitration demands, many of its clients are prospective class members, and their claims are apparently addressed in the proposed settlement that has been submitted for preliminary approval in the Class Action Lawsuit ("the Proposed Settlement").

4.     I am being compensated at my regular hourly rate of $750 per hour.

5.     I have reviewed documents supplied to me by WTO, which include the documents listed in Exhibit 2 attached.

6.     These documents, along with other information provided to me by CenturyLink counsel, provide evidence of the facts on which I base my opinions. Those facts are summarized in Exhibit 3 attached.

7.     The form retainer agreement Keller Lenkner used in soliciting CenturyLink customer clients ("the Retainer Agreement")[1] states that the agreement is governed by the laws of Illinois. (¶11) Regardless of whether this choice of law provision is enforceable against the consumer clients, the Keller Lenkner office is in Chicago, Illinois, so I assume that its lawyers are licensed in Illinois, although they may be licensed in other jurisdictions as well. For purposes of my opinions in this Declaration, I refer to the Illinois Rules of Professional Conduct. The provisions I cite are identical or nearly identical to similar provisions in other state rules of professional conduct, including the

---

[1] See Ex. 4, pp 24-29 ("CenturyLink Compensation Claims Retainer Agreement")/ See also, Ex. 3 ¶ 17; Decl. of Robert Matthews, Defendant's and Intervenors' Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval and Request for Temporary Injunction to Stay Parallel Arbitrations, Ex. 1.E, ¶¶ 5-12, Ex. 4.

Minnesota Rules of Professional Conduct, which are based on the ABA Model Rules of Professional Conduct. For purposes of any action that Keller Lenkner takes as counsel for putative class members in the Class Action Lawsuit, I also refer specifically to the Minnesota Rules of Professional Conduct.[2]

8.      On the basis of the facts described Exhibit 3 and my review of the documents in Exhibit 2, including my detailed examination of the questionnaire and the Retainer Agreement used by Keller Lenkner in signing up over 22,000 individuals to pursue mass arbitrations, which is attached to Exhibit 4, it is my professional opinion that the Keller Lenkner lawyers have engaged in numerous violations of their professional responsibilities, as set forth in detail in paragraphs 9-28 below. These violations involve fiduciary duties imposed on lawyers for the benefit of their clients. Although it is primarily the Keller Lenkner clients, many of whom are prospective class members, who may be harmed by their conduct, CenturyLink has an interest in the fair and efficient administration of justice, including a just and binding resolution of the class claims in the Class Action Lawsuit.

---

[2] Local Rule 83.6 for the United States District Court, District of Minnesota, provides that "[a]n attorney who is admitted to the court's bar or who otherwise practices before the court must comply with the Minnesota Rules of Professional Conduct, which are adopted as the rules of this court."

# I.    KELLER LENKNER'S MARKETING MATERIALS, INCLUDING THE RETAINER AGREEMENT, ACTIVELY MISLED PROSPECTIVE CLASS MEMBERS TO HIRE THE FIRM TO PURSUE ARBITRATION

9.    Keller Lenkner apparently began soliciting clients through the internet sometime between March and May 2019 and continued its solicitations through at least the date of this Declaration.[3] The marketing materials it used included an interactive website, a questionnaire, and a form Retainer Agreement authorizing Keller Lenkner to pursue the clients' claims through arbitration.[4] These marketing materials were actively misleading in several respects, including falsely stating or implying that: (1) arbitration is the sole or primary method by which their claims could be pursued; (2) Keller Lenkner was pursuing individual, as opposed to mass arbitrations; (3) there were no known conflicts of interest among its thousands of clients; and (4) Keller Lenkner's unreasonable legal fees would be paid by CenturyLink and not by the clients.

10.    <u>Falsely implying that arbitration is the sole or primary method by which claims could be resolved.</u> During the time period in which it was soliciting clients to sign the Retainer Agreement, Keller Lenkner knew or was on notice of the existence of the Class Action Lawsuit.[5] Additionally, during most of this time period, Keller Lenkner also knew of the existence of the tentative settlement reached in late May and early June 2019 ("the Tentative Settlement"),[6] which was likely to include many of the individuals with

---

[3] Ex. 3, ¶ 17.

[4] Id.; Ex. 4.

[5] Ex. 3 at ¶ 2.

[6] Id. at ¶ 3.

potential claims against CenturyLink—the very individuals being targeted by Keller Lenkner to pursue their claims in arbitration. Nevertheless, neither the internet marketing materials, the questionnaire, nor the Retainer Agreement refers to the existence of the entirely separate Class Action Lawsuit or the Tentative Settlement. Instead, the Retainer Agreement expressly authorizes Keller Lenkner to pursue the clients' claims through arbitration (¶1), thereby falsely implying that arbitration is the sole or primary[7] method of pursuing the clients' claims.[8] In my opinion, the existence of the entirely separate Class Action Lawsuit and the Tentative Settlement were facts necessary to make the Keller Lenkner marketing materials and the Retainer Agreement, considered as a whole, not materially misleading.[9] As a result, in my opinion the Keller Lenkner lawyers made false

---

[7] Paragraph 1 of the Retainer Agreement expressly authorizes Keller Lenkner to file an individual arbitration. It further states that the lawyers have no obligation to represent the clients in any other matter, but that the lawyers "may also pursue resolutions of your claims outside of or before initiation arbitration, including in court." This obscure reference to a possible court action, initiated by Keller Lenkner, clearly does not refer to or provide notice of the Class Action Lawsuit pending at the time of the Keller Lenkner solicitations.

[8] Under Rule 1.2(c) of both the Illinois and Minnesota Rules of Professional Conduct, lawyers are permitted to limit the scope of a representation, but only "if the limitation is reasonable under the circumstances and the client gives informed consent." Keller Lenkner never informed its clients that it was limiting the scope of the representation to exclude consideration of other existing avenues of compensation, including informal resolution and participation in the Class Action Lawsuit. Moreover, for reasons set forth in Paragraph 20, infra, it is my opinion that such a limitation would not have been reasonable.

[9] One example of the misleading nature of the marketing materials is evidenced by Keller Lenkner's purported representation of Kathleen Lodestein. Ms. Lodestein is married to, and shares a CenturyLink account with Plaintiff John Lodestein, who is a Settlement Class Representative in the MDL. Although Ms. Lodestein apparently signed up with Keller Lenkner, Mr. Lodestein has made clear that they intend to participate in the

or misleading communications about the lawyers' proposed services, in violation of Rule 7.1 of the Illinois Rules of Professional Conduct, as well as Rule 7.1 of the Minnesota Rules of Professional Conduct. It is also my opinion that the Keller Lenkner lawyers' use of false or misleading marketing materials constitutes dishonest conduct, in violation of Rule 8.4(c) of the Illinois Rules of Professional Conduct, as well as Rule 8.4(c) of the Minnesota Rules of Professional Conduct.

11. <u>Falsely stating that Keller Lenkner is pursuing individual, as opposed to mass arbitrations.</u> The Retainer Agreement expressly authorizes Keller Lenkner to pursue each client's claim through an "individual arbitration" (¶ 1); however, in fact Keller Lenkner has been pursuing these claims in an aggregated, consolidated manner. Initially, Keller Lenkner aggregated thousands of claims in a single arbitration demand document and attempted to resolve all these claims together, without any individual presentation or

---

Tentative Settlement and never agreed to arbitration. Thus, the Lodesteins apparently did not understand that they were signing up with Keller Lenkner to pursue arbitration in an effort that is entirely separate from the Class Action and Tentative Settlement. See Decl. of Drew Unthank, Defendant's and Intervenors' Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval and Request for Temporary Injunction to Stay Parallel Arbitrations, Ex. 2 ("Unthank Decl."), ¶ 55.

Similarly, a class action complaint filed by Uber drivers' alleged that Keller Lenkner's marketing materials soliciting Uber drivers to pursue arbitrations were false and misleading because they did not "disclose material facts, including, but not limited to, the fact that the FTC action has been resolved, that the Funds derived from the FTC action do not require the assistance or involvement of [Keller Lenkner], that the Fee Agreement has nothing whatever to do with the FTC or the Fund and that the Fund is being distributed by the FTC regardless of whether an Uber driver enters into a Fee Agreement." Class Action Complaint (ECF No. 1), *Brown v. Keller Lenkner, LLC*, No. 1:18-cv-12423-NMG (D. Mass. Nov. 20, 2018).

attempted resolution of each claim.[10] Indeed, in its June 19 letter, Keller Lenkner specifically refused to "engage in pre-demand discussion on an individual basis," arguing that, "at 15 minutes per client, such a pre-demand 'dialogue' would consume more than 3,500 hours, or the equivalent of 145 round-the-clock days."[11] When its initial effort to obtain a pre-filing aggregate settlement of all of its more than 22,000 claims failed, Keller Lenkner simultaneously submitted 1,000 arbitration claims, providing minimal information concerning the nature of these claims, including failing to provide any information concerning the dates and specific service at issue with the alleged overcharges—information that is important to CenturyLink's efforts to determine the applicable contract for each claimant and to informally resolve meritorious claims.[12] To date, Keller Lenkner has provided no information at all concerning the individual claims of its more than 21,000 remaining clients.

12.     Whether a claim will be pursued individually, or as part of an undifferentiated aggregate, is material because some individual claims are more valuable than others, depending on a number of factors affecting both the likely success of the claim and the likely damages. In addition, Keller Lenkner's mass claim approach is particularly material here because the arbitration contract on which Keller Lenkner is relying specifically prohibits pursuing claims on a consolidated basis. As a result, Keller Lenkner's approach subjects its clients to the risk that they will be found to have

---

[10] See, e.g., Ex. 3 at ¶¶ 5, 9.

[11] Id. at ¶ 9.

[12] Id. at ¶ 14.

materially breached the arbitration contract, thereby rendering it unenforceable. In my

opinion, by falsely stating that they were pursuing individual arbitrations, the Keller

Lenkner lawyers made false or misleading communications about the lawyers' proposed

services, in violation of Rule 7.1 of both the Illinois and Minnesota Rules, and such

conduct was dishonest, in violation of Illinois and Minnesota Rule 8.4(c).

13.     <u>Falsely stating that there were no known conflicts, including conflicts that</u>

<u>would arise through an aggregate settlement offer or demand.</u>  In its Retainer Agreement,

Keller Lenkner states: "The attorneys intend to represent many clients with claims like

yours. At this time, your interests and the interests of the other clients align. We know of

no conflicts of interest that would have an adverse impact on our representation of you. It

is, however possible that conflicts may arise in the future, including: ….A defendant

offers an aggregate or "lump sum" settlement to all of our clients that does not specify the

amount each client will receive." (¶ 8) Rule 1.7 of the Illinois Rules of Professional

Conduct provides that a conflict of interest among current clients exists when "there is a

significant risk that the representation of one or more clients will be materially limited by

the lawyer's responsibilities to another client." See also Minnesota Rules of Professional

Conduct, Rule 1.7. In addition, Comment [13] to Illinois Rule 1.8 provides that

"[d]ifferences in willingness to make or accept an offer of settlement are among the risks

of common representation of multiple clients by a single lawyer" and, further, that

"[u]nder Rule 1.7, this is one of the risks that should be discussed before undertaking the

representation…." See also Minnesota Rules of Professional Conduct, Rule 1.8, cmt [13].

In my opinion, there are numerous ways in which the interests of Keller Lenkner's tens of

thousands of clients' interests were already in conflict at the moment they were asked to sign the Retainer Agreement, including the following:

a. <u>Documented versus undocumented claims</u>. Presumably, there are clients whose claims are documented and clients whose claims are undocumented.[13] Keller Lenkner clients with documented claims have a better chance of success than clients with undocumented claims. In my opinion, there is a significant risk that Keller Lenkner's duties to clients with undocumented claims will materially limit the lawyers' ability to advocate for the best possible recovery for clients with documented claims. This is particularly so in the case of a voluntary settlement of all claims, which appears to be what Keller Lenkner is seeking to achieve.

b. <u>Claims barred by statute of limitations versus unbarred claims.</u> There are clients whose claims may be barred by the applicable statute of limitations[14] and clients whose claims are not so barred.[15] In my opinion, there is a significant risk that Keller Lenkner's duties to clients

---

[13] These two types of claims are being treated differently under the Proposed Settlement submitted for approval in the Class Action Lawsuit, where members with documented claims are being given an opportunity to receive higher damages than members without documented claims, on an individualized basis.

[14] See, e.g., Unthank Decl. at ¶ 62.

[15] Even with respect to clients whose claims are barred by the applicable statute of limitations, there are some clients who could nevertheless recover under the Proposed Settlement reached in the Class Action Lawsuit, which permits even time-barred claims if they arose after January 1, 2014.

with claims barred by the statute of limitations will materially limit the lawyers' ability to advocate for the best possible recovery for clients with unbarred claims. This is particularly so in the case of a voluntary settlement of all claims, which appears to be what Keller Lenkner is seeking to achieve.[16]

c.   Clients facing counterclaims versus clients not facing such counterclaims. There are clients as to whom CenturyLink may have meritorious counterclaims[17] and, perhaps, clients as to whom no such counterclaims can be asserted. In my opinion, there is a significant risk that Keller Lenkner's duties to clients facing counterclaims will materially limit the lawyers' ability to advocate for the best possible recovery for clients not facing counterclaims. This is particularly so in the case of a voluntary settlement of all claims, which appears to be what Keller Lenkner is seeking to achieve.

d.   The possibility of an aggregate settlement. The Retainer Agreement describes the "possibility" that conflicts might arise "in the future"

---

[16] Keller Lenkner did not provide any information about the dates of alleged overcharges on behalf of the 1,000 clients whose arbitration claims have been submitted. Keller Lenkner's refusal to supply such information is adverse to the interests of claimants who are not time barred; their claims are clearly more valuable, and that value could be captured in any effort to informally resolve these claims. In seeking to resolve the entire group of claims in an aggregate manner, Keller Lenkner's duty to its time-barred claimants clearly conflicts with its duty to claimants with valid claims.

[17] See, e.g., Unthank Decl. at ¶ 62.

under several circumstances, including a situation where "a defendant offers an aggregate or 'lump sum' settlement that does not specify the amount each client will receive." This statement is false and misleading in several respects.

    i. First, as Comment [13] to both Illinois and Minnesota Rule 1.8 states, the significant possibility of an aggregate settlement is "among the risks of common representation of multiple clients by a single lawyer" and "[u]nder Rule 1.7, this is one of the risks that should be discussed *before undertaking the representation*." (Emphasis added.) This is because under Rule 1.7, a conflict is defined to include not only actual conflicts, but "a significant risk" that the lawyer's duties to another client will limit the lawyer's ability to advocate for each client individually. Thus it was false and misleading to state that there was merely a possibility that such conflicts might arise in the future.

    ii. Second, Keller Lenkner's description of an aggregate settlement was false and misleading. An aggregate settlement may be sought by plaintiffs' counsel, as well as by a defendant, and Keller Lenkner apparently intended from the beginning to attempt to resolve its tens of thousands of claims in an aggregate

manner.[18] In addition, aggregate settlements are not limited to "lump sum" payments that do not specify the amount each client will receive, but also include settlements in which the claims are presented collectively and the lawyers are simultaneously negotiating the amounts different clients will receive. Given that Keller Lenkner apparently had not and did not intend to reasonably investigate the specifics of each client's claim before negotiating a pre-filing collective settlement, it was false and misleading to mischaracterize the circumstances under which the conflicts attendant to a potential aggregate settlement would arise. In my opinion, there was a significant risk that Keller Lenkner's responsibilities to each client would materially limit the lawyers' ability to advocate for the best possible recovery for the other clients, in light of the fact that Keller Lenkner was actively seeking a collective resolution of its clients' claims.[19]

e.  For all of the reasons set forth above, it is my opinion that there were blatant and serious conflicts of interest already existing at the time

---

[18] See, e.g., Ex. 3 at ¶¶ 5, 9.

[19] The fact that Keller Lenkner has now submitted arbitration claims on behalf of 1,000 of its more than 22,000 clients does not alter the probability that Keller Lenkner is continuing to seek an aggregate settlement on behalf of either all of its clients or the 1,000 clients whose claims have been submitted. Settling mass claims in a series of group settlements constitutes engaging in aggregate settlements under applicable rules of professional conduct.

Keller Lenkner was soliciting over 22,000 clients, including the

conflicts attendant to a potential aggregate settlement. In my opinion,

the Keller Lenkner lawyers' assertion that no known conflicts existed,

and its false characterization of an aggregate settlement, were false and

misleading communications about the lawyers' proposed services, in

violation of both Illinois and Minnesota Rule 7.1, and that the Keller

Lenkner lawyers' use of these communications constitutes dishonest

conduct, in violation of both Illinois and Minnesota Rule 8.4(c).

14.    <u>Falsely stating or implying – to secure unreasonable legal fees – that Keller</u>

<u>Lenkner's legal fees would be paid by CenturyLink and not by the clients.</u>

a.    Paragraph 2 of the Retainer Agreement provides a false or misleading

description of the Attorneys' Fees to be collected. For example, it states:

"If your case results in a recovery to you, then you will still not have to

pay any costs or fees out of your own pocket, but the attorneys will

collect a fee from the Company." This statement is false or misleading

because it implies that the legal fees are not being deducted from the

client's damages, but rather constitute a separate and additional payment

from CenturyLink. There is no general right to recover legal fees in

arbitration; as a result, legal fees may be be deducted from a client's

damages recovery. This is particularly true when the damages are

obtained as a result of a voluntary settlement, in which case

CenturyLink would be under no obligation to pay a separate and

additional amount for Keller Lenkner's legal fees. In fact, Keller
Lenkner specifically informed CenturyLink's counsel that ████████

████████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████[20] In my opinion, the above statement in the Retainer
Agreement was false or misleading, in violation of Illinois Rule 7.1 and
Minnesota Rule 7.1, and the Keller Lenkner lawyers' conduct in using it
was dishonest, in violation of both Illinois and Minnesota Rule 8.4(c).

b.  Paragraph 2 of the Retainer Agreement also states: "If your case
resolves before the commencement[21] of an arbitration or court case in
which you are a named party, then the attorney will collect a flat-fee of
$750 in exchange for preparing your claim for filing, making a demand
of the Company, and negotiating the resolution. You will never have to
pay these fees and costs out of your own pocket. If you win your claim,
the law requires the Company to pay you these fees and costs in
addition to the damages and penalties the Company owes you. The
attorneys will collect these fees from the Company as part of any award

---

[20] Ex. 3 at ¶ 19.

[21] With respect to the 1000 submitted claims, "commencement" has not yet occurred
because the term is defined as occurring when all arbitration fees have been paid and an
arbitrator is assigned.  See Retainer Agreement ¶ 2.

or settlement and deduct them from the recovery as their fee. You will
be entitled to retain the full recovery net of this fee." (Emphasis in
original.) These statements are false and misleading. The arbitration
demands assert varying legal claims, only some of which may provide
that a company must pay a successful claimant's legal fees. In any
event, this provision applies to resolution *prior to* the commencement of
arbitration or a court case, which could only be through a voluntary
settlement among the parties. There is no law that would require
CenturyLink, as part of a voluntary settlement agreement, to pay the
clients' legal fees in addition to the amount to be paid to the claimants,
and Keller Lenkner specifically informed CenturyLink's counsel that ██

████████████████████████████████████████████████████

████████████████.[22] In my opinion, the Keller Lenkner lawyers' use of
these false and misleading statements in the Retainer Agreement
violates both Illinois and Minnesota Rule 7.1, and such conduct was
dishonest, in violation of both Illinois and Minnesota Rule 8.4(c).

c.  Paragraph 2 of the Retainer Agreement further states: "If your case
resolves after commencement, then the attorneys will collect a lodestar
based on reasonable attorney's fee and recover their litigation costs
from the Company under any applicable fee-shifting law. Again, the

---

[22] Ex. 3 at ¶ 19.

16

attorneys will collect this fee from the Company, not from you." These statements were false and misleading. Even if legal fees and costs might be recoverable under a fee-shifting law, such a law would not apply in a voluntary settlement among the parties. There is no law that requires CenturyLink, as part of a voluntary settlement agreement to pay the clients' legal fees in addition to the amount to be paid to the clients, and Keller Lenkner specifically informed CenturyLink's counsel that ████

████████████████████████████████████████████████████

████████████ [23] In addition, the arbitration contract on which Keller Lenkner is relying provides that if the client initiates arbitration, the client is required, at a minimum, to pay one-half the arbitrator's fees up to $125.[24] Absent a voluntary agreement by CenturyLink to pay this cost, it will be deducted from any damages recovered by the client.

d. Further, Keller Lenkner lawyers used these false and misleading statements to improperly secure an unreasonable legal fee by implying that CenturyLink, and not the clients, are responsible for legal fees. Rule 1.5(a) of the Illinois Rules provides that "[a] lawyer shall not make an agreement for, charge, or collect an unreasonable fee." See also Minnesota Rules of Professional Conduct, Rule 1.5(a). In my opinion,

---

[23] Id.

[24] Id. at ¶ 11.

17

charging a $750 flat fee for all claims that are resolved before the commencement of an arbitration or court case is unreasonable. Given the terms of the Proposed Settlement in the Class Action Lawsuit, it is highly unlikely that CenturyLink would pay each of Keller Lenkner's clients an amount so far in excess of $750 that $750 would constitute a reasonable legal fee. This is particularly so given that Keller Lenkner clearly indicated that prior to filing arbitration demands, it did not and would not be spending as much as 15 minutes per client attempting to resolve the individual claims.[25] In my opinion, in charging a $750 flat fee for all pre-filing claims, the Keller Lenkner lawyers violated both Illinois and Minnesota Rule 1.5(a).

