Keith A. Custis (#218818)
  kcustis@custislawpc.com
CUSTIS LAW, P.C.
1875 Century Park East, Suite 700
Los Angeles, California 90067
(213) 863-4276

Justin Griffin (#234675)
  justingriffin@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
(213) 443-3100

Andrew Schapiro (*pro hac vice*)
  andrewschapiro@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN, LLP
191 N. Upper Wacker Dr., Suite 2700
Chicago, Illinois 60606
(312) 705-7472

Ashley Keller (*pro hac vice*)
  ack@kellerlenkner.com
Travis Lenkner (*pro hac vice*)
  tdl@kellerlenkner.com
Marquel Reddish (*pro hac vice*)
  mpr@kellerlenkner.com
KELLER LENKNER LLC
150 N. Riverside Plaza, Suite 4270
Chicago, Illinois 60606
(312) 741-5220

Warren Postman (*pro hac vice*)
  wdp@kellerlenkner.com
KELLER LENKNER LLC
1300 I Street, N.W., Suite 400E
Washington, D.C. 20005
(202) 749-8334

*Attorneys for Petitioners*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

|  |  |
|---|---|
| TERRELL ABERNATHY, et al., <br><br> *Petitioners*, <br><br> vs. <br><br> DOORDASH, INC., <br><br> *Respondent*. | Case Nos.   3:19-cv-07545 <br> 3:19-cv-07646 <br><br> **DECLARATION OF WARREN POSTMAN IN SUPPORT OF PETITIONERS' REPLY IN SUPPORT OF AMENDED MOTION TO COMPEL ARBITRATION** <br><br> **Date**:   February 10, 2020 <br> **Time**:   2:00 p.m. <br> **Judge**:   Hon. William H. Alsup |
| CHRISTINE BOYD, et al., <br><br> *Petitioners*, <br><br> vs. <br><br> DOORDASH, INC., <br><br> *Respondent*. |  |

I, Warren Postman, declare based on personal knowledge as follows:

1.     I am a Partner at Keller Lenkner LLC, counsel for Petitioners in this matter.

2.     I have personal knowledge of the facts stated herein, and if called upon as a witness I could and would testify competently thereto.

3.     This declaration is submitted in support of Petitioners' Reply in Support of Amended Motion to Compel Arbitration.

4.     As early as June 4, 2019—in response to DoorDash stating that it wanted confirmation that Keller Lenkner represented the clients it claims to represent—Keller Lenkner offered to let DoorDash choose a redacted sample of its engagement agreements to review, or to show unredacted copies of its agreements to a neutral mediator, who would confirm (without breaching privilege) that Petitioners had engaged Keller Lenkner.  Attached as Exhibit A is a true and correct copy of an email communicating this offer to DoorDash's counsel.  DoorDash never took Keller Lenkner up on the offer.

5.     In the same email, dated June 4, 2019, Keller Lenkner asked that DoorDash disclose the names of claimants that DoorDash said it could not locate in its records, so Keller Lenkner could provide supplemental information about them.  My partner Ashley Keller and I each repeated that suggestion on multiple phone calls with DoorDash, and assured DoorDash that we would not pursue claims for anyone it could demonstrate did not have a good-faith basis to demand arbitration.  On a phone call on November 6, 2019, DoorDash's counsel, Michael Holecek, stated that DoorDash did not want to share those names because DoorDash thought it would set a "bad precedent" if it worked with us to determine which individuals' claims should not go forward.

6.     On July 2, 2019, Keller Lenkner filed demands for individual arbitration with AAA and DoorDash on behalf of 250 Dashers.

7.     On July 29, 2019, DoorDash requested a two-week extension of AAA's payment deadline—to August 20, 2019—which AAA granted.

8.     Although AAA did not grant any further extensions, DoorDash did not pay the filing fees necessary to commence those arbitrations until September 5, 2019.

9.     On August 16, 2019, Keller Lenkner received settlement offers for most of the 250 Dashers who had filed demands for arbitration as referenced in the Keller Decl. ¶¶ 4–6 (ECF No. 152).  Thirteen of those Dashers accepted their offers.

10.     AAA has informed me that, while its rules allow it to appoint arbitrators directly, without strike lists, or to appoint arbitrators from a master strike list, it generally will issue individual strike lists for each arbitration if one party requests that it do so.  But AAA noted that if individual strike lists become unworkable, it will exercise its discretion to use a master strike list or appoint arbitrators directly.

11.     At the hearing on Petitioners' motion for a temporary restraining order, I offered to show the Court and DoorDash declarations for every Petitioner in the same form as ECF No. 5-2, which states under penalty of perjury that the Petitioner retained Keller Lenkner to represent him or her in arbitration against DoorDash.  *See* Keller Decl., Ex. II, Tr. at 21:10–15, ECF No. 152-35 ("We have every witness statement in a box.  If DoorDash or Your Honor would like me to, we can file them electronically.  We can give physical copies.").  Although DoorDash has requested other information from Keller Lenkner regarding Petitioners since then, it has not taken me up on this offer.

12.     On December 26, 2019, DoorDash's counsel requested the "DocuSign Envelope History and Certificate of Completion for each of the 5,010 declarations and 869 witness statements" Petitioners filed in this case (*see* ECF Nos. 153-6–153-8).  When asked why DoorDash would be entitled to this information, DoorDash's counsel responded that the "DocuSign Envelope History and Certificate of Completion are used to verify the authenticity of DocuSign signatures." Although Keller Lenkner maintained that DoorDash had no basis to challenge the authenticity of the signatures, we agreed to share certificates from 400 Petitioners of DoorDash's choosing. Attached as Exhibit B is a true and correct copy of the correspondence between Keller Lenkner and DoorDash's counsel from December 26, 2019 to January 2, 2020 regarding the DocuSign certificates of completion.

13.     DoorDash has argued that Keller Lenkner might not represent Petitioners because the DocuSign certificates of completion do not mention Keller Lenkner but instead mention Jeremy Troxel and Pioneertown Media.   Jeremy Troxel is a partner at Troxel Law, LLP and is Keller Lenkner's co-counsel.   *See* ECF No. 5-2 ("This declaration is an important document that will allow us to establish that you have retained Keller Lenkner LLC and Troxel Law, LLP to represent you in bring[ing] [sic] claims against DoorDash.").   Each Petitioner signed an engagement agreement that authorizes both Keller Lenkner and Troxel Law LLP to represent him or her in claims against DoorDash.   Pioneertown Media LLC is a company that manages attorney advertising for Troxel Law, LLP.

14.     On January 21, 2020, one of my colleagues at Keller Lenkner sent DoorDash's counsel a letter identifying a number of outstanding issues with DoorDash's data production and search processes.   Attached as Exhibit C is a true and correct copy of that letter.

15.     Attached as Exhibit D is a true and correct copy of the Transcript of Proceedings in this Court on December 20, 2019.

