# Exhibit E

ZIMMERMAN REED LLP
Caleb Marker (SBN 269721)
  caleb.marker@zimmreed.com
Christopher P. Ridout (SBN 143931)
  christopher.ridout@zimmreed.com
Flinn T. Milligan (SBN 323042)
  flinn.miligan@zimmreed.com
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone (877) 500-8780
Facsimile (877) 500-8781

*Attorneys for Objector*
*LaRonda Robinson*

ELECTRONICALLY
**F I L E D**
*Superior Court of California,*
*County of San Francisco*

**12/04/2019**
**Clerk of the Court**
BY: DAVID YUEN
Deputy Clerk

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| CYNTHIA MARCIANO, and DAVID CRISTINI, in their capacity as Private Attorney General Representatives,<br><br>        Plaintiffs,<br><br>    vs.<br><br>DOORDASH, INC,<br><br>        Defendant. | Case No. CGC-18-567869<br><br>*Assigned for all purposes to the*<br>*Honorable Ethan P. Schulman*<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Concurrently filed herewith:<br>1.  Declaration of Caleb Marker in Support thereof<br><br>Date:         December 17, 2019<br>Time:        09:30 a.m.<br>Department:  302 |

1

## TABLE OF CONTENTS

2    I.      INTRODUCTION ...................................................................................................1

3    II.     STATEMENT OF FACTS ......................................................................................2

4    III.    ARGUMENT .........................................................................................................3

5            A.   The Release of FLSA Claims on an Opt-Out Basis is Unlawful .....................................4

6            B.   The Harm of this Settlement is Compounded by Deficient, Confusing, False, and

7                 Misleading Notice ...............................................................................................5

8            C.   The Claims-Made, Email-Only Notice Model is Inadequate ...........................................6

9            D.   The Exclusion and Objection Process is Overcomplicated ............................................7

10           E.   The Opt-Out Requirements Interfere with Attorney-Client Relationships ....................8

11           F.   The Limited Discovery Fails the *Kullar* Test ...............................................................9

12           G.   The Proposed PAGA Penalty is Inadequate ..................................................................11

13           H.   Judicial Estoppel is Violated by LLR's Conflicting Representations to Judges ............12

14           I.    The Release Does Not Meet Class Settlement Requirements .......................................13

15           J.    The Dispute Resolution Fund Invites Scrutiny ............................................................14

16   IV.     CONCLUSION ...................................................................................................15

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

1

**TABLE OF AUTHORITIES**

2

Page(s)

3

**Cases**

4

*Amaral v. Cintas Corp.* No. 2,

5

    163 Cal. App. 4th 1157 (2008) ........................................................................................13

6

7

*Brown v. Jonathan Neil & Assocs., Inc.*,

8

    No. 1:17-CV-00675-SAB, 2018 WL 2734866 (E.D. Cal. June 5, 2018) ..........................9

9

*Cellphone Termination Fee Cases*,

10

    186 Cal. App. 4th 1380 (2010) ........................................................................................15

11

12

*Clark v. Am. Residential Servs. LLC*,

13

    175 Cal. App. 4th 785 (2009) ............................................................................................3

14

*Edwards v. Heartland Payment Sys., Inc.*,

15

    29 Cal. App. 5th 725 (Cal. Ct. App. 2018) ........................................................................3

16

17

*Gonzales v. San Gabriel Transit, Inc.,* ,

18

    40 Cal. App. 5th 1131 (Cal. Ct. App. 2019) ....................................................................11

19

*Hanlon v. Chrysler Corp.*,

20

    150 F.3d 1011 (9th Cir. 1998) ..........................................................................................9

21

22

*Haro v. City of Ros*emead,

23

    *174 Cal. App. 4th 1067 (2009)* .........................................................................................5

24

*Howard v. Babcock*,

25

    6 Cal. 4th 409 (1993) ........................................................................................................7

26

27

*In re Auto. Refinishing Paint Antitrust Litig.*,

28

    No. MDL 1426, 2004 WL 6248154 (E.D. Pa. Sept. 27, 2004) ........................................15

*In re Bluetooth Headset Prods. Liab. Litig.*,

   654 F.3d 935 (9th Cir. 2011) ..............................................................................................3

*In re Holocaust Victim Assets Litig.*,

   413 F.3d 183 (2d Cir. 2005) ..............................................................................................15

*In re M.L. Stern Overtime Litigation*,

   No. 07-CV-0118-BTM (JMA), 2009 WL 995864 (S.D. Cal. Apr. 13, 2009).................................2, 3

*In re Tableware Antitrust Litig.*,

   484 F. Supp. 2d 1078 (N.D. Cal. 2007)...............................................................................3

*In re TD Ameritrade Account Holder Litig.*,

   No. C 07-2852 SBA, 2011 WL 4079226 (N.D. Cal. Sept. 13, 2011) ................................................15

*In re Toyota Motor Corp. Unintended Acceleration Mktg Sales Practices, & Prod. Liab.* Litig.,

   No. 8:10ML 02151 JVS, 2013 WL 3224585 (C.D. Cal. June 17, 2013) ..........................................15

*Jackson v. Cty. of Los Angeles*,

   60 Cal. App. 4th 171 (1997)................................................................................................12

*Kakani v. Oracle Corp.*, No. C,

   06-06493 WHA, 2007 WL 1793774 (N.D. Cal. June 19, 2007).......................................4, 5

*Kullar v. Foot Locker Retail, Inc.*,

   168 Cal. App. 4th 116 (2008).............................................................................................3

*Luckey v. Superior Court*,

   228 Cal. App. 4th 81 (2014)...............................................................................................3

*Myles v. AlliedBarton Sec. Servs., LLC*,

   No. 12-CV-05761-JD, 2014 WL 6065602 (N.D. Cal. Nov. 12, 2014) ................................................5

