Pages 1 – 28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

TERRELL ABERNATHY, et al.,          )
                                    )
            Petitioners,            )
   VS.                              )  NO. C 19–07545 WHA
                                    )
DOORDASH, INC.,                     )
                                    )
            Respondent.             )
_____ )

CHRISTINE BOYD, et al.,             )
                                    )
            Petitioners,            )
   VS.                              )  NO. C 19–07646 WHA
                                    )
DOORDASH, INC.,                     )
                                    )  San Francisco, California
            Respondent.             )  Monday, February 10, 2020
_____ )

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Petitioners:
                    KELLER LENKNER LLC
                    1300 I Street, N.W.
                    Suite 400E
                    Washington, D.C.  20005
            BY:  **WARREN D. POSTMAN, ESQ.**

                    KELLER LENKNER LLC
                    150 N. Riversid Plaza
                    Suite 4270
                    Chicago, Illinois  60606
            BY:  **ASHLEY C. KELLER, ESQ.**
                 **MARQUEL P. REDDISH, ESQ.**
                 **TRAVIS D. LENKNER, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court
       (Appearances continued, next page)

**APPEARANCES, CONTINUED**:


For Respondent:
                        GIBSON, DUNN & CRUTCHER LLP
                        1050 Connecticut Avenue, N.W.
                        Washington, D.C.  20036-5306
                    BY: **JOSHUA LIPSHUTZ, ESQ.**

                        GIBSON, DUNN & CRUTCHER LLP
                        333 South Grand Avenue
                        Los Angeles, California  90071-3197
                    BY: **JAMES FOGELMAN, ESQ.**
                        **MICHAEL J. HOLECEK, ESQ.**
                        **KELLY DING, ESQ.**


Also Present:        **RYAN DESCHAINE**
                     **YIQUAN GUO**
                     **PATRICK WATERS**
                     **VICTORIA DILTZ**
                     **MARGO EDWARDS**

<u>**Monday - February 10, 2020**</u>                        <u>**2:02 p.m.**</u>

<u>**P R O C E E D I N G S**</u>

      **THE CLERK:**  Calling Civil Action 19-7545, Abernathy, et al. versus DoorDash, Inc., and related Case 19-7646, Boyd, et al. versus DoorDash, Inc.

    Counsel, please step forward and state your appearances for the record.

      **MR. POSTMAN:**  Good morning, Your Honor. Warren Postman for the petitioners.  And I'm joined today by my colleagues Ashley Keller, Travis Lenkner and Marquel Reddish.

    And we have several petitioners here.  I can read their names, if you would like.  They're just noting that they're here.

      **THE COURT:**  Please do that.

      **MR. POSTMAN:**  They are Ryan Deschaine, Yiquan Guo, Patrick Waters, Victoria Diltz, and Margo Edwards.

      **THE COURT:**  Okay.  Make your appearance, please.

      **MR. LIPSHUTZ:**  Good afternoon, Your Honor.  Joshua Lipshutz from Gibson Dunn on behalf of defendants.  And with me are my colleagues James Fogelman, Michael Holecek and Kelly Ding.

      **THE COURT:**  Welcome to all of you.

      **MR. LIPSHUTZ:**  Thank you, Your Honor.

      **THE COURT:**  Now, the preliminary matter, is the petitioner here who has a hearing disability?

1          **MR. POSTMAN:**  No, he did not make it today.

2          **THE COURT:**  All right.  I need to say something that

3   is not very complimentary to you.

4       Late Friday, not two weeks earlier, but late Friday --

5   this is a Monday -- you or somebody in your firm sent a message

6   to the Court saying that a petitioner who had a hearing

7   disability would be here, and, and asked that we supply a

8   sign-language interpreter.

9       True?

10          **MR. POSTMAN:**  That's true.

11          **THE COURT:**  Did you write that letter?

12          **MR. POSTMAN:**  I did not write the letter.

13          **THE COURT:**  Tell me which one of them wrote the

14   letter.

15          **MR. POSTMAN:**  It is no person in this courtroom; it

16   is an associate in our firm.  When we learned of the way in

17   which they wrote it and we saw it, we were disappointed.  And I

18   apologize to the Court that it was written --

19          **THE COURT:**  There's more.  There's more.  All right.