## II. KELLER LENKNER IS BREACHING ITS FIDUCIARY DUTIES TO PROSPECTIVE CLASS MEMBERS BY PURSUING HIGH-RISK MASS ARBITRATION WITH CONFLICTED REPRESENTATION

15.    In addition to misleading prospective class members to retain the firm, Keller Lenkner has breached its fiduciary duties to its clients by pursuing a mass arbitration approach without disclosing the risks of doing so, in a joint representation involving serious conflicts of interest. After obtaining minimal individual information from purported CenturyLink customers through its questionnaire,[26] which did not include such facts as the nature of the specific service at issue, the dates of service (other than the

---

[25] Id. at ¶ 9.

[26] Id. at ¶ 17.

18

last time a higher price was paid), or the CenturyLink conduct that formed the basis for each complaint, Keller Lenkner asked such customers to sign the Retainer Agreement, which authorized Keller Lenkner to pursue their claims through individual arbitration.

(¶1)  Keller Lenkner did not inform the clients of the alternatives to arbitration, including the existence of the Class Action Lawsuit and the Tentative Settlement, nor did Keller Lenkner inform the clients of the risks of the mass arbitration approach that the firm would pursue. As a result, Keller Lenkner manipulated the clients into choosing arbitration as the objective of the representation,[27] in violation of Rules 1.2 and 1.4 of both the Illinois and Minnesota Rules of Professional Conduct, as explained below. In addition, as described in Paragraph 11 above, Keller Lenkner has pursued its mass arbitration approach with tens of thousands of clients, despite the fact that there were already serious conflicts of interest among the Keller Lenkner clients at the time of retention. For the reasons set forth below, it is my opinion these conflicts were nonconsentable, and, in any event, the Keller Lenkner clients did not give their informed consent to the conflicts at the time of retention. As a result, the Keller Lenkner lawyers violated both Illinois and Minnesota Rule 1.7.

---

[27] As noted earlier, the Retainer Agreement mentioned the possibility that Keller Lenkner might (at its option) pursue some form of court proceeding; however, that was clearly not a reference to the existing Class Action Lawsuit brought by other lawyers. See n. 2, supra.

## A.   Manipulation of Clients to Pursue High-Risk Mass Arbitration Despite a Lower Risk Alternative

16.    Rule 1.2(a) of the Illinois Rules of Professional Conduct provides that "a lawyer shall abide by a client's decisions concerning the objectives of representation and, as required by Rule 1.4, shall consult with the client as to the means by which they are to be pursued." See also Minnesota Rules of Professional Conduct, Rule 1.2. Rule 1.4(b) provides that "a lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation." See also Minnesota Rules of Professional Conduct, Rule 1.4(b). Rule 1.4(a)(2) further states that the lawyer shall "reasonably consult with the client about the means by which the client's objectives are to be accomplished." See also Minnesota Rules of Professional Conduct, Rule 1.4(a)(2). The Keller Lenkner lawyer requested their clients to authorize them to seek to arbitrate their claims without providing them with *any* information about alternatives to arbitration, including waiting to see if the Tentative Settlement in the Class Action Lawsuit obtained preliminary approval, in which case the clients could decide, when notified, whether to accept the settlement (without having to pay legal fees) or to opt out of the settlement and pursue claims in individual arbitration or small claims court. The required explanation should have included not only the existence of the Class Action Lawsuit and the Tentative Settlement, but also the advantages and disadvantages of the alternative courses of action.

17.    The disadvantages of Keller Lenkner's mass arbitrations approach include the following increased risks for the clients.

a. <u>Difficulty of proving actionable misconduct by CenturyLink</u>. In order to succeed in individual arbitrations, Keller Lenkner has to prove that each client is entitled to recover damages. This would include proving actionable misconduct by CenturyLink, without the benefit of the extensive discovery obtained by Plaintiffs in the Class Action Lawsuit. That discovery material is not publicly available, and, in any event, is not focused on proving individualized claims. Plaintiffs in arbitration are not typically entitled to any discovery as a matter of right[28] and, to the extent permitted, tends to be more limited than in court litigation. If the Proposed Settlement is approved in the Class Action Lawsuit, the Plaintiffs in that action do not need to establish CenturyLink's liability in order for class members to participate in the settlement. If Keller Lenkner is unable to prove actionable misconduct by CenturyLink, then clients who have decided not to participate in any settlement of the Class Action Lawsuit will be unable to recover any alleged damages.

b. <u>Difficulty of proving each individual's right to recover</u>. Even if Keller Lenkner could convince an arbitrator that CenturyLink engaged in actionable misconduct affecting some of its customers, in order to succeed in individual arbitrations, Keller Lenkner has to prove: (1) that CenturyLink engaged in actionable misconduct with respect to each

---

[28] See, e.g., AAA Consumer Arbitration Rules, Rule R-22(a)(1).

individual client, (2) that each client suffered actual damages, and (3) that CenturyLink has no meritorious defenses (such as statute of limitations) or counterclaims (such as unpaid bills) with respect to each client. If CenturyLink prevails on any of these issues for any individual clients, then such clients who have decided not to participate in any settlement of the Class Action Lawsuit will be unable to recover any alleged damages.

c.  Risk of unfair aggregate settlement without court oversight. In MDL class actions, Rule 23 of the Federal Rules of Civil Procedure provides protections to class members, and an Article III judge has a duty to protect absent class members. With respect to any settlement in the Class Action Lawsuit, the court will determine whether the settlement is fair to class members before it awards any recovery to the lawyers. On the other hand, there is no similar protection or judicial oversight to ensure that any aggregate settlement resulting from Keller Lenkner's threatened mass arbitrations is fair and that the attorneys' fees are reasonable.

d.  Risk of material breach as a result of Keller Lenkner's refusal to comply with the arbitration contract. Keller Lenkner expressed unwillingness to spend as little as "15 minutes" to resolve each claim pre-filing.[29] Yet,

---

[29] Ex. 3 at ¶ 9.

CenturyLink's consumer contracts generally require its customers to provide Century Link the opportunity to resolve each dispute before proceeding to arbitration. [30] Thus, CenturyLink has taken the position,[31] and there is a risk a court will agree, that Keller Lenkner's repeated refusal to investigate, obtain, and supply individualized information to CenturyLink constitutes bad faith conduct that is a material breach of the clients' contracts and that results in a loss of any right to submit the claims for arbitration,[32] and as discussed below in the final section, Keller Lenkner may withdraw from its representation.[33] If this happens, then clients who have decided not to participate in any settlement of the Class Action Lawsuit could be left without legal representation and be unable to recover any damages.

---

[30] Id.

[31] See Unthank Decl. at ¶¶ 72-73.

[32] Keller Lenkner included additional information on behalf of the 1,000 clients within the claims it submitted to the AAA. However, as noted above, the arbitration contracts generally require that the clients provide CenturyLink an opportunity to resolve their claims prior to filing, and CenturyLink has maintained that Keller Lenkner's clients have materially breached their arbitration contracts through their repudiation and failure to comply with this requirement. Also, as noted earlier, Keller Lenkner has provided only minimal additional information on behalf of the 1,000 clients whose claims have been submitted for arbitration. See supra ¶11. Keller Lenkner did not provide any dates or identify specific services at issue with the alleged overcharges, information that is important to efforts by CenturyLink to identify and resolve meritorious claims. Id.

[33] See infra, ¶ 27.

e. <u>Risk of material breach as a result of Keller Lenkner's attempt to
resolve claims on an aggregated basis.</u> CenturyLink's consumer
contracts generally require its customers to agree to the use of
mandatory arbitration "on an individual basis" to resolve disputes,
rather than on a "consolidated basis."[34] Yet, Keller Lenkner has
threatened to "simultaneously" file thousands of demands for
"individual arbitrations,"[35] and has already simultaneously submitted
1,000 demands, and CenturyLink has taken the position that the manner
in which Keller Lenkner is aggregating and requiring that its clients'
claims be addressed on a class, consolidated, or mass basis constitutes a
material breach of the clients' contractual obligation to pursue their
claims on an individual basis.[36] There is therefore a risk that Keller
Lenkner's tactics will result in the loss of any right to submit these
claims for arbitration, and as discussed below in the final section, Keller
Lenkner may withdraw from its representation.[37] If this happens, then
clients who have decided not to participate in any settlement of the

---

[34] Ex. 3 at ¶ 8.

[35] See, e.g., id. at ¶ 5.

[36] See Unthank Decl. at ¶¶ 72-73.

[37] See infra, ¶ 27.

Class Action Lawsuit could be left without legal representation and

unable to recover any damages alleged basis.

f.   <u>Risk that claims could be moved to small claims court.</u> The public

filings in the Class Action Lawsuit confirm that claims by CenturyLink

customers are generally small, making them more appropriate for small

claims court.[38] CenturyLink's consumer contracts provide that either

party has the right to pursue claims in small claims court, instead of

arbitration.[39] The AAA Consumer Rules, to the extent applicable,

reinforce this right.[40] In addition, CenturyLink has informed Keller

Lenkner that it intends to pursue appropriate claims in small claims

court.[41] Thus, there is a risk that Keller Lenkner's clients will not have

the right to pursue any claims in arbitration, and as discussed below in

the final section, Keller Lenkner may withdraw from its representation

---

[38] Although Keller's 1,000 demands seek damage amounts for higher amounts, the stated damages amount in 92% of the claims is 10 - 300 times more than claimants' purported actual damages. See Unthank Decl. at ¶ 58. The Colorado statute provides for triple damages, but only "if it is established by clear and convincing evidence that [the defendant] engaged in bad faith conduct."  C.R.S.A. §6-1-113 (2)(a)(iii). Although Keller Lenkner cited the Colorado statute as one of the statutes governing all of the 1,000 claims, Keller Lenkner has not established that Colorado law applies to all these claims under the CenturyLink contract agreed to by each individual client and most of the clients are from states other than Colorado.

[39] Ex. 3 at ¶ 10.

[40] AAA Consumer Arbitration Rules, Rule R-9.

[41] Ex. 3 at ¶ 10.

and refuse to pursue any claims in small claims court. If this happens, then clients who have decided not to participate in any settlement of the Class Action Lawsuit could be left without legal representation and unable to recover any damages.

g. <u>Risk of being assessed with CenturyLink's costs.</u> If a claim is determined to be groundless or submitted in bath faith or for the purpose of harassment, then there is a risk that the claimant will be assessed CenturyLink's costs of the action.[42] Claimants whose claims are facially time-barred or who demand damages 10-300 times more than their purported actual damages[43] are especially at risk for such an assessment.

18.   For the reasons set forth above, it is my opinion that the Keller Lenkner lawyers manipulated the clients to select arbitration as the means of resolving their claims, without informing the clients of the existence of and advantages of alternative

---

[42] See, e.g., *Lochridge v. Lindsey Mgt. Co., Inc.,* 824 F.2d 780 (8th Cir. 2016) (court has discretion to award costs to prevailing defendant in F.L.S.A. case); C.R.S.A. § 6-1-113(3) (party submitting claim determined "to be groundless or in bad faith or for purpose of harassment *shall* be liable to the defendant for the costs of the action *together with reasonable attorney's fees*" (emphasis added); AAA Consumer Rules, Rule R-44(c) (arbitrator may allocate compensation, expenses and administrative fees upon a determination that claim was "filed for purposes of harassment or is patently frivolous"); AAA Consumer Rules, Costs of Arbitration, p. 33 (arbitrator compensation, expenses and administrative fees are subject to reallocation "as may be required by applicable law or upon the arbitrator's determination that a claim . . . was filed for purposes of harassment or is patently frivolous.").

[43] See supra n. 13.

objectives, including the existence of the Class Action Lawsuit and the Tentative

Settlement, in violation of Rules 1.2 and 1.4 of both the Illinois and Minnesota Rules.

**B.    Incompetent Representation of Clients with Nonconsentable Conflicts of Interests**

19.    As explained in Paragraph 13 above, it is my opinion that under Rule 1.7 of

both the Illinois and Minnesota Rules, there were serious conflicts of interest among

Keller Lenkner's tens of thousands of clients at the time of retention. Rule 1.7 provides

that a lawyer may not represent a client if there is a concurrent conflict of interest unless

the conflict is consentable and "each client gives informed consent." The general

standard of consentability is that "the lawyer reasonably believes that the lawyer will be

able to provide competent and diligent representation to each affected client" (Rule

1.7(b)(1). In my opinion, the conflicts of interest among Keller Lenkner's clients are

nonconsentable because of: (1) the unusually large number of clients (more than 22,000

to date), particularly since they may be differently situated; (2) Keller Lenkner's

insistence on treating the clients on a class, consolidated, or mass basis; and (3) the

existence of the Class Action Lawsuit, which will likely provide an alternative,

essentially cost-free remedy for many of the clients' claims.

20.    Under the standard for consentability, the Keller Lenkner lawyers cannot

reasonably believe that they can provide competent and diligent representation to their

clients with conflicting interests, and thus the Keller Lenkner lawyers' representation of

their clients is nonconsentable and improper. I am particularly concerned with Keller

Lenkner's statement in its June 19 letter, in which it refused to "engage in pre-demand

discussions on an individual basis," arguing that, "at 15 minutes per client, such a pre-demand 'dialogue' would consume more than 3,500 hours, or the equivalent of 145 round-the-clock days."[44] In making this statement, the Keller Lenkner lawyers conceded their unwillingness to spend as little as "15 minutes" on each individual client's representation, which in my opinion, constitutes a concession that they are not treating the clients as persons to whom they owe all of the duties associated with an individual lawyer-client relationship.[45] In my opinion, this approach does not provide "competent and diligent representation to each affected client."[46]

---

[44] Ex. 3 at ¶ 9.

[45] It is unclear how much time Keller Lenkner spent in preparing the 1,000 arbitration claims that it recently submitted. Those mostly generic claims provide minimal additional information with respect to each client, and do not contain important information such as the dates and the specific service at issue with the alleged overcharges or any indication as to whether the client has documentation to support the claim. In any event, Keller Lenkner has more than 21,000 additional clients.

[46] Under some circumstances, it may be permissible for a lawyer to request a client to limit the scope of a representation to group representation, rather than traditional individual representation; that is, representation in which the lawyer will represent large groups of similarly situated clients, and the lawyer will seek primarily to advance the interests of the group. However, under Rule 1.2(c) of both the Illinois and the Minnesota Rules of Professional Conduct, such a limitation is permissible only when "the limitation [on the scope of the representation] is reasonable under the circumstances and the client gives informed consent." The Keller Lenkner clients were never informed that the representation was being limited to arbitration over other existing alternatives, nor were they informed that the representation was being pursued on a group basis, where the lawyers would consider the interests of the group rather than the interests of any individual client; as a result, they never gave their informed consent to the limited representation. It is further my opinion that because of the unusually large number of differently situated clients, the high risk of mass arbitrations under the CenturyLink arbitration agreements, the seriousness of the conflicts, and the existence of the Class Action Lawsuit, such a group representation would not have been reasonable or consentable under the circumstances presented here.

21.     The inability of Keller Lenkner to provide "competent and diligent representation to each affected client" with a conflict of interest is compounded by the fact that, in addition to the more than 22,000 clients it represents with claims against CenturyLink, it is actively soliciting tens of thousands of clients with complaints against other companies, which Keller Lenkner is similarly attempting to resolve through mass arbitrations. In March 2019, Keller Lenkner informed DoorDash, Inc. that it was representing 3,000 current or former employees with arbitration claims against that company, and subsequently added 3,500 more for a total of 6,500.[47] In April, 2019, Keller Lenkner stated that it had signed up more than 17,000 persons to file arbitration demands against DraftKings, Inc. and FanDuel, Inc., and that Keller Lenkner's client base with respect to those two companies was increasing on a daily basis.[48] In addition, Keller Lenkner has claimed to represent at least 5,257 individuals in arbitrations against Postmates.[49] Thus, the total number of current clients that Keller Lenkner has claimed to represent, all of whom are pursuing "individual arbitration," appears to be at least 50,000.

22.     The risks associated with representing tens of thousands of clients with potentially different views toward settlement are aggravated with respect to the claims against CenturyLink because of the existence of the Tentative Settlement (now a Proposed Settlement) in the Class Action Lawsuit. The Proposed Settlement might be more attractive than arbitration to some but not all of Keller Lenkner's clients—

---

[47] Ex. 3 at ¶ 16.

[48] Id.

[49] Id.

especially those clients who would have difficulty proving meritorious claims or are subject to defenses or counterclaims. It is not reasonable to expect that Keller Lenkner can adequately advise its CenturyLink clients about their potential participation in any approved settlement in the Class Action Lawsuit, especially when Keller Lenkner has refused to spend "15 minutes" on each claim. As a result, it is likely that some clients will be confused and uncertain how to proceed when they receive notice of a settlement in the Class Action Lawsuit and they will not receive competent representation.

23.     For the reasons set forth above, it is my opinion that the serious conflicts among Keller Lenkner's CenturyLink clients are nonconsentable; as a result, the Keller Lenkner lawyers violated Rule 1.7 of both the Illinois and Minnesota Rules when they undertook the multiple representation of over 22,000 clients. It is further my opinion that, even if the conflicts are consentable, Keller Lenkner failed to obtain the clients' informed consent at the time of retention, as required. No consent was requested at the time of retention because, according to the false and misleading statements in the Retainer Agreement, there were no known conflicts. Moreover, any such consent would not have been informed because of Keller Lenkner's false and misleading statements and the absence of a meaningful explanation of the disadvantages and risks of the conflicted representation at the time of retention. As a result, it is my opinion the Keller Lenkner lawyers violated Rule 1.7 of both the Illinois and Minnesota Rules when they undertook the representation of these clients.

## III. KELLER LENKNER HAS PUT PROSPECTIVE CLASS MEMBERS IN AN UNTENABLE POSITION WITH THE CLASS SETTLEMENT AND GOING FORWARD

24.     Keller Lenkner's improper conduct detailed above, combined with the additional terms in the Retainer Agreement discussed below, lead me to conclude that Keller Lenkner's clients, many of whom are prospective class members, are in an untenable position with respect to the Proposed Settlement and any continued representation by Keller Lenkner.

25.     Client Termination. Paragraph 7 of the Retainer Agreement states: "You may terminate attorneys at any time by written notice….If you do so, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination."[50] Rule 1.16(a) of the Illinois Rules of Professional Conduct provides that a lawyer must withdraw from representation if "the lawyer is discharged." See also Minnesota Rules of Professional Conduct, Rule 1.16(a). That rule does not provide that the attorney is nevertheless entitled to legal fees when the client has agreed to either a contingent fee or a flat fee, as is true here. If the client agreed to a contingent fee, or a flat fee that contemplated completion of the representation, then a discharged lawyer can only recover fees (and costs) on a quantum meruit basis.

---

[50] The class action complaint in the Uber drivers' action alleges that Keller Lenkner used a similar provision in the form retention agreement it used to sign up Uber drivers for mass arbitrations. The complaint characterized this provision as "impos[ing] an outrageous, unconscionable and oppressive penalty on the driver in the event that the Uber driver (i.e., the client) desires to terminate the services of [Keller Lenkner]." Class Action Complaint (ECF No. 1), *Brown v. Keller Lenkner, LLC*, No. 1:18-cv-12423-NMG (D. Mass. Nov. 20, 2018).

Ordinarily, a quantum meruit award could not exceed the amount the lawyer would have received under the fee agreement. Paragraph 2 of the Retainer Agreement provides that the clients will not be responsible for any legal fees or reimbursement of costs *unless the client recovers damages*. As a result, under quantum meruit, Keller Lenkner may not be entitled to *any* legal fees (or reimbursement of costs) if the clients decide not to pursue their claims or if they pursue them unsuccessfully.

26.     In addition, if a client discharges Keller Lenkner because the client has learned of an approved settlement in the Class Action Lawsuit, and decides to participate in that settlement, then it is unlikely that Keller Lenkner would be entitled to any legal fee—that is, unless Keller Lenkner could establish that its conduct contributed significantly to the value of the settlement. In my opinion, the provision of the Retainer Agreement that purports to require a fee when a client discharges Keller Lenkner unfairly operates as a means of actively discouraging clients from discharging the firm, and that the statement is false and misleading in its implication that significant legal fees (and costs) will be owed whenever a client discharges Keller Lenkner, regardless of the client's reason for doing so. It is further my opinion that the Keller Lenkner lawyers' use of this false and misleading statement in the Retainer Agreement violates Rule 7.1 of both the Illinois and Minnesota Rules, and such conduct is dishonest, in violation of Rule 8.4(c) of both the Illinois and Minnesota Rules. Because the provision actively discourages and thereby burdens the clients' right to accept a settlement in the Class Action Lawsuit, it is further my opinion that the Keller Lenkner lawyers' use of this

provision violates Rule 1.2(a) of both the Illinois and Minnesota Rules, which provides that it is the client's decision whether to accept a settlement offer.

27.      _Attorney Withdrawal_. If Keller Lenkner's clients opt out of an approved class settlement, Paragraph 6 of the Retainer Agreement provides that "the attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason."[51] Rule 1.16(b) of the Illinois Rules of Professional Conduct provides that unless withdrawal can be "accomplished without material adverse effect on the interests of a client," a lawyer may not withdraw, except in certain specified situations or when "other good cause for withdrawal exists."[52] See also Minnesota Rules of Professional Conduct, Rule 1.16(b). There are numerous situations in which Keller Lenkner clients would be materially prejudiced by Keller Lenkner's withdrawal, including one where a client has opted out of an approved settlement in the Class Action Lawsuit and is unable to find another lawyer willing to represent the client in an individual arbitration. Clients also could be materially prejudiced if Keller Lenkner withdraws after the arbitration agreements are rendered unenforceable, due to its high-risk mass arbitration approach, or the claims are moved to

---

[51] The class action complaint in the Uber drivers' action alleges that Keller Lenkner used an identical provision in the form retention agreement it used to sign up Uber drivers for mass arbitrations. Id.