I declare that the foregoing is true under penalty of perjury of the laws of the United States.

Signed on January 23, 2020 in Toronto, Canada.

/s/ Warren Postman
Warren Postman

# Exhibit A

**From:** ack@kellerlenkner.com
**Date:** June 4, 2019 at 8:46:46 PM EDT
**To:** "Holecek, Michael" <MHolecek@gibsondunn.com>
**Subject: Re: Confidential Mediation/Settlement Communication**

Michael,

Thanks for the update. A 9:30 start is fine with us. I'd still appreciate the names of any clients your client was unable to find in its system of you are willing to provide it.

Regarding our engagement letters, I'm not willing to do more than what I told you by phone. If you will say in writing that doing so does not waive privilege, we will provide you with a redacted copy of our engagement agreement with signatures for five clients of your choice. Or we will show unredacted copies to the mediator under the auspices of the mediator privilege.

To be frank, I'm getting a little peeved at your client's position here. I take ethics seriously as do my partners. I represent these clients and would suffer serious repercussions if I falsely made that assertion. And if I have to file anything in court against your client, I am perfectly comfortable doing so in compliance with Rule 11.

Rest assured, I am not going to ask you to show me Gibson Dunn's retainer with Doordash in a game of turnabout being fair play. I think I've been more than reasonable on this issue and am not willing to consider any further inconvenience to my team or accommodation to your client. It may well be possible to send 500 signatures pages. But I'm not going to do so. Doordash has zero basis to challenge our representations and I've already gone above and beyond on this score. You have what I'm willing to provide. Let me know how you wish to proceed.


Ashley

**Ashley C. Keller**
Partner

Keller | Lenkner
150 N. Riverside Plaza, Suite 4270 | Chicago, IL 60606
312.741.5222 | Website | Email

# Exhibit B

| From: | Wilhelm, Andrew |
|---|---|
| To: | Warren Postman; Ashley Keller; Marquel Reddish; Travis Lenkner |
| Cc: | Lipshutz, Joshua S.; Fogelman, James P.; Holecek, Michael |
| Subject: | RE: Data for Abernathy/Boyd |
| Date: | Thursday, January 2, 2020 14:12:48 |
| Attachments: | 2020.01.02 Petitioners for Certificate of Completion.xlsx |

Warren,

Attached please find a spreadsheet listing 200 *Abernathy* petitioners and 200 *Boyd* petitioners, along with their email addresses.  We agree to receive the Certificates of Completion and not the Envelope Histories.

Thank you,

**Andrew Wilhelm**


# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3556 • Fax +1 202.530.9612
AWilhelm@gibsondunn.com • www.gibsondunn.com

---

**From:** Warren Postman <wdp@kellerlenkner.com>
**Sent:** Wednesday, January 1, 2020 5:36 PM
**To:** Holecek, Michael <MHolecek@gibsondunn.com>; Ashley Keller <ack@kellerlenkner.com>; Fogelman, James P. <JFogelman@gibsondunn.com>
**Cc:** Wilhelm, Andrew <AWilhelm@gibsondunn.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>; Lipshutz, Joshua S. <JLipshutz@gibsondunn.com>
**Subject:** Re: Data for Abernathy/Boyd

[External Email]
Michael,

While you still have not identified any basis to question the authenticity of our clients' declarations, we will provide Certificates of Completion for 400 Petitioners of your choosing in order to put this baseless line of inquiry to rest. Our understanding is that the relevant information on the Envelope Histories is already on the Certificates of Completion, so there is no point to pulling Envelope Histories as well, which would also have to be done manually and individually. If you provide us the names and email addresses for 400 Petitioners, we will aim to send you the Certificates within 2-3 business days.

Sincerely,

**Warren D. Postman**
Partner

# Keller | Lenkner

1300 I Street, N.W., Suite 400E | Washington, D.C. 20005

<u>202.749.8334</u> | <u>Website</u> | <u>Email</u>

---

**From:** "Holecek, Michael" <<u>MHolecek@gibsondunn.com</u>>
**Date:** Tuesday, December 31, 2019 at 4:41 AM
**To:** Ashley Keller <<u>ack@kellerlenkner.com</u>>, "Fogelman, James P."
<<u>JFogelman@gibsondunn.com</u>>, Warren Postman <<u>wdp@kellerlenkner.com</u>>
**Cc:** "Wilhelm, Andrew" <<u>AWilhelm@gibsondunn.com</u>>, Travis Lenkner
<<u>tdl@kellerlenkner.com</u>>, Marquel Reddish <<u>mpr@kellerlenkner.com</u>>, "Lipshutz, Joshua S."
<<u>JLipshutz@gibsondunn.com</u>>
**Subject:** RE: Data for Abernathy/Boyd

Ashley and Warren,

We are willing to compromise and seek only 400 of the DocuSign Envelope Histories and Certificates
of Completion at this time (200 from the Boyd petitioners and 200 from the Abernathy petitioners).
That is fewer than 10% of the Petitioners.  If you agree to send us that information by Friday, we will
send over a list of 400 names.  We reserve all rights to request additional information depending on
the results of that query.  Please let us know if you agree.

Thank you.

**Michael J. Holecek**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7018 • Fax +1 213.229.6018
<u>MHolecek@gibsondunn.com</u> • <u>www.gibsondunn.com</u>

---

**From:** Ashley Keller <<u>ack@kellerlenkner.com</u>>
**Sent:** Monday, December 30, 2019 6:56 AM
**To:** Fogelman, James P. <<u>JFogelman@gibsondunn.com</u>>; Warren Postman
<<u>wdp@kellerlenkner.com</u>>
**Cc:** Wilhelm, Andrew <<u>AWilhelm@gibsondunn.com</u>>; Travis Lenkner <<u>tdl@kellerlenkner.com</u>>;
Marquel Reddish <<u>mpr@kellerlenkner.com</u>>; Lipshutz, Joshua S. <<u>JLipshutz@gibsondunn.com</u>>;
Holecek, Michael <<u>MHolecek@gibsondunn.com</u>>
**Subject:** Re: Data for Abernathy/Boyd

[External Email]
James,

We have already produced a signature for each individual.  Each one is contained in Exhibits F and G to the Reddish declaration.  Each petitioner himself or herself signed the declarations or witness statements, just as the Court ordered, and just as we declared.  We have fully met our burden unless you have some basis to suggest we are lying. So you are not asking for "an alternative that would produce a signature for each individual."  Instead, as Andrew noted, you are asking for proof of authenticity—*i.e.*, that we didn't sign on our clients' behalf.  That request most certainly impugns our integrity, and the Court never said you are entitled to question, without any basis, whether we have perjured ourselves.  We have never questioned your ethics the way you are challenging ours: for instance, we have not requested and are not requesting screenshots that show the Dashers you found in your system signed up on the date you say, or last drove for DoorDash on the date you conveyed to us.