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

*O'Connor v. Uber Techs., Inc.*,

  No. C-13-3826 EMC, 2014 WL 2215860 (N.D. Cal. May 29, 2014)................8

*O'Connor v. Uber Technologies, Inc.*,

  201 F. Supp. 3d 1110 (N.D. Cal. 2016).......................................10, 11

*Pearson v. NBTY, Inc.*,

  772 F.3d 778 (7th Cir. 2014).................................................7

*Russell v. Rolfs*,

  893 F.2d 1033 (9th Cir.1990)................................................12

*Smith, Smith & Kring v. Superior Court (Oliver)*,

  60 Cal. App. 4th 573 (1997).................................................7

*Tijero v. Aaron Bros., Inc.*,

  No. 10–cv–01089–SBA, 2013 WL 60464 (N.D.Cal. Jan. 2, 2013) ..................5

*Young v. Polo Retail, LLC*,

  No. C-02-4546 VRW, 2006 WL 3050861 (N.D. Cal. Oct. 26, 2006)................2

**Statutes**

18 U.S.C. § 216(b).............................................................1

29 U.S.C. § 216(b)..........................................................4, 5

**Rules**

Cal. Rules of Court, Rule 3.769 ..............................................9

Fed. R. Civ. P. 23(e)(5)(B)..................................................14

**Other Authorities**

A. Conte & H.B. Newberg, Newberg on Class Actions (4th ed. 2002) .............2

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

1

Manual for Complex Litigation Third (1997) ..........................................................................................2

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

1
2

## <u>MEMORANDUM OF POINTS AND AUTHORITIES</u>

## I.   INTRODUCTION

3
4
5
6

The proposed settlement should be denied preliminary approval because it is unfair and inadequate. Objector LaRonda Robinson ("Robinson") opposes preliminary approval because the proposed settlement is so deficient that it does not warrant being presented to the proposed settlement class, and if notice is sent will confuse class members about how to protect their FLSA rights.

7
8
9
10
11
12
13

This proposed settlement is materially identical to a proposed settlement in *Rimler v. Postmates*, Case No. 18-567686, advanced by the same Plaintiffs' counsel, Lichten Liss Riordan ("LLR"). In *Rimler*, Judge Massullo denied preliminary approval detailing ten pages of defects in the proposed settlement. *Rimler* Tentative Ruling Re Motion for Preliminary Approval of Class Settlement, Case No. 18-567868 ("*Rimler* Tent.") attached as Exhibit A to Marker Decl. Robinson urges this Court to likewise deny preliminary approval for a similarly pernicious settlement that would result in confusion, loss of claims, undervaluation for the proposed class, and a waste of resources and time for the Court.

14
15
16
17
18
19
20

In what originally began as a PAGA-only action, this settlement now seeks to extinguish the valuable non-PAGA claims of 419,409 delivery drivers, including 380,620 in California and 38,789 in Massachusetts, for a total settlement amount of $39.5 million. *See* Declaration of Shannon Liss-Riordan in Support of Plaintiff's Motion for Preliminary Approval of Class Action Settlement ("SLR Decl.") ¶7, 13.  Many drivers, like Robinson, have already demanded arbitration, yet this settlement purports to release those claims unless they opt out without the assistance of their counsel. Beyond the fact that the settlement is an obvious attempt to shut down the arbitration proceedings, it is deficient in numerous other respects.

21
22
23
24
25
26
27
28

Foremost, the settlement improperly releases the Fair Labor Standards Act ("FLSA") claims of all drivers if they do not opt out through a needlessly complex and unclear procedure. To release an FLSA claim an employee must first affirmatively opt in to a collective action by providing their affirmative consent in writing pursuant to 18 U.S.C. § 216(b). Releasing an FLSA claim without a written opt-in is unlawful and ineffective. Therefore, the proposed settlement and class notice advising class members that they will release their FLSA claims even if they do not affirmatively opt in and file a written claim form is improper, misleading and will confuse the Class. Settlement ("Prop. SA") ¶2.41. This alone is a sufficient basis to deny preliminary approval. Second, the settlement is procedurally improper due to, *inter alia*, misleading notice,

and overcomplicated claims and exclusion processes, with the effect of not only minimizing the number of claims validly submitted, but of rendering the process of objection and exclusion so difficult that the number of "*valid*" requests for exclusion and objections will likely be very low. Third, the opt-out requirements interfere with attorney-client relationships. Fourth, the record is insufficient to compare the settlement value to potential damages. The parties have withheld the exact amount owed to the class by keeping critical information from the Court and the public, including the total hours worked by drivers during the various periods or stages of work (awaiting, picking up, and delivering an order). Fifth, the settlement's allocation of $750,000 to PAGA penalties is inadequate. Sixth, the settlement's allocation plan is faulty as it permits class members with similar claims to be treated dissimilarly without justification or court oversight through the use of a $350,000 "Dispute Resolution Fund" to be disbursed at LLR's sole discretion. Such a fund appears designed to allow LLR to "pick off" would-be objectors and other dissatisfied drivers without Court oversight.

Preliminary approval is only appropriate when the tentative settlement falls "within the range of possible judicial approval."[1] When a settlement presents this many flaws, many of which are unlawful, the settlement cannot be said to fall within the "range" of reasonableness and should be rejected before any notification is disseminated to the class. Otherwise, receiving notice of a faulty settlement and announcing obligations to protect legal rights that are contrary to law, has the effect of causing further harm and creating near-irreparable confusion to class members. Robinson therefore respectfully requests that the Court deny preliminary approval.

## II.     STATEMENT OF FACTS

Before Plaintiffs' counsel negotiated this proposed settlement, many drivers, including Robinson, had initiated arbitration against DoorDash. However, DoorDash and LLR announced the settlement in this case which would, as part of its broad releases, dispose of all pending or ongoing arbitrations and competing PAGA cases.