20   So, first of all, this -- it's not a completely out-of-line

21   request.  It's something that we are sympathetic to.  But you

22   are assuming that we are a big firm, and we have the resources

23   of a big firm, and that over the weekend we would be able to go

24   find a sign-language interpreter and bring them in here at

25   government expense.

1       Now, if something like that is going to be requested it

2   ought to be requested at least a week ahead of time, instead of

3   on a Friday night.  Just, just beyond the pale of -- it's

4   unreasonable.  Now, that's point one.

5       Point two is that we don't have a signing-language

6   interpreter.  We have language interpreters.  Spanish, for

7   example.  But we don't have interpreters for sign language.

8   Nevertheless -- and it would have been your expense, and it was

9   your duty, not our duty, your duty to bring the interpreter,

10  not ours, if you wanted one.

11      However, because we have staff at this Court who tries our

12  best, we tried to find some other alternative.  So what we came

13  up with was realtime reporting.  So we have got a certified

14  realtime reporter here.  And it should be being beamed onto

15  your table with the expectation that your petitioner who needed

16  the assistance would be able to sit there and read it.  All of

17  that trouble only to find out he doesn't show up.

18          **MR. POSTMAN:**  I understand the Court's --

19          **THE COURT:**  You should.

20          **MR. POSTMAN:**  -- frustration, and I --

21          **THE COURT:**  I don't think I've seen a better -- worse

22  example of lawyering, and of irritating the Court, going to a

23  lot of trouble.  And then -- it's like being asked to the prom,

24  and your date doesn't show up.  We did a lot of work for you,

25  and your firm, and for that one petitioner.

1       And I -- you know, an apology is not good enough in my

2   opinion.  I will accept your apology, but this is something I

3   will remember for a long time when you make a request like this

4   in the future.

5           **MR. POSTMAN:**  I thank you for accepting the apology.

6   As I said, I take responsibility for it.  It happened at our

7   firm, it should not have happened, and we will work to do the

8   best we can to not dis- -- we will not, certainly, make

9   unreasonable requests on the Court again.

10          **THE COURT:**  All right.  I'm going to put that to one

11  side now.  I got that off my chest.  It would have been better

12  actually if the petitioner had shown up.  That way, all the

13  work we did would not have been for naught.

14          **MR. POSTMAN:**  (Nods head)

15          **THE COURT:**  Okay.  All right.  We're here on two

16  motions.  The first is your motion to compel arbitration.  The

17  second is a motion to stay.  So let's hear -- you can have a

18  seat, please (Indicating).  And I'll let you stand up in a

19  minute.

20      All right, we don't have a lot of time.  I'll give you

21  about ten to 15 minutes to make your point, and then we are

22  going to go to the other motion.

23      Go ahead.

24          **MR. POSTMAN:**  Thank you, Your Honor.

25      This is actually an unusually simple motion.  Controlling

1   authority says that there are two elements and only two

2   elements that each petitioner, once established, can -- shows

3   an entitlement to relief.  Each petitioner needs to show a

4   valid agreement.  And they need to show that the agreement

5   covers the dispute between the parties, or that it delegates

6   threshold questions to the arbitrator.  Neither of these

7   elements is actually in dispute in this case.

8         DoorDash concedes that each petitioner has a valid

9   agreement to arbitrate.  And Doordash concedes that the

10  agreement covers the dispute between the parties, and delegates

11  all threshold questions to be decided at AAA.  That's the

12  beginning and the end of this motion.

13        The Supreme Court said in *Dean Witter Reynolds* (As read):

14              "The FAA, quote, leaves no place for the exercise of

15              discretion by a District Court, but instead mandates

16              that the District Court shall direct the parties to

17              proceed to arbitration on issues as to which an

18              arbitration agreement has been signed."

19        The only complexity in this case is the result of

20  DoorDash's attempts repeatedly to wiggle out of its contract

21  and to obstruct petitioners' attempts to proceed with

22  arbitration before AAA.

23        I'm happy to go point by point and explain why each

24  argument fails.  But I want to note that DoorDash's argument

25  essentially boils down to the assertion that arbitrating at AAA

1    isn't fair.

2         Well, DoorDash has been facing arguments from plaintiffs

3    for years who have argued that individual arbitration at AAA is

4    inefficient and isn't fair.