[52] The specified situations do not include the lawyer's belief that a potential claim is "unlikely to result in a recovery for any reason," nor does that constitute other "good cause" for withdrawal.

small claims court. It is my opinion that requiring its clients to agree that Keller Lenkner has the right to withdraw any time it concludes that some potential claims are unlikely to result in a recovery,[53] constitutes an attempt to violate Rule 1.16, in violation of Rule 8.4(a) of both the Illinois and Minnesota Rules, which provides that it is professional misconduct to "violate or attempt to violate" any of the Rules of Professional Conduct.

28.     _Power of attorney_. Paragraph 13 of the Retainer Agreement provides that "[c]onsistent with the attorney ethics rules and other requirements for powers of attorney, you grant us the power of attorney to execute all documents connected with your claims." Keller Lenkner may argue that this paragraph grants its lawyers the authority to opt the clients out of an approved class settlement, despite the fact that Paragraph 3 purportedly grants Keller Lenkner only a limited authority to accept a "full-value" settlement offer, and no authority to reject less than a "full-value" settlement offer. In my opinion, any effort by the Keller Lenkner lawyers to opt their clients out of a class settlement after misleading their clients at the time of retention and without obtaining their fully informed consent, including information concerning the advantages and disadvantages of opting out in order to pursue high risk arbitration (including advice concerning whether the

---

[53] The fact that the provision includes the phrase "consistent with their ethical responsibilities" does not, in my opinion, cure the ethical deficiencies of the provision. The only way in which withdrawal would be consistent with Rule 1.16 is if it would not materially prejudice the client, and this is unlikely to be the case. The clients could not possibly know under what circumstances it would be unethical for the lawyers to withdraw; therefore, in my opinion it was improper for the Keller Lenkner lawyers to ask clients to acknowledge the lawyers' presumptive right to withdraw if they decide that a client's claims is unlikely to succeed.

statute of limitations may have expired for individual clients), would violate Rules 1.2(a) and 1.4 of the Illinois and Minnesota Rules of Professional Conduct.[54]

Dated:  January 10, 2020

I hereby declare under the penalty of perjury that the foregoing is true and correct

/s/ *Nancy J Moore*

PROFESSOR NANCY J. MOORE

---

[54] The fact that the provision includes the phrase "consistent with their ethical responsibilities" does not, in my opinion, cure the problem. The clients could not possibly know under what circumstances it would be unethical for Keller Lenkner to invoke the power of attorney; therefore, in my opinion, it was improper for the Keller Lenkner lawyers to ask clients to acknowledge the lawyers' presumptive right to invoke such a power of attorney to execute potentially any documents Keller Lenkner deems necessary to pursue its chosen strategy.

# Exhibit 1

**NANCY J. MOORE**
Professor of Law and Nancy Barton Scholar
Boston University School of Law
nmoore@bu.edu
617-358-0501

EDUCATION:

--------Columbia Law School

    Degree:  J.D. l973
    Member of the Board of Editors, Columbia Law Review
    Harlan Fiske Stone Scholar
    Class of 1912 Prize

--------Smith College

    Degree: B.A. 1970, magna cum laude
    Major:  English Honors
    Honors: Phi Beta Kappa

EMPLOYMENT:

----------January 1, 1999 to present:

    Professor of Law and Nancy Barton Scholar
    Boston University School of Law
    765 Commonwealth Avenue
    Boston, MA 02215

    Subjects taught: Professional Responsibility, Lawyering in the 21st Century, Torts.

----------July 1, 1989 to December 31, 1998:

    Professor of Law
    Rutgers School of Law - Camden
    Fifth and Penn Streets
    Camden, New Jersey 08102

    (Asst. Prof. of Law, 1976-1980; Assoc. Prof. of Law with tenure, 1980-1989: Prof. of Law, 1989-1998; 1994-1997: Assoc. Dean for Academic Affairs)

    Subjects taught include Professional Responsibility, Law and Biomedical Ethics, Torts, Evidence, and Seminar in Professional Ethics.

----------Spring, 1987:  Visiting Lecturer
                        University of Graz
                        Graz, Austria

----------Summer, 1988: Visiting Associate Professor of Law
                        University of North Carolina at Chapel Hill
                        Chapel Hill, North Carolina

----------1974-1976: Assistant Attorney General. Commonwealth of Pennsylvania, Office of the
          Special Prosecutor. Philadelphia, PA.

----------1973-1974: Associate. Debevoise, Plimpton, Lyons & Gates (now Debevoise &
          Plimpton). New York, NY.


<u>PUBLICATIONS:</u>

---------PROFESSIONAL RESPONSIBILITY FOR BUSINESS LAWYERS (casebook under
          contract with WoltersKluwer; expected publication 2022);

--------"Forming Start-up Companies: Who's My Client?" ___Fordham L. Rev. (invitational
          symposium; expected publication 2020)

--------"Restating Intentional Torts: Problems of Process and Substance in the ALI's Third
          Restatement of Torts," 10 J. Tort Law 1515 (2017);

--------"The Future of Law as a Profession," 20 Chapman L. Rev. 255 (2017) (invitational
          symposium on future of the legal profession)

--------"Lawyering in the Regulatory State: Foreword," 84 *Fordham L. Rev.* 1811 (2016);

--------"Why is There No Clear Doctrine of Informed Consent for Lawyers?" 47 *Toledo L. Rev.*
          133 (2015);

--------"Financial Rewards for Whistleblowing Lawyers," 56 *B.C. L. Rev.* 1697 (2015);

--------"Ethical Issues in Mass Torts Plaintiffs' Representation: Beyond the Aggregate
          Settlement Rule," 81 *Fordham L. Rev.* 3233 (2013);

--------"Implications of Globalization for the Professional Status of Lawyers in the US and
          Elsewhere," 40 *Fordham Urban L. J.*  217 (2012);

---------"Who Will Regulate Class Action Lawyers?", 44 *Loy. U Chi. L. J.* 577 (2012);

----------"Regulating Conflicts of Interest in Global Law Firms: Peace in Our Time?" 80 *Fordham. L. Rev.* 2541 (2012) (co-authored with Janine Griffiths-Baker);

---------"Intent and Consent in the Tort of Battery: Confusion and Controversy," 61 *Amer. U. L. Rev.* 1585 (2012), reprinted in 63 Defense L. J. 65 (May 2014);

---------"The Complexities of Lawyer Ethics Code Drafting: The Contributions of Professor Fred Zacharias," 48 *San Diego L. Rev.* 335 (2011)

----------"The Absence of Legal Ethics in the ALI's Principles of Aggregate Litigation: A Missed Opportunity—And More," 79 *Geo. Wash. L. Rev.* 717 (2011)

----------"Is the Appearance of Impropriety an Appropriate Standard for Disciplining Judges in the Twenty-First Century?" 41 *Loy. U Chi. L. J.* 285 (2010);

----------"Mens Rea Standards in Lawyer Disciplinary Codes," 23 *Geo. J. Legal Ethics* 1 (2010);

----------"Choice of Law for Professional Responsibility Issues in Aggregate Litigation," 14 *Roger Williams L. Rev.* 73 (2009) (symposium issue);

----------"Litigators and the Public: The Evolving Role of Ethics Codes," in *Litigation Ethics: Celebrating the Canons Centennial.* L.J. Fox, S.R. Martyn, & A. S. Pollis, eds. (ABA Section of Litigation 2009);

----------"The ALI's Draft Proposal to Bypass the Aggregate Settlement Rule: Do Mass Tort Clients Need (or Want) Group Decision-making?" 57 *DePaul L. Rev.* 395 (2008);

----------"*Mr. Prinzo's Breakthrough* and the Limits of Confidentiality," 51 *St. Louis L.J.* 1059 (Summer 2007);

----------"Informed Consent in the Practice of Law," in 4 Encyclopedia of Philosophy 680 (2d ed. 2006);

----------"Regulating Law Firm Conflicts in the 21st Century: Implications of the Globalization of Legal Services and the Growth of the 'Mega Firm,'" 18 *Georgetown J. Legal Ethics* 521 (2005);

----------"Who Should Regulate Class Action Lawyers?" 2003 *U. of Illinois Law Review* 1477;

----------Regulating Self-Referrals and Other Physician Conflicts of Interest," 15 *Ethics Forum* 134 (2003);

----------"'In the Interests of Justice': Balancing Client Loyalty and the Public Good in the Twenty-First Century," 70 *Fordham Law Review* 1775 (2002);

----------"Lawyer Ethics Code Drafting in the Twenty-First Century," 30 *Hofstra Law Review* 923 (2002)

----------"Foreward: Lawyering for the Middle Class," 70 *Fordham Law Review* 623 (2001);

----------"What Doctors Can Learn From Lawyers About Conflicts of Interest," 81 *BU Law Review* 445 (April 2001);

----------"Ethics Matters, Too: The Significance of Professional Regulation of Attorney Fees and Costs in Mass Tort Litigation—A Response to Judith Resnik," 148 *University of Pennsylvania Law Review* 2209 (2000);

----------"The Ethical Role and Responsibilities of a Lawyer-Ethicist: The Case of the Independent Counsel's Independent Counsel," 68 *Fordham Law Review* 771 (1999) (symposium: ethics issues raised by Independent Counsel investigation of Pres. Clinton);

--------"The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits," 41 *South Texas Law Review* 149 (1999) (symposium on emerging professional responsibility issues in litigation);

---------"Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding Role of the Attorney-Employee," 39 *South Texas Law Review* 497 (1998);

---------"The Ethical Dilemmas of Insurance Defense Lawyers: Are Special Solutions Required?" 4 *Connecticut Insurance Law Journal* 259(1997);

----------"Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm," 16 *Texas Review of Litigation* 586 (1997);

----------"Restating the Law of Lawyer Conflicts" 10 *Georgetown J. Legal Ethics* 541 (1997);

----------"Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics," 28 *Rutgers L.J* 57 (1996);

---------"Conflicts of Interests in Representing Children," 64 *Fordham L. Rev.* 1819 (1996);

----------"Entrepreneurial Doctors and Lawyers: Regulating Business Activities in the Medical and Legal Professions, in R. Spece and R. Shimm, eds., *Conflicts of Interest in Medical Practice* (1995, Oxford University Press);

----------"Expanding Duties of Attorneys to 'Non-Clients': Reconceptualizing the Attorney-Client Relationship in Entity Representation and Other Inherently Ambiguous Situations," 45

*S. Carolina L. Rev.* 659 (1994)

---------"Intra-Professional Warfare Between Prosecutors and Defense Attorneys: A Plea For an End to the Current Hostilities," 53 *U. Pitt. L.Rev.* 515 (1992)

---------"Professionalism: Rekindled, Reconsidered or Reformulated?" 19 *Cap. U.L. Rev.* 1121 (1990)

---------"The Usefulness of Ethical Codes," 1989 *Ann. Surv. Amer. Law* 7

---------"`Two Steps Forward, One Step Back:' An Analysis of New Jersey's Latest `Right-To-Die' Decisions," 19 *Rutgers Law Journal* 955 (1988);

---------"Professionalism Reconsidered," 1987 *ABF Res. J* 773;

---------"Commentary," 4 *Bus. & Prof. Ethics J.* 83 (1985) (essay reviewing article by Professor David Luban on equality of access to legal services);

---------"Limits to Attorney-Client Confidentiality:  A Philosophically Informed' and Comparative Approach to Medical and Legal Ethics" 36 *Case Western Res. L. Rev.* 177 (1985-86);

---------"Conflicts of Interest in the Simultaneous Representation of Multiple Clients:  A Proposed Solution to the Current Confusion and Controversy," 61 *Tex. L. Rev.* 211 (1982);

---------"Disqualification of an Attorney Representing Multiple Witnesses Before a Grand Jury: Legal Ethics and the Stonewall Defense," 27 *UCLA Law Rev.* 1 (1979);

---------"Implications of the *Younger* Cases for the Availability of Federal Equitable Relief When No State Prosecution is Pending," 72 *Colum. L. Rev.* 874 (1972) (student note).

PRACTICE PUBLICATIONS:

---------"Ethical Issues in Transnational Legal Practice: the U.S. Lawyer Goes Abroad," 76 Bar Examiner 29(2007);

---------"Not Quite a Client," 90 ABAJ 50 (Jan. 2004);

---------"Sex with a Client: Adopt the ABA's Specific Prohibition," 19 GPSolo 37 (2002);

---------"Lawyer Ethics in a State of Flux: Revisions, Not Revolution," 88 ABAJ 48 (2002);

---------"Ethics Code Rework: Written Communications," 87 ABAJ 62 (2001);

5

----------ALI-ABA Committee on Continuing Professional Education, *A Practical Guide to Achieving Excellence in the Practice of Law* (1992)(Chief Reporter);

----------"Professional Liability of Lawyer to Clients and Non-Clients under United States Common Law," in Jonge Balie Congress 1991, *Bereopsaansprakelijkheid: Recht op een scheve schaats* 139 (W.E.J. Tjeenk Willink Azwolle 1991)(prepared for conference of Young Dutch Lawyers Organization in Noordwijk, The Netherlands).

FELLOWSHIPS AND GRANTS:

----------1988-1990: Director, N.J. Department of Higher Education Humanities Grant, "Introducing Ethics into the Core Curriculum of Undergraduate Legal Education";

----------1987-1990: Participant, N.J. Department of Higher Education Technological Grant, "AIDS:A Course in Science, Technology and Society" (one of three participants planning and team-teaching a required interdisciplinary undergraduate course);

----------1985-1986: Co-Director, N.J. Department of Higher Education Humanities Grant, "Humanistic Concerns in Legal and Medical Education" (introduction of law and medical ethics courses in law and medical schools; development of humanistic perspectives);

----------1983-1984: Fellow, Center for the Study of Values, University of Delaware.

PRESENTATION OF SCHOLARLY PAPERS:

-----------Oct. 2014: "Financial Rewards for Whistleblowing Lawyers." Legal Ethics Scholars' Roundtable. New York, NY.

-----------Oct. 2014: "Financial Rewards for Whistleblowing Lawyers." BU Faculty Workshop Series. Boston, NA.

----------Nov. 2012: "Ethical Issues in Mass Torts Plaintiffs' Representation: Beyond the Aggregate Settlement Rule." Fordham Law School Conference on Group Representation. New York, NY.

----------Apr. 2012: "Implications of Globalization for the Professional status of Lawyers in the United States and Elsewhere." Fordham Law School Conference on The Law: Business or Profession? The Continuing Relevance of Julius Henry Cohen for the Practice of Law in the Twenty-First Century." New York, NY.

----------Apr. 2012: "Who Will Regulate Class Action Lawyers?" The Future of Class Actions and its Alternatives. Loyola University Chicago Law Journal Conference, Chicago, IL.

----------Oct. 2011: "Regulating Global Law Firm Conflicts: Peace in Our Time." Fordham Law School Conference on Globalization and the Legal Profession. New York.

----------Oct. 2011: "Intent and Consent in the Law of Battery: Confusion and Controversy." BU Law Faculty Workshop. Boston, MA.

----------Mar. 2010: "The Absence of Legal Ethics in the ALI's Principles of the Law of Aggregate Litigation: A Missed Opportunity---and More." George Washington Law Review Symposium on Aggregate Ligation: Critical Perspectives. Wash. D.C.

---------May 2009: "Mens Rea Standards in Lawyer Disciplinary Codes." 36th ABA National Conference on Professional Responsibility. Chicago, IL.

---------Apr. 2009: "The Appearance of Impropriety: Is It an Appropriate Standard for Discipline of Judges in the Twenty-First Century?" The Judiciary in the Twenty-First Century. Loyola University Chicago Law Journal Conference. Chicago, IL.

---------Feb. 2009: "Mens Rea Standards in Lawyer Disciplinary Codes." Joint Program of Association of Professional Responsibility Lawyers and National Organization of Bar Counsel. ABA Midyear Meeting. Boston, MA.

---------Apr. 2007: "The ALI Draft Proposal to Bypass the Aggregate Rule." Clifford Symposium on Challenges to the Attorney/Client Relationship." DePaul University College of Law. Chicago, IL.

---------Apr. 2002: "Who Should Regulate Class Action Lawyers?" Symposium on Ethics 2000 and Beyond: Reform or Professional Responsibility as Usual? Univ. of Illinois, Champaign, IL.

---------Feb. 2002: "Who Should Regulate Class Action Lawyers?" Faculty Workshop, Rutgers School of Law, Camden, NJ.

---------Feb. 2001: "Conflicts of Interest in Patent Representation." Patenting Genomics and Proteomics. American Conference Institute. New York, NY.

---------Nov. 1999: "Ethics Matters, Too: A Response to Judith Resnik." Mass Torts: A Symposium sponsored by the David Berger Program on Complex Litigation and the University of Pennsylvania Law School in conjunction with the Advisory Committee of Civil Rules of the Judicial Conference of the United States. Philadelphia, PA.

---------Mar. 1999: "The Case Against Changing the Aggregate Settlement Rule in Mass Tort Lawsuits." Symposium on Emerging Professional Responsibility Issues in Litigation sponsored by South Texas Law Review. Houston, Texas.

---------Sept. 1997: "Conflicts of Interest For In-House Counsel: Emerging Issues in the Expanding

7

Role of the Attorney-Employee." Annual Ethics Symposium sponsored by the South Texas Law Review. Houston, Texas.

---------Feb. 1997: "Restating the Law of Lawyer Conflicts." Symposium on the Restatement of the Law Governing Lawyers sponsored by the Georgetown Journal of Legal Ethics. Georgetown University Law Center. Washington, D.C.

---------Feb. 1997: "Ethical Issues in Third Party Payment: Beyond the Insurance Defense Paradigm." Conflicts of Interest Symposium sponsored by University of Texas Review of Litigation and Texas Center for Ethics and Professionalism. Austin, Texas.

---------Jan. 1997: "The Ethical Dilemmas of Insurance Defense Lawyers: Are Special Solutions Required?" Joint Session of AALS Sections on Insurance Law and Professional Responsibility. AALS Annual Meeting. Washington, D.C.

---------May 1996: "Implications of *Circle Chevrolet* for Attorney Malpractice and Attorney Ethics." Conference on the Entire Controversy Doctrine. Rutgers Law School. Camden, N.J.

---------Sept. 1992: "Elaborating Standards of Professional Conduct." Strategic Planning Session of the Law Society of Upper Ontario. Toronto, Ontario, Canada.

---------Feb., 1990: "Professionalism: Rekindled, Reconsidered or Reformulated?" Symposium on Legal Ethics. Capital University Law Center. Columbus, Ohio.

---------Sept. 1989: "The Usefulness of Ethical Codes." University of Texas Law School Faculty Seminar. Austin, Texas.

--------April, 1989: "The Usefulness of Ethical Codes." Symposium on "Legal Ethics: The Social Responsibility of the Lawyer." NYU Annual Survey of American Law. NYU School of Law. New York, New York.

----------Oct. 1987: "The History and Present Status of the Right of a Competent Patient to Refuse Life-Sustaining Medical Treatment." Annual General Meeting of the American Society of Law and Medicine. Boston, Mass.

---------April, 1984: "Limits to Attorney-Client Confidentiality: A `Philosophically Informed' and Comparative Approach to Medical and Legal Ethics." Faculty Seminar. Center for the Study of Values. University of Delaware. Newark, Delaware.

PROFESSIONAL RECOGNITION AND ACTIVITIES:

---------Member, Multistate Professional Responsibility Examination Drafting Committee (member since 1991, chair 1995-2018);

----------Member, Warren G. Burger Prize Committee, American Inns of Court (since 2004);

---------Member, ABA Center for Professional Responsibility, Organizing Committee for CPR National Conference on Professional Responsibility (2012-2018);

---------Member, ABA Center for Professional Responsibility Strategic Planning Task Force (2017-2018)

---------Member, Advisers for the ALI, Restatement Third, Torts: Intentional Torts to Persons (2013-current);

---------Member, Ma. Sup. Jud. Ct. Committee on Review of the Code of Judicial Conduct (2012-2015);

---------Advisor to ALI-ABA Board of Directors Program Committee for Professional Responsibility (2006-2008) (2010-2011);

---------Member, ABA Center for Professional Responsibility Policy Implementation Committee (2002-2010);

---------Member, ALI Principles of Aggregate Litigation Members Consultative Group (2005-2009);

---------Member, Supreme Court of Rhode Island Committee to Review Rules of Professional Conduct (2002-2006);

----------Chief Reporter, ABA Commission on Evaluation of the Rules of Professional Conduct ("Ethics 2000") (Co-Reporter, 1997-1998; Chief Reporter, 1998-Aug. 2002);

----------Member, Advisers for the Restatement of the Law, Third, The Law Governing Lawyers (1989-2000); member, American Law Institute (elected 1992);

----------Chair, AALS Section on Professional Responsibility (1997-1998)(1987-1988);

----------Chair, Planning Committee for Fall 1998 AALS Workshop on Professional Responsibility;

----------Member, New Jersey Supreme Court Committee on Women in the Courts (1994-1998);

---------Reporter, ALI-ABA Practice Evaluation Project (1988-91)(drafted *How to Achieve Excellence in the Practice of Law*);

---------Member, ALI-ABA group reviewing standards for continuing legal education programs (1988-90);

---------Member, Planning Committee for Spring 1988 AALS- sponsored Workshop on Teaching of



Professional Responsibility (1987-88);

----------Trustee, N.J. Citizen's Committee on Biomedical Ethics (1988-1991);

---------Member, Institutional Review Board/Committee for the Protection of Human Subjects, UMDNJ-School of Osteopathic Medicine (1987-89)

----------Lectures and Panel Discussions:

June 2018: "Mass actions" mean mass problems: How the ethics rules restrict lawyers handling multi-plaintiff claims." Organizer and moderator. CPR National Conference on Professional Responsibility. Louisville, KY.