As Warren already relayed, the information you requested is stored in a way that would require us to manually retrieve the data for each signatory, which is a heavy burden that is grossly disproportionate to your unfounded concern.  That is why we proposed a 50-person sample composed entirely of petitioners of your choosing.  When the authenticating information for every single one of the 50 petitioners you select matches what you see on the declarations, you should have all the comfort you need that we have not worked a fraud on the Court.  If you disagree, please explain why you would still doubt the validity of the signatures.

You have already identified each petitioner as someone who drove for DoorDash, and thus the account page for each one is information already in your client's possession and control.  We are not going to provide you with screenshots of information you can readily obtain from DoorDash that won't help you authenticate signatures in any event.

Warren is overseas this week, but I can discuss these points by phone if you wish.


Regards,
Ashley


**Ashley C. Keller**
Partner

Keller | Lenkner
150 N. Riverside Plaza, Suite 4270 | Chicago, IL 60606
312.741.5222 | Website | Email

---

**From:** "Fogelman, James P." <JFogelman@gibsondunn.com>
**Date:** Saturday, December 28, 2019 at 4:54 PM
**To:** Warren Postman <wdp@kellerlenkner.com>
**Cc:** "Wilhelm, Andrew" <AWilhelm@gibsondunn.com>, Ashley Keller <ack@kellerlenkner.com>, Travis Lenkner <tdl@kellerlenkner.com>, Marquel Reddish <mpr@kellerlenkner.com>, "Lipshutz, Joshua S." <JLipshutz@gibsondunn.com>, "Holecek, Michael" <MHolecek@gibsondunn.com>
**Subject:** Re: Data for Abernathy/Boyd

Warren:

I appreciate the offer to compromise, and we are willing to reach a reasonable accommodation if we can find one. But the offer of 50 random ones is not enough to satisfy the burden the court has indicated you must meet, and the court was certainly not impugning anyone when it suggested that we are entitled to this information. I must confess that I did not think this was a burdensome request, and indeed I thought you had this already.  Can you perhaps explain the steps that must be taken to get this stuff? And perhaps suggest an alternative that would produce a signature for each individual? I had been thinking of also asking for a screen shot of the account page on the App for each plaintiff. That should not be burdensome. Is that something you would be willing to provide? I am happy to discuss any or all of this by phone if you prefer. Regards. JPF

**James P. Fogelman**

**GIBSON DUNN**

Gibson, Dunn & Crutcher LLP
333 South Grand Avenue, Los Angeles, CA 90071-3197
Tel +1 213.229.7234 • Fax +1 213.229.6234
JFogelman@gibsondunn.com • www.gibsondunn.com

> On Dec 28, 2019, at 9:19 AM, Warren Postman <wdp@kellerlenkner.com> wrote:

[External Email]
Andrew,

We understand why the information contained in the declarations is relevant.  What we don't understand, and what we take umbrage at, is your implicit suggestion that Keller Lenkner may have committed fraud on the Court by fabricating our clients' signatures.  The Court suggested we should be able to work out the factual predicates for our motion to compel through a good faith meet and confer process.  But a good faith meet and confer process does not include suggesting, without any basis, that attorneys have committed fraud.  Pulling each DocuSign envelope and certificate must be done manually and individually, and is therefore unreasonably burdensome given that you have no basis for asking us to disprove your baseless insinuations.

We will provide authenticating information for a sample of any 50 Petitioners you choose, which is more than enough to confirm that we have not fabricated client signatures.  We will not commit to do so by your arbitrary deadline of Monday, two business days after your initial request, but we will do so promptly.

Sincerely,

**Warren D. Postman**

Partner

# Keller | Lenkner

1300 I Street, N.W., Suite 400E | Washington, D.C. 20005

202.749.8334 | Website | Email

---

**From:** "Wilhelm, Andrew" <AWilhelm@gibsondunn.com>
**Date:** Friday, December 27, 2019 at 11:03 PM
**To:** Warren Postman <wdp@kellerlenkner.com>
**Cc:** Ashley Keller <ack@kellerlenkner.com>, Travis Lenkner <tdl@kellerlenkner.com>, Marquel Reddish <mpr@kellerlenkner.com>, "Fogelman, James P." <JFogelman@gibsondunn.com>, "Lipshutz, Joshua S." <JLipshutz@gibsondunn.com>, "Holecek, Michael" <MHolecek@gibsondunn.com>
**Subject:** RE: Data for Abernathy/Boyd

Warren,

The DocuSign Envelope History and Certificate of Completion are used to verify the authenticity of DocuSign signatures.  In light of your use of DocuSign for the declarations you submitted to the court, we are entitled to examine whether Petitioners have complied with Judge Alsup's order that "the petitioner himself or herself must sign" the declarations.  We are hoping to resolve this issue informally, but we are willing serve formal discovery if necessary.  As you will recall, at the November 25 TRO hearing, Judge Alsup stated that he would "give each side ten document requests," but also stated that providing information relevant to whether Petitioners have met their burden to compel arbitration "is something that the lawyers would be able to work out and not have to take discovery."  Please let us know by Sunday whether you will provide this information no later than Monday.

We are working diligently to provide answers to the questions you sent on December 20.

**Andrew Wilhelm**

## GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3556 • Fax +1 202.530.9612
AWilhelm@gibsondunn.com • www.gibsondunn.com

---

**From:** Warren Postman <wdp@kellerlenkner.com>
**Sent:** Friday, December 27, 2019 8:13 AM
**To:** Wilhelm, Andrew <AWilhelm@gibsondunn.com>
**Cc:** Ashley Keller <ack@kellerlenkner.com>; Travis Lenkner <tdl@kellerlenkner.com>; Marquel Reddish <mpr@kellerlenkner.com>; Fogelman, James P. <JFogelman@gibsondunn.com>; Lipshutz,

Joshua S. <JLipshutz@gibsondunn.com>; Holecek, Michael <MHolecek@gibsondunn.com>
**Subject:** Re: Data for Abernathy/Boyd

[External Email]
Andrew,


Please explain why you believe you need and are entitled to this information.


Please also let us know when you will respond to our questions from December 20, regarding the clients for whom we provided supplemental information and DoorDash's search process.


Sincerely,



**Warren D. Postman**
Partner

Keller | Lenkner
1300 I Street, N.W., Suite 400E | Washington, D.C. 20005
202.749.8334 | Website | Email



On Dec 26, 2019, at 4:09 PM, Wilhelm, Andrew <AWilhelm@gibsondunn.com> wrote:

Warren,

By December 30, 2019 would you please produce the DocuSign Envelope History and Certificate of Completion for each of the 5,010 declarations and 869 witness statements that you included as part of your amended motion to compel arbitration?

Relatedly, can you please explain why the 869 witness statements have two signatures each and, if each witness statement has two Envelope Histories and Certificates of

Completion, would you please produce both versions?