---

[1] *In re M.L. Stern Overtime Litigation*, No. 07-CV-0118-BTM (JMA), 2009 WL 995864, at *3 (S.D. Cal. Apr. 13, 2009), citing A. Conte & H.B. Newberg, NEWBERG ON CLASS ACTIONS § 11.25 (4th ed. 2002) (quoting MANUAL FOR COMPLEX LITIGATION THIRD § 30.41 (1997); MANUAL, § 21.632 at 321). *See also Young v. Polo Retail, LLC,* No. C-02-4546 VRW, 2006 WL 3050861, at *5 (N.D. Cal. Oct. 26, 2006).

1    DoorDash has historically vigorously contested its drivers' rights to sue in a court of law.  But it has

2    agreed to this proposed settlement because it stands to benefit from the aggregation and discounting of the

3    claims against it, and seeks to avoid the cost of the individual arbitrations into which it has previously forced

4    its drivers. This view is bolstered by the various hurdles that DoorDash and LLR have enacted to make it

5    difficult for class members and parties in arbitration to exclude themselves from the settlement. Forcing

6    drivers into arbitration through an arbitration clause to avoid class liability only to settle those claims for a

7    pittance on a class basis after drivers actually demand arbitration is an abuse of the class action device.

8    **III.    ARGUMENT**

9    Before granting preliminary approval of the proposed settlement, the Court must conduct a

10   preliminary analysis of the fairness, reasonableness and adequacy of the settlement. *Clark v. Am. Residential*

11   *Servs. LLC*, 175 Cal. App. 4th 785, 799 (2009).

12   Ms. Robinson has standing as a class member to scrutinize and oppose the proposed settlement, seek

13   discovery, and voice her concerns and objections to the Court. *Edwards v. Heartland Payment Sys., Inc.*,

14   29 Cal. App. 5th 725, 736–37 (Cal. Ct. App. 2018), review denied (Mar. 13, 2019). At this stage, the

15   Court considers whether the tentative settlement falls "within the range of possible judicial approval." *Stern*

16   *Overtime Litig.*, 2009 WL 995864 at *3. In weighing these factors, the Court acts as a fiduciary, serving as

17   a guardian of the absent class members. *Kullar v. Foot Locker Retail, Inc.*, 168 Cal. App. 4th 116, 129

18   (2008). In addition, increased scrutiny should be applied to the proposed settlement because a class has not

19   yet been certified. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011)

20   (explaining "[p]rior to class certification, there is an even greater potential for a breach of fiduciary duty

21   owed to the class during settlement…."). "While the court 'must stop short of the detailed and thorough

22   investigation that it would undertake if it were actually trying the case' it 'must eschew any rubber stamp

23   approval in favor of an independent evaluation.'" *Clark v. Am. Residential Servs. LLC,* 175 Cal. App. 4th

24   785, 799 (2009)*.* Where, as here, there has been no adversary class certification proceeding, this scrutiny is

25   enhanced to ensure that "the absent class members, whose rights may not have been considered by the

26   negotiating parties, be adequately protected against fraud and collusion." *Luckey v. Superior Court*, 228 Cal.

27   App. 4th 81, 94 (2014) (internal quotation marks omitted). Preliminary approval should be denied if a

28   proposed settlement contains obvious deficiencies. *See In re Tableware Antitrust Litig.*, 484 F. Supp. 2d

1078, 1079 (N.D. Cal. 2007). This proposed settlement contains obvious deficiencies that preclude preliminary approval.

### A. The Release of FLSA Claims on an Opt-Out Basis is Unlawful

The settlement violates the FLSA. The FLSA prohibits traditional class actions and authorizes only an opt-in collective action. 29 U.S.C. § 216(b). Counsel cannot eliminate a worker's FLSA rights including those of a worker to control his or her own claim by requiring a putative class member to opt out of a class action to protect those rights. Voluntary opt-ins may be bound by a release, but it is "unconscionable to try to take away the FLSA rights of all workers, whether or not they choose to join in affirmatively." *Kakani v. Oracle Corp.*, No. C 06-06493 WHA, 2007 WL 1793774, at *7 (N.D. Cal. June 19, 2007).

Additional protections of the FLSA are sidestepped here. Since payment under the settlement is predicated on the submission of a claim, and since FLSA claims can only be released for class members who opt in, in *Kakani*, the court proposed a fair solution: limit releases to those class members who submit a claim *and receive monetary relief. Id.* at 6. However, the settlement at issue makes no such distinction and instead includes FLSA claims among the general released claims of class members. Prop. SA ¶ 2.37.[2]

The settlement states that "all Settlement Class Members who have not been excluded from the Settlement Class . . . agree to forever release, discharge, hold harmless, and covenant not to sue each and all of the Release Parties from each and all of the  . . . Settlement Class Members' Released Claims (in the case of the Settlement Class Members who have not been excluded from the Settlement Class as provided in the Opt-Out List) . . .". Prop. SA ¶9.1. As above, those released claims include FLSA claims, as ¶2.37 provides that "Settlement Class Members' Released Claims" "specifically includ[e]: claims pursuant to the Fair Labor Standards Act." *Id.*

Therefore, the release in ¶9.2 is overbroad, unlawful, and unconscionable as the release applicable to "Settlement Class Members" serves to release those persons' FLSA claims when they have never taken

---

[2] The FLSA was a key issue in the *Rimler* action, with LLR apparently intending to trade on the incoherence of the agreement and its attendant ambiguity as to the status of FLSA claims. However, upon discovery of this term LLR was forced to concede that not only did it intend this unlawful release, such a release was actually a material term for its counterparty. Given the similarity between the cases, the companies, the attorneys, and the agreements, it seems very likely that this is also the case here. *See Rimler* Plaintiff's Opposition to Non-Party Altounian's Motion to Intervene, Case No. 18-567868 at 10.