5         And DoorDash's response was essentially:  Fair schmair,

6    the contract says all issues must be decided at AAA, and the

7    FAA requires that that contract to be -- is enforced.  Courts

8    have zero discretion on that.

9         That's their argument.  DoorDash won on those arguments,

10   and it's the height of chutzpah for it to say that now because

11   it thinks the process at AAA is unfair, it can treat its

12   arbitration agreement like an optional suggestion instead of a

13   binding contract.

14        DoorDash clearly breached its arbitration agreement.  And

15   I think it's important to recognize underneath all the

16   theoretical arguments about arbitration and the Federal

17   Arbitration Act, petitioners are low-wage workers with very

18   strong claims; they are trying to get a minimum wage; they have

19   been given the run-around for months.

20        What's more, DoorDash has brought up the *Marciano* case in

21   which they are now saying this -- petitioners' claim should be

22   put on ice until that settlement goes forward.

23        In early 2018, DoorDash moved to stay the *Marciano* case,

24   because they said everyone's claims had to go to individual

25   arbitration at AAA.  They said any representative action is

1    against the agreement, and it must be stayed.  They won that.

2        Once a substantial number of people brought claims before

3    AAA, they refused to proceed.  And now they are saying these

4    same petitioners who did what DoorDash asked have to wait

5    indefinitely again -- there's no hearing even set on the

6    *Marciano* action -- for that action to proceed.

7            **THE COURT:**  When did your lawsuit get -- your various

8    lawsuits get filed in relationship to that stay?

9            **MR. POSTMAN:**  The stay was entered in December of

10   2018.  Our firm first reached out to DoorDash in March of 2019.

11   Filed an initial group of demands in July of 2019, and the

12   petitioners' specific demands were filed in September and

13   October of 2019.

14       So if I could, I actually would just like to read

15   DoorDash's statements in *Marciano* in support of that stay.

16   This is a brief signed by Mr. Lipshutz:

17           "Section 1281.4..."

18       And this is the California equivalent of Section 3 of the

19   FAA.  (As read)

20           "...requires the trial court to stay a PAGA claim if

21           the issues subject to litigation might overlap with

22           those that are subject to arbitration.  Section

23           1281.4 requires a stay even when the parties to the

24           arbitration and the court action are different, as

25           long as there is overlap among the factual and legal

1    questions.  Overlap of a single question of law or

2    fact requires a stay of Section 1281.4."

3    They criticize the plaintiffs for arguing that the class

4    action could go forward or the representative action could go

5    forward because it wouldn't interfere with the arbitrations,

6    and they say that has it backwards.

7    (Reading)  The reason for a stay is not that arbitration

8    results might affect the litigation, but that the litigation

9    results could interfere with arbitration.

10   Section 3 of the FAA requires the same thing.  *Moses H.*

11   *Cone*, the U.S. Supreme Court held that a Federal District Court

12   committed plain error when it stayed a motion to compel because

13   it thought it would be more efficient to defer to a pending

14   state-court proceeding with overlapping parties.  That holding

15   is squarely on point here.

16   If the Court would like more recent precedent, Judge

17   Armstrong in this district received a request from the same

18   lawyers, overlapping team at Gibson Dunn, to stay the motion to

19   compel by petitioners in *Adams v. Postmates*.

20   They argued that the settlement in *Rimler v. Postmates*,

21   which is entered between the same law firms, Gibson Dunn on the

22   one hand representing Postmates, and the firm who is purporting

23   to represent plaintiffs in both *Rimler* and *Marciano*.

24   Judge Armstrong didn't even address it.  She entered the

25   order compelling arbitration, as *Moses H. Cone* requires.

1      So DoorDash has clearly breached.  It's a serious breach

2   that prevents low-wage workers from trying to get a minimum

3   wage.  They've been given the run-around long enough.

4      And the FAA and California law require two remedies.  The

5   FAA says when a court finds that there is the refusal to

6   arbitrate, it shall order arbitration in the manner specified

7   by the agreement.

8      Well, DoorDash's agreement here says two things.  It says

9   DoorDash has to comply with AAA's administrative

10  determinations.  And it says DoorDash cannot, quote (As read):

11              "...participate in a class action, a collective

12              action or a representative action with regard to

13              petitioners."

14  We respectfully ask the Court to order them to comply with

15  their agreement in both those respects.  California law, which

16  also applies here, also requires that DoorDash be ordered to

17  pay petitioners' costs and fees in the arbitration.  So we are

18  asking the Court to award both those remedies.