June 2017: "Can a Lawyer Be 'Independent' in Investigating a Client's Misconduct?" Organizer and presenter. CPR National Conference on Professional Responsibility, Scholars' Roundtable. Organizer and presenter. St. Louis, MO.

June 2017: "A Difference of Opinion: Federal-State Conflict on Lawyer Ethics Matters." Co-organizer and panelist. CPR National Conference on Professional Responsibility. St. Louis, MO.

Mar. 2017: "Ethics Panel." Panelist. PLI 22nd Annual Consumer Financial Services Institute. New York, NY

July 2016: "International Perspectives on the Business/Profession Dichotomy." Panelist. International Legal Ethics Conference VII. New York, NY.

June 2016: "Whistleblower Bounties: Is It Ethical for Lawyers to Seek Them?" CPR National Conference on Professional Responsibility. Philadelphia, PA.

May 2015: "Riding the Aggregate Settlement Bronco." Panel Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. Denver, CO.

May 2015. Scholarship Roundtable. Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. Denver, CO.

May 2013. "Ethical Issues for Lawyer Whistleblowers." Panel Organizer and Moderator. CPR National Conference of Professional Responsibility Lawyers. San Antonio, TX.

Apr. 2013. Response to Paper Presented by Prof. Ron Rotunda. Hofstra Law School Conference on the Ethical Infrastructure and Culture of Law Firms. Hempstead, NY.

Oct. 2012: "Corporate Lawyers as Whistleblowers." Co-presenter. LegalEd Center Webcast.

Feb. 2012: "Recent Developments in Aggregate Litigation." Panelist. Association of Professional Responsibility Lawyers Annual Meeting. New Orleans, LA.

Oct. 2011: "Legal Ethics in Pro Bono Practice." Panelist. Association of Pro Bono Counsel Annual Meeting. Boston, MA.

Dec. 2010: "The Future of Lawyers and Law Firms: An Ethics Perspective." Panelist. Second Annual FBA Hawaii Conference. Honolulu, HA

July 2010: "Ethics in U.S. Class Actions." Panelist. Stanford International Legal Ethics Conference. Palo Alto, CA.

April 2010: "The Future of Legal Ethics." Panelist. APRL's 20th Anniversary Celebration Conference. New Orleans, LA.

Aug. 2009: "The Ethics of Expert Witnesses: The Simon-Green Debate." Association of Professional Responsibility Lawyers. Chicago.

Apr. 2009: "Ethical Rules Applicable to Lawyers Representing Museums and Other Non-Profit Entities." Panel participant. Legal Issues in Museum Administration. Boston, MA.

Feb. 2009: "Strict Liability vs. Scienter---Filling the Mental-State Gaps in the Model Rules. Presenter and panel participant. Joint Program of Association of Professional Responsibility Lawyers/National Organization of Bar Counsel. Boston, MA.

Oct. 2008: "Developments in Ethics in Transactional Practice." ALI-ABA Program on Investment Management Basics." Boston, MA.

Apr. 2008: "Litigators and the Public." Panel participant. ABA Section on Litigation's Celebrating the Canons Centennial. Washington, D.C.

Feb. 2008: "Making the Call on Material Limitation Conflicts." Panel participant. Midyear Meeting of Association of Professional Responsibility Lawyers. Pasadena, CA.

June 2007: "Joint Representation and Aggregate Settlements." Panel participant. Annual Meeting of Association of Professional Responsibility Lawyers. San Francisco, CA.

June 2006: "Ethics in Transnational Legal Practice." Panel participant. 32nd National

Conference on Professional Responsibility. Vancouver, Canada.

Oct. 2005: "Impact Litigation: Ethical Issues in Representing Workers in Class, Collective & Multiple Plaintiff Action." Panel participant. Conference of National Employment Lawyers Association. Boston, MA.

June 2005: "Contract Lawyering Risks." Panel participant. ABA Counsel Connect teleconference.

April 2005: "Contract Lawyering." Panel participant. Spring 2005 ABA National Legal Malpractice Conference." Boston, MA.

Sept. 2004: "Ethics and Media Relations." Speaker, Association of Defense Trial Attorneys, New England Regional Conference. Framingham, MA.

Aug. 2004: "Attorney-Client Privilege and Work Product in the Post-Enron Era: Confidentiality Under Siege." Panel Participant, ABA Annual Meeting. Atlanta, GA.

Jun. 2004: "What is Fraud and Why Does it Matter?" Moderator, Panel Discussion. 30th National Conference on Professional Responsibility. Naples, FL.

Apr. 2004: "Lawyers Caught in the Enron Spotlight." Panel Participant. ABA Section of Business Law. Seattle, WA

Jan. 2004: "Ethics and Class Action Reform." Panel Participant. AALS Annual Meeting, Section on Professional Responsibility. Atlanta, GA.

Jan. 2003: "Hot Topics in Legal Ethics." Mid-year meeting of Conference of Chief Justice. Williamsburg, VA.

Jun. 2002: "General Counsel and the Model Rules of Professional Conduct: When Ethical Issues Are Up-Close and Personal." Panelist. Nat'l Assoc. Of College and University Attorneys 42nd Annual Conference. Boston, MA.

May, 2002: "Ethics 2000: What Have They Done and Where Do We Go From Here?" Moderator, Panel Discussion. 28th Nat'l Conference on Professional Responsibility. Vancouver, British Columbia, Canada.

Apr. 2002: "The Assault on the Citadel of Privilege." Primary speaker. St. Thomas More Society of Rhode Island Fourth Annual Spring Seminar. Providence, RI.

Oct. 2001: "New Influences on Professional Responsibility." Principal speaker. 11th Annual Dan K. Moore Program in Ethics. Chapel Hill, NC.

June 2001: "Lawyers' Duties to Non-clients." Rhode Island Bar Association Annual Meeting. Providence, RI.

May 2001: "Changing the ABA Model Rules on Ethics: An Update." Moderator, ABA Teleconference program.

May 2001: "An Ethics 2000 Town Hall." Moderator, Panel Discussion. Annual meeting of Professional Responsibility Lawyers. Miami, FL.

May 2001: "Multijurisdictional Practice." Conference on "Stewardship of Bar Admissions: Maintaining Integrity in a Changing World sponsored by the National Conference of Bar Examiners. Madison, WI.

April 2001: "The Impact of Ethics 2000 and Restatement on Finance Practice." Co-presenter, Spring meeting of American College of Investment Counsel. Chicago, IL.

Feb. 2001: "Conflicts of Interest in Patent Representation." Conference on Patenting Genomics sponsored by the American Conference Institute.

July 2000: "Ethics 2000." Presentation and Panel Discussion. Annual Meeting of Conference of Chief Justices of State Supreme Courts. Rapid City, So. Dakota.

June 2000: "Ethics 2000." Moderator, Panel Discussion. ABA National Conference of Professional Responsibility Lawyers. New Orleans, LA.

Aug. 1999: "Lawyers Investing In and Doing Business With Their Clients." Panel discussion. ABA Section of Litigation. ABA Annual Meeting. Atlanta, Georgia.

March 1997: "Ethics Issues in Third Party Payment." Faculty Colloquium. Roger Williams University School of Law. Briston, RI.

Sept. 1996: "Is the Restatement Necessary?" Annual Meeting of Colorado Bar Association. Vail, CO.

April 1995: "Implications for Legal Malpractice of the ALI's Restatement of the Law Governing Lawyers." ABA Section on Professional Liability. Phoenix, Arizona.

Aug. 1993: "Professionalism and Law Firm Culture." American Bar Association Annual Meeting. New York, NY.

Sept. 1992: "Quality Assurance and the Practice Evaluation Project." State Bar of New Mexico Annual Convention. Ruidoso, New Mexico.

April 1992: "The ALI-ABA Practice Evaluation Project." Annual Conference of

ABA Standing Committee on Lawyers' Liability. New Orleans.

November 1991: "Professional Liability of Lawyers to Clients and Non-Clients under United States Common Law." Conference of Young Dutch Lawyers' Organization. Noordwijk, The Netherlands.

Apr. 1991: "Legal and Ethical Aspects of Informed Consent." Rutgers-Camden anthropology class in Death and Dying. Camden, N.J. (Lecture also given in same class and in a graduate anthropology seminars in 1987-89 and in 1990.)

Feb. 1990: "Topics in Medical Malpractice." Course for fourth year medical students at UMDNJ-Rutgers-Camden. Camden, N.J. (Similar lectures also given in the winter terms of 1986-89).

Jan. 1990: "The Law of Informed Consent." Course in law and medicine. Pennsylvania College of Podiatric Medicine. (Similar lecture given in 1989.)

Dec. 1988: "Termination of Life-Sustaining Medical Treatment." Special law and medicine course for third-year medical students at UMDNJ-School of Osteopathic Medicine. Stratford, N.J.

Jan. 1988: "Professionalism: Rekindle or Reconsider?". Annual meeting of AALS Section on Professional Responsibility. Miami Beach, Fla. (Prepared and moderated panel discussion).

# Exhibit 2

## Index of Documents

|  | Date or Date Filed | Description |
|---|---|---|
| 1 | 2/15/2018 | Consolidated Class Action Complaint (ECF 38), *In re: CenturyLink Sales Practices and Securities Litigation*, D. Minn., Case No. 17-md-02795. |
| 2 | 9/1/2018 | Consumer Arbitration Rules for American Arbitration Association |
| 3 | 11/20/2018 | Class Action Complaint in Brown v. Keller Lenkner (ECF 1), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 4 | 4/25/2019 | Correspondence from Mr. A. Keller to Mr. C. Genetski (ECF 394-2), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 5 | 4/25/2019 | Demand for Arbitration to FanDuel, Inc. (ECF 394-3), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
| 6 | 4/25/2019 | Correspondence from Mr. A. Keller to Mr. R. Stanton Dodge (ECF 394-5), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
| 7 | 4/25/2019 | Demand for Arbitration to DraftKings (ECF 394-6), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 8 | 5/14/2019 | Correspondence from Mr. A. Keller to CenturyLink re Arbitration Demands |
| 9 | 5/31/2019 | Correspondence from Mr. A. Keller to CenturyLink re Arbitration Demands with Demand for Arbitration |
| 10 | 6/3/2019 | Motion to Compel Arbitration (ECF 4), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 11 | 6/7/2019 | Minute Order for Proceedings Held (ECF 407), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 12 | 6/12/2019 | Correspondence from Mr. D. Lobel to Mr. A. Keller re CenturyLink |
| 13 | 6/14/2019 | Transcript of Proceedings held on June 7, 2019 (ECF 412-4), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |

| 14 | 6/17/2019 | Respondent Postmates Inc.'s Opposition to Petitioners' Motion to Compel Arbitration (ECF 112), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
|----|-----------|---|
| 15 | 6/19/2019 | Correspondence from Mr. A. Keller to Mr. D. Lobel re Claims Against CenturyLink |
| 16 | 6/24/2019 | Reply in Support of Motion to Compel Arbitration (ECF 202), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 17 | 6/27/2019 | Respondent Postmates Inc.'s Notice of Motion and Cross-Motion to Compel Arbitration and Stay Proceedings; Memorandum of Points and Authorities (ECF 228), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 18 | 7/10/2019 | Correspondence from Mr. M. Williams to Mr. A. Keller re Mass Arbitration Demand |
| 19 | 7/11/2019 | Opposition to Cross-Motion to Compel Arbitration (ECF 237), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
| 20 | 7/18/2019 | Reply in Support of Respondent Postmates Inc.'s Cross-Motion to Compel Arbitration and Stay Proceedings (ECF 238), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
| 21 | 7/22/2019 | Correspondence from Mr. D. Lobel to The Honorable M. Davis (ECF 418), *In re: CenturyLink Sales Practices and Securities Litigation*, D. Minn., Case No. 17-md-02795 |
| 22 | 8/29/2019 | KL Revisions of CenturyLink Draft of Agreement to Evaluate Claims for Potential Presuit Resolution |
| 23 | 9/5/2019 | Correspondence from Mr. D. Lobel to The Honorable M. Davis (ECF 454), *In re: CenturyLink Sales Practices and Securities Litigation,* D. of Minn., Case No. 17-md-02795 |
| 24 | 9/6/2019 | Email from Mr. W. Postman to Mr. M. Williams re Draft of Proposed Agreement to Evaluate Claims for Potential Pre-suit Resolution |
| 25 | 9/10/2019 | Docket as of September 10, 2019, *Abadilla et al v. Uber Technologies, Inc.,* N.D. Cal. Case No. 3:18-cv-07343-EMC |
| 26 | 9/24/2019 | Correspondence from Mr. M. Williams to W. Postman re Mass Arbitration Demand |
| 27 | 9/24/2019 | Email from W. Postman to Mr. M. Williams re Draft of Proposed Agreement to Evaluate Claims for Potential Pre-suit Resolution |

| 28 | 9/24/2019 | Demand for Arbitration to CenturyLink |
|----|-----------|---------------------------------------|
| 29 | 9/24/2019 | Exhibit A to Demand for Arbitration to CenturyLink (Client List) |
| 30 | 9/24/2019 | Exhibit B to Demand for Arbitration to CenturyLink (List of Subsidiaries) |
| 31 | 9/24/2019 | Exhibit C to Demand for Arbitration to CenturyLink (High-Speed Internet Subscriber Agreement) |
| 32 | 10/4/2019 | Correspondence from Mr. D. Lobel to The Honorable M. Davis (ECF 461), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 33 | 10/8/2019 | Email from Mr. M. Williams to Mr. A. Keller |
| 34 | 10/16/2019 | Plaintiffs' Motion for Preliminary Approval of Settlement and Provisional Class Certification (ECF 466), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 35 | 10/16/2019 | Notice of Hearing on Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 467), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 36 | 10/16/2019 | Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 468), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 37 | 10/16/2019 | Declaration of Brian C. Gudmundson in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 469), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 38 | 10/16/2019 | Declaration of Layn R. Phillips (ECF 470), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 39 | 10/16/2019 | Declaration of Shannon R. Wheatmen, Ph.D, on Adequacy of Notices and Proposed Notice Program (ECF 471), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 40 | 10/16/2019 | Declaration of Tiffany A. Janowicz in Support of Motion for Preliminary Approval of Class Action Settlement (ECF 472), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |

| 41 | 10/16/2019 | Local Rule 7.1 Meet and Confer Statement Regarding Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 473), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 42 | 10/16/2019 | [Proposed] Preliminary Approval Order (ECF 474), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 43 | 10/21/2019 | Correspondence from Mr. J. Sommer to Judge O'Toole (ECF 399), *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677 |
| 44 | 10/21/2019 | Memorandum of Points and Authorities in Support of Proposed Intervenors and Objectors' Ex Parte Application to Intervene, *Jamal Adams, et al. v. Postmates, Inc.,* N.D. Cal., Case No. 3:19-cv-03042 |
| 45 | 10/22/2019 | Order Granting in Part and Denying in Part Petitioners' Motion to Compel Arbitration and Respondent's Cross-Motion to Compel Arbitration and Stay Proceedings (ECF 253), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677 |
| 46 | 11/5/2019 | Uber Technologies, Inc., Issuer Free Writing Prospectus |
| 47 | 11/6/2019 | Proposed Intervenors and Objectors' Opposition to Motion for Preliminary Approval of Class Action Settlement, *Jamal Adams, et al. v. Postmates, Inc.,* N.D. Cal., Case No. 3:19-cv-03042 |
| 48 | 11/7/2019 | Defendant and Intervenors' Response to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 481), *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |
| 49 | 11/21/2019 | Various of the 1000 Arbitration Demands against CenturyLink submitted by Keller Lenkner |
| 50 | 11/26/2019 | Order RE Motions to Intervene, *Jamal Adams, et al. v. Postmates, Inc.,* N.D. Cal., Case No. 3:19-cv-03042 |
| 51 | 11/26/2019 | Order RE Motion for Preliminary Approval of Class Settlement, *Jamal Adams, et al. v. Postmates, Inc.,* N.D. Cal., Case No. 3:19-cv-03042 |
| 52 | Ongoing | Webpage – Reclaim the Money CenturyLink Overbilled You |
| 53 | Ongoing | Online Materials - Ad – Sign Up for a Claim |

| 54 | Ongoing | Online Materials - Ad – Terms & Conditions for Troxel Law, LLP |
|----|---------|----------------------------------------------------------------|
| 55 | Ongoing | Online Materials - Thank you for submitting a claim |
| 56 | Ongoing | Questionnaire and Representation Agreement |
| 57 | Various dates | Customer complaints re: solicitations. |
| 58 | Filed herewith | Defendant's and Intervenors' Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval and Request for Temporary Injunction to Stay Parallel Arbitrations, along with all associated exhibits and attachments, *In re: CenturyLink Sales Practices and Securities Litigation,* D. Minn., Case No. 17-md-02795 |

# Exhibit 3

**Facts Forming the Basis of Expert Opinion of Professor Nancy J. Moore**

1.  In the summer of 2017 multiple consumer class actions were filed against CenturyLink, Inc. and various of its subsidiary operating companies ("CenturyLink"), resulting in the formation of an MDL before this Court on October 10, 2017.[1] Plaintiffs contend that CenturyLink overbilled customers for its services, including by: (1) promising a discount or promotion that was never applied, (2) charging more for services than it advertised or otherwise promised, (3) charging for services it did not provide, (4) charging for services customers did not request, (5) charging undisclosed or higher-than-agreed upon fees, (6) charging improper termination fees, and (7) putting customers into collections as a result of unpaid overcharges.[2]

2.  CenturyLink filed a motion to compel arbitration and enforce class-action waivers and a motion to dismiss.[3] Following extensive discovery and briefing on these initial motions, the parties agreed to mediate.[4] They met on May 20, 2019, and on May 24, 2019 they agreed to the terms of a potential class settlement, signing an initial term sheet.[5] Acceptance of the terms of the agreement was contingent upon confirmatory discovery that would test CenturyLink's representations and warranties given during the mediation process and the signing of a final settlement agreement.[6] On June 7, 2019 and through the date of settlement, the parties provided status reports to the Court regarding the successful mediation and discussed the details of the executed term sheet ("the Tentative Settlement").[7]

---

[1] Consolidated Class Action Complaint (ECF No. 38), *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM, pp. 1-106; Plaintiffs' Memorandum of Law in Support in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 468), *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM (hereinafter "Mot. for Prelim. Approval"), p. 1.

[2] Mot. for Prelim. Approval at pp. 1-2.

[3] *Id.* at p. 2.

[4] *Id.* at p. 9.

[5] *Id.* at p. 10; Transcript of Proceedings (ECF 412-4), June 7, 2019, *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM (hereinafter "June 7 Transcript"), p. 8.

[6] Mot. for Prelim. Approval at p. 10; June 7 Transcript at p. 8.

[7] June 7 Transcript at p. 8; Letter from Mr. D. Lobel to The Honorable M. Davis (ECF 418), July 22, 2019, *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM, p. 1; Letter from Mr. D. Lobel to the Honorable M. Davis (ECF 454), September 5, 2019, *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM, p. 1; Letter from Mr. D. Lobel to the Honorable M. Davis

After Plaintiffs pursued extensive confirmatory discovery of CenturyLink, focused largely on the scope of class damages, a final settlement agreement ("the Proposed Settlement") was signed on October 15, 2019, and submitted to this Court for preliminary approval on October 16, 2019.[8]

3. CenturyLink counsel have informed me that Ashely Keller and Warren Postman, both partners in Keller Lenkner, confirmed in various telephone conversations during the summer of 2019 that they were aware of the Class Action Lawsuit and the Tentative Settlement.

4. The Proposed Settlement is designed to provide monetary and non-monetary relief to current and former CenturyLink customers who, from January 1, 2014 though the date of preliminary approval, allegedly overpaid CenturyLink in a variety of ways.[9] It provides for $18 million in Settlement funds, $15.5 million of which will, in part, be used to pay settlement class members who submit either: (1) a Flat Payment Claim that provides a set payment of $30, adjusted by a Pro Rata Multiplier (depending on the total amount of claims to be paid), which needs no separate supporting documentation beyond completing a sworn claim form; or (2) a Supported Document Claim, which allows claimants to pursue the full amount of their overpayment for up to 6 months multiplied by both a Litigation Risk factor of 40% and the Pro Rata Multiplier by describing and demonstrating their overpayment through supporting evidence.[10] The Flat Fee Payment was derived by applying the 40% Litigation Risk Factor to the value of $68, which Plaintiffs confirmed was the average amount CenturyLink reimbursed to remedy escalated and unresolved complaints during the class period.[11]

5. On May 14, 2019, Keller Lenkner notified CenturyLink that more than 9,000 persons had retained it to pursue claims against Century Link for consumer fraud and that Keller Lenkner was prepared to file simultaneous demands for arbitration

---

(ECF 461), October 4, 2019, *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM, p. 1.

[8] Mot. for Prelim. Approval at pp. 2-3, 10, 44; Settlement Agreement and Release (ECF 469-1), *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM.

[9] Mot. for Prelim. Approval.at p. 3.

[10] *Id.*

[11] *Id.* at pp. 23, 25-26.

on behalf of each client with the American Arbitration Association ("AAA").[12] It enclosed a list of clients, which included names, addresses and telephone numbers, but did not provide any information concerning the individual claims of each client, such as the relevant time frame, the services ordered, the alleged conduct giving rise to the claims, the amount claimed, or the client's customer account number with CenturyLink. Despite failing to provide such information, Keller Lenkner claimed that the letter, as well as an enclosed sample arbitration demand, constituted pre-filing notice of the claims as required by their clients' arbitration agreements. The sample arbitration demand consisted of a single document, which essentially tracked many of the factual allegations and legal claims made in the Class Action Lawsuit complaint.[13] The arbitration demand provided no individualized description of any individual client's claim. The letter threatened to proceed with every arbitration "simultaneously," noting that proceeding to arbitration would obligate CenturyLink to pay AAA more than $30 million in initial fees and costs, which amount would grow as Keller Lenkner continued to sign up additional clients.[14] Keller Lenkner suggested that the parties "explore whether we can agree on an alternative process for resolving our clients' claims."