Thank you,

**Andrew Wilhelm**


# GIBSON DUNN

Gibson, Dunn & Crutcher LLP
1050 Connecticut Avenue, N.W., Washington, DC 20036-5306
Tel +1 202.887.3556 • Fax +1 202.530.9612

# Exhibit C

# Keller | Lenkner

January 21, 2020

Mr. Andrew Wilhelm
Gibson, Dunn, & Crutcher LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036

<u>VIA EMAIL</u>

Re:     Data for Abernathy/Boyd

Andrew:

My December 29 and 31 emails to you regarding DoorDash's data production identified concerns about the sufficiency of DoorDash's search processes. DoorDash has not provided timely or satisfactory responses to those concerns. It still has not even provided data for the Petitioners it admits it has since found in its records, using the supplemental information we provided.

For weeks, we have raised questions about DoorDash's search methods and requested that DoorDash perform a manual search for each Petitioner it has not already identified in its records. DoorDash has refused to perform that basic task—despite the Court's directive that Petitioners' counsel could "march through [DoorDash's] files . . . to find their names as proof that they, in fact, did" drive for DoorDash and sign an arbitration agreement. TRO Hr'g Tr. at 52:13–14. With briefing on the motion to compel nearly complete, DoorDash must promptly conduct a thorough search of its records for each Petitioner it contends does not have a claim in arbitration and respond to the questions and issues set forth below.

\*\*\*

**First**, in my December 29 and 31 emails, we identified several Petitioners who have documentary proof that they completed deliveries for DoorDash—contrary to DoorDash's claim that those Petitioners did not complete deliveries for DoorDash or did not have Dasher accounts. Please provide an update and explanation for each of these groups of Petitioners:

- Petitioners Cornell Thompson (5550777) and Carlos Barbosa (5525318)—whom DoorDash contend did not complete any deliveries—provided documentary proof that they completed deliveries on Dasher accounts that are associated with the email addresses we <u>already supplied</u> to DoorDash. DoorDash has not offered any explanation for why its search failed to identify these valid Dasher accounts.

- Petitioners Jermaine Miles (5764654), Sheliya Cosby (5709872), and Erika Espericueta (5907218) provided documentary proof that they completed deliveries in the form of screenshots of weekly pay statements from the Dasher app. Yet DoorDash continues to claim that these Petitioners never completed deliveries.

- Petitioners Marquise Chopra (5724529) and Rodolfo Molina (5501497) provided DoorDash with documentary proof of Dasher accounts and deliveries associated with email addresses DoorDash already had in its possession. DoorDash's "explanation" for this discrepancy was that Messrs. Chopra and Molina "changed their email address from the one they originally

# Keller | Lenkner

used to sign up for a Dasher account, causing difficulty in locating them." A. Wilhelm Email to M. Reddish (Jan. 3, 2020) re Data for Abernathy/Boyd. In other words, DoorDash has conceded that the search process it uses is unable to account for Dashers who have ever changed their email addresses. For the remaining Petitioners DoorDash claims are not Dashers with deliveries, can DoorDash confirm that this discrepancy is not the source of the issue? Can DoorDash also confirm that, for those Petitioners it was able to locate, it pulled a complete data set that accounts for any updates to Petitioners' email addresses over time?

**Second**, DoorDash has identified four Petitioners it says have "incomplete or no applicant data." *Id.* Three of those Petitioners—Hamza Shakir (4882715), Jasmine Johnson (5739053), and Desiree Wilbon (5396829)—provided screenshots from their Dasher accounts as proof that they made deliveries. In its attempt to explain this discrepancy, DoorDash stated that it believes there is no data because these Petitioners have "very old Dasher accounts." *Id.* But DoorDash has never explained how "old" data must be for it not to exist in DoorDash's system. And given the Petitioners' screenshots of their deliveries, it is unlikely that the data are no longer in DoorDash's system when they still exist and are readily accessible in the Dasher app. Please provide data for these Petitioners as soon as possible or provide a more thorough explanation for why no data are available.

**Third**, DoorDash stated that it needs more information for nine Petitioners before it can "narrow down" whether particular Dasher accounts belong to them. *Id.* Each of those Petitioners provided DoorDash with his or her name, email address(es), phone number(s), and address(es).[1] That should be more than enough information for DoorDash to cross-reference with the information from the Dasher account to determine to whom the account belongs. What more information could DoorDash possibly need, and why?

**Fourth**, on January 3, DoorDash stated that it was "still looking into" 15 Petitioners. *Id.* DoorDash has not provided an update. Please do so as soon as possible.

**Fifth**, DoorDash identified 42 Petitioners whom it found using the supplemental information we provided.[2] But DoorDash has yet to produce those Petitioners' data. Please do so as soon as possible. Furthermore, in its opposition to the motion to compel, DoorDash told the Court that it "found approximately 37 of these individuals in its records." Dkt. 151 at 11–12. Who are the five Petitioners DoorDash previously told us it found but later told the Court it cannot locate, and what is the explanation for their change in status?

**Sixth**, DoorDash has not yet responded to my December 31 email regarding seven Petitioners for whom we also provided additional information. And DoorDash omitted any mention of these seven Petitioners in its opposition to the motion to compel. *See* Dkt 151 at 11–12. Is DoorDash searching for these Petitioners' data, and if so, when does it plan to produce it?

**Seventh**, DoorDash provided data for 13 Petitioners for whom it showed a delivery date after the implementation of the CPR agreement but for whom it did not provide a CPR agreement signature

---

[1] Petitioner Terry Norris (5744786) also gave DoorDash the last four digits of his Social Security number and his driver's license number. Petitioners Ralph Virary (5709786), Gilbert Lopez (5596487), and Kamran Nejad (5906970) also gave DoorDash documentary proof of their accounts with deliveries.
[2] For Brittany Carter (5736360) and Spencer Oxholm (5838355), the only supplemental information were screenshots of pay statements from their Dasher accounts. The emails, phone numbers, and addresses stayed the same.

# Keller | Lenkner

date. We identified those individuals in PET0000004. As of January 3, DoorDash was "continuing to look into" the "Petitioners who appear to have completed deliveries after November 9 without record of accepting the updated arbitration agreement." A. Wilhelm Email to M. Reddish (Jan. 3, 2020) re Data for Abernathy/Boyd. Please provide an update as soon as possible. Also, does DoorDash intend to fulfill its obligation to supplement discovery by sending an updated list of Petitioners who have signed the CPR agreement, and if so, when?

*\*\*\**

On behalf of DoorDash, you and your colleagues represented to the Court that "none of these approximately 313 Petitioners possibly could have a valid Labor Code or FLSA claim." Dkt. 157 at 11. But DoorDash has not responded to the litany of issues set forth in our emails and repeated above. And the deficiencies in DoorDash's data establish that DoorDash's searches yield false negatives. It is particularly troubling that, even when confronted with these issues, DoorDash still refuses to conduct a manual search for the remaining Petitioners who are at issue.