any steps to affirmatively opt in to a FLSA action in writing as required by the Act. *See* 29 U.S.C. 216(b)("No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought."); *see also Haro v. City of Rosemead*, 174 Cal. App. 4th 1067, 1071, 1076 (2009). For this reason, the Proposed Settlement should be rejected. [3]

**B. The Harm of this Settlement is Compounded by Deficient, Confusing, False, and Misleading Notice**

In *Rimler* Judge Massullo ordered that the notice should clearly state that "only by submitting a claim form, is the Class Member consenting to join as a party plaintiff to the FLSA claims and releasing those claims." *Rimler* Tent. at 7. In the present case, the Notice does not even mention the FLSA or any federal claim (never even pled in the case), instead informing class members that plaintiffs have "sought relief under various California Labor Code provisions and Section 17200 of the California Business and Professions Code and the Massachusetts wage laws . . . [and] on a representative basis, seeking penalties under the Private Attorneys General Act of 2004." Prop. Notice at 4. On page 5 the Notice states, in bold and underlined, "[i]f you want to participate in the settlement and receive your payment, be sure to file your claim!" *Id.* at 5. The only logical reading of this emphasized sentence is that if you do not file a claim, you do not participate in the settlement. "Participate" in this context means "take part" or "be included" in. The only other reasonable available interpretation is "receive a payment from" but that interpretation is foreclosed by the clause "and receive your payment." In short, this informs a reader that to be included in the settlement they must "be sure to file" a claim. This is categorically and importantly false, as the settlement would still release that driver's FLSA claims (as well as all other claims) even if they are not "sure to file [a] claim."

Additionally, the Notice invents additional consideration not included – in fact by operation of Paragraph ¶12.4 specifically excluded – in the settlement itself. The Notice claims that "In addition to this

---

[3] *See Myles v. AlliedBarton Sec. Servs., LLC,* No. 12-CV-05761-JD, 2014 WL 6065602, at *3 (N.D. Cal. Nov. 12, 2014) ("The parties' attempt to extinguish claims under the federal Fair Labor Standards Act (FLSA) raises additional issues. The FLSA prohibits traditional class actions and authorizes only an opt-in collective action. 29 U.S.C. 216(b). But the settlement here operates as an opt-out settlement. That does not work for the compromise or release of FLSA claims.") citing *Kakani v. Oracle Corp.,* No. 06–cv–06493–WHA, 2007 WL 1793774, at *7 (N.D.Cal. Jun. 19, 2007) and *Tijero v. Aaron Bros., Inc.,* No. 10–cv–01089–SBA, 2013 WL 60464, at *8 (N.D.Cal. Jan. 2, 2013).

monetary payment, DoorDash has agreed to the following non-monetary terms as part of the settlement: DoorDash agrees to implement a pay model that ensures that every dollar that a customer tips will be on top of DoorDash's contribution for that delivery, and the amount DoorDash pays to a delivery driver, or "Dasher," for delivery will not vary based on the tip amount." Proposed Notice at 6. Not only is this simply untrue, as no such term exists, but here LLR appears to be attempting to take credit for a policy change that went into effect months before, in response to widespread outcry as to its deceptive reduction of its wage obligations by the inclusion of customer tips. According to LLR, the parties were not even in mediation until September 10, 2019. SLR Decl. ¶7. In its article on the policy change **in July 2019** the New York Times credits the change to, *inter alia*, "thousands of people" who "blasted the company," itself, tech journalists on Twitter – not LLR. *See, e.g.,* Andy Newman, *DoorDash Changes Tipping Model After Uproar From Customers*, New York Times, July 24, 2019. This demonstrates that this was an intentional attempt to mislead drivers by inflating both the value of the work performed by LLR and the value of the settlement for which drivers must pay so dearly. Unfortunately, this is just one example of what appears to be an irredeemable conflict of interest between LLR and the Class which does not support preliminary approval.

## C.  The Claims-Made, Email-Only Notice Model is Inadequate

There is no need for this settlement to be claims-made, as the defendant has significant information for each class member acquired during the application process and later as each courier was paid. Rather than accept a low claims rate, the Court should require a direct-pay model that allows couriers to contest the accuracy of the data underpinning the proposed payments, but require defendant to mail checks to each member. This could boost the claims rate from a low single digits to over 80%.[4]

Also concerning is the proposed settlement's provision of email-only notice. Prop. SA ¶ 6.4. A recent FTC staff report determined that email-only notice had the lowest claims rate of all available mediums, generating median claims rates of only 3%. FTC Report at 25. Indeed, the FTC study showed that only 17% of all *delivered* email notices were even opened by class members, inferring that the remainder

---

[4] The F.T.C. noted that the check cashing rate in direct-pay cases involving payments of more than $100 was 83%. FEDERAL TRADE COMMISSION, CONSUMERS AND CLASS ACTIONS: A RETROSPECTIVE AND ANALYSIS OF SETTLEMENT CAMPAIGNS 32 (Sept. 2019) ("FTC Report"), available at https://loadtest.ftc.gov/system/files/documents/reports/consumers-class-actions-retrospective-analysis-settlement-campaigns/class_action_fairness_report_0.pdf. Conversely, the claims rate in cases requiring submission of a claims form involving more than $100 is 10% or less. *Id*. at 33.

1  were either marked as spam or determined to be promotional or unimportant by class members. *Id.* at

2  30. LLR's expectations of a high claims rate is not based on objective data involving similar, email-only

3  notice campaigns.