19      I think it's important to note that DoorDash's arguments

20  about 707 really don't hold water.  They've argued two things.

21  One, they've argued that Section 707 cannot be applied

22  retroactively.

23      We're not asking for it to be applied retroactively.

24  DoorDash, if they had violated their obligation to pay fees,

25  and then fixed it in 2019, we agree, there would be no basis

1   under 707, the statute wouldn't apply, under -- under

2   California law, to require them to pay costs and fees.  But

3   they continued in an ongoing breach.

4        The statute says that when a party has failed to pay

5   filing fees that are owed, the party is in breach, not that

6   they did breach.  This is an ongoing violation.

7        And under California law, the *Eichelberger* case:  The

8   legislature may increase the consequences for an ongoing

9   violation without it being considered retroactive.

10       The way you know this is an ongoing breach is the

11  petitioners continue to be harmed.  So we're asking DoorDash to

12  be subject to the statute not for its conduct in 2019, but in

13  2020.

14       Section 707, California law, is also not preempted as

15  DoorDash argues.  First of all, as we say in our brief, as a

16  simple textual matter, the FAA requires that agreements be

17  valid -- to arbitrate, be valid, irrevocable and enforceable.

18  Statutes that interfere with that command are preempted.

19       1298.97, which is also Senate Bill 707 in California, does

20  nothing to render an arbitration agreement invalid, revocable,

21  or unenforceable.

22       I would also note that just last week, DoorDash filed a

23  motion in one of the arbitrations relying on California Code of

24  Civil Procedure 998 to seek costs in arbitration.  Section 998

25  is a state version similar to Rule 68 of the federal rules.

1   Just like Section 1281.97, Senate Bill 707, Section 998 is a

2   California rule that applies specifically to arbitration.   In

3   fact, 998 arguably discourages arbitration, whereas Senate Bill

4   707 does not.

5        What's more --

6        **THE COURT:**  You said that Judge Armstrong had denied

7   a similar motion to stay.  Have any judges anywhere in

8   California granted any motions to stay other --

9        **MR. POSTMAN:**  DoorDash has not cited and we have not

10  found a case in the entire country, ever, that has stayed a

11  motion to compel in favor of a class action.

12       **THE COURT:**  No, but I'm talking about I thought that

13  there were other -- is this a true statement?

14           "Several courts have granted DoorDash's motion to

15           stay in parallel actions that would be affected by

16           the *Marciano* settlement."

17       Is that true?

18       **MR. POSTMAN:**  With regard to court actions, yes, it's

19  true.  No court has said that a party's right to arbitrate can

20  be denied.

21       All of the cases they cite are other court actions where

22  you've got competing class actions --

23       **THE COURT:**  Well, this is a court action.  What do

24  you mean, "other court actions"?

25       **MR. POSTMAN:**  Where the parties are attempting to

1    litigate the underlying claims in court, the parties in all

2    those cases that were stayed were asking the Court to decide

3    the misclassification question that was purportedly being

4    resolved in *Marciano*.  And so as a matter of judicial

5    efficiency, the courts made a determination that it would be

6    efficient.

7         But the most important thing, Your Honor, is that because

8    there was no motion to compel filed in those cases, the FAA was

9    not an issue at all.  The FAA imposes a separate command that

10   trumps any separate *Levya* discretionary factors, which we can

11   go through.

12        But *Moses H. Cone*, I commend it to Your Honor.  It is on

13   all fours.  A District Court declined to move forward with

14   deciding a motion to compel under the FAA because it thought it

15   would be more efficient to let a proceeding in state court go

16   ahead.  There were multiple parties; there was only one party

17   in the federal action compelling arbitration.

18        The U.S. Supreme Court said it plainly violates the FAA.

19   It's an abuse of discretion, and plain error.  There's no

20   discretion when a party moves to compel and meets those two

21   requirements.

22        So on preemption, to finish the point, the stay action,

23   *Marciano*, that I mentioned was also brought by DoorDash under

24   California Civil Procedure Section 1281.4.  DoorDash has

25   repeatedly relied on California-specific arbitration

1   provisions, and never suggested they were preempted.  They

2   can't rely on California law when it likes it, and then say

3   that it's preempted when it doesn't.