6. On May 31, 2019 Keller Lenkner sent CenturyLink a second letter, including the same sample arbitration demand.[15] It further notified CenturyLink that Keller Lenkner had signed up an additional 3,000 individuals, who purportedly had consumer fraud claims against CenturyLink. The second letter stated: "As we stated previously, we are willing to honor the letter and spirit of the notice provisions in our clients' contracts with CenturyLink by discussing in good faith whether we can agree on an alternative process for resolving our clients' claims." As with the May 14 letter, this letter did not provide any information concerning the individual claim of any client.

7. Keller Lenkner now apparently has over 22,000 individual clients who have signed retention letters authorizing Keller Lenkner to represent them in arbitration

---

[12] Letter from Mr. A. Keller to CenturyLink regarding Arbitration Demands, May 14, 2019 (hereinafter "May 14 Letter") p. 1, attached to Decl. of Andrew Unthank (hereinafter "Unthank Decl."), as Ex. H.

[13] *Id.* at Enclosure (hereinafter "Demand for Arbitration").

[14] *Id.* at p. 1.

[15] Letter from Mr. A. Keller to CenturyLink regarding Arbitration Demands, May 31, 2019, p. 1, attached to Unthank Decl. as Ex. I.

against CenturyLink for one or more of the types of claims described in the generic sample demand.[16]

8. CenturyLink's consumer contracts, including the contract attached to Keller Lenkner's sample arbitration demand, generally require its customers to agree to have their claims decided through arbitration or small claims court "on an individual basis."[17] The contracts also feature waivers of the rights to proceed on a class or consolidated basis.

9. CenturyLink's contracts, including the contract attached to Keller Lenkner's sample arbitration demand, generally provide CenturyLink and its customers the opportunity to resolve their disputes before proceeding into formal legal proceedings.[18] In a letter dated June 19, 2019, Keller Lenkner refused "to engage in pre-demand discussions on an individual basis," arguing that "at 15 minutes per client, such a pre-demand 'dialogue' would consume more than 3,500 hours, or the equivalent of 145 round-the-clock days."[19] It insisted that CenturyLink engage in "a practical, pre-arbitration discussion that addresses all of our clients' claims, or we will proceed to individual arbitrations."[20]

10. CenturyLink's consumer contracts, including the contract attached to Keller Lenkner's sample arbitration demand, also generally provide that either party has a right to have disputes decided in small claims court.[21] In a letter dated July 10, 2019, CenturyLink informed Keller Lenkner that CenturyLink will invoke its right to have many of the clients' disputes decided in small claims court as opposed to arbitration.[22]

---

[16] Email from Mr. W. Postman to Mr. M. Williams regarding Draft of Proposed Agreement to Evaluate Claims for Potential Presuit Resolution, September 24, 2019, attached to Unthank Decl. as Ex. N (hereinafter "September 24 Email").

[17] Defendant and Intervenors' Response to Plaintiffs' Motion for Preliminary Approval of Class Action Settlement and Provisional Class Certification (ECF 481), *In re: CenturyLink Sales Practice and Securities Litigation,* No. 17-md-02795-MJD-KMM, p. 4; Demand for Arbitration, Exh. C (High-Speed Internet Subscriber Agreement (hereinafter "Subscriber Agreement")), pp. 2, 29, 30.

[18] *See* Subscriber Agreement at p. 29.

[19] Letter from Mr. A. Keller to Mr. D. Lobel re Claims Against CenturyLink, Inc., June 19, 2019, p. 1, attached to Unthank Decl. at Ex. K.

[20] *Id.*

[21] Subscriber Agreement at p. 29.

[22] Letter from Mr. M. Williams to Mr. A. Keller re Mass Arbitration Demand, July 10, 2019, attached to Unthank Decl. at Ex. L. (hereinafter "July 10 Letter").

11. The arbitration contract on which Keller Lenkner is relying requires, at a minimum, customers to pay one-half of the arbitrator's fee up to $125.[23]

12. Due to Keller Lenkner's refusal to provide basic information regarding its clients' claims, CenturyLink spent considerable time and resources attempting to locate business records that potentially could be connected to Keller Lenkner's clients.[24] As CenturyLink informed Keller Lenkner in a July 10 letter, CenturyLink's preliminary research raised red flags about the claims and underscored the need for Keller Lenkner to provide individualized information so that CenturyLink could understand and evaluate the claims.[25] Notably, CenturyLink's preliminary research pointed to the potentially varied and unique circumstances of the claims, which seemed to involve customers in three states where CenturyLink provides no internet or local telephone services to consumers, as well as customers whose prior complaints appeared to have been fully addressed.[26] Further, the research suggested that some of Keller Lenkner's clients potentially may be connected to customers whose accounts indicated they owed money to CenturyLink, customers with a long history of failing to pay bills on time, and customers who had failed to comply with alternative payment arrangements to which they had agreed with CenturyLink.[27]

13. CenturyLink also notified Keller Lenkner in CenturyLink's July 10 letter that it is reserving "all rights and defenses it has under the applicable contracts, by statute and at common law, including but not limited to statutes of limitations, the voluntary payments doctrine, breach of the duty of good faith and fair dealing, accord and satisfaction, payment and release, and waiver;" it also "intends to file counterclaims, in the appropriate forum, as applicable, and will demand full payment of all amounts owed to CenturyLink."[28] Additionally, CenturyLink stated that Keller Lenkner's clients' claims could be subject to different state laws, including not only Colorado (the only state law mentioned in the sample arbitration demand), but also Louisiana, which applies a one-year statute of limitations, and the state where services were provided.[29]

---

[23] Subscriber Agreement at p. 30.
[24] July 10 Letter at p. 3.
[25] *Id.* at pp. 2-3.
[26] *Id* at p 3.
[27] *Id.* at p. 4.
[28] *Id.* at p. 5.
[29] *Id.* at p. 5.

14. On November 21, 2019, Keller Lenkner submitted arbitration claims on behalf of 1,000 of its more than 22,000 clients. Those claims provided only minimal information concerning the nature of the claims, including failing to provide any information concerning the dates of the alleged overcharges—information that is important to CenturyLink's efforts to determine the applicable contract for each claimant and to attempt to informally resolve meritorious claims. As of January 8, 2020, Keller Lenkner has provided no information at all concerning the individual claims of its more than 21,000 remaining clients.

15. Although Keller's 1,000 demands seek damage amounts for higher amounts, in 92% of the claims the stated damages amount is 10 -300 times more than claimants' purported actual damages.[30] A Colorado statute provides for treble damages, but only "if it is established by clear and convincing evidence that ['the defendant] engaged in bad faith conduct."[31] Although Keller Lenkner cited the Colorado statute as one possible state statute governing all of the 1,000 claims submitted, the claimants are from multiple other states and it has not been established that Colorado law applies to all these claims.

16. Keller Lenkner has recently engaged in similar conduct against other companies, i.e., soliciting and signing up thousands of individuals to threaten mass arbitration of claims that are typically pending in class action lawsuits), including: an April 3, 2019 letter to DraftKings Inc. threatening to file mass arbitration demands on behalf of more than 9,000 individuals; an April 3, 2019 letter to FanDuel Inc. threatening to file mass arbitration demands on behalf of more than 8,000 persons.[32] These letters were virtually identical to the May 14, 2019 and May 31, 2019 letters to Century Link, in that they: (1) provided a list of clients without any specific information concerning their individual claims, (2) attached a consolidated draft arbitration demand that similarly failed to describe any individual's claim, (3) threatened to proceed with every arbitration simultaneously, (4) noted that proceeding to arbitration would obligate the company to pay extensive fees, (5) stated that the client base was expanding on a

---

[30] See Unthank Decl. at ¶ 58.

[31] C.R.S.A. 6-1-113(2)(a)(iii).

[32] Letter from Mr. A. Keller to Mr. R. Stanton Dodge re Arbitration Demands to DraftKings (ECF 394-5), April 3, 2019, *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677, p. 1; Letter from Mr. A. Keller to Mr. C. Genetski re Arbitration Demands to FanDuel (ECF 394-2), April 3, 2019, *In re: Daily Fantasy Sport Litigation,* D. Mass., Case No. 1:16-md-02677, p. 1, attached as Ex. B. to Unthank Decl..

daily basis, and (6) sought to explore "an alternative process" for resolving the claims. Keller Lenkner wrote these letters at a time that both companies were defendants in class action lawsuits that were consolidated in an MDL proceeding in the federal district court in Massachusetts.[33] In addition, Keller Lenkner has claimed to represent at least 5,257 individuals with arbitration claims against Postmates, Inc. and 6,500 current and former employees with arbitration claims against DoorDash[34]; further, a November 19, 2018 class action complaint filed by an Uber driver in the federal district court in Massachusetts alleged that Keller Lenkner engaged in a marketing campaign to sign up thousands of Uber drivers to pursue arbitration claims that had been the subject of an FTC settlement against Uber.[35]

17. I have reviewed a copy of Keller Lenkner's form retainer agreement ("Retainer Agreement")[36] and questionnaire[37] used in internet solicitations for CenturyLink customers. It is my understanding that these documents were generated from a Keller Lenkner marketing website in late August 2019.[38] The documents purport to be on behalf of Troxel Law LLP and Keller Lenkner.[39] I assume that these are materially identical, or at least substantially similar, to the questionnaire and form retainer agreement that Keller Lenkner has been using in its internet marketing

---

[33] On October 21, 2019, attorneys for FanDuel and DraftKings informed the Massachusetts MDL judge that on October 11, 2019 Keller Lenkner filed with the AAA 1,000 mass arbitrations against FanDuel and another 1,000 against DraftKings. The defendants informed the court that these mass arbitrations pose the risk of inconsistent rulings while the MDL remains before the Court pending resolution of defendants' motion to compel arbitration. Correspondence from Mr. J. Sommer to Judge O'Toole (ECF 399), *In re: Daily Fantasy Sport Litigation*, D. Mass., Case No. 1:16-md-02677, p. 1.

[34] Motion to Compel Arbitration (ECF 4), *Adams v. Postmates,* No. 4-19-cv-03042-SBA, p. 4; Declaration of Joshua Lipshutz (Doc 35-5), *Abernathy v. DoorDash, Inc.,* No. 3:19-cv-07545-WHA (N.D. Cal.), pp. 2-3, 6.

[35] Class Action Complaint (ECF 1), *Brown v. Keller Lenkner,* No.1:18-cv-12423-NMG, pp. 1-2.

[36] Ex. 4, pp. 24-29 ("CenturyLink Compensation Claims Retainer Agreement").

[37] Id. at pp. 21-23 ("CenturyLink Overbilling Compensation Questions").

[38] Id., at pp. 1-4 (webpage entitled "Reclaim the Money CenturyLink Overbilled You"), p. 5 (website pop-up to "Sign Up for a Claim"), pp. 6-18 ("Troxel Law, LLP Terms & Conditions of Use").

[39] Id. at 20 (Cover letter).

efforts beginning at least as early as March 2019[40] and continuing through the date of my Declaration.[41] The Retainer Agreement includes the following, without limitation:

  a.  "We agree to represent you in investigating and, if appropriate in the attorneys' opinion, filing an individual arbitration . . . . The attorneys shall have no obligation to represent you in any other matter . . . . If we think it will help reach a successful resolution of your claims, we may also pursue resolution of your claims outside of or before initiating arbitration, including in court." (¶ 1)

  b.  "If your case results in a recovery to you, then you will still not have to pay any costs or fees out of your own pocket, but the attorneys will collect a fee from the Company."  (¶ 2)

  c.  "If your case resolves before the commencement of an arbitration or court case in which you are a named party, then the attorney will collect a flat-fee of $750 in exchange for preparing your claim for filing, making a demand of the Company, and negotiating the resolution. You will never have to pay these fees and costs out of your own pocket. If you win your claim, the law requires the Company to pay you these fees and costs in addition to the damages and penalties the Company owes you. The attorneys will collect these fees from the Company as part of any award or settlement and deduct them from the recovery as their fee. You will be entitled to retain the full recovery net of this fee." (Id.)

  d.  "If your case resolves after commencement, then the attorneys will collect a lodestar based on reasonable attorney's fee and recover their litigation costs from the Company under any applicable fee-shifting law. Again, the attorneys will collect this fee from the Company, not from you." (Id.)

  e.  "By signing this Agreement, you instruct the attorneys to, without further direction or authorization from you, accept a 'full-value' settlement offer. A

---

[40] According to the website WHOis.net, the website was created on March 10, 2019. See also, Unthank Decl. at ¶¶ 19-21.

[41] A materially identical Retainer Agreement was being used immediately prior to filing on January 6, 2020.  See Decl. of Robert Matthews, Defendant's and Intervenors' Supplemental Brief in Support of Plaintiffs' Motion for Preliminary Approval and Request for Temporary Injunction to Stay Parallel Arbitrations, Ex. 1.E, ¶¶ 5-12, Ex. 4.

full-value settlement offer is any settlement offer made to you by the Company that:
- pays to you an amount equal to or more than the amount of any overpayments you made to paid to the Company in the past 36 months based on the information you provided . . . ." (¶ 3)

f. "[T]he attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason." (¶ 6)

g. "You may terminate attorneys at any time by written notice....If you do so, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination." (¶ 7)

h. "The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of the other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you. It is, however possible that conflicts may arise in the future, including: ....A defendant offers an aggregate or "lump sum" settlement to all of our clients that does not specify the amount each client will receive." (¶ 8)

i. "Consistent with the attorney ethics rules and other requirements for powers of attorney, you grant us the power of attorney to execute all documents connected with your claims."  (¶ 13)

18. Portions of the Retainer Agreement are strikingly similar to provisions in the form retention agreement allegedly used by Keller Lenkner to sign-up Uber drivers for mass arbitrations, as set forth in the Massachusetts class action complaint described above.[42]

19. During discussions with CenturyLink counsel over the summer of 2019, Keller Lenkner expressly informed CenturyLink's counsel that ████████████████████

_____

[42] See supra note 32.

9

███████████████████████████████████████ [3]

20. CenturyLink also recently has learned that one of the individuals in Keller Lenkner's lists of more than 22,000 clients is Kathleen Lodestein, who is married to and shares a CenturyLink account with Plaintiff John Lodestein.  Mr. Lodestein is a Settlement Class Representative in this MDL and intends to participate in the Tentative Settlement. Although Ms. Lodestein apparently signed up with Keller Lenkner, the Lodesteins intend to participate in the Tentative Class Settlement so Ms. Lodestein apparently did not understand that Keller Lenkner's effort was entirely separate from the Class Action and Tentative Settlement. [44]

21. CenturyLink recently has learned that some CenturyLink customers have raised complaints about Keller Lenkner's solicitation efforts.[45]

---

[43] Email from Mr. W. Postman to Mr. M. Williams regarding Draft of Proposed Agreement to Evaluate Claims for Potential Presuit Resolution, August 22, 2019; Draft Agreement to Evaluate Claims for Potential Presuit Resolution, August 20, 2019, p. 5, Comment 12.

[44] See Unthank Decl. at ¶¶ 27-29.

[45] Customer complaints of solicitations, dated April – October 2019, attached as Ex. F and G to Unthank Decl.

Case 3:19-cv-07545-WHA   Document 157-5   Filed 01/16/20   Page 686 of 726

# Exhibit 4



Attorney Advertising

# Reclaim the Money
# CenturyLink Overbilled You

We help CenturyLink customers get compensation for bills that were <u>more than originally quoted</u>.

**Sign Up for a Claim to Recover Your Money**

**CenturyLink regularly overbilled customers, charged them hidden fees and made it nearly impossible to get out of contracts.**

**You may be able to recover the full amount CenturyLink overbilled you.**



### The CenturyLink Bait and Switch

If you think CenturyLink pulled a bait and switch on your bill, you're probably right.

Thousands of customers have reported getting gouged with bills that are much higher than they were quoted.



One CenturyLink employee estimated that only 1 in 5 bills are close to the price they quoted.

According to multiple lawsuits, CenturyLink routinely promised one

### CenturyLink False Advertising

Promising one price then sending a bill for a higher price is considered false

Page 2 of 4

CASE 0:17-md-02795-MJD-KMM   Document 510-4   Filed 01/10/20   Page 3 of 31
Case 3:19-cv-07545-WHA   Document 157-5   Filed 01/16/20   Page 688 of 726



advertising.

Customers who are overcharged because of false advertising are entitled to underline{recover all the money} they were cheated out of.

### You can sign up to reclaim your money in 2-minutes.

We only need two minutes of your time to sign-up for a claim to get the money you overpaid back.

We try to make the sign up process as easy as possible. It's free to sign up and you never owe us anything unless



### We Help Consumers

We are consumer protection attorneys who have represented thousands of individuals who were ripped off or defrauded.

Super Lawyers 2018    AMERICAN ASSOCIATION for JUSTICE

### Here's How CenturyLink Overbilled its Customers

CenturyLink used several tactics to make a customer's bill much higher than the price they thought they were signing up for, according to recent lawsuits.

Advertising one price then charging another is straight fraud. Consumers who have been defrauded are entitled to receive the money they lost because of the fraud.

*Customers are "Disqualified" from Receiving the Promotional Price*

CenturyLink lured people in with a seemingly fair promotional price, but in reality there are over 2,000 exceptions and disqualifying reasons that keep the vast majority of people from ever actually receiving that price.

*Dozens of Hidden Fees*

On top of its base rates, CenturyLink added literally dozens of one-time and monthly fees to customers' bills.

Some of these fees have names that don't seem to mean anything, such as the "Internet Cost Recovery Fee."



*Ignore the Customer Until they Go Away*

When someone called customer support to get their bill adjusted, CenturyLink regularly put customers on hold for hours, and refused to honor the first agent's promise.

Customers who ask to end their service were often threatened with a several hundred dollar cancellation fee.

## Our legal team makes it easier for consumers to recover compensation.

If CenturyLink billed you more than you were first quoted, you likely have a claim to <u>get your money back</u>.

**Sign Up for a
Compensation Claim**

# We make getting compensation straightforward

**Sign Up in 2-Minutes**

1 Complete the contact form.

2 We will send you a couple questions about your CenturyLink bills.

3 We will then start working to get you compensation.

4 **You owe nothing unless we get you compensation.**

**Sign Up for Your
Overbilling Claim**

Attorney Advertising. Troxel Law LLP. 2019. No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers.

If you would like to speak to someone today, please call us at:

(800) 597-9765

CASE 0:17-md-02795-MJD-KMM   Document 510-4   Filed 01/10/20   Page 6 of 31



First Name *

Last Name *

Email *

Phone *

Did CenturyLink bill you more than they first quoted you? *

Did CenturyLink ever bill you for services you never requested? *

We may follow up with you by phone and text pursuant to our privacy policy. By signing up, you agree to our terms and conditions.

Sign Up for a Claim

Page 1 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 692 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 7 of 31

Troxel
Law LLP

Attorney Advertising

# Terms &
# Conditions of Use

IMPORTANT NOTICE: THIS WEBSITE IS FOR EDUCATIONAL AND INFORMATIONAL PURPOSES ONLY. NO ATTORNEY-CLIENT RELATIONSHIP IS FORMED BY YOUR USE OF THIS WEBSITE OR BY ANY COMMUNICATION YOU SEND OR RECEIVE THROUGH THIS SITE. THE CONTENT AND FEATURES ON THIS WEBSITE SHALL NOT BE CONSTRUED AS LEGAL ADVICE. THE CONTENT AND FEATURES OF THIS WEBSITE, INCLUDING MEANS TO SUBMIT A QUESTION OR INFORMATION, DO NOT CONSTITUTE AN OFFER TO REPRESENT YOU.

ARBITRATION NOTICE: THIS AGREEMENT SPECIFIES THAT DISPUTES RELATED TO THIS WEBSITE WILL BE RESOLVED BY BINDING, INDIVIDUAL ARBITRATION AND YOU WAIVE YOUR RIGHT TO PARTICIPATE IN A JURY TRIAL, A CLASS ACTION LAWSUIT OR CLASS-WIDE ARBITRATION.

PLEASE READ THE FOLLOWING TERMS OF SERVICES & LEGAL NOTICES ("THIS AGREEMENT") CAREFULLY BEFORE USING THIS WEBSITE ("the Site"). The website you are visiting is owned and managed by Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn NY, 11201. Any use of this website is subject to the complete Terms of Use, Disclaimers and Privacy Policy set forth on this page. The terms tell you about your (and our) rights under this Agreement, explain how we protect your privacy, and make certain disclosures required by the law. By using the Site, you give your assent to the terms of this Agreement. If you do not agree to these terms, you may not use the Site. Troxel Law, LLP ("We," "Us," or "Our") has the right, in our sole discretion, to modify, add or remove any terms or conditions of this Agreement without giving individual notice to you, by posting the changes on the Site. Your continuing use of the Site signifies your acceptances of any such changes.

The law differs in every jurisdiction, and you should not rely on any opinion except that of an attorney you have retained, who has a professional duty to advise you after being fully informed of all the pertinent facts, and who is licensed in the applicable state, and is familiar with the applicable law. Internet subscribers and online readers should seek professional counsel about their legal rights and remedies. You should not act or refrain from acting on the basis of any information found on this website. Any actions or decisions about your legal rights should be based on the particular facts and circumstances of your situation, and appropriate legal advice from an attorney. Troxel Law, LLP expressly disclaims all liability with respect to actions taken or not taken based upon any information or other contents of this site

## Confidentiality is Not Guaranteed

Any information sent to Troxel Law, LLP via Internet e-mail or through the website is not secure and is done on a non-confidential

basis. Troxel Law, LLP respects the privacy of any person who contacts our firm, and we will make reasonable efforts to keep information confidentially internally, but because of the nature of Internet communications and the absence of an attorney/client relationship, we cannot promise or guarantee confidentiality.