DoorDash's halfhearted search—followed by its attempt to use that halfhearted search to oppose arbitration and claim that certain Petitioners couldn't "possibly" have claims, *id.*—is the exact type of "hide-the-ball" tactic that precipitated the need for discovery in the first place, TRO Hr'g Tr. at 54:15. The Court ordered DoorDash to open its files so Petitioners can "find their names as proof that they, in fact, did" drive for DoorDash. *Id.* at 52:13–15. The Court did not order DoorDash to run automated searches and then throw up its hands when those searches do not yield accurate results.

In addition to answering the questions and requests set forth above, please confirm that DoorDash intends to satisfy its discovery obligations and perform a manual search and cross-reference for the few hundred remaining Petitioners it claims could not "possibly . . . have a valid Labor Code or FLSA claim." Dkt. 157 at 11. Please also confirm when DoorDash plans to complete those efforts and provide us the results in advance of the February 10 hearing.

Regards,

Marquel P. Reddish

cc:     James Fogelman
        Joshua Lipshutz
        Michael Holecek

# Exhibit D

Pages 1 - 21

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

TERRELL ABERNATHY, et al.,              )
                                        )
            Petitioner,                 )
                                        )
    VS.                                 )   NO. C 19-07545 WHA
                                        )
DOORDASH, INC.,                         )
                                        )
            Respondent.                 )
_____             )

                              San Francisco, California
                              Friday, December 20, 2019

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Petitioner:
                    KELLER LENKNER LLC
                    1300 I Street N.W.
                    Suite 400E
                    Washington, D.C. 20005
              **BY:  WARREN D. POSTMAN**
                    **ATTORNEY AT LAW**


For Third Party CPR:
                    MORGAN, LEWIS & BOCKIUS LLP
                    101 Park Avenue
                    New York, New York 10178-0060
              **BY:  KIMBERLEY E. LUNETTA**
                    **ATTORNEY AT LAW**


                    MORGAN, LEWIS & BOCKIUS LLP
                    1400 Page Mill Road
                    Palo Alto, California  94304
              **BY:  ANDREW P. FREDERICK**
                    **ATTORNEY AT LAW**


Reported By:  Ana M. Dub, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, CSR No. 7445

| | |
|---|---|
| 1 | <u>**Friday - December 20, 2019**</u>                                    <u>**10:55 a.m.**</u> |
| 2 | **P R O C E E D I N G S** |
| 3 | ---o0o--- |
| 4 | **THE CLERK:**  Calling Civil Action 19-7545, Abernathy, |
| 5 | et al. versus DoorDash, Inc. |
| 6 | Counsel, please step forward and state your appearances |
| 7 | for the record. |
| 8 | **MR. POSTMAN:**  Good morning, Your Honor.  Warren |
| 9 | Postman from Keller Lenkner for the petitioners. |
| 10 | **MS. LUNETTA:**  Good morning, Your Honor.  Kimberley |
| 11 | Lunetta from Morgan Lewis & Bockius on behalf of third party |
| 12 | CPR.  And I have with me my colleague. |
| 13 | **MR. FREDERICK:**  Hi.  Good morning, Your Honor.  Andrew |
| 14 | Frederick from Morgan Lewis as well. |
| 15 | **THE COURT:**  Welcome to all of you. |
| 16 | So have you solved your problem? |
| 17 | **MS. LUNETTA:**  We're close.  If we could potentially -- |
| 18 | if I could just share with Your Honor what the issue seems to |
| 19 | be and we can maybe get some help resolving, that would be |
| 20 | great. |
| 21 | First of all, we've come to a lot of additional |
| 22 | understanding today.  So your method works, of having everyone |
| 23 | sit in the room. |
| 24 | Basically, what I understand the issue to be is that while |
| 25 | CPR believes that under Ninth Circuit law, all that matters for |

1   an assessment of substantive unconscionability, all that

2   matters is what's on the face of the protocol or the rules of

3   the arbitral forum, Mr. Postman is concerned that there's some

4   back -- and I'm not casting aspersions.  What he believes is

5   that there may be a motive on behalf of the defendant in this

6   case, DoorDash, to slow roll, if you will, the assignment of

7   arbitrators if this initial mediation process fails and that

8   that would allow Gibson Dunn and DoorDash to sort of delay

9   paying the fees over time for the arbitrations and it would

10  encourage them, incentivize them to not resolve the case and

11  just to have, basically, an annuitized legal spend over a

12  number of years when arbitrations are not going forward.

13      That is certainly not CPR's intention or understanding of

14  what they're doing.  But I understand Mr. Postman would plan to

15  argue that we need -- he needs that discovery about Gibson

16  Dunn's communications with CPR to see if that was the ask.

17      And so what I would like to do is -- I think we've come to

18  a -- we may have come to a resolution where, if we could just

19  place on the record our understanding that that is the

20  concern -- that Gibson Dunn and DoorDash had motivated, on the

21  back-end, these other processes for assigning arbitrators that

22  are not on the face of the protocol -- that if they've asked to

23  slow roll that and that's not on the face of the protocol but

24  it could be -- and it's not -- but it could be an understanding

25  between CPR and Gibson Dunn that would affect the process, I

1    understand why he would be concerned if that is the case.

2         I can represent to the Court that it's not.  I've looked

3    at the documents.  But we'd be willing to produce those

4    communications between Gibson Dunn, DoorDash, and CPR and any

5    internal discussions about those communications.

6         So DoorDash told us this on a call today.  We would be

7    willing to produce that to address that concern, that perhaps

8    DoorDash and Gibson Dunn asked for some delay in the procedures

9    that do not appear on the face of the protocol.

10        It's my understanding that if we were to do that, we could

11   do that with a confidentiality order in place so that those

12   documents wouldn't be used outside this case and that that

13   would alleviate the concern that Mr. Postman had about wanting

14   to get all communications that CPR had with anyone and

15   everyone, internally and externally, about the protocol, their

16   finances, and all the other things that we found troublesome.

17            **THE COURT:**  Go ahead.

18            **MR. POSTMAN:**  Your Honor, and I'm sorry.  I think

19   before we had come in, we thought we were close to an

20   understanding.

21        My understanding was, actually, that what we were close to

22   was something different, which was CPR, it sounds like, was not

23   aware that DoorDash had pending arbitrations that they would

24   seek to apply the new protocol to; and they thought they were

25   being asked to create something for other arbitrations, not

**PROCEEDINGS**

1    ones that had already been filed with AAA; and they actually

2    thought, I believe, that DoorDash in this matter may not have

3    been attempting to still apply the CPR agreement to any of the

4    petitioners.

5             **THE COURT:**  Too many double negatives in there.  I

6    can't follow what you're saying.

7             **MR. POSTMAN:**  I'm sorry.  CPR's understanding was that

8    DoorDash agreed everyone here was subject to the AAA agreement,

9    not the --

10            **THE COURT:**  "Here."  What do you mean?

11            **MR. POSTMAN:**  In this case, all the petitioners.