4          Due to the inclusion of a similar term in *Rimler* and extensive discussion thereof, LLR has been

5  placed on notice of the fact that such a policy all but guarantees that a certain number of drivers will never

6  receive notice as it will be caught in "spam" filters. Further, LLR appears not to fully understand how email

7  works, as it seems to believe that the provision of multiple emails and for mailed notice in the event that

8  email notice is "undeliverable" cures this. Prop. SA ¶ 6.4. *See also Rimler*, Plaintiff's Opposition to Non-

9  Party Altounian's Motion to Intervene, Case No. 18-567686 ("had Altounian's counsel read the agreement

10  more carefully, they would have learned that the settlement agreement in fact provides for issuance of notice

11  and at least two reminders to all class members via email and, if the email is returned undeliverable, via first-

12  class mail"). For the sake of efficiency, Robinson hopes to avert a repeat of this debate by explaining that a)

13  second or third emails have no greater likelihood of avoiding a spam filter than a first and b) when an email

14  is caught in a filter it is not returned as undeliverable – this only occurs when an email is undeliverable, such

15  as when the email address is defunct. Robinson respectfully suggests that the Parties could have provided

16  for app-based notice using the DoorDash app as a more cost-effective and reliable method.

17          At a minimum, a notice which a) states falsehoods as material terms, b) fails to notify class members

18  of fundamental rights being released, c) is unclear as to the effect of action and inaction, and d) has a good

19  chance of never reaching its target, fails the *Kullar* test, fails basic notions of fairness and due process, and

20  should not be preliminarily approved.

21          **D.  The Exclusion and Objection Process is Overcomplicated**

22          The exclusion and objection process is designed to make it difficult to avoid this settlement. Judge

23  Posner has noted that with overly burdensome procedures it is "hard to resist the inference that [Defendants

24  were] trying to minimize the number of claims that class members would file." *Pearson v. NBTY, Inc.*, 772

25  F.3d 778, 783–84 (7th Cir. 2014); *see also Howard v. Babcock*, 6 Cal. 4th 409, 425 (1993) (describing the

26  Court's "legitimate concerns of assuring client choice of counsel"); *and Smith, Smith & Kring v. Superior

27  Court (Oliver)*, 60 Cal. App. 4th 573, 580 (1997). Comparison with *O'Connor v. Uber* is illustrative, as there

28  the court found that failure to allow for an email address to which class members could send their request to

opt out rendered the process insufficient. No. C-13-3826 EMC, 2014 WL 2215860, at *3 (N.D. Cal. May 29, 2014). Inconsistency is found in the manner by which the settlement deems emails a sufficient means of putting a class member on notice (Prop. SA ¶6.4) but demands a hand signed (or "wet ink" to use the parties' term) written request to be "mailed to the Settlement Administrator." Prop. SA ¶7.1. Remarkably, Defendant's general counsel signed the settlement itself via DocuSign, so it is hard to imagine that the Parties have any serious doubts as to the effectiveness of electronic signatures as an option. If the parties believe that email is good enough for notice, it should be good enough for lay drivers to exclude themselves – and under the terms of the settlement they will *have* to do it themselves – and the inconsistency betrays a naked desire to avoid legitimate opt-outs. Considering that an attempted opt-out is, by definition, an expression of an intent not to be bound, this intentional complication demonstrates a deviation from LLR's duty to absent class members and demonstrates the conflicted position in which LLR finds itself: one in which it knows that what is very good for it, is very bad for most of the class members.

In *Rimler* the exclusion procedure arguably did allow for email opt-outs (though this was far from unambiguous) yet Judge Massullo commented on the confusing opt-out procedures and scrutinized the inconsistent procedures for submitting claims and submitting opt-outs. *Rimler* Tent. at 4-5. This is in addition to the court's critiques of the interference with attorney-client relationships discussed *infra*. All of these concerns are present or magnified in this case, in which the parties do not even entertain the possibility of e-signatures or email exclusion, demanding a "wet ink" signature and a mailed exclusion. Prop. SA ¶7.1-7.9. The thing speaks for itself, but it is worth noting that the parties are aware that the Class in this case includes an overrepresented population of homeless or otherwise transient individuals, non-English speaking individuals, and young, low-income workers for whom this procedure is effectively a prohibition.

Finally, it is highly likely that an individual who may incorrectly believe that they have submitted an adequate request for exclusion will not submit a claim, resulting in the threat of losing *both* their right to object *and* their ability to partake in the resolution.

### E. The Opt-Out Requirements Interfere with Attorney-Client Relationships

The settlement further obstructs the opt-out process by prohibiting class members' counsel from assisting them with their request for exclusion either by signing the request or by submitting, on the client's request, a request completed and signed by the driver. Prop. SA ¶7.1. In critiquing the *Rimler* settlement and

its equally invasive, though actually less complex, procedure, Judge Massullo questioned "what interest do Plaintiffs have in preventing counsel to opt out on behalf of their clients, either individually or on behalf of a group? What is the justification for preventing counsel from even helping submit an opt-out?" *Rimler* Tent. at 4 [emphasis in original].[5] There is no logical reason to prevent attorneys from representing and assisting their clients other than to reduce the number of exclusion requests submitted. The prohibition also means that represented parties currently in litigation or arbitration against DoorDash (of which there are many) cannot rely on their attorney to mail or submit a request for exclusion. Prop. SA ¶7.1. This is a clear attempt to nullify the many pending and imminent arbitrations the drivers are pursuing through counsel. When it comes to deciding whether an attempted exclusion is valid (such as whether the signature requirement has been met as above), the Court allegedly has no authority because *all authority* is vested in the settlement administrator, whose decision is "final, binding, and nonappealable," (Prop. SA. ¶7.5) an item called out for critique by Judge Massullo in the *Rimler* settlement. *See Rimler* Tent. at 5. Courts should not force a settlement upon a proposed class and should not discourage or restrict class members' relationships with retained counsel. The Court should deny approval to the settlement based on its confusing and misleading requirements and notice to class members, which they must navigate personally and individually rather than through counsel. *See Brown v. Jonathan Neil & Assocs., Inc.*, No. 1:17-CV-00675-SAB, 2018 WL 2734866, at *4 (E.D. Cal. June 5, 2018) (disapproving of notice that is "likely to mislead" class members).