4        On the stay, I really think *Moses H. Cone* and *Dean Witter*

5   *Reynolds* answers it.

6        If Your Honor has further questions on that or any other

7   issue, I am happy to address them.  You did note you were short

8   on time, so I'll pause there.

9             **THE COURT:**  Where does the state-court -- where does

10  the *Marciano* case stand now?

11            **MR. POSTMAN:**  Judge Shulman, the motions judge, had

12  it on his calendar.  He took it off the calendar -- designated

13  it as --

14            **THE COURT:**  Took what off?

15            **MR. POSTMAN:**  The motion for preliminary approval of

16  that settlement.  So it has not been approved.

17       The judge who was going to hear the motion transferred the

18  case to the complex division.  No judge has been assigned; no

19  hearing has been set.

20       As we note in our response to Your Honor's most recent

21  order, the *Rimler v. Postmates* settlement, which is virtually

22  identical, has been repeatedly delayed.

23            **THE COURT:**  Say that again?

24            **MR. POSTMAN:**  The *Rimler v. Postmates* settlement

25  which, again, was entered into by the same law firms as the

1    *Marciano* settlement and is structured in virtually the same

2    way, has been repeatedly delayed.  The judge there, a complex

3    judge, potentially the same judge who will receive the *Marciano*

4    settlement, raised a host of concerns about how it failed to

5    protect absent class members.

6         And --

7              **THE COURT:**  Who is that judge?

8              **MR. POSTMAN:**  Judge Massullo.  And that's included in

9    our papers.  That order raising a host of concerns about how it

10   may not be fair.

11        The fundamental point is the FAA and California law say

12   litigation has to wait for arbitration.  Arbitration doesn't

13   wait for litigation.  Case after case says that.  DoorDash said

14   that in *Marciano*.

15        In fact, we think it's going to be interesting in *Marciano*

16   for DoorDash, having won a stay -- to be clear, those quotes I

17   read, DoorDash was saying that *Marciano*, itself, this very

18   case, had to be stayed so long as there were any other pending

19   arbitrations.  There's over 240 pending arbitrations against

20   DoorDash now.

21        DoorDash's position in that case was it doesn't matter if

22   those parties are also in the *Marciano* case.  The *Marciano* case

23   needs to be stayed.

24        This all just illustrates, again, under the FAA,

25   litigation has to wait for arbitration.  Not the other way

1  around.  It could well be months before any settlement is

2  preliminarily approved, if it's ever approved.  There are

3  serious issues there.

4      But having stayed the *Marciano* case for 18 months, then

5  stonewalled and not proceeded with the arbitrations our

6  petitioners brought, to flip back and say now their

7  arbitrations can't go forward, forget about the FAA, "We want

8  to do a contractually forbidden class proceeding," it's cynical

9  and bad-faith delay.

10      One additional point illustrates this.  DoorDash noted

11  that it's proceeding with roughly 250 arbitrations in which we

12  also represent the Dashers.  DoorDash had none of the

13  objections it has now to any of those arbitrations.  Never said

14  the demands were deficient.  Never said they didn't state an

15  amount in controversy.  Moved ahead.  Paid the fees.

16  Proceeded.  Never has moved for a stay in those.

17      This idea that arbitrations have to wait for *Marciano*,

18  they haven't moved to stay in any of those cases.  It just

19  shows that the real issue here is they don't want to proceed

20  with too many.  And they talk about the filing fees, but there

21  is a bigger issue here which I touched on the last time we

22  spoke, in the context of the temporary retraining order.

23      DoorDash's real problem is that they violated the rights

24  of a massive number of people who have very strong wage claims.

25  They hoped that arbitration would allow them to allow only a

1    few of those to proceed at any one time.  Most firms can only

2    handle a few.  And so if you have to litigate for a year and in

3    five arbitrations and then you settle them, so be it.  You can

4    continue the policy of misclassification.

5         Our firm has brought incredible resources, we're prepared

6    to litigate these.  And as more get litigated, we think it will

7    get more and more efficient.

8         One example, the first arbitrator to address the issue in

9    the 250 I mentioned held that four petitioners have a strong

10   likelihood of success on the merits, and she's going to allow

11   them to brief summary judgment on liability.  If they prevail

12   on that, which she's found they are likely to, the case can

13   likely be wrapped up with no discovery, no hearing.  And as

14   more and more arbitrators do this, which we believe they will,

15   more and more cases get assigned, we most certainly can

16   litigate all of these.