By submitting information to us, you agree that we may release your contact information and all information that may be submitted by you to law firms with whom we partner expressing an interest in possibly pursuing your potential claim(s) and you further agree and understand that such law firms may contact you directly should they have any interest in discussing your potential claim(s) with you, unless you request in writing your desire not to be contacted. By submitting information to us, you also agree that we may use your contact information to send you electronic newsletters. In no event, however, shall we be obligated to release any submitted information to law firms with whom we partner, including contact names, but rather may or may not do so at our sole discretion. Furthermore, in no event is any law firm obligated to contact you with regard to your potential claim(s), but rather may or may not do so at its sole discretion. By accepting the submission of your information, we do not offer any advice on whether you may have a legal remedy for your potential claim(s), and make no representation or guarantee that you will obtain satisfaction, justice or compensation for your potential claim(s), and we do not offer any opinion whatsoever concerning the merits of any potential claim you might have. If, after discussing your specific case with an attorney, the attorney is willing to represent you in the specific matter you have presented to them, they will send you a retainer agreement in the mail that you will need to sign and return before they can represent you in that specific matter. If either the attorneys or you do not agree in writing to create an attorney-client relationship, none will exist. In the meantime, you are encouraged to seek and retain the advice of other counsel if you intend to pursue any potential claims to avoid having your potential case barred by relevant statutes of limitation, statutes of repose, and/or other similar deadlines by which you must bring a lawsuit or lose the right to do so.

## Privacy Policy

Your personal information is subject to our Privacy Policy, which is incorporated herein by reference. Please reference our privacy policy by clicking HERE.

## Participation in the Site

You are granted a non-exclusive, non-transferable, revocable license (1) to access and use the Site strictly in accordance with these Terms and Conditions; (2) to use the Site solely for internal, personal, non-commercial purposes; and (3) to print out discrete information and search results from the Site solely for internal, personal, non-commercial purposes and provided that you maintain all copyright and other notices contained therein.

By submitting information to, reading, participating, or otherwise using the Site, you agree that you will abide by the following rules:

The Site may only be used in good faith and may not be used to transmit or otherwise make available any information that is false or that you do not have a right to make available under any law or under contractual or fiduciary relationships (such as inside information, proprietary and confidential information learned or disclosed as part of employment relationships or under nondisclosure agreements), to threaten, abuse, harass, or invade the rights of any person or entity, to infringe on any person or entity's intellectual property rights, or in any other way that could reasonably be deemed unethical, illegal, or offensive.

You may not misidentify yourself or impersonate any person or entity, or falsely state or otherwise misrepresent your affiliation with a person or entity (e.g., pretend to be a different person or from a different company or organization).

Unless you have our prior written consent, you will not post advertisements or promotional materials, solicit participants and/or visitors of the Site, reproduce, duplicate, copy, sell, resell or exploit for any commercial purposes, any portion of the Site or its Services, use of the Site or it Services, or access to the Site or its Services.

You are prohibited from using any type of computer "worm," "virus" or any other device that is intended or is likely to disrupt, overload, or otherwise impair the workings of any part of the Site. If you do engage in such conduct, the resulting damage will be hard to quantify as a dollar amount and thus you hereby agree to pay us liquidated damages in the amount of $5,000 for each day that the Site is damaged until the Site is completely repaired. This amount is derived by estimating the value of (1) the loss of good will caused by an inoperable site, (2) the time and money it will take to repair the Site and to address the concerns of visitors. We are required to use reasonable efforts to repair the Site as quickly as possible. This clause will not prohibit us from seeking additional compensation if your conduct injures us in a way not expressly contemplated herein.

You are not permitted to collect or store personal data about other users.

You are not permitted to access the Site for the purpose of data mining or extracting content from the Site beyond your personal end use.

You may not forge headers or otherwise manipulate identifiers in order to disguise the origin of any Content transmitted through the Site.

You agree to not harm minors in any way.

You shall not intentionally or unintentionally violate any applicable local, state, national or international law, including, but not limited to, regulations promulgated by the U.S. Securities and Exchange Commission, any rules of any national or other securities exchange, including, without limitation, the New York Stock Exchange, the American Stock Exchange or the NASDAQ, and any regulations having the force of law.

In the event you submit information through the Site, you agree to provide true, accurate, current and complete information and agree to promptly update the information to keep it true, accurate, current and complete. If you provide any information that is untrue, inaccurate, not current or incomplete, and/or we have reasonable grounds to suspect that such information is untrue, inaccurate, not current or incomplete, we have the right to suspend or terminate your participation in the Site and/or refuse any and all current or future use of the Site or its services (or any portion thereof).

You understand and agree that all information, statistical data, text, software, music, sound, photographs, graphics, video, messages or other materials (Content), whether publicly posted or privately transmitted by you and other users of our service, are the sole responsibility of the person from which such Content originated. This means that you, and not us, are entirely responsible for all Content that you upload, post, email or otherwise transmit via the Site. We do not control all of the Content posted via the Site and, as such, do not guarantee the accuracy, integrity or quality of such Content. You understand that by using the Site, you may be exposed to Content that is offensive, indecent or objectionable. Under no circumstances will we be liable in any way for any Content, including, but not limited to, for any errors or omissions in any Content, or for any loss or damage of any kind incurred as a result of the use of any Content posted, emailed or otherwise transmitted via the Site.

You acknowledge that we may or may not pre-screen Content, but that we and our designees shall have the right (but not the obligation) in our sole discretion to pre-screen, refuse, or move any Content that is available via the Site. Without limiting the foregoing, we and our designees shall have the right (but not the obligation) to remove any Content that violates this agreement or is otherwise objectionable.

## Intellectual Property Rights

You acknowledge and agree that the Site and any necessary software used in connection with the Site may contain proprietary and confidential information that is protected by applicable intellectual property and other laws. Except for the limited license contained in paragraph 8 below, nothing in these Terms and Conditions grants or should be construed to grant any licenses or rights, by implication, estoppel or otherwise, under copyright or other intellectual property rights. You agree that all right, title and interest (including all copyrights, trademarks, service marks, patents and other intellectual property rights) in this Site and its content belong to us, or our licensors, as applicable. No part of the materials including graphics or logos, available in this site may be copied, photocopied, reproduced, translated or reduced to any electronic medium or machine-readable form, in whole or in part, without specific permission. Except as expressly authorized by us, you further agree not to modify, rent, lease, loan, sell, distribute or create derivative works based on the Site or the software, in whole or in part.

## Information Not Intended to be Medical Advice

The content provided on this site, such as documents, text, graphics, images, videos, or other materials, are for informational purposes only. The information is not intended to be a substitute for professional medical advice, diagnosis, or treatment. Always consult a physician for diagnosis and treatment of any medical condition or for any questions you may have regarding a health concern. Never disregard professional medical advice or delay in seeking it because of something you have read or seen on this site. Links to other sites are provided for information only. Use of trade names is for identification only and does not constitute endorsement by the Us.

Page 4 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 695 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 10 of 31

## We Are Not Responsible for Content

We may periodically change, remove or update the material in this website without notice. This material may contain technical or typographical errors. We assume no liability or responsibility for any errors or omissions in the contents of this website. Your use of this website is at your own risk. Under no circumstances shall We or any other party involved in the creation, production or delivery of this website be liable to you or any other person for any indirect, special, incidental, or consequential damages of any kind arising from your access to, or use of, this website.

IN NO EVENT SHALL WE BE LIABLE FOR ANY SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES RELATING TO THIS MATERIAL, FOR ANY USE OF THIS WEBSITE, OR FOR ANY OTHER LINKED WEBSITE.

## Third Party Websites

This website may contain links to third party websites for the convenience of our users. We do not endorse any of these third party sites and does not imply any association between Us and those sites, other than as specifically set forth herein. We do not control these third party websites and cannot represent that their policies and practices will be consistent with these Terms of Use, Disclaimers and Privacy Policy. If you use links to access and use such websites, you do so at your own risk. We are not responsible for the content or availability of any linked sites. These links are provided only as a convenience to the recipient.

## Relationship Among Lawyers

Troxel Law, LLP lawyers are licensed to practice law only within the state of New York, but we associate on certain types of cases with lawyers licensed or otherwise admitted to practice law throughout the United States (the "Attorney Group"). Attorneys and law firms associated by Troxel Law, LLP are determined by Troxel Law, LLP, in the professional judgment of its principal, to be experienced in and qualified to handle the litigation matters for which they are associated.

Initial consultations on a particular matter are provided free of cost, and upon agreement with the potential client and in the sole discretion of Troxel Law, LLP. Troxel Law, LLP will enter into a contract for legal services with the potential client which describes in writing the fee charged for a particular engagement, as well as other terms of the representation, including disclosure that other attorneys or law firms may be associated to participate in the representation. If known, the identity of any affiliated attorney or law firm that will have a role in the representation will be included in the contract. Otherwise, in the event that counsel is associated on a particular matter, the client will be informed and any consent required by applicable rules of professional conduct will be obtained.

All matters are handled on a contingency fee basis, meaning that a client pays no fees or costs unless a recovery is obtained on the client's behalf, unless otherwise requested by You and agreed to by Troxel Law, LLP. Fees paid in the event of a recovery are a percentage of the total recovery, as agreed to with the client prior to undertaking the representation and as set forth in the contract for legal services, and are intended to be in accordance with standards in the legal services industry and, where applicable, state rules of professional responsibility. Costs incurred in the representation are deducted from the client's portion of any recovery but are not required to be paid out of pocket by the client. If there is no recovery, the client will not be responsible for any cost incurred in the representation (unless expressly agreed to by the client prior to the cost being incurred). The use of affiliated attorneys or law firms does not increase the fee, although other factors may increase the fee.

Inquiries made through this website are typically responded to by Troxel Law, LLP. We reserve the right to not respond to inquiries on this website and may, at its discretion, direct inquiries to other attorneys or law firms without an initial response. In such instances, Troxel Law, LLP makes no representation regarding the ability of the responding attorney to represent the potential client in accordance with applicable standards of care. Troxel Law LLP may or may not decide to associate as counsel on such cases.

Telephone calls made or received by Troxel Law, LLP regarding an inquiry made through this website may be recorded for record-keeping, training and quality-assurance purposes.

The laws of each state are different. This website may contain information about general or common rules that apply in some states. This website may also contain information about verdicts or settlements in past cases. You cannot assume that the same rules apply, or that the same result would occur, in your state or any particular state or case.

Statutes of limitations are especially important. Every state has laws called the "statute of limitations" which set a deadline to file a lawsuit. A lawsuit filed too late may be thrown out, regardless of the defendant's fault or the severity of the injuries. Some states

Page 5 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/10/20 Page 696 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 117 of 31

have a three-year period for negligence injury claims; the time period in other states may be longer or shorter. Because investigation and research is needed to identify all possible defendants and theories of recovery, if you have an accident or injury, you should consult a lawyer as soon as possible.

## Legal and Ethical Requirements

Troxel Law, LLP has tried to comply with all legal and ethical requirements in compiling this website. We welcome comments about our compliance with applicable rules and will update the site as warranted, upon learning of any new or different requirements. We only want to represent clients based on their review of this website if it complies with all legal or ethical requirements.

To the extent that the professional responsibility rules of any jurisdiction require us to designate a principal office or an attorney responsible for this website, Troxel Law, LLP designates its office in Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn NY, 11201, and attorney Jeremy Troxel.

## Honors, Accolades and Recognition

To the extent that any display of honors, accolades and recognition made on this website are considered attorney advertising, no aspect of such advertisement has been approved or sanctioned by the supreme courts or accrediting organizations of any state. The inclusion of an honor, accolade or recognition is not intended to compare the services of Troxel Law, LLP or its attorneys with any other attorney or law firm, nor is it intended to create an expectation of results that can be obtained in a particular matter. Any honor, accolade or recognition that uses the term "super," "best," "superior," "leading," "top-rated," or the like, only means that the attorney has been included in a list containing that term. It is not intended to convey any superlative ability of the attorney recognized.

The websites of the organizations conferring the honor, accolade or recognition may be linked to from the badge or logo displayed on this website, and you are encouraged to visit those websites to learn more about the process by which the Troxel Law, LLP attorney was selected. Where the logo of a publication is listed as featuring Troxel Law, LLP or one of its attorneys, you are encouraged to perform an author search or other type of search on that website for the information communicated by or about Troxel Law, LLP or the Troxel Law, LLP attorney on that website. Alternatively, information about honors, accolades and recognition can be provided upon request.

## Disclosures Regarding Attorney Advertising

Some jurisdictions may consider the Site to be a form of advertising for legal services and as such may require specific disclosures. Please read the following carefully:

THIS IS AN ADVERTISEMENT. The determination of the need for legal services and the choice of a lawyer are extremely important decisions and should not be based solely upon advertisements. Anyone considering a lawyer should independently investigate the lawyer's credentials and ability, and not rely upon advertisements or self-proclaimed expertise. Hiring a lawyer is an important process that should not be based solely upon advertisements.

The attorney responsible for the content of this Site is Jeremy Troxel, of Troxel Law, LLP, Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn NY, 11201. The member attorneys of Troxel Law, LLP are licensed to practice law only in New York.

Troxel Law, LLP does not operate as a lawyer-advertising cooperative, lawyer referral service, prepaid legal insurance provider, or similar organization the business or activities of which include the referral of customers, members, or beneficiaries to lawyers for the performance of fee-generating legal services or the payment for or provision of legal services to the customers, members, or beneficiaries in matters for which they do not bear ultimate responsibility. While Troxel Law, LLP maintains joint responsibility for and participates in cases obtained as a result of advertising on the Site, such cases may be referred to other attorneys for principal responsibility and participation.

**FREE BACKGROUND INFORMATION AVAILABLE UPON REQUEST**

Before you decide to hire Troxel Law, LLP, ask them to send you free written information about their qualifications and experience. Additional information about the lawyers or firms may also be obtained by contacting the Bar Association in the State in which such lawyers or law firms are licensed. No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers. Memberships and offices in legal fraternities and legal societies, technical and professional licenses, and memberships in scientific, technical and professional associations and societies of law or fields of practice do not mean that a lawyer is a specialist, expert, authority or is certified in a particular field of law, nor do such memberships or licenses mean that such a lawyer is more expert or competent than any other lawyer.

Page 6 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 697 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 12 of 31

A description or indication of limitation of practice does not mean that any agency or board has certified such lawyer as a specialist, expert or authority in an indicated field of law practice, nor does it mean that such lawyer is more expert or competent than any other lawyer. We urge all potential clients to make their own independent investigation and evaluation of any lawyer being considered.

Except where otherwise indicated, neither Troxel Law, LLP nor any of the lawyers or law firms in the Attorney Group are certified by the Florida Bar Board of Legal Specialization and Education, the Texas Board of Legal Specialization ("Not Certified by the Texas Board of Legal Specialization"), or any other entity or body. The fact that certain attorneys or firms concentrate their practices to plaintiffs' class actions, labor & employment, or consumer claims (or any other field) is not meant to imply that they have gained any specific type of certification in these areas. Indeed, many states do not recognize certifications of specialties in the practice of law and explicitly state that any such certificate, award or recognition is not a requirement to practice law in those states.

Because some material on this website may be found to constitute attorney advertising, and because this website may be viewed from anywhere in the United States, particular disclosures may be required by the rules of some states. To the extent applicable, the Companies adopt and make the following disclosures:

**Alabama**: No representation is made that the quality of the legal services to be performed is greater than the quality of legal services performed by other lawyers.

**Alaska**: The Alaska Bar Association does not accredit or endorse certifying organizations.

**Arizona**: ATTORNEY ADVERTISING. No representation is made promising or guaranteeing a particular outcome or result. Any attorneys claiming certification in an area of law are certified by the Arizona Board of Legal Specialization.

**Colorado**: Colorado does not certify attorneys as specialists in any field.

**Florida**: The hiring of a lawyer is an important decision that should not be based solely upon advertisements. Before you decide, ask us to send you free written information about our qualifications and experience.

**Hawai'i**: The Supreme Court of Hawai'i grants Hawai'i certification only to lawyers in good standing who have successfully completed a specialty program accredited by the American Bar Association.

**Illinois**: The Supreme Court of Illinois does not recognize certifications of specialties in the practice of law and that the certificate, award or recognition is not a requirement to practice law in Illinois.

**Iowa**: The determination of the need for legal services and the choice of a lawyer are extremely important decisions and should not be based solely upon advertisements or self-proclaimed expertise. This disclosure is required by rule of the Supreme Court of Iowa.

NOTICE TO THE PUBLIC: Memberships and offices in legal fraternities and legal societies, technical and professional licenses, and memberships in scientific, technical and professional associations and societies of law or field of practice do not mean that a lawyer is a specialist or expert in a field of law, nor do they mean that such a lawyer is necessarily any more expert or competent than any other lawyer. All potential clients are urged to make their own independent investigation and evaluation of any lawyer being considered. This notice is required by rule of the Supreme Court of Iowa.

**Kentucky and Oregon**: THIS IS AN ADVERTISEMENT.

**Massachusetts**: If a Massachusetts lawyer holds himself or herself out as "certified" in a particular service, field or area of law by a non-governmental body, the certifying organization is a private organization, whose standards for certification are not regulated by the Commonwealth of Massachusetts.

**Mississippi**: The Mississippi Supreme Court advises that a decision on legal services is important and should not be based solely on advertisements.

**Missouri**: ADVERTISING MATERIAL: COMMERCIAL SOLICITATIONS ARE PERMITTED BY THE MISSOURI RULES OF PROFESSIONAL CONDUCT BUT ARE NEITHER SUBMITTED TO NOR APPROVED BY THE MISSOURI BAR OR THE SUPREME COURT OF MISSOURI. Neither the Supreme Court of Missouri nor the Missouri Bar reviews or approves certifying organizations or specialist designations.

**Nevada**: Neither the state bar of Nevada nor any agency of the State Bar has certified any lawyer identified here as a specialist or as an expert. Anyone considering a lawyer should independently investigate the lawyer's credentials and ability.

**New Jersey**: ATTORNEY ADVERTISEMENT — NOT A REFERRAL SERVICE. Before making your choice of an attorney, you should give this matter careful thought. The selection of an attorney is an important decision. Any certification as a specialist, or any certification in a field of practice, that does not state that such certification has been granted by the Supreme Court of New Jersey or by an organization that has been approved by the American Bar Association, indicates that the certifying organization has not been approved, or has been denied approval, by the Supreme Court of New Jersey and the American Bar Association.

**New Mexico**: LAWYER ADVERTISEMENT. Any certification by an organization other than the New Mexico Board of Legal Specialization does not constitute recognition by the New Mexico Board of Legal Specialization, unless the lawyer is also recognized by the board as a specialist in that area of law.

**New York**: ATTORNEY ADVERTISING. Prior results do not guarantee a similar outcome.

**Rhode Island**: The Rhode Island Supreme Court licenses all lawyers in the general practice of law. The court does not license or certify any lawyer as an expert or specialist in any field of practice.

**Tennessee**: None of the attorneys in this firm are certified as a Civil Trial, Criminal Trial, Business Bankruptcy, Consumer Bankruptcy, Creditor's Rights, Medical Malpractice, Legal Malpractice, Accounting Malpractice, Estate Planning or Elder Law specialist by the Tennessee Commission on Continuing Legal Education and Specialization. Certification as a specialist in all other listed areas is not currently available in Tennessee.

**Texas**: Unless otherwise stated, our attorneys claiming certification in an area of law are not certified by the Texas Board of Legal Specialization.

**Washington**: The Supreme Court of Washington does not recognize certification of specialties in the practice of law and that the certificate, award, or recognition is not a requirement to practice law in the State of Washington.

**Wyoming**: The Wyoming State Bar does not certify any lawyer as a specialist or expert. Anyone considering a lawyer should independently investigate the lawyer's credentials and ability, and not rely upon advertisements or self-proclaimed expertise.

Except on pages containing information about a particular attorney or as otherwise noted, individuals depicted in photographs on this website are not affiliated with the Us in any capacity, and their depiction is not intended in any way to create an unreasonable expectation of results that might be obtained in a particular case. Such individuals are actors, and they are depicted in stock photographs that have been properly licensed by Us. Any user is prohibited from downloading photographs on this website for any reason other than for personal use, including but not limited to retransmitting, reproducing or otherwise engaging in unauthorized use of the photographs.

The material on this site is not intended to, and does not, include any advertisements for legal services that contain dramatizations, testimonials or endorsements. This site is intended to provide useful, factual information presented in a non-sensational, objective and understandable manner. The images and pictures on this site are not meant to represent or depict actual persons or events, but rather are merely provided for illustrative purposes only.

This Site is not intended for the purpose of advertising legal services to be performed in any state solely by Troxel Law, LLP or other attorney members of the Attorney Group, unless they are specifically licensed to practice in that respective State.

To the extent that this Site does not comply with the laws or regulations of any jurisdiction in which it may be received, Troxel Law, LLP does not wish to, and will not knowingly, accept legal representation based on or resulting from the use of the Site from a person located in that jurisdiction. Troxel Law, LLP, does not wish to, and will not knowingly, accept legal representation based on or resulting from the use of the Site from a person located outside the United States.

## Website Comment Policy

Page 8 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 699 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 147 of 31

While not all pages or posts on this website will be open to comments, comments are otherwise welcomed and encouraged. However, comments containing the following may be edited or deleted, at our sole discretion: Spam or questionable spam; profane, derogatory or defamatory language; offensive language or concepts; attacks either on a person individually or the Companies. Users submitting comments that violate this comment policy may be banned from further commenting on this website.

Whether a page or post is open to comments is in our sole discretion. We reserve the right, without notice, to pre-approve, edit or delete any comments for any reason.