12            **THE COURT:**  Yes.  So DoorDash agreed what now?

13            **MR. POSTMAN:**  I apologize.  I'm not --

14            **THE COURT:**  You're not being very clear.

15            **MR. POSTMAN:**  I will take a --

16            **THE COURT:**  Say it again.

17            **MR. POSTMAN:**  I will take a step back, if I may.

18       We plan to file a revised petition to compel arbitration

19    pursuant to the stipulated scheduling order; that we'll argue

20    that the vast majority of our clients have either never signed

21    the CPR agreement and therefore get to go to AAA or have signed

22    it and then opted out.

23       But there's this third bucket, which Your Honor raised in

24    the last hearing, of people who have signed the CPR agreement

25    but have either not submitted the opt-out in time or have not

**PROCEEDINGS**

 1  yet submitted an opt-out at all.

 2      DoorDash's position, as I understand it, is that those

 3  people, even though they've already filed at AAA and were

 4  closed out there due to DoorDash's refusal to proceed, now have

 5  to go to the new process at CPR.

 6      My understanding is that Ms. Lunetta didn't realize, CPR

 7  didn't realize that that was DoorDash's position.  They

 8  thought --

 9          **THE COURT:**  Wait.  Okay.  Wait.  So what did CPR think

10  was going to happen?

11          **MR. POSTMAN:**  It would only be for other people, not

12  petitioners.  None of the petitioners would go.  It would just

13  be some other DoorDash driver who brings a claim for the first

14  time in arbitration after the agreement was rolled out.

15          **THE COURT:**  All right.  So now I understand what

16  you're saying.

17          **MR. POSTMAN:**  I'm sorry.

18          **THE COURT:**  How does that affect today's proceeding?

19          **MR. POSTMAN:**  In light of that, we thought one way to

20  resolve it would be to just ask for CPR to ask DoorDash to

21  agree that that was what they would document.

22      And DoorDash -- Ms. Lunetta called them; they declined.

23  They said they still may -- they're willing to discuss it on a

24  case-by-case basis, but they may attempt to enforce the CPR

25  agreement against some of the petitioners in this case.

**PROCEEDINGS**

1     So the issue, as we see it, is still in the case.

2         **MS. LUNETTA:**  If I could just clarify, because I spoke

3     to Gibson Dunn just a few minutes ago.

4         Their position is people who had filed a petition in AAA

5     but subsequently agreed to the CPR agreement and did not opt

6     out of that would be able -- would still have the option, if

7     they want -- they would be bound by the CPR agreement and, if

8     they didn't opt out, would continue to be bound by the CPR

9     agreement.

10        What I was told was, there are some people who may choose

11    to stay with the CPR agreement, and those people should be

12    allowed to do that.  Those who do not wish to can opt out and

13    go back to AAA.  And the people in the middle, who maybe didn't

14    get notice or didn't realize what they were signing, those

15    people could raise the issue to Gibson Dunn and DoorDash; and

16    they would probably allow those people, with good cause, to

17    not -- to go to back to AAA.

18        I think that's not -- CPR isn't part of that piece.

19    I think that's a question of contract probably, but that's not

20    CPR's piece of this.

21        **THE COURT:**  What do you mean, it's not your -- it's

22    not CPR's piece of it?

23        **MS. LUNETTA:**  So CPR is just there -- it's just their

24    rules that have been referenced and designated in the new

25    DoorDash agreement.  Anybody who signs this agreement will be

1    subject to arbitration under the rules of CPR, including the

2    mass arbitration protocol, if applicable.  Right?  So they're

3    just sitting there as the arbitral forum.

4         And whether DoorDash has a contract with somebody to go to

5    AAA or a contract to go to CPR isn't for CPR to decide.

6    They're going to be there for people who are subject to

7    arbitration before CPR.

8         THE COURT:  How does this -- look, this is --

9    all right.  I'm pleased to hear all this argument about the

10   broader issues in the case, but you're here for a discovery

11   dispute.  So --

12        MR. POSTMAN:  If I may explain why I don't think that

13   we actually resolved it and what I would ask for, given

14   DoorDash's position that we still need to litigate over whether

15   some of the petitioners have to go to CPR.

16        I thought CPR was going to consider, because they didn't

17   realize that was going to be the case, saying CPR would not --

18   would refuse to take any of petitioners' cases because turns

19   out they were already at AAA and CPR is not going to use this

20   for people who already started at AAA.

21        It sounds like, based on Ms. Lunetta's proposal just now,

22   that CPR is not willing to do that.

23        Is that correct?

24        MS. LUNETTA:  So my hope was that that was always the

25   understanding on the DoorDash side, but I'm not sure whether

1    that was their understanding or not.

2        The problem that CPR has is they contracted to handle

3    arbitrations that DoorDash brings them with people who have

4    agreements saying that they'll arbitrate through CPR.  So CPR

5    has to take all comers, so to speak.  People who opted to keep

6    and not opt out of the CPR agreement have a valid agreement

7    that CPR has to abide by.  So that piece of it, I believe, will

8    have to be decided by you, Your Honor.

9        However, the reason that it matters to our discovery

10   dispute is that the Ninth Circuit case law and California state

11   case law says that in determining whether a protocol like CPR's

12   protocol is unconscionable goes to the process itself.  Is the

13   process fair?  And we -- I think we agree that on the face of

14   the protocol, it appears to be fair.

15       What Mr. Postman is concerned about is that if there --

16   there are all of these sort of soft administrative decisions

17   that are made by CPR or AAA or any arbitral provider about how

18   quickly cases will be assigned to an arbitrator, how long it

19   may take to schedule discovery and schedule hearings.

20       And Mr. Postman's concern is that there may have been

21   conversations by Gibson Dunn to CPR in developing the protocol

22   where they said, "Hey, we don't want these to go quickly.  We

23   want to slow roll this process."

24       And so there weren't.  I can represent that to the Court.

25   However, Mr. Postman, understandably, doesn't want to take my

PROCEEDINGS

1    word for it.

2        So what --

3            **THE COURT:**  Were you the one who did this?  Were you

4    an actor in the thing?  How can you be so sure?

5            **MS. LUNETTA:**  I reviewed all the documents,

6    Your Honor.  I reviewed all the communications.

7            **THE COURT:**  Well, maybe there were slow roll

8    conversations that were verbal.

9            **MS. LUNETTA:**  There may have been.  But I've spoken to

10   the people who were involved, and they've represented to me

11   that there weren't.  And they would testify -- if we had a

12   deposition, they would testify that there were not.  So that's

13   that piece.

14       However, I would be willing to provide all of the

15   documentations -- all of the documentation between Gibson Dunn,

16   DoorDash, and CPR to the plaintiffs as long as -- I think we've

17   discussed doing it under a protective order before, but I would

18   be willing to produce that stuff.