**F.  The Limited Discovery Fails the *Kullar* Test**

The parties reached this settlement after little to no discovery. Contrary to the guidance provided in Cal. Rules of Court, Rule 3.769, *Kullar*, and similar cases, LLR and DoorDash are improperly leveraging their exclusive knowledge to coerce the large class of drivers – who are unaware of their exact mileage and thus the value of their potential claims – to settle their claims without providing the actual value of those claims. Rather, they ask the Court to take LLR at its word. *Kullar* requires more, as did Judge Massullo who wrote that LLR "must disclose, in a declaration, the 'substantial data' that was received in advance of

---

[5] It is worth noting that LLR attempted to pre-emptively answer this question by accusing objectors in that action of fabricating clients and making the comparison to attempts to opt out entire unrepresented subclasses, as was the case in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1024 (9th Cir. 1998). This led to the revelation that, to the contrary, LLR's named plaintiff, Jacob Rimler, had actually signed a retainer agreement with objector's counsel within days of his purported acceptance of the proposed settlement with Postmates. At time of writing, the undersigned is not aware of the conclusion of this exchange.

1  mediation and the discovery that was obtained in the *Albert* case before the case was stayed. Generalized

2  statements will be deemed insufficient." *Rimler* Tent. at 3. In this case, LLR's claims of exchanges of

3  "extensive" data should likewise be deemed insufficiently generalized to properly apprise the Court and

4  Class. SLR Decl. ¶7.

5        An example of the importance of this information can be found in analyzing LLR's damages

6  estimates, in which LLR underestimates the values of claims. Robinson conservatively estimates that the

7  average driver worked a minimum of five days, which results in 1.9 million work days. At $500 per day in

8  damages and penalties, DoorDash's actual exposure approaches $1 billion. If the average driver worked

9  more, shorter days, then the damages would be even higher because of the per-day municipal damages.

10  Comparison even with LLR's other gig-economy class settlements, in which drivers have received over

11  $2,000[6] for almost identical claims, further emphasizes the importance of being able to accurately weigh the

12  value of claims. The actual exposure in this case could be calculated if the parties complied with *Kullar*.

13        For example, the mileage figure LLR references does not include mileage for the time period

14  between delivering an order and waiting for DoorDash to offer another delivery. Prop. SA ¶2.8. It also does

15  not include statutory damages and minimum penalties provided by certain California local governments and

16  discounts all manner of Labor Code violations such as those arising from meal and rest break violations.

17  Rather, LLR dismisses the value of those claims as only having "minimal value." *Marciano* Motion at 18

18  n14. In fact, actual and statutory damages in these types of cases – where deducting mileage expenses from

19  drivers' pay results in nominal or negative hourly pay – can frequently exceed $500 per worker, per day. For

20  example, in a ten-hour workday, a driver might drive 120 miles but only earn $80.00. After deducting the

21  mileage ($69.60 at the IRS rate), the driver really earned $10.40, or a little more than a dollar per hour.

22  Marker Decl. ¶9. A more rigorous and accurate damages calculation shows that this hypothetical driver

23  would be entitled to an additional $161.40 in minimum wages (8 X $15.59, + $2 X 23.39 = $171.50), $161.40

24  in liquidated damages, additional statutory "waiting time" penalties where failure to pay was willful, and

25  hundreds more in municipal statutory damages ($50 in San Francisco and $120 in Los Angeles, for instance).

26  However, performing such a damages calculation is impossible where the parties refuse to release crucial

27

28

---

[6] *O'Connor v. Uber Technologies, Inc.*, 201 F. Supp. 3d 1110 (N.D. Cal. 2016).

information. Being unable to value the claim due to the lack of discovery and data means that class members are unable to appraise the settlement and make an informed decision as to whether it is in their interest to accept it. Therefore, this settlement cannot pass muster under the *Kullar* requirements and should be rejected. Judge Massullo observed this same fundamental defect in *Rimler* when she noted that "[failure to disclose estimated delivery miles or value of each mile] makes it practically impossible for a class member to dispute those figures or make a reasonable estimate of their payment." *Rimler* Tent. at 7.

The settlement also ignores the import of several significant developments in California law. Within the past year, AB-5 has codified the more worker-friendly *Dynamex* test and the *Gonzales v. San Gabriel*[7] court has found *Dynamex* to be retroactive. The parties' case valuation, which fails to adequately address the effect of AB-5 and *Gonzales*, underestimates the real-world value, characterizing the context as a "challenging landscape" because of the theoretical possibility that gig-economy companies achieve, by ballot initiative, a carve-out of the recent AB-5. Not only is this speculative *at best*, it does not address the impact that such an eventuality will have on current law under *Dynamex* and, incredibly, simply omits mention of *Gonzales* which has held that *Dynamex* is to be applied retroactively. *Marciano* Motion at 2. The undersigned believes that these cases have a settlement value in excess of $5,000. Regardless, failing to engage crucial precedent while denying access to fundamental data cannot begin to approximate the demand of *Kullar*.