17        DoorDash's real concern is having to face these claims on

18   the merits.  And at the end of the day, whatever they want to

19   say about the process at AAA, they picked it.  They forced it

20   on a bunch of drivers in court who didn't want to go there.

21   They said:  You have to go there.

22        All those fairness arguments are really nice, but it

23   doesn't matter.  The FAA requires courts, no discretion, to be

24   involved, you have to send it.

25        They're completely flip-flopping on that, because they

don't like the consequences.  But it's their choice.

        **THE COURT:**  All right, let me hear from the other side.

        **MR. LIPSHUTZ:**  Thank you, Your Honor.

    Your Honor, this is not a normal case.  This is not a class action where counsel on the other side is representing a group of people that they've been found adequate to represent.  This is a -- plaintiffs' firm represents -- claimants represent 6,000 people on an individual basis.

    That means they claim that they have individual attorney/client relationships with each of these 6,000 people, and that they are serving these people's interest without any conflicts of interest arising between those 6,000 people.

    However, in the time between when Keller Lenkner first filed this petition to compel arbitration on behalf of 6,000 people earlier this year and now, when they filed an amended petition to compel arbitration, 360 of those people that they claimed to individually represent have disappeared.  They're no longer part of the amended motion to compel arbitration, because we pointed out to the other side that those people have no possible claim against DoorDash.  Either because they never signed up to use the platform at all, or because they did sign up to use the platform but never used it.  So where do those 360 people go?  They simply dropped them from the case.

    For another 400 people that they claim to represent on an

1  individual basis, we have lists submitted to DoorDash by other

2  law firms that claim that they represent those very same

3  people.  And Keller Lenkner has not disputed that.

4      In fact, in one case, the case of Mr. Jaysfer Duarte,

5  plaintiffs' firm over here, to my right, filed a AAA demand on

6  behalf of Mr. Duarte, and then a motion to compel in this court

7  asking that this Court compel him to arbitration.  Even though

8  we have already begun arbitrating with Mr. Duarte, he's

9  represented by a different law firm.  We have already paid the

10  fees, and are in the middle of arbitrating with Mr. Duarte.

11      So they were trying to compel arbitration on the same

12  claims on behalf of the same person who is already represented

13  by another law firm, and we're already arbitrating.

14      **THE COURT:**  Look.  I can deal with that kind of

15  problem by saying that if it turns out that that law firm has

16  procedurally screwed up, and more case -- that they're going to

17  pay all of your attorneys' fees.  But that's not a basis on

18  which to deny 6,000 people relief.  It might occur in a dozen

19  cases.

20      **MR. LIPSHUTZ:**  The problem is it's not a dozen cases,

21  Your Honor.  There's 400 people at least who appear to be

22  represented by other law firms.

23      There's another 869 people out of the 5,000 where this

24  Court ordered that plaintiffs go out -- plaintiffs' counsel go

25  out and get declarations from their clients --

1    **THE COURT:**  I said, get a bunch of declarations.

2    Now, I agree those things called "witness statements," that's

3    no good.  That's out the window.  But those other declarations

4    are what I asked for.

5    **MR. LIPSHUTZ:**  They are, Your Honor, with one

6    problem.

7    The problem is that nowhere in those declarations do those

8    people say at all that they are represented by Keller Lenkner,

9    or even that they know who Keller Lenkner is.

10   And here's why that's problem.  We asked for the

11   certificates of completion --

12   **THE COURT:**  Didn't they -- did I not -- look.  They

13   supplied declarations that said what I told them to put in.  If

14   you had wanted me to put that in there, you should have told me

15   to put that in there.

16   **MR. LIPSHUTZ:**  Fair enough, Your Honor.  My point is

17   simply this.  When we pressed a little bit to find out how

18   those DocuSign -- because they're all electronic signatures --

19   we pressed a little bit to find out whether those electronic

20   signatures were real, and where they came from.  We asked for

21   the certificates of completion.

22   **THE COURT:**  If it turns out that you can show forgery

23   or something else, I'm going to order the arbitrator to pay

24   your fees.  That law firm.  Not the individual, your law firm.