A posted comment should not be deemed to have been approved or endorsed Us, and We take no responsibility for the content of a posted comment. If you believe a posted comment is defamatory to you or others, constitutes speech not protected under law, or is in violation of this comment policy, you are encouraged to contact Us in the manner provided for on this page to express your concern.

This comment policy is subject to change at any time, with or without notice to the users of the website.

## Governing Laws in Case of Dispute; Jurisdiction, Binding Arbitration

These Terms of Use and Disclaimers shall be governed by and construed in accordance with the laws of the State of New York without regard to any choice of law principles.

In the event of any dispute, controversy, or claim between us (or our respective heirs, successors, assigns, or affiliates) arising out of, relating to, or in connection with your use of this Site and/or the relationship between you and us (a "dispute"), you and we waive the right to seek remedies in court, including the right to a jury trial, and agree to submit said dispute exclusively to binding individual arbitration conducted by a single arbitrator subject to the rules of the American Arbitration Association ("AAA"). The arbitrator shall not have the authority to decide any claims as a class, collective, or representative action. The seat of the arbitration will be in New York, New York unless AAA determines that this location will impose undue hardship, in which case the location will be set by AAA. The parties will share the expense of arbitration equally, except that if you represent that this would impose an undue hardship, you will initially be responsible only for a filing fee equal to the amount that would be necessary to file your claim in court. In that event, we will advance the remaining fees and expenses on your behalf and the arbitrator will determine any additional amount you can pay without sustaining undue hardship. Threshold issues of arbitrability shall be decided by the arbitrator, including the scope of this agreement and whether a controversy or claim arises out of or relates to your engagement of us.

## Disclaimer of Warranties

YOU EXPRESSLY UNDERSTAND AND AGREE THAT:

YOUR USE OF THE SITE IS AT YOUR SOLE RISK. ALL CONTENT AND SERVICES ON THE SITE IS PROVIDED SOLELY ON AN "AS-IS/AS-AVAILABLE" BASIS. TO THE EXTENT PERMITTED BY APPLICABLE LAW, WE EXPRESSLY DISCLAIM ALL WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, BUT NOT LIMITED TO THE IMPLIED WARRANTIES AND CONDITIONS OF MERCHANTABILITY, SATISFACTORY QUALITY, FITNESS FOR A PARTICULAR PURPOSE OR USE AND NON-INFRINGEMENT. WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, WE MAKE NO REPRESENTATION OR WARRANTY THAT (i) THE CONTENT AND SERVICE OF THIS SITE WILL MEET YOUR REQUIREMENTS, (ii) THE CONTENT AND SERVICE OF THIS SITE WILL BE UNINTERRUPTED, TIMELY, SECURE, OR ERROR-FREE, (iii) THE RESULTS THAT MAY BE OBTAINED FROM THE USE OF THE SITE WILL BE ACCURATE OR RELIABLE, OR (iv) THE QUALITY OF ANY PRODUCTS, SERVICES, INFORMATION, OR OTHER MATERIAL PURCHASED OR OBTAINED BY YOU THROUGH THE SITE IS ACCURATE OR WILL MEET YOUR EXPECTATIONS.

WE DO NOT GUARANTY THE ACCURACY OR COMPLETENESS OF ANY CONTENTOR SERVICES AND WE DO NOT GUARANTY IN ANY SERVICES OR GOODS ASSOCIATED WITH THE SITE WILL BE ERROR-FREE OR UNINTERRUPTED, OR THAT ANY SERVICE OR GOOD WILL CONTINUE TO BE AVAILABLE.

ANY MATERIAL DOWNLOADED OR OTHERWISE OBTAINED THROUGH THE USE OF THE SERVICE IS DONE AT YOUR OWN DISCRETION AND RISK AND THAT YOU WILL BE SOLELY RESPONSIBLE FOR ANY DAMAGE TO YOUR COMPUTER SYSTEM OR LOSS OF DATA THAT RESULTS FROM THE DOWNLOAD OF ANY SUCH MATERIAL.

NO INFORMATION, WHETHER ORAL OR WRITTEN, OBTAINED BY YOU FROM US OR THROUGH OR FROM THE SITE SHALL CREATE ANY WARRANTY NOT EXPRESSLY STATED IN THIS AGREEMENT.

# Limitation of Liability

## Exclusions and Limitations

THE ABOVE EXCLUSIONS OF WARRANTIES AND LIMITATIONS OR EXCLUSIONS OF LIABILITY APPLY TO THE EXTENT PERMITTED BY APPLICABLE LAW.

## Entire Agreement

This agreement constitutes the entire agreement between you and us and governs your use of the Site, superseding any prior agreements between you and us. You also may be subject to additional terms and conditions that may apply when you use or purchase certain other services, affiliate services, third-party content or third-party software.

The section titles in this agreement are for convenience only and have no legal or contractual effect.

## Waiver and Severability
## Terms

Our failure to exercise or enforce any right or provision of this agreement shall not constitute a waiver of such right or provision. If any provision of the agreement is found by a court of competent jurisdiction to be invalid, the parties nevertheless agree that the court should endeavor to give effect to the parties' intentions as reflected in the provision, and the other provisions of the agreement shall remain in full force and effect.

## Statute of Limitation

You agree that regardless of any statute or law to the contrary, any claim or cause of action arising out of or related to use of this Site, this agreement and/or the relationship between you and us must be filed within one (1) year after such claim or cause of action arose or be forever barred.

## Attorney Ethics Notice

If you are an attorney participating in any aspect of this Site, you acknowledge that rules of professional conduct apply to all aspects of your participation and that you will abide by such rules. The rules include, but are not limited to, the rules relating to advertising, solicitation of clients, unauthorized practice of law, and misrepresentations of fact. We disclaim all responsibility for your compliance with these rules.

## Nature of Investigations and Allegations

This Site may describe companies that are currently being investigated by private attorneys or have been subject to lawsuits or other allegations of misconduct by the companies. The fact that these companies are being investigated or have been subject to lawsuits or allegations of misconduct does not mean to state or imply that they have in fact committed any illegal or improper act.

# YOUR CALIFORNIA PRIVACY RIGHTS

Page 10 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 701 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 16 of 31

A business subject to California Civil Code Section 1798.83 is required to disclose to its California customers, upon request, the identity of any third parties to whom it has disclosed personal information within the previous calendar year for the third parties' direct marketing purposes, along with the type of personal information disclosed.

If you are a California resident and would like to make such a request, please submit your request in writing to info@TroxelLaw.com

# PRIVACY POLICY

Troxel Law, LLP is committed to protecting your privacy. Please read the following Privacy Policy to understand how your personal information will be treated as you use this website. When you use this website, you consent to the use of your personal information by the companies in the manner specified in this Privacy Policy. This policy may change periodically, so please check back from time to time. The date of the last update to this Privacy Policy was April 28, 2019. By using this site, you agree to the terms of this policy. Any changes will be effective immediately upon the posting of the revised Privacy Policy unless otherwise specified and your continued use of the this website after the effective date of the revised Privacy Policy will constitute your consent to those changes.

Note: If you are under 18 years old or reside in a country other than the United States of America, you may not use this site.

## Information We Collect Automatically

As with most websites, if you visit our website to browse, read, or download information:

Your web browser automatically sends us (and we may retain) information such as the:

Internet domain through which you access the Internet (e.g., yourServiceProvider.com if you use a commercial Internet service provider, or yourSchool.edu if you use an Internet account from your school);

Internet Protocol address of the computer you are using;

Type of browser software and operating system you are using;

Date and time you access our site; and

The Internet address of the site from which you linked directly to our site.

We will use this information as aggregate data to help us maintain this site, e.g., to determine the number of visitors to different sections of our site, to ensure the site is working properly, and to help us make our site more accessible and useful.

We will not use this information to identify individuals, except for site security, to follow up with you directly regarding the subjects addressed on this Site, or law enforcement purposes.

We will not obtain personally identifying information about you when you visit our site, unless you choose to provide such information.

## Other Information We Collect

If you choose to identify yourself (or otherwise provide us with personal information) when you use our online forms:

We will collect (and may retain) any personally identifying information, such as your name, street address, email address, and phone number, and any other information you provide. We will use this information to try to fulfill your request and may use it provide you with additional information at a later time. We will not disclose such information to third parties, except as specified in this privacy policy.

If you request information, services, or assistance, we may disclose your personal information to those third parties, including affiliated counsel, who (in our judgment) are appropriate in order to fulfill your request. If, when you provide us with such

information, you specify that you do not want us to disclose the information to third parties, we will honor your request. Note, however, that if you do not provide such information, it may be impossible for us to refer, respond to or fulfill your request.

If your communication relates to a law enforcement matter, we may disclose the information to law enforcement agencies that we deem appropriate.

If you wish to request or provide changes to the personal information you have provided to us, please send an email with "Personal Information Request Change" in the subject line to info@TroxelLaw.com

## How Long We Keep Information

We may keep information that we collect for as long as we determine is reasonably necessary.

## How We Protect Your Information

**How we protect your information:** We only disclose personally identifiable information about individual users in accordance with this Privacy Policy and our Terms and Conditions, or when we have a good-faith belief that such action is necessary to comply with applicable laws, valid legal process, a court order, a current judicial proceeding, or to protect our rights or property. We also disclose personally identifiable individual information and the other information you provide us to lawyers or law firms with whom we are affiliated and who are interested in determining whether your submission could form the basis of a lawsuit or entitle you to relief under a pending lawsuit. Such lawyers or law firms agree to keep your information confidential and agree not to share it with any third party without your express permission. We may also provide aggregate statistical information (such as the city or state you live in) to third parties to describe our services to prospective partners, advertisers, and other third parties, and for other lawful purposes. We will not, however, disclose any personally identifiable information to these parties.

Please keep in mind that whenever you voluntarily disclose personal information online – for example on message boards, through e-mail, or in chat areas – that information can be collected and used by others. We do not, however, include any personally identifiable information on our message boards unless you specifically include it in the content of your posting. If you are an attorney submitting information, we will not disclose any information to any third party without your express permission.

## Security

Please note that electronic communication, particularly email, is not necessarily secure against interception. Please do not send sensitive data (e.g., Social Security, bank account, or credit card numbers) by email or web form.

## Cookies

We may use cookies in order to customize this site for return visitors. These cookies are not required for site functionality. Additionally, third-party widgets may install cookies depending on their configuration. You are not required to accept any cookies to use this site.

## Google Analytics

We may use a tool called "Google Analytics" to collect information about use of this site. Google Analytics collects information such as how often users visit this site, what pages they visit when they do so, and what other sites they used prior to coming to this site. We use the information we get from Google Analytics only to improve this site. Google Analytics collects only the IP address assigned to you on the date you visit this site, rather than your name or other identifying information. We do not use Google Analytics to collect personally identifiable information. Although Google Analytics plants a permanent cookie on your web browser to identify you as a unique user the next time you visit this site, the cookie cannot be used by anyone but Google. Google's ability to use and share information collected by Google Analytics about your visits to this site is restricted by the Google Analytics Terms of Use and the Google Privacy Policy. You can prevent Google Analytics from recognizing you on return visits to this site by disabling cookies on your browser.

## Express Written Consent to Receive Text Messages and Automated Calls

You provide us and our designees and agents your express permission and authorization to send text messages and automated calls to the number or numbers you provide to us or our agents during the intake process and thereafter. You represent that you are the

Page 12 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 703 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 18 of 31

subscriber of those numbers and have the authority to give such consent. By executing this agreement, you authorize us to deliver or cause to be delivered to you telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice. You may revoke this consent at any time while speaking to us or our agents, by sending an email with "TCPA Consent Revocation" in the subject line to info@TroxelLaw.com, or by mail sent to Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn, NY 11201. You further understand that you are not required to consent to receipt of calls or text messages containing an artificial or prerecorded voice or sent using an automatic telephone dialing system in order to engage Troxel Law, LLP as your attorney.

## How We Respond to "Do Not Track Signals

Note that your browser settings may allow you to automatically transmit a "Do Not Track" signal to websites and online services you visit. Troxel Law's websites honor when they receive a "Do Not Track" request from a visitor's browser.

## Other Privacy Matters

Information From Children: The Companies do not direct their websites to children under thirteen (13) years of age. Individuals under eighteen (18) should not use this website.

Monitoring, Enforcement, and Legal Requests: The Companies are not obligated to monitor this website or its use, or to retain the content of any user session. However, the Companies reserve the right at all times to monitor, review, retain, and/or disclose any information as necessary to satisfy any applicable law, regulation, legal process, or governmental request, or to cooperate with law enforcement and other authorities in investigating a claim of illegal activity. We may use IP addresses to identify a user when we feel it is necessary to protect our service, website, clients, potential clients, or others.

Other Websites: Except as otherwise expressly discussed in this Privacy Policy, this policy only addresses the Companies' use and disclosure of information we collect from you. To the extent that you disclose personal information to other websites, you are subject to the privacy customs and policies of those other sites. We encourage you to ask questions before you disclose any personal information.

Transmission Errors or Unauthorized Acts: No data transmission over the Internet can be guaranteed to be 100 percent secure. While we strive to protect your personal information, the Companies cannot ensure or warrant the security of any information you transmit to us or any information provided online, and you do so at your own risk. The Companies will not be liable for disclosures of your personal information due to errors in transmission or unauthorized acts of third parties. Once we receive your transmission, we will do our best to ensure its security on our systems by making reasonable efforts to protect the information.

Security: Any information provided to the Companies is treated with care and discretion. The Companies will take a proactive approach to ensure the information is kept private and is not misused.

## Questions About Website Privacy Policy

We pursue a full-disclosure approach to responsibly care for the information you have entrusted with us, and we depend on information sharing as our principal means to best serve you. We will continually monitor feedback and seek to improve our services to meet your needs. If you have any questions about this Privacy Policy or the practices of this website, or if you would like to provide comments, please contact us using our online forms, by telephone at (312) 356-3200, by email info@TroxelLaw.com or by regular mail at Troxel Law, LLP, 195 Montague St., 14th Floor, Brooklyn NY, 11201.

# CLIENT PRIVACY POLICY

Privacy Policy Notice. We value our clients' privacy and attempt to protect the confidentiality of the personal information clients have given us to the extent practicable. Under federal law, attorneys, like other professionals who advise clients on personal financial matters, are required to inform their clients of their policies regarding privacy of client information. In addition to the document security measures described above, we are bound by professional standards of confidentiality found in Rule 1.6 of the New York Rules of Professional Conduct, which are even more stringent than those required by federal law. Non-lawyer assistants

Page 13 of 13

Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 704 of 726
CASE 0:17-md-02795-MJD-KMM Document 510-4 Filed 01/10/20 Page 13 of 31

we engage to assist us on matters, and who work under our supervision, are likewise bound and, as noted above, are required to review, confirm their understanding of, and adhere to our office's policies regarding ethics, confidentiality and privilege.

In the course of providing our clients advice concerning income and other taxes, estate and personal financial planning, employment questions and personal debt issues, we may receive significant nonpublic personal financial information from our clients. All information that we receive from you is held in confidence, and is not released to people outside of our supervision, except as agreed to by you, or as required under an applicable law or under the New York Rules of Professional Conduct.

We retain records relating to professional services that we provide so that we are better able to assist you with your personal needs and, in some cases, to comply with professional guidelines. In order to guard your privacy, we restrict access to nonpublic personal information about only to those who need to know that information to provide services to you or on your behalf.

Troxel Law, LLP

195 Montague St., 14th Floor, Brooklyn, NY 11201.

Phone: (312) 356-3200 Email: info@TroxelLaw.com

YOU EXPRESSLY UNDERSTAND AND AGREE THAT WE SHALL NOT BE LIABLE FOR ANY, INDIRECT, INCIDENTAL, SPECIAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES, INCLUDING BUT NOT LIMITED TO, DAMAGES FOR LOSS OF REVENUES, PROFITS, GOODWILL, USE, DATA, FAILURE TO REALIZE EXPECTED SAVINGS, OR OTHER INTANGIBLE LOSSES (EVEN IF WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES), RESULTING FROM: (i) THE USE OR THE INABILITY TO USE THE SITE; (ii) THE COST OF PROCUREMENT OF SUBSTITUTE GOODS AND SERVICES RESULTING FROM ANY GOODS, DATA, INFORMATION OR SERVICES PURCHASED OR OBTAINED OR MESSAGES RECEIVED OR TRANSACTIONS ENTERED INTO THROUGH OR FROM THE SITE; (iii) INVALID DESTINATIONS, TRANSMISSION ERRORS, OR UNAUTHORIZED ACCESS TO OR ALTERATION OF YOUR TRANSMISSIONS OR DATA; (iv) STATEMENTS OR CONDUCT OF ANY THIRD PARTY ON THE SITE; (v) YOUR FAILURE TO RECEIVE ANY THIRD PARTY SERVICES OR PRODUCTS REQUESTED THROUGH THE SITE OR (vi) ANY OTHER MATTER RELATING TO THE SITE. IN NO EVENT ARE WE LIABLE TO YOU FOR AN AMOUNT IN EXCESS OF THE AMOUNT PAID BY YOU TO US FOR THE SERVICES IN QUESTION, IF ANY.

Thank you for signing up, we have sent your claim agreement to your email.

If you have any questions, please contact us at: attorneys@centurylinkclaims.com or feel free to call (800) 597-9765

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F


Troxel
Law LLP

# Keller | Lenkner

## CenturyLink Overbilling Compensation Claims

Dear Jeanne

Thank you for the opportunity to represent you in getting compensation for CenturyLink's overbilling practices. We take this responsibility seriously and will do our best to help you receive fair compensation.

The following documents are a questionnaire and our representation agreement. This agreement explains the scope of the work we will do as your attorneys.

If you have any questions or experience any difficulties completing this document, feel free to email us at: attorneys@centurylinkclaims.com. Or you can call our office at (800) 597-9765.

Best regards,

Jeremy Troxel
Founding Partner
Troxel Law, LLP
Jeremy@centurylinkclaims.com

---

About Your Legal Team-

Keller Lenkner LLC - Keller Lenkner is a law firm located in Chicago that represents consumers, employees, investors, and other plaintiffs in complex litigation across the country. You can learn more at www.kellerlenkner.com.

Troxel Law LLP - Troxel Law and its founder Jeremy Troxel represent injured consumers, employees, patients and other plaintiffs all over the United States. Troxel Law is currently building out its website. You can learn more about Jeremy at the website of his other law firm, Troxel, Krauss & Chapman, located at tkclaw.com.

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

 Troxel
Law LLP

Keller | Lenkner

## CenturyLink Overbilling Compensation Questions

**To help us with your claim, please answer the below questions to the best of your ability. Once you have completed everything a copy will be sent to your email.**

Overbilling Questions

What was the monthly price you were quoted when you signed up for service with CenturyLink?

$ [ ]

On average, what was your actual monthly bill after you signed up?

$ [ ]

Did you wind up paying that higher price?

Yes ⌄

Was any of this increase based on extra services you requested after signing up?

No ⌄

How much?

$

For how many months did you pay the higher price?

 -- sele ⌄

When was the last time that you paid the higher price?

-- sele⌄    -- sele⌄

Did CenturyLink place a negative report on your credit because of the overcharges?

Yes⌄

## Customer Service Questions

Did you complain to CenturyLink about these overcharges?

Yes⌄

Did CenturyLink refund your money?

No ⌄

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

## Informational Questions

**The answers to these questions are essential because they allow us to keep in touch with you and, eventually, will allow CenturyLink to find your account records and determine how much they owe you.**

What is your date of birth?

-- select -- | -- select -- | -- selec

What is your current address?

Street:

City:

States: -- select | Zip:

What is the name associated with your CenturyLink account?

What is the phone number associated with your CenturyLink account?

Was the address associated with your CenturyLink account the same as your current address?

Yes

What is the address associated with your CenturyLink account?

Street:

City:

States: Zip:

Have you previously consulted with or hired another lawyer to bring a legal claim against CenturyLink?

No

Please review the answers to the questions above. When you are done, please press the "Confirm" button below.

Confirm

---

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

## CenturyLink Compensation Claims
### Retainer Agreement

This agreement is between you, the client, on the one hand, and, on the other, Keller Lenkner LLC and Troxel Law LLP, the attorneys or us.

### 1. Scope of Representation

We will represent you to the best of our ability and comply with all professional standards of competence and integrity.

We agree to represent you in investigating and, if appropriate in the attorneys' opinion, filing an individual arbitration asserting consumer fraud and/or related claims against CenturyLink, Inc. and, if appropriate, its subsidiaries or affiliates (collectively, the "Company").

The attorneys shall have no obligation to represent you in any other matter, and no obligation to handle any appeal of any decision in this matter. If we think it will help reach a successful resolution of your claims, we may also pursue resolution of your claims outside of or before initiating arbitration, including in court.

### 2. Attorneys' Fees

You will not owe the attorneys anything unless we are successful in collecting a recovery, payment to you, or settlement for your claim.

You have the right to accept or reject any settlement offer made to you.

Under no circumstances will the attorneys collect an unreasonably large fee.

If your case does not result in a recovery to you, then the attorneys will collect no fee and you will owe nothing. If your case results in a recovery to you, then you will still not have to pay any costs or fees out of your own pocket, but the attorneys will collect a fee from the Company as follows:

If your case resolves before the commencement of an arbitration or court case in which you are a named party, then the attorneys will collect a flat-fee of $750 in exchange for preparing your claim for filing, making a demand of the Company, and negotiating the resolution. "Commencement" means, for an arbitration, the payment of all filing fees and the appointment of an arbitrator. For a court case, it means the filing of the case with a court. You will never have to pay these fees and costs out of your own pocket. If you win your claim, the law requires the Company to pay you these fees and costs in addition to the damages and penalties the Company owes you. The attorneys will collect these fees from the Company as part of any award or settlement and deduct them from the total recovery as their fee. You will be entitled to retain the full recovery net of this fee. You agree that $750 is a reasonable fee reflective of the time, effort, expense, and skill the attorneys will put into your case to get it to the point of pre-commencement resolution.