19       The concern that I have is that we not -- that CPR's

20   reputation as a neutral is not sullied in this process.  And

21   CPR is willing to discuss how they could potentially -- and

22   maybe it's with DoorDash and with petitioners' counsel -- how

23   they can, on the back-end process, handle some of these

24   concerns that they have about timing and about the assignment

25   of arbitrators and the timing in which arbitrations would

1  happen and some escape valves if that process is not fast

2  enough.  They're perfectly willing to undertake that effort,

3  and they have no intention of slow rolling anything.

4       And they certainly don't want to appear to anyone to be

5  not neutral or to be not working as efficiently as possible to

6  adjudicate arbitrations.

7       **MR. POSTMAN:**  So, Your Honor, if I may, I do have to

8  say, I mentioned those other two options because that's what we

9  were discussing and what I thought we were close to agreeing

10  to.  We did not agree to any of that.

11       We agreed to potentially pulling back a bunch of discovery

12  if our clients were not going to be subjected to the CPR

13  protocol.

14       It sounds like Ms. Lunetta's client was not willing to

15  agree to that, and we've walked in, and now I need to address

16  the basic issue, which is -- these facts are undisputed; and

17  Ms. Lunetta can please jump in if anything I'm saying is

18  inaccurate -- Gibson Dunn knew, before it reached out to CPR

19  about the protocol, that Keller Lenkner was representing a

20  large number of clients against two of its clients, DoorDash

21  and Postmates.  It reached out in May.

22       My understanding is that there really wasn't much

23  discussion in earnest of the new protocol until mid-September,

24  which was right after Keller Lenkner filed the large number of

25  demands and AAA made the administrative rulings DoorDash did

1    not like.

2         The rulings DoorDash did not like were that all of the

3    arbitrations had to proceed without delay.  DoorDash, through

4    its counsel, Gibson Dunn, who is one of the largest donors,

5    among the largest level -- the highest category of donors to

6    CPR, was on six substantive phone calls -- we don't know how

7    many scheduling calls or other calls -- but six substantive

8    calls, three of which had in-house counsel at DoorDash, to

9    review the rules and comment on them.  So it was actively

10   involved in the review process.

11        Gibson Dunn, quote, made some suggestions.  And as they

12   face their payment deadline for our clients at AAA, they urged

13   CPR to publish the rules as soon as possible.  Then, when our

14   clients' claims were closed out, they rolled out the new rules,

15   incorporating the CPR agreement the next day.

16        I do think there are things that are unconscionable on the

17   face of the protocol.  I think the protocol allows our clients'

18   claims to be staged in a way that could take years for them to

19   even have a hearing or even be assigned to an arbitrator.

20        I believe that there is a lot of circumstantial

21   evidence -- I don't have the actual communications right now --

22   but circumstantial evidence, based on the development of the

23   case, that Gibson Dunn and DoorDash went to CPR, with their

24   intention being to come up with a set of rules that would stage

25   these arbitrations to undo the decision of AAA.

**PROCEEDINGS**

 1          Now, I understand that Ms. Lunetta feels like CPR didn't

 2   know that; they didn't join Gibson Dunn in the endeavor of

 3   writing the rules that way.  But based on the way this rule

 4   developed and what has been --

 5              **THE COURT:**  What is the name of the rule?

 6              **MR. POSTMAN:**  The CPR Mass Employment Claims Protocol.

 7              **MS. LUNETTA:**  I brought a copy for Your Honor.

 8                  (Document handed up to the Court.)

 9              **MS. LUNETTA:**  These are the main rules, and then the

10   protocol comes right after.

11              **THE COURT:**  What do you object to about this protocol?

12   What's so bad about this?

13              **MR. POSTMAN:**  Under the protocol, if more than 30

14   plaintiffs bring related similar claims against a single

15   defendant, the defendant only has to face ten at first.  The

16   rest are stayed.  The ten are bellwethered.  And then there is

17   a mediation process where the rest remain stayed.

18          And, of course, parties mediate knowing what's coming

19   next.  And what's coming next in this case is, unlike a class

20   where you do your initial decision and it gets applied to

21   everyone else, none of the other plaintiffs get any benefit

22   from the initial rulings.  They'd have to litigate it again.

23          And when it comes time to litigate it again, everybody is

24   assigned a number and put in order and they proceed

25   sequentially, to the extent practicable.

1    To our understanding, CPR right now has 63 employment

2  arbitrators; whereas AAA has thousands.  As I discussed in the

3  last hearing, I think that could mean it could take years

4  before any individual has even been assigned to an arbitrator.

5    This is at the very core of the dispute between the

6  parties at AAA, the very issue DoorDash was trying to undo, and

7  I think it's unfair.

8    As I said, to take an extreme example, if a set of rules

9  said that only five arbitrations could proceed against any

10  defendant each year, and everyone else has to wait, and this is

11  a defendant that is, in our view, misclassifying hundreds of

12  thousands of people in an obvious way, paying them below

13  minimum wage, saying to the minimum wage workers or sub-minimum

14  wage workers, "You'll get your arbitrator assignment in six

15  years," that is unfair on the face.

16    There is a dispute about whether that's how it would play

17  out.  I understand that.  CPR heavily disputes it.  I would

18  submit that one good way to help Your Honor decide if that's

19  how this might play out is if that's how the parties involved

20  in the drafting intended it to play out.  And the

21  communications between the parties would certainly shed light

22  on that.

23    We have two very different world views of how these should

24  proceed.  But if what was being discussed at CPR was "These

25  should be staged; don't make them go all at once," and CPR was

1   hearing that from a bunch of defendants, I think that's highly

2   relevant to the unconscionability question we'll be briefing in

3   this case.

4            **MS. LUNETTA:**  Your Honor, if I may respond to that.

5            **THE COURT:**  Wait a sec.  You can, but wait.

6        I'm trying to sort out.  I know that there are people who

7   have the AAA and have opted out of CPR.  And DoorDash said last

8   time those people go back to AAA.  That was an important thing

9   that happened at the last hearing.

10       But with respect to those people who do not opt out of

11  CPR, we have several categories.  One would be the category of

12  employee who actually wants -- I should call it driver --

13  driver who wants CPR.  Second category is the people who did

14  not want CPR, wanted AAA, but screwed up and didn't opt out.

15  And you seem to be mentioning a third category.

16           **MR. POSTMAN:**  I think it would be the people who did

17  not want CPR, opted out, but did it too late.  There's a 30-day

18  window.

19           **THE COURT:**  All right.  Those people.  All right.

20       So how about brand-new drivers who never had AAA?  Are you

21  trying to represent them too?

22           **MR. POSTMAN:**  We have -- my firm has a number of

23  clients that are in that situation.  None of them are

24  petitioners here in this case.  So I haven't raised the

25  situation they'd be in with Your Honor.

**PROCEEDINGS**

1      In discussing this discovery issue, my view is that I need

2 to be focused on the petitioners in this case and how it's

3 relevant to --

4      **THE COURT:**  All right.  I'll tell you what I want to

5 do here.  You ready for my ruling on the discovery point?