## G.  The Proposed PAGA Penalty is Inadequate

This settlement offers inadequate PAGA relief. The original *O'Connor* settlement provided $1 million for PAGA penalties, and later $11 million, both of which were determined to be insufficient. *O'Connor*, 201 F. Supp. 3d at 1133. The *O'Connor* court found that LLR's settlement of the PAGA claims had "no rational basis" given the reduced risk faced by those non-arbitrable clams. *Id.* at 1135. The same is true here, where 380,000 drivers have a claim to recover PAGA penalties that are likely in excess of $3 billion as calculated by the parties with the benefit of their "extensive" and *exclusive* knowledge. SLR Decl. ¶7, 31. Likewise, even LLR objected to a gig-economy settlement that resolved $1 billion in PAGA penalties

---

[7] *Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131 (Cal. Ct. App. 2019), review filed (Nov. 18, 2019)

for $7.75 million, alleging that the low value indicated that the settlement had to be the result of collusion.[8]
In the recent *Rimler* action, Judge Massullo found that "while a substantial discount for PAGA penalties
may be reasonable, counsel failed to provide any factual or legal basis to justify the near 100% discount.
None of the cases Plaintiffs cited justify the 0.09% allocation." *Rimler* Tent. at 3. In that case $250,000 was
allocated to PAGA with the claims valued at $1 billion *if stacked* as counsel for intervenors in that matter
argued was appropriate. In this case both the allocation and estimated value are precisely three times higher
*without stacking*, and as such the true discount is potentially significantly greater as LLR points out. Prop.
SA ¶2.23, SLR Decl. ¶31. While LLR in this case provides more factual and legal support than in *Rimler*, it
is unpersuasive, particularly as it openly states that the PAGA recovery for a *single pay period* would be $55
million, and while it argues that recovery of the full stacked amount of PAGA penalties would be unlikely
given a Court's discretion to reduce "oppressive" awards, it does not attempt to justify its 99.97% discount.
SLR Decl. ¶32.[9]

### H. Judicial Estoppel is Violated by LLR's Conflicting Representations to Judges

The purpose of the doctrine of judicial estoppel is to "protect the integrity of the judicial process,"
and to "protect against a litigant playing fast and loose with the courts."[10] The *spirit* and *purpose* of the
doctrine should be considered here. Certain of LLR's representations in prior cases bear repeating at this
juncture:

*Price v. Uber Technologies, Inc.* **(in which LLR was seeking intervention to oppose a
settlement):** "There have been no substantive rulings from the Court in this case, nor any discovery disputes
resolved by the Court [weighing against settlement approval]."[11] However, the same is true here. "[The *Price*
settlement] will provide [drivers] with about a dollar per driver and no non-monetary relief, while depriving

---

[8] *See generally* LLR's *Price* Settlement Objection, attached to Marker Decl. as Exh. B.
[9] It is somewhat noteworthy that in previous cases LLR has insisted upon consultation with the State at this
stage of proceedings for the purpose of determining PAGA allocation. *O'Connor* Class Sur-Reply And
Request for the Court to Solicit LWDA Opinion on Settlement (attached as Exh. C to Marker Decl. emphasis
added). Robinson respectfully encourages such an avenue in this case.
[10] *Jackson v. Cty. of Los Angeles*, 60 Cal. App. 4th 171, 181 (1997) citing *Russell v. Rolfs*, 893 F.2d 1033,
1037 (9th Cir.1990), internal quotation marks omitted.
[11] Memorandum In Support of *O'Connor* Class Motion to Intervene at 5 (attached as Exh. D to Marker
Decl.)

1    them of a far greater remedy they could obtain if these claims were tried successfully." *Id.* at 8. Here, the

2    total PAGA relief amounts to less than one dollar per driver.

3            ***Cotter v. Lyft* (in which LLR was attempting to defend its own proposed settlement against**

4    **objection):** "Of the very few PAGA claims that have resulted in a judgment, and which were also subject to

5    scrutiny on appeal, one Court of Appeal has stated in no uncertain terms that a PAGA award in the amount

6    of one-third of damages is a reasonable PAGA award. *Amaral v. Cintas Corp.* No. 2, 163 Cal. App. 4th

7    1157, 1214 (2008) (holding that a PAGA penalty in the amount of one-third of damages award was

8    "proportional to [defendant's] misconduct.")"[12] LLR's $750,000 PAGA allocation for at least $3 billion in

9    penalties fails this bright-line rule it previously advocated.

10           While the above quotations are exemplary rather than exhaustive due to page limits, they paint a

11   picture of counsel that changes its views when beneficial. This raises doubts as to the adequacy of the current

12   representation.

13           **I.   The Release Does Not Meet Class Settlement Requirements**

14           It is unusual that the release for named plaintiffs is different from the settlement class members'

15   release. That is exactly the case here as the named plaintiffs are releasing a very broad array of additional

16   claims for no additional consideration. As noted by Judge Massullo the service award cannot serve as

17   consideration for a broader release as that money is only being paid for their service, not for the release of

18   their claims. *See Rimler* Tent. at 10 ("To the extent Plaintiffs claim the service awards may be used as

19   consideration for Plaintiffs' release of additional claims, Plaintiffs must provide argument supported by

20   citation to legal authority in support of their position.").

21           Unlike a typical class action in this matter there are a number of active and vigorously contested

22   arbitrations, and more are anticipated.[13] Thus it is concerning that the settlement purports to "resolve

23   arbitrations." *See* Prop. SA ¶3.8.10 ("Declares this Agreement . . . to be binding on . . . all pending and future

24

25   ─────────────────────

26   [12] *Cotter v. Lyft*, Case No. 13-cv-04065-VC (2017); Plaintiff's Response to the Teamsters' and Objectors'
     Objections to Preliminary Approval of Proposed Class Settlement at 13 (attached as Exh. E to Marker Decl.).
     [13] This situation is becoming increasingly common in gig-economy actions. *See, e.g.,* Joel Rosenblatt, *Uber*

27   *Gambled On Driver Arbitration And Might Have Come Up The Loser*, Los Angeles Times (May 8, 2019)
     available      at      https://www.latimes.com/business/la-fi-uber-ipo-arbitration-miscalculation-20190508-

28   story.html (discussing the recent disclosure of fellow gig-economy employer Uber that it is currently
     engaged in over 60,000 individual arbitrations).