25   Because I do feel that there is -- that's a lot of paperwork.

```
1   And out of those 6,000 there probably are some people who
2   you've kind of pulled the wool over my eyes a little bit on the
3   plaintiffs' side.
4        But I believe that most -- the vast majority of these are
5   legit.  And I'm not going to hold up relief that you forced on
6   them -- you forced it on them to go to arbitration.  I'm not
7   going to hold up that relief just because there are going to be
8   a few glitches.
9            MR. LIPSHUTZ:  Totally understand, Your Honor.  And
10  no one is suggesting that we should hold up relief.  What we
11  are suggesting --
12           THE COURT:  Yes, you are.  You want a stay.  And I'm
13  not going to grant any stay on account of some case that's
14  going nowhere in state court.
15           MR. LIPSHUTZ:  I don't think it's going nowhere,
16  Your Honor.  We --
17           THE COURT:  It's going nowhere, and anyway, they're
18  going to opt out of it.
19           MR. LIPSHUTZ:  Well, I think that that's a problem.
20  Because in Footnote 6 of their reply brief in support of their
21  motion, they explain why these problems are arising.
22       This law firm called Troxel Law is apparently the one that
23  is doing the communicating with the clients.  Jeremy Troxel is
24  a solo practitioner, he's not licensed here --
25           THE COURT:  Save it for the arbitrator.
```

1        **MR. LIPSHUTZ:**  That's fine, Your Honor.

2        **THE COURT:**  I'm not going to deny them relief that

3   you can raise in front of the arbitrator and then get a lot of

4   the fees out of that law firm if they had -- if they played

5   games with the paperwork.

6        **MR. LIPSHUTZ:**  I understand, Your Honor.

7        **THE COURT:**  I promise you, you will get -- but I

8   don't believe that there are going to be many of those.  I

9   believe there will be -- you know, let's say there's a hundred

10   of them.  All right.  Instead of talking 6,000 people.

11        And you won't give them their day in arbitration.  It's

12   too late to say "day in court," because you've took that away

13   from them.

14        The only thing they've got left is the right to arbitrate.

15   And now you want to take that away from them.

16        **MR. LIPSHUTZ:**  We don't Your Honor.  We really don't.

17        **THE COURT:**  Yes, you do.  Yes, you do.  You want a

18   stay forever.  I know how this works.

19        **MR. LIPSHUTZ:**  We really don't, Your Honor.

20        **THE COURT:**  No, you're going to go, and you're going

21   to pay that money and -- millions of dollars.  But that's what

22   you bargained to do, and you're going to do it.

23        **MR. LIPSHUTZ:**  I understand, Your Honor.  The point

24   is simply that we do have a class settlement that covers

25   350,000 people --

1          **THE COURT:**  No, it doesn't.  There are all kinds of

2      issues.  All kinds of fairness issues.  Massullo's already

3      figured it out.  And it hasn't even gotten preliminary

4      approval.

5          And if it ever did get to final approval, they could opt

6      out.  That's what I expect they would do.

7          **MR. LIPSHUTZ:**  They could opt out, but their clients

8      have to be informed of the settlement.

9          We had a --

10         **THE COURT:**  And your gimmicky thing in there, that

11     they can't -- it has to be a ink signature by the individual.

12     Oh, so that means that lawyers can't opt out on behalf of a

13     long list.

14         **MR. LIPSHUTZ:**  Yes, Your Honor.

15         **THE COURT:**  That's no good.  I'm -- take that to

16     Judge Massullo, and say that Judge Alsup thinks that, alone, is

17     unfair to the class.

18         **MR. LIPSHUTZ:**  Your Honor, the Ninth Circuit has said

19     that that's an appropriate way to opt out --

20         **THE COURT:**  Well, that's not what I think.  I think

21     if you'd look at it in the context of what's going on here,

22     it's unfair.

23         **MR. LIPSHUTZ:**  I would -- I understand everything

24     you're saying, Your Honor.  I would just point the Court to

25     another situation that's exactly like this one where Keller

1   Lenkner is on the other side.

2       In the *Centurylink* case, the District of Minnesota

3   enjoined their arbitration because of the very problem --

4           **THE COURT:**  Good for Minnesota.  I'm in California.

5           **MR. LIPSHUTZ:**  I understand, Your Honor.

6           **THE COURT:**  I'm in the Ninth Circuit.