If your case resolves after commencement, then the attorneys will collect a lodestar-based reasonable attorney's fee and recover their litigation costs from the Company under any applicable fee-shifting law. Again, the attorneys will collect this fee from the Company, not from you. "Lodestar" means the amount of money that results when you multiply the attorneys' hourly rates by the number of hours the attorneys' spend on your case. You authorize the attorneys to pursue this fee by asking any court or arbitrator for it and you agree that it will belong to the attorneys.

You acknowledge that this fee is negotiable and is the result of an arm's length transaction between you and the attorneys.

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

You grant the attorneys a lien to secure payment of the fees and expenses described by this agreement.

Even though you will pay nothing unless you recover, some states' laws require that we disclose to you our regular hourly rates. The hourly rates for the attorneys and other billing professional staff who may work on your case range from $100 for junior paralegal staff to $950 per hour for senior partners. The attorneys reserve the right to update these rates on 60-days written notice to you.

The attorneys will divide any fee recovered between them, with 10% going to Troxel Law LLP and the rest to Keller Lenkner LLC.

## 3. Direction to Settle at Full Value

The attorneys will work to get you the maximum amount allowed under the law. By signing this Agreement, you instruct the attorneys to, without further direction or authorization from you, accept a "full-value" settlement offer. A full-value settlement offer is any settlement offer made to you by the Company that:

- pays to you an amount equal to or more than the amount of any overpayments you made to paid to the Company in the past 36 months. Based on the information you provided, this amount is $ __100.00__
- requires you to release only those claims against the Company related to its billing practices; and
- requires you to keep the terms of the settlement confidential, meaning that you will not disclose them except to your immediate family, lawyers, and tax or financial professionals.

You may revoke or change this instruction by sending an email with your new instructions to centurylinkclaims@klclientservices.com. If you do not revoke or change this instruction and we accept, on your behalf, a qualifying settlement, then we will execute the necessary paperwork on your behalf and direct payment to the address we have on file for you.

## 4. Client's Duties

a. Contact Information – You agree to inform the attorneys by email to centurylinkclaims@klclientservices.com if you change your address, phone number, or email address. You agree to do so within two weeks of the change.

b. Participation in Discovery – You may be required to locate and produce documents, answer written questions, or appear at a time and place to answer questions under oath. You agree to make yourself available to do these things on reasonable notice.

c. Participation in Hearing or Trial – You agree to make yourself available to participate in a hearing or trial on your claims on reasonable notice.

d. Document Preservation – You must not destroy, delete, or discard documents and other information sources in your possession that are relevant to your potential claims. This includes physical, paper documents and electronic documents like email or social media posts, whether on a computer, phone, or other device.

You agree and acknowledge that your failure to fulfill any of these duties is grounds for the attorneys to stop representing you.

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

## 5. Third-Party Liens

Certain third parties may have, or may assert in the future, liens on any recovery you might obtain. You recognize and understand that any liens must be resolved before we can distribute to you your portion of any recovery. You acknowledge that we may engage a company that specializes in resolving these types of liens, and that any fee paid to such company will be treated as an expense under this Agreement. Lien resolution could reduce or eliminate your recovery. If any liens on the proceeds of this matter are asserted, you authorize us to hold in trust any funds we reasonably believe are or may be subject to any liens, until such liens are resolved and released.

## 6. Attorneys' Right to Withdraw

You acknowledge that the attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason, including, but not limited to, the Company's inability to pay.

## 7. Client's Right to Terminate Attorneys

You may terminate attorneys at any time by written notice by email to centurylinkclaims@klclientservices.com. If you do, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination.

## 8. Potential Conflicts

The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you. It is, however, possible that conflicts may arise in the future, including:

We discover that there is a limited pool of assets from which recovery is reasonably likely (for example, an insurance policy), and those assets are insufficient to pay all of our clients the full value of their claims.

A defendant offers an aggregate or "lump sum" settlement to all of our clients that does not specify the amount each client will receive.

A defendant offers to settle, but only if a certain percentage, or even all, of our clients accept the proposed settlement.

We may also be required by the applicable rules of professional conduct to share material information about your claims and negotiating position with our other clients with similar claims. While we will try to avoid these issues if it is practical to do so, they might occur. If any conflict of interest affecting you does arise, we will inform you promptly and work with you on how best to proceed in accordance with the applicable rules of professional conduct.

## 9. No Guarantee

You acknowledge that the attorneys have not and will not provide any guarantee about the outcome of your claims.

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

## 10. Association of Counsel

You acknowledge that the attorneys may associate with other counsel to assist with your potential claims and you authorize us to do so on written notice to you. We will pay for associated counsel without passing the expense on to you.

## 11. Entire Agreement and Choice of Law

This Agreement contains the entire agreement of the parties. It cannot be modified or canceled except in writing signed by all parties. This Agreement will be construed in accordance with the laws of Illinois notwithstanding choice of law rules.

## 12. Arbitration

In the event of any dispute, controversy, or claim between us (or our respective heirs, successors, assigns, or affiliates) arising out of, relating to, or in connection with your engagement of us (any of the foregoing, a "dispute"), you and we waive the right to seek remedies in court, including the right to a jury trial, and agree to submit said dispute exclusively to binding individual arbitration conducted by a single arbitrator subject to the rules of the American Arbitration Association ("AAA"). The arbitrator shall not have the authority to decide any claims as a class, collective, or representative action. The seat of the arbitration will be in Chicago, Illinois unless AAA determines that this location will impose undue hardship, in which case the location will be set by AAA. The parties will share the expense of arbitration equally, except that if you represent that this would impose an undue hardship, you will initially be responsible only for a filing fee equal to the amount that would be necessary to file your claim in court. In that event, the attorneys will advance the remaining fees and expenses on your behalf and the arbitrator will determine any additional amount you can pay without sustaining undue hardship. Threshold issues of arbitrability shall be decided by the arbitrator, including the scope of this agreement and whether a controversy or claim arises out of or relates to your engagement of us.

You are not required to agree to the above paragraph for us to represent you. If you do not want the above paragraph to apply, simply let us know within 90 days of signing this agreement by sending an email to centurylinkclaims@klclientservices.com indicating that you do not want the arbitration provision of this agreement to apply. The above paragraph does not apply if it is prohibited by the applicable attorney ethics rules.

## 13. Power of Attorney

Consistent with the attorney ethics rules and other requirements for powers of attorney, you grant us the power of attorney to execute all documents connected with your claims.

## 14. No Tax or Benefit Advice

You acknowledge and agree that the attorneys cannot and will not provide legal advice regarding the tax and government benefit implications of you receiving any settlement or sum of money.

### 15. Express Written Consent to Send Text Messages and Make Automated Calls

You provide us and our designees and agents your express permission and authorization to send text messages to the number or numbers you provide to us or our agents during the intake process and thereafter. You represent that you are the subscriber of those numbers and have the authority to give such consent. By executing this agreement, you authorize us to deliver or cause to be delivered to you telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice.

---

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

You are not required to provide us this authorization for us to represent you. If you do not wish to receive text messages, please let us know within 90 days of signing this agreement by sending an email to centurylinkclaims@klclientservices.com indicating that you do not wish to receive text messages.

### 16. Other Law Firms

You represent to us that you have not signed an agreement with another law firm to pursue any claims against the Company for you and that you do not recall signing such an agreement. To the extent you did and you do not remember, by signing this agreement, you are exercising your right to terminate any prior agreement with any other law firm in connection with your claims against the Company. You authorize the attorneys to communicate with any other firm about all issues related to any claims you have against the Company, and you agree that by signing this agreement, you are instructing any other firm to discuss your Company claims only with us and not you.

### 17. Authority to Sign

You represent that you have read and understood this agreement and have authority to sign it.

** ** **

We look forward to working to get you fair compensation.

Date:

By: _____

[ Finish ]

DocuSign Envelope ID: 303E6931-D0DB-4ECB-9CEC-A1AAB0F8545F

## Declaration in Support of Application for Waiver of Fees – California Consumers

In consumer arbitrations in California, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.

NAME OF CONSUMER: _____

ADDRESS:_____

_____

GROSS MONTHLY INCOME: _____

NUMBER OF PERSONS IN HOUSEHOLD: _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this _____ day of _____August_____, 2019, at _____, California.

_____

Signature of Consumer

# EXHIBIT Q

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A



Keller | Lenkner

## CenturyLink Overbilling Compensation Claims

Dear Robert

Thank you for the opportunity to represent you in getting compensation for CenturyLink's overbilling practices. We take this responsibility seriously and will do our best to help you receive fair compensation.

The following documents are a questionnaire and our representation agreement. This agreement explains the scope of the work we will do as your attorneys.

If you have any questions or experience any difficulties completing this document, feel free to email us at: attorneys@centurylinkclaims.com. Or you can call our office at (800) 597-9765.

Best regards,

Jeremy Troxel
Founding Partner
Troxel Law, LLP
Jeremy@centurylinkclaims.com

About Your Legal Team-

Keller Lenkner LLC – Keller Lenkner is a law firm located in Chicago that represents consumers, employees, investors, and other plaintiffs in complex litigation across the country. You can learn more at www.kellerlenkner.com.

Troxel Law LLP – Troxel Law and its founder Jeremy Troxel represent injured consumers, employees, patients and other plaintiffs all over the United States. Troxel Law is currently building out its website. You can learn more about Jeremy at the website of his other law firm, Troxel, Krauss & Chapman, located at tkclaw.com.

Troxel
Law LLP

Keller | Lenkner

## CenturyLink Overbilling Compensation Questions

**To help us with your claim, please answer the below questions to the best of your ability. Once you have completed everything a copy will be sent to your email.**

<u>Overbilling  Questions</u>

What was the monthly price you were quoted when you signed up for service with CenturyLink?

$

On average, what was your actual monthly bill after you signed up?

$

Did you wind up paying that higher price?

Yes

Was any of this increase based on extra services you requested after signing up?

No

How much?

$

For how many months did you pay the higher price?

When was the last time that you paid the higher price?

Did CenturyLink place a negative report on your credit because of the overcharges?

Yes

<u>Customer  Service Questions</u>

Did you complain to CenturyLink about these overcharges?

Yes

Did CenturyLink refund your money?

No

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A

<u>Informational Questions</u>

**The answers to these questions are essential because they allow us to keep in touch with you and, eventually, will allow CenturyLink to find your account records and determine how much they owe you.**

What is your date of birth?

What is your current address?

Street:

City:

States:                                    Zip:

What is the name associated with your CenturyLink account?

What is the phone number associated with your CenturyLink account?

Was the address associated with your CenturyLink account the same as your current address?

 Yes

What is the address associated with your CenturyLink account?

Street:

City:

States:                                    Zip:

Have you previously consulted with or hired another lawyer to bring a legal claim against CenturyLink?

 No

<span style="color:darkred">Please review the answers to the questions above. When you are done, please press the "Confirm" button below.</span>

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A

CASE 0:17-md-02795-MJD-KMM Document 157-5 Filed 01/16/20 Page 721 of 726
CASE 0:17-md-02795-MJD-KMM Document 512-5 Filed 01/10/20 Page 27 of 32

### CenturyLink Compensation Claims
### Retainer Agreement

This agreement is between you, the client, on the one hand, and, on the other, Keller Lenkner LLC and Troxel Law LLP, the attorneys or us.

### 1. Scope of Representation

We will represent you to the best of our ability and comply with all professional standards of competence and integrity.

We agree to represent you in investigating and, if appropriate in the attorneys' opinion, filing an individual arbitration asserting consumer fraud and/or related claims against CenturyLink, Inc. and, if appropriate, its subsidiaries or affiliates (collectively, the "Company").

The attorneys shall have no obligation to represent you in any other matter, and no obligation to handle any appeal of any decision in this matter. If we think it will help reach a successful resolution of your claims, we may also pursue resolution of your claims outside of or before initiating arbitration, including in court.

### 2. Attorneys' Fees

You will not owe the attorneys anything unless we are successful in collecting a recovery, payment to you, or settlement for your claim.

You have the right to accept or reject any settlement offer made to you.

Under no circumstances will the attorneys collect an unreasonably large fee.

If your case does not result in a recovery to you, then the attorneys will collect no fee and you will owe nothing. If your case results in a recovery to you, then you will still not have to pay any costs or fees out of your own pocket, but the attorneys will collect a fee from the Company as follows:

If your case resolves before the commencement of an arbitration or court case in which you are a named party, then the attorneys will collect a flat-fee of $750 in exchange for preparing your claim for filing, making a demand of the Company, and negotiating the resolution. "Commencement" means, for an arbitration, the payment of all filing fees and the appointment of an arbitrator. For a court case, it means the filing of the case with a court. You will never have to pay these fees and costs out of your own pocket. If you win your claim, the law requires the Company to pay you these fees and costs in addition to the damages and penalties the Company owes you. The attorneys will collect these fees from the Company as part of any award or settlement and deduct them from the total recovery as their fee. You will be entitled to retain the full recovery net of this fee. You agree that $750 is a reasonable fee reflective of the time, effort, expense, and skill the attorneys will put into your case to get it to the point of pre-commencement resolution.

If your case resolves after commencement, then the attorneys will collect a lodestar-based reasonable attorney's fee and recover their litigation costs from the Company under any applicable fee-shifting law. Again, the attorneys will collect this fee from the Company, not from you. "Lodestar" means the amount of money that results when you multiply the attorneys' hourly rates by the number of hours the attorneys' spend on your case. You authorize the attorneys to pursue this fee by asking any court or arbitrator for it and you agree that it will belong to the attorneys.

You acknowledge that this fee is negotiable and is the result of an arm's length transaction between you and the attorneys.

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A

CASE 0:17-md-02795-MJD-KMM Document 512-5 Filed 01/10/20 Page 28 of 32
Case 3:19-cv-07545-WHA Document 157-5 Filed 01/16/20 Page 722 of 726

You grant the attorneys a lien to secure payment of the fees and expenses described by this agreement.

Even though you will pay nothing unless you recover, some states' laws require that we disclose to you our regular hourly rates. The hourly rates for the attorneys and other billing professional staff who may work on your case range from $100 for junior paralegal staff to $950 per hour for senior partners. The attorneys reserve the right to update these rates on 60-days written notice to you.

The attorneys will divide any fee recovered between them, with 10% going to Troxel Law LLP and the rest to Keller Lenkner LLC.

## 3. Direction to Settle at Full Value

The attorneys will work to get you the maximum amount allowed under the law. By signing this Agreement, you instruct the attorneys to, without further direction or authorization from you, accept a "full-value" settlement offer. A full-value settlement offer is any settlement offer made to you by the Company that:

- pays to you an amount equal to or more than the amount of any overpayments you made to paid to the Company in the past 36 months. Based on the information you provided, this amount is $
- requires you to release only those claims against the Company related to its billing practices; and
- requires you to keep the terms of the settlement confidential, meaning that you will not disclose them except to your immediate family, lawyers, and tax or financial professionals.

You may revoke or change this instruction by sending an email with your new instructions to centurylinkclaims@klclientservices.com. If you do not revoke or change this instruction and we accept, on your behalf, a qualifying settlement, then we will execute the necessary paperwork on your behalf and direct payment to the address we have on file for you.

## 4. Client's Duties

a. Contact Information – You agree to inform the attorneys by email to centurylinkclaims@klclientservices.com if you change your address, phone number, or email address. You agree to do so within two weeks of the change.

b. Participation in Discovery – You may be required to locate and produce documents, answer written questions, or appear at a time and place to answer questions under oath. You agree to make yourself available to do these things on reasonable notice.

c. Participation in Hearing or Trial – You agree to make yourself available to participate in a hearing or trial on your claims on reasonable notice.

d. Document Preservation – You must not destroy, delete, or discard documents and other information sources in your possession that are relevant to your potential claims. This includes physical, paper documents and electronic documents like email or social media posts, whether on a computer, phone, or other device.

You agree and acknowledge that your failure to fulfill any of these duties is grounds for the attorneys to stop representing you.

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A

## 5. Third-Party Liens

Certain third parties may have, or may assert in the future, liens on any recovery you might obtain. You recognize and understand that any liens must be resolved before we can distribute to you your portion of any recovery. You acknowledge that we may engage a company that specializes in resolving these types of liens, and that any fee paid to such company will be treated as an expense under this Agreement. Lien resolution could reduce or eliminate your recovery. If any liens on the proceeds of this matter are asserted, you authorize us to hold in trust any funds we reasonably believe are or may be subject to any liens, until such liens are resolved and released.

## 6. Attorneys' Right to Withdraw

You acknowledge that the attorneys have the right to stop representing you at any time if, in their professional judgment and consistent with their ethical responsibilities, they come to believe that your potential claims are unlikely to result in a recovery for any reason, including, but not limited to, the Company's inability to pay.

## 7. Client's Right to Terminate Attorneys

You may terminate attorneys at any time by written notice by email to centurylinkclaims@klclientservices.com. If you do, you agree that the attorneys are entitled to a reasonable fee and reimbursement of costs for the work performed prior to termination.

## 8. Potential Conflicts

The attorneys intend to represent many clients with claims like yours. At this time, your interests and the interests of other clients align. We know of no conflicts of interest that would have an adverse impact on our representation of you. It is, however, possible that conflicts may arise in the future, including:

We discover that there is a limited pool of assets from which recovery is reasonably likely (for example, an insurance policy), and those assets are insufficient to pay all of our clients the full value of their claims.

A defendant offers an aggregate or "lump sum" settlement to all of our clients that does not specify the amount each client will receive.

A defendant offers to settle, but only if a certain percentage, or even all, of our clients accept the proposed settlement.

We may also be required by the applicable rules of professional conduct to share material information about your claims and negotiating position with our other clients with similar claims. While we will try to avoid these issues if it is practical to do so, they might occur. If any conflict of interest affecting you does arise, we will inform you promptly and work with you on how best to proceed in accordance with the applicable rules of professional conduct.

## 9. No Guarantee

You acknowledge that the attorneys have not and will not provide any guarantee about the outcome of your claims.

DocuSign Envelope ID: 8D08423B-4D94-445A-89B9-9E5EC4CE5A7A

## 10. Association of Counsel

You acknowledge that the attorneys may associate with other counsel to assist with your potential claims and you authorize us to do so on written notice to you. We will pay for associated counsel without passing the expense on to you.

## 11. Entire Agreement and Choice of Law

This Agreement contains the entire agreement of the parties. It cannot be modified or canceled except in writing signed by all parties. This Agreement will be construed in accordance with the laws of Illinois notwithstanding choice of law rules.

## 12. Arbitration

In the event of any dispute, controversy, or claim between us (or our respective heirs, successors, assigns, or affiliates) arising out of, relating to, or in connection with your engagement of us (any of the foregoing, a "dispute"), you and we waive the right to seek remedies in court, including the right to a jury trial, and agree to submit said dispute exclusively to binding individual arbitration conducted by a single arbitrator subject to the rules of the American Arbitration Association ("AAA"). The arbitrator shall not have the authority to decide any claims as a class, collective, or representative action. The seat of the arbitration will be in Chicago, Illinois unless AAA determines that this location will impose undue hardship, in which case the location will be set by AAA. The parties will share the expense of arbitration equally, except that if you represent that this would impose an undue hardship, you will initially be responsible only for a filing fee equal to the amount that would be necessary to file your claim in court. In that event, the attorneys will advance the remaining fees and expenses on your behalf and the arbitrator will determine any additional amount you can pay without sustaining undue hardship. Threshold issues of arbitrability shall be decided by the arbitrator, including the scope of this agreement and whether a controversy or claim arises out of or relates to your engagement of us.

You are not required to agree to the above paragraph for us to represent you. If you do not want the above paragraph to apply, simply let us know within 90 days of signing this agreement by sending an email to centurylinkclaims@klclientservices.com indicating that you do not want the arbitration provision of this agreement to apply. The above paragraph does not apply if it is prohibited by the applicable attorney ethics rules.

## 13. Power of Attorney

Consistent with the attorney ethics rules and other requirements for powers of attorney, you grant us the power of attorney to execute all documents connected with your claims.

## 14. No Tax or Benefit Advice

You acknowledge and agree that the attorneys cannot and will not provide legal advice regarding the tax and government benefit implications of you receiving any settlement or sum of money.

## 15. Express Written Consent to Send Text Messages and Make Automated Calls

You provide us and our designees and agents your express permission and authorization to send text messages to the number or numbers you provide to us or our agents during the intake process and thereafter. You represent that you are the subscriber of those numbers and have the authority to give such consent. By executing this agreement, you authorize us to deliver or cause to be delivered to you telemarketing calls using an automatic telephone dialing system or an artificial or prerecorded voice.

You are not required to provide us this authorization for us to represent you. If you do not wish to receive text messages, please let us know within 90 days of signing this agreement by sending an email to centurylinkclaims@klclientservices.com indicating that you do not wish to receive text messages.

## 16. Other Law Firms

You represent to us that you have not signed an agreement with another law firm to pursue any claims against the Company for you and that you do not recall signing such an agreement. To the extent you did and you do not remember, by signing this agreement, you are exercising your right to terminate any prior agreement with any other law firm in connection with your claims against the Company. You authorize the attorneys to communicate with any other firm about all issues related to any claims you have against the Company, and you agree that by signing this agreement, you are instructing any other firm to discuss your Company claims only with us and not you.

## 17. Authority to Sign

You represent that you have read and understood this agreement and have authority to sign it.

**  **  **

We look forward to working to get you fair compensation.

Date:

By: _____

# Declaration in Support of Application for Waiver of Fees – California Consumers

In consumer arbitrations in California, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of the arbitration fees.

NAME OF CONSUMER: _____

ADDRESS:_____

_____

GROSS MONTHLY INCOME: _____

NUMBER OF PERSONS IN HOUSEHOLD: _____

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed on _____, at _____, California.

_____

Signature of Consumer