6 Thank you.  Here's the ruling.

7      **MS. LUNETTA:**  Your Honor, if I may, my client paid for

8 me to fly all the way out here.  If I could just speak to it

9 briefly before you rule.

10      **THE COURT:**  No.  I've heard what I need to hear.

11      **MS. LUNETTA:**  Okay.

12      **THE COURT:**  You agreed to produce some documents;

13 correct?

14      **MS. LUNETTA:**  Yes, Your Honor.

15      **THE COURT:**  Did you explain to your opponent what

16 those documents were?

17      **MS. LUNETTA:**  Yes.  In short, those are the

18 communications between CPR, Gibson Dunn, and DoorDash; and

19 communications internally that reflect conversations with

20 DoorDash or Gibson Dunn.

21      **THE COURT:**  All right.  I'm going to order you to

22 produce those, but no further ones for the time being.

23      **MR. POSTMAN:**  Your Honor, minor category, if I may.

24      **THE COURT:**  I don't want to hear anything more.  I'm

25 quashing most of what you submitted.

**PROCEEDINGS**

1    I have a standing order that you grossly violated.  I say

2   you can never have a 30(b)(6) with more than ten topics, and

3   you have 30-something topics.  Did you know you were violating

4   that?

5          **MR. POSTMAN:**  Your Honor, I apologize that you view

6   our notice as doing it that way.  We believe there are seven

7   headings, and we provided --

8          **THE COURT:**  There are 30-something.

9          **MR. POSTMAN:**  I apologize.

10          **THE COURT:**  It was way beyond the pale.

11    I used to practice longer than any of you three here,

12   24 years before I got this job.  And I've now been on this job

13   almost 20 1/2.  And one of the most abused things is

14   Rule 30(b)(6).

15    And you are a prime example of how it can be abused.  I'm

16   going to be frank.  You just listed 30-something topics and

17   expect them to stand on their head and stack greased BBs and

18   comply.  Sorry.  It's just too abusive.  So quashed in its

19   entirety.

20    And I'm also quashing the rest of the document requests

21   for the same reason, overbroad, except for the ones you've

22   agreed to produce.

23          **MS. LUNETTA:**  Thank you, Your Honor.

24          **THE COURT:**  Now, but you need to identify -- I'm

25   talking now to CPR -- one witness who knows what happened.

1          Who was the person who was in charge of all this?

2          **MS. LUNETTA:**  It was Allen Waxman.  He's the president

3   and CEO.

4          **THE COURT:**  Was he in these conversations?

5          **MS. LUNETTA:**  He was.

6          **THE COURT:**  All right.

7      Now, I may wind up letting you take more than one

8   deposition, but we're going to start with the right way to do

9   this.  And I hope you all learn something from this about how

10  discovery ought to be conducted.

11     No 30(b)(6).  Mr. Waxman will appear for his deposition,

12  and plaintiffs' counsel can depose him on all of this using the

13  documents that you have, and he may inquire into the existence

14  of other documents.  He may inquire into the existence of other

15  witnesses that might be useful, but he can also inquire into

16  everything he wants to with respect to what happened here on

17  these mass rules.  And we'll have one day.

18         And if I was doing the deposition, I would get -- if I was

19  a lawyer -- not to toot my own horn -- I would do a good job,

20  and I would get some real -- instead of grandstanding, I would

21  get some real useful information that could be used to the next

22  step and say, "Judge, now we got this, here's the next step we

23  need of more discovery."

24         So we will do it in a measured way, proportional to the

25  needs of the case, instead of this grossly beyond the pale.

**PROCEEDINGS**

1   You know, some judges would just quash this and say you're

2   not going to get anything.

3       But you're going to produce Mr. Waxman.  Do you want me to

4   give you the date now, or can you agree that it will be done --

5   what date did I give?  What did I say before?

6           **MS. LUNETTA:**  Your Honor, we had agreed to produce

7   Mr. Waxman as noticed, but we were just trying to work out the

8   scope.  So there's not going to be --

9           **THE COURT:**  What date was he noticed?

10          **MS. LUNETTA:**  I believe it was by December 15th.

11          **THE COURT:**  Well, he hasn't -- that's come and gone.

12          **MS. LUNETTA:**  Exactly.  So whenever you tell us to

13  produce him, we will do so.

14          **THE COURT:**  All right.  How about the week between --

15  how about December 27th?  Would that be too much of an

16  imposition?

17          **MS. LUNETTA:**  It would not be for me.  However, I just

18  have to check with Mr. Waxman and make sure that he doesn't

19  have travel plans.

20          **THE COURT:**  I'll give you the following dates:  27,

21  30, or January 3 or 6.  And he can choose.  Mr. Waxman can

22  choose.  Then plaintiff is going to have to wreck his holiday

23  to be there.

24          **MS. LUNETTA:**  Thank you.

25          **MR. POSTMAN:**  Thank you.

1          **THE COURT:**  All right.  Now, you've got to produce the

2     documents at least 24 hours before the deposition.  You can't

3     spring them on him at the deposition.

4          **MS. LUNETTA:**  Understood.

5          **THE COURT:**  All right.  Now, what I expect will happen

6     from this if plaintiffs' counsel does a decent job is he will

7     come out of that with the identity of one more witness that

8     needs to be deposed and a group of documents that are narrowly

9     defined and reasonably narrow, proportional to the needs of the

10    case.

11       So that's what I think should occur here.

12         **MR. POSTMAN:**  Thank you, Your Honor.  And if I may, I

13    apologize on the 30(b)(6).

14         **THE COURT:**  You should.  And this was beyond the pale.

15    I think this is a topic worthy of examination, but not to the

16    overreaching extent that you tried.  And I think CPR's counsel

17    has been eminently reasonable.

18         **MR. POSTMAN:**  I agree.

19         **MS. LUNETTA:**  Thank you, Your Honor.

20         **MR. POSTMAN:**  I agree.

21         **THE COURT:**  So you go back and tell your client that

22    you were -- the judge thinks you were eminently reasonable.

23         **MS. LUNETTA:**  Thank you, Your Honor.

24         **THE COURT:**  Are we done for today?

25         **MS. LUNETTA:**  We are.  Have a happy holiday.

PROCEEDINGS

 1          **THE COURT:**  Happy Holidays.

 2          **MS. LUNETTA:**  Thank you, Your Honor.

 3               (Proceedings adjourned at 11:22 a.m.)

 4                        ---o0o---

 5

 6               __CERTIFICATE OF REPORTER__

 7          I certify that the foregoing is a correct transcript

 8    from the record of proceedings in the above-entitled matter.

 9

10    DATE:   Monday, December 23, 2019

11

12

13

14    _____

15        Ana M. Dub, CSR No. 7445, RDR, CRR, CCRR, CRG, CCG
              Official Reporter, U.S. District Court
16

17

18

19

20

21

22

23

24

25