1    lawsuits or other proceedings . . . that encompass the Settlement Class Members' Released Claims and that

2    are maintained by or on behalf of any Settlement Class Member who has not been excluded from the

3    Settlement Class . . . regardless of whether the Settlement Class Member previously initiated or subsequently

4    initiates individual litigation, arbitration, or other proceedings encompassed by [the Prop. SA] even if such

5    Settlement Class Member never received actual notice of the Action or this proposed Settlement."). This

6    demonstrates that the parties are aware that many class members are currently advancing their rights in

7    individual arbitrations and yet seeks to nullify those arbitrations, which they are pursuing through their own

8    chosen counsel and for which they have already incurred out-of-pocket costs. Further, it purports to wipe out

9    these claims while prohibiting counsel from excluding their clients, as discussed *supra*. Finally, as discussed

10   *supra* in relation to FLSA claims, the terminology of the releases is so muddled that it is impossible for a

11   driver to determine which claims they were releasing, violating the requirements set forth in *Kullar*.

12        **J.  The Dispute Resolution Fund Invites Scrutiny**

13        Identically to the *Rimler* settlement, Paragraph 2.9 provides for a "Dispute Resolution Fund," in this

14   case of $350,000. This fund is purportedly free from any judicial approval or disclosure, enabling counsel to

15   distribute arbitrary *additional* payments to class members as LLR sees fit. According to Paragraph 10.4, this

16   fund enables the parties, through their settlement administrator's "binding" determination, to pay off

17   dissatisfied class members, objectors, and others without the Court's knowledge to buy peace and prevent

18   appeals. This is what Fed. R. Civ. P. 23(e)(5)(B) was designed to prevent. For example, if a driver was

19   (reasonably) upset at their potential recovery, counsel could offer them $10,000 (or more) – double what the

20   Court is asked to approve for putative class representatives – to buy their silence and push the settlement

21   forward to final approval. Judge Massullo required LLR to "justify" the fund and "explain how

22   compensating for payments mistakenly excluded from the class should not be covered as party of the . . . set

23   aside for claims administration." *Rimler* Tent. at 3. The class action device has been honed to avoid these

24   types of murky discretionary "funds." This is not how class actions are supposed to be settled, and the Court

25   should deny the motion on this ground alone.

26        The Court should also deny use of this fund for another reason, as it would allow LLR to treat class

27   members differently without a reasonable basis for doing so. It is well established that, particularly in the

28   case of large settlements comprising different types of claims, "allocation . . . must be based, at least in part,

OPPOSITION TO MOTION FOR PRELIMINARY APPROVAL

on the comparative strengths and weaknesses of the asserted legal claims."[14] Given this policy and the procedural requirement that courts must approve incentive awards to class representatives based on specific criteria, it is difficult to see how either the class or public policy is served by permitting unilateral, unreviewable, and secretive *de facto* incentive awards to be handed out on the side by LLR. *Cellphone Termination Fee Cases*, 186 Cal. App. 4th 1380, 1394 (2010), as modified (July 27, 2010).

The settlement also provides for double recovery ("points doubled") to those putative class members who have either a) opted out of arbitration, b) initiated arbitration, or c) "expressed an intent to do so" prior to October 24, 2019. Prop. SA ¶5.3 *See* discussion *infra*; *see also In re Holocaust Victim Assets Litig., supra* at 186. This is clearly not based on the relative strength of the class member's particular legal claim, as required, but is based solely on an intention to pick off drivers likely to opt out of this otherwise inadequate settlement. While such circumstances may affect the risk of litigation as to that driver, the conversion of this into a doubled recovery appears to be essentially arbitrary and, like other discretionary disbursements within the settlement, apparently unreviewable. (Judge Massullo found the same provision in *Rimler* to be "vague" and that "the reasons for such an allocation should be set forth in more detail." *Rimler* Tent. at 10.) Finally, the settlement does not explain what type and degree of "expression" would be considered sufficient. Prop. SA ¶5.3. Judge Massullo wondered the same thing about the term in the *Rimler* settlement. *Rimler* Tent. at 7.

## IV.   CONCLUSION

This settlement cannot be allowed to proceed through the expensive yet futile notice process to final approval. Robinson respectfully requests that the Court deny preliminary approval.

---

[14] *In re Holocaust Victim Assets Litig.*, 413 F.3d 183, 186 (2d Cir. 2005) (per curiam). *See also In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, No. 8:10ML 02151 JVS, 2013 WL 3224585 at *2-4, 10 (C.D. Cal. June 17, 2013) (approving class action settlement and certifying settlement class where there was an allocation plan which treated class members differently based on the perceived strength of their claims); *In re Auto. Refinishing Paint Antitrust Litig.*, No. MDL 1426, 2004 WL 6248154, at *9 ("In general, a plan of allocation that reimburses class members based on the type and extent of their injuries is reasonable."); *In re TD Ameritrade Account Holder Litig.*, No. C 07-2852 SBA, 2011 WL 4079226, at *16 (N.D. Cal. Sept. 13, 2011) (settlement approved where monetary relief provided for some class members who experienced identity theft but not for other class members who did not).

1

2

3

4     Date: December 4, 2019

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

ZIMMERMAN REED LLP

By:  _____
Caleb Marker
Christopher P. Ridout
Flinn T. Milligan
2381 Rosecrans Avenue, Suite 328
Manhattan Beach, CA 90245
Telephone (877) 500-8780
Facsimile (877-500-8781

*Attorneys for Objector*