7           **MR. LIPSHUTZ:**  How do we proceed with respect to the

8   people where there are overlapping law firms, and the absence

9   of declarations?

10      How do we proceed with respect to those?

11          **THE COURT:**  I'm going to sort it all out in an order.

12          **MR. LIPSHUTZ:**  Okay.

13          **THE COURT:**  The ones where they gave me the

14  declaration that I wanted, they're going to go forward.  And

15  you're going to pay the fees, pronto.

16      There are some -- there are some that we have identified

17  in this order where I believe petitioners' counsel have failed

18  to do their job, and have given me lousy witness statements

19  that don't -- no.  They're going to lose on those.  But that's

20  a small minority, out of the larger picture.

21          **MR. LIPSHUTZ:**  I understand, Your Honor.  I would

22  just reiterate the arguments that are in our briefs regarding

23  SB 707.  They are asking to apply a law that took effect

24  January 1st of this year.

25          **THE COURT:**  I think you're going to win that issue.

1    In other words, I'm not going to make you pay their attorneys'

2    fees for -- on this.  Or at least at this stage, I'm not.

3            MR. LIPSHUTZ:  If Your Honor has any other questions,

4    I'd be happy to address them.

5            THE COURT:  No, I don't.  I don't.

6        There's a motion to seal some materials.  I'm going to

7    deny that.  And the reason I'm bringing this up now is that in

8    the Court's view, all of the communications between Gibson Dunn

9    and the CPR arbitration company should be laid bare to the

10   world at large.  Because there is a public interest in the

11   world at large knowing that someone like CPR, that holds itself

12   out to be an independent agency, is actually being guided by an

13   employer-side firm.  All of that, in my view, should be laid

14   bare.

15       However, I'm going to give you -- on the sealing part,

16   only, I'll give you 14 days.  I'll keep it under seal for 14

17   days, if you want to get emergency relief from the Court of

18   Appeals.  Otherwise, all of that's going to become public.

19       All right, I'm going to bring it to a close, unless you

20   have a rebuttal.

21           MR. POSTMAN:  Your Honor, I respect what you've said,

22   and I'm not going to fight hard on what you said.  I'd just

23   note that for the 869 petitioners who submitted witness

24   statements, as opposed to the format --

25           THE COURT:  You lose on those.

```
 1            MR. POSTMAN:  I respect that.  If I could ask that we

 2    have more time to submit for them the idea that --

 3            THE COURT:  I'm not going to decide that now.

 4            MR. POSTMAN:  Okay.

 5            THE COURT:  I don't know why you couldn't -- I gave

 6    you a roadmap to victory, and you went out and didn't do a very

 7    good job on them.

 8        And I do want to say this.  The Gibson Dunn people raise a

 9    plausible -- not terribly convincing, but a plausible argument

10    that somebody getting these electronic -- there may be some

11    shenanigans going on there that I don't know about.

12        And if it turns out in arbitration that the Gibson Dunn

13    people can prove that, I think you -- your firm -- not the

14    petitioners, your firm should pay their fees for that.

15            MR. POSTMAN:  I agree.

16            THE COURT:  Okay.  All right.

17            MR. POSTMAN:  And we are comfortable with that

18    challenge.  We are confident in the process, and that there are

19    no shenanigans.

20            THE COURT:  Okay.  That's the basis of my ruling is

21    that, at least with respect to the ones where you gave the

22    declarations, I'm presuming no shenanigans.  But that's still

23    up -- they could prove that there were some.  And I'm not

24    taking that off the table.  But that's going to be for

25    Mr. Arbitrator or Ms. Arbitrator, not for me.
```

1          **MR. POSTMAN:**  Thank Your Honor.

2          **MR. LIPSHUTZ:**  Thank Your Honor.

3          **THE COURT:**  I'll get an order out maybe today, maybe

4    tomorrow.  Thank you.

5        (Proceedings concluded)

1

2

3

4                    **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6    Court, Northern District of California, hereby certify that the

7    foregoing is a correct transcript from the record of

8    proceedings in the above-entitled matter.

9

10                        *Belle Ball*

11                    _____
                          /s/ Belle Ball

12              Belle Ball, CSR 8785, CRR, RDR

13                Tuesday, February 11, 2020

14

15

16

17

18

19

20

21

22

23

24

25